# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| STROITELSTVO BULGARIA LTD., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:07-CV-00634-RMC |
| | ) | |
| v. | ) | |
| | ) | Hon. Rosemary M. Collyer |
| THE BULGARIAN-AMERICAN ENTERPRISE | ) | |
| FUND and THE BULGARIAN-AMERICAN | ) | |
| CREDIT BANK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT BULGARIAN-AMERICAN ENTERPRISE FUND'S MOTION AND MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULES 12(b)(2) AND 12(b)(3), OR ALTERNATIVELY BASED ON THE DOCTRINE OF *FORUM NON CONVENIENS***

## TABLE OF CONTENTS

FACTUAL BACKGROUND ...................................................................................2

    A.    The Parties ............................................................................2

    B.    The Loan Agreement ...........................................................3

    C.    Suspension of Credit Under the Agreement ........................5

    D.    Bulgarian Resolution of the Dispute ...................................5

    E.    Stroitelstvo Files This Lawsuit ...........................................6

ARGUMENT ....................................................................................................7

    I.    BAEF Is Not Subject To Personal Jurisdiction In The District Of Columbia. ...........................................................................7

        A.    This Court Lacks Specific Jurisdiction Over BAEF Because None of the Conduct at Issue Occurred in the District of Columbia. ...................8

        B.    This Court Lacks General Jurisdiction Over BAEF Because BAEF Does Not Have a Sufficient Connection to This District. ...........................9

        C.    In Any Event, This Court Cannot Exercise Personal Jurisdiction Over BAEF Consistent With Due Process. ...............................11

        D.    The RICO Statute Does Not Establish Personal Jurisdiction Over BAEF. ...........................................................12

    II.    Venue Is Not Proper In This District. ...................................13

        A.    The Forum Selection Clause Should Be Enforced. ...................14

        B.    Venue is Not Proper Under Either Statute Cited by Stroitelstvo. ...............18

            1.    Venue is Not Proper Here Under 28 U.S.C. § 1391. .....................18

            2.    Venue is not Proper Under 18 U.S.C. § 1965. ...............................19

    III.    The Complaint Should Be Dismissed Based On The Doctrine Of *Forum Non Conveniens.* ........................................................21

        A.    Bulgaria is Both Available and Adequate as an Alternate Forum. ...........22

        B.    The Private Interests of the Litigants Strongly Favor Dismissal. ..............24

            1.    Sources of Proof are Located in Bulgaria (Factor 1). ...................24

            2.    Bulgarian Witnesses Would Not Be Subject To Compulsory Process For Testimony In This District and Their Presence Would be Costly  (Factors 2 and 3). ...................25

            3.    Enforcement of a Judgment Could Be an Issue Due to the Potential for Inconsistency (Factor 4). ...........................................26

4.    The Need for Translation Creates Expense and Inefficiency (Factor 5)................................................................26

C.    The Public Interest Factors Strongly Favor Dismissal. .........................27

1.    This is a Bulgarian Controversy that Belongs in Bulgaria (Factor 1)................................................................27

2.    District of Columbia Citizens Should Not Be Burdened with Resolving This Dispute (Factor 2)........................................28

3.    This Court Should Not Be Burdened With Applying Bulgarian Law (Factor 3)...............................................29

D.    Plaintiff's Chosen Forum is Not A Significant Factor.............................30

CONCLUSION............................................................................31

# TABLE OF AUTHORITIES

**Cases**

*AGS Int'l Servs. S.A. v. Newmont USA Ltd.,*
    346 F. Supp. 2d 64 (D.D.C. 2004) ............................................................................... 10, 13

*Agudas Chasidei Chabad v. Russian Fed'n,*
    466 F. Supp. 2d 6 (D.D.C. 2006) ...................................................................................... 22

*Anderson v. Wiggins,*
    460 F. Supp. 2d 1 (D.D.C. 2006) ........................................................................................ 6

*Armco Steel Co., L.P. v. CSX Corp.,*
    790 F. Supp. 311 (D.D.C. 1991) ...................................................................................... 19

*Asahi Metal Indus. v. Super. Ct. of Cal.,*
    480 U.S. 102 (1987) .......................................................................................................... 11

*Baltierra v. W. Va. Bd. of Medicine,*
    253 F. Supp. 2d 9 (D.D.C. 2003) ...................................................................................... 10

*BCCI Holdings (Luxembourg), Societe Anonyme v. Mahfouz,*
    828 F. Supp. 92 (D.D.C. 1993) .............................................................................. 25, 26, 30

*BPA Int'l, Inc. v. Kingdom of Sweden,*
    281 F. Supp. 2d 73 (D.D.C. 2003) ............................................................................... 21, 26

*Bridge v. Inv. Am., Inc.,*
    748 F. Supp. 948 (D.R.I. 1990) ....................................................................................... 20

*Brock v. Entre Computer Ctrs., Inc.,*
    740 F. Supp. 428 (N.D. Tex. 1990) ................................................................................. 17

*Brunson v. Kalil & Co.,*
    404 F. Supp. 2d 221 (D.D.C. 2005) .................................................................................... 8

*Butcher's Union Local No. 498, United Food & Commercial Workers v. SDC Inv., Inc.,*
    788 F.2d 535 (9th Cir. 1986) ........................................................................................... 12

*Capital Bank Int'l Ltd. v. Citigroup, Inc.,*
    276 F. Supp. 2d 72 (D.D.C. 2003) ..................................................................................... 7

*Carnival Cruise Lines v. Shute,*
    499 U.S. 585 (1991) .......................................................................................................... 14

*Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,*
    709 F.2d 190 (3d Cir. 1983) ....................................................................................... 16, 17

*Cory v. Aztec Steel Bldg., Inc.,*
  468 F.3d 1226 (10th Cir. 2006) ............................................................ 12

*Crane v. N.Y. Zoological Soc'y,*
  894 F.2d 454 (D.C. Cir. 1990) .............................................................. 7

*Crenshaw v. Antokol,*
  287 F. Supp. 2d 37 (D.D.C. 2003) ....................................................... 20

*Crescent Int'l, Inc. v. Avatar Comms., Inc.,*
  857 F.2d 943 (3d Cir. 1988) ................................................................ 16

*Dooley v. United Techs. Corp.,*
  786 F. Supp. 65 (D.D.C. 1992) ............................................................ 13

*Eacho v. N D Res., Inc.,*
  No. 83-2903, 1984 WL 2398 (D.D.C. Feb. 2, 1984) ............................ 20

*Edmond v. United States Postal Serv. Gen. Counsel,*
  949 F.2d 415 (D.C. Cir. 1991) .............................................................. 7

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n,*
  48 F.3d 1260 (D.C. Cir. 1995) .............................................................. 6

*El-Fadl v. Cent. Bank of Jordan,*
  75 F.3d 668 (D.C. Cir. 1996) ............................................................ 9, 23

*Eze v. Yellow Cab Co. of Alexandria, Va., Inc.,*
  782 F.2d 1064 (D.C. Cir. 1986) ............................................................ 6

*Fandel v. Arabian Am. Oil Co.,*
  345 F.2d 87 (D.C. Cir. 1965) ........................................................... 10, 11

*FC Inv. Group LC v. IFX Markets, Ltd.,*
  479 F. Supp. 2d 30 (D.D.C. 2007) ..................................................... 8, 13

*First Chicago Int'l v. United Exch. Co. Ltd.,*
  836 F.2d 1375 (D.C. Cir. 1988) ........................................................... 11

*Friedman v. World Transport., Inc.,*
  636 F. Supp. 685 (N.D. Ill. 1986) ........................................................ 17

*Gorman v. Ameritrade Holding Corp.,*
  293 F.3d 506 (D.C. Cir. 2002) .............................................................. 7

*GTE New Media Servs. Inc. v. BellSouth Corp.,*
  199 F.3d 1343 (D.C. Cir. 2000) ............................................................ 7

*Gulf Oil Corp. v. Gilbert,*
  330 U.S. 501 (1947)..................................................................................... 21, 24

*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
  466 U.S. 408 (1984) ................................................................................. 7, 9, 11

\*In re Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980,*
  540 F. Supp. 1141 (D.D.C. 1982) .......................................................... 22, 23, 28

\*Irwin v. World Wildlife Fund, Inc.,*
  448 F. Supp. 2d 29 (D.D.C. 2006) .......................................................... 26, 27, 29

*Japan Gas Lighter Ass'n v. Ronson Corp.,*
  257 F. Supp. 219 (D.N.J. 1966) ..................................................................... 18

*L&L Constr. Assocs., Inc. v. Slattery Skanska, Inc.,*
  No. CIV 05-1289, 2006 WL 1102814 (D.D.C. Mar. 31, 2006) ................................ 14, 31

*Lambert v. Kysar,*
  983 F.2d 1110 (1st Cir. 1993) .................................................................... 15, 17

*Lescs v. Martinsburg Police Dept.,*
  No. 00-2404, 2002 WL 215511 (D.D.C. Jan. 28, 2002).......................................... 21

*M/S Bremen v. Zapata Off-Shore Co.,*
  407 U.S. 1 (1972) ........................................................................................ 14

*Manetti-Farrow, Inc. v. Gucci Am., Inc.,*
  858 F.2d 509 (9th Cir. 1988) .................................................................... 16, 17

*Marra v. Papandreou,*
  59 F. Supp. 2d 65 (D.D.C. 1999) ..................................................................... 15

*Modaressi v. Vedadi,*
  441 F. Supp. 2d 51 (D.D.C. 2006) ................................................................ 14, 20

\*Pain v. United Techs. Corp.,*
  637 F.2d 775 (D.C. Cir. 1980) ................................................................... passim

\*Piper Aircraft Co. v. Reyno,*
  454 U.S. 235 (1981)............................................................................... passim

*PT United Can Co. v. Crown Cork & Seal Con.,*
  138 F.3d 65 (2d Cir. 1998)............................................................................ 12

*Ross v. Prod. Dev. Corp.,*
  736 F. Supp. 285 (D.C. Cir. 1989)..................................................................... 9

*Southmark Prime Plus, L.P. v. Falzone*,
    768 F. Supp. 487 (D. Del. 1991) ...................................................................... 20

*Square D Co. v. Niagara Frontier Tariff Bureau*,
    No. 83-1958, 1984 WL 2929 (D.D.C. Jan. 24, 1984) ...................................... 18

*Stephens v. Entre Computer Ctrs, Inc.*,
    696 F. Supp. 636 (N.D. Ga. 1988) ................................................................... 17

*Stromberg v. Marriott, Int'l*,
    474 F. Supp. 2d 57 (D.D.C. 2007) .............................................................. 25, 29

*Terra Int'l, Inc. v. Mississippi Chem. Corp.*,
    922 F. Supp. 1334 (N.D. Iowa 1996) ............................................................... 15

*Trerotola v. Cotter*,
    601 A.2d 60 (D.C. 1991) ..................................................................................... 9

*United States v. Philip Morris Inc.*,
    116 F. Supp. 2d 116 (D.D.C. 2000) .................................................................... 7

*Vijuk Equip., Inc. v. Otto Hohner KG*,
    728 F. Supp. 1368 (N.D. Ill. 1990) ................................................................... 16

*Willis v. Willis*,
    655 F.2d 1333 (D.C. Cir. 1981) .......................................................................... 8

*World Wide Minerals v. Republic of Kazakhstahn*,
    116 F. Supp. 2d 98 (D.D.C. 2000) .................................................................... 13

*Worldwide Network Servs., LLC v. DynCorp Int'l*,
    --- F. Supp. 2d ---, 2007 WL 1695648 (D.D.C. June 7, 2007) ................... 15, 17

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) .......................................................................................... 11

**Statutes**

18 U.S.C. § 1961 ......................................................................................................... 6

18 U.S.C. § 1965 ................................................................................................. passim

22 U.S.C. § 5402 ......................................................................................................... 1

22 U.S.C. § 5421 ......................................................................................................... 1

28 U.S.C. § 1331 ......................................................................................................... 6

28 U.S.C. § 1332 ......................................................................................................... 6

28 U.S.C. § 1391 ................................................................................................ 14, 18, 19

D.C. Code § 13-334 ............................................................................................... 9, 10, 11

D.C. Code § 13-422 ......................................................................................................... 9

D.C. Code § 13-423 ......................................................................................................... 8

**Other Authorities**

Chernev Declaration ..................................................................................... 5, 6, 22, 23

Complaint ............................................................................................................. 3, 5, 12

Loan Agreement ......................................................................................... 2, 3, 15, 29

Schiller Declaration ............................................................................................. passim

Settlement Agreement ........................................................................................... 5, 6

**Rules**

Fed. R. Civ. P. 12(b)(2) ........................................................................................ 2, 7, 31

Fed. R. Civ. P. 12(b)(3) .................................................................................. 2, 14, 18, 31

This case should never have been filed in this Court, or indeed anywhere in the United States, because the entire action relates to a dispute between two Bulgarian companies about a loan agreement that was executed in Bulgaria, pertains to a Bulgarian construction project, and is governed by Bulgarian law. The plaintiff in this action, Stroitelstvo Bulgaria Ltd. ("Stroitelstvo"), is a Bulgarian company with no known ties to the United States. In March 2005, Stroitelstvo entered into a "Loan Agreement," Ex. A, with defendant Bulgarian-American Credit Bank (the "Bank"). The Bank is a Bulgarian company that does business only in Bulgaria. (Ex. C, Schiller Decl. ¶ 7)

The Loan Agreement is governed by Bulgarian law, *id.* ¶ 17.07, and includes a forum selection clause that requires "any disputes arising from this Agreement or concerning it . . . [to] be settled by the Competent Bulgarian court." (*Id.* ¶ 17.08) Stroitelstvo defaulted on the Loan Agreement, and the Bank refused to extend further credit. As Stroitelstvo admits in its Complaint, Compl. ¶¶ 21-23, after Stroitelstvo and the Bank availed themselves of legal process in Bulgaria concerning the debt, Stroitelstvo and the Bank entered into a settlement agreement in Bulgaria to resolve all disputes between them.

Apparently unhappy with that settlement agreement, Stroitelstvo sued both the Bank and its parent company, the Bulgarian-American Enterprise Fund ("BAEF"), in this Court.[1] BAEF is a not-for-profit corporation that was established under Delaware Law pursuant to the Support for East European Democracy Act of 1989 (the "SEED Act"), 22 U.S.C. §§ 5402, 5421, to promote private sector development in Bulgaria. (Ex. C ¶ 3) BAEF, which is a majority owner of the Bank, has its only U.S. office in Chicago (its other office is in Bulgaria), and has no ongoing or regular business contacts with the District of Columbia. (*Id.* ¶¶ 4-5) The Bank

---

[1] The Bank has not been served yet, and thus this motion is being filed only on behalf of BAEF.

operates independently from BAEF, and BAEF had no involvement whatsoever in the loan transaction between Stroitelstvo and the Bank.  (*Id.* ¶ 8)

Stroitelstvo's Complaint suffers from a host of jurisdictional and venue problems, and must be dismissed for at least three reasons:

- *First*, because BAEF has no office or agent in the District, and the action in no way relates to activities in this District, this Court lacks personal jurisdiction over BAEF. As such, the Complaint must be dismissed pursuant to Federal Rule 12(b)(2).

- *Second*, even assuming that BAEF is subject to the jurisdiction of this Court, venue is not proper in the District of Columbia. BAEF is not a resident of the District of Columbia and the action did not arise here. Thus, the action must be dismissed pursuant to Federal Rule 12(b)(3).

- *Third*, even if venue is arguably proper in this district, the action should still be dismissed based on the doctrine of *forum non conveniens* because the entire dispute relates to Bulgaria. *See, e.g., Pain v. United Techs. Corp.*, 637 F.2d 775, 785 (D.C. Cir. 1980).

At bottom, this is a classic case of forum shopping. Stroitelstvo's action has no meaningful connection to either BAEF or the District of Columbia. It is wholly improper for Stroitelstvo to burden BAEF and this Court with a lawsuit that has absolutely nothing to do with the United States. Accordingly, this action should be dismissed.[2]

## FACTUAL BACKGROUND

### A.    The Parties

Stroitelstvo is a company organized under the laws of Bulgaria, commercially registered in Sofia City Court, and headquartered in Sofia, Bulgaria. (Ex. A ¶ 1; Compl. ¶ 8)

---

[2] Stroitelstvo's Complaint also fails to state a claim upon which relief can be granted, and thus should be dismissed pursuant to Federal Rule 12(b)(6). Stroitelstvo's Complaint also does not plead fraud with sufficient particularity, requiring dismissal of the RICO count under Federal Rule 9(b) (which in turn requires dismissal of the entire Complaint for lack of subject matter jurisdiction). Moreover, even if jurisdiction and venue were proper here, and even if plaintiff's Complaint could pass muster under Rules 12(b)(6) and 9(b), the more appropriate venue for this action is the Northern District of Illinois, where BAEF is based. To avoid confusion, and hopefully to minimize the burden on this Court, BAEF is filing two additional motions: (1) a Rule 12(b)(6) and Rule 9(b) motion to dismiss, and; (2) a motion for change of venue under Section 1404. Of course, if this Court agrees that this action should be dismissed for any one of the jurisdiction and venue issues raised in this motion, then it need not address the issues presented in BAEF's separate motions.

Stroitelstvo engages in construction projects in Bulgaria, including the development and construction of residential buildings and the sale of residential units in Sofia. (*See* Ex. A ¶ 1.06) Stroitelstvo alleges no business connections in the United States (or outside of Bulgaria) in its Complaint. (Compl. ¶¶ 2, 5)

The Bank is located in Bulgaria and registered as a Bulgarian joint stock company. (Compl. ¶ 7; Ex. A ¶ 2) BAEF is the majority owner of the Bank. (Compl. ¶ 7; Ex. C ¶ 7) Among other things, the Bank operates as an investing bank in the areas of small and medium-size enterprise lending, construction lending, and home mortgage lending. (Compl. ¶ 7; Ex. C ¶ 7)

BAEF is a private, not-for-profit U.S. corporation based in Chicago, Illinois. (Compl. ¶ 6; Ex. C ¶ 4) BAEF was originally funded by the United States Congress through the SEED Act, which was adopted by Congress in 1989 (and expanded in 1991) to support the development of free markets and private enterprise in the former Soviet bloc following the collapse of the Berlin Wall. (Compl. ¶ 6; Ex. C ¶ 43) BAEF's purpose is to participate in the development and expansion of the economy in Bulgaria by investing in the Bulgarian private sector. (Compl. ¶ 6; Ex. C ¶ 3) BAEF is incorporated under the laws of Delaware and has its registered agent for service of process in Delaware. (Ex. C ¶ 4) BAEF has its only U.S. office in Chicago; it has a second office in Sofia, Bulgaria. (*Id.*) BAEF regularly transacts its business in Chicago and Bulgaria. (Compl. ¶ 4; Ex. C ¶ 4) BAEF is not a resident of the District of Columbia and maintains no office or registered agent there. (Compl. ¶ 5) BAEF transacts no business in the District. (*Id.*)

**B.     The Loan Agreement**

The Loan Agreement was entered into by Stroitelstvo and the Bank on March 24, 2005, in Sofia, Bulgaria. (Compl. ¶ 9; Ex. A, Preamble) The Loan Agreement was signed by

Bulgarians — Metodi Liubenov Dimitrov for Stroitelstvo and Stoyan Nikolov Dinchiiski and Dimitar Stoyanov Voutchev for the Bank. (*Id.*) BAEF had no involvement in the Loan Agreement and was not even aware of it until it received notice of Stroitelstvo's Complaint. (Ex. C ¶ 8)

Under the Agreement, the Bank agreed to loan 2,659,704 EUR (including interest and a management fee that were payable in advance) to Stroitelstvo for the design and construction of a residential real estate project in Sofia. (Ex. A ¶¶ 1.06 (defining project), 2.01, 2.06 (funds to be used exclusively for the project)) The Bank agreed to disburse loan funds periodically to Stroitelstvo, subject to various conditions. (*Id.* ¶¶ 3.01, 3.03(d)) Stroitelstvo was required to notify the Bank immediately of certain events of default. (*Id.* ¶ 14.07)

The Loan Agreement anticipated that presales of residential units would occur prior to their completion. (*Id.* ¶ 1.17) Stroitelstvo was required to notify the Bank and obtain its approval for any such presales. (*Id.* ¶ 14.12) Stroitelstvo also had to transfer proceeds from presale agreements to the Bank as loan repayments until the loan was fully repaid. (*Id.* ¶¶ 9.05, 9.06, 10.01, 10.03) Any failure to obtain the Bank's approval for presale agreements was an "Event of Default," as was a failure to transfer presale proceeds to the Bank. (*Id.* ¶¶ 10.01, 16.01(x); *see also id.* ¶ 10.03(c) (the Bank could refuse to make further disbursements of funds if Stroitelstvo failed to transfer sales proceeds)) In the event of a default, the Bank had the right, among other things, to: (1) cancel its commitment to disburse any remaining amounts of the loan not yet disbursed; (2) accelerate the loan for immediate repayment; (3) foreclose on collateral; and, (4) seek legal fees incurred to take legal action against Stroitelstvo. (*Id.* ¶¶ 16.04, 16.06)

The Loan Agreement is governed by Bulgarian law. (*Id.* ¶ 17.07) The Bulgarian language version of the Agreement controls in the event of any conflict with the English language version. (*Id.* ¶ 17.12) Significantly, the Loan Agreement includes a forum selection clause that states that:

> any disputes under the agreement, including interpretation, validity, nonperformance or termination, ***shall be settled by the Competent Bulgarian Court***.

(*Id.* ¶ 17.08 (emphasis added))

### C.    Suspension of Credit Under the Agreement

After making disbursements under the Loan Agreement, the Bank learned that Stroitelstvo had failed to obtain the Bank's prior consent for presale contracts and failed to transfer presale agreement payments to the Bank. (Compl. ¶¶ 15, 16) The Bank ultimately suspended further disbursements, but in effort to resolve the dispute, offered to have its affiliated property management company purchase the project from Stroitelstvo and assume the loan. (*Id.* ¶ 19) Stroitelstvo declined the offer. (*Id.* ¶ 20) After efforts to resolve the default failed, the Bank asserted its right to recover the full amount of the loan. (*Id.* ¶¶ 15, 21)

### D.    Bulgarian Resolution of the Dispute

On December 12, 2005, the Bank obtained an immediate decree of execution from the Sofia Regional Court (the first instance court) for 970,000 EUR. (Compl. ¶ 21; *see also* Ex. B, Settlement Agreement, at I. 3.; Ex. D, Chernev Decl. ¶¶ 10, 24) On December 15, 2005, the Bank initiated foreclosure proceedings with an execution officer to the Sofia Regional Court and attached the assets of Stroitelstvo that had been mortgaged to secure the loan. (Ex. D ¶ 25)

Thereafter, Stroitelstvo challenged the amount of the writ of execution, and the Sofia Regional Court ruled for partial cessation of the foreclosure proceedings. (Ex. B at I. 4.;

Ex. D ¶ 26)  The Bank appealed that decision to the Sofia City Court (the second instance court and the district court for the Sofia district).  (Ex. B at I. 4.; Ex. D ¶ 27)

On May 9, 2006 (one month after the Sofia Regional Court ruling and prior to a decision from the Sofia City Court), the Bank and Stroitelstvo entered into a settlement agreement to resolve their disputes ("Settlement Agreement").  (Ex. B; *see also* Compl. ¶ 23; Ex. D ¶ 28)  Under the Settlement Agreement, Stroitelstvo agreed to pay 563,000 EUR to the Bank. (Compl. ¶ 23; Ex. B at II. Art. 1; Ex. D ¶ 29)  The Bank and Stroitelstvo each agreed to waive further claims and appeals based on the Loan Agreement.  (Ex. B at II. Arts. 2-4, 5; Ex. D ¶ 29)

E.    **Stroitelstvo Files This Lawsuit**

On April 4, 2007, Stroitelstvo filed this action.  BAEF was served on June 18, 2007, through its registered agent in Delaware.  In its Complaint, Stroitelstvo purports to assert five claims against BAEF:  (1) a RICO claim under 18 U.S.C. § 1961(c) (Count One); (2) intentional interference with various contracts Stroitelstvo entered into with third parties pertaining to the construction project in Bulgaria (Count Three); (3) intentional interference with prospective advantage arising from the Bulgarian construction project (Count Four); (4) breach of fiduciary duty (Count Five), and; (5) civil conspiracy (Count Seven).[3]  Stroitelstvo alleges that this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1332 (diversity jurisdiction).[4]  (Compl. ¶ 1)

---

[3]    Plaintiff has also asserted a claim for breach of the loan agreement (Count Two) and abuse of process (Count Six), but those claims apparently are alleged only against the Bank.

[4]    Stroitelstvo is mistaken that diversity jurisdiction exists.  *Eze v. Yellow Cab Co. of Alexandria, Va., Inc.*, 782 F.2d 1064, 1065 (D.C. Cir. 1986) (there is no diversity jurisdiction where one alien sues an American citizen and another alien).  Federal question jurisdiction relies exclusively on Stroitelstvo's RICO claim (the only federal claim asserted).  As this Court is aware, if Stroitelstvo's RICO claim is dismissed, then the entire action should be dismissed.  *See, e.g., Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260 (D.C. Cir. 1995) (district court abused its discretion by deciding state law claims after dismissing RICO claim); *Anderson v. Wiggins*, 460 F. Supp. 2d 1 (D.D.C. 2006) (declining to hear state law claims after dismissing RICO claim).

## ARGUMENT

### I.    BAEF Is Not Subject To Personal Jurisdiction In The District Of Columbia.

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing a factual basis for the court's exercise of personal jurisdiction over the defendant. *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990). The plaintiff must allege specific facts connecting the defendant with the forum. *Capital Bank Int'l Ltd. v. Citigroup, Inc.*, 276 F. Supp. 2d 72, 74 (D.D.C. 2003). Bare allegations and conclusory statements are insufficient. *Id.* The court need not treat all of the plaintiff's allegations as true. *United States v. Philip Morris Inc.*, 116 F. Supp. 2d 116, 120 n. 4 (D.D.C. 2000). Instead, the court "may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts." *Id.*

A court may exercise personal jurisdiction over a non-resident defendant in the District of Columbia "by finding specific jurisdiction based on conduct connected to the suit, or by finding general jurisdiction [over the party]." *Id.*; *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). Under both specific and general jurisdiction, the exercise of personal jurisdiction must comply with constitutional due process. *See, e.g., GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).[5]

In this case, Stroitelstvo has not asserted (and cannot assert) any factual basis that would warrant this Court's exercise of personal jurisdiction over BAEF. Not only does the conduct at issue in this lawsuit lack any connection whatsoever to this jurisdiction, but BAEF has

---

[5]    Where, as here, a plaintiff alleges federal question jurisdiction and no federal long-arm statute applies, the court must apply the jurisdictional law of the state in which it resides. *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509 (D.C. Cir. 2002); *Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991). Accordingly, this Court should apply District of Columbia law in determining whether personal jurisdiction exists.

nothing even remotely approaching the systematic and continuous dealings with the District of Columbia that are required to justify the exercise of general jurisdiction.

**A.      This Court Lacks Specific Jurisdiction Over BAEF Because None of the Conduct at Issue Occurred in the District of Columbia.**

To determine whether the court may exercise specific personal jurisdiction over a defendant, a court must first examine whether jurisdiction is available under the applicable long-arm statute, and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process. *Brunson v. Kalil & Co.*, 404 F. Supp. 2d 221, 226 (D.D.C. 2005). The District of Columbia long-arm statute provides in pertinent part:

> A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's
>
> (1) transacting any business in the District of Columbia . . . .

D.C. Code § 13-423(a) (2007). Because a court in the District may exercise jurisdiction over a non-resident defendant "only [for] a claim for relief arising from the specific acts enumerated in [the statute] . . . ," *id.* § 13-423(b), plaintiff's jurisdictional allegations must arise from the same conduct of which the plaintiff complains. *See, e.g.*, *Willis v. Willis*, 655 F.2d 1333, 1336 (D.C. Cir. 1981). In other words, specific personal jurisdiction allows only those claims "based on acts of a defendant that touch and concern the forum," *Brunson*, 404 F. Supp. 2d at 226, and a plaintiff relying on this provision must show both that the defendant transacted business in the District of Columbia and that the claim arose from the business transacted in the District. *FC Inv. Group LC v. IFX Markets, Ltd.*, 479 F. Supp. 2d 30, 39 (D.D.C. 2007).

In its Complaint, Stroitelstvo has alleged no business transactions by BAEF in the District of Columbia, much less any business transactions from which any of its claims arise.

(*See* Compl.)   Nor has BAEF transacted any such business in the District.   (Ex. C ¶ 5)

Accordingly, there is no specific jurisdiction over BAEF in the District of Columbia.

**B.    This Court Lacks General Jurisdiction Over BAEF Because BAEF Does Not Have a Sufficient Connection to This District.**

The District's general jurisdiction statutes confer jurisdiction over a defendant corporation for all purposes, not merely for those claims arising out of a defendant's contacts with the district. *See, e.g., Ross v. Prod. Dev. Corp.*, 736 F. Supp. 285, 290 (D.C. Cir. 1989).  In the District of Columbia, the plaintiff may establish general jurisdiction under District of Columbia Code Sections 13-422 or 13-334.  For general jurisdiction under Section 13-422, the plaintiff must demonstrate that the defendant is "domiciled in, organized under the laws of, or maintain[s] . . . its principal place of business in, the District." *Trerotola v. Cotter*, 601 A.2d 60, 63 (D.C. 1991) (quoting D.C. Code § 13-422).   Stroitelstvo concedes that BAEF is a non-resident of the District (Compl. ¶ 6 (BAEF has "at all times" been based in Chicago)).   As explained above, BAEF is a Delaware corporation with its principal office in Chicago. Accordingly, plaintiff cannot establish general jurisdiction over BAEF under D.C. Code § 13-422.

For general jurisdiction under Section 13-334, Stroitelstvo must show that BAEF "carries on a consistent pattern of regular business activity within the jurisdiction." *Id.*  (citing D.C. Code § 13-334).  For a court to have general jurisdiction pursuant to Section 13-334, BAEF must have a continuing corporate presence in the District that is directed at advancing BAEF's objectives. *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 675 (D.C. Cir. 1996); *see also Helicopteros Nacionales*, 466 U.S. at 415 (doing business for purposes of general jurisdiction means "systematic and continuous" contacts with the jurisdiction).  Stroitelstvo has not alleged that BAEF has any contacts with the District, much less that it "carries on a consistent pattern of

regular business activity" here.  D.C. Code § 13-334 (2007).  Nor could it in good faith do so, given that BAEF does not have any "systematic and continuous" contacts with the District.  (*See* Ex. C ¶ 5)

The sole contact with the District alleged in Stroitelstvo's complaint is the fact that BAEF was established and funded by Congress under the SEED Act.  (*See* Compl. ¶ 6)  But in fact, although BAEF originally received funding from Congress, BAEF is a privately established, non-stock corporation organized under the General Corporation law of the State of Delaware.  (Ex. C ¶ 4)  The fact that BAEF received funding from Congress years ago does not establish general jurisdiction.  *C.f. AGS Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 76-77 (D.D.C. 2004) (federal district court did not have general personal jurisdiction, under District of Columbia long-arm statute, over mining joint venture based in Peru when contacts consisted of trips to District by employees to discuss details of funding with bank located in District); *Baltierra v. W. Va. Bd. of Medicine*, 253 F. Supp. 2d 9, 14 (D.D.C. 2003) (rejecting attempt to establish "doing business" general jurisdiction in the District of Columbia because defendant "maintain[s] close communications with the SECRETARY OF DHHS . . . ."), *Fandel v. Arabian Am. Oil Co.*, 345 F.2d 87, 88-89 (D.C. Cir. 1965) (Delaware corporation which produced, refined, and sold oil and gas in Saudi Arabia was not doing business within District of Columbia where it maintained an office used solely for the purpose of maintaining continuing relationships with and exchanging information with State Department, other federal agencies, diplomatic missions, and public and private educational and international organizations).  As the D.C. Circuit explained in *Fandel*:

> [I]t appears that the Washington office of appellee is, if not the sole, at least a significant element in its diplomatic and intelligence apparatus. But that element is centered in Washington simply because of what Washington is, namely the capital city where

> public and private persons, with interests or responsibilities in the
> Middle East, foregather and make their contribution, real or
> fancied, to the formulation of official policies . . . .
>
> [W]ashington presents many business organizations with special
> needs for a continuous and ponderable physical presence there,
> which needs are not those customarily associated with strictly
> commercial operations; and that the purpose of Congress was not
> to make that presence in every case a base for the assertion of
> personal jurisdiction.

*Id.* BAEF simply has no ongoing or meaningful connection to the District. Thus, it is not

subject to general jurisdiction under Section 13-334.

C.    **In Any Event, This Court Cannot Exercise Personal Jurisdiction Over BAEF Consistent With Due Process.**

Both the "transacting business" provision of the District of Columbia long-arm

statute and the "doing business" provision of the District of Columbia general jurisdiction statute

permit the exercise of personal jurisdiction to the full extent permitted by the Due Process Clause

of the U.S. Constitution. *See, e.g.*, *First Chicago Int'l v. United Exch. Co. Ltd.*, 836 F.2d 1375,

1377 (D.C. Cir. 1988). Due process concerns are satisfied only where a nonresident corporate

defendant "has certain minimum contacts with [the forum] such that the maintenance of the suit

does not offend traditional notions of fair play and substantial justice." *See Helicopteros*

*Nacionales*, 466 U.S. at 414. These minimum contacts must be grounded in "some act by which

the defendant purposefully avails itself of the privilege of conducting activities with the forum

state, thus invoking the benefits and privileges of its laws." *Asahi Metal Indus. v. Super. Ct. of*

*Cal.*, 480 U.S. 102, 109 (1987). In other words, "the defendant's conduct and connection with

the forum State [must be] such that he should reasonably anticipate being haled into court there."

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

In this case, asserting jurisdiction in the District of Columbia would offend

traditional notions of fair play and substantial justice given BAEF's lack of any meaningful

connection to the District. BAEF's single alleged contact with the District (establishment and funding from Congress under the SEED Act) is not an affirmative act by which BAEF purposefully avails itself of the privilege of conducting business within the District of Columbia. Moreover, because BAEF is headquartered in Chicago and conducts its business there (as well as in Bulgaria), BAEF could not have reasonably anticipated being haled into court in the District of Columbia. In short, it would be unfair to require BAEF to litigate this dispute in the District of Columbia.

**D.**    **The RICO Statute Does Not Establish Personal Jurisdiction Over BAEF.**

Stroitelstvo apparently recognizes that it cannot successfully assert either specific or general personal jurisdiction over BAEF in the District of Columbia, because it alleges that this Court has personal jurisdiction over BAEF pursuant to 18 U.S.C. §§ 1965(b) and (d). (Compl. ¶ 1) Stroitelstvo is wrong.

The majority of appellate courts that have addressed this issue have rejected the argument that RICO creates nationwide personal jurisdiction over all defendants. *See, e.g.*, *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1231-32 (10th Cir. 2006) ("When a civil RICO action is brought in a district court where personal jurisdiction can be established over at least one defendant, summonses can be served nationwide on other defendants if required by the ends of justice"); *PT United Can Co. v. Crown Cork & Seal Con.*, 138 F.3d 65, 71 (2d Cir. 1998) ("[A] civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant."); *Butcher's Union Local No. 498, United Food & Commercial Workers v. SDC Inv., Inc.*, 788 F.2d 535 (9th Cir. 1986) (for nationwide service to be imposed under section of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965(b), court must have personal jurisdiction over at least one participant in alleged multidistrict conspiracy).

Consistent with these cases, all but one court in this district have rejected similar attempts to use the RICO statute to create personal jurisdiction over a defendant. In *FC Inv. Group LC v. IFX Markets, Ltd.*, 479 F. Supp. 2d 30, 43-44 (D.D.C. 2007), the Court noted that plaintiffs appeared to assert personal jurisdiction based on the nationwide service of process provision of the RICO statute, 18 U.S.C. § 1965 (the same provision Stroitelstvo cites here). The Court explained that District of Columbia courts have recently rejected that argument:

> The basic question regarding the scope of Section 1965 is whether it permits a court to consider a defendant's nationwide contacts in analyzing jurisdiction. Judge Green concluded in *Dooley* that a plaintiff's jurisdictional burden is met under Section 1965 "by showing that a defendant has contacts with the United States. Minimum contacts with the forum . . . [are] not necessary [and a] defendant's contact with the United States is sufficient to satisfy the requirements of due process." *Dooley v. United Techs. Corp.*, 786 F. Supp. [65,] 71 [(D.D.C. 1992)] (Green, J.). More recently, however, Judges Lamberth and Walton have rejected the nationwide contacts test of *Dooley*, and held that Section 1965(a) requires the Court to determine whether at least one defendant had minimum contacts within the forum. *See World Wide Minerals v. Republic of Kazakhstahn*, 116 F. Supp. 2d 98, 107-08 (D.D.C. 2000) (Lamberth, J.), remanded on other grounds, 296 F.3d 1154; *see also AGS Int'l Services S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d at 86-87 (Walton, J.). Thus, under Judge Lamberth's and Judge Walton's approach, Section 1965(a) still requires sufficient minimum contacts within the district.

*FC Inv. Group*, 479 F. Supp. 2d at 44. The more logical, and widely accepted, interpretation of RICO Section 1965 is that a plaintiff must show that at least one defendant has minimum contacts with the District of Columbia. *Id.* Because, as explained above, plaintiff has not alleged, and cannot allege, that BAEF has sufficient contacts with the District of Columbia to warrant the exercise of personal jurisdiction, BAEF's motion to dismiss should be granted.

## II.    Venue Is Not Proper In This District.

Venue statutes "protect[ ] a defendant from the inconvenience of having to defend an action in a trial court that is either remote from the defendant's residence or from the place

where the acts underlying the controversy occurred." *Modaressi v. Vedadi*, 441 F. Supp. 2d 51, 53 (D.D.C. 2006) (internal quotation omitted). Rule 12(b)(3) permits a defendant at the outset of litigation to test whether plaintiff has brought the case in a venue the law deems appropriate. *Id.* (citing Fed. R. Civ. P. 12(b)(3) (2007)). "Because it is the plaintiff's obligation to institute the action in a permissible forum, the plaintiff usually bears the burden of establishing that venue is proper." *Modaressi*, 441 F. Supp. 2d at 53 (internal quotation omitted).

Stroitelstvo alleges that venue is proper in the District of Columbia under both 28 U.S.C. § 1391 and 18 U.S.C. § 1965. Stroitelstvo is wrong again. Because Stroitelstvo agreed with the Bank in the Loan Agreement that the proper venue is Bulgaria, venue is not proper in this district. But even if for some reason the forum selection clause were not enforced here, venue would still not be proper in this district under either 28 U.S.C. § 1391 or 18 U.S.C. § 1965.

### A.    The Forum Selection Clause Should Be Enforced.

When there is a valid forum selection clause in place, the court must defer to the expressed intent of the parties unless plaintiff can demonstrate that enforcement would be unjust or that the contract is invalid. *See, e.g.*, *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972). Courts routinely enforce such agreements. *See, e.g.*, *Carnival Cruise Lines v. Shute*, 499 U.S. 585, 591-92 (1991) (a court is unlikely to set aside a forum selection clause even when the designated forum is remote); *L&L Constr. Assocs., Inc. v. Slattery Skanska, Inc.*, No. CIV 05-1289, 2006 WL 1102814, at *4 (D.D.C. Mar. 31, 2006) (conclusory allegations that the clause was obtained by fraud were insufficient to overcome the strong presumption in favor of enforcing forum selection clauses).

In this case, plaintiff does not allege that the clause was secured by fraud or is otherwise unenforceable under the law.[6] Thus, the central issue facing this Court is whether the clause applies to all of the claims in this dispute. *See, e.g., Marra v. Papandreou*, 59 F. Supp. 2d 65 (D.D.C. 1999). The answer to that question is clearly "yes."

There can be no dispute that Stroitelstvo's breach of contract claim against the Bank falls squarely within the scope of the clause. (Ex. A ¶ 17.08 ("any disputes under the [Loan Agreement], including interpretation, validity, nonperformance or termination, ***shall be settled by the Competent Bulgarian Court***)" (emphasis added)) The forum selection clause applies to Stroitelstvo's RICO and tort claims as well, because those claims are all related (directly or indirectly) to the contractual relationship.

Whether a forum selection clause in a contract also requires dismissal of non-contract claims depends on "whether the non-contract claims asserted are directly or indirectly related to the contractual relationship of the parties." *Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 922 F. Supp. 1334, 1379 (N.D. Iowa 1996); *see also Worldwide Network Servs., LLC v. DynCorp Int'l*, --- F. Supp. 2d ---, 2007 WL 1695648, at *3 (D.D.C. June 7, 2007) (citing *Terra Int'l* with approval; "because plaintiff's claims turn on the existence and performance of the contract at issue, the Court finds that plaintiff's claims fall within the forum selection clause."). Courts have thus applied forum selection clauses to non-contractual claims where, for instance: (1) the non-contract claims "involv[e] the same operative facts as a parallel claim for breach of contract," *Lambert v. Kysar*, 983 F.2d 1110 (1st Cir. 1993); (2) "resolution of the [non-contract] claims relates to interpretation of the contract," *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858

---

[6]    Stroitelstvo makes a vague allegation in its complaint that Bulgarian courts are not available for redress of its contract claim. (Compl. ¶ 57) However, that conclusory assertion is wrong (*see* Ex. D, Chernev Decl. ¶¶ 9-22), and does not demonstrate that the forum selection clause is invalid or should not be enforced.

F.2d 509, 514 (9th Cir. 1988), or; (3) the non-contract claims "ultimately depend on the existence of a contractual relationship." *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 203 (3d Cir. 1983).[7]

Here, Stroitelstvo's non-contract claims are inextricably related to the contractual relationship between the Bank and Stroitelstvo. Stroitelstvo's tortious interference claims are based on purported breaches of the Loan Agreement, including refusal to provide funds under that Agreement. (*See* Compl. ¶¶ 62, 67 (alleging that defendants knew plaintiff required loan funds under the Loan Agreement); *id.* ¶¶ 63, 70 (alleging that defendants wrongfully "failed and refused to provide the funds required by the [Loan Agreement] with plaintiff, wrongfully suspended credit, and wrongfully froze and attached and interfered with Plaintiff's assets.")) Stroitelstvo's breach of fiduciary duty claim is based on these same acts, *id.* ¶ 77, and the RICO claim is based on the Bank's lending practices — namely its performance under the Loan Agreement and under a handful of similar agreements with others (although none are specifically alleged). (*Id.* ¶ 39 (alleging "stripping equity and property from Plaintiff," "engaging in predatory and unlawful loan practices and bank fraud," and intending to "permanently deprive Plaintiff" of money and business). Finally, Stroitelstvo's conspiracy claim simply alleges a conspiracy to undertake all of these actions. (*Id.* ¶ 86). For **each claim**, Stroitelstvo maintains that its damages include "the loss of the benefit of its bargain." (*Id.* ¶¶ 46, 65, 72, 78, 88) In

---

[7]    *See also Crescent Int'l, Inc. v. Avatar Comms., Inc.*, 857 F.2d 943 (3d Cir. 1988) (enforcing forum selection clause as to RICO violation, fraud, unfair competition, and tortious interference claims where although only one claim was based on a breach of contract theory, all claims involved allegations arising out of the contract and implicating its terms); *Vijuk Equip., Inc. v. Otto Hohner KG*, 728 F. Supp. 1368, 1371 (N.D. Ill. 1990) ("It is well settled that forum selection clauses such as this one apply not only to strictly breach of contract claims but also to tort claims which require interpretation of the contract.").

short, these claims all center around activities related to, involve the same operative facts as, require interpretation of, and depend upon the Loan Agreement.[8]

It is immaterial to this analysis that BAEF is not a party to the Loan Agreement. In *Manetti-Farrow*, the plaintiff brought several tort claims related to a contract between the plaintiff and one of several defendants. *Manetti-Farrow*, 858 F.2d at 514. The contract included a forum selection clause which provided that Florence, Italy would be the forum for resolving disputes regarding "interpretation" and "fulfillment" of the contract. Plaintiff argued that his tort claims were not subject to the clause, but the court rejected that argument, finding that the close relationship between the conduct complained of and the contractual relationship of the plaintiff and one of the defendants established that the forum selection clause applied to "all defendants." *Id.* Therefore, all claims in the plaintiff's lawsuit were dismissed as having been brought in the wrong forum. *Id.*[9]

No amount of "artful pleading" can change this result. *See Worldwide Network Servs., LLC*, 2007 WL 1695648, at *3 ("strategic or artfully drawn pleadings will not be permitted to circumvent an otherwise applicable forum selection clause, because narrowly interpreting a forum selection clause may permit parties to avoid it by simply pleading non-contractual claims; an outcome that runs counter to the law favoring forum selection clauses.").[10]

---

[8] Although not asserted against BAEF, Stroitelstvo's abuse of process claim is likewise based on the Bank's execution of remedies under (and upon termination of) the Loan Agreement. (*Id.* ¶¶ 80, 84)

[9] *See also Brock v. Entre Computer Ctrs., Inc.*, 740 F. Supp. 428, 430 (N.D. Tex. 1990) (forum selection clause applies to tort claims as well as contract claims, and also applies to "transaction participants" even if they were not parties to the contract); *Stephens v. Entre Computer Ctrs, Inc.*, 696 F. Supp. 636, 638 (N.D. Ga. 1988) (rejecting argument that forum selection clause did not apply to non-signatories of contract); *Friedman v. World Transport., Inc.*, 636 F. Supp. 685, 690-91 (N.D. Ill. 1986) (a party cannot escape his contractual obligation to sue in a specified forum merely by joining additional parties who did not sign the contract).

[10] *See also Lambert*, 983 F.2d at 1121 ("We cannot accept the invitation to reward attempts to evade enforcement of forum selection agreements through 'artful pleading of [tort] claims' in the context of a contract dispute"); *Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.*, 709 F.2d 190, 203 (3d Cir. 1983) (the same public policy

The bottom line is that Stroitelstvo agreed to litigate in Bulgaria the disputes it has raised in this case. This Court should hold plaintiff to its commitment and dismiss the case for improper venue.

**B.    Venue is Not Proper Under Either Statute Cited by Stroitelstvo.**

Even if the forum selection clause does not apply here, this action must still be dismissed pursuant to Federal Rule 12(b)(3) because venue is not proper in the District of Columbia. Neither statute cited by Stroitelstvo establishes proper venue in this district.

**1.    Venue is Not Proper Here Under 28 U.S.C. § 1391.**

Stroitelstvo alleges that venue is proper under 28 U.S.C. § 1391(b), (c) [11] and (d)[12]. 28 U.S.C. § 1391(b) provides, in relevant part:

> (b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in
>
> (1) a judicial district where any defendant resides, if all defendants reside in the same State,
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or
>
> (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

---

that favors enforcement of forum selection clauses "requires that they not be defeated by 'artful pleading of [tort] claims.'" (citation omitted)).

[11] Subsection (c) simply defines "residence" for purposes of the chapter and does not provide an independent basis for venue.

[12] Subsection (d), which provides that "an alien may be sued in any district," does not render the District of Columbia a proper venue where one defendant (BAEF) is a non-alien. *See Square D Co. v. Niagara Frontier Tariff Bureau*, No. 83-1958, 1984 WL 2929, at *3-5 (D.D.C. Jan. 24, 1984) (where an alien and a nonalien are joined as defendants, venue for the entire action is proper in any district where it is correct as to nonalien defendant); *Japan Gas Lighter Ass'n v. Ronson Corp.*, 257 F. Supp. 219 (D.N.J. 1966) (same).

Subsection (b)(1) is inapplicable because BAEF and BACB do not reside in the "same State" (here, the District of Columbia).  For purposes of the chapter, "a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c) (2007).  Because BAEF is not subject to personal jurisdiction in the District of Columbia, it does not "reside" there under Section 1391(b)(1).  Moreover, Stroitelstvo has made no allegations that would suggest the Bank is subject to personal jurisdiction in the District.

Subsection (b)(2) is likewise inapplicable because the District of Columbia is not "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2).  In fact, Stroitelstvo has not alleged that any of the events or omissions giving rise to the claim occurred here.  Nor has Stroitelstvo alleged that any of the property at issue is situated here.

Finally, subsection (b)(3) does not apply.  Being "found" in a district means "having a presence" or "engaging in continuous local activity" there. *See, e.g., Armco Steel Co., L.P. v. CSX Corp.*, 790 F. Supp. 311, 319 (D.D.C. 1991).  Neither BAEF nor the Bank has an office or registered agent in the District, and neither engages in any kind of continuous local activity here. (*See* Ex. C ¶ 5)  The only potential districts that might arguably fit the bill under subsection (b)(3) are the Northern District of Illinois, where BAEF resides and transacts business and the District of Delaware, where BAEF is incorporated.  But none of the provisions of Section 1391(b) suggest that venue is proper in the District of Columbia.

### 2.    Venue is not Proper Under 18 U.S.C. § 1965.

Stroitelstvo also asserts that venue is proper under provisions of the RICO statute, 18 U.S.C. § 1965.  The only potential basis for RICO-based venue is Section 1965(a). *See, e.g.,*

*Modaressi*, 441 F. Supp. 2d at 54-55 (RICO's venue provision is found at Section 1965(a)).[13] Section 1965(a) provides that an action may "be instituted in the district court of the United States for any district in which [a defendant] resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a) (2007).

Here, the Complaint does not allege that either defendant resides, is found, has an agent, or transacts its affairs in the District of Columbia. In fact, neither defendant fits any of these categories. (*See* Ex. C ¶¶ 4-5, 7) Thus, venue is not proper in this district under Section 1965. *Cf. Modaressi*, 441 F. Supp. 2d at 54-55 (case could not proceed in District of Columbia based on RICO venue provision where the allegations of the complaint did not support a finding that any defendant resides, is found, has an agent, or transacts affairs in the District of Columbia); *Eacho v. N D Res., Inc.*, No. 83-2903, 1984 WL 2398, at *3 (D.D.C. Feb. 2, 1984) (venue would not lie pursuant to RICO provision where no defendant was located or could be found in the District of Columbia or transacted any business there).

Furthermore, even if one defendant transacted business in the District of Columbia, venue still would not be proper under RICO. The ends of justice do not require bringing both defendants before a District of Columbia forum where, as here, the dispute is centered in Bulgaria. *Cf., Crenshaw v. Antokol*, 287 F. Supp. 2d 37 (D.D.C. 2003) (venue not proper in District of Columbia although two defendants transact affairs in the District, because the ends of justice do not favor extending venue to all defendants where most defendants have no

---

[13]   Stroitelstvo cites to 18 U.S.C. § 1965(b) in its Complaint, but that provision pertains only to hauling additional defendants into the district once venue is properly established for at least one defendant. *See, e.g., Southmark Prime Plus, L.P. v. Falzone*, 768 F. Supp. 487 (D. Del. 1991) ("ends of justice" required district court to exercise jurisdiction over all RICO conspiracy defendants, even though not all defendants were otherwise subject to venue in district); *Bridge v. Inv. Am., Inc.*, 748 F. Supp. 948 (D.R.I. 1990) (jurisdiction over nonresident defendant was proper under ends of justice determination where, among other things, several defendants were associated with Rhode Island, only the defendant who was contesting jurisdiction had not dealt directly in Rhode Island, and assertion of jurisdiction and venue would serve the purpose of having the entire action litigated in one court).

ties whatsoever to the District and none of the events in dispute took place there); *Lescs v. Martinsburg Police Dept.*, No. 00-2404, 2002 WL 215511, at *2 (D.D.C. Jan. 28, 2002) (it would not serve the ends of justice to find proper venue in the District where the majority of the alleged acts or omissions took place in West Virginia and the majority of witnesses and applicable records are in West Virginia).

III.    **The Complaint Should Be Dismissed Based On The Doctrine Of *Forum Non Conveniens.***

Even assuming that this Court can assert personal jurisdiction over BAEF, and that venue is proper here, the case must still be dismissed. The doctrine of *forum non conveniens* permits a court to dismiss an action over which it has jurisdiction when there is an adequate alternative forum in which the case can be more conveniently heard. *BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 86 (D.D.C. 2003) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504 (1947)). The threshold inquiry is whether there is an adequate alternative forum where the plaintiff may bring its claims. *BPA Int'l*, 281 F. Supp. 2d at 86 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n.22 (1981)). If there is such an alternative forum, a court should then balance the private interests of the litigants and the public interest to determine whether a motion to dismiss should be granted. *BPA Int'l*, 281 F. Supp. 2d at 86 (citing *Gulf Oil Corp.*, 330 U.S. at 508). The weight of either the private interest factors or the public interest factors alone may be cause for dismissal. *BPA Int'l*, 281 F. Supp. 2d at 86.

In this case, Bulgarian courts provide an alternative forum that is both available and adequate. Furthermore, virtually all of the relevant public and private interest factors

suggest that Bulgaria is the appropriate forum for resolution of this litigation. Accordingly, this action should be dismissed.[14]

### A.    Bulgaria is Both Available and Adequate as an Alternate Forum.

The first issue is whether an alternative forum is available. *See, e.g., Piper Aircraft Co.*, 454 U.S. at 254 n.22. A foreign forum is ordinarily deemed available when the defendant is subject to process in that forum. *Id.* The Bank, a Bulgarian entity, is of course subject to process in Bulgaria (and indeed specifically agreed in the Loan Agreement to litigate there). Likewise, BAEF is subject to jurisdiction in Bulgaria on various grounds. (Ex. D ¶¶ 16-18). Moreover, if there is any doubt that BAEF is subject to the jurisdiction of the Bulgarian courts, BAEF is willing to consent to the exercise of jurisdiction by Bulgarian courts as a condition of dismissal. *See Pain v. United Techs. Corp.*, 637 F.2d 775, 785 (D.C. Cir. 1980) (entering dismissal on the condition that the defendant agree to submit to the jurisdiction of the foreign courts); *In re Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980*, 540 F. Supp. 1141, 1145 (D.D.C. 1982) (granting dismissal where "[d]efendants have attempted to remove all contention over this threshold issue by agreeing to submit themselves to the jurisdiction of the national courts in either Saudi Arabia [or various other foreign courts].")

The second issue is whether an alternative forum is adequate. *See, e.g., Piper Aircraft Co.*, 454 U.S. at 254 n.22. An alternate forum is considered adequate in all but rare cases — even where it does not offer the same theories of recovery as do courts in the United States. *See id.* at 250-54 (the Court of Appeals erred in holding that plaintiffs may defeat a

---

[14]    Defendant BAEF has submitted limited, directed affidavits in support of its motion. *See, e.g., Piper Aircraft Co.*, 454 U.S. at 258-59 (detailed affidavits are not required, but a defendant seeking *forum non conveniens* dismissal must provide enough information to allow the court to apply the *forum non conveniens* factors). However, if the Court believes that it requires additional evidence to resolve this motion, BAEF respectfully requests that this Court grant the parties discovery on jurisdictional issues and the opportunity to present additional argument. *Cf. Agudas Chasidei Chabad v. Russian Fed'n*, 466 F. Supp. 2d 6, 27 (D.D.C. 2006) (deciding adequacy of alternate forum after jurisdictional discovery and oral argument).

motion to dismiss on the ground of *forum non conveniens* merely by showing that the substantive law that would be applied in the alternative forum is less favorable to the plaintiffs); *El-Fadl*, 75 F.3d at 678 (foreign forum not inadequate where it has less favorable substantive law or adjudicative procedures); *In Re Disaster at Riyadh Airport*, 540 F. Supp. at 1145 (a potentially smaller damage award and an inability to rely on a particular theory of liability do not render a forum inadequate).   Indeed, a forum is inadequate only where "the remedy provided in the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper Aircraft Co.*, 454 U.S. at 254.[15]

A Bulgarian forum is adequate to hear this dispute.   According to BAEF's Bulgarian legal expert, who is a practicing attorney and professor of Civil Procedure in Bulgaria, Bulgaria has an independent judiciary that is available to hear commercial disputes between parties.   (Ex. D ¶ 9)   Bulgaria's legal system has multiple levels of appellate review and procedures to enforce judgments.   (*Id.* ¶ 11)   Indeed, the structure of Bulgarian courts does not differ in any meaningful way from the European standard.   (*Id.* ¶ 13)   Nor does Bulgarian commercial law differ significantly from European norms.   (*Id.* ¶ 20)   While Bulgaria does not have specific equivalents for each count alleged by Stroitelstvo in its Complaint, several Bulgarian legal theories would apply and a remedy is generally available for the type of conduct alleged.   (*Id.* ¶ 21)   Thus, Stroitelstvo can achieve a full and fair resolution in the Bulgarian court system.   (*Id.* ¶ 13)

Tellingly, Stroitelstvo has already conceded that Bulgarian courts are adequate, because it agreed to resolve in Bulgaria "any disputes under the [Loan A]greement, including

---

[15]   The Court of Appeals for the District of Columbia has noted that American courts should recognize "the ability of foreign courts to perform their adjudicatory functions fully as well as do the courts of the United States." *Pain*, 637 F.2d at 797.

interpretation, validity, nonperformance or termination." (Ex. A ¶ 17.08) Stroitelstvo cannot seriously contend that Bulgarian courts are unavailable or inadequate when it expressly agreed to allow them to resolve all Loan Agreement disputes.

**B.     The Private Interests of the Litigants Strongly Favor Dismissal.**

The private interest factors weigh heavily in favor of dismissal. Relevant private interest factors include: (1) relative ease of access to sources of proof; (2) availability of compulsory process for attendance of unwilling witnesses; (3) cost of attendance of witnesses; (4) enforceability of a judgment, if obtained; and, (5) other practical problems that make trial of a case easy, expeditious, and inexpensive. *See, e.g., Gulf Oil*, 330 U.S. at 508.

**1.     Sources of Proof are Located in Bulgaria (Factor 1).**

Essentially all of the sources of proof in this case are in Bulgaria. The key documents related to the loan transaction are in the custody of the Bank and/or Stroitelstvo (the parties to the Loan Agreement) in Bulgaria. Documents related to presales agreements (one of the alleged events of default) would be located in Bulgaria in the possession of either Stroitelstvo and/or the Bulgarian purchaser(s). Other potentially relevant documents include those related to the construction project in Bulgaria, documents concerning internal management and corporate issues at Stroitelstvo and Bulgarian police investigations into such issues, documents related to the Bank's offer to have its affiliate purchase the building and assume the loan, Bulgarian court pleadings, and documents concerning Stroitelstvo's new loan — all of which would be available only in Bulgaria. By contrast, BAEF, the only party located in the United States, maintains no documents concerning this matter, as it had no involvement in the loan. (Ex. C ¶ 8)

In addition, the witnesses to the events alleged in the Complaint are Bulgarian citizens and residents. Owners and/or employees of Stroitelstvo and the Bank, including those who signed the Loan Agreement, would be the key witnesses to this dispute, and all are located

in Bulgaria. Other potential witnesses are Bulgarian citizens and residents, including persons who entered presales agreements with Stroitelstvo, employees of the Bank's related entity who participated in the alleged purchase offer, Sofia construction project subcontractors, and so forth. By contrast, only BAEF employees, who are not key witnesses to the events alleged in the Complaint, are located within the United States, and those employees are based in Chicago.

The location of documents and witnesses in Bulgaria is a key factor warranting dismissal. *See, e.g., Stromberg v. Marriott, Int'l*, 474 F. Supp. 2d 57 (D.D.C. 2007) (granting *forum non conveniens* dismissal where, "[alt]hough some defense witnesses, who would testify regarding the nature of the franchise relationship between [Marriott's franchisee] and Marriott, are located near the District, the bulk of the evidence and testimony would revolve around Marriott's dealings with and supervision of [the franchisee] in Mexico."); *BCCI Holdings (Luxembourg), Societe Anonyme v. Mahfouz*, 828 F. Supp. 92, 97 (D.D.C. 1993) (granting *forum non conveniens* dismissal in a RICO case where the majority of the material acts of fraud mentioned in the complaint were alleged to have occurred abroad, the Procurement Deed at the heart of the complaint was drafted in England, executed in England and Luxembourg, and contained choice of law provisions referring to English and Luxembourg law, and resolution of the matter would therefore require examination of a majority of documents and witnesses located in England).

### 2. Bulgarian Witnesses Would Not Be Subject To Compulsory Process For Testimony In This District and Their Presence Would be Costly (Factors 2 and 3).

Because most witnesses to the events alleged in the Complaint are Bulgarian citizens and residents, availability of compulsory process for attendance of unwilling witnesses and the cost of attendance of witnesses are important concerns that weigh in favor of dismissal. This Court lacks the ability to compel testimony from these witnesses, and even if they were

willing to testify, the cost of obtaining their testimony would be prohibitive.  In *BPA Int'l, Inc.*, 281 F. Supp. 2d at 86, for instance, the court granted *forum non conveniens* dismissal where "[m]any, if not most, of the potential witnesses and much of the evidence will likely be located in Sweden and therefore will likely be beyond the reach of this Court's compulsory process" and "obtaining witnesses' attendance will be significantly less costly if the case were heard in Sweden rather than the District."  Similarly, in *Irwin v. World Wildlife Fund, Inc.*, 448 F. Supp. 2d 29, 34 (D.D.C. 2006), the court granted *forum non conveniens* dismissal where most witnesses were located in Gabon, creating concerns about the court's ability to compel testimony and the cost of attendance for willing witnesses.  Here too, the location of the evidence and associated difficulties warrants dismissal in favor of a Bulgarian resolution.

> ### 3.    Enforcement of a Judgment Could Be an Issue Due to the Potential for Inconsistency (Factor 4).

Allowing this lawsuit to go forward could create enforcement problems because it would risk inconsistent judgments.  Indeed, the fact that the Bank and Stroitelstvo have already engaged in legal proceedings under the Loan Agreement in Bulgaria and entered a settlement agreement there to resolve their disputes, weighs heavily in favor of dismissal.  *Cf. BCCI Holdings*, 828 F. Supp. at 98 ("Yet another private interest factor supporting dismissal of this case for *forum non conveniens* is the existence of the virtually identical proceeding in England. Dismissal of this suit in favor of the English litigation clearly will relieve the defendants of the burdens of litigating parallel proceedings and will negate the possibility of inconsistent judgments.").

> ### 4.    The Need for Translation Creates Expense and Inefficiency (Factor 5).

An additional practical problem that would make trial of this case more difficult, inefficient and expensive, is the need for translation of Bulgarian documents and interpretation of

Bulgarian witnesses. Most, if not all, of the relevant documents are written in Bulgarian, requiring translation for use by an American trier of fact. Moreover, because most witnesses are Bulgarian, it is reasonable to anticipate that translation of testimony would also be required. As the court noted in *Irwin*:

> administrative difficulties of trying this case in a forum thousands of miles away from the majority of witnesses and the evidence are obvious . . . . As French is the national language of Gabon and the language of the legal system, it is likely that many of the witnesses and much of the evidence would need to be translated from French. Thus, the administrative difficulties of trying the case in the District of Columbia weigh in favor of dismissal.

*Irwin*, 448 F. Supp. 2d at 34-35.

### C.    The Public Interest Factors Strongly Favor Dismissal.

Relevant public interest factors include: (1) the preference for deciding local controversies at home; (2) the burden of jury duty on citizens of a forum unrelated to the case, and; (3) the familiarity of the forum with applicable state law. *Id.* at 508-09. These factors all favor dismissal as well.

### 1.    This is a Bulgarian Controversy that Belongs in Bulgaria (Factor 1).

The Loan Agreement was entered in Bulgaria between Bulgarian parties for purposes of financing a Bulgarian residential construction project that would result in sales of residential units to Bulgarians. Obligations under the Loan Agreement were to be performed in Bulgaria, and any breaches of the Loan Agreement occurred there. At bottom, this controversy arises from and centers around the relationship between Stroitelstvo and the Bank. Accordingly, Bulgarian courts have a clear interest in policing this dispute.

By contrast, the only arguable tie to the United States is the fact that BAEF, the Bank's parent company, received its initial funding through the SEED Act. But BAEF has been self-funded for at least the past five years. (*See* Ex. C ¶ 6) In any event, the controversy at issue

has nothing to do with either the source of funding or the United States. Moreover, the only United States resident (BAEF) is a nominal party at best. It had no involvement in the Loan Agreement and was not even aware of its existence until after this Complaint was filed. (Ex. C ¶ 8) Under the circumstances, the United States in general and this forum in particular do not have sufficiently strong interests in this dispute.

Courts will not hesitate to find that controversies such as this one are localized in a foreign jurisdiction and should be decided there. In *Pain*, for example, the court considered "the most striking feature of this case" to be "the lack of any significant contacts between the event in dispute and the forum chosen by the plaintiffs in which to litigate the consequences of that event." *Pain*, 637 F.2d at 792. The two contacts with the United States, the residence of the decedent's mother and the crashed helicopter's manufacturer, were insufficient to justify resolution in the District of Columbia. *Id.* Similarly in *In re Disaster at Riyadh Airport*, the court found that a dispute arising out of a plane crash in Saudi Arabia involving a plane operated by a Saudi Arabian national corporation and an intra-Saudi Arabian flight should not be heard in the United States because "Saudi Arabia's interest in resolving a controversy occurring within its borders and involving one of its nationally owned corporations is clearly superior to the insignificant American interest in prosecuting these actions." *In re Disaster at Riyadh Airport*, 540 F. Supp. 1141, 1153. Here too, Bulgaria's interest in resolving a controversy occurring within its borders and involving two Bulgarian corporations is clearly superior to the American interest in the case.

### 2. District of Columbia Citizens Should Not Be Burdened with Resolving This Dispute (Factor 2).

Given the lack of connection of this dispute to the District of Columbia, it would be unfair to require this Court and the citizens of the District to expend valuable resources to

resolve the dispute. *Cf. Stromberg*, 474 F. Supp. 2d at 63 ("[T]he court is sensitive to the desirability of avoiding the unnecessary review of foreign disputes. The District's highly burdened jury pool would also benefit by not bearing the responsibility of hearing this case, which relates in only the slightest degree to the District and to the interests of its citizens."); *Pain*, 637 F.2d at 792 ("As the trial judge quite properly determined, jury duty for this matter ought not be imposed upon the people of the District of Columbia, nor should local dockets be clogged by appeals in this case.").

### 3.    This Court Should Not Be Burdened With Applying Bulgarian Law (Factor 3).

Under the Loan Agreement, Bulgarian law governs disputes. (Ex. A ¶ 17.07) The core claims at issue in this case all stem from that Loan Agreement, including allegations that the Bank improperly determined under the Loan Agreement that an event of default had occurred, that the Bank improperly suspended Stroitelstvo's credit under the Loan Agreement, and that the Bank improperly exercised its rights of recovery under the Loan Agreement. These claims are therefore governed by Bulgarian law. Moreover, even if the Loan Agreement's choice of law provision was somehow inapplicable to tort claims, Bulgarian law would still apply since Bulgaria has the most significant relationship to the dispute. *See, e.g., Stromberg*, 474 F. Supp. 2d at 61-62 ("the court must determine which forum has a more substantial interest in the resolution of the issues presented" in determining which law to apply).

The need to apply Bulgarian law weighs heavily in favor of dismissal. *See, e.g., Piper Aircraft Co.*, 454 U.S. at 260 n.29 (many forum non conveniens decisions have held that the need to apply foreign law favors dismissal); *Irwin*, 448 F. Supp. 2d at 36 ("Many of the legal

questions require interpretation of Gabonese law, and Gabon is in the best position to interpret and apply its own law.")[16]

Even if United States federal law could somehow apply to isolated claims — such as Stroitelstvo's RICO claim — Bulgarian law would still predominate.  In *BCCI Holdings*, for instance, the court granted a *forum non conveniens* dismissal where "resolution of some counts of the complaint . . . necessitate[d] inquiry into the law of England, Luxembourg, or other foreign countries, notwithstanding the fact that plaintiffs' claims are based in large part on RICO." *BCCI Holdings*, 828 F. Supp. at 100; *see also Pain*, 637 F.2d at 793 ("We believe that Norwegian substantive law will predominate the trial of this case and that the mere presence of a count pleaded under Connecticut law but which may have little chance of success does not warrant a different conclusion.  If we were to hold otherwise, the plaintiff could avoid dismissal on *forum non conveniens grounds* by the inclusion of a substantive count based on American law regardless of the merits of that claim.")

### D.    Plaintiff's Chosen Forum is Not A Significant Factor.

Stroitelstvo's choice of forum does not counter-balance the overwhelming weight of the private and public interest factors.  In a case commenced by a foreign plaintiff, United States courts will not presume that the plaintiff has chosen the forum for its convenience, and the plaintiff's choice of forum will not be afforded the normal deference. *Piper Aircraft Co.*, 454 U.S. at 255-56.  Instead, it is reasonable to infer that a plaintiff that selects such a forum has done so simply to take advantage of more favorable law or to harass the defendant, each of which warrants a *forum non conveniens* dismissal.  *Id.*; *see also Pain*, 637 F.2d at 784 (a plaintiff who

---

[16]  Moreover, this Court faces not just the need to interpret Bulgarian law, but also the need to decipher the scope and precedential significance of Bulgarian legal processes and a Bulgarian settlement.  That additional layer of complexity weighs further in favor of dismissal.

chooses a competent but clearly inappropriate forum in which to bring suit should be required to show some reasonable justification for his institution of the action in the forum state).

That is especially true here, where Stroitelstvo conceded the convenience of Bulgarian courts when it agreed to the Loan Agreement's forum selection clause. *See L&L Constr. Assocs., Inc.* 2006 WL 1102814, at *4 (the forum selection clause is the dominant factor in the determination of convenience). Thus, Stroitelstvo's choice of this forum is entitled to no weight, and the action should be dismissed on *forum non conveniens* grounds.

## CONCLUSION

This case has no business in the United States courts, and it certainly has no business in the District of Columbia. It also has no business being filed against BAEF, and BAEF's inclusion appears to be a desperate attempt to find some tie (however insignificant) to the United States. For the reasons explained above, this Court lacks personal jurisdiction over BAEF, and thus dismissal under Federal Rule 12(b)(2) is required. Moreover, venue is not proper in this district, so dismissal is also required under Federal Rule 12(b)(3). Finally, even assuming that plaintiff could somehow overcome these jurisdictional and venue problems, it is clear that dismissal is proper under the doctrine of *forum non conveniens*. For all these reasons, the action should be dismissed.

Dated:  August 8, 2007

Respectfully submitted,

*Karen N. Walker /eHe*

Karen N. Walker (D.C. Bar No. 412137)
Eunnice H. Eun (D.C. Bar No. 500203)
Samantha A. Gingold (*admission pending*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Tel.  (202) 879-5000
Fax  (202) 879-5200


Brian D. Sieve, P.C. (*pro hac vice*)
Stephanie A. Brennan (*pro hac vice*)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601
Tel.  (312) 861-2000
Fax  (312) 861-2200


***Attorneys for The Bulgarian-American
Enterprise Fund***

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2007, I caused a true and complete copy of Defendant's Motion and Memorandum in Support of its Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rules 12(b)(2) and 12(b)(3), or Alternatively Based on the Doctrine of *Forum Non Conveniens* to be served on the following counsel of record by ECF.

_____
Karen N. Walker

Recipients:

Philip M. Musolino
MUSOLINO & DESSEL
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
Tel. (202) 466-3883

Sylvia J. Rolinski
Danielle M. Espinet
ROLINSKI & SUAREZ, LLC
14915 River Road
Potomac, Maryland 20854
Tel. (240) 632-0903

33

# Exhibit A

| ДОГОВОР ЗА БАНКОВ КРЕДИТ | LOAN AGREEMENT |
|---|---|

Днес, 24.03.2005г. ("Дата на сключване"), в гр. София, бе сключен следният Договор за банков кредит, наричан по-долу ("Договор") между:

On this day of March 24, 2005 ("Date of Agreement") in Sofia, Bulgaria, the following loan agreement, hereinafter referred to as the "Agreement", was made by and between:

1. "СТРОИТЕЛСТВО БЪЛГАРИЯ" ООД, със седалище и адрес на управление гр. София, район Изгрев, ул."Самоков" 11А, рег. по ф.д. №11749/2003 на Софийски градски съд, вписано в Регистъра за търговски дружества под №80176, том 956, стр.92, БУЛСТАТ 131169857, данъчен №12201179725, представлявано от МЕТОДИ ЛЮБЕНОВ ДИМИТРОВ, ЕГН:5604186661, с лична карта №162000676, издадена на 29.08.2007г. от МВР София, в качеството му на управител, наричан по-долу ("Кредитополучател");

1. STROITELSTVO BULGARIA, OOD with headquarters in Sofia, Izgrev zone 11A Samokov Street, with company registration №11749/2003 as per Commercial Register of Sofia City Court, batch 80176, volume 956, page 92, BULSTAT 131169857, tax №12201179725, represented by its manager METODI LIUBENOV DIMITROV, UCI#5604186661, identity card №162000676, issued on 29.08.2007 by Police Department Sofia, hereinafter referred to as the "Borrower",

и

And

2. БЪЛГАРО – АМЕРИКАНСКА КРЕДИТНА БАНКА АД, регистрирана със съдебно решение от 3 декември 1996 г. на Софийски градски съд, по дело номер 12587/1996, партида номер 35659, том 397, регистър 1, стр. 180, със седалище и адрес на управление, гр. София, район Средец, ул. Кракра № 16, представлявана от изпълнителните директори Стоян Николов Динчийски с ЕГН 7006114488, с л.к. No. 159356248, издадена на 02.09.2002г. от МВР София, и Димитър Стоянов Вучев, ЕГН:5910266685, л.к. №159148938, изд. на 25.04.2000г. от МВР- София, наричана по-долу "Банката";

2. BULGARIAN-AMERICAN CREDIT BANK AD, registered with a court decision from December 3rd, 1996 of the Sofia City Court, Company File 12587/1996, Batch 35659, Volume 397, register 1, page 180, located in Sofia, Municipality Sredetz, 16 Krakra Street, represented by its Executive Directors Stoyan Nikolov Dinchilski, CI#7006114488, identity card #159356248, issued on September 2, 2002 by Police Department Sofia, and Dimitar Stoyanov Voutchev, CI#5910266685, identity card #159148938, issued April 25, 2000 by Police Department, Sofia, hereinafter referred to as the "Bank",

Наричани общо "Страните" или поотделно "Страна".

Collectively hereinafter referred to as the "Parties" or singularly as a "Party".

ПРЕДПОСТАВКИ:

WITNESSETH:

С ОГЛЕД НА ТОВА, че Кредитополучателят е дружество с ограничена отговорност с предмет на дейност покупка, строеж и обзавеждане на недвижими имоти и др.

WHEREAS, the Borrower is a Limited Liability Company, established to design architectural drawings, to construct industrial and non-industrial buildings, to buy real estate properties and to carry out renovations, etc.

С ОГЛЕД НА ТОВА, че Кредитополучателят е поискал от Банката и Банката се е съгласила да предостави на Кредитополучателя заем в размер до 2,659,704 Евро (ДВА МИЛИОНА ШЕСТСТОТИН ПЕТДЕСЕТ И ДЕВЕТ ХИЛЯДИ СЕДЕМСТОТИН И ЧЕТИРИ ЕВРО) при условията на настоящия Договор;

WHEREAS, the Borrower has requested from Lender and Lender has agreed to provide to Borrower a loan in the amount of up to TWO MILLION SIX HUNDRED AND FIFTY NINE THOUSAND SEVEN HUNDRED AND FOUR EURO (EUR 2,659,704) subject to the terms and conditions set forth herein;

Въз ОСНОВА НА взаимните обещания, уверения, гаранции и декларации, съдържащи се в настоящия Договор, Страните се споразумяха, както следва:

NOW, THEREFORE, in consideration of the promises, representations, warranties and agreements contained herein, the Parties hereby agree to follows:

Раздел I. ДЕФИНИЦИИ

SECTION I.    DEFINITIONS

Всички термини в настоящия Договор, които са подчертани и започват с главна буква имат следното значение:

Capitalized and bold terms in this Agreement shall have the meanings set forth below:

1.01. "Работен ден" означава всеки ден без събота, неделя и официалните празници в България.

1.01. "Business Day" means any day other than a Saturday, Sunday or official holiday in Bulgaria.

1.02. "Строителен бюджет" означава бюджета за завършване на Проекта (определен по-долу), представен от Кредитополучателя на Банката и одобрен от нея, съдържащ се в Член 4.05. по-долу.

1.02. "Construction Budget" means the budget for completion of the Project (hereinafter defined) which Borrower has submitted to Lender, and Lender has approved, contained below in Article 4.05.

1.03. "Дата на първо предоставяне на средства" означава първата дата, на която ще бъде извършено Предоставяне на средства по Кредита (дефиниран по-долу). Дата на Първо предоставяне на средства определя започването на Периода на строителство (дефиниран по-долу).

1.03. "Initial Disbursement Date" means the first date on which a Disbursement of Funds (hereinafter defined) is made. It marks the beginning of the Construction Period, as defined below.

1.04. "Преценка на Банката" означава, че Банката има право периодично и по свое усмотрение да прави и променя преценката си за бъдещите разходи по всяко перо от Строителния бюджет, които Кредитополучателят ще понесе във връзка със завършването на Проекта (дефиниран по-долу).

1.04. "Lender's Estimate" means that from time to time Lender shall have the right to make and/or revise, in its good faith judgment, an estimate of the future costs and expenses of each line item of the Construction Budget which may be incurred by Borrower to complete Project (hereinafter defined).

1.05. "Представител на Банката" означава който и да е представител или представители, който /които/ Банката може да назначи по собствено усмотрение да представлява(т) Банката и да контролира(т) процеса на строителство и неговото завършване.

1.05. "Lender's Representative" means any representative or representatives which Lender may appoint, contract or employ in its sole discretion to represent Lender and to monitor the construction process and its completion.

1.06. "Проект" означава вход "А", вход "Б" и сутерена на вход "В" в монолитна жилищна сграда с подземни гаражи, магазини, жилища и ателиета, които ще бъде построена в УРЕГУЛИРАН ПОЗЕМЛЕН ИМОТ NiIV-66, находящ се в гр. София кв. 35 по плана на гр. София местността ж.к."Овча купел – 2", с площ от 3500 кв.м., върху сграда се изгражда съгласно нотариален акт №34, том III, рег. №12130, дело 402 от 2004г. на нотариус №268 на НК, одобрен архитектурен проект от 02.12.2004г., Разрешение за строеж №994 от 11.12.2004г., като копия от всички изброени документи са приложени към този Договор.

1.06. "Project" means entrance "A", section "B" and the basement of section "V" of the residential building with underground garages, shops, apartments and ateliers, which shall be constructed in REGULATED LAND PLOT NrIV-66, located in Sofia in district 38 as per the city plan of Sofia, residential area Ovcha kupel -2 zone, with area of 3500 sq.м., which building shall be constructed pursuant to the notary deed Nr 34, volume III, reg. Nr12130, file 402 dated 2004 as per the notary Nr268 of the NC, architectural design approved on 02.12.2004 and Construction Permit Nr 994 dated 11.12.2004, all represented as Exhibits to this Agreement.

1.07. "Обект" означава който и да е апартамент, ателие, подземен гараж или магазин от Проекта, включващ съответните им мазета и съответните идеални части от общите части на сградата.

1.07. "Unit" means any one of the apartments, ateliers, the underground garages or shops of the Project, including assigned storage spaces and ideal parts of the common parts of the building.

1.08. "Разрешение за ползване" означава документа за въвеждане в експлоатация, издаден в съответствие със Закона за устройство на територията и другите нормативни актове, който ще удостовери приемането и въвеждането в експлоатация на Проекта и Обектите, и който ще бъде осигурен от Кредитополучателя.

1.08. "Permit for Usage" means Occupancy Permit issued pursuant to the Zoning act and the other applicable regulations, that shall certify the acceptance and bringing into use of the Project and the permission to use the Units, and shall be provided by the Borrower.



1.09. "Акт 15" означава Приложение Образец 15, издаден в съответствие с Наредба №3 от 31.07.2003г. за съставяне на актове и протоколи по време на строителство, издадена от МРРБ, ДВ бр. 72 от 15.08.2003г. който ще удостовери завършването на Проекта, и който ще бъде осигурен и подписан от Кредитополучателя.

1.09. "Act 15" means Exhibit Form 15 issued in accordance with Regulation No. 3 from 31.07.2003 for any penalties and protocols during the construction period issued by the Ministry of Construction and Urban Development, State Gazette Issue No72 of 15.08.2003 which shall certify the termination of the Project and shall be provided and signed by the Borrower.

1.10. "Дата на уведомяване" означава датата, на която Кредитополучателят уведомява Банката за получаването на Разрешението за ползване. Тази уведомяване следва да се извърши в срок от пет Работни дни, считано от датата на издаване на Разрешението за ползване. В противен случай ще се счита, че е настъпил Случай на неизпълнение (дефиниран по-долу).

1.10. "Notification Date" means the date on which Borrower notifies Lender of the receipt by the Project of the Permit for Usage. Failing to notify Lender within five business days of the Project's receipt of the Permit for Usage of the Loan (hereinafter defined) is an Event of Default (hereinafter defined).

1.11. "Период на строителство" е периодът от време между Датата на първо предоставяне на средства по Кредита и датата на Изтичане на Периода на строителство (дефинирано по-долу). По време на Периода на строителството, Кредитополучателят има право да подава Искания за предоставяне на средства (дефинирано по-долу) за целите на Член 2.06. от настоящия Договор.

1.11. "Construction Period" is the term between the Initial Disbursement Date and the Termination of Construction Period (hereinafter defined). During the Construction Period the Borrower has the right to make Disbursement Requests (hereinafter defined) according to Article 2.06 of this Agreement.

1.12. "Изтичане на Периода на строителство" е по-ранната от следните две дати: датата, на която изтичат 20 (двадесет) календарни месеца от датата на Първо предоставяне на средства, или Датата на уведомяване. След тази дата Кредитополучателят няма право да иска Предоставяне на средства по Кредита (дефинирано по-долу), освен в случаите, когато се използва Лихвения резерв (дефиниран по-долу). След Изтичане на Периода на строителството започва Периода на продажби (дефиниран по-долу).

1.12. "Termination of Construction Period" is defined as the date earlier of twenty (20) months after the Initial Disbursement Date or the Notification Date. After that date Borrower shall not have the right to request Disbursements (hereinafter defined) under the Loan (hereinafter defined), except for advances under the Interest Reserve (hereinafter defined) line item. After the Termination of Construction Period, the Sales Period (hereinafter defined) applies.

1.13. "Период на продажби" е срок от 6 (шест) календарни месеца, считано от датата на Изтичане на Периода на строителство, по време на който, но не по-късно от Падежа (дефиниран по-долу) Кредитът трябва да бъде напълно изплатен.

1.13. "Sales Period" shall mean a period of six (6) calendar months following the Termination of Construction Period during which the Loan must be fully repaid not later than Final Maturity Date (hereinafter defined).

1.14. "Лихвен резерв" е сума в размер до £533,143 (петстотин тридесет и три хиляди сто четиридесет и три) Евро, която Кредитополучателят може да използва по Кредита (дефиниран по-долу) единствено с цел да погаси задължението си за плащане на Лихва по Кредита. С използването средства от Лихвения резерв се увеличава размера на Неизплатената част от главницата на Кредита, считано от съответната дата на предоставяне на средства.

1.14. "Interest Reserve" shall mean an amount of up to €533,143 (five hundred and thirty three thousand one hundred and forty three Euro), which Borrower can use under the Loan (hereinafter defined) only for payment of Interest under the Loan. The outstanding Principal Balance (hereinafter defined) under the Loan (hereinafter defined) shall be increased by the amount used under the Interest Reserve as of the date of disbursement.

1.15. "Купувач" означава купувача на който и да е Обект от Проекта

1.15. "Buyer" shall mean the Buyer of a Unit of the Project.

1.16. "Дължима сума за Обекта" означава сумата от Главницата, която Кредитополучателят трябва да погаси за да даде Банката съгласие за заличаване на ипотеката върху съответния Обект. Дължимата сума за Обекта е определена в Схема на дължими суми по Обекти в Член 9.06.

1.16. "Required Repayment Per Unit" shall mean the amount of Principal that the Borrower must repay in order for the Lender to give consent for the mortgage release of the relevant Unit. The Required Repayment Per Unit is listed in Article 9.06.

1.17. "Предварителен Договор за Продажба" означава всеки предварителен договор за продажба в съответствие с член 19 от Закона за Задълженията, сключен между Кредитополучателя и Купувач на един или повече Обекти от Проекта.

1.17. "Presale Agreement" shall mean any presale agreement executed between the Borrower and Buyer of one or more Units in the Project.

1.18. "Дата на Предварителния Договор за Продажба" означава датата на сключване на предварителния договор.

1.18. "Presale Agreement Date" shall mean the Agreement Date under the Presale Agreement.

1.19. "Окончателен Договор за Продажба" означава договор във формата на Нотариален Акт за продажба на един или повече Обекти от Проекта.

1.19. "Final Sale Agreement" shall mean the agreement in the form of a Notary Deed for sale one or more Units from the Project.

1.20. "Дата на Окончателен Договор за Продажба" означава датата на сключване на окончателния договор за продажба на Обекта.

1.20. "Final Sale Agreement Date" shall mean the date under the Sale Agreement.

1.21. "Постъпления от Продажби" означават приходите на Кредитополучателя от продажба на Обект от Проекта. Постъпленията от продажби могат да са в резултат както на Предварителния Договор за Продажба, така и на Окончателния Договор за Продажба.

1.21. "Sales Proceeds" refers to the proceeds from selling a Unit in the Project. Sales Proceeds may result from either a Presale Agreement or Final Sale Agreement.

1.22. "Такса за ангажимент" означава плащане в размер на 1,500 Евро (ХИЛЯДА И ПЕТСТОТИН ЕВРО), преведени от Кредитополучателя по сметка на Банката преди подписване на настоящия Договор.

1.22. "Commitment Fee" refers to payment of EUR 1,500 (one thousand five hundred Euro), transferred to Lender's bank account prior to signing this Agreement.

1.23. "Дата на обезпечение" означава датата, на която обезпечението по Раздел XII е надлежно учредено в полза на Банката съгласно този Договор и нормативните актове.

1.23. "Security date" refers to the date on which the Collateral pursuant to Section XII is properly secured in favor of the Lender pursuant to this Contract and the applicable laws.

**Раздел II.     ОБЩИ УСЛОВИЯ**

**SECTION II.     GENERAL TERMS AND CONDITIONS**

2.01. Кредит. Банката се е съгласила да предостави на Кредитополучателя кредит в размер до 2,659,704 Евро (ДВА МИЛИОНА ШЕСТСТОТИН ПЕТДЕСЕТ И ДЕВЕТ ХИЛЯДИ СЕДЕМСТОТИН И ЧЕТИРИ ЕВРО), наричан по-долу "Кредит", при условията на настоящия Договор.

2.01. The Loan. Lender has agreed to provide to Borrower a loan in the amount of up to TWO MILLION SIX HUNDRED AND FIFTY NINE THOUSAND SEVEN HUNDRED AND FOUR EURO (EUR 2,659,704), hereinafter referred to as the "Loan", subject to the terms and conditions set forth herein.

2.02. Валута. Кредитът се предоставя в евро и всички пресмятания на Главницата (дефиниция по-долу), Лихвата (дефиниция по-долу) и Лихвата за забава (дефиниция по-долу) се извършват в евро. Всички плащания се извършват в евро. КРЕДИТОПОЛУЧАТЕЛЯТ РАЗБИРА И ПОЕМА ИЗЦЯЛО РИСКА ОТ ПРОМЕНИ ВЪВ ВАЛУТНИЯ КУРС.

2.02. Currency. The Loan is being granted in EURO, and all calculations of Principal (hereinafter defined), Interest (hereinafter defined), and Penalty Interest (hereinafter defined) shall be made in EURO. ALL PAYMENTS ARE TO BE MADE IN EURO. Borrower understands and acknowledges that Borrower bears all foreign exchange risk.



2.03. Лихвен процент. Кредитополучателят изплаща на Банката лихва ("Лихва") върху целия размер на Кредита (без Лихвения резерв и Таксата за Управление) в размер на 12% (дванадесет процента) годишно. Лихвата се начислява, дължи и плаща в съответствие с Раздел IX от настоящия Договор.

2.03. Interest. Borrower shall pay simple interest ("Interest") to Lender on the full Loan amount (without the Interest reserve and the Loan Management fee) at a fixed rate of twelve percent (12%) per annum. Interest shall accrue, be charged, and paid as provided for in Section IX, hereof.

2.04. Лихва за забава. Съгласно Раздел XI от настоящия договор, в случай на неплащане, забавено или частично плащане по Договора за кредит Кредитополучателят дължи Лихва за забава в размер на двадесет и пет процента (25%) годишно върху Невиплатената част от Главницата по Кредита.

2.04. Penalty Interest. Pursuant to Section XI of this agreement, in the case of non-payment, late payments or partial payments of Interest, Borrower will be liable for additional penalty Interest ("Penalty Interest"), which will be determined as twenty five (25%) per annum on the Principal Balance of the Loan.

2.05. Падеж. Цялата Главница по Кредита, (дефиниция по-долу) ведно с Лихвата и евентуалната Лихва за забава (дефиниция по-долу), следва да бъдат изплатени в съответствие с Раздел IX, X и XI от настоящия Договор не по-късно от по-ранната от двете дати ("Падеж") – датата на изтичането на 26 (двадесет и шест) месеца от Датата на обезпечението и датата на изтичане на 6 (шест) месеца от Датата на уведомлението.

2.05. Final Maturity Date. The full Principal (hereinafter defined) amount of the Loan, plus Interest and Penalty Interest (hereinafter defined), if any, must be paid in accordance with Sections IX X, and XI hereof no later than the earlier of twenty six (26) months after Date of Security or six (6) months after the Notification Date ("Final Maturity Date").

2.06. Предназначение на средствата. Средствата, предоставени от Банката по настоящия Договор следва да се използват единствено за:

2.06. Use of Funds. Funds disbursed by Lender hereunder are to be used exclusively for:

(а) За извършването на строителните работи по Проекта – до 1,864,136 Евро (един милион осемстотин шестдесет и четири хиляди сто тридесет и шест Евро);

(a) For execution of construction works for Project – up to ONE MILLION EIGHT HUNDRED AND SIXTY FOUR THOUSAND ONE HUNDRED AND THIRTY SIX EUR (1,864,136);

(б) Заплащане на дължима лихва ("Лихвен резерв") по Кредита – 533,143 (петстотин тридесет и три хиляди сто четиридесет и три) Евро, която се начислява и удържа еднократно от сумата на Кредита на Датата на обезпечение.

(b) For interest payments ("Interest reserve") – up to 533,143 (five hundred and thirty three thousand one hundred and fourty three) Euro, which is accrued and withheld from the Loan amount on the Date of Security.

(в) Резерви по Строителния бюджет – до 186,414 Евро (сто осемдесет и шест хиляди четиристотин и четиринадесет Евро).

(c) Contingency Reserve (hereinafter defined) – up to EUR 186,414 (one hundred and eighty six thousand four hundred and fourteen EURO)

(г) Заплащане на Такса за Управление на Кредита в размер на три процента (3%) от сумата на Кредита, или седемдесет и седем хиляди петстотин и единадесет ЕВРО (€77,511), която се начислява и удържа еднократно от сумата на Кредита на датата на Първо предоставяне на средства по Кредита след приспадане на Таксата за ангажимент.

(d) For payment of Loan Management Fee in the amount of three percent (3%) of the amount of the Loan, equal to seventy seven thousand five hundred and eleven EUR (€77,511), which is withheld from the Loan amount on the First Disbursement Date after the "Commitment Fee" is deducted.

**Раздел III.        ПРЕДОСТАВЯНЕ НА СРЕДСТВА**

**SECTION III.        DISBURSEMENT OF FUNDS**

3.01. Предоставяне на средства.

3.01. Disbursements of Funds:

(а) Кредитополучателят може да иска Предоставяне на средства по Член 2.06.(а) единствено за позициите, включени в Строителния бюджет, които са завършени и изпълнени според стандартите, изисквани за Проекта. Кредитополучателят може да иска Предоставяне на средства за Проекта за извършване на строителни работи само по време на Периода на строителството.

(a) Borrower shall only request Disbursements of Funds for works according to the line items of the Construction Budget and which have been completed and are finished according to the standards required for the Project. Borrower may only request for disbursement of funds under the Construction Budget only during the Construction Period.

(б) Средствата от Резерва по Строителния бюджет могат да бъдат използвани след тяхното преразпределяне за Строителния бюджет, по реда на Раздел IV от Договора.

(b) The funds from the Contingency can be used only after their allocation or reallocation under the Construction Budget according to Section IV of this Agreement.

(в) Кредитополучателят може да иска Предоставяне на средства от Лихвения резерв до размера, предвиден в чл. 2.06.(б) от настоящия Договор с цел заплащане на дължимата Лихва и/или Такса за ангажимент към Датата на падежа (дефиниран по-долу).

(c) Borrower may only request for Disbursement of funds from the Interest Reserve up to the amount provided in Article 2.06.(b) from this Agreement for payment of the Interest and/or Commitment fee due as of the Maturity Date (defined hereunder).

(г) Средствата по Член 2.06.(г) ще бъдат усвоени еднократно, безкасово чрез превод по сметка на Банката.

(d) The funds from Article 2.06.(d) will be transferred directly to a bank account of the Bank.

3.02. Срок за Първо предоставяне на средства. Кредитополучателят следва да учреди Обезпечението по настоящия Договор и да поиска Първо предоставяне на средства в срок от 30 (тридесет) дни от Датата на сключване. В случай, че Обезпечението не бъде учредено и такова предоставяне на средства не бъде извършено в този срок поради това, че Кредитополучателят не е поискал или не е изпълнил условията за предоставяне на средства, както е описано в Член 3.03. по-долу, настоящия Договор се прекратява. В този случай Банката не е дължи връщане на получената Такса за Ангажимент и Кредитополучателят трябва да заплати незабавно цялата Лихва и Такса за управление.

3.02. Deadline for Initial Disbursement of Funds. Borrower must establish the Collateral under this Agreement and request First Disbursement of Funds within thirty (30) days from the Date of Agreement. In case that the Collateral is not established and no First Disbursement of Funds is made in the due term, or Borrower has not fulfilled the conditions for Disbursement of Funds as outlined in Article 3.03. below, this Agreement shall terminate. In this case the Lender will not refund the already received Commitment Fee and the Borrower owes immediately the Interest due and the Management Fee.

3.03. Условия за Предоставяне на средства. Банката не е длъжна да предостави каквито и да било средства по Кредита докато не бъдат изпълнени следните условия:

3.03. Conditions for Disbursement of Funds. Lender shall not be obligated to make any Disbursement of Funds under the Loan until all of the following conditions shall have been met:

(а) Кредитополучателят е подал писмено Искане за Предоставяне на средства по Кредита най-малко пет (5) работни дни преди желаната дата за Предоставяне на средства, удостоверявайки, че Декларациите и гаранциите, от раздел XIII, са верни и в сила. Искането за предоставяне на средства трябва да е по форма одобрена от Банката. Кредитополучателят трябва сам да попълни Искането за предоставяне на средства и поема всички рискове и разходи, произтичащи от неправилно попълнени Искания за предоставяне на средства.

(a) Borrower shall have executed a written request for Disbursement of Funds under the Loan at least five (5) Business Days before the desired date for disbursing the funds, certifying that the Representations and Warranties in Section XIII hereof are true and remain in effect. The Disbursement Request must be in a form approved by Lender. The Disbursement Request must be completed by the Borrower; Borrower bears all risks and costs stemming from incorrectly completed Disbursement Requests.

(б) Банката е придобила права върху Обезпечението съгласно Член 12.01. на настоящия Договор, надлежно учредено от

(b) Lender shall have acquired a security interest and rights under the Collateral under Article 12.01. of this Agreement, properly established



Кредитополучателя по предвидения в Закона ред в приемливи за Банката форма и съдържание, придобила е права като бенефициент по всички договори за застраховка, изисквани по Член 14.03. от настоящия Договор и всички съгласувания по тези раздели, са в сила и по тях не е налице неизпълнение.

by the Borrower in the due legal way in form and substance acceptable to Lender, and shall have acquired rights as a beneficiary under all insurance agreements required under Article 14.03. of this Agreement and all agreements required by the same sections are in effect without default.

(в) Кредитополучателят е предоставил на Банката декларация за свързани лица съгласно изискванията на банковото законодателство (приложена в настоящия Договор като Приложение 5). Кредитополучателят се задължава на всеки шест месеца и при всяка промяна да актуализира данните по декларацията.

(c) Borrower shall have presented to Lender a Declaration of Related Parties as required by Banking Act (attached hereto as Exhibit 5). Borrower is obliged to update the Declaration every six months and upon any change to the required Declaration.

(г) Не е настъпил Случай на неизпълнение или случай, който с даване на предизвестие и/или с течение на времето може да се превърне в Случай на неизпълнение (дефинирано по-долу) по Раздел XVI от настоящия Договор.

(d) No Event of Default or event that with notice and/or lapse of time would become an Event of Default (hereinafter defined) under Section XVI of this Agreement shall have occurred and be continuing.

(д) От Датата на сключване, или от датата на предходното Предоставяне на средства (в случай, че е извършено такова): (а) не е възникнало нищо, което да се отрази неблагоприятно на финансовото състояние или бизнес перспективи на Кредитополучателя, или което може да намали вероятността, че Кредитополучателят ще бъде в състояние да изпълни всички свои задължения по настоящия Договор, и (б) не са възникнали никакви значителни загуби или задължения за или по отношение на Кредитополучателя (освен задълженията, които може да са възникнали при условията и съответните разпоредби на настоящия Договор).

(e) Since the Date of Agreement or, as the case may be, the date of the previous Disbursement of Funds: (i) nothing shall have occurred which might materially and adversely affect the Borrower's business prospects or financial condition, or which also make it improbable that the Borrower will be able to fulfill any of its obligations under this Agreement; and (ii) the Borrower shall not have incurred any material loss or liability (except such liabilities as may be incurred by the Borrower in accordance with the relevant provisions of this Agreement).

(е) Кредитополучателят е представил на Банката и периодично актуализира необходимите разрешителни за приемане, строеж и завършване на Проекта, които се изискват според българското законодателство и от съответните институции.

(f) Borrower has presented to the Lender and periodically updates all required permits and licenses necessary for inception, construction and completion of the Project as required by current Bulgarian legislation and relevant authorities.

(ж) Преди всяко Предоставяне на средства, частта от Проекта, която е била завършена към датата на подаване на Искането за предоставяне на средства трябва да е била прегледана и одобрена от Банката или от Представителя на Банката.

(g) Before any Disbursement of Funds is made, the portion of the Project that has been completed at the time of the Disbursement Request shall have been inspected and approved by the Lender or Lender's Representative.

(з) Едновременно с всяко Искане за предоставяне на средства, Кредитополучателят е представил и актуализиран Строителен бюджет (по образеца от Член 4.05.), от който да е видно отражението на това Предоставяне на средства върху оставащите разходи за строителство.

(h) Borrower shall have provided with each Disbursement Request an updated Construction Budget (as in Article 4.05.) reflecting effect of that Disbursement of Funds on remaining costs.

(и) Кредитополучателят е открил при Банката разплащателна сметка, чрез която Банката предоставя средствата по Кредита, а Кредитополучателят изплаща всички предоставени по Кредита средства, както и всички Лихви и Лихва за забава (дефиниция по-долу) така, както това е предвидено в този Договор, ведно с всички разходи за обслужване.

(i) Borrower has opened a current account, through which the Bank disburses Loan funds, and Borrower repays all amounts disbursed under the Loan as well as pays the due Interest and Penalty Interest (hereinafter defined) according to the provisions of this Agreement, along with all service expenses.

(к) Кредитополучателят е открил при Банката разплащателна сметка, чрез която Банката предоставя средствата по Кредита, а Кредитополучателят изплаща всички предоставени по Кредита средства, както и всички Лихви и Лихва за забава (дефиниция по-долу) така, както това е предвидено в този Договор, ведно с всички разходи за обслужване.

(l) Borrower has opened a current account, through which the Bank disburses Loan funds, and Borrower repays all amounts disbursed under the Loan as well as pays the due Interest and Penalty Interest (hereinafter defined) according to the provisions of this Agreement, along with all service expenses.

3.04. Всяко Искане за предоставяне на средства трябва да:

3.04. Each Disbursement Request shall:

(а) показва към датата на издаването му всяко перо от Строителния бюджет, което е завършено и за което се иска Предоставяне на средства и/или да указва, че Кредитополучателят иска да погаси задължението си по Лихвата със средствата предвидени в Лихвения резерв.

(a) show each line item of the Construction Budget that has been completed and for which Disbursement of Funds is requested as of the date of the Disbursement Request and that the Borrower wishes to cover Borrower's Interest expenses from the Loan and is requesting a drawdown from the Interest Reserve.

(б) бъде придружено от такава допълнителна документация, подготвена от Кредитополучателя, заедно с всички приложения и подкрепяща информация, споменати в документацията, каквато Банката по своя преценка може да изиска и чиято форма и съдържание са приемливи за нея.

(b) be accompanied by such supporting documents as Lender may require, the form and content of which must be satisfactory to Lender in exercise of its good faith judgment, executed by Borrower, together with the attachments and back-up information referred to therein.

3.05. Банката има право да откаже Предоставяне на средства в описаните по-долу случаи, но без да е ограничен само до тях:

3.05. Lender Shall Have Right to Refuse Disbursement of Funds, in cases including but not limited to the following:

(а) Кредитополучателят може единствено да иска Предоставяне на средства от Строителния бюджет за работи, включени в Строителния бюджет, които са завършени и изпълнени според стандартите, изисквани за Проекта. Банката ще има правото да откаже Предоставяне на средства за пера, работата по които не е завършена или е изпълнена в отклонение от изискваните стандарти по нейна преценка или не е прегледана и одобрена от Банката или от Представителя на Банката.

(a) Borrower shall only request Disbursement of Funds from the Construction Budget for works according to the Construction Budget and which have been completed and are finished according to the standards required for the Project. Lender shall have the right to refuse to make any Disbursement for the line items, which have not, in the good faith opinion of Lender, been completed or are not completed to the required standards or which have not been inspected and approved by Lender or by Lender's Representative.

(б) В случай че Кредитополучателят не съдейства на Банката, например като отказва да оправдае строителни разходи или без причина не се съобразява с изискванията на Банката, Банката има право да откаже Предоставяне на средства по Кредита.

(b) If Borrower refuses to cooperate with Lender, for example by refusing to justify construction expenditures or by failing without reason to comply with Lender's requests, Lender shall have the right to refuse Disbursement under the Loan.

(в) В случаите, описани в Член 3.03.(г), 3.06., 5.02., 10.03.(в), 10.03.(д) и 16.04.(а). Банката има право да откаже Предоставяне на средства по Кредита.

(c) In the cases under Articles 3.03.(d), 3.06., 5.02., 10.03.(c), 10.03.(e) and 16.04.(a). Lender shall have the right to refuse Disbursement of Funds under the Loan.

Borrower/Кредитополучател: _____     стр. 4 от 21     Lender/Банка: _____

| Bulgarian | English |
|---|---|
| 3.06. Спазване на Строителния бюджет. Кредитът ще бъде контролиран на принципа на "балансирана достъпчивост на средствата". Ако в някой момент по мнение на Банката, остатъкът от одобрените средства по Кредита не е достатъчен за довършване на Проекта, Банката може да откаже Предоставяне на средства по Кредита, докато не бъде възстановен баланса на Строителния бюджет (дефинирано по-долу) по Кредита. Неоправдани забавяния ще се считат за Забавяне на Строителството по Член 16.01(с). | 3.06. Adherence to Construction Budget. The Loan will be monitored on a balance-to-complete basis. If at any time in the Lender's opinion, the remaining Loan proceeds are not sufficient to complete the Project, the Lender shall have the right to refuse Disbursement of Funds under the Loan until the Construction Budget (hereinafter defined) is in Balance (hereinafter defined). Unreasonable delays, however, may be judged a Delay in Construction under Article 16.01(r). |
| 3.07. Дати на предоставяне. За дата на предоставяне на средства се счита датата, на която разплащателната сметка на Кредитополучателя, открита при Банката съгласно член 3.03.(и) по-горе, бъде заверена със сумата, указана в съответния Искане за предоставяне на средства. | 3.07. Date of Disbursement. The date of disbursement is considered to be the date the requested funds are transferred to the Borrower's account with the Bank as per Article 3.03(и), pursuant to the instructions on the respective Disbursement Request. |
| 3.08. Кредитът се отчита на отделна заемна сметка и средствата по Кредита се предоставят по разплащателната сметка, открита на името на Кредитополучателя при Банката, така както е предвидено в член 3.03 (и) по-горе. | 3.08. The Loan will be accounted by a separate account and the Loan funds will be disbursed to the current account opened in the name of the Borrower with the Bank, as provided in Article 3.03.(и) above. |
| **Раздел IV.    СТРОИТЕЛЕН БЮДЖЕТ** | **SECTION IV.    CONSTRUCTION BUDGET** |
| 4.01. Кредитополучателят декларира и гарантира, че по неговата добросъвестна преценка: | 4.01. The Borrower represents and warrants that in Borrower's best estimate: |
| (а) съвкупните разходи за завършване на Проекта няма да надхвърлят Строителния бюджет (Член 4.05.); | (a) the total cost of constructing the Project shall not exceed the Construction Budget (Article 4.05.); |
| (б) Кредитополучателят ще спазва Строителния бюджет. | (b) The Borrower shall adhere to the Construction Budget. |
| 4.02. ИНВЕСТИЦИЯ НА КРЕДИТОПОЛУЧАТЕЛЯ. ПРЕДИ ДАТАТА НА ПЪРВО ПРЕДОСТАВЯНЕ НА СРЕДСТВА, КРЕДИТОПОЛУЧАТЕЛЯТ ЩЕ Е НАПРАВИЛ ТАКЪВ РАЗМЕР ОТ СЪВКУПНИТЕ РАЗХОДИ ЗА СТРОИТЕЛСТВОТО, КОЙТО ДА Е ДОСТАТЪЧЕН ЗА ДА ОСИГУРИ, ЧЕ ОСТАНАЛИТЕ РАЗХОДИ ЗА СТРОИТЕЛСТВО ПО ПРОЕКТА НЕ НАДХВЪРЛЯТ РАЗМЕРА НА КРЕДИТА. | 4.02. THE BORROWER'S INVESTMENT. BEFORE THE INITIAL DISBURSEMENT DATE, THE BORROWER SHALL HAVE PAID A SUFFICIENT AMOUNT OF THE TOTAL CONSTRUCTION COSTS SO THAT THE REMAINING CONSTRUCTION COSTS OF THE PROJECT DO NOT EXCEED THE LOAN AMOUNT. |
| 4.03. Кредитът е представил на Банката и Банката е одобрила Строителен бюджет (Член 4.05.) за завършване на Проекта. Всички промени в Строителния бюджет подлежат на предварително писмено одобрение от Банката. Кредитополучателят може, с разрешение на Банката, да разпредели Резерва по Строителния бюджет (дефиниран по-долу) по перата на Строителния бюджет. Одобрението от Банката на Строителния бюджет не означава приемане или съгласие на последната, че всички разходи са точни или правилно отразени в Строителния бюджет, като отговорността за това остава изцяло на Кредитополучателя. | 4.03. Borrower has submitted to Lender, and Lender has approved, the Construction Budget (Article 4.05.) for completion of the Project. All changes to the Construction Budget shall in all respects be subject to the prior written consent and approval of Lender. Borrower may with Lender's approval allocate the Contingency Reserve (hereinafter defined) to line items in the Construction Budget. Lender's approval of the Construction Budget does not constitute a representation or agreement by Lender that all such costs are accurate or properly reflected in the Construction Budget, the responsibility thereof being solely that of the Borrower. |
| 4.04. Бюджетни пера. Строителният бюджет включва следните пера: подробно изложена разбивка на преките разходи по Проекта, включително всички разходи за инсталация и оборудване, всички плащания по строителни подизпълнителски договори. | 4.04. Budget Line Items. The Construction Budget includes the following line items: an itemized breakdown of all direct costs of the Project, including all costs of fixtures and equipment for the same, all construction contractors payments, general overhead, and reimbursements. |
| 4.05. Строителен бюджет: | 4.05. Construction Budget: |

| Stage of Construction | Етап на строителството | Unit / Мярка | Quantity / Количество | Unit Cost / Единична цена (в Евро) | Estimated Cost in EUR after ADVANCE / Цена в Евро след АВАНС |
|---|---|---|---|---|---|
| **ADVANCE** | **АВАНС** | | | | 186,413.60 |
| **Stage 1: organizing construction** | **Етап 1: Организация на строителството** | | | | - |
| Scaffolding | Скеле | m2 | | | - |
| Lift | Повдигачи (хаспели, асансьори) | мсм | | | - |
| Fencing | Ограждане и шунтова ограда | м | | | - |
| Demolition and garbage removal | Събаряне на постройки и извозване на отпадъци | бр. | | | - |
| Temporary traffic organization | Временна организация на движението | сума | | | - |
| Removal of trees | Изсичане на дървета | бр. | | | - |
| Temporary construction | Временни постройки | бр. | | | - |
| **Stage 2: excavation** | **Етап 2: Земни работи** | | | | - |
| Excavation | Изкопни работи | м3 | | | - |
| Soil removal | Извозване на земни маси | м3 | | | - |
| **Stage 3: concrete rough construction** | **Етап 3: Бетонови работи и грубо строителство** | | | | - |
| Foundations 1) Forms | Фундаменти 1) Кофражи | м2 | | | - |
| Foundations 2) Steel reinforcement | Фундаменти 2) Армировка | кг | | | - |
| Foundations 3) Concrete | Фундаменти 3) Бетонови работи | м3 | 1783.00 | € 60.00 | 96,282.00 |
| Slabs 1) forms | Плочи 1) Кофражи | м2 | 11334.93 | € 12.32 | 125,703.44 |
| Slabs 2) steel reinforcement | Плочи 2) Армировка | кг | 158688.97 | € 0.80 | 113,915.48 |
| Slabs 3) concrete | Плочи 3) Бетонови работи | м3 | 2266.82 | € 60.00 | 122,408.54 |
| Columns 1) forms | Колони 1) Кофражи | м2 | 2709.11 | € 7.00 | 17,067.41 |
| Columns 2) steel reinforcement | Колони 2) Армировка | кг | 58998.45 | € 0.80 | 42,352.26 |
| Columns 3) concrete | Колони 3) Бетонови работи | м3 | 842.84 | € 60.00 | 45,513.09 |
| Beams 1) forms | Греди 1) Кофражи | м2 | 0.00 | € 0.00 | - |
| Beams 2) steel reinforcement | Греди 2) Армировка | кг | 0.00 | € 0.00 | - |
| Beams 3) concrete | Греди 3) Бетонови работи | м3 | 0.00 | € 0.00 | - |
| Bearing walls 1) forms | Носещи стени и шайби 1) Кофражи | м2 | 10595.64 | € 5.00 | 47,680.38 |
| Bearing walls 2) steel reinforcement | Носещи стени и шайби 2) Армировка | кг | 80659.31 | € 0.80 | 57,901.59 |
| Bearing walls 3) concrete | Носещи стени и шайби 3) Бетонови работи | м3 | 1151.87 | € 60.00 | 62,201.22 |
| **Stage 4: brick rough construction** | **Етап 4: Зидарски работи** | | 0.00 | € 0.00 | - |
| Bottom half of building | Зидария в мазе и сутерен | м2 | 587.58 | € 9.26 | 4,899.30 |
| Top half of building - external | Етажна зидария - външна | м3 | 476.00 | € 79.48 | 34,049.31 |

| | | | | | |
|---|---|---|---|---|---|
| Top half of building - internal | Етажна зидария - вътрешна | m2 | 5447.12 | € 12.18 | 59,711.35 |
| Aesthetic masonry (if it exists) | Фигурална фасадна зидария | м3 | 0.00 | € 0.00 | - |
| **Stage 5: roof** | **Етап 5 : Покриви** | | 0.00 | € 0.00 | - |
| Roof structure from wood | Покривна конструкция от дърво | м3 | 0.00 | € 0.00 | - |
| Concrete on roof | Керамзитобетон покрив | м2 | 0.00 | € 0.00 | - |
| Wood on roof (if it exists) | Дървена обшивка | м2 | 0.00 | € 0.00 | - |
| Roof sheeting | Покривна обшивка от ламарина | м2 | 0.00 | € 0.00 | - |
| Plaster | Замазки | м2 | 0.00 | € 0.00 | - |
| Roof plastic cover | Покривна мушама | м2 | 1420.78 | € 8.28 | 10,584.85 |
| Roof cover | Покривно покритие | м2 | 1420.78 | € 10.13 | 12,958.11 |
| Thermoinsulation | Топлоизолация | м2 | 1420.78 | € 12.58 | 16,082.63 |
| Chimneys | Комини | бр. | 26.90 | € 100.00 | 2,600.75 |
| Gutters | Улуци и улами | м | 139.87 | € 7.91 | 994.85 |
| **Stage 6: hydro insulation** | **Етап 6: хидроизолации** | | 0.00 | € 0.00 | - |
| Hydroinsulation - balconies | Хидроизолация - тераси | м2 | 1864.67 | € 8.56 | 14,358.72 |
| Hydroinsulation - foundations | Хидроизолация - основи | м2 | 738.48 | € 5.33 | 3,539.92 |
| Thermoinsulation | Топлоизолация | м2 | 6105.34 | € 11.76 | 64,643.60 |
| **Stage 7: plaster** | **Етап 7: мазилки** | | 0.00 | € 0.00 | - |
| Internal | Вътрешни | м2 | 23393.06 | € 4.83 | 101,725.59 |
| External | Външни | м2 | 2292.51 | € 8.65 | 17,849.38 |
| Gypsum | Шпакловки | м2 | 22975.68 | € 3.03 | 62,589.51 |
| Decorative elements | Декоративни елементи | м | 0.00 | € 0.00 | - |
| **Stage 8: flooring** | **Етап 8: настилки** | | 0.00 | € 0.00 | - |
| Plaster | Замазки | м2 | 10695.64 | € 2.60 | 24,793.80 |
| Parquet | Паркети | м2 | 0.00 | € 0.00 | - |
| Terracotta | Теракоти | м2 | 0.00 | € 0.00 | - |
| Marble | Мрамори | м2 | 0.00 | € 0.00 | - |
| Grinitogres | Гранитогрес | м2 | 0.00 | € 0.00 | - |
| Mosaic | Мозайки | м2 | 973.68 | € 11.57 | 10,139.35 |
| **Stage 9: windows and doors** | **Етап 9: Дограма** | | 0.00 | € 0.00 | - |
| Windows | Прозорци | м2 | 1311.07 | € 115.36 | 136,122.80 |
| External doors | Външни врати | бр. | 27.29 | € 236.82 | 5,816.80 |
| Garage doors | Гаражни врати | бр. | 12.04 | € 457.46 | 4,957.22 |
| Internal doors | Вътрешни врати | бр. | 524.16 | € 61.08 | 28,816.20 |
| Storage areas' doors | Врати - мазета | бр. | 72.24 | € 48.90 | 3,179.41 |
| **Stage 10: painting** | **Етап 10: боядисване** | | 0.00 | € 0.00 | - |
| Latex | Латекс | м2 | 22975.68 | € 4.31 | 89,126.61 |
| Whitewash | Постно | м2 | 0.00 | € 0.00 | - |
| Oil paint-windows | Блажна боя прозорци | м2 | 0.00 | € 0.00 | - |
| Oil paint-doors | Блажна боя врати | м2 | 0.00 | € 0.00 | - |
| Radiators, pipes | Радиатори, тръби | м2 | 0.00 | € 0.00 | - |
| Railings | Парапети | м2 | 0.00 | € 0.00 | - |
| **Stage 11: ironware** | **Етап 11: железарски работи** | | 0.00 | € 0.00 | - |
| Railings | Парапети | м | 568.31 | € 37.19 | 19,022.66 |
| Sheet-iron on balconies | Обшивка балкони | м2 | 0.00 | € 0.00 | - |
| Covers | Капаци | бр. | 0.00 | € 0.00 | - |
| Metal frames | Метални рамки | бр. | 0.00 | € 0.00 | - |
| Sky-lights | Оберлихти | м2 | 0.00 | € 0.00 | - |
| Other | Други | м2 | 0.00 | € 0.00 | - |
| **Stage 12: outside** | **Етап 12: вертикална планировка** | | 0.00 | € 0.00 | - |
| Grading | Настилки | м2 | 235.99 | € 14.13 | 3,001.58 |
| Drainage | Външно отводняване | м2 | 0.00 | € 0.00 | - |
| Landscaping | Озеленяване | м2 | 0.00 | € 0.00 | - |
| **Stage 13: water supply and sewerage systems** | **Етап 13: ВиК инсталация** | | 0.00 | € 0.00 | - |
| Water supply connection | Външна водопроводна връзка | м | 60.20 | € 30.02 | 1,626.44 |
| Sewage connection | Външна канална връзка | м | 60.20 | € 32.03 | 1,735.31 |
| Vertical inside pipes - water | Вертикална разводка - водопровод | м | 2145.62 | € 5.19 | 10,016.53 |
| Horizontal inside pipes - water | Хоризонтална разводка - водопровод | м | 821.96 | € 4.49 | 3,322.97 |
| Vertical inside pipes - sewage | Вертикална разводка - канал | м | 715.21 | € 5.51 | 3,545.37 |
| Horizontal inside pipes - sewage | Хоризонтална разводка - канал | м | 348.37 | € 4.79 | 1,502.26 |
| Faucets | Смесителни батерии | бр. | 0.00 | € 0.00 | - |
| Sanitary units | Санитарен фаянс | бр. | 0.00 | € 0.00 | - |
| Shower/bathtub | Душкабини/вани | бр. | 0.00 | € 0.00 | - |
| Bathroom cupboards | Тоалетни шкафчета | бр. | 0.00 | € 0.00 | - |
| Water meters | Водомери, кранове | бр. | 960.22 | € 12.24 | 10,577.62 |
| **Stage 14: electrical transformer with connections** | **Етап 14: трафопост и външни ел връзки** | | 0.00 | € 0.00 | - |
| Construction of transformer hut | Трафопост - АС част | м2 | 9.63 | € 123.78 | 1,073.10 |
| Equipment | Оборудване | бр. | 0.80 | € 38,420.01 | 27,755.76 |
| Cable lines | Кабелни линии | м | 240.81 | € 27.70 | 6,002.67 |
| **Stage 15: electrical installation, including telephone** | **Етап 15: ел инсталация, включително телефон** | | 0.00 | € 0.00 | - |
| Apartment panels | Апартаментни табла | бр. | 122.01 | € 48.00 | 5,270.85 |
| Main panel | Главно ел. табло | компл. | 3.21 | € 2,033.92 | 5,877.46 |
| Switches, sockets | Ел. обзавеждане | бр. | 2440.21 | € 2.66 | 5,839.04 |
| Cables | Кабели | м | 30952.11 | € 0.89 | 24,728.15 |
| TV and/or computer cables | ТВ и компютърни и нисковолтови връзки | м | 6100.52 | € 1.19 | 8,808.08 |
| **Stage 16: heating and ventilation** | **Етап 16: отопление и вентилация** | | 0.00 | € 0.00 | - |
| Distributor/dispatcher | Абонатна станция | бр. | 1.61 | € 8,876.85 | 12,825.81 |
| Radiators | Глидери | бр. | 3852.96 | € 7.26 | 25,181.85 |
| Pipes | Комплект разводка | м | 428.64 | € 5.83 | 2,248.61 |
| Air-conditioning | Климатизатор-комплект | компл. | 0.00 | € 0.00 | - |
| **Stage 17: extra finishes** | **Етап 17: Допълнително обзавеждане** | | 0.00 | € 0.00 | - |
| kitchen | Кухни | компл. | 0.00 | € 0.00 | - |
| common area fixtures (e.g. Cabinets) | Коридорни гардероби и шкафове | компл. | 0.00 | € 0.00 | - |
| **Stage 18: elevator** | **Етап 18: асансьор** | | 0.00 | € 0.00 | - |
| Supply | Доставка | компл. | 4.01 | € 13,695.00 | 49,468.39 |

Borrower/Кредитополучател: _____  стр. 6 от 21 Lender/Банка: _____

| Installation | Монтаж | компл. | 4.01 | € 2,139.00 | 7,726.39 |
| TOTAL | ОБЩО | | | | 1,864,136.00 |

**4.06.** Разпределение на Резервите по Строителния бюджет и икономии. Кредитополучателят има право (но не е задължен):

(a) периодично да разпределя и преразпределя Резервите по Строителния бюджет по перата на Строителния бюджет;

(б) при наличие на икономии (по усмотрение на Банката, след отчитане, заедно с всяка друга релевантна информация, състоянието на завършеност на работата по съществуващи договори, подизпълнителски договори и други споразумения, клаузи и съветите на Представителя на Банката) за някое или някои от перата на Строителния бюджет, Банката се съгласява да разрешава разпределяне и преразпределяне на такива икономии между други пера на Строителния бюджет по писмено искане на Кредитополучателя (отправяно не по-често от един път месечно). Заедно с всяко такова искане Кредитополучателят ще представя на Банката цялата документация и информация, която служи за доказване на икономиите.

**4.07.** В случай, че неразпределените от Кредита средства по определено перо от Строителния бюджет са недостатъчни за завършване на работите по това перо, то Банката има право да разпределя оставащите в разположение Резерви по Строителния бюджет за покриване на този недостиг. Ако Резервите от Строителния бюджет са недостатъчни за покриване на недостига, то Кредитополучателят е длъжен да финансира със собствени средства недостига по това перо до пълното завършване на работите по перо.

**Раздел V.         БАЛАНСИРАНЕ НА КРЕДИТА**

**5.01.  Балансиран Кредит.**

(a) Кредитът е балансиран ("Балансиран"), когато по Преценка на Банката цялата неизползвана сума по Кредита в частта на Строителния бюджет или отделни негови пера, е достатъчна за финансиране на завършването на всички работи по Строителния бюджет и по всяко отделно негово перо.

(б) Независимо от всякакви други условия и уговорки от настоящия Договор, Кредитът трябва във всеки момент да е Балансиран. В случай, че Кредитът не е Балансиран, се прилагат разпоредбите и изискванията на Член 4.07.

**5.02.** Банката се освобождава от задължението си да предоставя каквото и да е средства от Кредита по което и да е перо, докато Кредитът не е Балансиран. Ако в даден момент се появи Недостиг на средства, като резултат от завишаване на Преценката на Банката, налагащ Кредитополучателя да извърши Плащане при недостиг на средства, тогава Преценката на Банката трябва да се изрази в писмен вид, включващ детайлиране на основанията за Преценката на Банката.

**5.03.** По всяко време размерът на Предоставените средства по Кредита, увеличен с размера на оставащите разходи за строителство трябва да е по-малък от размера на Кредита. Винаги, когато по Преценка на Банката (дефинирани по-долу), размерът на средствата от Кредита, които все още не са предоставени, не е достатъчен, за да покрие оставащите разходи по Проекта, Кредитополучателят ще депозира при Банката такава сума, която, добавена към все още непредоставените средства по Кредита ще е достатъчна, за да покрие оставащите разходи по Проекта. Всички такива депозирани средства при Банката ще бъдат предоставени при условията на настоящия Договор и ще бъдат предоставени от Банката при условията за Предоставяне на средства по настоящия Договор преди предоставянето на останалите средства по Кредита.

**5.04.** Кредитополучателят приема, че Банката има право периодично и по свое усмотрение да прави и променя преценката си за бъдещите разходи по всяко перо от Строителния бюджет, които Кредитополучателят ще понесе във връзка с Проекта ("Преценка на Банката"). Що се отнася до стойността на строителните работи, Преценката на Банката ще взема под внимание съветите на Представителя на Банката, съществуващите условия по сключени договори и писмени търгове с престижни партньори и достаѝнщи на материали, приемливи за Банката, процентът на завършеност на работата, както и такива разпределения за резерви, каквито Банката прецени за подходящи по нейна преценка.

**5.05.** Преценката на Банката включва още и съображения, които Банката по свое усмотрение счете за релевантни или можещи да окажат влияние върху Строителния Бюджет, като текущи анализи, разходи за материали и наличност на материали, доставчици, сегашни и бъдещи пазарни очаквания, както и способността на трети лица да изпълняват задълженията си по сключени договори и писмени търгове.

**Раздел VI.         ОСЪЩЕСТВЯВАНЕ НА ПРОЕКТА**

**6.01.** Кредитополучателят за своя сметка ще предприеме всички необходими действия за да завърши Проекта и да получи Разрешение за Ползване своевременно, преди изтичане на Периода на

---

**4.06. Allocation of Contingency Reserve and cost savings.** Borrower shall be entitled (but shall not be obligated):

(a) to allocate and reallocate from time to time the Contingency Reserve among the various line items of the Construction Budget.

(b) if there shall be demonstrated cost savings (as determined in good faith by Lender after taking into account, among other relevant information, the state of completion of the work under existing contracts, subcontracts, and other agreements, the provisions of such contracts, and the advice of Lender's Representative) in any one or more line item(s) of the Construction Budget, Lender agrees to permit allocation and reallocation of such cost savings among other line items of the Construction Budget, upon written request from Borrower (submitted not more frequently than once a month). With any such request Borrower shall provide Lender all documentation and information on which Borrower intends to rely to show such demonstrated cost savings.

**4.07.** If the aggregate amount not yet disbursed under the Loan under any line item from the Construction Budget is not enough to complete construction works under this line item, Lender has the right to apply the remaining available Contingency Reserve to this line item to cover the shortfall. If the Contingency Reserve is not enough to cover the shortfall, Borrower shall cover the shortfall through investing his own funds until the construction works under this line item are fully completed.

**SECTION V.         LOAN BALANCING**

**5.01.  Loan to be In Balance**

(b) The Loan shall be determined to be in balance ("In Balance") only if the aggregate amount not yet disbursed under the Loan in the part of the Construction Budget or certain line items from it is enough to support the completion of all construction works under the Construction Budget and the separate line items.

(b) Anything contained in this Agreement to the contrary notwithstanding, it is expressly understood and agreed that the Loan must at all times be in balance. If at any time the Loan is not In Balance, Borrower shall be complying with the requirements of Article 4.07. hereof).

**5.02.** Lender shall have no obligation to make any Disbursements under the Loan for any line item as long as the Loan is not In Balance. If, at any time or times, an increase in the Lender's Estimate would result in a Deficiency requiring Borrower to make a Deficiency Payment, then Lender's Estimate shall be in writing and shall set forth in reasonable detail the basis for Lender's Estimate.

**5.03.** At no time shall the total amount of Disbursements made by the Lender to the Borrower under this Agreement, when added to the remaining costs to complete the Project exceed the Loan Amount. If at any time, in the reasonable Lender's Estimate, then undisbursed portion of the Loan shall be insufficient to defray the remaining cost of the Project, the Borrower shall deposit funds with the Lender that, when added to the undisbursed portion of the Loan, will be sufficient, in the Lender's opinion, to satisfy the remaining cost of completing the Project. All funds so deposited with the Lender shall be disbursed under the terms of this Agreement and shall be advanced by the Lender under the terms for Disbursement of Funds set in this Agreement before advancing any proceeds of the Loan.

**5.04.** Borrower agrees that from time to time Lender shall have the right to make and/or revise, in its good faith judgment, an estimate of the future costs and expenses of each line item of the Construction Budget which may be incurred by Borrower in connection with the Project ("Lender's Estimate"). Lender's Estimate as it relates to cost of construction, shall take into consideration the advice of Lender's Representative, the existing contracts and terms of any executed contracts or written bids with responsible contractors and materials suppliers satisfactory to Lender, the percentage of completion of the work, and such allowances for reserves as Lender shall deem appropriate, in Lender's good faith judgment.

**5.05.** In addition, Lender's Estimate shall take into account other considerations which Lender, in its good faith judgment, deems relevant or likely to have an impact upon the Construction Budget, including current costs for and availability of materials, and suppliers, current and expected future market considerations, and the ability of third parties to perform in accordance with the terms of executed contracts or written bids.

**SECTION VI.         CONSTRUCTION OF PROJECT**

**6.01.** The Borrower shall, at its expense, take all necessary actions to construct the Project and obtain the Permit for Usage in a timely manner, no later than the Termination of Construction Period. The

---

Borrower/Кредитополучател:          стр. 7 от 21          Lender/Банка:

Строителство. Проектът трябва да бъде завършен професионално и при спазване на изискванията на строителните норми и правила, на Българския Държавен Стандарт, на архитектурния проект и на другите спецификации, които са били предоставени на Банката и са били одобрени от нея (приложени като Приложение 1). Освен това, Проектът трябва да бъде построен законно при спазване на всички изисквания за строителство, безопасност, териториално устройство, опазване на околната среда и всички други изисквания на съответните общински или държавни органи.

Project shall be completed in a workmanlike manner and in compliance with statutory construction rules and norms, the Bulgarian State Standards, and the Plans and specifications previously submitted to and approved by the Lender (attached as Exhibit 1). In addition, the Project shall be legally constructed in compliance with all building, safety, zoning, environmental, and any other requirements of any municipal, or government authority.

**6.02.** Промяна на архитектурните проекти. Банката има право по всяко време да изисква стриктно спазване на одобрените архитектурни проекти.

**6.02.** Changes to the Plans. The Lender shall at all times have the right to require strict compliance with the Plans.

**6.03.** Спазване на одобрените архитектурни проекти. Всички средства, материали и оборудване използвани за завършване на Проекта следва да съответстват на одобрените архитектурни проекти и на техните изменения (ако има такива), одобрени от Банката. Освен това, работата по Проекта не може да нарушава никакви нормативни актове или други рестриктивни уговорки.

**6.03.** Compliance with the Plans. All materials, fixtures, equipment and other articles used in the construction or equipping of the Project shall comply with the Plans, as modified by any changes approved by the Lender. In addition, the Project shall not be constructed in violation of any restrictive covenants, laws, statutes, ordinances, or other governmental rules or regulations.

**6.04.** Ако Кредитополучателят или негов съдружник участват като контрагент, доставчик или оказват услуги от своя име или чрез друго лице, в което те или друго лице, свързано с тях, притежават дял в него или го управляват ("Свързан интерес"), като между Кредитополучателя и това друго лице, участващо като контрагент, доставчик или оказващо услуги или по друг начин, е сключен договор, то настоящия договор между страните, имащи такъв Свързан интерес, ще се смята само и единствено като приблизителна оценка за целите на настоящия член. Кредитополучателят е длъжен да уведомява незабавно Банката при възникване, по какъвто и да е повод, на свързан интерес.

**6.04.** Restriction on Related Interest. If Borrower or any affiliate of Borrower shall act as a contractor or supplier or service provider in its own name or through a separate entity in which it or any entity related to it has an ownership interest or control ("Related Interest") between Borrower and any party acting as a contractor, supplier, service provider or otherwise, any contract between parties having such identity of interest shall be regarded solely as an estimate for the purposes of this article. Borrower is obliged to immediately inform Lender whenever a Related Interest arises.

**Раздел VII.** ДОПЪЛНЕНИЯ И ПРОМЕНИ НА ПРОЕКТА

**SECTION VII.** EXTRAS AND PROJECT CHANGES

**7.01.** Кредитополучателят е длъжен да информира Банката относно намеренията си за промени в плановете и спецификациите на Проекта и да получи предварително писмено съгласие от Банката за всяка промяна в плановете и спецификациите на Проекта.

**7.01.** Borrower has the obligation to inform Lender of intentions to change plans and specifications. The prior written consent of Lender shall always be required for any changes in the plans and specifications for the Project.

**(a)** Ако Кредитополучателят не получи преди промените писмено одобрение от Банката и въпреки това извърши промяната, счита се че е налице Случай на Неизпълнение по настоящия Договор.

**(a)** Failing to receive prior written consent and still carrying out the changes will be considered an Event of Default.

**7.02.** Кредитополучателят ще представя предложените промени в плановете или спецификациите не по-късно от десет (10) Работни дни преди началото на строителството на съответния етап, засягащ промените. Кредитополучателят е длъжен да се увери и да удостовери, че така предложените промени са съобразени с изискванията на закона. Кредитополучателят своевременно ще представя на Банката всички промени в спецификациите по Проекта.

**7.02.** Borrower shall submit any proposed changes in the plans and specifications at least ten (10) Business Days prior to commencement of the construction stage relating to such change. Borrower is responsible for ensuring the legality of such a change. Borrower shall deliver promptly to Lender all changes in the specifications of the Project.

**Раздел VIII.** ПРАВО НА БАНКАТА ДА НАЗНАЧИ СВОЙ ПРЕДСТАВИТЕЛ

**SECTION VIII.** LENDER'S RIGHT TO EMPLOY LENDER'S REPRESENTATIVE

**8.01.** Банката има право да назначи и/или наеме за своя сметка Представител на Банката, който да преглежда плановете, спецификациите, документите и всички други материали по Проекта, както и да инспектира всички действия, свързани със строежа и неговия напредък. Банката има право да участва и в издаването на всички необходими документи в процеса на строителството.

**8.01.** Lender shall have the right to appoint and/or employ at its expense Lender's Representative to review the plans, specifications, documents, and all other Project materials and to inspect all matters related to the construction and progress of the same. Lender shall have the right to participate during issuance of all documents relevant to the construction process.

**8.02.** Кредитополучателят ще съдейства (като осигури и съдействието на трети лица - договорни партньори) на Банката при организирането на инспекциите на строителния обект от Представителя на Банката, както и от всички други представители на Банката, упълномощени в даден момент.

**8.02.** Borrower will cooperate (and will cause third-party contractors to cooperate) with Lender in arranging for inspections of the progress of the construction by Lender's Representative and other representatives of Lender, from time to time.

**РАЗДЕЛ IX.** ИЗПЛАЩАНЕ НА ЛИХВИТЕ, ГЛАВНИЦАТА И ТАКСИТЕ ПО КРЕДИТА

**SECTION IX.** PAYMENT OF INTEREST, PRINCIPAL AND TAXES DUE ON THE LOAN

**9.01.** Задължения на Кредитополучателя за плащане. При условията на настоящия Договор, Кредитополучателят неотменимо и безусловно се задължава да плати всички суми, действително предоставени по Кредита ("Главница") и да плати всички Лихви и Лихва за забава (дефиниция по-долу) така, както е предвидено в настоящия Договор, както и всички разходи за обслужване.

**9.01.** Scope of Borrower's Obligation for Payment. Under this Agreement, Borrower irrevocably and unconditionally obligates itself to repay all amounts actually disbursed under the Loan ("Principal"), and payment of all Interest and Penalty Interest (hereinafter defined), as required under this Agreement, plus any servicing expenses.

**9.02.** Начисляване на Лихва.

**9.02.** Interest Accrual.

**(a)** Плащане на Лихвата. ЦЯЛАТА ЛИХВА В РАЗМЕР НА 533,143 ЕВРО (ПЕТСТОТИН ТРИДЕСЕТ И ТРИ ХИЛЯДИ СТО ЧЕТИРИДЕСЕТ И ТРИ ЕВРО) ИЗЧИСЛЕНА СЪГЛАСНО ЧЛ. 2.03. И ЧЛ. 9.02. СЕ ДЪЛЖИ НАВЕДНЪЖ ОТ КРЕДИТОПОЛУЧАТЕЛЯ И СЕ УДЪРЖА ОТ ЛИХВЕНИЯ РЕЗЕРВ НА ДАТАТА НА ПЪРВО ПРЕДОСТАВЯНЕ НА СРЕДСТВА, КАТО АКО ТАКОВА НЕ БЪДЕ ИЗВЪРШЕНО В СРОКА ПО ЧЛЕН 3.02, КРЕДИТОПОЛУЧАТЕЛЯТ НЕ МОЖЕ ДА ИЗВЪРШВА ПОВЕЧЕ УСВОЯВАНИЯ И ЛИХВАТА СЕ ДЪЛЖИ НА ПЪРВИЯ ДЕН СЛЕД ИЗТИЧАНЕ НА ТОЗИ СРОК.

**(a)** Interest Payment. THE INTEREST IN THE FULL AMOUNT OF 533,143 (FIVE HUNDRED AND THIRTY THREE THOUSAND ONE HUNDRED AND FOURTY THREE EURO) SHALL BE DUE FROM BORROWER AT ONCE AND IS WITHHELD FROM THE INTEREST RESERVE ON THE DATE OF FIRST DISBURSEMENT OF FUNDS WHEREAS IF SUCH A DISBURSEMENT IS NOT MADE WITHIN THE DUE TERM PURSUANT TO ART. 3.02, THE BORROWER CAN NOT REQUEST FURTHER DISBURSEMENT OF FUNDS AND INTEREST IS DUE ON THE FIRST DATE AFTER THE TERMINATION OF THE PERIOD.

**9.03.** Плащания

**9.03.** Payment

**(a)** Плащане на Лихвата. ЦЯЛАТА ЛИХВА В РАЗМЕР НА 533,143 ЕВРО (ПЕТСТОТИН ТРИДЕСЕТ И ТРИ ХИЛЯДИ СТО ЧЕТИРИДЕСЕТ И ТРИ

**(a)** Interest Payment. THE INTEREST IN THE FULL AMOUNT OF 533,143 (FIVE HUNDRED AND THIRTY THREE THOUSAND ONE

| (Bulgarian) | (English) |
|---|---|
| ЕВРО) ИЗЧИСЛЕНА СЪГЛАСНО ЧЛ. 2.03. И ЧЛ. 9.02. СЕ ДЪЛЖИ НАВЕДНЪЖ ОТ КРЕДИТОПОЛУЧАТЕЛЯ НА ДАТАТА НА ОБЕЗПЕЧЕНИЕ НА ТОЗИ ДОГОВОР. | HUNDRED AND FOURTY THREE EURO) SHALL BE DUE FROM BORROWER ON THE DATE OF SECURITY. |
| (б)   Плащане на Главницата. | (b)   Principal Payment. |
| (ба)   Изплащането на Главницата се извършва както през Периода на Строителство, така и през Периода на Продажби и не по-късно от датата на Падежа. | (ba)   Repayment of Principal shall be made during either the Construction Period or the Sales Period, no later than Final Maturity Date. |
| (бб)   Изплащане на Главницата може да става периодично по време на Кредита, според изискванията, описани в Член 9.06. и Раздел X. | (bb)   Repayment of Principal can occur periodically throughout the Loan, subject to the requirements outlined in Article 9.06. and Section X. |
| 9.04.   Лихвата платена съгласно член 9.03. е окончателна и не подлежи на промяна, нито на връщане, дори и в случаите когато Кредитополучателят независимо от причината не усвои пълния размер на Главницата или изобщо не направи усвояване по този Договор. | 9.04   The interest paid pursuant to article 9.03. is final and subject to no changes, nor reimbursement, even in cases whereas the Borrower does not use the full amount of the Principal or does not use any amount of the Principal, for whatever reason. |
| 9.05.   Постъпления от продажби. Всички Постъпления от продажби се изплащат приоритетно от Кредитополучателя на Банката до пълно изплащане на дължимите суми по Кредита. Постъпления от продажба за всеки отделен Обект се изплащат на Банката най-малко до размера на Дължимата сума за съответния Обект както тя е определена в Член 9.06 по-долу. Купувачът също може да плаща директно на Банката. | 9.05   Sales Proceeds. All Sales Proceeds must be paid by Borrower to Lender, until the amount due under the Loan is fully repaid. Sales Proceeds from each Unit must be paid up to at least the Required Repayment Per Unit defined in Article 9.06. below. Buyer can also pay Lender directly. |
| (а)   Постъпленията от продажби ще се прилагат за погасяване така както е описано в Член 9.09. | (a)   Sales Proceeds shall be applied in the order outlined in Article 9.09. |
| (б)   Постъпленията от продажби са предмет на допълнителни условия, описани в Раздел X. | (b)   Sales Proceeds are subject to additional conditions outlined in Section X. |
| 9.06.   Схемата на дължими суми по Обекти, приложена по-долу, установява сумата на минималното задължително плащане на Главница, за да разреши Банката частично освобождаване на Обезпечението (дефинирано по-долу) отнасящо се единствено до дадения Обект. | 9.06   Required Repayment Per Unit Schedule. The Required Repayment Per Unit Schedule below shall establish the minimum Principal repayment due in order for the Lender to permit a partial release of the Collateral pertaining solely to the specified Unit. |

### Схема на дължими суми по Обекти / Required Repayment Per Unit Schedule

| Част | Вид | Секция | Етаж | Застроена площ (м2) | Ид.части (м2) | Общо (м2) | Дължими суми по Обекти В Евро |
|---|---|---|---|---|---|---|---|
| Unit | Type | Entrance | Floor | Built Area | Common Areas | Total Area | Required Repayment Per Unit In EURO |
| A1 | магазин 1 | A | 0 | 113.64 | 0 | 113.64 | € 51,138 |
| A2 | магазин 2 | A | 0 | 80.23 | 0 | 80.23 | € 36,104 |
| A3 | магазин 3 | A | 0 | 80.23 | 0 | 80.23 | € 36,104 |
| A4 | магазин 4 | A | 0 | 56.21 | 0 | 56.21 | € 25,295 |
| A5 | магазин 5 | A | 0 | 248.29 | 0 | 248.29 | € 65,381 |
| A6 | магазин 6 | A | 0 | 420.68 | 0 | 420.68 | € 189,306 |
| A7 | магазин 7 | A | 0 | 220.71 | 0 | 220.71 | € 54,320 |
| A8 | апартамент 1 | A | 1 | 71.31 | 9.27 | 80.58 | € 32,249 |
| A9 | апартамент 2 | A | 1 | 64.54 | 8.39 | 72.93 | € 29,187 |
| A10 | апартамент 3 | A | 1 | 80.23 | 10.43 | 90.66 | € 36,283 |
| A11 | апартамент 4 | A | 1 | 80.23 | 10.43 | 90.66 | € 36,283 |
| A12 | апартамент 5 | A | 1 | 84.27 | 10.96 | 95.23 | € 38,112 |
| A13 | апартамент 6 | A | 1 | 140.22 | 18.24 | 158.46 | € 63,417 |
| A14 | апартамент 7 | A | 1 | 186.94 | 24.31 | 211.25 | € 84,544 |
| A15 | апартамент 1 | A | 2 | 52.47 | 6.82 | 59.29 | € 23,728 |
| A16 | апартамент 2 | A | 2 | 64.54 | 8.39 | 72.93 | € 29,187 |
| A17 | апартамент 3 | A | 2 | 56.48 | 7.35 | 63.83 | € 25,545 |
| A18 | апартамент 4 | A | 2 | 56.48 | 7.35 | 63.83 | € 25,545 |
| A19 | апартамент 5 | A | 2 | 69.17 | 9 | 78.17 | € 31,284 |
| A20 | апартамент 6 | A | 2 | 75.09 | 9.77 | 84.86 | € 33,961 |
| A21 | апартамент 7 | A | 2 | 111.27 | 14.47 | 125.74 | € 50,322 |
| A25 | апартамент 4 | A | 3 | 56.48 | 7.35 | 63.83 | € 26,184 |
| A26 | апартамент 5 | A | 3 | 69.17 | 9 | 78.17 | € 32,066 |
| A27 | апартамент 6 | A | 3 | 75.09 | 9.77 | 84.86 | € 34,811 |
| A28 | апартамент 7 | A | 3 | 111.27 | 14.47 | 125.74 | € 51,580 |
| A30 | апартамент 3 | A | 4 | 64.54 | 8.39 | 72.93 | € 29,917 |
| A32 | апартамент 4 | A | 4 | 56.48 | 7.35 | 63.83 | € 26,184 |
| A33 | апартамент 5 | A | 4 | 69.17 | 9 | 78.17 | € 32,066 |
| A34 | апартамент 6 | A | 4 | 75.09 | 9.77 | 84.86 | € 34,811 |
| A39 | апартамент 4 | A | 5 | 56.48 | 7.35 | 63.83 | € 26,838 |
| A40 | апартамент 5 | A | 5 | 69.17 | 9 | 78.17 | € 32,868 |
| A41 | апартамент 6 | A | 5 | 75.09 | 9.77 | 84.86 | € 35,681 |
| A42 | апартамент 7 | A | 5 | 111.27 | 14.47 | 125.74 | € 52,869 |
| A45 | апартамент 3 | A | 6 | 56.48 | 7.35 | 63.83 | € 26,838 |
| A46 | апартамент 4 | A | 6 | 56.48 | 7.35 | 63.83 | € 26,838 |
| A47 | апартамент 5 | A | 6 | 69.17 | 9 | 78.17 | € 32,868 |
| A48 | апартамент 6 | A | 6 | 75.09 | 9.77 | 84.86 | € 35,681 |
| A50 | апартамент 1 | A | 7 | 52.47 | 6.82 | 59.29 | € 24,929 |
| A51 | апартамент 2 | A | 7 | 64.54 | 8.39 | 72.93 | € 30,665 |
| A52 | апартамент 3 | A | 7 | 56.48 | 7.35 | 63.83 | € 26,838 |
| A53 | апартамент 4 | A | 7 | 56.48 | 7.35 | 63.83 | € 26,838 |
| A54 | апартамент 5 | A | 7 | 69.17 | 9 | 78.17 | € 32,868 |
| A57 | ателие 1 | A | 8 | 93.3 | 12.13 | 105.43 | € 44,330 |
| A58 | ателие 2 | A | 8 | 56.46 | 7.34 | 63.8 | € 26,826 |
| A59 | ателие 3 | A | 8 | 56.46 | 7.34 | 63.8 | € 26,826 |
| A60 | ателие 4 | A | 8 | 69.19 | 9 | 78.19 | € 32,876 |
| A61 | ателие 5 | A | 8 | 190.8 | 24.81 | 215.61 | € 90,657 |

Borrower/Кредитополучател:            Lender/Банка:

| | 71,10% идеални части от Подземен паркинг в сутерена на вход "А" и вход "Б", състоящ се от следните паркоместа, а именно: | | | | |
|---|---|---|---|---|---|
| ПМ6 | Паркоместо 6 | А | -1 | 18.26 | 21.36 | 39.62 | € 4,754 |
| ПМ7 | Паркоместо 7 | А | -1 | 18.26 | 21.36 | 39.62 | € 4,754 |
| ПМ8 | Паркоместо 8 | А | -1 | 20.81 | 24.34 | 45.15 | € 5,418 |
| ПМ9 | Паркоместо 9 | А | -1 | 27.35 | 31.99 | 59.34 | € 8,000 |
| ПМ12 | Паркоместо 12 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ13 | Паркоместо 13 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ14 | Паркоместо 14 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ15 | Паркоместо 15 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ16 | Паркоместо 16 | А | -1 | 14.2 | 16.61 | 30.81 | € 4,000 |
| ПМ17 | Паркоместо 17 | А | -1 | 14.2 | 16.61 | 30.81 | € 4,000 |
| ПМ18 | Паркоместо 18 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ19 | Паркоместо 19 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ20 | Паркоместо 20 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ21 | Паркоместо 21 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ22 | Паркоместо 22 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ23 | Паркоместо 23 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ24 | Паркоместо 24 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ25 | Паркоместо 25 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ26 | Паркоместо 26 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ27 | Паркоместо 27 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ28 | Паркоместо 28 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ29 | Паркоместо 29 | А | -1 | 17.1 | 20 | 37.1 | € 4,500 |
| ПМ30 | Паркоместо 30 | А | -1 | 16.22 | 18.97 | 35.19 | € 4,500 |
| Б1 | Магазин 8 | Б | 0 | 52.87 | 0 | 52.87 | € 23,792 |
| Б2 | Магазин 9 | Б | 0 | 38.26 | 0 | 38.26 | € 17,217 |
| Б3 | Магазин 10 | Б | 0 | 29.29 | 0 | 29.29 | € 13,181 |
| Б4 | Магазин 11 | Б | 0 | 53.19 | 0 | 53.19 | € 23,936 |
| Б5 | Магазин 12 | Б | 0 | 77.46 | 0 | 77.46 | € 34,857 |
| Б6 | Апартамент 8 | Б | 1 | 188.2 | 29.42 | 217.62 | € 67,093 |
| Б7 | Апартамент 9 | Б | 1 | 114.61 | 17.91 | 132.52 | € 53,035 |
| Б8 | Апартамент 10 | Б | 1 | 77.66 | 12.14 | 89.8 | € 35,939 |
| Б9 | Ателие 11 | Б | 1 | 71.56 | 11.19 | 82.75 | € 33,117 |
| Б10 | Апартамент 12 | Б | 1 | 64.43 | 10.07 | 74.5 | € 29,815 |
| Б11 | Ателие 13 | Б | 1 | 49.14 | 7.68 | 56.82 | € 22,740 |
| Б12 | Апартамент 8 | Б | 2 | 112.13 | 17.53 | 129.66 | € 51,891 |
| Б13 | Апартамент 9 | Б | 2 | 76.57 | 11.97 | 88.54 | € 35,434 |
| Б14 | Апартамент 10 | Б | 2 | 64.31 | 10.05 | 74.36 | € 29,759 |
| Б15 | Ателие 11 | Б | 2 | 62.82 | 9.82 | 72.64 | € 29,071 |
| Б16 | Апартамент 12 | Б | 2 | 64.43 | 10.07 | 74.5 | € 29,815 |
| Б17 | Ателие 13 | Б | 2 | 49.14 | 7.68 | 56.82 | € 22,740 |
| Б18 | Апартамент 8 | Б | 3 | 112.13 | 17.53 | 129.66 | € 53,188 |
| Б19 | Апартамент 9 | Б | 3 | 76.57 | 11.97 | 88.54 | € 36,320 |
| Б21 | Ателие 11 | Б | 3 | 62.82 | 9.82 | 72.64 | € 29,798 |
| Б22 | Апартамент 12 | Б | 3 | 64.43 | 10.07 | 74.5 | € 30,561 |
| Б23 | Ателие 13 | Б | 3 | 49.14 | 7.68 | 56.82 | € 23,308 |
| Б24 | Апартамент 8 | Б | 4 | 112.13 | 17.53 | 129.66 | € 53,188 |
| Б25 | Апартамент 9 | Б | 4 | 76.57 | 11.97 | 88.54 | € 36,320 |
| Б27 | Ателие 11 | Б | 4 | 62.82 | 9.82 | 72.64 | € 29,798 |
| Б29 | Ателие 13 | Б | 4 | 49.14 | 7.68 | 56.82 | € 23,308 |
| Б30 | Апартамент 8 | Б | 5 | 112.13 | 17.53 | 129.66 | € 54,518 |
| Б31 | Апартамент 9 | Б | 5 | 76.57 | 11.97 | 88.54 | € 37,228 |
| Б33 | Ателие 11 | Б | 5 | 62.82 | 9.82 | 72.64 | € 30,543 |
| Б35 | Ателие 13 | Б | 5 | 49.14 | 7.68 | 56.82 | € 23,891 |
| Б37 | Апартамент 9 | Б | 6 | 76.57 | 11.97 | 88.54 | € 37,228 |
| Б39 | Ателие 11 | Б | 6 | 62.82 | 9.82 | 72.64 | € 30,543 |
| Б40 | Апартамент 12 | Б | 6 | 64.43 | 10.07 | 74.5 | € 31,325 |
| Б41 | Ателие 13 | Б | 6 | 49.14 | 7.68 | 56.82 | € 23,891 |
| Б43 | Апартамент 9 | Б | 7 | 76.57 | 11.97 | 88.54 | € 37,228 |
| Б45 | Ателие 11 | Б | 7 | 62.82 | 9.82 | 72.64 | € 30,543 |
| Б47 | Ателие 13 | Б | 7 | 49.14 | 7.68 | 56.82 | € 23,891 |
| Б48 | Ателие 6 | Б | 8 | 193 | 30.17 | 223.17 | € 93,836 |
| Б49 | Ателие 7 | Б | 8 | 64.22 | 10.04 | 74.26 | € 31,224 |
| Б50 | Ателие 8 | Б | 8 | 62.39 | 9.75 | 72.14 | € 30,332 |
| Б51 | Ателие 9 | Б | 8 | 64.65 | 10.11 | 74.76 | € 31,434 |
| Б52 | Ателие 10 | Б | 8 | 46.2 | 7.22 | 53.42 | € 22,461 |
| | Подземен паркинг в сутерена на вход "В", състоящ се от следните паркоместа, а именно: | | | | |
| ПМ1 | Паркоместо 1 | В | -1 | 13.8 | 16.45 | 30.25 | € 4,000 |
| ПМ2 | Паркоместо 2 | В | -1 | 13.8 | 16.45 | 30.25 | € 4,000 |
| ПМ3 | Паркоместо 3 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ4 | Паркоместо 4 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ5 | Паркоместо 5 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ6 | Паркоместо 6 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ7 | Паркоместо 7 | В | -1 | 15.26 | 18.19 | 33.45 | € 4,000 |
| ПМ1' | Паркоместо 1' | В | -1 | 15.26 | 18.19 | 33.45 | € 4,000 |
| ПМ8 | Паркоместо 8 | В | -1 | 13.8 | 16.45 | 30.25 | € 4,000 |
| ПМ9 | Паркоместо 9 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ10 | Паркоместо 10 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ11 | Паркоместо 11 | В | -1 | 13.8 | 16.45 | 30.25 | € 4,000 |
| ПМ12 | Паркоместо 12 | В | -1 | 14.1 | 16.81 | 30.91 | € 4,000 |
| ПМ13 | Паркоместо 13 | В | -1 | 28.08 | 33.48 | 61.56 | € 7,966 |
| ПМ14 | Паркоместо 14 | В | -1 | 20.05 | 23.9 | 43.95 | € 7,000 |
| ПМ15 | Паркоместо 15 | В | -1 | 20.94 | 24.96 | 45.9 | € 7,000 |
| ПМ16 | Паркоместо 16 | В | -1 | 22.36 | 26.66 | 49.02 | € 7,000 |
| ПМ17 | Паркоместо 17 | В | -1 | 21.04 | 25.08 | 46.12 | € 7,000 |
| | Мазета №№ 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31 във вход "А" с обща площ от 139.78 м2 | | | | | | | €0 |

| Мазета №№ 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47 във вход "Б" с обща площ от 211.27 м2 | €0 |
|---|---|

**9.07.** Получаване на застрахователни суми. Застрахователни суми, получени по някой от застрахователните договори по Член 14.03. от настоящия Договор, се изплащат на Банката, считат се за получени плащания по Кредита и се прилагат за погасяване както описва в Член 9.09. от настоящия Договор.

**9.08.** Данъци. Всички суми, дължими от Кредитополучателя на Банката, следва да бъдат изплатени изцяло на Банката, без от тях да се приспадат или удържат каквито и да било данъци върху сума плащани от Кредитополучателя на Банката, представляващи плащания по Главницата, Лихвата и/или Лихвата за забава (дефиниция по-долу). Всички съществуващи или в бъдеще установени данъци или удържки за данъци върху суми, платени от Кредитополучателя на Банката, представляващи плащания по Главницата, Лихвата и/или Лихвата за забава (дефиниция по-долу), ще са за сметка на Кредитополучателя.

**9.09.** Погасително действие на плащанията. Всички плащания по Кредита и наличните средства по разплащателната сметка на Кредитополучателя се използват за погасяване на задължения по следния ред:
(1)   такси, комисионни и разноски на Банката;
(2)   Лихва за забава (дефинирана по-долу);
(3)   Дължима лихва към датата на дължимото плащане;
(4)   Просрочена Главница;
(5)   редовна Лихва;
(6)   редовна Главница;

**9.10.** Начин на плащане. Всички плащания по този Договор се извършват чрез разплащателната сметка, открита на името на Кредитополучателя при Банката съгласно Член 3.03.(и) по-горе. Банката може да посочи писмено други свои сметки и/или банки в България, по които Кредитополучателят чрез плащане в брой или чрез банков превод да извършва всички плащания по този Договор.

**9.11.** Дата на плащане. Всички плащания от Кредитополучателя на Банката за каквото и да е суми по настоящия Договор се считат изплатени от датата, на която налични средства постъпят по банковата сметка на Банката, определена в съответствие с Член 9.10. по-горе.

**9.12.** На датата на Първо предоставяне на средства Кредитополучателят заплаща на Банката еднократна Такса за Управление на Кредита в размер на три процента годишно (3%) от сумата на Кредита, или седемдесет и седем хиляди петстотин и единадесет Евро (77,511 евро), която се удържа от сумата на Кредита, след приспадане на Таксата за ангажимент.

**9.13.** Банкови комисионни. Каквито и да било банкови комисионни, свързани с превода и/или погашенията по Кредита са за сметка и платими от Кредитополучателя. Кредитополучателят се съгласява веднага да възстанови каквото и да било банкови комисионни, които Банката може да е платила от името на Кредитополучателя.

**9.14.** Служебно събиране на вземането. Банката служебно събира всички свои вземания по този Договор от средствата, налични по разплащателната сметка на Кредитополучателя, открита при Банката съгласно Член 3.03.(и) по-горе или по други сметки на Кредитополучателя в национална и в чуждестранна валута, открити при Банката.

**9.15** Съгласие за служебно инкасо. С подписването на настоящия Договор Кредитополучателят дава неотменимо писменото си съгласие за служебно инкасо в полза на Банката съгласно Наредба No.3 на БНБ за безналичните плащания и националната платежна система, въз основа на което Банката може да събира на Датата на дължимо плащане или след нея изискуемите по този Договор вземания, като задължава служебно сметки на Кредитополучателя в национална и чуждестранна валута, открити при нея, включително, когато това е необходимо, чрез откупуване на чуждестранна валута, съответно арбитражиране по курса на Банката в деня на операцията.

**Раздел X.ПРОДАЖБИ НА ОБЕКТИ ОТ ПРОЕКТА**

**10.01.** Задължение да се получи одобрението на Банката. Кредитополучателят е длъжен да получи одобрението на Банката относно всеки Предварителен договор преди последния да бъде сключен. Сключването на Предварителния договор за продажба без одобрението на Банката се счита за Случай на неизпълнение по Договора с дата – Датата на Предварителния договор за продажба.

**10.02.** Задължение да се информира Купувача. Кредитополучателят е длъжен да информира всеки Купувач за всички относими съображения във връзка с настоящия Договор. Задължително в Предварителните Договори за продажба да съдържат поне информацията че:
(а)   върху Обекта на продажба съществува Ипотека в полза на Банката;
(б)   Купувачът има възможността да заплаща всички вноски директно на Банката.

**10.03.** Постъпления от Продажби
(а)   Постъпленията от продажби ще се използват от Кредитополучателя за извършване на плащания по Кредита.

**9.07.** **Insurance Proceeds.** Any insurance proceeds from insurance specified in Article 14.03. hereof will be paid to Lender and shall be shall be deemed to be receipt of payment under the Loan, and will be applied in the order specified in Article 9.09. hereof.

**9.08.** **Taxes.** All sums paid by Borrower to Lender shall be paid to Lender in full, free of any deductions or withholdings for any and all present and future taxes on sums paid by Borrower to Lender representing **Principal, Interest and/or Penalty Interest** (hereinafter defined) payments. Any taxes or withholdings for taxes which may be due on sums paid by Borrower to Lender representing **Principal, Interest and/or Penalty Interest** (hereinafter defined) payments, whether present or future, shall be for the account of and at the expense of Borrower.

**9.09.** **Application of Payments.** All payments under the Loan, as well as the funds in the Borrower's current account  shall be applied as follows:
(1)   any fees, charges, commissions or other expenses of the Bank;
(2)   Penalty Interest (hereinafter defined);
(3)   Interest due as of the Payment Due Date;
(4)   Past due Principal;
(5)   Due Principal;
(6)   Prepayment of Principal.

**9.10.** **Method of Payment.** All payments are to be made through the current account opened in the name of the Borrower with the Bank according to Article 3.03.(и) above. The Bank may specify in writing other accounts and/or bank(s) in Bulgaria through which the Borrower will make in cash or by bank transfer all Loan payments under this Agreement.

**9.11.** **Date of Payment.** All payments from Borrower to Lender of any amounts due under this Agreement will be deemed paid from the date immediately available funds arrive at Lender's bank account as per Article 9.10. above.

**9.12.** On the date of **First disbursement**, Borrower shall have paid to **Lender** a **Loan Management Fee** in the amount of three percent per annum (3%) of the amount of the Loan, equal to seventy seven thousand five hundred and eleven Euro (EUR 77,511), which is withheld from the Loan amount on the Date of Security after the "Commitment Fee" is deducted.

**9.13.** **Bank Fees.** Any bank fees related to disbursement and /or payments under the Loan are for the account of and at the expense of Borrower.  Borrower agrees to immediately reimburse Lender for any bank fees that Lender may pay on Borrower's behalf.

**9.14.** **Collection of debt.** Bank shall collect all and any of its receivables under this Agreement from the amounts, deposited in the Borrower's current account with the Bank according to Article 3.03.(и) above, or in any other account in local or foreign currency opened with the Bank.

**9.15.** **Consent for immediate collection.** Borrower hereby provides its unconditional and irrevocable consent for immediate collection in favor of the Bank pursuant to Regulation #3 for wire transfers and the national payment system issued by BNB for the right of Bank to collect on the Payment Due Date or after it all and any of Bank receivables under this Agreement from the amounts deposited in Borrower's accounts opened with the Bank, including, when necessary, buying foreign currency at exchange rates of the Bank for the date of transaction.

**SECTION X. UNIT SALES**

**10.01.** **Obligation to obtain Lender's approval.** Borrower is obliged obtain written Lender's approval of any and all Presale Agreements prior to executing any Presale Agreement. Failing to obtain Lender's approval is an Event of Default. That Event of Default shall be as of the Presale Agreement Date.

**10.02.** **Obligation to inform Buyer.** Borrower is obligated to inform any and all Buyer(s) of all relevant considerations under this Loan. Particularly, Presale Agreements must contain at least the information:
a)   that Lender currently has a mortgage on the available Unit(s);
b)   Buyer has option to pay all Sales Proceeds directly to Lender.

**10.03.** **Sales Proceeds**
a)   Sales Proceeds shall be used by Borrower to make payments under the Loan.

Borrower/Кредитополучател: _____          стр. 11 от 21          Lender/Банка: _____

(б) плащанията, от Купувача на един или повече Обекти ще се извършват или директно по Купувача на Банката, или чрез Кредитополучателя на Банката в размер поне на съответната сума за Обекта по Схема на дължимите суми по Обекти. След като съответната сума от дължимите суми по Обекти бъде изплатена, Кредитополучателят може да продължи да превежда Постъпления от Продажби за Банката по собствена преценка.

b) Payments made by Buyer on a Unit or Units shall be paid to Lender either directly by the Buyer or through the Borrower, at least the amount of the Required Repayment Per Unit Schedule for the relevant Unit. After the Required Repayment Per Unit has been paid, Borrower can continue to pay Sales Proceeds to Lender at his discretion.

(в) Банката има право да откаже поредно Предоставяне на средства по Кредита, след като Кредитополучателят е получил Постъпления от продажби в резултат на сключен Предварителен договор за продажба без да е превел на Банката съответстващата в размера по подадения Обект сума от Схемата на дължими суми по обекти по Чл. 9.06. По този начин общата сума на Кредита може да се намали с размера на невнесеното Постъпление от Продажба до указаната сума по Чл. 9.06. за съответния обект.

b) Lender has the right to refuse to make further Disbursement of Funds under this Loan in case the Lender has received Sales Proceeds resulting from an executed Presale Agreement without transferring them to the Lender in the amount stipulated by the Required Repayment Per Unit Schedule under Article 9.06. Thus, the total amount of the Loan could be reduced by any Sales Proceeds unpaid to Lender up to the stipulated amount under Article 9.06.

(г) Кредитополучателят е длъжен да посочи към кой Обект се прилагат Постъпленията от продажби.

b) Borrower is obligated to indicate toward which Unit each Payment of Sales Proceeds applies.

(д) В случай че Постъпленията от продажби по сключен Предварителен договор за продажба са по-големи от сумата на дължимите Лихва за забава, Лихва и Главница и за може това превишение на изплатени на Банката средства да се приложи към съответстващата сума от Схемата за дължимите суми по Обект, Кредитополучателят и Банката се споразумяват по кои Пера от Строителния бюджет това превишение да се приложи. Банката ще откаже поредно Предоставяне на средства по Кредита до момента, в който работите по така определените Пера от Строителния бюджет не са завършени.

e) If Sales Proceeds from an executed Presale Agreement are greater than the combined Penalty Interest, Interest, and Principal Payments due under the Loan, in order for Sales Proceeds in excess of those paid to Lender to be applied toward the relevant Unit's Required Repayment Per Unit, the Borrower and Lender must agree toward which Budget Line Items the excess Sales Proceeds shall be applied. Lender shall refuse further Disbursement of Funds under the Loan until the identified Budget Line Items are completed.

10.04. Окончателен Договор за Продажба. На Датата на Окончателния Договора за Продажба на Обект Кредитополучателят погасява Главница в размер на оставащата сума за изплащане от Дължимия сума по Обекти, както тя е определена в Схема на дължими суми по Обекти за съответния Обект.

10.04. Final Sale Agreements. On Final Sale Agreement Date for the relevant Unit, Borrower must repay Principal in the remaining amount of the Required Repayment Per Unit for the relevant Unit.

(а) в случай че Постъпленията от Продажба за даден Обект са по-малки от Дължимата сума по Обекти, Кредитополучателя се задължава да заплати разлика между Дължимата сума по Обект и Постъпленията от Продажби.

e) If Sales Proceeds for a given Unit are less than the Required Repayment Per Unit, Borrower must pay the difference between Required Repayment Per Unit and Sales Proceeds.

## РАЗДЕЛ XI. ПРОСРОЧЕНИ ПЛАЩАНИЯ

## SECTION XI. OVERDUE PAYMENTS

11.01. Лихва за забава. В случая на неплащане, забавено или частично плащане на Лихва или Главница, Кредитополучателят дължи допълнителна лихва ("Лихва за забава") в размер на двадесет и пет процента (25%) годишно върху Неизплатената част на Кредита. Кредитополучателят дължи Лихва за забава от Датата на дължимото плащане, на която не е извършено плюс плащане по Лихва или Главница, до момента, в който няма повече дължими плащания по Лихвата. Лихвата за забава ще включва плащането на Лихва за забава и за деня на извършване на забавеното плащане.

11.01. Penalty Interest. In the case of non-payment, late payments or partial payments of Interest or Principal, Borrower will be liable for additional penalty interest ("Penalty Interest") of twenty five percent (25%) per annum on the Principal Balance of the Loan. Borrower will be charged Penalty Interest beginning on the Payment Due Date that full payment of Interest or Principal has not been made, until such time as all payments of Interest have been brought current. The Penalty Interest includes Penalty Interest charged for the day that the late payment is made.

11.02. Просрочени плащания на Постъпления от Продажби. В случай на неплащане, частично или забавено плащане на Постъпления от Продажби, плащания на Постъпления от продажби, извършени в несъответствие с Член 10.03.(б) към Банката, Кредитополучателят дължи допълнителна Лихва за забава в размер на двадесет и пет процента (25%) годишно върху Главницата, освен в случай когато основна лихва се определи със закон.

11.02. Overdue Payment of Sales Proceeds. In the case of non-payment, or late payments of Sales Proceeds to Lender, or partial payments of Sales Proceeds not in compliance with Article 10.03.(b), Borrower will be liable for additional Penalty Interest of twenty five percent (25%) per annum on the Principal Balance of the Loan, unless a lower rate is imposed by law.

(а) Лихва за забава в случай на неплащане, или забавено плащане на Постъпления от Продажби по Предварителен договор за продажба се начислява и дължи, считано от установената в Предварителен договор за продажба дата на извършване на плащането. Ако Кредитополучателят не получи плащането от Купувача на гореупоменатата дата, Банката трябва да бъде уведомена писмено.

a) In the case of non-payment, or late payments of Sales Proceeds to Lender under Presales Agreement the date at which Penalty Interest will start accruing is determined by the date stipulated in the Presales Agreement on which the payment is due. The Lender must be notified in writing if Borrower does not receive from the Buyer the payment on that date.

(б) Постъпленията от Продажби, които надвишават дължимата сума за съответния Обект както тя е определена в Схема на дължими суми по Обекти не са обект на Лихва за забава.

b) Sales Proceeds in excess of the Required Repayment Per Unit for that Unit will not be subject to Penalty Interest if not paid by Borrower to Lender.

(в) Лихвата за забава включва начислена Лихва за забава и за деня в който забавеното плащане е направено.

c) The Penalty Interest includes Penalty Interest charged for the day the late payment is made.

11.03. Лихва за забава в Случай на Неизпълнение. Ако е налице Случай на неизпълнение, както той е определен в Раздел XVI, Кредитополучателят дължи допълнително Лихва за забава в размер на двадесет и пет процента (25%) годишно върху Неизплатената част от Главница по Кредита.

11.03. Penalty Interest in Event of Default. In the case of any Event of Default as defined in Article 16.03., Borrower will be liable for additional Penalty Interest of twenty five percent (25%) per annum on the Principal Balance of the Loan.

## РАЗДЕЛ XII. ОБЕЗПЕЧЕНИЕ

## SECTION XII. COLLATERAL

12.01. Обезпечение. Кредитополучателят обезпечава всички вземания на Банката по настоящия Договор със следното Обезпечение, надлежно учредено по предвидения в Закона ред в приемливи за Банката форма и съдържание:

12.01. Collateral. This Loan shall be secured by the following Collateral described below, properly executed by the Borrower in the due legal way in form and substance acceptable to Lender:

(а) Запис на заповед издаден в полза на Банката, с падеж на предявяване, без протест, за сумата от 2,659,704 (ДВА МИЛИОНА ШЕСТСТОТИН ПЕТДЕСЕТ И ДЕВЕТ ХИЛЯДИ СЕДЕМСТОТИН И ЧЕТИРИ) евро и лихва за забава в размер на 25% (двадесет и пет процента) годишно, авалиран от Христо Иванов Христов, ЕГН:7107210601, Йордан Павлов Йорданов

a) Promissory Note issued in favor of Lender, with due date upon submittance, without protest, for the amount of EUR 2,659,704 (TWO MILLION SIX HUNDRED AND FIFTY NINE THOUSAND SEVEN HUNDRED AND FOUR EURO) and penalty interest calculated on yearly basis under twelve five percent (25%) per annum, guaranteed

ЕГН:6403241429 и Милена Бойкова Блатева, ЕГН 7412286032 ("Авалисти"). Банката има правото да предяви на Кредитополучателя Записа за заповед, издаден от него по настоящия Член 12.01. или Член 12.07., само при възникване на Случай на неизпълнение по настоящия Договор съгласно клаузите на Раздел XVI по-долу.

by Hristo IvanovHristov, UCI #7107210601, Jordan Pavlov Jordanov UCN: 6403241429 and Milena Bojkova Blateva, UCI#7412286032 ("Guarantors"). The Lender has the right to call to the Borrower the Promissory Note issued by the latter under this Article 12.01. and Article 12.07. only in the **Event of default** under this Agreement pursuant to Section XVI hereunder.

(5) Договорна ипотека за обезпечаване на вземане в размер на 2,659,704 (ДВА МИЛИОНА ШЕСТСТОТИН ПЕТДЕСЕТ И ДЕВЕТ ХИЛЯДИ СЕДЕМСТОТИН И ЧЕТИРИ) Евро, включително дължимите 12% (дванадесет процента) годишна Лихва върху общия размер на Кредита (без Лихвения резерв и Такса за Управление) и Такса за управление на кредита в размер на три процента (3%) върху целия размер на кредита, заедно с двадесет и пет процента (25%) Лихва за забава, учредена върху:

(5) Contractual Mortgage for the amount of EUR 2,659,704 (TWO MILLION SIX HUNDRED AND FIFTY NINE THOUSAND SEVEN HUNDRED AND FOUR EURO) including twelve percent (12%) per annum on the total amount of the Loan (without the interest reserve and the Loan Management Fee) of regular Interest and Initiation Fee in the amount of three percents (3%) per annum on the total amount of the loan, together with Penalty Interest of twenty five percent (25%) per annum, established on:

(5а) Ателие №В-7, на две нива на кота +16.90м и на кота +19.50 м, находящо се на тераcовидния етаж в секция "В" на жилищна сграда в гр. София, Столична община – район "Красно село" на ул. "Пирински проход" №47 в урегулиран поземлен имот VII-347 от кв.288а по плана на гр. София местността "Булевард България – Мотописта", целият с площ от 4756 кв.м., което ателие е с разгъната застроена площ от 148.14 кв.м., заедно с 3.4657% идеални части от общите части на секция "В" на сградата и 0.9183% идеални части от правото на строеж върху урегулирания поземлен имот, в който е построена сградата, описан подробно в нотариален акт №55 том IV per.№7908 дело №559/2004г. на нотариус №260 на Нотариалната камара;

(ba) Atelier №B-7, on two levels on level +16.90m and on level +19.50 m, on the terrace floor in section "B" of a residential building in Sofia Stolichna Municipality "Krasno selo" region at 47 Pirinski prohod Street in regulated land plot VII-347 in district 288a as per the city plan of Sofia Blvd. Bulgaria – Motopista zone, the whole with area of 4756 sq.m., which atelier is with total built-up area of 148.14 sq.m., together with 3.4657% ideal parts of the common parts of the section B of the building and 0.9183% ideal parts of the right-to-build on the plot on which is located the building, described in details in the notary deed N55 volume IV reg.Nr7908 file №559/2004 as per the register of the notary №260 of the Notary Chamber;

(5б) Гараж №В-6, находящ се в сутеренния етаж на жилищна сграда в гр. София, Столична община – район "Красно село" на ул. "Пирински проход" №47 в урегулиран поземлен имот VII-347 от кв.288а по плана на гр. София местността "Булевард България – Мотописта", целият с площ от 4 756 кв.м., който гараж е с площ от 26.33 кв.м., заедно с 0.8251% идеални части от общите части на секция "В" на сградата и 0.2189% идеални части от правото на строеж върху урегулирания поземлен имот, в който е построена сградата, описан подробно в нотариален акт №55 том IV per.№7908 дело №559/2004г. на нотариус №260 на Нотариалната камара.

(bb) Garage №B-6, located on the basement of a residential building in Sofia Stolichna Municipality "Krasno selo" region at 47 Pirinski prohod Street in regulated land plot VII-347 in district 288a as per the city plan of Sofia Blvd. Bulgaria – Motopista zone, the whole with area of 4756 sq.m., which garage is with built-up area of 26.33 sq.m., together with 0.8251% ideal parts of the common parts of the section B of the building and 0.2189% ideal parts of the right-to-build on the plot on which is located the building, described in details in the notary deed N55 volume IV reg.Nr7908 file №559/2004 as per the register of the notary №260 of the Notary Chamber;

(5в) Апартамент №11, находящ се в гр. София на ул. "Селиврия"№15-17 на третия етаж на жилищна сграда, със застроена площ 97.42 кв.м., заедно с мазе №11 в сутерена на сградата, заедно с 3.83% идеални части от общите части на сградата и правото на строеж върху урегулирания поземлен имот VIII-238, 239, кв.119 по плана на гр. София местността "Красно село – Плавателен канал", целият с площ от 1000 кв.м., описан подробно в нотариален акт №117 том X, дело №1960/1996г. на нотариус при РС София.

(bc) Apartment №11, located in Sofia 15-17 Selivrija Street on the third floor of the residential building, with built-up area of 97.42 sq.m., together with basement №11 in the basement of the building, together with 3.83% ideal parts of the common parts of the building and the right-to-build on the plot on which is located the building VIII-238, 239, in district 119 as per the city plan of Sofia "Krasno selo – plavatelen kanal" zone, the whole with area of 1000 sq.m., described in details in the notary deed N117 volume X, file No1960/1996 as per the register on the notary by the regional Court Sofia.

(5г) Гараж №8, находящ се в гр. София на ул. "Селиврия"№15-17 на приземния етаж на жилищна сграда, със застроена площ 18.40 кв.м., заедно с 0.67% идеални части от общите части на сградата и правото на строеж върху урегулирания поземлен имот VIII-238, 239, кв.119 по плана на гр. София местността "Красно село – Плавателен канал", целият с площ от 1000 кв.м., описан подробно в нотариален акт №117 том X, дело №1960/1996г. на нотариус при РС София.

(bd) Garage №8, located in Sofia 15-17 Selivrija Street on the parter floor of the residential building, with built-up area of 18.40 sq.m., together with 0.67% ideal parts of the common parts of the building and the right-to-build on the plot on which is located the building VIII-238, 239, in district 119 as per the city plan of Sofia "Krasno selo – plavatelen kanal" zone, the whole with area of 1000 sq.m., described in details in the notary deed N117 volume X, file No1960/1996 as per the register on the notary by the regional Court Sofia.

(5д) 1648/3500 идеални части от УРЕГУЛИРАН ПОЗЕМЛЕН ИМОТ №IV-66, находящ се в гр. София кв. 3Б по плана на гр. София жилищна ж.к."Овча купел – 2", с площ от 3500 кв.м., описан подробно в нотариален акт №33, том III, дело №112122, дело 401 от 2004г. на нотариус №268 на Нотариалната камара;

(be) 1648/3500 ideal parts of REGULATED LAND PLOT NoIV-66, located in Sofia in district 3B as per the city plan of Sofia, residential area Ovcha kupel -2 zone, with area of 3500 sq.m., described in details in notary deed Nr 33, volume III, reg. No12122, file 401 dated 2004 as per the register of the notary №268 of the Notary Chamber;

(5е) ПРАВОТО НА СТРОЕЖ за обектите от Проекта, дефиниран в чл.1.06. от настоящия Договор, собственост на "Строителство България" ООД, както следва:

(be) THE TIGHT-TO-BUILD for the units of the Project (defined in Article 1.06) owned by "Striotelstvo Bugiaria" OOD and in particular:

във вход "А"
на партера: магазин 1, магазин 2, магазин 3, магазин 4, магазин 5, магазин 6, магазин 7,
на първи етаж: апартамент 1, апартамент 2, апартамент 3, апартамент 4, апартамент 5, апартамент 6, апартамент 7,
на втори етаж: апартамент 1, апартамент 2, апартамент 3, апартамент 4, апартамент 5, апартамент 6, апартамент 7,
на трети етаж: апартамент 4, апартамент 5, апартамент 6, апартамент 7,
на четвърти етаж: апартамент 2, апартамент 4, апартамент 5, апартамент 6,
на пети етаж: апартамент 3, апартамент 4, апартамент 5, апартамент 6,
на шести етаж: апартамент 3, апартамент 4, апартамент 5, апартамент 6,
на седми етаж: апартамент 1, апартамент 2, апартамент 3, апартамент 4, апартамент 5,
на подпокривен етаж: ателие 1, ателие 2, ателие 3, ателие 4, ателие 5,

in the entrance "A"
on the partier: shop 1, shop 2, shop 3, shop 4, shop 5, shop 6, shop 7,
on first floor: apartment 1, apartment 2, apartment 3, apartment 4, apartment 5, apartment 6, apartment 7,
ha second floor: apartment 1, apartment 2, apartment 3, apartment 4, apartment 5, apartment 6, apartment 7,
ha third floor: apartment 4, apartment 5, apartment 6, apartment 7,
on fourth floor: apartment 2, apartment 4, apartment 5, apartment 6,
on fifth floor: apartment 4, apartment 5, apartment 6, apartment 7,
on sixth floor: apartment 3, apartment 4, apartment 5, apartment 6,
on seventh floor: apartment 1, apartment 2, apartment 3, apartment 4, apartment 5,
on underroof floor: atelier 1, atelier 2, atelier 3, atelier 4, atelier 5,

във вход "Б"
на партера: магазин 8, shop 9, shop 10, shop 11, shop 12,
на първи етаж: апартамент 8, апартамент 9, апартамент 10, ателие 11, апартамент 12, ателие 13,
на втори етаж: апартамент 8, апартамент 9, апартамент 10, ателие 11, апартамент 12, ателие 13,
на трети етаж: апартамент 8, апартамент 9, ателие 11, апартамент 12, ателие 13,
на четвърти етаж: апартамент 8, апартамент 9, ателие 11, ателие 13,
на пети етаж: апартамент 9, апартамент 9, ателие 11, ателие 13,

in the entrance "Б"
on the partier: shop 8, shop 9, shop 10, shop 11, shop 12,
on first floor: apartment 8, apartment 9, apartment 10, atelier 11, apartment 12, atelier 13,
on second floor: apartment 8, apartment 9, apartment 10, atelier 11, apartment 12, atelier 13,
on third floor: apartment 8, apartment 9, atelier 11, apartment 12, atelier 13,
на четвърти floor: apartment 8, apartment 9, atelier 11, atelier 13,
on fifth floor: apartment 8, apartment 9, atelier 11, atelier 13,
on sixth floor: apartment 9, apartment 11, apartment 12, atelier 13,
on seventh floor: apartment 9, atelier 11, atelier 13,

Borrower/Кредитополучател:          стр. 13 от 21          Lender/Банка: 

на шести етаж: апартамент 9, ателие 11, апартамент 12, ателие 13,
на седми етаж: апартамент 9, ателие 11, ателие 13,
на подпокривен етаж: ателие 6, ателие 7, ателие 8, ателие 9, ателие 10,
както и 71.10% идеални части от подземен паркинг, състоящ се от тридесет паркоместа във вход "А" в сутерена на сградата, съответни на следните паркоместа: паркомясто 6, паркомясто 7, паркомясто 8, паркомясто 9, паркомясто 12, паркомясто 13, паркомясто 14, паркомясто 15, паркомясто 16, паркомясто 17, паркомясто 18, паркомясто 19, паркомясто 21, паркомясто 22, паркомясто 23, паркомясто 25, паркомясто 26, паркомясто 27, паркомясто 28, паркомясто 29, паркомясто 30,
както и подземен паркинг, състоящ се от осемнадесет паркоместа във вход "В" в сутерена на сградата,
заедно с прилежащите мазета.

on underfloor floor: atelier 6, atelier 7, atelier 8, atelier 9, atelier 10
as well as 71.10% ideal parts of the underground parking lot consisting of thirty parking places in the entrance "A" in the basement of the building, respective to the following parking places: паркомясто 6, паркомясто 7, паркомясто 8, паркомясто 9, паркомясто 12, паркомясто 13, паркомясто 14, паркомясто 15, паркомясто 16, паркомясто 17, паркомясто 18, паркомясто 19, паркомясто 21, паркомясто 22, паркомясто 23, паркомясто 25, паркомясто 26, паркомясто 27, паркомясто 28, паркомясто 29, паркомясто 30,
as well as the underground parking lot consisting eighteen parking places in the entrance "B" in the basement of the building,
together with the respective basements.

**12.02.** Ако стойността на Обезпечението намалее по някаква причина или Банката счете стойността на Обезпечението за недостатъчна по време на валидността на Кредита, Кредитополучателят се съгласява при първо писмено искане от страна на Банката да осигури допълнително Обезпечение до изисканата от Банката стойност или да намали задължението си по настоящия Договор съгласно изискванията на Банката.

**12.02.** If the value of Collateral decreases for any reason, or if Lender finds the Collateral value insufficient at any time during the life of the Loan, then upon receipt of the first written request from Lender, Borrower agrees to provide additional Collateral to the value determined by Lender, or to decrease its Loan obligation under this Agreement as requested by Lender.

**12.03.** Разноски. Всички разноски и такси, свързани с надлежното сключване и изпълнение на договорите, учредяващи Обезпечението, както и всички разходи по освобождаване на Обезпечението, са за сметка на Кредитополучателя.

**12.03.** Fees. Any costs or fees associated with the proper execution and perfection of the collateral agreements and with the release of the Collateral are for Borrower's expense. Borrower shall be liable for.

**12.04.** Нито една от разпоредбите на този раздел няма да се счита за ограничаваща правата на Банката да действа в противния смисъл.

**12.04.** None of the provisions in this Section shall be construed as limiting the powers of Lender in acting to the contrary.

**12.05.** Кредитополучателят не може да бъде страна в никакви споразумения, които обещават или гарантират Обезпечението на трета страна без предварителното писмено съгласие от страна на Банката.

**12.05.** Lender may not enter into any agreements that promise or guarantee the Collateral to a third party without prior written consent of Lender.

**12.06.** Банката е длъжна да даде нотариално заверено съгласие за частично заличаване на вписаната в Договорната ипотека по Член 12.01.(б) в частта на отделни Обекти от Проекта единствено и само когато следните условия са изпълнени:

**12.06.** Lender will issue Approval for a partial mortgage release on collateralized property under 12.01.(b) in the part regarding separate Units from the Project only after the following conditions are met:

(а)  Кредитополучателят не дължи Лихва за забава или Лихва; и

(a)  Borrower has no Penalty Interest or Interest due; and

(б)  Кредитополучателят е намалил дължимата Главница със съответната за дадения Обект сума както тя е определена в Схема на дължими суми по Обекти; и

(b)  Borrower has reduced Principal Balance by the Required Repayment Per Unit for the relevant Unit; and

(в)  Кредитополучателят е заплатил разходите за нотариалната заверка на заличаването.

(c)  The Borrower has paid the notary fee for the mortgage release.

**12.07.** При поискване както от Банката, така и от Кредитополучателя, последният издава нов Запис на заповед по образеца на същия, издаден по Член 12.01.(а) за сума в размер на Неизплатената част от главницата. В този случай Записът на заповед, отнасящ се за цялата сума на Кредита, издаден съгласно Член 12.01.(а) или настоящия Член 12.07., се връща на Кредитополучателя.

**12.07.** In case of request either from Lender or from Borrower, a new promissory note following the same pattern as the one issued under Article 12.01.(a), for the amount of the Principal Balance on the Loan (hereinafter defined) then outstanding. In this case the promissory note issued by Borrower pertaining to the Loan pursuant to Article 12.01.(a) or this Article 12.07. will be returned to Borrower.

**12.08.** Банката освобождава напълно ипотека по настоящия договор и връща на Кредитополучателя Записът на заповед, издаден съгласно Член 12.01.(а), или Член 12.07., единствено и само когато всички задължения по настоящия Договор бъдат изпълнени изцяло, Договорът бъде прекратен и Кредитополучателят е представил писмено искане за пълно освобождаване на Обезпечението.

**12.08.** The Lender will perform a full mortgage release on the above defined property and will return the Promissory Note issued under Article 12.01.(a) or 12.07. only when all obligations under this Agreement have been satisfied in full, this Agreement has been terminated and the Borrower has submitted a written request for full release of Collateral.

**РАЗДЕЛ XIII. ДЕКЛАРАЦИИ И ГАРАНЦИИ**

**SECTION XIII.  REPRESENTATIONS AND WARRANTIES**

**13.01.** Декларации и гаранции. Кредитополучателят декларира и гарантира относно следното към Датата на Сключване:

**13.01. Representations and Warranties.**  Borrower represents and warrants the following as of the Date of Agreement:

(а)  Цялата информация, предоставена на Банката от Кредитополучателя при кандидатстване за Кредита, е вярна и пълна и Кредитополучателят не е пропуснал да информира Банката относно каквито и да било съществени факти.

(a)  All of the information given to Lender by Borrower to apply for the Loan is true and complete, and Borrower has not omitted or failed to inform Lender of any material facts.

(б)  Средствата, предоставени по този Кредит ще бъдат използвани единствено и само за целите по Член 2.06. от настоящия Договор.

(b)  Proceeds from Disbursement of Funds under the Loan will be used exclusively for the purposes stated in Article 2.06 hereof.

(в)  Средствата по Кредита няма да се използват за производство и продажба на военна продукция, на оборудване за извършване на аборти или за извършване на услуги, свързани с оръжия или аборти.

(c)  Loan proceeds will not be used for the production or sale of munitions, or for abortion equipment, or for the rendering of services linked to weapons or abortion.

(г)  Кредитополучателят е правоспособен за сключването и изпълнението на настоящия Договор и компетентните органи на Кредитополучателя са предприели всички необходими действия, за да бъде налице представителна власт на лицето, което сключва настоящия Договор.

(d)  Borrower has the legal capacity to execute and comply with this Agreement and all necessary corporate actions have been taken in order for the person who is executing this Agreement to have the legal authority to act on behalf of Borrower.

(д)  Кредитополучателят не е страна по съдебни, арбитражни или административни производства и на Кредитополучателя не са известни никакви предстоящи или възможни претенции, които биха могли да окажат съществено неблагоприятно въздействие върху стопанската дейност на Кредитополучателя, както и не са известни предстоящи събития, които биха могли да попречат на Кредитополучателя да изпълнява задълженията си по настоящия Договор.

(e)  Borrower is not involved in any judicial, arbitrage, or administrative proceedings, and Borrower is not aware of any pending or threatened claims, which could have a material adverse impact on the Borrower's business and there are no known forthcoming conditions which could prevent Borrower from performing its obligations under this Agreement.

(е)  Сключването на настоящия Договор и Предоставяне на средства по

(f)  Execution of this Agreement and Disbursement of Funds of funds

| | |
|---|---|
| него няма да има за резултат неизпълнение на задължения или противоречие с условията по друг кредит или друг договор. | hereunder will not create a default under or conflict with any other loan agreement or contract. |
| (ж) Кредитополучателят притежава всички удостоверения, разрешения и лицензи, необходими за извършване на стопанска дейност в съответствие с българското законодателство и за получаване на кредити. | (g) Borrower has all certificates, permits and licenses required to conduct business in accordance with Bulgarian law and to borrow under the terms hereof. |
| (з) На строителната площадка на Кредитополучателя не се намират никакви опасни отпадъци и той няма никакви задължения по приложими нормативни актове и закони по опазване на околната среда. | (h) No hazardous waste is present on Borrower's premises, and there is no environmental liability under any applicable law, regulation or decree for protection of the environment. |
| (и) Кредитополучателят е разкрил писмено пред Банката всички свои дъщерни предприятия и направления на стопанска дейност. | (i) Borrower has disclosed in writing to Lender all its subsidiaries and lines of business. |
| (й) Не се случило или не е основателно предвидимо събитие или условие, което, с течение на времето или с отправяне на предизвестие, или и с двете, да има за резултат Случай на неизпълнение (дефиниция по-долу) по настоящия Договор. | (j) No event or condition has occurred or is reasonably foreseeable which, with the lapse of time or giving of notice or both, would constitute an Event of Default (as hereinafter defined) hereunder. |
| (к) Кредитополучателят не е в нарушение и не носи гражданска отговорност по нито един закон или наредба за териториално и селищно устройство или с условията на което и да е разрешение за строеж, които биха могли да имат съществено неблагоприятно въздействие върху способността на Кредитополучателя да изпълнява задълженията си по настоящия Договор или по Договорите за обезпечение. | (k) Borrower is not in breach of and has not incurred or become subject to any civil liability under any law and legislation for regional and urban planning or the terms of any building permit which would have a material adverse effect on the Borrower's ability to perform its obligations under this Agreement or the Collateral Agreements. |
| (л) Към Датата на Сключване на Договора Кредитополучателят притежава и поддържа всички разрешения, които се изискват за да се получи Разрешение за ползване на Проекта и за извършване на стопанската му дейност, и се е съобразил с всички условия и изисквания, съдържащи се в тях и с всички други приложими закони, които биха имали съществено неблагоприятен ефект върху способността на Кредитополучателя да изпълнява задълженията си по настоящия Договор, и че не е извършил или позволил извършването на действие или пропуск, в резултат на които което и да е от разрешенията да подлежи на промяна или отмяна. | (l) Borrower has acquired and maintained all licenses required to obtain Permit for Usage for the Project relevant to the Project as of the Date of Agreement and to conduct its business and has complied with all terms and conditions relating thereto and with all other applicable laws which would have a material adverse effect on the Borrower's ability to perform its obligations under this Agreement and has not done or permitted any act or omission whereby any such license would be liable to be changed or revoked. |
| (м) Кредитополучателят гарантира и декларира, че всички документи, свързани с Проекта, и в частност одобрените архитектурни проекти от Приложение 1 (Проекти), представени на Банката са действителни и валидни. | (m) Borrower represents that all documents pertaining to the Project, particularly the Plans shown in Exhibit 1 (Plans) and presented to Lender are current and valid. |
| (н) Кредитополучателят е предоставил на Банката вярна и актуална информация относно Обезпечението на Проекта. Кредитополучателят декларира и гарантира, че няма сключени Договори за предварителни продажби отнасящи се към Обезпечението. | (n) Borrower has provided Lender accurate and up-to-date information regarding the availability of Collateral within the Project. Borrower declares and guarantees that there are no executed pre-sales agreements pertaining to Collateral. |
| (о) Кредитополучателят декларира, че към момента на сключването на настоящия Договор няма получени други кредити. | (o) The Borrower represents that as of the day of signing this Agreement, it has no other liable loans. |
| **РАЗДЕЛ XIV. ЗАДЪЛЖЕНИЯ НА КРЕДИТОПОЛУЧАТЕЛЯ** | **SECTION XIV. AFFIRMATIVE COVENANTS** |
| От Датата на Сключване до момента на пълното плащане или погасяване на Кредита и на всички други задължения по настоящия Договор Кредитополучателят е съгласен да спазва следните условия: | From the Date of Agreement until such time as the Loan and all other obligations under this Agreement have been paid in full or fulfilled, Borrower agrees to comply with the following: |
| 14.01. При условията на настоящия Договор, Кредитополучателят неотменимо и безусловно се задължава солидарно да изплати всички суми, предоставени по Кредита, и да плати всички лихви, такси и разноски по настоящия Договор, ведно с всички разходи за банково обслужване. | 14.01. Under this Agreement, Borrower irrevocably and unconditionally obligate itself for the repayment of all amounts disbursed under the Loan and payment of all interests, fees and expenses under this Agreement, plus any bank servicing expenses. |
| 14.02. Плащане на данъци и други задължения. Кредитополучателят ще плаща в срок всички данъци, такси и други държавни вземания. Кредитополучателят ще плаща в срок и всички други задължения, които, ако останат неизплатени, могат да доведат до обременяване на Обезпечението или други активи на Кредитополучателя. | 14.02. Payment of Taxes and Other Obligations. Borrower will pay when due and payable all taxes, fees and other governmental levies. Borrower shall pay all other claims which if left unpaid might become a lien on the Collateral or any of Borrower's assets. |
| 14.03. Застраховка. Кредитополучателят е длъжен да сключи и поддържа за своя сметка през целия срок на Кредита следните застраховки върху общия размер на Кредита: | 14.03. Insurance. Borrower, at its own expense, shall obtain and maintain the following insurance for the Loan amount throughout the term of the Loan: |
| (а) застраховка строителен риск за Проекта през строителството, покриваща всички стандартни рискове, и застраховка срещу пожар и природно бедствие (с разширено покритие, с клаузи за умишлена вреда и вандализъм, земетресение) за Проекта през Периода на продажби. | (a) Builder's risk insurance during the Construction Period covering all standard risks and also insurance against fire and natural disaster (with extended coverage malicious mischief, and vandalism endorsements, earthquake) for the Project during the Sales Period. |
| (б) застраховка(и) срещу пожар и природно бедствие (с разширено покритие, с клауза за умишлена вреда и вандализъм, земетресение) върху цялото имущество извън Проекта, което по силата на Договор за обезпечение се явява Обезпечение по Кредита. | (b) A policy or policies of insurance against fire and natural disaster (with extended coverage malicious mischief, and vandalism endorsements, earthquake) on all other properties subject to the lien of Collateral or otherwise securing the Loan. |
| (в) застраховка "Отговорност трети лица". | (c) Public liability insurance |
| (г) застраховката трябва да сочи Банката като единствен бенефициент в случай на застрахователно събитие. Застрахователната сума следва да бъде указана в евро, платима в лева по фиксинга на Българска Народна Банка в деня на изплащане на средствата по застраховката. | (d) The insurance must name Lender as the sole loss payee. The insurance proceeds for the insurance on the Collateral must be expressed in EURO and be payable in Leva at the official Bulgarian National Bank exchange rate on the day of payment of the insurance proceeds. |
| (д) Кредитополучателят потвърждава и се съгласява, че Банката има право да плаща застрахователни премии по всяка от застрахователните полици от името и за сметка на Кредитополучателя, в случай на неплащане от | (e) Under any insurance policy, Borrower hereby acknowledges that Lender shall have the right to pay the insurance premiums in the name and on the account of Borrower, in case of Borrower's |

страна на Кредитополучателя. Кредитополучателят неотменимо се съгласява незабавно да възстановява на Банката така направените разноски.

(е) Всички застрахователни договори ще бъдат сключвани със застрахователи и със съдържание задоволително за Банката и няма да могат да бъдат прекратявани освен с 30 дневно писмено предизвестие до Банката.

**14.04. Финансови отчети.** Кредитополучателят ще предостави на Банката всяка поискана от Банката финансова информация, подписана и заверена от Управителя и Главния счетоводител. Без да има нужда от искане, Кредитополучателят ще предостави на Банката:

(а) шестмесечни финансови отчети за дейността на фирмата (Отчет за приходи и разходи и Счетоводен баланс) изготвени в съответствие със Закона за счетоводството, в срок до тридесет (30) дни след края на всяко шестмесечие.

(б) годишни финансови отчети за фирмата (вкл. Отчет за приходи и разходи и Счетоводен баланс), в срок до сто и двадесет (120) дни след края на всяка данъчна година.

**14.05.** Достъп до помещения и проверки. Кредитополучателят се задължава да дава на служители и представители на Банката достъп до помещенията, в които осъществява своята дейност, в рамките на нормалното работно време и без за това да е нужно предизвестие, с цел проверка на дейността на Кредитополучателя. Подобна проверка може да включва, освен други действия, и проверка на собствените или взети под наем активи или Обезпечението, или преглед на счетоводните книги и други финансови документи.

**14.06.** При поискване от Банката или от нейни представители Кредитополучателят ще оказва необходимото съдействие, за да го/ги улесни в извършването на такова проучване на правото на собственост върху всяка част от Собствеността и запитвания по въпроси във връзка с него, каквото би предприел всеки добросъвестен кредитор или ипотекарен кредитор, и ще предостави на Банката и/или нейни представители цялата информация, която те смятат за необходима, свързана със строителния процес.

**14.07. Предизвестие за неизпълнение и други неблагоприятни промени.** Кредитополучателят незабавно ще уведомява Банката за:

(а) възникване на Случай на неизпълнение (дефиниция по-долу);

(б) искове срещу Кредитополучателя или насочени към Обезпечението;

(в) възникването на друго обстоятелство или събитие, което има вероятност да окаже съществено неблагоприятно въздействие върху финансовото състояние, стопанската дейност или перспективи, или способността за изпълнение на задълженията на Кредитополучателя; и

(г) възникването на друго обстоятелство или събитие, което би могло да засегне стойността на Обезпечението или правата на Банката върху него.

**14.08.** Строителните проекти в Случай на неизпълнение. В Случай на неизпълнение или от страна на Кредитополучателя по настоящия Договор, Кредитополучателят е длъжен в срок до 10 (десет) работни дни след получаване на писмено уведомление от Банката да прехвърли на Банката правата върху одобрените от съответните институции архитектурни чертежи и всички други необходими документи, свързани с Проекта.

**14.09.** Дейността на Кредитополучателя ще бъде подчинена на всички изисквания на българските закони за опазване на околната среда и стандартите на Международната Финансова Корпорация от групата на Световната банка за здравни норми и безопасност.

**14.10.** Кредитополучателят упълномощава Банката да предостави официална информация за Кредитополучателя на Международната Финансова Корпорация и ЕБВР, в случай че бъде поискана.

**14.11.** Спазване на законите. Кредитополучателят е длъжен да се съобразява разпоредбите на всички съществуващи и бъдещи закони и подзаконови нормативни актове, както и всяко уведомление, заповед, указание, разрешение, съгласие или позволение, дадени или направени (включващи без никакво ограничение всички приложими закони за териториално и селищно устройство и разрешителни за строеж), и изискванията на всяка компетентна институция, доколкото всяко едно от тях би могло да се отнася до неговите активи или тяхното ползване или дейности, извършвани в Собствеността.

**14.12.** Кредитополучателят е длъжен да уведомява Банката и да й предостави копие от всеки сключен Предварителен договор за продажба или Окончателен договор за продажба на който и да е Обект.

**14.13.** Кредитополучателят е длъжен да удостовери, че всички документи и разрешителни свързани с приемането, строежа и завършването на Проекта са в съответствие с действащото Българско законодателство.

**14.14.** Кредитополучателят е длъжен да актуализира поне веднъж на всеки три

nonpayment thereof. Borrower irrevocably agrees to immediately reimburse Lender for any such payments.

(f) All policies must be provided by an insurer and in a form satisfactory to Lender and the Insurance must name Lender and must be noncancelable except upon thirty- (30) days' written notice to the Lender.

**14.04. Financial Statements.** Borrower shall furnish Lender with signed and certified by its Manager and Chief Accountant, any financial information requested by Lender. Without the need for any request Borrower shall furnish Lender with:

(a) six-months financial statements (Income Statement and Balance Sheet) made in accordance with the Accountancy Act, within thirty (30) days of the end of each six months.

(b) annual financial statements (incl. Income Statement and Balance Sheet), within one hundred and twenty (120) days of the end of each fiscal year.

**14.05. Access to Premises and Inspection.** Borrower hereby agrees to allow Lender's employees and representatives to visit its business premises for the purposes of inspecting Borrower's business without notice and at any time during normal business hours. Such inspection may include, but is not limited to, inspection of leased or owned property and equipment or Collateral, or review of accounting records and other financial statements.

**14.06.** Borrower shall assist the Lender or its representatives on request to enable it or them to carry out such investigation of title to any Property and inquiries into matters in connection with them as would be carried out by a prudent creditor or mortgagee and shall furnish the Lender and/or its representatives with all information which the latter deems necessary connected with the building process.

**14.07. Notice of Default and Other Adverse Changes.** Borrower shall immediately notify Lender of:

(a) the occurrence of any Event of Default (hereinafter defined);

(b) any lawsuits against the Borrower, or directed at the Collateral;

(c) the occurrence of any other condition or event that is likely to have a material adverse effect on the Borrower's financial condition, business operations or prospects, or their ability to perform their obligations; and

(d) the occurrence of any other condition or event which might impair the Lender's security interest in or value of Collateral.

**14.08. Construction Drawings In Event of Default.** If the Borrower Defaults under this Agreement, Borrower is obliged to transfer Lender the rights upon the approved by the Authorities drawings and all other necessary documents, relevant to the Project within ten (10) Business Days upon receiving a written notice from Lender.

**14.09.** Any activity of Borrower shall comply with the applicable Bulgarian requirements for environment safety and IFC Health and Safety Guidelines.

**14.10.** Borrower authorizes Lender to disclose official information about Borrower to the IFC and EBRD if such is requested.

**14.11. Compliance with the Law.** Borrower shall comply with the provisions of all present or future laws and by-laws and every notice, order, direction, license, consent or permission given or made thereunder (including without limitation all applicable laws and legislation for regional and urban planning and building permits) and the requirements of any competent authority so far as any of the same shall relate to its assets or their use or anything done on the Project.

**14.12.** Borrower is obliged to immediately notify and to provide the Lender with a copy of any Presale Agreement or Final Sale Agreement for any of the Units.

**14.13.** Borrower is obliged to ensure that all documents and permissions related to inception, construction and completion of the Project are in compliance with Bulgarian legislation.

**14.14.** Borrower is obliged to present to Lender on a quarterly basis or upon

месеца или при поискване документите, лицензиите и разрешителните, свързани с Проекта и легализацията на Проекта.

demand documents, licenses and permits relevant to the construction and legalization of the **Project**.

**14.15.** Кредитополучателят е длъжен да завърши Проекта в съответствие с Раздел VI от настоящия Договор, и не по-късно от Изтичане на Периода на Строителство.

**14.15. Borrower** is obliged to construct the **Project** according to Section VI and on or before the **Termination of Construction Period**.

**14.16.** Независим строителен надзор. Кредитополучателят е длъжен да определи нуждата за Строителен надзор преди да е определил Строителния Бюджет (Член 4.05.). Ако се налага сключване на договор с Строителен надзор, Кредитополучателят е длъжен да получи одобрението на Банката за сключване на договор за Независим строителен надзор.

**14.16. Independent Construction Supervisor. Borrower** is obliged to identify the potential need for an **Independent Construction Supervisor** in advance of determining the **Construction Budget** (Article 4.05.). If an **Independent Construction Supervisor** is to be hired, **Borrower** is obliged to obtain **Lender's** approval for the execution of a contract with the Independent Construction Supervisor.

**14.17.** Задължението информиране на Купувачите на Обекти. Както е описано в раздел X "Продажба на Обекти", Кредитополучателят е длъжен да информира Купувача на Обект(и) за съучастието на Банката в Проекта.

**14.17. Obligation to Communicate to Buyers of Units.** As prescribed in Unit Sales Section X, **Borrower** is obliged inform the Buyer of **Lender's** involvement in the **Project**.

**14.18.** Задължение да се получи одобрението на Банката относно рекламни материали. Кредитополучателят да получи предварителното одобрение на Банката относно всеки рекламен материал по отношение на Проекта, като например постер, разположен на самия Проект.

**14.18. Obligation to Obtain Lender's Approval of Advertising Materials. Borrower** is obligated to obtain **Lender's** prior approval of any advertising materials pertaining to the **Project**, such as a sign located at **Project** site.

**14.19.** Задължение по обезпечението. Кредитополучателят е длъжен да предостави на Банката Обезпечението по Раздел XII в срок от пет работни дни от Датата на сключване.

**14.19. Obligation concerning Collateral. Borrower** shall arrange the **Collateral** pursuant to Section XII to be given within 5 business days of the **Date of Agreement**.

**14.20.** Кредитополучателят се задължава в срок от три месеца от датата на подписване на този Договор да представи официален документ, издаден от органа, издал разрешението за строеж за Проекта, както и становище от ДНСК, че строежът на вход В от монолитна жилищна сграда с подземни гаражи, магазини, жилища и ателиета, може да бъде извършен като втори етап, който няма да попречи на приемането за ползване на вход А и вход Б на сградата като първи етап на строежа. В случай че Кредитополучателят не представи тези документи, Банката има право да преустанови отпускането на средства докато Кредитополучателят не изпълни със собствени средства строежа на вход В на сградата. Неизпълнението по този член представлява неизпълнение по настоящия Договор.

**14.20. The Borrower** is obliged within three months of the date of signing of this agreement to present an official document issued by the authority, that has issued the **Construction Permit** for the **Project** as well as a statement by **DNCC**, that the construction of section V of the residential building with underground garages, shops, apartments and ateliers could be executed as a second phase which shall not hinder the certifying for occupancy of the sections A and B of the building representing the first phase of the construction. In the event that the **Borrower** fails to present these documents the Bank shall be entitled to stop the disbursement of amounts until the **Borrower** executes on his own expense the construction of the section V of the building. The default pursuant to this Article shall be deemed an event of default under this Agreement.

## РАЗДЕЛ XV. ЗАБРАНИ ЗА КРЕДИТОПОЛУЧАТЕЛЯ

## SECTION XV. NEGATIVE COVENANTS

От Датата на сключване до окончателното погасяване и изплащане на всички задължения по Кредита и настоящия Договор, Кредитополучателят се съгласява, без да е получил изрично писмено разрешение от страна на Банката за всеки отделен случай:

From the Date of Agreement until such time as the **Loan** and all obligations under this **Agreement** have been paid in full or fulfilled, and without obtaining specific advance written permission to the contrary from the **Lender**, **Borrower** agrees to:

**15.01.** ДА НЕ учредява ипотека, залог или други тежести върху който и да било от своите активи.

**15.01.** NOT create any mortgage, pledge, lien or other charges on any of its assets.

**15.02.** ДА НЕ извършва инвестиции в или предоставя кредити на свързани с него дружества или други трети страни.

**15.02.** NOT make investments in or loans to affiliates or any other third parties.

**15.03.** ДА НЕ променя характера на стопанската си дейност или да извършва друга дейност.

**15.03.** NOT change the nature of its present business or operations or carry on any other business.

**15.04.** ДА НЕ променя контрола, управлението или собствеността на Кредитополучателя.

**15.04.** NOT change the control, management or ownership of the **Borrower**.

**15.05.** ДА НЕ продава, прехвърля, отдава под наем или по друг начин се разпорежда с каквато и да е част от дълготрайните активи на Кредитополучателя, освен ако заменя съществуващи дълготрайни активи с нови дълготрайни активи с равна или по-голяма стойност.

**15.05.** NOT sell, assign, lease or otherwise dispose of any fixed assets of **Borrower** other than to replace existing fixed assets with new fixed assets of equal or greater value.

**15.06.** ДА НЕ прекратява съществуването си или преустановява дейността си.

**15.06.** NOT dissolve or otherwise cease to do business.

**15.07.** ДА НЕ гарантира дългове, лизингови плащания или каквито и да било други задължения на трети страни.

**15.07.** NOT guarantee any third party debt, lease or other obligations.

**15.08.** ДА НЕ получава допълнителни кредити нито да влиза в лизингови отношения.

**15.08.** NOT take on any additional new loans nor enter any lease agreements without prior written approval by **Lender**.

**15.09.** ДА НЕ сключва каквито и да било договори за дружества или за съвместна дейност, или други подобни споразумения, при които доходите или печалбите на Кредитополучателя ще подлежат, или могат да подлежат, на разпределение или подялба с кого и да е друго лице.

**15.09.** NOT enter into any partnership, profit-sharing or royalty agreement or other similar arrangement whereby **Borrower's** income or profits are, or might be, shared with any other person.

**15.10.** ДА НЕ продава, разпорежда или отдава под наем каквато и да било част от Обезпечението или Обектите и да не се съгласява или да предоставя каквото и да било права по отношение на гореказаното, освен разрешеното в настоящия Договор; при условие, че такива продажби, разпореждания или отдаването под наем подобряват условията за плащанията от Кредитополучателя на Банката по настоящия Договор, писмено разрешение от страна на Банката за това не може да бъде отказано неоснователно.

**15.10.** NOT sell, dispose, or rent any part of the **Collateral** or the **Units**, and not agree to or grant any option in respect of any of the foregoing, other than as allowed under this **Agreement**; provided, however, that in the event such selling, disposing, or renting improve conditions for payments by **Borrower** to **Lender** under this **Agreement**, written permission to the contrary from the **Lender** shall not be unreasonably denied.

**15.11.** ДА НЕ извършва или позволява да бъдат извършени действия върху Проекта, които представляват разрушаване, промяна, добавяне или промяна в използването, което и да не извършва действия, които по мнение на Банката биха намалили стойността на Проекта.

**15.11.** NOT do or suffer to be done on the Project anything which shall be demolition, alteration, addition or a change of use, nor do any act which in the **Lender's** opinion might adversely affect the value of the **Project**.

**15.12.** ДА НЕ обсъжда или посочва пред потенциален Купувач(и) точната сума, срок и условия на Кредита, освен указаните в Чл. 10.02.

**15.12.** NOT communicate to potential **Buyer(s)** the exact amount and terms of the **Loan**, except for the cases stipulated in Article 10.02.

## РАЗДЕЛ XVI. СЛУЧАИ НА НЕИЗПЪЛНЕНИЕ

## SECTION XVI. EVENTS OF DEFAULT

**16.01.** Случаи на неизпълнение. Без да изключва предвидените в закона или на друго място в настоящия Договор случаи на неизпълнение, настъпването на което и да е от следните събития ("Случаи на неизпълнение") също ще представлява пълно неизпълнение от страна на Кредитополучателя по настоящия Договор:

**16.01. Events of Default.** Without prejudice to events of default established under applicable law or in other sections of this **Agreement**, the occurrence of any one of the following events shall also constitute a default by Borrower under this **Agreement** ("Event of Default"):

(a)    Неплащане, изцяло или частично, на която и да е вноска по Главницата или Лихвата продължило повече от петнадесет (15) дни след

(a)    Nonpayment or partial payment of any **Principal** or **Interest** which continues more than fifteen (15) days after the applicable Payment

| | | | |
|---|---|---|---|
| | съответната Дата на дължимо плащане. | | Due Date. |
| (б) | Кредитополучателят наруши някоя договореност по Раздел XIV или XV от настоящия Договор и нарушението продължи повече от петнадесет (15) дни. | (b) | Borrower violates any Covenant in Section XIV or XV hereof, which violation continues for fifteen (15) days. |
| (в) | Кредитополучателят представи неточни, невалидни или неверни декларации и гаранции, Договора за обезпечение, молбата за кредит, Договора или каквото и да е друг документ, свързан със Кредита или превода като средства по настоящия Договор. | (c) | Borrower submits improper, invalid or false representations and warranties, Collateral documents, loan application, the Agreement or any other document related to the Loan or Disbursement of Funds under this Agreement. |
| (г) | Първоначална или последваща неистинност или недействителност на Декларация или Гаранция от Раздел XIII от настоящия Договор, продължила повече от петнадесет (15) дни след узнаване от Кредитополучателя. | (d) | Any Representation or Warranty in Section XIII hereof turns out to have been or becomes untrue or invalid, and is not cured within fifteen (15) days of Borrower's learning thereof. |
| (д) | Кредитополучателят не предостави и/или учреди Обезпечението по т. 12.01. | (e) | Borrower fails to mortgage and/or pledge Collateral. |
| (е) | Кредитополучателят изпадне в неплатежоспособност, или бъде обявен в неизпълнение по друг кредит, по който е страна или гарант, или подаде молба за обявяване в несъстоятелност, или срещу него бъде заведено производство за обявяване в несъстоятелност. | (f) | Borrower becomes insolvent, files for bankruptcy, or bankruptcy proceedings are commenced against Borrower, or Borrower is declared bankrupt. |
| (ж) | Кредитополучателят не осигури допълнително Обезпечение, ако е поискано от Банката съгласно Член 12.02., в рамките на тридесет (30) дни от поискването. | (g) | Borrower fails to provide additional Collateral if requested by Lender as per Article 12.02. within thirty (30) days of the request. |
| (з) | Кредитополучателят не изпълни своевременно което и да е друго свое задължение към Банката по друг договор или кредит. | (h) | Borrower fails to perform any of their obligations to Lender under any other agreement or loan. |
| (и) | Кредитополучателят не уведоми своевременно Банката за настъпването на Случай на неизпълнение. | (i) | Borrower fails to promptly notify Lender of any Event of Default. |
| (к) | Лице, задължено по Обезпечението, не изпълни свое задължение по него или която и да е част от Обезпечението е укрита, преместена, продадена, загубена, отхвърлена, унищожена, или съществено е намалила стойността си и не е заменена в рамките на тридесет (30) дни освен ако Банката не е получил изплащането по застрахованите средства. | (k) | Any person obligated under the Collateral breaches its duties thereunder or any of the Collateral is hidden, relocated, sold, lost, stolen or destroyed, or has materially decreased in value and is not replaced within thirty (30) days unless Lender has received the insurance proceeds. |
| (л) | Кредитополучателят не изпълни изискванията за застраховане, както е указано в Член 14.03. | (l) | Borrower fails to abide by insurance requirements in Article 14.03. |
| (м) | Финансовото състояние на Кредитополучателя претърпи съществено неблагоприятно изменение, което, по мнението на Банката, заплашва способността на Кредитополучателя да изплати Кредита. | (m) | Borrower's financial condition undergoes a material adverse change that, in the opinion of Lender, jeopardizes Borrower's ability to repay the Loan. |
| (н) | Някаква част от активите на Кредитополучателя (независимо дали са част от Обезпечението или не) са прехвърлени извън България без писмено разрешение на Банката. | (n) | Any assets of the Borrower (whether or not part of Collateral) are relocated outside of Bulgaria without written permission from Lender. |
| (о) | Кредитополучателят представи фалшиви фактури или други документи или използва средствата на Кредита за каквато и да е друга цел, освен одобрените в Член 2.06. | (o) | Borrower presents fraudulent invoices or other documents, or uses Loan proceeds for any purpose not approved in Article 2.06. |
| (п) | Кредитополучателят или свързани с него лица не изпълнят което и да било задължение по други договори със Банката или свързани с Банката лица. | (p) | Borrower or entities related to it do not fulfill any obligation under any other contracts that they may have with Lender or related to Lender entities. |
| (р) | Невъзможност да се завърши Проекта. Проектът не е завършен преди или на датата на Прекратяване на периода на строителството или, според изричната преценка на Банката или на Представителя на Банката, Проектът не може да бъде завършен до датата на Прекратяване на периода на строителството. | (q) | Inability to Complete Project. The Project is not completed on or before the Termination of Construction Period, or, in the exclusive judgment of the Lender or Lender's Representative, cannot be completed on or before the Termination of Construction Period. |
| (с) | Забавяне на строителството. Строителството по Проекта не се извършва в разумни срокове. | (r) | Delays in Construction. Construction of the Project is not carried on with reasonable dispatch. |
| (т) | Кредитополучателят не получи Разрешение за ползване в срок от 20 (двадесет) месеца от Датата на първо предоставяне на средства по Кредита. | (s) | Borrower fails to obtain Permit for Usage before the Termination of Construction Period. |
| (у) | Отказ на достъп до информация. Кредитополучателят откаже да предостави информация, свързана с Проекта или откаже достъп до Проекта на служител, на представител на Банката или на упълномощено от Банката лице. | (t) | Denial of Access or Information. Any employee, agent, or assignee of the Lender is denied any information regarding the Project or is denied access to the Project. |
| (ф) | Кредитополучателят не уведоми Банката за получаването на Разрешението за ползване в срок от пет работни дни след получаването му. | (u) | Borrower fails to notify Lender of the Project having received the Permit for Usage within five business days. |
| (х) | Кредитополучателят не получи писмено одобрение от Банката на Предварителния договор с всеки Купувач преди Датата на Предварителния Договор. | (v) | Borrower fails to receive written approval from Lender of Presales Agreement with each Buyer in advance of Presale Agreement Date. |
| (ц) | Кредитополучателят не преведе на Банката получени Постъпления от продажби в размер най-малко на сумата, определена за Обект в Схема на дължими суми по Обекти, както е описано в Раздел X. | (x) | Borrower fails to pay Lender Sales Proceeds from an executed Presale Agreement up to at least the Required Repayment Per Unit for the relevant Unit, as outlined in Section X. |
| (ч) | Кредитополучателят не получи всички необходими документи и разрешителни свързани с приемането, строежа и завършването на Проекта в съответствие с изискванията на Българското законодателство. | (y) | Borrower fails to obtain all documents and permissions related to inception, construction and completion of the Project that are in compliance with Bulgarian legislation. Borrower fails to obtain proper |

Borrower/Кредитополучател:                              стр. 18 от 21                              Lender/Банка:

| Кредитополучателят не получи своевременно съответните документи, лицензии и разрешители от общинските и разпоредители органи преди всеки строителен етап или подетап, подлежащи на одобрение или лицензиране. | approvals, licences and permits from municipal and regulatory agencies in advance of the stage or substage of construction relevant to that approval or licensing procedure. |
|---|---|
| (ш) Кредитополучателят не представя на Банката своевременно всички документи и разрешители, свързани с приемането, строежа и завършването на Проекта. | (z) Borrower fails to present to Lender on a timely basis all documents and permissions related to inception, construction and completion of the Project. |
| (аа) Кредитополучателят направи промени в Проекта или в плана на Проекта и спецификациите без писмено одобрение от Банката. | (aa) Borrower made changes to Project or to Project's plans and specifications without prior written approval from Lender. |
| (бб) Кредитополучателят представя невярна информация относно Проекта и Обезпечението, включително описаното на Обезпечението, съдържащо се в Член 12.01. | (bb) Borrower misrepresented information about the Project and the Collateral, including the description of Collateral contained in Article 12.01. |
| (вв) Неспазване от страна на Кредитополучателят на указания срок по Член 14.08. за прехвърляне на правата върху одобрените от Авторитети институции архитектурни чертежи и всички други документи, свързани с Проекта, на Банката. | (cc) The Borrower fails to comply with the required by Article 14.08. term for transferring Lender the rights upon the approved by the Authorities drawings and all other necessary documents, relevant to the Project. |
| 16.02. Известие при Случай на неизпълнение. При възникване на Случай на неизпълнение, Кредитополучателят е длъжен незабавно да уведоми Банката за естеството на неизпълнението, както и за мерките, които Кредитополучателят е предприел и ще предприеме за изправянето му. | 16.02. Notification of Events of Default. If an Event of Default occurs, Borrower is obligated to notify Lender immediately of the nature of the default and the measures Borrower has taken and will take to cure the default. |
| 16.03. Лихва за забава. Ако възникне Случай на Неизпълнение по настоящия Договор, Кредитополучателят е длъжен да заплати Лихва за забава както е описано в Член 11.03. | 16.03. Penalty Interest. If an Event of Default occurs, Borrower is obligated to pay Penalty Interest as outlined in Article 11.03. |
| 16.04. Права при неизпълнение. Ако възникне Случай на неизпълнение, Банката има правото (но не и задължението), в допълнение и кумулативно с правата, дадени й по закон или по други разпоредби на настоящия Договор, без да дава предизвестие на Кредитополучателя или да изчаква определен срок, да предприеме всички или някои от следните действия: | 16.04. Remedies. Upon occurrence of an Event of Default, Lender has the right (but not the obligation), in addition and accumulated to the rights given to Lender by law or under this Agreement, without any notice to Borrower or waiting period, to take any or all of the following measures: |
| (a) Да отмени поетите си ангажименти по предоставяне на каквато и да е средства по Кредита, които не са предоставени на Кредитополучателя до този момент. | (a) Cancel its commitment to disburse any remaining amounts of the Loan not yet disbursed to Borrower. |
| (б) Да обяви Кредита за незабавно изискуем и да изиска плащане на цялата Неизплатена част от главницата и всички натрупани Лихви и евентуални Лихви за забава. | (b) Accelerate the Loan for immediate repayment of the full Principal Balance and all accrued Interest, and Penalty Interest, if any and to start automatic collection amounts due, as per the present Agreement. |
| (в) Да изиска от Кредитополучателя да предостави Обезпечението на разположение на Банката за продажба съгласно Закона за Банките, Закона за особените залози, Търговския Закон, ЗЗД, ГПК и всички други актове, уреждащи тези отношения. Кредитополучателят се съгласява, че продажбата на Обезпечението, с изключение на недвижимите имоти, ще се извърша без съдебна намеса. | (c) Require Borrower to assemble Collateral and make it available to Lender for sale according to the Law for Banks, Special Pledges Act, Commercial Law, Law for Obligations and Contracts and Civil Proceedings Code and any other pertinent Bulgarian legislation involved. Borrower agrees that the sale of the Collateral, except for the immovable property, will be carried out without intervention of any court. |
| (г) Да започне принудително изпълнение върху Обезпечението или да предяви запис на заповед по т. 12.01.(а) или 12.07. от настоящия Договор. | (d) Foreclose on the Collateral or call the Promissory Note under Articles 12.01.(a) or 12.07. of this Agreement. |
| (д) Да упражни всякакви други права като кредитор, разрешени от закона. | (e) Exercise any other rights as a creditor that are allowed by law. |
| (е) Кредитополучателят е длъжен да позволи на Банката и нейните представители и адвокати в подходящо време и след предизвестие: | (f) The Borrower will permit the Lender and its representatives and lawyers at reasonable times and upon reasonable notice: |
| (еа) да влезе в Обектите и да прегледа състоянието им или състоянието на Обезпечението, и | (fa) to enter into or upon the Project and to view the state and condition thereof or of any of the Collateral, and |
| (еб) да извърши за сметка на Кредитополучателя всякакви действия свързани с принудително изпълнение, които Банката смятe за необходими или желани във връзка с която и да било част от Реалното обезпечение, с цел да се осигури спазване на уговорките и задълженията по настоящия Договор. | (fb) to carry out at the expense of the Borrower any action related to foreclosure, which the Lender shall consider necessary or desirable in connection with any part of the Collateral to procure compliance with any covenant or obligation in this Agreement. |
| (ж) В Случай на неизпълнение от страна на Кредитополучателя по настоящия Договор, в съответствие с Член 14.08. по-горе Банката има правото да изиска от Кредитополучателя да й прехвърли владението върху одобрените от съответните институции архитектурни чертежи и всички други необходими документи, свързани с Проекта. | (g) In case of default on part of the Borrower under this Agreement , in compliance with Article 14.08. stated above the Lender will have the right to request from the Borrower to submit him all documents, permits and all other papers necessary regarding the Project. |
| (з) Ако Кредитополучателят изпадне в неизпълнение по настоящия Договор, Банката може сам и по своя собствена преценка да отпуска средства по Кредита пряко на подизпълнители, доставчици на материали и оборудване или на работници по Проекта. | (h) If the Borrower Defaults under this Agreement, the Lender may, in its sole discretion, pay any portion of any Disbursement directly to any subcontractor or supplier of materials, fixtures, equipment, or labor for the Project. |
| 16.05. Без отказ от права. Забавяне от страна на Банката при упражняване нейни права по настоящия Договор или по договора за Обезпечение, не представлява отказ от неговите права или изправителни действия по тези договори. | 16.05. No Waiver. Any delay on the part of Lender in exercising its rights or remedies under this Agreement or the Collateral agreements does not constitute a waiver of any of its rights or remedies under such agreements. |
| 16.06. Разноски и хонорари при защита на права. Ако Банката предприеме юридически действия срещу Кредитополучателя или върху Обезпечението, Кредитополучателят поема за всички съдебни и извънсъдебни разходи и адвокатски хонорари по водене на дела или събиране на вземания. | 16.06. Legal Fees and Expenses. If Lender takes any legal action against Borrower or against the Collateral, Borrower is liable for any and all in- or out-of-court legal fees, litigation, or collection expenses. |

Borrower/Кредитополучател:                    стр. 19 от 21                    Lender/Банка:

| Bulgarian | English |
|---|---|
| **РАЗДЕЛ XVII. ДРУГИ УСЛОВИЯ** | **SECTION XVII. MISCELLANEOUS PROVISIONS** |

17.01. Съставни части на Договора. Всички Приложения към настоящия Договор са негови неделими съставни части.

17.01. Integral Parts of the Agreement. All Exhibits to this Agreement are inseparable parts of this Agreement.

17.02. Без отговорности по управлението. Кредитополучателят удостоверява, че Банката не отговаря за управлението на предприятието на Кредитополучателя.

17.02. No Managerial Liability. Borrower hereby acknowledges that Lender has no liability for the management of Borrower's business.

17.03. Изменения на настоящия Договор. Измененията на настоящия Договор са действителни, само ако са извършени в писмена форма и са подписани от двете страни.

17.03. Amendments to this Agreement. Any amendments to this Agreement shall only have effect if made in writing and signed by both Parties.

17.04. Дата на влизане в сила. Настоящият Договор влиза в сила на Датата на сключване, посочена в него и към Датата на сключване Страните поемат всички свои права и задължения, произтичащи от настоящия Договор.

17.04. Effective Date. The effective date of this Agreement is the Date of Agreement shown herein, and as of the Date of Agreement the Parties hereto shall assume all their rights and obligations resulting from this Agreement.

17.05. Такси. Кредитополучателят поема всички разходи или такси, включително адвокатски и съдебни такси, направени от Банката, във връзка със събиране на каквито и да са суми по настоящия Договор и Кредит.

17.05. Fees. Borrower shall be liable for any reasonable costs or fees, including legal fees and/or out of pocket expenses, incurred by Lender, associated with the collection of any amounts due under this Agreement or the Loan.

17.06. Описателни заглавия. Заглавията в настоящия Договор са предназначени само за справка и не ограничават или засягат смисъла му. Който и да било документ, упоменат в настоящия Договор (включително настоящия Договор) ще се счита за такъв документ дори да бъде променян от време на време.

17.06. Descriptive Headings. The headings in this Agreement are for the purpose of reference only and do not limit or affect its meaning. Any document defined or referred to in this Agreement (including this Agreement) shall be considered a reference to such document even if it is amended from time to time.

17.07. Приложим закон. Този Договор се подчинява на, и се тълкува в съответствие със законите на Република България.

17.07. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Republic of Bulgaria.

17.08. Разрешаване на спорове. Всички спорове между Страните, породени от този Договор или отнасящи се до него, включително споровете, породени от компетентна юрисдикция, неизпълнение или прекратяване, ще бъдат разрешавани от компетентния български съд.

17.08. Dispute Resolution. It is agreed and understood by the Parties, that any disputes arising from this Agreement or concerning it, including disputes arising from or concerning its interpretation, validity, nonperformance or termination, shall be settled by the Competent Bulgarian court.

17.09. Частична недействителност. Ако някоя разпоредба от този Договор бъде обявена за недействителна или неприложима или бъде анулирана или отменена от компетентна юрисдикция, в резултат на такава частична недействителност или неприложимост оставалата част на Договора няма да стане недействителна или неприложима.

17.09. Severability. If any provision of this Agreement shall be judged invalid or not enforceable or is voided or canceled by a competent jurisdiction, then such partial invalidity or unenforceability shall not cause the remainder of the Agreement to be or become invalid or unenforceable.

17.10. Изчерпателност на Договора. Настоящият Договор, заедно с документите по Обезпечението, съдържа всички задължения и споразумения между Страните в рамките на настоящия Договор и от датата на влизането му в сила той прекратява и обезсилва всички предишни споразумения, договорености и преговори, отнасящи се до Кредита.

17.10. Entire Agreement. This Agreement, together with the Collateral documents, defines all obligations and agreements of the Parties hereto within the scope of issues that are governed by this Agreement, and on the date of its coming into force, it terminates and supersedes all previous agreements, arrangements and negotiations as they are related to the Loan.

17.11. Правоприемство. Настоящият Договор ще бъде в сила и ще обвързва всички правоприемници на Страните по този Договор. Без предварителното писмено съгласие на Банката, Кредитополучателят няма да има право да прехвърля или делегира каквото и да било част от своите права или задължения по настоящия Договор.

17.11. Succession. This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Parties hereto. The Borrower shall not, without prior written consent of Lender, assign or delegate all or any part of its interest or obligation hereunder.

17.12. Меродавен език. В случай на противоречие между вариантите на Договора на български и английски език, меродавен е вариантът на български език.

17.12. Governing Language. In case of contradiction between the Bulgarian and the English language versions of this Agreement, the Bulgarian version shall govern.

17.13. Предизвестия. Всички уведомления, изявления и известия, отнасящи се до настоящия Договор, следва да бъдат давани в писмена форма. Всяка Страна ще уведомява другата Страна писмено за промени в адреса за кореспонденция без да се нуждае от подпис от другата Страна. Цялата кореспонденция ще се счита за получена, ако се доставя лично, изпрати по телекс или по факс с потвърждение на получаването, или чрез препоръчана поща на следните адреси на Страните:

17.13. Notices. All notifications, statements and information related to the present Agreement shall be in writing. Each Party shall notify the other in writing of changes to contact information without need of signature from the other Party. All correspondence shall be construed as received if delivered personally, sent by telex or telefax with confirmation of delivery, or registered mail to the following addresses of the Parties:

На Кредитополучателя:
"СТРОИТЕЛСТВО БЪЛГАРИЯ" ООД
гр. София, район Овча купел, жк Овча купел, бл.65, вх.А, ет.8, ап.36
На вниманието на: Управителя
Телефон: 8548164, 8561080, 0898/787844, 0888/520709

To Borrower:
STROITELSTVO BULGARIA, OOD
Sofia, Ovcha Coupel, bl.65, entr.A, fl.8, ap.36
Attention: Executive Manager
Telephone: 8548164, 8561080, 0898/787844, 0888/520709

На Банката:
Българо-Американска Кредитна Банка
Ул. "Кракра" №16, София 1504, България
На вниманието на: Управителен Директор Недвижими имоти
Телефон: 9658358, Факс: 9445009

To Lender:
Bulgarian-American Credit Bank
16, Krakra Str., Sofia 1504, Bulgaria
Attention: Managing Director, Real Estate
Telephone: 9658 358, Fax: 944 5009

17.14. С подписването на настоящия Договор Кредитополучателят приема за задължителни за него условия на Общи условия за делова дейност и Тарифата за таксите и комисионните на Банката, както и всички изменения по тях, които Банката си запазва правото да извършва, като промените ще бъдат оповестявани на видно място в салона на Банката.

17.14. Upon signing of this Agreement Borrower shall be bound by the current General Business Conditions and the List of terms and Conditions of the Bank, as well as by any amendments to them, that the Bank may approve and any such amendments shall be made public on the business premises of the Bank.

17.15. Брой на оригиналите. Настоящият Договор се сключи в три екземпляра – два за Банката и един за Кредитополучателя.

17.15. Number of Originals. This Agreement was executed in three originals – two for the Lender and one for the Borrower.

В УВЕРЕНИЕ НА КОЕТО Страните, представлявани от надлежно

IN WITNESS WHEREOF, each of the Parties hereto has caused this

Borrower/Кредитополучател:                    стр. 20 от 21                    Lender/Банка:

упълномощени представители биха настоящия Договор на датата, | Agreement to be executed and delivered on its behalf by its duly authorized
записана по-горе. | representative on the date first above written.

За КРЕДИТОПОЛУЧАТЕЛЯ/ For BORROWER:

МЕТОДИ ЛЮБЕНОВ ДИМИТРОВ | METODI LIUBENOV DIMITROV
Управител | Manager
"СТРОИТЕЛСТВО БЪЛГАРИЯ" ООД | STROITELSTVO BULGARIA, OOD

За БАНКАТА/ For BANK:

Димитър Стоянов Вучев / Dimitar Stoyanov Vouchev | Стоян Николов Динчийски / Stoyan Nikolov Dinchiiski
Изпълнителен директор / Executive Director | Изпълнителен директор / Executive Director
"БЪЛГАРО-АМЕРИКАНСКА КРЕДИТНА БАНКА" АД / BULGARIAN-AMERICAN CREDIT BANK AD

Изготвили / Prepared by:

Сабин Симеонов / Sabin Simeonov | Цветомир Тодоров / Tsvetomir Todorov
Специалист инвестиции / Investment officer | Адвокат / Attorney at Law

| | Приложения | Exhibits |
|---|---|---|
| 1 | Одобрен архитектурен проект | Approved Architectural Plan |
| 2 | Разрешение за строеж | Building Permit |
| 3 | Протокол за строителна линия и ниво | Protocol for Construction Line and Levels |
| 4 | Нотариален акт | Notary Deeds |
| 5 | Декларация за свързани лица | Declaration of Related Parties |

# Exhibit B

# СПОРАЗУМЕНИЕ

Днес, **09.05.2006** /девети май две хиляди и шеста/ година (**"Дата на сключване"**), в гр. София, бе сключено следното споразумение (**"Споразумение"**) между:

1.**"БЪЛГАРО-АМЕРИКАНСКА КРЕДИТНА БАНКА" АД**, със седалище и адрес на управление гр. София 1504, Община "Средец", ул. "Кракра" N 16, регистрирано в Софийски градски съд по ф.д. 12587/1996 г. и вписано в търговския регистър под парт. N 35659, рег. I, том. 397, стр. 180, данъчен № 1223073227, БУЛСТАТ №Ю121246419, представлявано от **ДИМИТЪР СТОЯНОВ ВУЧЕВ**, ЕГН 5910266685, л.к. № 159148938, издадена на 25.04.2000г. от МВР - София - Изпълнителен директор и **Мария Светославова Шейтанова**, ЕГН 7004186956, л.к. №163150006, издадена на 16.10.2000 г. от МВР – София, действаща като пълномощник на Изпълнителните директори **ДИМИТЪР СТОЯНОВ ВУЧЕВ** и **СТОЯН НИКОЛОВ ДИНЧИЙСКИ**, ЕГН 7006114488, съгласно нотариално заверено пълномощно с рег №1462/27.04.2006 и №1486/28.04.2006 г. по описа на Нотариус Слава Пилякова с рег. №344 на НК с район СРС, наричано по-долу „**Банка- ВЗИСКАТЕЛ**"

**И**

2. **"СТРОИТЕЛСТВО БЪЛГАРИЯ" ЕООД**, със седалище и адрес на управление гр. София, район Триадица, ж.к."Бокар" 16А, рег. по ф.д. №11749/2003г. на Софийски градски съд, вписано в Регистър за търговски дружества под №80176, том 956, стр.92, БУЛСТАТ 131169857, данъчен №1220179725, представлявано от Управителя **МЕТОДИ ЛЮБЕНОВ ДИМИТРОВ**, ЕГН:5604186661, с лична карта №162000676, издадена на 29.08.2000г. от МВР София, в качеството му на длъжник по изп. дело № 33205/2005г. по описа на СИС при Софийски районен съд, наричано по-долу „**ДЛЪЖНИК**";

наричани заедно **"СТРАНИ"**,
се сключи настоящето извънсъдебно споразумение за следното:

## I. КОНСТАТАЦИИ:

Страните установиха и констатираха следното:

1. Банката- **ВЗИСКАТЕЛ** и **ДЛЪЖНИКЪТ** са сключили Договор за банков кредит от 24 март 2005г. (наричан по- долу „**Договор за банков кредит**") за предоставяне на банков кредит в общ договорен размер до 2 659 704 евро (два милиона шестстотин петдесет и девет хиляди седемстотин и четири) евро, от който са отпуснати средства в размер на 970 438.41 евро (деветстотин и седемдесет хиляди четиристотин тридесет и осем евро и четиридесет и един евро цента);
2. За обезпечаване на вземанията на Банката- **ВЗИСКАТЕЛ**, произтичащи от Договора за банков кредит е учредена договорна ипотека в полза на Банката- **ВЗИСКАТЕЛ** по силата на *Нотариален акт № 73, том I, рег. № 760, дело 67/2005 по описа на нотариус Слава Пилякова с рег. № 344 на НК, вписан в Служба по вписванията- гр. София с вх. рег. №12902/28.03.2005г., акт №53, том Х, дело №9227/2005г.*;

Длъжник: _____                    1              Банка-Взискател: _____ _____

3. Длъжникът е осъден да заплати на **Взискателя**, съгласно изпълнителен лист от 12.12.2005г., изд. от Софийски районен съд, 79- ти състав, сумите както следва: 970 438.41 Евро (деветстотин и седемдесет хиляди четиристотин тридесет и осем евро и четиридесет и един евро цента), представляваща *главница по Договор за банков кредит от 24 март 2005г.*, ведно със *законната лихва* върху главницата, считано от 06.12.2005г. до окончателното й изплащане, както и сумата от 57 260.25 лева (петдесет и седем хиляди двеста и шестдесет лева и двадесет и пет стотинки), представляващи *извършени разноски по делото*;

4. С определение от 04.04.2006г. Софийски районен съд, 50- ти състав се е произнесъл с определение по гр. д № 6340/2006г. по описа на СРС, с което е постановил частично спиране на изпълнителните действия по изп. дело №33205/2005г. по описа на СИС при СРС, уважавайки по този начин предявеното от Длъжника възражение по чл. 250 от ГПК. **Банката- ВЗИСКАТЕЛ** е обжалвала пред СГС това определение.

5. Към дата 09.05.2006г. общият размер на задължението на **ДЛЪЖНИКА** по изпълнителното дело към **ВЗИСКАТЕЛЯ** възлиза на 1,022,558.84 евро (един милион двадесет и две хиляди петстотин петдесет и осем евро и осемдесет и четири евро цента) и 57 221,27 лв. (петдесет и седем хиляди двеста двадесет и един лева и двадесет и седем стотинки), от които Присъдена главница – 970,438.41 Евро (деветстотин и седемдесет хиляди четиристотин тридесет и осем евро и четиридесет и един евро цента), Законна лихва, начислена за периода от 06.12.2006г. до 09.05.2006г. върху размера на присъдената главница - 52.120,43 евро (петдесет и две хиляди сто и двадесет евро и четиридесет и три евро цента); и съдебни разноски по принудителното събиране на вземането- 57 221,27 лева (петдесет и седем хиляди двеста двадесет и един лева и двадесет и седем стотинки);

## II. СТРАНИТЕ СЕ СПОРАЗУМЯХА ЗА СЛЕДНОТО:

**Чл. 1.** Длъжникът се задължава да изплати на Банката- ВЗИСКАТЕЛ сумата от 563 000 (петстотин шестдесет и три хиляди) Евро, както следва:

(а) за сумата от *500 000 (петстотин хиляди) евро* в деня на подписване на това споразумение е открит неотменяем акредитив в полза на **Банката- ВЗИСКАТЕЛ** от ТБ „Инвестбанк" АД, плащането по който се извършва със средства, предоставени по Договор No.КЦ-67/2006-В за банков кредит във валута, сключен между **ДЛЪЖНИКА** и ТБ „Инвестбанк" АД;

(б) остатъкът от сумата в размер на *63 000 (шестдесет и три хиляди) евро* **ДЛЪЖНИКЪТ** изплаща на **Банката- ВЗИСКАТЕЛ** в срок до 11.05.2006г. по банкова сметка № 1499999900, банков код 16091603 при БАКБ АД, с бенефициент- „Българо-американска кредитна банка" АД, а като основание за извършваното плащане да бъде посочено- плащане по настоящето **Споразумение**. В деня на подписване на този договор **ДЛЪЖНИКЪТ** представя на **Банката- ВЗИСКАТЕЛ** копие от платежното нареждане.

**Чл.2.** Страните по настоящето Споразумение се съгласяват, че единствено след като **Банката- ВЗИСКАТЕЛ** получи пълния размер на сумата по чл. 1 чрез плащане в срок до 11.05.2006г. на *63 000 (шестдесет и три хиляди) евро* по сметката, посочена в б.(б) на член 1 по-горе и чрез плащане по открития акредитив по б.(а) на член 1 по- горе, то **Банката- ВЗИСКАТЕЛ** ще счита *задължението на* **ДЛЪЖНИКА**, произтичащо от **Договора за банков кредит**, *за напълно изплатено*, а вземането на **Банката- ВЗИСКАТЕЛ**, за събирането на което **Банката- ВЗИСКАТЕЛ** е инициирала принудително изпълнение по изп. дело №33205/2005г. по описа на СИС при Софийски районен съд, *за напълно погасено.*

Длъжник:                              2                Банка-Взискател:

**Чл. 3. ДЛЪЖНИКЪТ** заявява, че се отказва от всякакви свои претенции и възражения по повод инициираното от **Банката- ВЗИСКАТЕЛ** принудително изпълнение по изп. Дело №33205/2006г. по описа на СИС при СРС, заявени с предвеноето на основание чл. 250 от ГПК искане за спиране на горецитираното изпълнително дело.

При подписване на настоящето **Споразумение ДЛЪЖНИКЪТ** предоставя на **Банката-ВЗИСКАТЕЛ** нотариално заверена молба за отказ от възражението по чл. 250 от ГПК, за прекратяване на гражданското дело, образувано по подадената от **Банката – ВЗИСКАТЕЛ** жалба срещу определение от 04.04.2006г. на Софийски районен съд, 50- ти състав по гр. д № 6340/2006г., както за обезсилване на така цитираното определение.

**Чл. 4.** При условие, че **ДЛЪЖНИКЪТ** изплати изцяло и в срок в полза на **Банката-ВЗИСКАТЕЛ** сумата от 563 000 /петстотин шестдесет и три хиляди/ евро, по начина, посочен в чл. 1 по- горе, то **Банката- ВЗИСКАТЕЛ** няма да има каквито и да било претенции спрямо Длъжника във връзка с и по повод на **Договора за банков кредит.**

**Чл.5. (1)** В срок до пет работни дни след получаване на пълната сума по член 1 по-горе, **Банката-ВЗИСКАТЕЛ** се ангажира със следното:

1. упълномощено от нея лице да депозира молба до съдия изпълнител при СИС при Софийски районен съд за прекратяване на изпълнителните действия и вдигане на наложените възбрани по изпълнително дело №33205/2005г. по описа на СИС при Софийски районен съд.

2. да изготви нотариално заверено съгласие за заличаване на договорната ипотека върху недвижимите имоти, учредена с *Нотариален акт № 73, том I, рег. № 760, дело 67/2005 по описа на нотариус Слава Пилякова с рег. № 344 на НК, вписан в Служба по вписванията при СРС с вх. рег. №12902/28.03.2005г.; акт№53, том X, дело №9227/2005г.* Нотариално завереното съгласие ще бъде на разположение за получаване от **ДЛЪЖНИКА** след изтичане на уговорения по-горе срок в централния офис на Банката: гр.София, ул."Кракра" No.16.

**(2)** Разноските, дължими във връзка с посочените в предходната алинея правни и фактически действия (включително нотариални такси и други държавни такси) са изцяло за сметка на **ДЛЪЖНИКА.** Нотариалната такса, дължима за нотариално заверено съгласие за заличаване на договорната ипотека следва да бъде депозирана при **Банката- ВЗИСКАТЕЛ** в срок не по- късно от 3 (три) работни дни от датата, на която **Банката- ВЗИСКАТЕЛ** е извършил плащане на сумата от 563 000 /петстотин шестдесет и три хиляди/ евро. Неплащането на дължимите разноски, препятстващо **Банката- ВЗИСКАТЕЛ** от точно изпълнение на поетите по ал. 1 по- горе задължения, не съставлява случай на забава от страна на **Банката- ВЗИСКАТЕЛ.**

**Чл.6.** Страните се задължават да спазват занапред такова поведение, което отговаря на установеното с настоящето Споразумение правно положение и се задължават да се въздържат занапред от всякакво негово оспорване и да избягват и каквито и да са възможни бъдещи спорове свързани с предмета на настоящето **Споразумение** или произтичащи от права, задължения или правоотношения, предмет на разглеждане и разрешаване от същото.

**Чл.7.** Настоящето споразумение влиза в сила и обвързва страните при условие, че **ДЛЪЖНИКЪТ** е извършил в полза на **Банката- ВЗИСКАТЕЛ**, а **Банката- ВЗИСКАТЕЛ** е получила, пълно плащане на сумата от 563 000 /петстотин шестдесет и три хиляди/ евро, по начина и в сроковете, посочени в член 1 по-горе. При забавено или непълно плащане, при неизвършване на плащане или при неспазване на реда и начина за извършване на

Длъжник:                                           3                   Банка-Взискател:

плащане в полза на **Банката- ВЗИСКАТЕЛ**, определен съгласно чл. 1 по- горе, настоящето **Споразумение** не влиза в сила и никоя от **Страните** по него не може да черпи права от текста на **Споразумението**, нито да се позовава на същото.

**Чл.8.** С влизане в сила на настоящето **Споразумение** и с пълното и точно изпълнение на задълженията, поети от **Страните** по това **Споразумение**, всички отношения между тях, възникнали от и във връзка с **Договора за кредит** и описаната и установена по-горе фактическа обстановка се считат за окончателно и безусловно уредени и всяка една от **Страните** по настоящето **Споразумение** декларира и гарантира, че няма каквито и да било претенции, възникнали от и/или във връзка с **Договора за кредит**, както и констатациите и договореностите, описани в настоящето **Споразумение**.

**Чл.9.** Настоящето споразумение може да се променя само с писменото съгласие на двете **Страни**.

**Чл.10.** Настоящето споразумение се сключи в 4 /четири/ еднообразни екземпляра, два за Банката-Взискател, един за Длъжника и един за ТБ„Инвестбанк"АД.

**За Банката- ВЗИСКАТЕЛ:**

Димитър Вучев                                      Мария Шейтанова
Изпълнителен директор                          Пълномощник
„Българо- американска кредитна банка" АД

**За ДЛЪЖНИКА:**

Методи Любенов Димитров
"СТРОИТЕЛСТВО БЪЛГАРИЯ" ЕООД

Длъжник: _____            4            Банка-Взискател: _____   _____

## AGREEMENT

Today, **May 9, 2006** (the ninth day of May, in the year two thousand six) (hereinafter referred to as "**Date of Signing**"), in Sofia, the following Agreement (hereinafter referred to as "**Agreement**") was entered into between:

1. **BULGARIAN AMERICAN CREDIT BANK JSC**, with a principal place of business and registered office at 16 Krakra Street, Sredets Municipality, 1504 Sofia, registered with the Sofia City Court under Company Case No. 12587/1996 and entered into the Commercial Registry under No. 35659, Reg. I, Volume 397, Page 180, Tax ID No. 1223073227, BULSTAT No. IU121246419, represented by **DIMITAR STOIANOV VUCHEV**, Executive Director, Personal Citizenship No. 5910266685, Personal ID Card No. 159148938 issued on April 25, 2000 by the Sofia Department of Internal Affairs, and **Maria Svetoslavova Sheitanova**, Personal Citizenship No. 7004186956, Personal ID Card No. 163150006 issued on October 16, 2000 by the Sofia Department of Internal Affairs, acting as a representative of Executive Directors **DIMITAR STOIANOV VUCHEV** and **STOIAN NIKOLOV DINCHIISKI, Personal Citizenship No. 7006114488**, pursuant to notarized authorization of Reg. No. 1462 of April 27, 2006 and No. 1486 of April 28, 2006, in accordance with the inventory of Slava Piliakova, Notary Public, Notary Chamber Registration No. 344, acting within the jurisdiction of the Sofia District Court, hereinafter referred to as "**CLAIMANT Bank**"

**AND**

2. **STROITELSTVO BULGARIA LTD.**, with a principal place of business and registered office at 16A Bokar Residential Complex, District of Triaditsa, Sofia, registered with the Sofia City Court under Company Case No. 11749/2003 and entered into the Commercial Registry under No. 80176, Vol. 956, Page 92, BULSTAT No. 13[illegible]169857, Tax ID No. 1220179725, represented by Manager **METODI LIUBENOV DIMITROV**, Personal Citizenship No. 5604186661, Personal ID Card No. 162000676 issued on August 29, 2000 by the Sofia Department of Internal Affairs, in its capacity as debtor under Execution Case No. 33205/2005, in accordance with the docket of the Sofia District Court, hereinafter referred to as "**DEBTOR**";

**Jointly to be referred to as "PARTIES,"**
which have entered into the present Settlement Agreement regarding the following:

## I. FINDINGS:

**The Parties have established and find as follows:**

1. **CLAIMANT Bank** and **DEBTOR** signed a Bank Loan Agreement dated March 24, 2005 (hereinafter referred to as "**Bank Loan Agreement**") to grant a bank loan in the total contractual amount of up to EUR 2,659,704 (two million six hundred fifty-nine thousand seven hundred four euro), under which funds in the amount of EUR 970,438.41 (nine hundred seventy thousand four hundred thirty-eight euro and forty-one euro cents) has been paid;

2. For purposes of securing receivables for **CLAIMANT Bank** under the **Bank Loan Agreement**, a conventional mortgage for the benefit of **CLAIMANT Bank** was recorded pursuant to *Deed No. 73, Vol. I, Reg. No. 760, Case No. 67/2005, in accordance with the inventory of Slava Piliakova, Notary Public, Notary Chamber Registration No. 344, entered into the Sofia Registry Agency under Reg. No. 12902 dated March 28, 2005, Deed No. 53, Vol. X, Case No. 9227/2005;*

Debtor: [Illegible Signature]          Claimant Bank:  [Illegible Signature] [Illegible Signature]

3.  Pursuant to a writ of execution dated December 12, 2005 issued by the Sofia District Court, 79th Panel, **Debtor** was obligated to pay **Claimant** the following amounts:  EUR 970,438.41 (nine hundred seventy thousand four hundred thirty-eight euro and forty-one euro cents), constituting *the principal under the Bank Loan Agreement dated March 24, 2005,* along with *legal interest* on the principal as of December 6, 2005 and until final repayment thereof, as well as the amount of BGN 57,260.25 (fifty-seven thousand two hundred sixty leva and twenty-five stotinkas), constituting *expenses in connection with the case*;

4.  On April 4, 2006, the Sofia District Court, 50th Panel, ruled (ruling regarding Civil Case No. 6340/2006, in accordance with the docket of the Sofia District Court) partial suspension of execution under Execution Case No. 33205/2005 in accordance with the docket of the Judicial Execution Service of Sofia District Court, thereby honoring the objection filed by Debtor under Article 250 of the Code of Civil Procedure.  **CLAIMANT Bank** appealed this ruling before the Sofia City Court.

5.  As of May 9, 2006, the total amount of **DEBTOR'S** liability toward **CLAIMANT** under the execution case amounted to EUR 1,022,558.84 (one million twenty-two thousand five hundred fifty-eight euro and eighty-four euro cents), and BGN 57,221.27 (fifty-seven thousand two hundred twenty-one leva and twenty-seven stotinkas), of which the awarded principal – EUR 970,438.41 (nine hundred seventy thousand four hundred thirty-eight euro and forty-one euro cents), legal interest accrued for the period from December 6, 2006 until May 9, 2006 on the amount of the awarded principal – EUR 52,120.43 (fifty-two thousand one hundred twenty euro and forty-three euro cents), and legal expenses related to the enforcement of liability – BGN 57,221.27 (fifty-seven thousand two hundred twenty-one leva and twenty-seven stotinkas);

## II.  THE PARTIES AGREE AS FOLLOWS:

**Article 1.  Debtor** shall be obligated to pay to **CLAIMANT Bank the amount of EUR 563,000 (five hundred sixty-three thousand euro)**, as follows:

(a)  An irrevocable letter of credit in the amount of *EUR 500,000 (five hundred thousand euro)*, as of the date of signing hereof, has been opened for the benefit of **CLAIMANT Bank** by Investbank Commercial Bank JSC, and payment thereunder shall be made with funds provided pursuant to Foreign Currency Bank Loan Agreement No. KTs-67/2006, entered into between **DEBTOR** and Investbank Commercial Bank JSC;

(b)  The remainder in the amount of *EUR 63,000 (sixty-three thousand euro)*, shall be paid by **DEBTOR** to **CLAIMANT Bank** by May 11, 2006 into Bank Account No. 1499999900, Banking Code 16091603 with BACB JSC, with Bulgarian American Credit Bank JSC as beneficiary, and payment pursuant to the present **Agreement** shall be indicated as basis for the payment.  As of the date of signing of the present agreement, **DEBTOR** shall present to **CLAIMANT Bank** a copy of the payment order.

**Article 2.**  The **Parties** to the present **Agreement** agree that only after **CLAIMANT Bank** has received the full amount under Article 1, via payment by May 11, 2006 of *EUR 63,000 (sixty-three thousand euro)* into the account specified in Section (b) of Article 1 above and via payment under the letter of credit opened pursuant to Section (a) of Article 1 above, shall **CLAIMANT Bank** consider the *liability of* **DEBTOR** under the **Bank Loan Agreement** *to have been fully disbursed, and the receivables of* **CLAIMANT Bank**, for the collection of which **CLAIMANT Bank** has initiated enforcement under Execution Case No. 33205/2005, in accordance with the docket of the Judicial Execution Service of the Sofia District Court, *to have been fully discharged.*

Debtor:  [Illegible Signature]          Claimant Bank:  [Illegible Signature] [Illegible Signature]

2

**Article 3. DEBTOR** hereby states that it waives any claims and objections in relation to the enforcement under Execution Case No. 33205/2006 in accordance with the docket of the Judicial Execution Service of the Sofia District Court initiated by **CLAIMANT Bank** and stated in the request to suspend the aforementioned execution case filed pursuant to Article 250 of the Code of Civil Procedure.

Upon signing the present **Agreement, DEBTOR** shall provide **CLAIMANT Bank** with a notarized request to waive the objection, pursuant to Article 250 of the Code of Civil Procedure, to terminate the civil action initiated by the appeal of **CLAIMANT Bank** against the April 4, 2006 ruling of the Sofia District Court, 50th Panel, on Civil Case No. 6340/2006, as well as to invalidate the ruling cited above.

**Article 4.** Provided that **DEBTOR** pays in full and on time to **CLAIMANT Bank** the amount of EUR 563,000 (five hundred sixty-three thousand euro) in the manner as set forth in Article 1 above, **CLAIMANT Bank** shall have no claims towards **Debtor** in connection with the **Bank Loan Agreement**.

**Article 5. (1)** Within five business days upon receipt of the full amount under Article 1 above, **CLAIMANT Bank** shall undertake the following steps:

1. An authorized representative of **CLAIMANT Bank** shall file with an executory officer of the Judicial Execution Service of the Sofia District Court a request to terminate the enforcement actions and lift the injunctions imposed under Execution Case No. 33205/2005 in accordance with the docket of the Judicial Execution Service of the Sofia District Court.

2. Prepare a notarized consent to delete the conventional real estate mortgage recorded pursuant to *Deed No. 73, Vol. I, Reg. No. 760, Case No. 67/2005, in accordance with the inventory of Slava Piliakova, Notary Public, Notary Chamber Registration No. 344, entered into the Sofia Registry Agency under Reg. No. 12902 of March 28, 2005, Deed No. 53, Vol. X, Case No. 9227/2005.* The notarized consent shall be available to be received by **DEBTOR** upon expiration of the above timeframe agreed upon at the central office of the Bank at: 16 Krakra Street, Sofia.

**(2)** The expenses due in connection with the legal and factual actions described in the previous paragraph (including notarization fees and other administrative fees) shall be paid in full by **DEBTOR**. The notarization fee due for a notarized consent to delete the conventional mortgage must be deposited with **CLAIMANT Bank** no later than within three (3) business days of the date on which **CLAIMANT Bank** [sic] has made a payment in the amount of EUR 563,000 (five hundred sixty-three thousand euro). Failure to cover the expenses due, which would prevent **CLAIMANT Bank** from strictly discharging the obligations undertaken in accordance with Par. 1 above, shall not constitute a case of default on the part of **CLAIMANT Bank**.

**Article 6.** The Parties shall be obligated to comply in the future with conduct in accordance with the legal situation established by the present Agreement and shall be obligated to refrain from any future challenges thereof and to avoid any future disputes associated with the subject of the present **Agreement** or arising from rights, obligations or legal relationships that are subject to examination and resolution thereof.

**Article 7.** The present Agreement shall become effective and binding for the Parties provided that **DEBTOR** has made payment for the benefit of **CLAIMANT Bank** and **CLAIMANT Bank** has received full payment in the amount of EUR 563,000 (five hundred sixty-three thousand euro), in the manner and within the timeframe set forth in Article 1 above. In the event of a delayed or incomplete payment, failure to make payment or failure to comply with the procedure for making payment for the benefit of CLAIMANT Bank, as defined in accordance with Article 1 above, the present **Agreement** shall not enter into effect and neither Party shall benefit from any rights set forth in the present **Agreement** nor shall it have the right to refer hereto.

Debtor: [Illegible Signature]                    Claimant Bank: [Illegible Signature] [Illegible Signature]

**Article 8.**  As of the effective date of the present **Agreement,** and as a result of full and strict discharge of the obligations undertaken by the **Parties** to the present **Agreement,** all relationships between the **Parties** that have arisen in connection with the **Loan Agreement** and the facts as described and established above shall be deemed finally and unconditionally settled and each **Party** of the present **Agreement** hereby declares and guarantees that it shall have no claims arising from and / or in connection with the **Loan Agreement** as well as the findings and arrangements described in the present **Agreement**.

**Article 9.**  The present Agreement may be amended only upon written consent of both **Parties.**

**Article 10.**  The present Agreement is signed in four (4) identical copies, of which two shall be for the Claimant Bank, one for the Debtor and one for Investbank Commercial Bank JSC.

**On behalf of CLAIMANT Bank:**

L.S. [Legal Seal:  Bulgarian American Credit Bank JSC [Emblem]]

[Illegible Signature]                   [Illegible Signature]
Dimitar Vuchev                          Maria Sheitanova
Executive Director                      Authorized Representative
         BULGARIAN AMERICAN CREDIT BANK JSC

**On behalf of DEBTOR:**

L.S. [Legal Seal:  Stroitelstvo Bulgaria, Ltd.]

[Illegible Signature]
Metodi Liubenov Dimitrov
[Illegible]
STROITELSTVO BULGARIA LTD.

Debtor:  [Illegible Signature]                    Claimant Bank:  [blank] [blank]

4

Exhibit C

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STROITELSTVO BULGARIA LTD., | ) |
| | ) |
| | ) |
| | ) |
| Plaintiff, | )      Case No.: 1:07-cv-00634 |
| | ) |
| v. | ) |
| | )      Hon. Rosemary M. Collyer |
| THE BULGARIAN-AMERICAN ENTERPRISE | ) |
| FUND, *et al.,* | ) |
| | ) |
| Defendants. | ) |
| | ) |

### DECLARATION OF NANCY L. SCHILLER

I, Nancy L. Schiller, do hereby certify and declare as follows:

### PERSONAL BACKGROUND

1.    My name is Nancy L. Schiller.  I submit this declaration in support of Defendant the Bulgarian American Enterprise Fund's ("BAEF") Motion to Dismiss Plaintiff Stroitelstvo Bulgaria's ("Stroitelstvo") Complaint Pursuant to Federal Rules 12(b)(2) and 12(b)(3) or Alternatively Based on the Doctrine of *Forum Non Conveniens* ("Motion to Dimsiss").  The facts set forth in this Declaration are based on my personal knowledge.

2.    I am Managing Director for BAEF in its Chicago, Illinois office and have held that position for the past 15 years.  In that capacity, my responsibilities include interaction with the Board of Directors, government relations, and human resources.

3.    In 1989, Congress passed the Support for East European Democracy Act ("SEED Act"), 22 U.S.C. ¶§§ 5402, 5421, to promote private sector development in Poland and Hungary. The SEED Act was later expanded to provide funding for the establishment of additional enterprise funds (such as BAEF) that would promote private sector development in Eastern Europe.

4.    BAEF is a private, not-for-profit U.S. corporation established in 1991 under the Delaware General Corporation Law.  BAEF is based in Chicago, Illinois.  BAEF has its only U.S. office in Chicago and regularly transacts its business in Chicago.  BAEF also maintains an office in Sofia, Bulgaria and regularly transacts its business in Bulgaria.  BAEF's registered agent is located in Delaware.

5.    BAEF has no ongoing or regular contacts with the District of Columbia.  BAEF is not a resident of the District of Columbia and maintains no office or registered agent there. BAEF is not organized under the laws of the District of Columbia.  Nor does BAEF regularly transact any business in the District.

6.    The BAEF has semi-annual reporting obligations to the U.S. Agency for International Development ("USAID") as a condition of the original grant agreement between USAID and BAEF.  Howeveer, BAEF is not (and has never been) under the supervision of Congress.  Moreover, BAEF has not received any funding from USAID within the past five years.

7.    The  Bulgarian-American Credit Bank ("the Bank") is a majority-owned subsidiary of BAEF that operates exclusively in Bulgaria.  The Bank operates as an investment bank in the areas of small and medium size enterprise lending, construction lending and home

mortgage lending. The bank also offers other commercial banking services. The Bank has no office in the United States, has no registered agent here, and does not regularly transact any business here.

8.    The Bank operates independently from BAEF. Among other things, BAEF is not involved in the Bank's loan transactions. BAEF was not involved in any way in the loan transaction between the Bank and Stroitelstvo. In fact, BAEF was unaware of that particular loan (and any of its details) prior to receiving notice of this lawsuit. BAEF maintains no files or records related to the Bank's specific loan transactions, including this one.

9.    After receiving notice of this lawsuit, BAEF requested and obtained from the Bank's in-house attorney a true and correct copy of the March 24, 2005 Loan Agreement referenced in the Complaint, which is attached to BAEF's Motion to Dismiss as Exhibit A. BAEF also requested and obtained from the Bank's in-house attorney a true and correct copy of the May 9, 2006 Settlement Agreement between the Bank and Stroitelstvo (also referenced in the Complaint), which is attached to BAEF's Motion to Dismiss as Exhibit B.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on  8 / 6 / 07

Nancy L. Schiller

Exhibit D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STROITELSTVO BULGARIA LTD., ) | |
| ) | |
| ) | |
| Plaintiff, ) | Case No.: 1:07-cv-00634 |
| ) | |
| v. ) | |
| ) | Hon. Rosemary M. Collyer |
| THE BULGARIAN-AMERICAN ENTERPRISE ) | |
| FUND, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## <u>DECLARATION OF SILVY CHERNEV</u>

I, SILVY CHERNEV, do hereby certify and declare as follows:

### BACKGROUND AND RETENTION

1.       My name is Silvy Chernev.  I submit this declaration in support of Defendant the

Bulgarian American Enterprise Fund's ("BAEF") Motion to Dismiss Plaintiff Stroitelstvo

Bulgaria's ("Stroitelstvo") Complaint Pursuant to Federal Rules 12(b)(2) and 12(b)(3) or

Alternatively Based on the Doctrine of *Forum Non Conveniens*.  The facts set forth in this

Declaration are true and correct to the best of my information and belief.  I have drawn from my

professional expertise and general familiarity with Bulgarian courts and Bulgarian law in

preparing this Declaration.  I speak and write English fluently.

2.       I have been retained in this matter by BAEF to act as an expert consultant on

Bulgarian law and the Bulgarian legal system.  I am charging my standard hourly consultation

fee of 120 EURO per hour for work done in this matter.  I have not done any previous work for BAEF, although my law firm has handled a few matters in the past for one of its affiliates, Bulgarian American Property Management.

## QUALIFICATIONS AND EXPERIENCE

3.    I am a licensed attorney in Bulgaria and am currently a partner in the law firm of Chernev Komitova and Partners.  I have more than 25 years of experience practicing commercial law, civil litigation, and arbitration in Bulgaria.

4.    I earned an LLM in 1977 from Sofia University.  I earned my PhD in law at the Center for Legal Studies of the Bulgarian Academy of Science and Sofia University with a specialization in Civil Procedure in 1987.

5.    I have served as a Professor of Civil Procedure at several universities in Bulgaria over the past 25 years (since 1984), including Sofia University (for 6-7 years), Bourgas University (since 1993), Plovdiv University (for the past 2 years), and Varna University (for 6-7 years).  I have numerous publications in Bulgarian Civil Procedure, including a 350-page book entitled, "The Instances in the Civil Procedure of the Republic of Bulgaria (Problems of Reform in the Civil Procedure Law)" (which addresses the jurisdiction of courts at different levels), and numerous other articles and studies.

6.    For the past 8 years, I have served as President of the Court of Arbitration of the Bulgarian Chamber of Commerce and Industry.  The Court of Arbitration of the Bulgarian Chamber of Commerce and Industry was established more than 50 years ago and is the oldest and most respected court of arbitration in Bulgaria.  As President, as an arbitrator, and as an

2

attorney, I participate in high profile international arbitrations and domestic disputes. I also train university students and young lawyers in arbitration techniques.

7.     I have advocated for numerous legal and judicial reform initiatives in Bulgaria and have drafted several laws. Many of my proposals have been adopted into law in Bulgaria.

8.     A copy of my curriculum vitae is attached hereto.

### ADEQUACY OF BULGARIAN COURTS

9.     In Bulgaria, there is an independent judiciary that is available to hear commercial disputes between parties. In fact, under the Second Article of Bulgaria's Code of Civil Procedure, Bulgarian courts are obliged to hear and resolve any complaint or petition concerning personal or monetary rights filed before them.

10.     Bulgaria has a state court system comprised of general courts that are available to hear both criminal and civil matters. The system is a four-tier system, which consists of: (1) regional courts; (2) district courts; (3) appellate courts; and (4) the Supreme Court of Cassation. Most cases begin at the regional court, although some begin at the district court level (depending on the sum involved, type of case, and so forth). The Sofia Regional Court is a regional, first instance court. The Sofia City Court is a district court performs both as first and second instance court.

11.     In general, each commercial case may go through at least three levels of consideration, including two levels of review. At the first level of appellate review, the reviewing court considers the case *de novo*. At the second level of review, the case may be heard twice. Thus, the process allows for an ample consideration of each case.

3

12.    In Bulgaria, the regular court procedure ends with a final decision (*res judicata* decision), which may serve as grounds for forced execution. Bulgaria has extensive procedures in place for execution and enforcement of judgments.

13.    The Bulgarian courts are fully developed and operating at full capacity. Commercial litigants can achieve full and fair resolution of their disputes in the Bulgarian court system. Bulgaria's court system is consistent with the continental European tradition and its structure and procedures do not deviate in any significant way from those of other European courts.

14.    I have reviewed the March 2005 "Loan Agreement" between the Bulgarian American Credit Bank ("the Bank") and Stroitelstvo Bulgaria ("Stroitelstvo"). The Loan Agreement is a standard agreement of the type that is widely used in commercial practice in Bulgaria. As such, disputes related to this type of Loan Agreement are frequently encountered and addressed by Bulgarian courts.

## JURISDICTION OF BULGARIAN COURTS OVER FOREIGN LITIGANTS

15.    There are at least four means by which Bulgarian courts could assert jurisdiction over BAEF in this case.

16.    First, Bulgarian courts have jurisdiction if the claimant is a Bulgarian person. Chapter 2, Article 4, Paragraph 2 of Bulgaria's International Private Law Code ("ILPC") provides that: "The international competence of the Bulgarian courts and of other bodies shall be existing, if: 2. the claimant . . . . is a Bulgarian citizen or is a legal person, registered in the Republic of Bulgaria." Here, the claimant (Stroitelstvo) is a Bulgarian person, thus, the Bulgarian courts would have jurisdiction over BAEF and the dispute.

4

17.     Second, Bulgarian law provides for jurisdiction over corporations that reside and/or transact business in Bulgaria. ILPC Chapter 2, Article 4, Paragraph 1 provides that: "The international competence of the Bulgarian courts and of other bodies shall be existing, if the defendant has a customary residence seat . . . . or a location of the actual management in the Republic of Bulgaria." Here, BAEF has an office and regularly does business in Sofia, Bulgaria; thus, the Bulgarian courts would have jurisdiction over BAEF and the dispute.

18.     Third, Bulgarian law provides for jurisdiction over any civil litigant who has caused damage in tort to a party in Bulgaria. ILPC Chapter 2, Article 18, Paragraph 1 provides that: "The Bulgarian courts shall be competent upon claims for damages from tort [with exceptions not applicable here], and if the damaging act has been committed in the Republic of Bulgaria or the damages or part of them have occurred in the Republic of Bulgaria." Here, Stroitelstvo claims that it was damaged in Bulgaria; thus, the Bulgarian courts would have jurisdiction over BAEF and the dispute.

19.     Fourth, under ILPC Chapter 2, Article 23, Paragraph 2, even if the Bulgarian court does not have jurisdiction, if there is an agreement between the parties, the Bulgarian courts may exercise jurisdiction.

### CLAIMS AVAILABLE UNDER BULGARIAN LAW

20.     Bulgarian civil and commercial law contain no significant deviations from European continental tradition.

21.     I have reviewed the general allegations made in the Complaint in this matter. Although not all of the specific claims asserted have exact Bulgarian equivalents (such as the "RICO" claim), a remedy is available under Bulgarian law for the type of conduct alleged in the

Complaint. Thus, the Bank and Stroitelstvo's understanding as set forth in the Loan Agreement that Bulgarian courts would be available to resolve "any disputes under the agreement, including interpretation, validity, nonperformance or termination" was correct. (*See* Loan Agreement § 17.08)

22.    Several provisions of Bulgarian law could potentially apply to the allegations at issue in the Complaint. Governing law includes the Bulgarian Obligations and Contracts Act, which is the general law in civil matters. Specifically:

a.    Bulgarian law recognizes and enforces contractual obligations between parties. (*See* Obligations and Contracts Act, Article 20a ("Contracts shall have the force of law for the parties which have concluded them."))

b.    The Bulgarian Obligations and Contracts Act contains provisions to allow contract invalidation for circumstances such as fraud, coercion, and duress. (*See, e.g.,* Obligations and Contracts Act, Article 26 (absolute invalidity), Article 27 (causes for relative invalidity), Article 29 (fraud))

c.    Under Bulgarian law, good faith is required in behavior between commercial parties, including pre-contractual and post-contractual behavior. Specifically, the Code provides: "The parties shall act in good faith in conducting negotiations and concluding contracts. Otherwise, they shall owe damages." (Obligations and Contracts Act, Article 12; *see also id.,* Article 63, ¶ 1 ("Each of the parties to the contract must fulfill its obligations arising from it accurately and in good faith . . . ."))

6

       d.     Under Bulgarian law, "a creditor shall be in default when he refuses without justification to accept the performance offered by the debtor or fails to provide the necessary assistance without which the debtor is unable to perform his obligation." (Obligations and Contracts Act, Article 95)

       e.     Bulgaria recognizes a cause of action for abuse of existing rights. (*See* Bulgarian Constitution Article 57, ¶ 2; Law on Commerce Article 289 (abuse of rights); Civil Procedure Code, Article 3 (abuse of procedural rights may lead to liability))

       f.     Under Bulgarian law, "each person must redress the damages he has guiltily caused to another person." (Obligations and Contracts Act, Article 45). That is Bulgaria's general tort liability provision that would apply to disputes between commercial parties.

       g.     Under Bulgarian law, a settlement must include "mutual concessions." (Obligations and Contracts Act, Article 365).

## LEGAL PROCEEDINGS TO DATE IN BULGARIA

23.     I have reviewed relevant Bulgarian legal documents related to the Loan Agreement, including court acts and some of the motions those acts were based upon. Such documents make clear that both Stroitelstvo and the Bank have already availed themselves of the Bulgarian legal system.

24.     On December 12, 2005, the Bank obtained an immediate decree of execution on the loan from the Sofia City Court in the amount of 970,000 EURO by showing a statement of accounts. Such a procedure does not require court adjudication and is a normal, appropriate

mechanism for obtaining this type of writ in Bulgaria. (*See* Civil Procedure Code, Article 237, ¶ 1c; Law on Credit Institutions, Article 60, ¶ 2)

25.    On December 15, 2005, the Bank initiated foreclosure proceedings with an execution officer and attached the assets of Stroitelstvo that had been mortgaged to secure the loan.

26.    In March 2006, Stroitelstvo challenged the writ of execution in the Sofia Regional Court (claiming that it only owed 360,000 EURO), and the Sofia Regional Court ruled for partial suspension of the foreclosure proceedings.  To successfully challenge a writ of execution before the Sofia Regional Court, the debtor need only present prima facie evidence that he does not owe the amount under the writ of execution.

27.    The Bank then appealed that decision to the Sofia City Court.    In June 2006, the Sofia City Court ruled in favor of the Bank by repealing the order stopping the foreclosure and stating that the Bank had the right to foreclose and collect the full amount (970,000 EURO).

28.    Prior to the decision from the Sofia City Court, however, the Bank and Stroitelstvo had entered into negotiations that led to an agreement to resolve the proceedings and settle disputes between them ("Settlement Agreement").

29.    Under the Settlement Agreement, Stroitelstvo agreed to pay 563,000 EURO (less than the amount being sought by the Bank and more than that Stroitelstvo was conceding it owed) to the Bank.  (Ex. B to Motion to Dismiss, Settlement Agreement, at § II., Art. I)  In addition, the Bank and Stroitelstvo each agreed to waive further claims and appeals based on the Loan Agreement. (*Id.*, § II, Articles II, IV & VI)

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _Aug 2, 2007_

_____
Silvy Chernev