## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STROITELSTVO BULGARIA LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Civ. Action No. 1:07-CV-00634-RMC |
| v. | ) |
| | ) Judge Rosemary M. Collyer |
| THE BULGARIAN-AMERICAN ENTERPRISE | ) |
| FUND, and THE BULGARIAN-AMERICAN | ) |
| CREDIT BANK, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANT BULGARIAN-AMERICAN ENTERPRISE FUND'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULES 9(b) AND 12(b)(6)

# TABLE OF CONTENTS

FACTUAL BACKGROUND ..................................................................................................2

    A.    The Parties .............................................................................................2

    B.    The Alleged Relationship Between the Bank's Conduct and BAEF...........3

    C.    The Loan Agreement ...............................................................................3

    D.    Suspension of Credit Under the Agreement ...............................................4

    E.    Bulgarian Resolution of the Dispute .........................................................5

    F.    Alleged Wrongful Actions By The Bank.....................................................5

    G.    Stroitelstvo Files This Lawsuit ...............................................................5

CHOICE OF LAW ..........................................................................................................6

ARGUMENT ...................................................................................................................7

  I.    Stroitelstvo Has Not Alleged Sufficient Facts To Impute The Bank's
        Liability To BAEF. ...................................................................................8

  II.    The RICO Claim Should Be Dismissed Pursuant To Rules 12(b)(6) And
        9(b). ......................................................................................................8

    A.    Failure To State A Claim. ........................................................................9

        1.    BAEF's Alleged Conduct Did Not Proximately Cause
                Plaintiff's Injury. ....................................................................9

        2.    Plaintiff Fails to Adequately Allege an Enterprise Distinct
                From the Person From Whom Damages are Sought. ...................11

        3.    Plaintiff Fails to Allege That Any of BAEF's Conduct
                Affected United States Commerce.............................................13

        4.    Plaintiff Fails to Allege The Required Predicate Acts.................14

        5.    Plaintiff Also Fails To Establish A Pattern Of Racketeering
                 Activity Under D.C. Law.........................................................18

    B.    Failure To Meet The Heightened Pleading Standard Under Rule
        9(b). .....................................................................................................20

    C.    Because The RICO Claim Must Be Dismissed, All Other Counts
        Should Be Dismissed For Lack Of Subject Matter Jurisdiction..............21

  III.    Each Of Plaintiff's Other Tort Claims Is Fatally Flawed. .....................................22

    A.    Plaintiff's Intentional Interference with Contract Claim Fails as a
        Matter of Law and Should be Dismissed.................................................23

    B.    Plaintiff Fails to State a Claim for Intentional Interference with
        Prospective Advantage..........................................................................24

i

C.      There Is No Fiduciary Relationship Between Plaintiff and BAEF............26

D.      Plaintiff Fails to State a Claim for Civil Conspiracy. ...............................27

E.      The Breach Of Contract And Abuse Of Process Claims Are Not
        Asserted Against BAEF, But Even If They Were, They Fail To
        State A Claim.........................................................................................28

        1.      Breach of Contract ......................................................................28

        2.      Abuse of Process..........................................................................29

CONCLUSION...................................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Haverford Coll.*,
    851 F. Supp. 179 (E.D. Pa. 1994) ................................................................................. 29

*Anderson v. USAA Cas. Ins. Co.*,
    221 F.R.D. 250 ........................................................................................................... 20, 21

*Anderson v. Wiggins*,
    460 F. Supp. 1 (D.D.C. 2006) ..................................................................................... 22

\**Bates v. Nw. Human Servs., Inc.*,
    466 F. Supp. 2d 69 (D.D.C. 2006) ................................................................. 8, 12, 13, 21

\**Bell Atlantic Corporation v. Twombly*,
    127 S. Ct. 1955 (2007) ........................................................................................ 7, 8, 18

*Bessette v. Avco Fin. Servs., Inc.*,
    230 F.3d 439 (1st Cir. 2000) ....................................................................................... 12

*Browning v. Clinton*,
    292 F.3d 235 (D.C. Cir. 2002) ...................................................................................... 9

*Butler v. Fairbanks Capital*,
    No. Civ. A. 04-0367 (RMU), 2005 WL 5108537 (D.D.C. Jan. 3, 2005) ...................... 29

*Byer Indus., Inc. v. Gulf Ins. Co.*,
    888 F. Supp. 1 (D.D.C. 1995) .................................................................................... 20

*Cambridge Holdings Group, Inc. v. Fed. Ins. Co.*,
    357 F. Supp. 2d 89 (D.D.C. 2004) ......................................................................... 24, 28

*Carnegie Mellon Univ. v. Cohill*,
    484 U.S. 343 (1988) ................................................................................................... 22

*Cephas v. MVM, Inc.*,
    403 F. Supp. 2d 17 (D.D.C. 2005) ................................................................................ 3

*Conley v. Gibson*,
    355 U.S. 41 (1957) ....................................................................................................... 7

*Cox v. Adm'r U. S. Steel & Carnegie*,
    17 F.3d 1386 (11th Cir. 1994) ................................................................................... 10

*Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*,
    941 F.2d 1220 (D.C. Cir. 1991) ................................................................................. 22

*DiLeo v. Ernst & Young,*
    901 F.2d 624 (7th Cir. 1990) ............................................................ 20

*Doe I v. State of Israel,*
    400 F. Supp. 2d 86 (D.D.C. 2005) ..................................................... 14

*Dooley v. United Techs. Corp.,*
    803 F. Supp. 428 (D.D.C. 1992) ....................................................... 18

*Dumbarton Condo. Ass'n v. 3120 R St. Assocs. Ltd. P'ship,*
    657 F. Supp. 226 (D.D.C. 1987) ....................................................... 22

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005) ........................................................................... 7

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n,*
    48 F.3d 1260 (D.C. Cir. 1995) ......................................... 18, 19, 22

*Ellipso v. Mann,*
    Civ. Action No. 05-1186 (RCL), 2006 WL 1126814 (D.D.C. Apr. 27, 2006) ................ 27

*Eze v. Yellow Cab Co. of Alexandria, Va., Inc.,*
    782 F.2d 1064 (D.C. Cir. 1986) ....................................................... 22

*Ficken v. Rice,*
    Civ. Action No. 04-1132 (RMU), 2007 WL 1020805 (D.D.C. Mar. 29, 2007) .............. 28

*Genetic Sys. Corp. v. Abbott Labs.,*
    691 F. Supp. 407 (D.D.C. 1998) ....................................................... 25

*Gov't Relations Inc. v. Howe,*
    No. Civ. A. 05-1081 CKK, 2007 WL 201264 (D.D.C. Jan. 24, 2007) ...................... 23

*Graves v. United States,*
    961 F. Supp. 314 (D.D.C. 1997) ....................................................... 27

*H.J. Inc. v. Nw. Bell Tel. Co.,*
    492 U.S. 229 (1989) ......................................................................... 18

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983) ......................................................... 27

*Hall v. Clinton,*
    285 F.3d 74 (D.C. Cir. 2002) ........................................................... 27

*Hamrick v. Gottlieb,*
    416 F. Supp. 2d 1 (D.D.C. 2005) ..................................................... 18

*Hicks v. Ass'n of Am. Med. Colls.*,
    Civil Action No. 07-00123 (ESH), 2007 WL 1577841 (D.D.C. May 31, 2007)............... 7

*High v. McLean Fin. Corp.*,
    659 F. Supp. 1561 (D.D.C. 1987) ..................................................................................... 26

*Holmes v. Secs. Investor Prot. Corp.*,
    503 U.S. 258 (1992) ...................................................................................................... 9, 10

*In re U.S. Office Prods. Co. Sec. Litig.*,
    251 F. Supp. 2d 77 (D.D.C. 2003) ................................................................................. 28

*Int'l Audiotext Network, Inc. v. AT&T Co.*,
    62 F.3d 69 (2d Cir. 1995) ................................................................................................. 3

*Johnson v. Computer Tech. Servs., Inc.*,
    670 F. Supp. 1036 (D.D.C. 1987) ................................................................................... 21

*King & King, Chartered v. Harbart Intern, Inc.*,
    436 F. Supp. 2d 3 (D.D.C. 2006) .................................................................................... 23

*Kowal v. MCI Commc'ns Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994) .......................................................................................... 7

*Long Distance Serv. of Wash., Inc. v. MCI Telecommc'ns Corp.*,
    692 F. Supp. 1402 (D.D.C. 1988) ................................................................................... 22

*Lowe v. DEA*,
    Civil Action No. 06-0133 (CKK), 2007 WL 2104309 (D.D.C. July 22, 2007) ............ 2, 8

*Lutz v. U.S.*,
    Civil Action No. 06-1177 (RMC), 2007 WL 1954438 (D.D.C. July 5, 2007).................. 8

*Martens v. U.S.*,
    Civil Action No. 05-1805 (RMC), 2007 WL 2007580 (D.D.C. July 6, 2007)................... 8

*McCullough v. Suter*,
    757 F.2d 142 (7th Cir. 1985) ......................................................................................... 11

*McManus v. MCI Commc'ns. Corp.*,
    748 A.2d 949 (D.C. 2000) .............................................................................................. 25

*Moncrief v. Kennedy*,
    Civ. A. No. 86-1131 SSH, 1987 WL 26415 (D.D.C. Nov. 19, 1987) ............................. 25

*Nix v. Hoke*,
    62 F. Supp. 2d 110 (D.D.C. 1999) ................................................................................. 10

*Ohio Cas. Ins. Co. v. Bank One*,
  No. 95 C 6613, 1997 WL 30951 (N.D. Ill. Jan. 22, 1997) ................................. 29

*Paley v. Estate of Ogus*,
  20 F. Supp. 2d 83 (D.D.C. 1998) ........................................................................... 3

*Papasan v. Allain*,
  478 U.S. 265, 286 (1986) ....................................................................................... 7

*Prunte v. Universal Music Group*,
  484 F. Supp. 2d 32 (D.D.C. 2007) ........................................................ 11, 20, 26

*Rattigan v. Gonzales*,
  Civil Action No. 04-2009 (ESH), 2007 WL 1577855 (D.D.C. May 31, 2007)................. 7

*Rickards v. Canine Eye Registration Found., Inc.*,
  704 F.2d 1449 (9th Cir. 1983) ............................................................................. 26

*Riddell v. Riddell Wash. Corp.*,
  866 F.2d 1480 (D.C. Cir. 1989) ........................................................................... 27

*Scott v. District of Columbia*,
  101 F.3d 748 (D.C. Cir. 1996) ............................................................................. 29

*Smith v. D. C.*,
  413 F.3d 86 (D.C. Cir. 2005) ............................................................................... 10

*Sorrells v. Garfinckel's, Brooks Bros., Miler & Rhoads, Inc.*,
  565 A.2d 285 (D.C. 1989) .................................................................................... 24

*Stromberg v. Marriott Int'l, Inc.*,
  474 F. Supp. 2d 57 (D.D.C. 2007) ......................................................................... 6

*U.S. v. Ortho-McNeil Pharm., Inc.*,
  No. 03 C 8239, 2007 WL 1091185 (N.D. Ill. July 20, 2007) ............................... 8

*United States v. Am. Bldg. Maint. Indus.*,
  422 U.S. 271 (1975) .............................................................................................. 14

*United States v. Robertson*,
  514 U.S. 669 (1995) .............................................................................................. 14

*W.L. Meng v. Schwartz*,
  116 F. Supp. 2d 92 (D.D.C. 2000) ................................................................. 22, 27

*Wallace v. Abramson*,
  CIV. A. No. 85-4039 (JHP), 1988 WL 63065 (D.D.C. June 7, 1988)................. 20, 21

*Wash. Hosp. Ctr. Corp. v. Waters*,
    No. 91-1638 (GHR), 1992 WL 23746 (D.D.C. Jan. 21, 1992)........................ 24

*Weaver v. Bratt*,
    421 F. Supp. 2d 25 (D.D.C. 2006) ...................................................... 11

*Western Assocs. Ltd. P'ship v. Market Square Assocs.*,
    235 F.3d 629 (D.C. Cir. 2001) .................................................... 19, 20

*Weyrich v. The New Republic, Inc.*,
    235 F.3d 617 (D.C. Cir. 2001) .......................................................... 7

*Wolf v. Rare Medium, Inc.*,
    210 F. Supp. 2d 490 (S.D.N.Y. 2002)................................................ 29

*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*,
    883 F.2d 132 (D.C. Cir. 1989) ....................................................... 11

**Statutes**

18 U.S.C. § 1331 ................................................................................. 1

18 U.S.C. § 1344 ......................................................................... 15, 21

18 U.S.C. § 1951 ......................................................................... 15, 16

18 U.S.C. § 1952 ......................................................................... 15, 17

18 U.S.C. § 1961 .................................................................... 5, 12, 15

18 U.S.C. § 1962 ......................................................................... 13, 14

18 U.S.C. §§ 891-894 ................................................................... 15, 16

22 U.S.C. § 5402 ................................................................................. 2

22 U.S.C. § 5421 ................................................................................. 2

D.C. Code § 22-3851 ......................................................................... 17

D.C. Code § 22-3852 ......................................................................... 17

**Other Authorities**

Complaint................................................................................. passim

Loan Agreement................................................................. 3, 4, 6, 19

**Rules**

Fed. R. Civ. P. 12(b)(6)............................................................................................... passim

Fed. R. Civ. P. 9(b) ................................................................................................... 20, 21

This case arises from a dispute over a loan agreement between two Bulgarian companies — plaintiff Stroitelstvo Bulgaria, Ltd. ("Stroitelstvo") and Defendant Bulgarian-American Credit Bank (the "Bank"). Defendant Bulgarian-American Enterprise Fund ("BAEF") is the majority owner of the Bank, but BAEF had absolutely no knowledge of, or involvement with, the loan that is the subject of the dispute.[1]

In a separate motion, BAEF explained why plaintiff's Complaint should be dismissed on jurisdictional and venue grounds, pursuant to Federal Rules 12(b)(2) and 12(b)(3), or alternatively based on the doctrine of *forum non conveniens*. This motion, which of course the Court need address only if it denies the jurisdictional and venue motion, explains why dismissal is also proper under Rules 9(b) and 12(b)(6). As explained in more detail below, plaintiff's Complaint suffers from a host of fatal pleading defects:

- *First*, Stroitelstvo alleges no specific misconduct by BAEF at all in its Complaint. Instead, plaintiff improperly attempts to impute liability to BAEF for acts allegedly committed by the Bank. That is improper, and dismissal is thus appropriate under Rule 12(b)(6).

- *Second*, plaintiff's RICO count fails to state a claim and also fails to plead fraud with the required particularity. As such, the claim must be dismissed under Federal Rules 12(b)(6) and 9(b). Because this Court's subject matter jurisdiction is based on the existence of a federal question (18 U.S.C. § 1331), if the RICO claim is dismissed, then the entire action should be dismissed as well.

- *Third*, each of plaintiff's remaining claims against BAEF suffers from one or more pleading defects, and thus must be dismissed pursuant to Rule 12(b)(6).

This Court should see plaintiff's Complaint for what it really is — a thinly veiled effort to end run a prior litigation in Bulgaria. This dispute relates to two Bulgarian companies about a loan agreement that was executed in Bulgaria and is governed by Bulgarian law. As

---

[1] The Bank has not yet been served; this motion is thus being filed only on behalf of BAEF.

plaintiff's Complaint essentially concedes, BAEF had absolutely nothing to do with that loan. Plaintiff litigated its dispute with the Bank in Bulgaria, and entered into a settlement agreement resolving its claims.   Stroitelstvo's conclusory and vague allegations against BAEF here are nothing more than an improper attempt to create jurisdiction in this Court, apparently so that Stroitelstvo can have a second bite at the apple.  But at bottom, none of plaintiff's claims against BAEF are proper under the Federal Rules, and thus the claims against BAEF should be dismissed with prejudice.

## FACTUAL BACKGROUND[2]

### A.     The Parties

Stroitelstvo is a Bulgarian for-profit company organized under the laws of Bulgaria. (Compl. ¶ 5)

The Bank is located in Bulgaria and registered as a Bulgarian joint stock company.  (*Id.* ¶ 7)  Plaintiff alleges that at all times pertinent to the averments in the Complaint, the Bank was a wholly-owned subsidiary of BAEF and that BAEF was the main shareholder of the Bank.  (*Id.*)  Among other things, the Bank operates as an investing bank in the areas of small and medium size enterprise lending, construction lending, and home mortgage lending.  (*Id.*)

BAEF is a private, not-for-profit U.S. corporation established in 1991 pursuant to the Support for East European Democracy Act ("SEED Act"), 22 U.S.C. §§ 5402, 5421.  (*Id.* ¶ 6)  BAEF's purpose is to participate in the development and expansion of the economy in Bulgaria by investing in the Bulgarian private sector.  (*Id.*)  Since its inception in 1991, BAEF has been based in Chicago, Illinois.  (*Id.*)  In 1992, BAEF commenced its operations with $58,000,000 in funding from the American government.  (*Id.*)  Additionally, the Complaint

---

2     Solely for purposes of this motion, BAEF accepts Stroitelstvo's well-pleaded allegations as true. *See, e.g.,* *Lowe v. DEA*, Civil Action No. 06-0133 (CKK), 2007 WL 2104309 (D.D.C. July 22, 2007).

alleges that at the end of fiscal year 2004, BAEF owned a 68% interest in BML Leasing ("BML"), a joint venture with a small Bulgarian leasing firm. (*Id.*) Stroitelstvo also contends that at all times pertinent to the averments in the Complaint, BAEF was the parent company of Bulgarian American Property Management EOOD ("BAPM"). (*Id.*)

### B.    The Alleged Relationship Between the Bank's Conduct and BAEF

The Complaint alleges that: (1) the Bank's conduct constitutes the conduct of BAEF, *id.* ¶ 30; (2) "the Bank acted as and held itself out as a department of BAEF, *id.* ¶ 31; (3) "[t]he Bank's actions and decisions were subject to the control and the direction of BAEF," *id.* ¶ 32; (4) "[t]he Bank's actions and decisions were subject to the supervision of BAEF," *id.* ¶ 33; (5) "[t]he Bank's actions and decisions were subject to the policies and the demands of BAEF," *id.* ¶ 34; and, (6) "BAEF ratified and affirmed the conduct of the Bank as alleged in the Complaint." (*Id.* ¶ 35) These are the only factual allegations in the Complaint averred against BAEF. Stroitelstvo does not allege any independent behavior or conduct by BAEF that gave rise to its claims.

### C.    The Loan Agreement

On March 24, 2005, Stroitelstvo and the Bank entered into a "Loan Agreement." (Compl. ¶ 9; Ex. A, Loan Agreement[3]) Under the Loan Agreement, the Bank agreed to loan 2,659,704 EUR to Stroitelstvo. (Compl. ¶ 10) The Complaint alleges that the Bank disbursed

---

[3] Because plaintiff's Complaint references the Loan Agreement, the terms of the agreement are deemed incorporated into the Complaint. *See, e.g., Cephas v. MVM, Inc.*, 403 F. Supp. 2d 17, 20 (D.D.C. 2005) (court considered collective bargaining agreement to determine motion to dismiss that had been incorporated by reference and upon which the complaint was based); *Paley v. Estate of Ogus*, 20 F. Supp. 2d 83 (D.D.C. 1998) (stating that, in deciding a motion to dismiss, the court may consider any documents either attached to or incorporated in the complaint). *See also Int'l Audiotext Network, Inc. v. AT&T Co.*, 62 F.3d 69 (2d Cir. 1995) (holding that the court may take a document into consideration in deciding defendant's 12(b)(6) motion to dismiss without converting the proceeding into one for summary judgment, even if plaintiff chose not to attach to complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint).

361,000 EUR to Stroitelstvo as part of the draw down amount, *id.* ¶ 12, and that the Bank made at least four other disbursements to Stroitelstvo. (*Id.* ¶¶ 13,14)

The Loan Agreement anticipated that presales of residential units would occur prior to their completion. (Ex. A ¶ 1.17) Stroitelstvo was required to notify the Bank and obtain its approval for any such presales. (*Id.* ¶ 14.12) Stroitelstvo also had to transfer proceeds from presale agreements to the Bank as loan repayments until the loan was fully repaid. (*Id.* ¶¶ 9.05, 9.06, 10.01, 10.03) Any failure to obtain the Bank's approval for presale agreements was considered an "Event of Default," as was a failure to transfer presale proceeds to the Bank. (*Id.* ¶¶ 10.01, 16.01(x); *see also id.* ¶ 10.03(c) (the Bank could refuse to make further disbursements of funds if Stroitelstvo failed to transfer sales proceeds)) In the event of a default, the Bank had the right, among other things, to: (1) cancel its commitment to disburse any remaining amounts of the loan not yet disbursed; (2) accelerate the loan for immediate repayment; (3) foreclose on collateral; and, (4) seek legal fees incurred to take legal action against Stroitelstvo. (*Id.* ¶¶ 16.04, 16.06) The Loan Agreement is governed by Bulgarian law. (*Id.* ¶ 17.07)

### D.    Suspension of Credit Under the Agreement

On November 11, 2005, after having made various disbursements under the Loan Agreement, the Bank suspended further credit payments to Stroitelstvo and asserted an event of default and the right to recover 970,438 EUR. (Compl. ¶ 15) The Complaint alleges that the event of default was based on plaintiff's failure to obtain prior consent of the Bank for certain preliminary contracts, and on plaintiff's failure to transfer certain advanced payments from buyers. (*Id.* ¶ 16) In an effort to resolve the dispute, the Bank offered to have BAPM, its affiliated property management company, purchase the project from Stroitelstvo and assume the loan. (*Id.* ¶ 19) Stroitelstvo declined the offer. (*Id.* ¶ 20) After efforts to resolve the default failed, the Bank asserted its right to recover the full amount of the loan. (*Id.* ¶¶ 15, 21)

### E.    Bulgarian Resolution of the Dispute

On December 12, 2005, the Bank obtained a decree of execution from a Bulgarian court. (*Id.* ¶ 21)  Plaintiff alleges that the Bank utilized this decree of execution to attach and freeze the assets of plaintiff. (*Id.* ¶ 22)  On May 9, 2006, the Bank and Stroitelstvo entered into a settlement agreement to resolve their disputes. (*Id.* ¶ 23)  Under the settlement agreement, Stroitelstvo agreed to pay the Bank 563,000 EUR. (*Id.* ¶ 24)  Stroitelstvo now alleges that it entered into the agreement under duress. (*Id.* ¶ 23)  Conspicuously, none of Stroitelstvo's seven claims relates to the validity of the settlement agreement, despite its contention that it was "forced to enter into an Agreement with the Bank." (*Id.*)

### F.    Alleged Wrongful Actions By The Bank

Stroitelstvo alleges that "these actions by the Bank" — without further clarifying what "these actions" means — "amount to extortion, blackmail, bank fraud and predatory lending practices . . . and constitute a pattern of racketeering activity" under civil RICO. (*Id.* ¶ 25)  Stroitelstvo seeks consequential damages resulting from the Bank's suspension of disbursements. (*Id.* ¶ 27)  Additionally, the "conduct of the bank" allegedly conforms with the Bank's pattern and practice and is part of a general scheme to take its borrowers' assets and equity. (*Id.* ¶¶ 28-29)  According to Stroitelstvo, the Bank allegedly has used the same pattern of conduct with at least four other small businesses, none of which are identified. (*Id.* ¶ 29)

### G.    Stroitelstvo Files This Lawsuit

On April 4, 2007, Stroitelstvo filed this action.  BAEF was served in Delaware on June 18, 2007, through BAEF's registered agent.  In its Complaint, Stroitelstvo purports to assert five claims against BAEF:  (1) a RICO claim under 18 U.S.C. § 1961(c), *id.* ¶¶ 36-47; (2) intentional interference with various contracts Stroitelstvo purportedly entered into with third parties pertaining to the construction project in Bulgaria, *id.* ¶¶ 58-65; (3) intentional interference

with prospective advantage arising from the Bulgarian construction project, *id.* ¶¶ 66-72; (4) breach of fiduciary duty, *id.* ¶¶ 73-78; and, (5) civil conspiracy, *id.* ¶¶ 85-88. Plaintiff has also asserted a claim for breach of the loan agreement, *id.* ¶¶ 48-57, and abuse of process, *id.* ¶¶ 79-84, but those claims apparently are alleged only against the Bank.

The Loan Agreement entered into by plaintiff and the Bank form the basis of plaintiff's RICO claim, as well as each and every one of plaintiff's common law tort claims. (*See id.* ¶¶ 46, 78, 84, 88 (damages include plaintiff's loss of benefit of the bargain); 48-57 (breach of contract claim); and 63-64, 70-71 (refusal to provide funds under the contract was intentional interference with plaintiff's third-party contracts and prospective advantage).

## CHOICE OF LAW

As discussed in BAEF's motion to dismiss on jurisdictional and venue grounds, or alternatively on the doctrine of *forum non conveniens*, it is clear that the Loan Agreement that is the basis of this action is governed by Bulgarian law, and should be resolved by a Bulgarian court. (*See* Ex. A ¶¶ 17.07-17.08) Even apart from the Loan Agreement, Bulgarian law should apply because Bulgaria has the most substantial interest in the resolution of this dispute. *See, e.g., Stromberg v. Marriott Int'l, Inc.*, 474 F. Supp. 2d 57, 61 (D.D.C. 2007) (stating that if a conflict exists, the court must then determine "which jurisdiction has a 'more substantial interest' in the resolution of the issues."). As stated in BAEF's alternative motions, this analysis should lead the Court to dismiss this action or, at the very least, transfer it to the Northern District of Illinois. Assuming, *arguendo*, that this Court finds that Bulgarian law does not control and that the District of Columbia is a proper forum, the Court would arguably apply either the law of Illinois or the District of Columbia. Because plaintiff's RICO claim is based on federal law, and because there is no conflict between the laws of Illinois and the District of Columbia for the

common law claims asserted in the Complaint, for the purposes of this motion BAEF relies on federal and District of Columbia law.

## ARGUMENT

In order to survive a motion to dismiss under Rule 12(b)(6), the complaint must contain "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Dismissal is proper when the plaintiff "fails to allege all the material elements of [its] cause of action." *Weyrich v. The New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001) (citation and internal quotation marks omitted). "[T]he court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Importantly, the Supreme Court's recent decision in *Bell Atlantic Corporation v. Twombly*, 127 S. Ct. 1955 (2007), clarified *Conley*'s pleading standards for motions to dismiss. A complaint must be dismissed pursuant to Rule 12(b)(6) if it does not plead "enough facts to state a claim for relief that is plausible on its face." Plaintiffs must "nudge their claims across the line from conceivable to plausible" or else "their complaint must be dismissed." *Twombly*, 127 S. Ct. at 1974. Only then does the plaintiff satisfy the requirement to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* at 1964.[4]

---

[4] Although *Twombly*'s elevated pleading requirements were set forth in the context of an alleged antitrust conspiracy, this Court has applied *Twombly*'s pleading requirements to several non-antitrust related claims. *See, e.g., Rattigan v. Gonzales*, Civil Action No. 04-2009 (ESH), 2007 WL 1577855, at *6 (D.D.C. May 31, 2007) (applying *Twombly*'s pleading standards in the context of an employment discrimination claim); *Hicks v. Ass'n of Am. Med. Colls.*, Civil Action No. 07-00123 (ESH), 2007 WL 1577841, at *2 (D.D.C. May 31, 2007) (applying *Twombly*'s pleading standards to a claim of retaliatory employment termination); *Martens v. U.S.*,

**I.    Stroitelstvo Has Not Alleged Sufficient Facts To Impute The Bank's Liability To BAEF.**

The Complaint does not state or describe any independent behavior by BAEF that has caused plaintiff any damages.    Instead, as explained above, Stroitelstvo makes only conclusory assertions that the "conduct of the Bank as alleged in the Complaint constitutes the conduct of BAEF." (*See, e.g.*, Compl. ¶ 30)    But such broad, conclusory allegations do not satisfy the pleading standards under *Twombly*.  *See Twombly*, 127 S. Ct. at 1965 (holding that although the plaintiff need not allege all of the facts involved in a claim, the claim must still be supported with enough facts, taken as true, that plausibly suggest that the plaintiff is entitled to relief); *see also U.S. v. Ortho-McNeil Pharm., Inc.*, No. 03 C 8239, 2007 WL 1091185 (N.D. Ill. July 20, 2007) (dismissing claims against a parent corporation where the plaintiff failed to set forth facts that would plausibly suggest liability of the parent corporation under a "piercing of the corporate veil" theory).    This defect alone requires dismissal of plaintiff's claims against BAEF.

**II.    The RICO Claim Should Be Dismissed Pursuant To Rules 12(b)(6) And 9(b).**

Stroitelstvo has alleged that BAEF violated RICO Section 1962(c).  In order to allege a violation of Section 1962(c) of the RICO statute, a plaintiff must allege that:  "(1) a person or persons (2) associated with an enterprise (3) conducted (4) affairs of that enterprise (5) through a pattern (5) of racketeering activity."  *Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 78 (D.D.C. 2006).

---

Civil Action No. 05-1805 (RMC), 2007 WL 2007580, at *1 (D.D.C. July 6, 2007); *Lutz v. U.S.*, Civil Action No. 06-1177 (RMC), 2007 WL 1954438, at *2 (D.D.C. July 5, 2007) (applying *Twombly*'s pleading standards in the context of claims alleging IRS tax violations); and *Lowe v. DEA*, Civil Action No. 06-1133 (CKK), 2007 WL 2104309, at *2 (D.D.C. July 22, 2007) (applying *Twombly*'s pleading standards in the context of a FOIA request).

Plaintiff has not alleged, and cannot allege, a proper RICO claim. As an initial matter, Stroitelstvo has failed to allege essential elements of a RICO claim, requiring dismissal under Rule 12(b)(6). In addition, plaintiffs have failed to plead the underlying predicate acts with specificity, as required by Rule 9(b). Because the RICO claim must be dismissed under Rule 12(b)(6) and/or Rule 9(b), this Court lacks subject matter to address the remaining tort claims asserted by plaintiff.

### A.    Failure To State A Claim.

There are at least five major defects in plaintiff's RICO claim: (1) plaintiff does not allege that BAEF's conduct proximately caused plaintiff's injury, and therefore plaintiff lacks standing; (2) plaintiff has not alleged an "enterprise" distinct from the person from whom damages are sought; (3) none of BAEF's alleged conduct affected United States commerce; (4) plaintiff has not adequately alleged any RICO predicate acts; and, (5) plaintiff has not alleged a "pattern" of racketeering activity. Any one of these five defects requires dismissal under Rule 12(b)(6).

### 1.    BAEF's Alleged Conduct Did Not Proximately Cause Plaintiff's Injury.

In order to have standing under RICO, a plaintiff must plead facts that demonstrate "'some direct relation between the injury asserted and the injurious conduct alleged' — in other words, proximate cause." *Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) (quoting *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). *See also Holmes*, 503 U.S. at 268 (stating that to establish proximate cause, plaintiff must demonstrate a "direct relation between the injury asserted and the injurious conducted alleged."). Proof of a "direct relation" between plaintiff's injury and defendant's alleged conduct requires a showing that the alleged conduct was "'a substantial factor in the sequence of responsible causation.'" *Nix v.*

*Hoke*, 62 F. Supp. 2d 110, 115 (D.D.C. 1999) (quoting *Cox v. Adm'r U. S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994). A plaintiff has failed to plead causation, and therefore lacks standing, unless it demonstrates that its injury was a direct and foreseeable result of a defendant's individual actions. *Smith v. D.C.*, 413 F.3d 86, 103 (D.C. Cir. 2005) (stating that "[p]roximate cause . . . requires an element of foreseeability."). The proximate cause requirement is thus meant to "limit a [defendant's] responsibility for the consequences of ***that [defendant's] own acts***." *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. at 268 (emphasis added). Here, plaintiff's Complaint does not plead facts to show that its alleged injuries are the direct and foreseeable result of BAEF's own individual acts.

The Loan Agreement forms the basis of plaintiff's RICO claim. However, nothing in the Complaint suggests that BAEF played any role in the formation, performance, or breach of the contract. There are no facts alleged that directly and foreseeably connect any of BAEF's individual actions to plaintiff's alleged injuries. In fact, plaintiff's Complaint is utterly devoid of any factual allegations that show BAEF committed any unlawful acts, let alone acts that were the proximate cause of plaintiff's alleged injury. The only factual allegations plaintiff makes in its Complaint with regard to BAEF are that:

- BAEF is a not-for-profit corporation established pursuant to the SEED Act, Compl. ¶ 6;

- BAEF was established to promote private sector development and entrepreneurship in Bulgaria through, among other things, grants, loans, and equity investments, *id.*;

- BAEF commenced operations in 1992 with $58 million in funding from the American government, *id.*;

- BAEF has, at all times, been based in Chicago, Illinois, *id.*;

- BAEF was owner of a 68% interest in BM Leasing at the end of fiscal year 2004, *id.*;

- BAEF was the parent company of Bulgarian American Property Management EOOD ("BAPM"), *id.*, and;

- BAEF was a main shareholder of the Bank, a wholly-owned subsidiary of BAEF. (*Id.* ¶ 7)

None of these facts allege any improper conduct by BAEF. Plaintiff's failure to plead any facts demonstrating that BAEF's individual conduct was the direct and foreseeable cause of its alleged injuries makes clear that it lacks standing. *See, e.g., Weaver v. Bratt*, 421 F. Supp. 2d 25, 36-37 (D.D.C. 2006) (dismissing plaintiff's RICO claims for failure to demonstrate proximate causation).

### 2. Plaintiff Fails to Adequately Allege an Enterprise Distinct From the Person From Whom Damages are Sought.

To allege an enterprise under the RICO statute, plaintiff must name two distinct entities: (1) a person, and (2) an enterprise. *See Prunte v. Universal Music Group*, 484 F. Supp. 2d 32, 42 (D.D.C. 2007) (making clear that an enterprise "is simply not the same person referred to under a different name — that is to say, there must be some distinctness between the RICO defendant and the RICO enterprise." (citations and internal quotations omitted)). To be clear, "[a] corporation may be either a 'person' or an 'enterprise' under RICO *but the same corporation or association cannot be both the person and the enterprise*." *Id.* (emphasis added). *See also Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 883 F.2d 132, 139 (D.C. Cir. 1989) ("Logic alone dictates that one entity may not serve as the enterprise and the person associated with it because, as Judge Posner of the Seventh Circuit has stated, 'you cannot associate with yourself.'" (quoting *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985)). In cases where a parent corporation and its subsidiaries are alleged to be both a "person" and an "enterprise," the court will "look to the allegations in the complaint to determine whether the parent's activities are sufficiently distinct from those of [its subsidiaries] at the time

that the alleged RICO violations occurred." *Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 84 (D.D.C. 2006) (quoting *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 449 (1st Cir. 2000) (internal quotations omitted)).

Here, plaintiff alleges that BAEF and the Bank are each a "person" as well as members of an "enterprise" under 18 U.S.C. § 1961. (Compl. ¶ 38)  Plaintiff makes no attempt, however, to plead factual allegations to show any wrongful conduct specifically committed by BAEF distinct from the Bank's conduct or the greater "enterprise."  In fact, as explained above, plaintiff merely makes conclusory statements imputing the Bank's conduct to BAEF, then proceeds to "treat[], and refer[] to, the defendant corporations as if they were a single, undifferentiated mass." *Bates*, 466 F. Supp. 2d at 85.  Specifically, plaintiff alleges that:

- BAEF and the Bank (collectively, "Defendants") were associated with the Enterprise, Compl. ¶ 40;

- Defendants conducted and participated, directly and indirectly, in racketeering activity, *id.* ¶ 41;

- The alleged racketeering activity consisted of two or more incidents of racketeering activity committed by Defendants, *id.* ¶ 42; and,

- Plaintiff was injured as a direct and proximate cause of Defendants' acts. *Id.* ¶ 46.

Nowhere in the Complaint does plaintiff even attempt to dissect BAEF's distinct role in the alleged racketeering activity.  In fact, plaintiff seems to purposefully lump BAEF and the Bank together in its generic and conclusory allegations that "the conduct of the Bank . . . constitutes the conduct of BAEF," that the Bank's actions and decisions were subject to the "control and . . . direction," "supervision," and "policies and demands," of BAEF, and that BAEF "ratified and affirmed the conduct of the Bank as alleged in the Complaint." (*See* Compl. ¶¶ 30-35)  "Such imprecision makes it difficult, if not impossible, for the Court to parse the complaint in such a way as to understand the specific role each defendant allegedly played —

12

whether as a RICO person or a RICO enterprise — in the purportedly fraudulent scheme." *Bates*, 466 F. Supp. 2d at 85; *see also id.* at 84 ("If the actions or interentanglement of [the parent corporation] and its subsidiaries . . . are so indistinguishable in the context of what allegedly occurred in this case as to make the parent corporation liable for criminal activities attributed to its wholly owned subsidiaries under the applicable tests, then it would be inconsistent to treat [the parent corporation and its subsidiary co-defendants] as different entities under Section 1962(c).").[5]

Plaintiff's failure to plead any facts to demonstrate that BAEF is a distinct entity, separate and apart from the Bank, constitutes an independent basis for dismissing its RICO claim. *See, e.g., Bates*, 466 F. Supp. 2d at 88 (dismissing plaintiff's RICO claim for failure to demonstrate that a parent company and its subsidiary co-defendants were distinct entities, explaining that "plaintiffs' three Section 1962(c) claims, when viewed together and without the benefit of a clearly pled complaint, essentially collapse into a single allegation that the parent corporation . . . and its two subsidiaries . . . are each simultaneously a RICO person acting through the other entities in their roles as RICO enterprises and a RICO enterprise through which the other entities act as RICO persons.").

### 3. Plaintiff Fails to Allege That Any of BAEF's Conduct Affected United States Commerce.

Under the RICO statute, the alleged "enterprise" must be engaged in, or involved in activities that affect, "interstate or foreign commerce."    18 U.S.C. § 1962(c) (2007). "Interstate commerce" is defined as either "*intra*state commercial activities that nonetheless have

---

[5]    Plaintiff's addition of BAEF's subsidiary BAPM, and "any individuals who aided and abetted or otherwise participated in their unlawful activities," to the alleged enterprise does not redeem its Complaint. In fact, the addition of these entities, without more, just serves to cloud further the distinctiveness analysis. *See Bates*, 466 F. Supp. 2d at 85 (asserting that it was "especially" difficult to understand each defendant's individual role as a RICO person or RICO enterprise where plaintiffs alleged several alternative enterprises, some of which added the District of Columbia as a member).

substantial *inter*state effects," *United States v. Robertson*, 514 U.S. 669, 671 (1995) (emphasis in original), or "'direct[] engage[ment] in the production, distribution, or acquisition of goods or services in interstate commerce.'" *Id.* at 672 (quoting *United States v. Am. Bldg. Maint. Indus.*, 422 U.S. 271, 283 (1975). In order to apply the RICO statute to foreign conduct, "[t]he activity at issue must, at minimum, produce or be intended to produce effects in this country." *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 116 (D.D.C. 2005).

Stroitelstvo has failed to plead a single fact asserting that BAEF is engaged in, or involved in activities that affect, either interstate or foreign commerce. Plaintiff does not allege that BAEF was engaged in any activities that affected interstate commerce. Nor does plaintiff allege any commercial conduct by BAEF that produced effects in the United States, or that was even intended to produce effects in the United States. In fact, one of the few facts alleged about BAEF's commercial activities is that it was established to promote "private sector development and entrepreneurship *in Bulgaria* . . . ." (Compl. ¶ 6) This Court has recognized that when "the primary and significant effects of the . . . defendants' actions [were] felt abroad, not in the United States; [and that,] indeed, any effect on American commerce [was] negligible, unforeseeable, and unintended," a plaintiff's RICO claim must be dismissed. *Doe I*, 400 F. Supp. 2d at 116. Given plaintiff's concession that BAEF's activities promote commerce in Bulgaria, and the absence of any allegations connecting any of BAEF's commercial activities to the United States, Stroitelstvo's claim must be dismissed for failure to demonstrate that BAEF is engaged in interstate or foreign commerce under the RICO statute.

**4.    Plaintiff Fails to Allege The Required Predicate Acts.**

In order to state a RICO claim under Section 1962(c), a plaintiff must allege facts to demonstrate a "pattern of racketeering activity." 18 U.S.C. § 1962(c) (2007). The RICO statute defines a "pattern" as "at least two acts of racketeering activity," as defined in 18 U.S.C.

§ 1961(1), that take place within a ten year period. *See* 18 U.S.C. § 1961(5) (2007). Plaintiff's Complaint completely fails to plead the required predicate acts of racketeering activity.

Plaintiff asserts six different predicate racketeering acts against BAEF: (1) bank fraud, in violation of 18 U.S.C. § 1344; (2) extortion, in violation of 18 U.S.C. § 1951; (3) extortionate credit transactions, in violation of 18 U.S.C. §§ 891-894; (4) violation of the Travel Act, 18 U.S.C. § 1952, which deals with interstate and foreign travel or transportation in aid of the racketeering enterprise; (5) extortion; and, (6) blackmail "within the meaning of the applicable state law." (Compl. ¶ 43a.-e. ) Plaintiff makes no effort to state any facts to support a claim under any of these alleged predicate offenses.

### a.    Bank Fraud Under 18 U.S.C. § 1344

To make out a bank fraud claim, plaintiff must allege facts to demonstrate that BAEF: (1) knowingly executes, or attempts to execute; (2) a scheme or artifice; (3) to defraud a financial institution, or to obtain any of the moneys owned by, or under the custody or control of, a financial institution; (4) by means of false or fraudulent pretenses. *See* 18 U.S.C. § 1344 (2007). Plaintiff's Complaint does not contain a single allegation of any intent by BAEF to defraud any financial institution, much less any individual conduct on BAEF's part to support this claim.[6]

### b.    Extortion Under 18 U.S.C. § 1951

Plaintiff fails to plead an allegation of extortion, which requires plaintiff to demonstrate that BAEF "obstruct[ed] . . . commerce . . . by robbery or extortion . . . or commits or threatens physical violence to any person or property in furtherance of a plan . . . to do

---

[6]    Plaintiff furthermore fails to meet the heightened pleading requirement of Rule 9(b) of the Federal Rules of Civil Procedure, which governs the specificity required to plead allegations of fraud. *See further* Section II.B., *infra.*

15

anything in violation of [Section 1951] . . . ."  18 U.S.C. § 1951(a) (2007).  Besides plaintiff's

bald assertions that BAEF "extort[ed] funds," plaintiff makes no *factual* allegations that BAEF

personally obstructed "commerce" by "robbery or extortion."  Nor can plaintiff do so.  Section

1951 defines commerce as "commerce within the District of Columbia, or any Territory or

Possession of the United States; all commerce between any point in a State, Territory,

Possession, or the District of Columbia and any point outside thereof; all commerce between

points within the same State through any place outside such State; and all other commerce over

which the United States has jurisdiction."  18 U.S.C. § 1951(b)(3) (2007).  Because the only

allegations that plaintiff makes with regard to BAEF's commercial activities connect BAEF to

Bulgaria, *see* Compl. ¶ 6, plaintiff does not state a claim under this statute.

### c.    Extortionate Credit Transactions Under 18 U.S.C. §§ 891-894

In order to state a claim for extortionate credit transactions under 18 U.S.C.

§§ 891-894, plaintiff must show that BAEF either made an "extortionate extension of credit or

conspired to do so," financed an extortionate extension of credit, or collected an extension of

credit by "extortionate means."  *See* 18 U.S.C. §§ 892-894 (2007).  An "extortionate extension of

credit" is defined as "any extension of credit with respect to which it is the understanding of the

creditor and the debtor at the time it is made that delay in making repayment or failure to make

repayment could result in the use of violence or other criminal means to cause harm to the

person, reputation, or property of any person."  *Id.* § 891(6).  "Extortionate means" is defined as

"any means which involves [sic] the use, or an express or implicit threat of use, of violence or

other criminal means to cause harm to the person, reputation, or property of any person."  *Id.*

§ 891(7).  Plaintiff again fails to plead any facts to establish that BAEF either:  (1) agreed to lend

money to plaintiff with the understanding of the parties that BAEF would use "violence or other

criminal means" to harm plaintiff if plaintiff failed to make repayment or delayed to make

repayment; (2) financed such an agreement; or, (3) collected an extension of credit using "violence or other criminal means."

### d.    The Travel Act, 18 U.S.C. § 1952

A requisite and central element of the Travel Act is that the violator travel "in interstate or foreign commerce, or use[] the mail or any facility in interstate or foreign commerce." As established above, plaintiff concedes that BAEF's activities promote commerce in Bulgaria, and Stroitelstvo fails to state affirmatively any conduct by BAEF in or affecting United States commerce. Plaintiff thus fails to state a claim for the Travel Act.

### e.    Extortion and Blackmail Under D.C. Law

The final predicate acts alleged by Stroitelstvo are acts of extortion and blackmail "within the meaning of the applicable state law." (Compl. ¶ 43e. ) Under D.C. law, a person commits extortion if "[t]hat person obtains or attempts to obtain the property of another with the other's consent . . . induced by wrongful use of actual or threatened force or violence or by wrongful threat of economic injury; or . . . under color or pretense of official right." D.C. Code § 22-3851 (2007). In D.C., a person commits blackmail "if, with intent to obtain property of another or to cause another to do or refrain from doing any act, that person threatens: (1) To accuse any person of a crime; (2) To expose a secret or publicize an asserted fact . . . tending to subject any person to hatred, contempt, or ridicule; or, (3) To impair the reputation of any person . . . ." D.C. Code § 22-3852 (2007). Yet again, plaintiff fails to allege any facts to show that BAEF personally carried out any elements of these crimes. And plaintiff's assertions that BAEF, collectively with the other members of the enterprise, "extort[ed] funds," and "blackmail[ed]" plaintiff, do not meet even the basic pleading requirement under Rule 8 of the Federal Rules of Civil Procedure.

"[A] plaintiff's obligation to provide the 'grounds' for 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007). Here Stroitelstvo does not trouble itself to do even that much. Plaintiff's outright failure to plead any element of any alleged offense must result in a dismissal of its RICO claims. *See, e.g., Hamrick v. Gottlieb*, 416 F. Supp. 2d 1, 5 (D.D.C. 2005) (dismissing RICO claim for failure to plead both the RICO statute and the alleged predicate acts).

## 5. Plaintiff Also Fails To Establish A Pattern Of Racketeering Activity Under D.C. Law.

Even assuming that plaintiff sufficiently pleaded the predicate acts of its RICO claim (which it did not), plaintiff must still establish that BAEF engaged in a "pattern of racketeering activity." A plaintiff may prove a pattern of racketeering activity by showing that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The two alleged predicate acts must also exhibit attributes of continuity and relatedness. *See Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1264 (D.C. Cir. 1995) (stating that plaintiff must show "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.") (emphasis in original). Moreover, plaintiff may not satisfy the pattern requirement by relying on generalized allegations of wrongful conduct by "the Defendants." Instead, plaintiff "must allege that ***each defendant*** participated in the conduct of an enterprise through a pattern of racketeering activity." *Dooley v. United Techs. Corp.*, 803 F. Supp. 428 (D.D.C. 1992) (emphasizing that, "[a]t a minimum, [plaintiff] must allege that the individual . . . defendants each committed two RICO predicate acts.") (emphasis added).

On a Rule 12(b)(6) motion to dismiss in the D.C. Circuit, the Supreme Court's "relatedness" and "continuity" factors are determined by consideration of the following factors: "(1) the number of unlawful acts; (2) the length of time over which the acts were committed; (3) the similarity of the acts; (4) the number of victims; (5) the number of perpetrators; and, (6) the character of the unlawful activity." *Western Assocs. Ltd. P'ship v. Market Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001) (first stated in *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995)). Proof of the pattern requirement is of particular import to the RICO statute because it "helps to prevent ordinary business disputes from becoming viable RICO claims." *Western Assocs.*, 235 F.3d at 637.

Honing in on these six factors, this Court can easily determine that the pattern requirement is not met here. Plaintiff alleges that the Bank (and therefore BAEF) conducted a "scheme to strip assets and equity from its borrowers," and that the Bank "utilized the same pattern of wrongful conduct" on "at least four other occasions, involving four other small businesses. (Compl. ¶¶ 28-29) While plaintiff describes the events between plaintiff and the Bank as occurring between March 24, 2005 (the date that plaintiff and the Bank entered into a Loan Agreement, *see id.* ¶ 9) and May 9, 2006 (the date that plaintiff entered into a settlement agreement with the Bank, *see id.* ¶ 23), it fails to provide any timeframe for the purported "four other occasions" on which the Bank carried out the same "scheme" on four other, unidentified, small businesses. It is impossible to determine a pattern of activity using the six-factor *Edmondson* test with such scarce information.

Based on the facts alleged in its Complaint, plaintiff can, at most, allege that a single scheme was carried out once, against one victim (the plaintiff), by one perpetrator (the Bank). Plaintiff's failure to allege a pattern of racketeering "inexorably leads to the conclusion

that [plaintiff] failed to state a legally cognizable claim under RICO." *Western Assocs.*, 235 F.2d at 634.

**B.    Failure To Meet The Heightened Pleading Standard Under Rule 9(b).**

In cases that allege predicate acts of fraud, Federal Rule of Civil Procedure 9(b) governs the specificity required to plead both the elements of the predicate offenses as well as the overall elements of the RICO claim. *See, e.g. Prunte v. Universal Music Group*, 484 F. Supp. 2d 32, 42 (D.D.C. 2007) (stating that Rule 9(b) "mandates that '[i]n *all* averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.' This heightened pleading standard is applicable to civil RICO claims . . . .") (emphasis added).

Rule 9(b) "requires that the pleader provide the 'who, what, when, where, and how' with respect to the circumstances of the fraud." *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (requiring the pleader to provide the equivalent of a "first paragraph of any newspaper story"). What is more, it is insufficient for plaintiff to "merely refer back to previous portions of the complaint which set forth the alleged facts of the case, provided such references do not identify the specific moment, victim, perpetrator, and content of such frauds." *Wallace v. Abramson*, CIV. A. No. 85-4039 (JHP), 1988 WL 63065, at *3 (D.D.C. June 7, 1988). Rule 9(b)'s specificity requirement ensures that "the [defendant] has notice of the claim, prevents attacks on his reputation where the claim for fraud is unsubstantiated, and protects him against a strike suit brought solely for its settlement value." *Anderson*, 221 F.R.D. at 253 (citations omitted). A plaintiff's failure to plead a fraud-based predicate act sufficiently and with specificity may result in dismissal of its RICO claim for failure to state a claim. *See, e.g., Byer Indus., Inc. v. Gulf Ins. Co.*, 888 F. Supp. 1 (D.D.C. 1995) (dismissing RICO claims for failure to plead fraud-based predicate acts with specificity); *Johnson v. Computer Tech. Servs., Inc.*, 670 F. Supp. 1036

(D.D.C. 1987) (dismissing with prejudice plaintiff's RICO claim for failure to plead fraud with specificity).

Stroitelstvo falls woefully short of the heightened pleading requirements contemplated by Rule 9(b). In its RICO claim, Stroitelstvo avers that "Defendants" committed "[r]epeated acts of bank fraud within the meaning of 18 U.S.C. § 1344 . . . ." (Compl. ¶ 42, 43a.) But plaintiff does not even list the elements of this claim, much less plead with particularity the "time, place, and content of the false misrepresentations, the misrepresented fact, and what the opponent retained or the claimant lost as a consequence of the alleged fraud." *Anderson*, 221 F.R.D. at 253 (D.D.C. 2004) (citations omitted). Stroitelstvo's "unmitigated vagueness regarding which defendant played which role in the fraudulent conduct is surely inconsistent with the heightened pleading requirement of Rule 9(b)." *Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 90 (D.D.C. 2006). Furthermore, plaintiff's blanket declaration that Defendants committed "repeated acts of bank fraud" plainly fails to meet Rule 9(b)'s heightened pleading standard.

Rule 9(b)'s particularity requirement is meant to protect defendants from precisely the types of conclusory and unfounded allegations of fraud asserted here, "a matter of particular concern when the charge is one as serious as that of racketeering." *Wallace*, 1988 WL 63065, at *2. For this reason, and because plaintiff failed to state a claim for bank fraud under the heightened pleading standard, Stroitelstvo's RICO claim should be dismissed.

## C. Because The RICO Claim Must Be Dismissed, All Other Counts Should Be Dismissed For Lack Of Subject Matter Jurisdiction.

This Court's consideration of Stroitelstvo's Complaint hangs on one thin thread: plaintiff's inadequately pled RICO claim. Should the Court dismiss this claim, BAEF requests

that it decline to exercise supplemental jurisdiction over the remaining common law claims and dismiss such claims for lack of subject matter jurisdiction.

When a federal claim is dismissed at an early stage, "the Court has no reason not to dismiss the state claims as well." *Long Distance Serv. of Wash., Inc. v. MCI Telecommc'ns Corp.*, 692 F. Supp. 1402, 1406 (D.D.C. 1988) (citing *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) (stating that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.").[7]

As the Court of Appeals has held, "absent the jurisdictional peg of RICO, there [is] nothing to hold [the supplemental common law claims] within the federal court." *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, (D.C. Cir. 1991). Thus, this Court should dismiss Stroitelstvo's remaining common law claims for lack of subject matter jurisdiction.[8]

## III.    Each Of Plaintiff's Other Tort Claims Is Fatally Flawed.

For the reasons explained above, if the Court dismisses the RICO claim, it need not address the sufficiency of plaintiff's remaining counts. However, out of an abundance of

---

[7]    *See also Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260 (D.C. Cir. 1995) (remanding case to District Court, after review for abuse of discretion, for deciding pendent common law claims after properly dismissing RICO claim); *Dumbarton Condo. Ass'n v. 3120 R St. Assocs. Ltd. P'ship*, 657 F. Supp. 226, 232 (D.D.C. 1987) ("Dismissing the RICO count necessarily entails dismissing the remaining pendent state claims for want of subject matter jurisdiction."). *See also Anderson v. Wiggins*, 460 F. Supp. 1 (D.D.C. 2006) (dismissing RICO claim pursuant to Rule 12(b)(6), and dismissing state claims after declining to exercise pendent jurisdiction over such claims); *W.L. Meng v. Schwartz*, 116 F. Supp. 2d 92 (D.D.C. 2000) (same).

[8]    Plaintiff mistakenly asserts that subject matter jurisdiction also exists on the basis of diversity, but "[a] diversity suit . . . may not be maintained in federal court by an alien against a citizen of a state and a citizen of some other foreign country." *Eze v. Yellow Cab Co. of Alexandria, Va., Inc.*, 782 F.2d 1064, 1065 (D.C. Cir. 1986). As plaintiff concedes, Stroitelstvo Bulgaria is "organized under the laws of the Republic of Bulgaria," Compl. ¶ 5, while BAEF "has at all times been based in Chicago, Illinois," Compl. ¶ 6. And, as plaintiff recognizes, the Bank is also a citizen of Bulgaria. (Compl. ¶ 7) Diversity jurisdiction, therefore, does not exist.

caution, BAEF explains below why each of plaintiff's remaining claims must be dismissed pursuant to Rule 12(b)(6).

**A.**    **Plaintiff's Intentional Interference with Contract Claim Fails as a Matter of Law and Should be Dismissed.**

To state a claim for intentional interference with contract, a plaintiff must allege facts that establish:  (1) the existence of a contract between the plaintiff and a third party; (2) knowledge of the contract by the defendant; (3) intentional procurement of its breach by the defendant; and, (4) damages resulting from the breach.  *See, e.g.*, *King & King, Chartered v. Harbart Intern, Inc.*, 436 F. Supp. 2d 3, 16 (D.D.C. 2006) (dismissing intentional interference with contract claim because plaintiff was unable to allege that any contract was breached).  Plaintiff's claim is deficient in several respects.

*First,* Stroitelstvo provides insufficient and conclusory allegations as to the existence of a contract between it and third parties.  Stroitelstvo's failure to specify what "contracts" BAEF allegedly interfered with warrants dismissal of this claim.  In pleading intentional interference with contract, plaintiff must plead "details regarding the nature of any 'contract' such as whether the Parties had any written or oral agreement and the terms of said agreement . . . ."  *Gov't Relations Inc. v. Howe*, No. Civ. A. 05-1081 CKK, 2007 WL 201264, at *9 (D.D.C. Jan. 24, 2007) (dismissing a claim of tortious interference with a contract because the plaintiff failed to identify what third-party contract was allegedly interfered).  The only allegations as to third-party contracts contained in the Complaint are that defendants knew that "Plaintiff had entered into contracts with suppliers, vendors, tradesmen and others for the design and construction of residential housing in Bulgaria;" and that "Plaintiff had entered in contracts of sale for the purchase of residential housing in Bulgaria."  (Compl. ¶¶ 60-61)  The Complaint

provides no further detail about the nature of plaintiff's contracts with third parties. Such bare allegations are insufficient to plead this element of the claim.

*Second,* Stroitelstvo also has failed to allege BAEF's intentional procurement of a breach of third-party contracts.[9] The Complaint seems to allege that the breach of the Loan Agreement by Defendants constitutes the intentional act done by the Defendants to procure Stroitelstvo's breach of third-party contracts. (*See id.* ¶¶ 62-63) But of course, BAEF is not a party to the Loan Agreement. Thus, it is impossible for BAEF to breach an agreement that does not exist. Indeed, the Complaint fails to allege a single intentional act committed by BAEF that caused a breach of any contract with a third party.

*Third,* the claim for intentional interference with contract is related to an underlying breach of contract action rather than an action sounding in tort. Therefore, it must be dismissed because it merely restates the breach of contract claim asserted in Count II. *See Wash. Hosp. Ctr. Corp. v. Waters*, No. 91-1638 (GHR), 1992 WL 23746, at * 4 (D.D.C. Jan. 21, 1992).

**B.    Plaintiff Fails to State a Claim for Intentional Interference with Prospective Advantage.**

Plaintiff also fails to state a claim against BAEF for intentional interference with prospective advantage. To establish a claim for this tort, plaintiff must plead the following: "(1) the existence of a valid . . . expectancy; (2) knowledge of the . . . expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach [or] termination of the . . . expectancy; and, (4) resultant damages." *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407,

---

[9]    In determining whether there was intentional procurement of a breach, a court may consider the following seven factors: "(1) the nature of the actor's conduct; (2) the actor's motive; (3) the interest of the other with which the actor's conduct interferes; (4) the interests sought to be achieved by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual interest s of the other; (6) the proximity or remoteness of the actor's conduct to interference; and, (7) the relations of the parties." *Cambridge Holdings Group, Inc. v. Fed. Ins. Co.*, 357 F. Supp. 2d 89, (D.D.C. 2004) (citing *Sorrells v. Garfinckel's, Brooks Bros., Miler & Rhoads, Inc.*, 565 A.2d 285, 290 (D.C. 1989) (dismissing an intentional interference with contract claim where the plaintiff failed to allege facts describing the nature of the alleged conduct).

422-23 (D.D.C. 1998). Under D.C. law, a "prospective advantage" is defined as "business expectancies, not grounded on present contractual relationships but which are commercially reasonable to anticipate, [and] are considered to be property." *McManus v. MCI Commc'ns. Corp.*, 748 A.2d 949, 957 (D.C. 2000). Put differently, plaintiff must allege that defendant interfered with a future advantage. *See Moncrief v. Kennedy*, Civ. A. No. 86-1131 SSH, 1987 WL 26415, at *1 (D.D.C. Nov. 19, 1987) ("For the most part the 'expectancies' thus protected have been those of future contractual relations . . . .").

Plaintiff describes its "prospective advantage" as "a business plan and a business model" that it "***had already developed***." (Compl. ¶ 68 (emphasis added)) Common sense dictates that a plan and a model that had already been developed cannot be ***anticipated*** as a ***prospective*** or ***future*** advantage or expectancy. An already-developed business plan and business model thus cannot be considered a "business expectancy" and is therefore not a prospective advantage as contemplated under the law.

Nor can plaintiff plead facts to show the requisite intent element. Plaintiff asserts that BAEF knew plaintiff "required the loan funds from the Contract" in order to obtain the business plan and business model that plaintiffs had already developed, but that BAEF "deliberately, in order to strip Plaintiff's assets, including . . . [the already developed business plan and business model], failed and refused to provided [sic] the funds required by the Contract to Plaintiff." (*Id.* ¶¶ 69-70) However, "a general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings is insufficient to impose liability." *Genetic Sys.*, 691 F. Supp. at 423. In fact, "[m]otive or purpose . . . is of central concern in a tortious interference case . . . and a strong showing of intent is required to establish liability." *Id.* (dismissing tortious interference with prospective advantage claim, finding that plaintiff's allegations with regard to

the intent element were "too vague to withstand defendants' motions.") (quoting *Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1456 (9th Cir. 1983)). The only averment the Complaint includes is the conclusory statement that BAEF acted "deliberately." (Compl. ¶ 70) That is plainly insufficient.

Finally, plaintiffs do not, and cannot, show that such alleged intent caused a "termination of the . . . expectancy." Plaintiff's business model and business plan existed before the Loan Agreement between it and the Bank was executed, and the business model and business plan ostensibly continue to exist now.

**C.    There Is No Fiduciary Relationship Between Plaintiff and BAEF.**

The Complaint feebly attempts to plead a fiduciary relationship by alleging that "Plaintiff had a special relationship with Bank." (*Id.* ¶ 75) Even though the existence of a special relationship alone would not give rise to a fiduciary relationship, the Complaint clearly does not sufficiently allege that BAEF had or has a "special relationship" with Stroitelstvo. Furthermore, "[f]or a fiduciary duty to exist between parties, there must be a special relationship of trust or confidence." *Prunte v. Universal Music Group*, 484 F. Supp. 2d 32, 43 (D.D.C. 2007). Stroitelstvo does not allege that a relationship of "trust and confidence" exists between BAEF and plaintiff.

A special confidential relationship that may give rise to a fiduciary duty "transcends an ordinary business transaction and requires each party to act with the interests of the other in mind." *High v. McLean Fin. Corp.*, 659 F. Supp. 1561, 1568 (D.D.C. 1987). A special relationship of trust may be implied where an agreement required plaintiff to disclose information that defendant was to keep confidential. *Id.* Here, Stroitelstvo alleges — without citing any particular statutory provision — that a fiduciary duty between it and BAEF arose through the SEED Act. But the SEED Act gave rise to ***no relationship*** between BAEF and

Stroitelstvo, let alone a fiduciary relationship. Stroitelstvo, therefore, does not and cannot allege a breach of fiduciary duty by BAEF.

> ### D.     Plaintiff Fails to State a Claim for Civil Conspiracy.

To state a claim for civil conspiracy, plaintiff must allege facts to show that BAEF participated in: "(1) 'an agreement to take part in an unlawful action or a lawful action in an unlawful manner'; and, (2) 'an overt tortious act in furtherance of the agreement that causes injury.'" *Hall v. Clinton*, 285 F.3d 74, 83-84 (D.C. Cir. 2002) (quoting *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)).

Plaintiff makes a bare assertion that BAEF "agreed" with the Bank to undertake the "wrongful conduct" described in the complaint, which was "overt and unlawful." (Compl. ¶¶ 86-87) Such conclusory and vague allegations, without more, are insufficient to state a claim for civil conspiracy. *See Ellipso v. Mann*, Civ. Action No. 05-1186 (RCL), 2006 WL 1126814, at *3 (D.D.C. Apr. 27, 2006); *Graves v. United States*, 961 F. Supp. 314, 320-21 (D.D.C. 1997) (dismissing conspiracy claim for lack of allegations of an agreement or overt acts taken in furtherance of the alleged conspiracy).

Furthermore, if the Court finds that the other counts alleged in plaintiff's Complaint should be dismissed, the conspiracy claim necessarily must be dismissed, for "[c]ivil conspiracy, of course, is not actionable in and of itself but serves instead 'as a device through which vicarious liability for the underlying wrong may be imposed upon all who are a party to it, where the requisite agreement exists among them.'" *Hall*, 285 F.3d at 82 (D.C. Cir. 2002) (quoting *Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480, 1493 (D.C. Cir. 1989)). *See also W.L. Meng v. Schwartz*, 305 F. Supp. 2d 49, 60 (D.C. Cir. 2004) (holding that "because there is no independent cause of action for civil conspiracy under D.C. law, dismissal of the plaintiffs'

breach of fiduciary duty and negligence claims also disposes of any underlying tort to which the civil conspiracy claim could have attached, necessitating its dismissal.").

E.     **The Breach Of Contract And Abuse Of Process Claims Are Not Asserted Against BAEF, But Even If They Were, They Fail To State A Claim.**

On the face of the Complaint, it appears that Stroitelstvo has asserted its breach of contract and abuse of process claims only against the Bank. That would make sense, given Stroitelstvo's admissions that BAEF was not a party to the Loan Agreement and had no involvement in the Bulgarian litigation that is the basis for these two claims. Nevertheless, BAEF briefly explains below why each of these two remaining counts must be dismissed under Rule 12(b)(6) even if they are asserted against BAEF.

1.     **Breach of Contract**

Stroitelstvo's breach of contract claim against BAEF should be dismissed because the Complaint does not state the existence of a contract between BAEF and Stroitelstvo. In this Court, it is settled law that to survive a motion to dismiss for a breach of contract claim, a plaintiff must "plainly identify the existence of the contract, the breach and the resultant damage." *In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 93-94 (D.D.C. 2003); *see also, Ficken v. Rice*, Civ. Action No. 04-1132 (RMU), 2007 WL 1020805, at *4 (D.D.C. Mar. 29, 2007) (dismissing breach of contract claim where plaintiff failed to establish grounds for defendant's liability under a contract to which it was not a party); *Cambridge Holdings Group, Inc. v. Fed. Ins. Co.*, 357 F. Supp. 2d 89 (D.D.C. 2004) (dismissing breach of contract claim where plaintiff failed to allege that the defendant was a party to the contract).

BAEF is not a party to the Loan Agreement. Plaintiff admits as much in its Complaint, describing the contract between Stroitelstvo and the Bank solely as an agreement between it and the Bank, *i.e.*, "Plaintiff entered into a relationship with the Bank pursuant to a

Loan Agreement with the Bank dated March 24, 2005 (the 'Contract'). The Contract obligated the Bank to provide funds to Plaintiff on specified terms and conditions." (Compl. ¶ 9) Because the plaintiff has failed to allege that it has in any way whatsoever contracted with BAEF, this claim should be dismissed.

The Complaint also fails to state the terms of the contract that have been breached allegedly by either BAEF or the Bank. This Court has "dismissed breach of contract allegations for failure to state a claim when the allegation does not identify a specific contractual provision — or, indeed, the contract — that the defendant breached." *Butler v. Fairbanks Capital*, No. Civ. A. 04-0367 (RMU), 2005 WL 5108537, at * 7 (D.D.C. Jan. 3, 2005). Courts in other jurisdictions are in accord. *See, e.g., Wolf v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002) (holding that "a plaintiff must identify the specific provision of the contract that was breached as a result of the acts at issue"); *Ohio Cas. Ins. Co. v. Bank One*, No. 95 C 6613, 1997 WL 30951, at *2 (N.D. Ill. Jan. 22, 1997); *Anderson v. Haverford Coll.*, 851 F. Supp. 179 (E.D. Pa. 1994) (dismissing a breach of contract claim where the plaintiff failed to indicate specific provisions, policies, practices and procedures the defendant allegedly violated when it terminated plaintiff).

## 2.    Abuse of Process

Plaintiff's abuse of process claim also fails because the Complaint is devoid of factual allegations to show that BAEF used any legal process — let alone misused a legal process — that affected Stroitelstvo in any way. To establish a claim for abuse of process, plaintiff must show:  (1) use of the legal system; (2) "to accomplish some end which is without regular purview of the process"; or, (3) ". . . which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do." *Scott v. District of Columbia*, 101 F.3d 748, 755 (D.C. Cir. 1996).

The Complaint does not allege that BAEF employed any legal or judicial process. Rather, plaintiff alleges that *"[t]he Bank* proceeded ex parte and otherwise to attach and freeze Plaintiff's assets by falsely alleging the amount of the debt," Compl. ¶ 80, and that *"[t]he Bank's* purpose in initiating the litigation to freeze Plaintiff's assets was to strip Plaintiff of those assets at a forced sale price." (*Id.* ¶ 82 (emphasis added)) The Complaint also fails to allege (a) use of process by BAEF "to accomplish some end without regular purview of the process," or (b) misuse of process by BAEF. As already stated, BAEF did not play a role in or instigate any legal proceedings against Plaintiff nor does Plaintiff allege such. Accordingly, this claim should be dismissed.

## CONCLUSION

For the foregoing reasons, BAEF respectfully requests that Stroitelstvo's Complaint against Defendant BAEF be dismissed with prejudice.

Dated: August 8, 2007

Respectfully submitted,

_Karen N. Walker /ette_

Karen N. Walker (D.C. Bar No. 412137)
Eunnice H. Eun (D.C. Bar No. 500203)
Samantha A. Gingold (*admission pending*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Tel. (202) 879-5000
Fax (202) 879-5200

Brian D. Sieve, P.C. (*pro hac vice*)
Stephanie A. Brennan (*pro hac vice*)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
Tel. (312) 861-2000
Fax (312) 861-2200

***Attorneys for The Bulgarian-American Enterprise Fund***

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2007, I caused a true and complete copy of

Defendant's Memorandum in Support of its Motion to Dismiss Plaintiff's Complaint Pursuant to

Federal Rules 9(b) and 12(b)(6) to be served on the following counsel of record by ECF.

_____
Karen N. Walker

Recipients:

Philip M. Musolino
MUSOLINO & DESSEL
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
Tel:  (202) 466-3883

Sylvia J. Rolinski
Danielle M. Espinet
ROLINSKI & SUAREZ, LLC
14915 River Road
Potomac, Maryland 20854
Phone:  (240) 632-0903

Exhibit A

| ДОГОВОР ЗА БАНКОВ КРЕДИТ | LOAN AGREEMENT |
|---|---|

Днес, 24.03.2005г. ("Дата на сключване"), в гр. София, бе сключен следният Договор за банков кредит, наричан по-долу ("Договор") между:

On this day of March 24, 2005 ("Date of Agreement") in Sofia, Bulgaria, the following loan agreement, hereinafter referred to as the "Agreement", was made by and between:

1. "СТРОИТЕЛСТВО БЪЛГАРИЯ" ООД, със седалище и адрес на управление гр. София, район Изгрев, ул."Самоков" 11А, рег. по ф.д. №11749/2003г. на Софийски градски съд, вписано в Регистъра за търговски дружества под №80176, том 956, стр.92, БУЛСТАТ 131169857, представлявано от METODI ЛЮБЕНОВ ДИМИТРОВ, ЕГН:5604186661, с лична карта №162000676, издадена на 29.08.2001г. от МВР София, в качеството му на управител, наричан по-долу ("Кредитополучател");

1. STROITELSTVO BULGARIA, OOD with headquarters in Sofia, Izgrev zone 11A Samokov Street, with company registration №11749/2003 as per Commercial Register of Sofia City Court, batch 80176, volume 956, page 92, BULSTAT 131169857, represented by its manager METODI LIUBENOV DIMITROV, UCI#5604186661, identity card №162000676, issued on 29.08.2001 by Police Department Sofia, hereinafter referred to as the "Borrower",

и

And

2. БЪЛГАРО – АМЕРИКАНСКА КРЕДИТНА БАНКА АД, регистрирана със съдебно решение от 3 декември 1996 г. на Софийски градски съд, по дело номер 12587/1996, партида номер 35659, том 397, регистър 1, стр. 180, със седалище и адрес на управление, гр. София, район Средец, ул. Кракра № 16, представлявана от изпълнителните директори Стоян Николов Динчийски с ЕГН 7005114488, с л.к. No. 159356248, издадена на 02.09.2002г. от МВР София, и Димитър Стоянов Вучев, ЕГН:5910266685, л.к. №159148938, изд. на 25.04.2000г. от МВР- София, наричана по-долу "Банката";

2. BULGARIAN-AMERICAN CREDIT BANK AD, registered with a court decision from December 3rd, 1996 of the Sofia City Court, Company File 12587/1996, Batch 35659, Volume 397, register 1, page 180, located in Sofia, Municipality Sredetz, 16 Krakra Street, represented by its Executive Directors Stoyan Nikolov Dinchilski, CI#7005114488, identity card #159356248, issued on September 2, 2002 by Police Department Sofia, and Dimitar Stoyanov Voutchev, CI#5910266685, identity card #159148938, issued April 25, 2000 by Police Department, Sofia, hereinafter referred to as the "Bank",

Наричани общо "Страните" или поотделно "Страна".

Collectively hereinafter referred to as the "Parties" or singularly as a "Party".

ПРЕДПОСТАВКИ:

WITNESSETH:

С ОГЛЕД НА ТОВА, че Кредитополучателят е дружество с ограничена отговорност с предмет на дейност покупка, строеж и обзавеждане на недвижими имоти и др.;

WHEREAS, the Borrower is a Limited Liability Company, established to design architectural drawings, to construct industrial and non-industrial buildings, to buy real estate properties and to carry out renovations, etc.

С ОГЛЕД НА ТОВА, че Кредитополучателят е поискал от Банката и Банката се е съгласила да предостави на Кредитополучателя кредит в размер до 2,659,704 Евро (ДВА МИЛИОНА ШЕСТСТОТИН ПЕТДЕСЕТ И ДЕВЕТ ХИЛЯДИ СЕДЕМСТОТИН И ЧЕТИРИ ЕВРО) при условията на настоящия Договор;

WHEREAS, the Borrower has requested from Lender and Lender has agreed to provide to Borrower a loan in the amount of up to TWO MILLION SIX HUNDRED AND FIFTY NINE THOUSAND SEVEN HUNDRED AND FOUR EURO (EUR 2,659,704) subject to the terms and conditions set forth herein;

Въз ОСНОВА НА взаимните обещания, уверения, гаранции и декларации, съдържащи се в настоящия Договор, Страните се споразумяха, както следва:

NOW, THEREFORE, in consideration of the promises, representations, warranties and agreements contained herein, the Parties hereby agree as follows:

Раздел I. ДЕФИНИЦИИ

SECTION I.        DEFINITIONS

Всички термини в настоящия Договор, които са подчертани и започват с главна буква имат следното значение:

Capitalized and bold terms in this Agreement shall have the meanings set forth below:

1.01. "Работен ден" означава всеки ден без събота, неделя и официалните празници в България.

1.01. "Business Day" means any day other than a Saturday, Sunday or official holiday in Bulgaria.

1.02. "Строителен бюджет" означава бюджета за завършване на Проекта (определен по-долу), представен от Кредитополучателя на Банката и одобрен от нея, съдържащ се в Член 4.05. по-долу.

1.02. "Construction Budget" means the budget for completion of the Project (hereinafter defined) which Borrower has submitted to Lender, and Lender has approved, contained below in Article 4.05.

1.03. "Дата на първо предоставяне на средства" означава първата дата, на която ще бъде извършено Предоставяне на средства по Кредита (дефиниран по-долу). Дата на предоставяне на средства определя започването на Периода на строителство (дефиниран по-долу).

1.03. "Initial Disbursement Date" means the first date on which a Disbursement of Funds (hereinafter defined) is made. It marks the beginning of the Construction Period, as defined below.

1.04. "Преценка на Банката" означава, че Банката има право периодично и по свое усмотрение да прави и променя преценката си за бъдещите разходи по всяко перо от Строителния бюджет, които Кредитополучателят ще понесе във връзка със завършването на Проекта (дефиниран по-долу).

1.04. "Lender's Estimate" means that from time to time Lender shall have the right to make and/or revise, in its good faith judgment, an estimate of the future costs and expenses of each line item of the Construction Budget which may be incurred by Borrower to complete Project (hereinafter defined).

1.05. "Представител на Банката" означава който и да е представител или представители, който /които/ Банката може да назначи по собственото усмотрение да представлява(т) Банката и да контролира(т) процеса на строителство и неговото завършване.

1.05. "Lender's Representative" means any representative or representatives which Lender may appoint, contract or employ in its sole discretion to represent Lender and to monitor the construction process and its completion.

1.06. "Проект" означава вход "А", вход "Б" и сутерена на вход "В" в монолитна жилищна сграда с подземни гаражи, магазини, жилища и ателиета, която ще бъде построена в УРЕГУЛИРАН ПОЗЕМЛЕН ИМОТ №IV-66, находящ се в гр. София кв. 35 по плана на гр. София местността ж.к."Овча купел – 2", с площ от 3500 кв.м, върху сграда се изгражда съгласно нотариален акт №34, том III, рег. №12130, дело 402 от 2004г. на нотариус №268 на НК, одобрен архитектурен проект от 02.12.2004г. Разрешение за строеж №994 от 11.12.2004г., като копия от всички изредени документи са приложени към този Договор.

1.06. "Project" means entrance "A", section "B" and the basement of section "V" of the residential building with underground garages, shops, apartments and ateliers, which shall be constructed in REGULATED LAND PLOT №IV-66, located in Sofia in district 35 as per the city plan of Sofia, residential area Ovcha kupel -2 zone, with area of 3500 sq.m., which building shall be constructed pursuant to the notary deed No 34, volume III, reg. №12130, file 402 dated 2004 as per the register of the notary №268 of the NC, architectural design  approved on 02.12.2004 and Construction Permit № 994 dated 11.12.2004, all represented as Exhibits to this Agreement.

1.07. "Обект" означава който и да е апартамент, ателие, подземен гараж или магазин от Проекта, включващ принадлежащите им мазета и съответните идеални части от общите части на сградата.

1.07. "Unit" means any one of the apartments, ateliers, the underground garages or shops of the Project, including assigned storage spaces and ideal parts of the common parts of the building.

1.08. "Разрешение за ползване" означава документа за въвеждане в експлоатация, издаден в съответствие със Закона за устройство на територията и другите нормативни актове, който ще удостовери приемането и въвеждането в експлоатация на Проекта и Обектите, и който ще бъде осигурен от Кредитополучателя.

1.08. "Permit for Usage" means Occupancy Permit issued pursuant to the Zoning act and the other applicable regulations, that shall certify the acceptance and bringing into use of the Project and the permission to use the Units, and shall be provided by the Borrower.



1.09. "Акт 15" означава Приложение Образец 15, издаден в съответствие с Наредба №3 от 31.07.2003г. за съставяне на актове и протоколи по време на строителство, издадена от МРРБ, ДВ бр. 72 от 15.08.2003г. който ще удостовери завършването на Проекта, и който ще бъде осигурен и подписан от Кредитополучателя.

1.09. "Act 15" means Exhibit Form 15 issued in accordance with Regulation No. 3 from 31.07.2003 for any penalties and protocols during the construction period issued by the Ministry of Construction and Urban Development, State Gazette Issue No72 of 15.08.2003 which shall certify the termination of the Project and shall be provided and signed by the Borrower.

1.10. "Дата на уведомяване" означава датата, на която Кредитополучателят уведомява Банката за получаването на Разрешението за ползване. Тази уведомяване следва да се извърши в срок от пет Работни дни, считано от датата на издаване на Разрешението за ползване. В противен случай ще се счита, че е настъпил Случай на неизпълнение (дефиниран по-долу).

1.10. "Notification Date" means the date on which Borrower notifies Lender of the receipt by the Project of the Permit for Usage. Failing to notify Lender within five business days of the Project's receipt of the Permit for Usage of the Loan (hereinafter defined) is an Event of Default (hereinafter defined).

1.11. "Период на строителство" е периодът от време между Датата на първо предоставяне на средства по Кредита и датата на Изтичане на Периода на строителство (дефинирано по-долу). По време на Периода на строителството, Кредитополучателят има право да подава Искания за предоставяне на средства (дефинирано по-долу) за целите на Член 2.06. от настоящия Договор.

1.11. "Construction Period" is the term between the Initial Disbursement Date and the Termination of Construction Period (hereinafter defined). During the Construction Period the Borrower has the right to make Disbursement Requests (hereinafter defined) according to Article 2.06 of this Agreement.

1.12. "Изтичане на Периода на строителство" е по-ранната от следните две дати: датата, на която изтичат 20 (двадесет) календарни месеца от датата на Първо предоставяне на средства, или Датата на уведомяване. След тази дата Кредитополучателят няма право да иска Предоставяне на средства по Кредита (дефинирано по-долу), освен в случаите, когато се използва Лихвения резерв (дефиниран по-долу). След Изтичане на Периода на строителството започва Периода на продажби (дефиниран по-долу).

1.12. "Termination of Construction Period" is defined as the date earlier of twenty (20) months after the Initial Disbursement Date or the Notification Date. After that date Borrower shall not have the right to request Disbursements (hereinafter defined) under the Loan (hereinafter defined), except for advances under the Interest Reserve (hereinafter defined) line item. After the Termination of Construction Period, the Sales Period (hereinafter defined) applies.

1.13. "Период на продажби" е срок от 6 (шест) календарни месеца, считано от датата на Изтичане на Периода на строителство, по време на който, но не по-късно от Падежа (дефиниран по-долу) Кредитът трябва да бъде напълно изплатен.

1.13. "Sales Period" shall mean a period of six (6) calendar months following the Termination of Construction Period during which the Loan must be fully repaid not later than Final Maturity Date (hereinafter defined).

1.14. "Лихвен резерв" е сума в размер до €533,143 (петстотин тридесет и три хиляди сто четиридесет и три) Евро, която Кредитополучателят може да използва по Кредита (дефиниран по-долу) единствено с цел да погаси задължението си за плащане на Лихва по Кредита. С използването средства от Лихвения резерв се увеличава размера на Неизплатената част от главницата по Кредита, считано от съответната дата на предоставяне на средства.

1.14. "Interest Reserve" shall mean an amount of up to €533,143 (five hundred and thirty three thousand one hundred and fourty three Euro), which Borrower can use under the Loan (hereinafter defined) only for payment of Interest under the Loan. The outstanding Principal Balance (hereinafter defined) under the Loan (hereinafter defined) shall be increased by the amount used under the Interest Reserve as of the date of disbursement.

1.15. "Купувач" означава купувача на който и да е Обект от Проекта

1.15. "Buyer" shall mean the Buyer of a Unit of the Project.

1.16. "Дължима сума за Обекта" означава сумата от Главницата, която Кредитополучателят трябва да погаси за да даде Банката съгласие за заличаване на ипотеката върху съответния Обект. Дължимата сума за Обекта е определена в Схема на дължими суми по Обекти в Член 9.06.

1.16. "Required Repayment Per Unit" shall mean the amount of Principal that the Borrower must repay in order for the Lender to give consent for the mortgage release of the relevant Unit. The Required Repayment Per Unit is listed in Article 9.06.

1.17. "Предварителен Договор за Продажба" означава всеки предварителен договор за продажба в съответствие с член 19 от Закона за Задълженията, сключен между Кредитополучателя и Купувач на един или повече Обекти от Проекта.

1.17. "Presale Agreement" shall mean any presale agreement executed between the Borrower and Buyer of one or more Units in the Project.

1.18. "Дата на Предварителния Договор за Продажба" означава датата на сключване на предварителния договор.

1.18. "Presale Agreement Date" shall mean the Agreement Date under the Presale Agreement.

1.19. "Окончателен Договор за Продажба" означава договор във формата на Нотариален Акт за продажба на един или повече Обекти от Проекта.

1.19. "Final Sale Agreement" shall mean the agreement in the form of a Notary Deed for sale one or more Units from the Project.

1.20. "Дата на Окончателния Договор за Продажба" означава датата на сключване на окончателния договор за продажба на Обекта.

1.20. "Final Sale Agreement Date" shall mean the date under the Sale Agreement.

1.21. "Постъпления от Продажби" означават приходите на Кредитополучателя от продажба на Обект от Проекта. Постъпленията от продажби могат да са в резултат както на Предварителния Договор за Продажба, така и на Окончателния Договор за Продажба.

1.21. "Sales Proceeds" refers to the proceeds from selling a Unit in the Project. Sales Proceeds may result from either a Presale Agreement or Final Sale Agreement.

1.22. "Такса за ангажимент" означава плащане в размер на 1,500 Евро (ХИЛЯДА и ПЕТСТОТИН ЕВРО), преведени от Кредитополучателя по сметка на Банката преди подписване на настоящия Договор.

1.22. "Commitment Fee" refers to payment of EUR 1,500 (one thousand and five hundred Euro), transferred to Lender's bank account prior to signing this Agreement.

1.23. "Дата на обезпечение" означава датата, на която обезпечението по Раздел XII е надлежно учредено в полза на Банката съгласно този Договор и нормативните актове.

1.23. "Security date" refers to the date on which the Collateral pursuant to Section XII is properly secured in favor of the Lender pursuant to this Contract and the applicable laws.

Раздел II.     ОБЩИ УСЛОВИЯ

SECTION II.     GENERAL TERMS AND CONDITIONS

2.01. Кредит. Банката се е съгласила да предостави на Кредитополучателя кредит в размер до 2,659,704 Евро (ДВА МИЛИОНА ШЕСТСТОТИН ПЕТДЕСЕТ и ДЕВЕТ ХИЛЯДИ СЕДЕМСТОТИН И ЧЕТИРИ ЕВРО), наричан по-долу "Кредит", при условията на настоящия Договор.

2.01. The Loan. Lender has agreed to provide to Borrower a loan in the amount of up to TWO MILLION SIX HUNDRED AND FIFTY NINE THOUSAND SEVEN HUNDRED AND FOUR EURO (EUR 2,659,704), hereinafter referred to as the "Loan", subject to the terms and conditions set forth herein.

2.02. Валута. Кредитът се предоставя в евро и всички пресмятания на Главницата (дефиниция по-долу), Лихвата (дефиниция по-долу) и Лихвата за забава (дефиниция по-долу) се извършват в евро. Всички плащания се извършват в евро. КРЕДИТОПОЛУЧАТЕЛЯТ РАЗБИРА И ПОЕМА ИЗЦЯЛО РИСКА ОТ ПРОМЕНИ ВЪВ ВАЛУТНИЯ КУРС.

2.02. Currency. The Loan is being granted in EURO, and all calculations of Principal (hereinafter defined), Interest (hereinafter defined), and Penalty Interest (hereinafter defined) shall be made in EURO. ALL PAYMENTS ARE TO BE MADE IN EURO. Borrower understands and acknowledges that Borrower bears all foreign exchange risk.

Borrower/Кредитополучател: _____     стр. 2 от 21     Lender/Банка: _____ 

2.03. Лихвен процент. Кредитополучателят изплаща на Банката лихва ("Лихва") върху целия размер на Кредита (без Лихвения резерв и Таксата за Управление) в размер на 12% (дванадесет процента) годишно. Лихвата се начислява, дължи и плаща в съответствие с Раздел IX от настоящия Договор.

2.03. **Interest.** Borrower shall pay simple interest ("Interest") to Lender on the full Loan amount (without the Interest reserve and the Loan Management fee) at a fixed rate of twelve percent (12%) per annum. Interest shall accrue, be charged, and paid as provided for in Section IX, hereof.

2.04. Лихва за забава. Съгласно Раздел XI от настоящия договор, в случай на неплащане, забавено или частично плащане по Договора за кредит Кредитополучателят дължи Лихва в размер на двадесет и пет процента (25%) годишно върху Неизплатената част от Главницата по Кредита.

2.04. **Penalty Interest.** Pursuant to Section XI of this agreement, in the case of non-payment, late payments or partial payments of Interest, Borrower will be liable for additional penalty interest ("Penalty Interest"), which will be determined as twenty five (25%) per annum on the Principal Balance of the Loan.

2.05. Падеж. Цялата Главница по Кредита, (дефиниция по-долу) ведно с Лихвата и евентуалната Лихва за забава (дефиниция по-долу), следва да бъдат изплатени в съответствие с Раздел IX, X и XI от настоящия Договор не по-късно от по-ранната от двете дати ("Падеж") – датата на изтичането на 26 (двадесет и шест) месеца от Датата на обезпечението и датата на изтичане на 6 (шест) месеца от Датата на уведомяване.

2.05. **Final Maturity Date.** The full Principal (hereinafter defined) amount of the Loan, plus Interest and Penalty Interest (hereinafter defined), if any, must be paid in accordance with Sections IX X, and XI hereof no later than the earlier of twenty six (26) months after Date of Security or six (6) months after the Notification Date ("Final Maturity Date").

2.06. Предназначение на средствата. Средствата, предоставени от Банката по настоящия Договор следва да се използват единствено за:

2.06. **Use of Funds.** Funds disbursed by Lender hereunder are to be used exclusively for:

(а) За извършването на строителните работи по Проекта – до 1,864,136 Евро (един милион осемстотин шестдесет и четири хиляди сто тридесет и шест Евро);

(a) For execution of construction works for Project – up to ONE MILLION EIGHT HUNDRED AND SIXTY FOUR THOUSAND ONE HUNDRED AND THIRTY SIX EUR (1,864,136);

(б) Заплащане на дължима лихва ("Лихвен резерв") по Кредита – 533,143 (петстотин тридесет и три хиляди сто четиридесет и три) Евро, която се начислява и удържа еднократно от сумата на Кредита на Датата на обезпечение.

(b) For interest payments ("Interest reserve") – up to 533,143 (five hundred and thirty three thousand one hundred and fourty three) Euro, which is accrued and withheld from the Loan amount on the Date of Security.

(в) Резерви по Строителния бюджет – до 186,414 Евро (сто осемдесет и шест хиляди четиристотин и четиринадесет Евро).

(c) Contingency Reserve (hereinafter defined) – up to EUR 186,414 (one hundred and eighty six thousand four hundred and fourteen EURO)

(г) Заплащане на Такса за Управление на Кредита в размер на три процента (3%) от сумата на Кредита, или седемдесет и седем хиляди петстотин и единадесет ЕВРО (€77,511), които се начислява и удържа еднократно от сумата на Кредита на датата на Първо предоставяне по Кредита след приспадане на Таксата за ангажимент.

(d) For payment of Loan Management Fee in the amount of three percent (3%) of the amount of the Loan, equal to seventy seven thousand five hundred and eleven EUR (€77,511), which is withheld from the Loan amount on the First Disbursement Date after the "Commitment Fee" is deducted.

### Раздел III.    ПРЕДОСТАВЯНЕ НА СРЕДСТВА

### SECTION III.    DISBURSEMENT OF FUNDS

3.01. Предоставяне на средства.

3.01. Disbursements of Funds:

(а) Кредитополучателят може да иска Предоставяне на средства по Член 2.06.(а) единствено за позициите, включени в Строителния бюджет, които са завършени и изпълнени според стандартите, изисквани за Проекта. Кредитополучателят може да иска Предоставяне на средства за Проекта за извършване на строителни работи само по време на Периода на строителството.

(a) Borrower shall only request Disbursements of Funds for works according to the line items of the Construction Budget and which have been completed and are finished according to the standards required for the Project. Borrower may only request for disbursement of funds under the Construction Budget only during the Construction Period.

(б) Средствата от Резерва по Строителния бюджет могат да бъдат използвани след тяхното преразпределяне за Строителния бюджет, по реда на Раздел IV от Договора.

(b) The funds from the Contingency can be used only after their allocation or reallocation under the Construction Budget according to Section IV of this Agreement.

(в) Кредитополучателят може да иска Предоставяне на средства от Лихвения резерв до размера, предвиден в чл. 2.06.(б) от настоящия Договор с цел заплащане на дължимата Лихва и/или Такса за ангажимент към Датата на падежа (дефиниран по-долу).

(c) Borrower may only request for Disbursement of funds from the Interest Reserve up to the amount provided in Article 2.06.(b) from this Agreement for payment of the Interest and/or Commitment fee due as of the Maturity Date (defined hereunder).

(г) Средствата по Член 2.06.(г) ще бъдат усвоени еднократно, безкасово чрез превод по сметка на Банката.

(d) The funds under Article 2.06.(d) will be transferred directly to a bank account of the Bank.

3.02. Срок за Първо предоставяне на средства. Кредитополучателят следва да учреди Обезпечението по иск Предоставяне на средства по Член 2.06.(а) единствено за позициите, включени в Строителния бюджет, и да поиска Първо предоставяне на средства в срок от 30 (тридесет) дни от Датата на сключване. В случай, че Обезпечението не бъде учредено и такова предоставяне на средства не бъде извършено в този срок поради това, че Кредитополучателят не е поискал или не е изпълнил условията за предоставяне на средства, както е описано в Член 3.03. по-долу, настоящия Договор се прекратява. В този случай Банката не е длъжна връщане на получената Такса за Ангажимент и Кредитополучателят трябва да заплати незабавно цялата Лихва и Такса за управление.

3.02. Deadline for Initial Disbursement of Funds. Borrower must establish the Collateral under this Agreement and request First Disbursement of Funds within thirty (30) days from the Date of Agreement. In case that the Collateral is not established and no First Disbursement of Funds is made in the due term, or Borrower has not fulfilled the conditions for Disbursement of Funds as outlined in Article 3.03. below, this Agreement shall terminate. In this case the Lender will not refund the already received Commitment Fee and the Borrower owes immediately the Interest due and the Management Fee.

3.03. Условия за предоставяне на средства. Банката не е длъжна да предостави каквито и да било средства по Кредита докато не бъдат изпълнени следните условия:

3.03. Conditions for Disbursement of Funds. Lender shall not be obligated to make any Disbursement of Funds under the Loan until all of the following conditions shall have been met:

(а) Кредитополучателят е подал писмено Искане за Предоставяне на средства по Кредита най-малко пет (5) работни дни преди желаната дата на Предоставяне на средства, удостоверявайки, че представянето и гаранциите, от раздел XIII, са верни и в сила. Искането за предоставяне на средства трябва да е по форма одобрена от Банката. Кредитополучателят трябва сам да попълни Искането за предоставяне на средства и поема всички рискове и разходи, произтичащи от неправилно попълнени Искания за предоставяне на средства.

(a) Borrower shall have executed a written request for Disbursement of Funds under the Loan at least five (5) Business Days before the desired date for disbursement of funds, certifying that the Representations and Warranties in Section XIII hereof are true and remain in effect. The Disbursement Request must be in a form approved by Lender. The Disbursement Request must be completed by the Borrower; Borrower bears all risks and costs stemming from incorrectly completed Disbursement Requests.

(б) Банката е придобила права върху Обезпечението съгласно Член 12.01. на настоящия Договор, надлежно учредено от

(b) Lender shall have acquired a security interest and rights under the Collateral under Article 12.01. of this Agreement, properly established

Borrower/Кредитополучател: _____    стр. 3 от 21    Lender/Банка: _____ 

Кредитополучателя по предвидения в Закона ред в приемливи за Банката форма и съдържание, придобила е права като бенефициент по всички договори за застраховка, изисквани по Член 14.03; от настоящия Договор и всички съглашения по тези раздели, са в сила и по тях не е налице неизпълнение.

by the Borrower in the due legal way in form and substance acceptable to Lender, and shall have acquired rights as a beneficiary under all insurance agreements required under Article 14.03 of this Agreement and all agreements required by the same sections are in effect without default.

(в) Кредитополучателят е предоставил на Банката декларация за свързани лица съгласно изискванията на банковото законодателство (приложена в настоящия Договор като Приложение 5). Кредитополучателят се задължава на всеки шест месеца и при всяка промяна да актуализира данните по декларацията.

(c) Borrower shall have presented to Lender a Declaration of Related Parties as required by Banking Act (attached hereto as Exhibit 5). Borrower is obliged to update the Declaration every six months and upon any change to the required Declaration.

(г) Не е настъпил Случай на неизпълнение или случай, който с даване на предизвестие и/или с течение на времето може да се превърне в Случай на неизпълнение (дефинирано по-долу) по Раздел XVI от настоящия Договор.

(d) No Event of Default or event that with notice and/or lapse of time would become an Event of Default (hereinafter defined) under Section XVI of this Agreement shall have occurred and be continuing.

(д) От Датата на сключване, или от датата на предходното Предоставяне на средства (в случай, че е извършено такова): (а) не е възникнало нищо, което има да се отрази неблагоприятно на финансовото състояние или бизнес перспективи на Кредитополучателя, или което може да намали вероятността, че Кредитополучателят ще бъде в състояние да изпълни всички свои задължения по настоящия Договор, и (б) не са възникнали никакви значителни загуби или задължения за или по отношение на Кредитополучателя (освен задълженията, които може да са възникнали при условията и съответните разпоредби на настоящия Договор).

(e) Since the Date of Agreement or, as the case may be, the date of the previous Disbursement of Funds: (i) nothing shall have occurred which might materially and adversely affect the Borrower's business prospects or financial condition, or which also make it improbable that the Borrower will be able to fulfill any of its obligations under this Agreement; and (ii) the Borrower shall not have incurred any material loss or liability (except such liabilities as may be incurred by the Borrower in accordance with the relevant provisions of this Agreement).

(е) Кредитополучателят е представил на Банката и периодично актуализира необходимите разрешителни за приемане, строеж и завършване на Проекта, които се изискват според българското законодателство и от съответните институции.

(f) Borrower has presented to the Lender and periodically updates all required permits and licenses necessary for inception, construction and completion of the Project as required by current Bulgarian legislation and relevant authorities.

(ж) Преди всяко Предоставяне на средства, частта от Проекта, която е била завършена към датата на подаване на Искането за предоставяне на средства трябва да е била прегледана и одобрена от Банката или от Представителя на Банката.

(g) Before any Disbursement of Funds is made, the portion of the Project that has been completed at the time of the Disbursement Request shall have been inspected and approved by the Lender or Lender's Representative.

(з) Едновременно с всяко Искане за предоставяне на средства, Кредитополучателят е представил и актуализиран Строителен бюджет (по образеца от Член 4.05.), от който да е видно отражението на това Предоставяне на средства върху оставащите разходи за строителство.

(h) Borrower shall have provided with each Disbursement Request an updated Construction Budget (as in Article 4.05.) reflecting effect of that Disbursement of Funds on remaining costs.

(и) Кредитополучателят е открил при Банката разплащателна сметка, чрез която Банката предоставя средствата по Кредита, а Кредитополучателят изплаща всички предоставени по Кредита средства, както и всички Лихви и Лихва за забава (дефиниция по-долу) така, както това е предвидено в този Договор, ведно с всички разходи за обслужване.

(i) Borrower has opened a current account, through which the Bank disburses Loan funds, and Borrower repays all amounts disbursed under the Loan as well as pays the due Interest and Penalty Interest (hereinafter defined) according to the provisions of this Agreement, along with all service expenses.

(к) Кредитополучателят е открил при Банката разплащателна сметка, чрез която Банката предоставя средствата по Кредита, а Кредитополучателят изплаща всички предоставени по Кредита средства, както и всички Лихви и Лихва за забава (дефиниция по-долу) така, както това е предвидено в този Договор, ведно с всички разходи за обслужване.

(l) Borrower has opened a current account, through which the Bank disburses Loan funds, and Borrower repays all amounts disbursed under the Loan as well as pays the due Interest and Penalty Interest (hereinafter defined) according to the provisions of this Agreement, along with all service expenses.

3.04. Всяко Искане за предоставяне на средства трябва да:

3.04. Each Disbursement Request shall:

(а) показва към датата на издаването му всяко перо от Строителния бюджет, което е завършено и за което се иска Предоставяне на средства и/или да указва, че Кредитополучателят иска да погаси задължението си по Лихвата със средствата предвидени в Лихвения резерв.

(a) show each line item of the Construction Budget that has been completed and for which Disbursement of Funds is requested as of the date of the Disbursement Request and that the Borrower wishes to cover Borrower's Interest expenses from the Loan and is requesting a drawdown from the Interest Reserve.

(б) бъде придружено от такава допълнителна документация, подготвена от Кредитополучателя, заедно с всички приложения и подкрепяща информация, спомената в документацията, каквато Банката по своя преценка може да изиска и чиято форма и съдържание са приемливи за нея.

(b) be accompanied by such supporting documents as Lender may require, the form and content of which must be satisfactory to Lender in exercise of its good faith judgment, executed by Borrower, together with the attachments and back-up information referred to therein.

3.05. Банката има право да откаже Предоставяне на средства в описаните по-долу случаи, но без да е ограничен само до тях:

3.05. Lender Shall Have Right to Refuse Disbursement of Funds, in cases including but not limited to the following:

(а) Кредитополучателят може единствено да иска Предоставяне на средства от Строителния бюджет за работи, включени в Строителния бюджет, които са завършени и изпълнени според стандартите, изисквани за Проекта. Банката ще има правото да откаже Предоставяне на средства за пера, работата по които не е завършена или е изпълнена в отклонение от изискваните стандарти по нейна преценка или не е прегледана и одобрена от Банката или от Представителя на Банката.

(a) Borrower shall only request Disbursement of Funds from the Construction Budget for works according to the Construction Budget and which have been completed and are finished according to the standards required for the Project. Lender shall have the right to refuse to make any Disbursement for the line items, which have not, in the good faith opinion of Lender, been completed or are not completed to the required standards or which have not been inspected and approved by Lender or by Lender's Representative.

(б) В случай че Кредитополучателят не съдейства на Банката, например като отказва да оправдае строителни разходи или без причина не се съобразява с изискванията на Банката, Банката има право да откаже Предоставяне на средства по Кредита.

(b) If Borrower refuses to cooperate with Lender, for example by refusing to justify construction expenditures or by failing without reason to comply with Lender's requests, Lender shall have the right to refuse Disbursement under the Loan.

(в) В случаите, описани в Член 3.03.(г), 3.06., 5.02., 10.03.(в), 10.03.(д) и 16.04.(а). Банката има право да откаже Предоставяне на средства по Кредита.

(c) In the cases under Articles 3.03.(d), 3.06., 5.02., 10.03.(c), 10.03.(e) and 16.04.(a). Lender shall have the right to refuse Disbursement of Funds under the Loan.

Borrower/Кредитополучател: _____ стр. 4 от 21    Lender/Банка: _____

3.06. Спазване на Строителния бюджет. Кредитът ще бъде контролиран на принципа на "балансирана достъчност на средствата". Ако в какъв момент по мнение на Банката, остатъкът от одобрените средства по Кредита не е достатъчен за да довършване на Проекта, Банката може да откаже Предоставяне на средства по Кредита, докато не бъде възстановен баланса на Строителния бюджет (дефинирано по-долу) по Кредита. Неоправдани забавяния все се считат за Забавяне на Строителството по Член 16.01(с).

3.06. Adherence to Construction Budget. The Loan will be monitored on a balance-to-complete basis. If at any time in the Lender's opinion, the remaining Loan proceeds are not sufficient to complete the Project, Lender shall have the right to refuse Disbursement of Funds under the Loan until the Construction Budget (hereinafter defined) is in Balance (hereinafter defined). Unreasonable delays, however, may be judged a Delay in Construction under Article 16.01(r).

3.07. Дати на предоставяне. За дата на предоставяне се счита датата, на която разплащателната сметка на Кредитополучателя, открита при Банката съгласно член 3.03.(и) по-горе, бъде заверена със сумата, указана в съответния Искане за предоставяне на средства.

3.07. Date of Disbursement. The date of disbursement is considered to be the date the requested funds are transferred to the Borrower's account with the Bank as per Article 3.03(и), pursuant to the instructions on the respective Disbursement Request.

3.08. Кредитът се отчита по отделна заемна сметка и средствата по Кредита се предоставят по разплащателната сметка, открита на името на Кредитополучателя при Банката, така както е предвидено в член 3.03 (и) по-горе.

3.08. The Loan will be accounted by a separate account and the Loan funds will be disbursed to the current account opened in the name of the Borrower with the Bank, as provided in Article 3.03.(и) above.

Раздел IV.        СТРОИТЕЛЕН БЮДЖЕТ

SECTION IV.        CONSTRUCTION BUDGET

4.01. Кредитополучателят декларира и гарантира, че по неговата добросъвестна преценка:

4.01. The Borrower represents and warrants that in Borrower's best estimate:

(а)  съвкупните разходи за завършване на Проекта няма да надхвърлят Строителния бюджет (Член 4.05.);

(a)  the total cost of constructing the Project shall not exceed the Construction Budget (Article 4.05.);

(б)  Кредитополучателят ще спазва Строителния бюджет.

(b)  The Borrower shall adhere to the Construction Budget.

4.02. ИНВЕСТИЦИЯ НА КРЕДИТОПОЛУЧАТЕЛЯ. ПРЕДИ ДАТАТА НА ПЪРВО ПРЕДОСТАВЯНЕ НА СРЕДСТВА, КРЕДИТОПОЛУЧАТЕЛЯТ ЩЕ Е НАПРАВИЛ ТАКЪВ РАЗМЕР ОТ СЪВКУПНИТЕ РАЗХОДИ ЗА СТРОИТЕЛСТВОТО, КОЙТО ДА Е ДОСТАТЪЧЕН ЗА ДА ОСИГУРИ, ЧЕ ОСТАНАЛИТЕ РАЗХОДИ ЗА СТРОИТЕЛСТВО ПО ПРОЕКТА НЕ НАДХВЪРЛЯТ РАЗМЕРА НА КРЕДИТА.

4.02. THE BORROWER'S INVESTMENT.        BEFORE THE INITIAL DISBURSEMENT DATE, THE BORROWER SHALL HAVE PAID A SUFFICIENT AMOUNT OF THE TOTAL CONSTRUCTION COSTS SO THAT THE REMAINING CONSTRUCTION COSTS OF THE PROJECT DO NOT EXCEED THE LOAN AMOUNT.

4.03. Кредитополучателят е представил на Банката и Банката е одобрила Строителния бюджет (Член 4.05.) за завършване на Проекта. Всички промени в Строителния бюджет подлежат на предварително писмено одобрение от Банката. Кредитополучателят може, с разрешение на Банката, да разпредели Резерва по Строителния бюджет (дефинирани по-долу) по перата на Строителния бюджет. Одобрението от Банката на Строителния бюджет не означава приемане или съгласие на последната, че всички разходи са точни или правилно отразени в Строителния бюджет, като отговорността за това остава изцяло на Кредитополучателя.

4.03. Borrower has submitted to Lender, and Lender has approved, the Construction Budget (Article 4.05.) for completion of the Project. All changes to the Construction Budget shall in all respects be subject to the prior written consent and approval of Lender. Borrower may with Lender's approval allocate the Contingency Reserve (hereinafter defined) to line items in the Construction Budget. Lender's approval of the Construction Budget does not constitute a representation or agreement by Lender that all such costs are accurate or properly reflected in the Construction Budget, the responsibility thereof being solely that of the Borrower.

4.04. Бюджетни пера. Строителният бюджет включва следните пера: подробно изложена разбивка на преките разходи по Проекта, включително всички разходи за инсталация и оборудване, всички плащания по строителни подизпълнителни договори.

4.04. Budget Line Items. The Construction Budget includes the following line items: an itemized breakdown of all direct costs of the Project, including all costs of fixtures and equipment for the same, all construction contractors payments, general overhead, and reimbursements.

4.05. Строителен бюджет:

4.05. Construction Budget:

| Stage of Construction | Етап на строителството | Unit<br><br>Мярка | Quantity<br><br>Количество | Unit Cost<br><br>Единична цена (в Евро) | Estimated Cost in EUR after ADVANCE<br><br>Цена в Евро след АВАНС |
|---|---|---|---|---|---|
| ADVANCE | АВАНС | | | | 186,413.60 |
| Stage 1: organizing construction | Етап 1: Организация на строителството | | | | |
| Scaffolding | Скеле | m2 | | | - |
| Lift | Повдигачи /хаспели, асансьори/ | мсм | | | - |
| Fencing | Ограждане и шпунтова ограда | м | | | - |
| Demolition and garbage removal | Събаряне на постройки и извозване на отпадъци | бр. | | | - |
| Temporary traffic organization | Временна организация на движението | сума | | | - |
| Removal of trees | Изсичане на дървета | бр. | | | - |
| Temporary construction | Временни постройки | бр. | | | - |
| Stage 2: excavation | Етап 2: Земни работи | | | | |
| Excavation | Изкопни работи | м3 | | | - |
| Soil removal | Извозване на земни маси | м3 | | | - |
| Stage 3: concrete rough construction | Етап 3: Бетонови работи и грубо строителство | | | | |
| Foundations 1) Forms | Фундаменти 1) Кофражи | м2 | | | - |
| Foundations 2) Steel reinforcement | Фундаменти 2) Армировка | кг | | | - |
| Foundations 3) Concrete | Фундаменти 3) Бетонови работи | м3 | 1783.00 | € 60.00 | 96,282.00 |
| Slabs 1) forms | Плочи 1) Кофражи | м2 | 11334.93 | € 12.32 | 125,703.44 |
| Slabs 2) steel reinforcement | Плочи 2) Армировка | кг | 158688.97 | € 0.80 | 113,915.48 |
| Slabs 3) concrete | Плочи 3) Бетонови работи | м3 | 2266.82 | € 60.00 | 122,408.54 |
| Columns 1) forms | Колони 1) Кофражи | м2 | 2709.11 | € 7.00 | 17,067.41 |
| Columns 2) steel reinforcement | Колони 2) Армировка | кг | 58998.45 | € 0.80 | 42,352.26 |
| Columns 3) concrete | Колони 3) Бетонови работи | м3 | 842.84 | € 60.00 | 45,513.09 |
| Beams 1) forms | Греди 1) Кофражи | м2 | 0.00 | € 0.00 | - |
| Beams 2) steel reinforcement | Греди 2) Армировка | кг | 0.00 | € 0.00 | - |
| Beams 3) concrete | Греди 3) Бетонови работи | м3 | 0.00 | € 0.00 | - |
| Bearing walls 1) forms | Носещи стени и шайби 1) Кофражи | м2 | 10595.64 | € 5.00 | 47,680.38 |
| Bearing walls 2) steel reinforcement | Носещи стени и шайби 2) Армировка | кг | 80659.31 | € 0.80 | 57,901.59 |
| Bearing walls 3) concrete | Носещи стени и шайби 3) Бетонови работи | м3 | 1151.87 | € 60.00 | 62,201.22 |
| Stage 4: brick rough construction | Етап 4: Зидарски работи | | | | |
| Bottom half of building | Зидария в мазе и сутерен | м2 | 0.00 | € 0.00 | - |
| | Зидария в мазе и сутерен | м2 | 587.58 | € 9.26 | 4,899.30 |
| Top half of building - external | Етажна зидария - външна | м3 | 476.00 | € 79.48 | 34,049.31 |

Borrower/Кредитополучател:

стр. 5 от 21

Lender/Банка:

| Description (EN) | Description (BG) | Unit | Qty | Unit price | Total |
|---|---|---|---|---|---|
| Top half of building - internal | Етажна зидария - вътрешна | m2 | 5447.12 | € 12.18 | 59,711.35 |
| Aesthetic masonry (if it exists) | Фигурална фасадна зидария | m3 | 0.00 | € 0.00 | - |
| **Stage 5: roof** | **Етап 5: Покриви** | | 0.00 | € 0.00 | - |
| Roof structure from wood | Покривна конструкция от дърво | м3 | 0.00 | € 0.00 | - |
| Concrete on roof | Керамзитобетон покрив | м2 | 0.00 | € 0.00 | - |
| Wood on roof (if it exists) | Дървена обшивка | м2 | 0.00 | € 0.00 | - |
| Roof sheeting | Покривна обшивка от ламарина | м2 | 0.00 | € 0.00 | - |
| Plaster | Замазки | м2 | 0.00 | € 0.00 | - |
| Roof plastic cover | Покривна мушама | м2 | 1420.78 | € 8.28 | 10,584.85 |
| Roof cover | Покривно покритие | м2 | 1420.78 | € 10.13 | 12,958.11 |
| Thermoinsulation | Топлоизолация | м2 | 1420.78 | € 12.58 | 16,082.63 |
| Chimneys | Комини | бр. | 28.90 | € 100.00 | 2,600.75 |
| Gutters | Улуци и улами | м | 139.67 | € 7.91 | 994.85 |
| **Stage 6: hydro Insulation** | **Етап 6: хидроизолации** | | 0.00 | € 0.00 | - |
| Hydroinsulation - balconies | Хидроизолация - тераси | м2 | 1864.67 | € 8.56 | 14,358.72 |
| Hydroinsulation - foundations | Хидроизолация - основи | м2 | 738.48 | € 5.33 | 3,539.92 |
| Thermoinsulation | Топлоизолация | м2 | 6105.34 | € 11.76 | 64,643.60 |
| **Stage 7: plaster** | **Етап 7: мазилки** | | 0.00 | € 0.00 | - |
| Internal | Вътрешни | м2 | 23393.06 | € 4.83 | 101,725.59 |
| External | Външни | м2 | 2292.51 | € 8.65 | 17,849.38 |
| Gypsum | Шпакловки | м2 | 22975.68 | € 3.03 | 62,589.51 |
| Decorative elements | Декоративни елементи | м | 0.00 | € 0.00 | - |
| **Stage 8: flooring** | **Етап 8: настилки** | | 0.00 | € 0.00 | - |
| Plaster | Замазки | м2 | 10595.64 | € 2.60 | 24,793.80 |
| Parquet | Паркети | м2 | 0.00 | € 0.00 | - |
| Terracotta | Теракоти | м2 | 0.00 | € 0.00 | - |
| Marble | Мрамори | м2 | 0.00 | € 0.00 | - |
| Grinitogres | Гранитогрес | м2 | 0.00 | € 0.00 | - |
| Mosaic | Мозайки | м2 | 973.68 | € 11.57 | 10,139.35 |
| **Stage 9: windows and doors** | **Етап 9: Дограма** | | 0.00 | € 0.00 | - |
| Windows | Прозорци | м2 | 1311.07 | € 115.36 | 136,122.80 |
| External doors | Външни врати | бр. | 27.29 | € 236.82 | 5,816.80 |
| Garage doors | Гаражни врати | бр. | 12.04 | € 457.46 | 4,957.22 |
| Internal doors | Вътрешни врати | бр. | 524.16 | € 61.08 | 28,816.20 |
| Storage areas' doors | Врати - мазета | бр. | 72.24 | € 48.90 | 3,179.41 |
| **Stage 10: painting** | **Етап 10: боядисване** | | 0.00 | € 0.00 | - |
| Latex | Латекс | м2 | 22975.68 | € 4.31 | 89,126.61 |
| Whitewash | Постно | м2 | 0.00 | € 0.00 | - |
| Oil paint-windows | Блажна боя прозорци | м2 | 0.00 | € 0.00 | - |
| Oil paint-doors | Блажна боя врати | м2 | 0.00 | € 0.00 | - |
| Radiators, pipes | Радиатори, тръби | м2 | 0.00 | € 0.00 | - |
| Railings | Парапети | м2 | 0.00 | € 0.00 | - |
| **Stage 11: Ironware** | **Етап 11: железарски работи** | | 0.00 | € 0.00 | - |
| Railings | Парапети | м | 568.31 | € 37.19 | 19,022.66 |
| Sheet-iron on balconies | Обшивка балкони | м2 | 0.00 | € 0.00 | - |
| Covers | Капаци | бр. | 0.00 | € 0.00 | - |
| Metal frames | Метални рамки | бр. | 0.00 | € 0.00 | - |
| Sky-lights | Оберлихти | м2 | 0.00 | € 0.00 | - |
| Other | Други | м2 | 0.00 | € 0.00 | - |
| **Stage 12: outside** | **Етап 12: вертикална планировка** | | 0.00 | € 0.00 | - |
| Grading | Настилки | м2 | 235.99 | € 14.13 | 3,001.58 |
| Drainage | Външно отводняване | м2 | 0.00 | € 0.00 | - |
| Landscaping | Озеленяване | м2 | 0.00 | € 0.00 | - |
| **Stage 13: water supply and sewerage systems** | **Етап 13: ВиК инсталации** | | 0.00 | € 0.00 | - |
| Water supply connection | Външна водопроводна връзка | м | 60.20 | € 30.02 | 1,626.44 |
| Sewage connection | Външна канална връзка | м | 60.20 | € 32.03 | 1,735.31 |
| Vertical Inside pipes - water | Вертикална разводка - водопровод | м | 2145.62 | € 5.19 | 10,016.53 |
| Horizontal Inside pipes - water | Хоризонтална разводка - водопровод | м | 821.96 | € 4.49 | 3,322.97 |
| Vertical Inside pipes - sewage | Вертикална разводка - канал | м | 715.21 | € 5.51 | 3,545.37 |
| Horizontal Inside pipes - sewage | Хоризонтална разводка - канал | м | 348.37 | € 4.79 | 1,502.26 |
| Faucets | Смесителни батерии | бр. | 0.00 | € 0.00 | - |
| Sanitary units | Санитарен фаянс | бр. | 0.00 | € 0.00 | - |
| Shower/bathtub | Душкабини/вани | бр. | 0.00 | € 0.00 | - |
| Bathroom cupboards | Тоалетни шкафчета | бр. | 0.00 | € 0.00 | - |
| Water meters | Водомери, кранове | бр. | 960.22 | € 12.24 | 10,577.62 |
| **Stage 14: electrical transformer with connections** | **Етап 14: трафопост и външни ел връзки** | | 0.00 | € 0.00 | - |
| Construction of transformer hut | Трафопост - АС част | м | 9.63 | € 123.78 | 1,073.10 |
| Equipment | Оборудване | бр. | 0.80 | € 38,420.01 | 27,755.76 |
| Cable lines | Кабелни линии | м | 240.81 | € 27.70 | 6,002.67 |
| **Stage 15: electrical installation, including telephone** | **Етап 15: ел инсталация, включително телефон** | | | | |
| Apartment panels | Апартаментни табла | бр. | 122.01 | € 48.00 | 5,270.85 |
| Main panel | Главно ел. табло | компл. | 3.21 | € 2,033.92 | 5,877.46 |
| Switches, sockets | Ел. обзавеждане | бр. | 2440.21 | € 2.66 | 5,839.04 |
| Cables | Кабели | м | 30952.11 | € 0.89 | 24,728.15 |
| TV and/or computer cables | TV / компютърни и нисковолтови връзки | м | 6100.52 | € 1.18 | 8,808.08 |
| **Stage 16: heating and ventilation** | **Етап 16: отопление и вентилация** | | 0.00 | € 0.00 | - |
| Distributor/dispatcher | Абонатна станция | бр. | 1.61 | € 8,876.85 | 12,825.81 |
| Radiators | Глидери | бр. | 3852.96 | € 7.26 | 25,181.85 |
| Pipes | Комплект разводка | м | 428.64 | € 5.83 | 2,248.61 |
| Air-conditioning | Климатизатор-комплект | компл. | 0.00 | € 0.00 | - |
| **Stage 17: extra finishes** | **Етап 17: Допълнително обзавеждане** | | 0.00 | € 0.00 | - |
| kitchen | Кухни | компл. | 0.00 | € 0.00 | - |
| common area fixtures (e.g. Cabinets) | Коридорни гардероби и шкафове | компл. | 0.00 | € 0.00 | - |
| **Stage 18: elevator** | **Етап 18: асансьор** | | 0.00 | € 0.00 | - |
| Supply | Доставка | компл. | 4.01 | € 13,695.00 | 49,468.39 |

Borrower/Кредитополучател

стр. 6 от 21

Lender/Банка 

| Installation | Монтаж | компл. | 4.01 | € 2,139.00 | 7,726.39 |
|---|---|---|---|---|---|
| **TOTAL** | **ОБЩО** | | | | **1,864,136.00** |

**4.06.** Разпределение на Резерва по Строителния бюджет и икономии. Кредитополучателят има право (но не е задължен):

(a) периодично да разпределя и преразпределя Резервите по Строителния бюджет по перата на Строителния бюджет;

(б) при наличие на икономии (по усмотрение на Банката, след отчитане, заедно с всяка друга релевантна информация, състоянието на завършеност на работата по съществуващи договори, подизпълнителски договори и други споразумения, и съветите на Представителя на Банката) на някое или някои от перата на Строителния бюджет, Банката се съгласява да разрешава разпределяне и преразпределяне на такива икономии между други пера на Строителния бюджет по писмено искане на Кредитополучателя (отправено не по-често от един път месечно). Заедно с всяко такова искане Кредитополучателят ще представя на Банката цялата документация и информация, която служи за доказване на икономиите.

**4.07.** В случай, че непредоставените от Кредита средства по определено перо от Строителния бюджет са недостатъчни за завършване на работите по това перо, то Банката има право да разпредели оставащите в разположение Резерви по Строителния бюджет за покриване на този недостиг. Ако Резервите за Строителния бюджет са недостатъчни за покриване на недостига, то Кредитополучателят е длъжен да финансира със собствени средства недостига по това перо до пълното завършване на работите по него.

**Раздел V.**    **БАЛАНСИРАНЕ НА КРЕДИТА**

**5.01. Балансиран Кредит.**

(a) Кредитът е балансиран ("Балансиран"), когато по Преценка на Банката цялата неизползвана сума по Кредита в частта на Строителния бюджет или отделни негови пера, е достатъчна за финансиране на завършването на всички работи по Строителния бюджет и по всяко отделно негово перо.

(б) Независимо от всякакви други условия и уговорки по настоящия Договор, Кредитът трябва във всеки момент да е Балансиран. В случай, че Кредитът не е Балансиран, се прилагат разпоредбите и изискванията на Член 4.07.

**5.02.** Банката се освобождава от задължението си да предостави каквото и да е средства от Кредита по което и да е перо, докато Кредитът не е Балансиран. Ако в даден момент се появи Недостиг на средства, като резултат от завишаване на Преценката на Банката, налагащ Кредитополучателя да извърши Плащане при недостиг на средства, тогава Преценката на Банката трябва да се изрази в писмен вид, включващ детайлиране на основанията за Преценката на Банката.

**5.03.** По всяко време размерът на Предоставените средства по Кредита, увеличен с размера на оставащите разходи за строителство трябва да е по-малък от размера на Кредита. Винаги, когато по Преценка на Банката (дефинирани по-долу), размерът на средствата по Кредита, които все още не са предоставени, не е достатъчен, за да покрие оставащите разходи по Проекта, Кредитополучателят ще депозира при Банката такава сума, която, добавена към все още непредоставените средства по Кредита ще е достатъчна, за да покрие оставащите разходи по Проекта. Всички такива депозирани средства при Банката ще бъдат предоставяни при условията на настоящия Договор и ще бъдат предоставяни от Банката при условията за Предоставяне на средства по настоящия Договор преди предоставянето на останалите средства по Кредита.

**5.04.** Кредитополучателят приема, че Банката има право периодично и по свое усмотрение да прави и променя преценката си за бъдещите разходи по всяко перо от Строителния бюджет, които Кредитополучателят ще понесе във връзка с Проекта ("Преценка на Банката"). Що се отнася до стойността на строителните работи, Преценката на Банката ще взема под внимание съветите на Представителя на Банката, съществуващите условия по сключени договори и писмени търгове с престижни партньори и доставчици на материали, приемливи за Банката, процентът на завършеност на работата, както и такива разпределения за резерви, каквито Банката прецени за подходящи по нейна преценка.

**5.05.** Преценката на Банката включва още и съображения, които Банката по свое усмотрение счете за релевантни или можещи да окажат влияние върху Строителния Бюджет, като текущи анализи, разходи за материали и наличност на материали, доставчици, сегашни и бъдещи пазарни очаквания, както и способността на трети лица да изпълняват задълженията си по сключени договори и писмени търгове.

**Раздел VI.**    **ОСЪЩЕСТВЯВАНЕ НА ПРОЕКТА**

**6.01.** Кредитополучателят за своя сметка ще предприеме всички необходими действия за да завърши Проекта и да получи Разрешение за Ползване своевременно, преди изтичане на Периода на

---

**4.06. Allocation of Contingency Reserve and cost savings.** Borrower shall be entitled (but shall not be obligated):

(a) to allocate and reallocate from time to time the Contingency Reserve among the various line items of the Construction Budget.

(b) if there shall be demonstrated cost savings (as determined in good faith by Lender after taking into account, among other relevant information, the state of completion of the work under existing contracts, subcontracts, and other agreements, the provisions of such contracts, and the advice of Lender's Representative) in any one or more line item(s) of the Construction Budget, Lender agrees to permit allocation and reallocation of such cost savings among other line items of the Construction Budget, upon written request from Borrower (submitted not more frequently than once a month). With any such request Borrower shall provide Lender all documentation and information on which Borrower intends to rely to show such demonstrated cost savings.

**4.07.** If the aggregate amount not yet disbursed under the Loan under any line item from the Construction Budget is not enough to complete construction works under this line item, Lender has the right to apply the remaining available Contingency Reserve to this line item to cover the shortfall. If the Contingency Reserve is not enough to cover the shortfall, Borrower shall cover the shortfall through investing his own funds until the construction works under this line item are fully completed.

**SECTION V.**    **LOAN BALANCING**

**5.01. Loan to be In Balance**

(b) The Loan shall be determined to be in balance ("In Balance") only if the aggregate amount not yet disbursed under the Loan in the part of the Construction Budget or certain line items from it is enough to support the completion of all construction works under the Construction Budget and the separate line items.

(b) Anything contained in this Agreement to the contrary notwithstanding, it is expressly understood and agreed that the Loan must at all times be in balance. If at any time the Loan is not In Balance, Borrower shall be complying with the requirements of Article 4.07. hereof.

**5.02.** Lender shall have no obligation to make any Disbursements under the Loan for any line item as long as the Loan is not In Balance. If, at any time or times, an increase in the Lender's Estimate would result in a Deficiency requiring Borrower to make a Deficiency Payment, then Lender's Estimate shall be in writing and shall set forth in reasonable detail the basis for Lender's Estimate.

**5.03.** At no time shall the total amount of Disbursements made by the Lender to the Borrower under this Agreement, when added to the remaining costs to complete the Project exceed the Loan Amount. If at any time, in the reasonable Lender's Estimate, then undisbursed portion of the Loan shall be insufficient to defray the remaining cost of the Project, the Borrower shall deposit funds with the Lender that, when added to the undisbursed portion of the Loan, will be sufficient, in the Lender's opinion, to satisfy the remaining cost of completing the Project. All funds so deposited with the Lender shall be disbursed under the terms of this Agreement and shall be advanced by the Lender under the terms for Disbursement of Funds set in this Agreement before advancing any proceeds of the Loan.

**5.04.** Borrower agrees that from time to time Lender shall have the right to make and/or revise, in its good faith judgment, an estimate of the future costs and expenses of each line item of the Construction Budget which may be incurred by Borrower in connection with the Project ("Lender's Estimate"). Lender's Estimate as it relates to cost of construction, shall take into consideration the advice of Lender's Representative, the existence and terms of any executed contracts or written bids with responsible contractors and materials suppliers satisfactory to Lender, the percentage of completion of the work, and such allowances for reserves as Lender shall deem appropriate, in Lender's good faith judgment.

**5.05.** In addition, Lender's Estimate shall take into account other considerations which Lender, in its good faith judgment, deems relevant or likely to have an impact upon the Construction Budget, including current costs for and availability of materials, and suppliers, current and expected future market considerations, and the ability of third parties to perform in accordance with the terms of executed contracts or written bids.

**SECTION VI.**    **CONSTRUCTION OF PROJECT**

**6.01.** The Borrower shall, at its expense, take all necessary actions to construct the Project and obtain the Permit for Usage in a timely manner, no later than the Termination of Construction Period. The

Borrower/Кредитополучател:    стр. 7 от 21    Lender/Банка:

Строителство. Проектът трябва да бъде завършен професионално и при спазване на изискванията на строителните норми и правила, на Българския Държавен Стандарт, на архитектурния проект и на другите спецификации, които са били предоставени на Банката и са били одобрени от нея (приложени към Приложение 1). Освен това, Проектът трябва да бъде построен законно при спазване на всички изисквания за строителство, безопасност, териториално устройство, опазване на околната среда и всички други изисквания на съответните общински или държави органи.

Project shall be completed in a workmanlike manner and in compliance with statutory construction rules and norms, the Bulgarian State Standards, and the Plans and specifications previously submitted to and approved by the Lender (attached as Exhibit 1). In addition, the Project shall be legally constructed in compliance with all building, safety, zoning, environmental, and any other requirements of any municipal, or government authority.

6.02. Промяна на архитектурните проекти. Банката има право по всяко време да изисква стриктно спазване на одобрените архитектурни проекти.

6.02. Changes to the Plans. The Lender shall at all times have the right to require strict compliance with the Plans.

6.03. Спазване на одобрените архитектурни проекти. Всички средства, материали и оборудване използвани за изграждането на Проекта следва да съответстват на одобрените архитектурни проекти и на техните изменения (ако има такива), одобрени от Банката. Освен това, работата по Проекта не може да нарушава никакви нормативни актове или други рестриктивни уговорки.

6.03. Compliance with the Plans. All materials, fixtures, equipment and other articles used in the construction or equipping of the Project shall comply with the Plans, as modified by any changes approved by the Lender. In addition, the Project shall not be constructed in violation of any restrictive covenants, laws, statutes, ordinances, or other governmental rules or regulations.

6.04. Ако Кредитополучателят или негов съдружник участват като контрагент, доставчик или оказва услуги от своя име или чрез друго лице, в което те или друго лице, свързано с тях, притежават дял в него или го управляват ("Свързан интерес"), като между Кредитополучателя и това друго лице, участващо като контрагент, доставчик или оказва услуги или по друг начин, в сключен договор, то настоящия договор между страните, имащи свързан интерес, следва да се смята само и единствено като приблизителна оценка за целите на настоящия член. Кредитополучателят е длъжен да уведомява незабавно Банката при възникване, по какъвто и да е повод, на свързан интерес.

6.04. Restriction on Related Interest. If Borrower or any affiliate of Borrower shall act as a contractor or supplier or service provider in its own name or through a separate entity in which it or any entity related to it has an ownership interest or control ("Related Interest") between Borrower and any party acting as a contractor, supplier, service provider or otherwise, any contract between parties having such identity of interest shall be regarded solely as an estimate for the purposes of this article. Borrower is obliged to immediately inform Lender whenever a Related Interest arises.

Раздел VII.    ДОПЪЛНЕНИЯ И ПРОМЕНИ НА ПРОЕКТА

SECTION VII.    EXTRAS AND PROJECT CHANGES

7.01. Кредитополучателят е длъжен да информира Банката относно намеренията си за промени в плановете и спецификациите на Проекта и да получи предварително писмено съгласие от Банката за всяка промяна в плановете и спецификациите на Проекта.

7.01. Borrower has the obligation to inform Lender of intentions to change plans and specifications. The prior written consent of Lender shall always be required for any changes in the plans and specifications for the Project.

(а) Ако Кредитополучателят не получи преди промените писмено одобрение от Банката и въпреки това извърши промяната, счита се че е налице Случай на Неизпълнение по настоящия Договор.

(a) Failing to receive prior written consent and still carrying out the changes will be considered an Event of Default.

7.02. Кредитополучателят ще представя предложения промени в плановете или спецификациите не по-късно от десет (10) Работни дни преди началото на строителството на съответния етап, засягащ промените. Кредитополучателят е длъжен да се увери и да удостовери, че така предложените промени са съобразени с изискванията на закона. Кредитополучателят своевременно ще представя на Банката всички промени в спецификациите по Проекта.

7.02. Borrower shall submit any proposed changes in the plans and specifications at least ten (10) Business Days prior to commencement of the construction stage relating to such change. Borrower is responsible for ensuring the legality of such a change. Borrower shall deliver promptly to Lender all changes in the specifications of the Project.

Раздел VIII.    ПРАВО НА БАНКАТА ДА НАЗНАЧИ СВОЙ ПРЕДСТАВИТЕЛ

SECTION VIII.    LENDER'S RIGHT TO EMPLOY LENDER'S REPRESENTATIVE

8.01. Банката има право да назначи и/или наеме за своя сметка Представител на Банката, който да преглежда плановете, спецификациите, документите и всички други материали по Проекта, както и да инспектира всички действия, свързани със строежа и неговия напредък. Банката има право да участва в издаването на всички необходими документи в процеса на строителството.

8.01. Lender shall have the right to appoint and/or employ at its expense Lender's Representative to review the plans, specifications, documents, and all other Project materials and to inspect all matters related to the construction and progress of the same. Lender shall have the right to participate during issuance of all documents relevant to the construction process.

8.02. Кредитополучателят ще съдейства (като осигури и съдейства на трети лица - договорни партньори) на Банката при организирането на инспекциите на строителните работи от Представителя на Банката, както и от всички други представители на Банката, упълномощени в даден момент.

8.02. Borrower will cooperate (and will cause third-party contractors to cooperate) with Lender in arranging for inspections of the progress of the construction by Lender's Representative and other representatives of Lender, from time to time.

РАЗДЕЛ IX.    ИЗПЛАЩАНЕ НА ЛИХВИТЕ, ГЛАВНИЦАТА И ТАКСИТЕ ПО КРЕДИТА

SECTION IX.    PAYMENT OF INTEREST, PRINCIPAL AND TAXES DUE ON THE LOAN

9.01. Задължения на Кредитополучателя за плащане. При условията на настоящия Договор, Кредитополучателят неотменимо и безусловно се задължава да плати всички суми, действително предоставени по Кредита ("Главница") и да плати всички Лихви и Лихва за забава (дефиниция по-долу) така, както това е предвидено в настоящия Договор, както и всички разходи за обслужване.

9.01. Scope of Borrower's Obligation for Payment. Under this Agreement, Borrower irrevocably and unconditionally obligates itself to repay all amounts actually disbursed under the Loan ("Principal"), and payment of all Interest and Penalty Interest (hereinafter defined), as required under this Agreement, plus any servicing expenses.

9.02. Начисляване на Лихва.

9.02. Interest Accrual.

(а) Плащане на Лихвата. ЦЯЛАТА ЛИХВА В РАЗМЕР НА 533,143 ЕВРО (ПЕТСТОТИН ТРИДЕСЕТ И ТРИ ХИЛЯДИ СТО ЧЕТИРИДЕСЕТ И ТРИ ЕВРО) ИЗЧИСЛЕНА СЪГЛАСНО ЧЛ. 2.03. И ЧЛ. 9.02. СЕ ДЪЛЖИ НАВЕДНЪЖ ОТ КРЕДИТОПОЛУЧАТЕЛЯ И СЕ УДРЪЖА ОТ ЛИХВЕНИЯ РЕЗЕРВ НА ДАТАТА НА ПЪРВО ПРЕДОСТАВЯНЕ НА СРЕДСТВА, КАТО АКО ТАКОВА НЕ БЪДЕ ИЗВЪРШЕНО В СРОКА ПО ЧЛЕН 3.02, КРЕДИТОПОЛУЧАТЕЛЯТ НЕ МОЖЕ ДА ИЗВЪРШВА ПОВЕЧЕ УСВОЯВАНИЯ И ЛИХВАТА СЕ ДЪЛЖИ НА ПЪРВИЯ ДЕН СЛЕД ИЗТИЧАНЕ НА ТОЗИ СРОК.

9.02. Interest Accrual. Interest Payment. THE INTEREST IN THE FULL AMOUNT OF 533,143 (FIVE HUNDRED AND THIRTY THREE THOUSAND ONE HUNDRED AND FOURTY THREE EURO) SHALL BE DUE FROM BORROWER AT ONCE AND IS WITHHELD FROM THE INTEREST RESERVE ON THE DATE OF FIRST DISBURSEMENT OF FUNDS WHEREAS IF SUCH A DISBURSEMENT IS NOT MADE WITHIN THE DUE TERM PURSUANT TO ART. 3.02, THE BORROWER CAN NOT REQUEST FURTHER DISBURSEMENT OF FUNDS AND INTEREST IS DUE ON THE FIRST DATE AFTER THE TERMINATION OF THE PERIOD.

9.03. Плащания

9.03. Payment

(а) Плащане на Лихвата. ЦЯЛАТА ЛИХВА В РАЗМЕР НА 533,143 ЕВРО (ПЕТСТОТИН ТРИДЕСЕТ И ТРИ ХИЛЯДИ СТО ЧЕТИРИДЕСЕТ И ТРИ

(a) Interest Payment. THE INTEREST IN THE FULL AMOUNT OF 533,143 (FIVE HUNDRED AND THIRTY THREE THOUSAND ONE

ЕВРО) ИЗЧИСЛЕНА СЪГЛАСНО ЧЛ. 2.03. И ЧЛ. 9.02. СЕ ДЪЛЖИ НАВЕДНЪЖ ОТ КРЕДИТОПОЛУЧАТЕЛЯ НА ДАТАТА НА ОБЕЗПЕЧЕНИЕ НА ТОЗИ ДОГОВОР.

HUNDRED AND FOURTY THREE EURO) SHALL BE DUE FROM BORROWER ON THE DATE OF SECURITY.

(б)     Плащане на Главницата.

(b)     **Principal Payment.**

(ба)    Изплащането на Главницата се извършва както през Периода на Строителство, така и през Периода на Продажби и не по-късно от датата на Падежа.

(ba)    Repayment of Principal shall be made during either the Construction Period or the Sales Period, no later than Final Maturity Date.

(бб)    Изплащане на Главницата може да става периодично по време на Кредита, според изискванията, описани в Член 9.06. и Раздел X.

(bb)    Repayment of Principal can occur periodically throughout the Loan, subject to the requirements outlined in Article 9.06. and Section X.

9.04.   Лихвата платена съгласно член 9.03. е окончателна и не подлежи на промяна, нито на връщане, дори и в случаите когато Кредитополучателят независимо от причината не усвои пълния размер на Главницата или изобщо не направи усвояване по този Договор.

9.04    The interest paid pursuant to article 9.03. is final and subject to no changes, nor reimbursement, even in cases whereas the Borrower does not use the full amount of the Principal or does not use any amount of the Principal, for whatever reason.

9.05.   Постъпления от продажби. Всички Постъпления от продажби се изплащат приоритетно от Кредитополучателя на Банката до пълно изплащане на дължимите суми по Кредита. Постъпленията от продажба на всеки отделен Обект се изплащат на Банката най-малко до размера на Дължимата сума за съответния Обект както тя е определена в Член 9.06 по-долу. Купувачът също може да плаща директно на Банката.

9.05    Sales Proceeds.  All Sales Proceeds must be paid by Borrower to Lender, until the amount due under the Loan is fully repaid. Sales Proceeds from each Unit must be paid up to at least the Required Repayment Per Unit defined in Article 9.06. below. Buyer can also pay Lender directly.

(а)     Постъпленията от продажби ще се прилагат за погасяване така както е описано в Член 9.09.

(a)     Sales Proceeds shall be applied in the order outlined in Article 9.09.

(б)     Постъпленията от продажби са предмет на допълнителни условия, описани в Раздел X.

(b)     Sales Proceeds are subject to additional conditions outlined in Section X.

9.06.   Схемата на дължими суми по Обекти, приложена по-долу, установява сумата на минималното задължително плащане на Главницата, за да разреши Банката частично освобождаване на Обезпечението (дефинирано по-долу), отнасящо се единствено за дадения Обект.

9.06.   Required Repayment Per Unit Schedule. The Required Repayment Per Unit Schedule below shall establish the minimum Principal repayment due in order for the Lender to permit a partial release of the Collateral pertaining solely to the specified Unit.

| Част | Вид | Секция | Етаж | Застроена площ (м2) | Ид.части (м2) | Общо (м2) | Дължими суми по Обекти В Евро |
|---|---|---|---|---|---|---|---|
| Unit | Type | Entrance | Floor | Built Area | Common Areas | Total Area | Required Repayment Per Unit In EURO |
| A1 | магазин 1 | A | 0 | 113.64 | 0 | 113.64 | € 51,138 |
| A2 | магазин 2 | A | 0 | 80.23 | 0 | 80.23 | € 36,104 |
| A3 | магазин 3 | A | 0 | 80.23 | 0 | 80.23 | € 36,104 |
| A4 | магазин 4 | A | 0 | 56.21 | 0 | 56.21 | € 25,295 |
| A5 | магазин 5 | A | 0 | 248.29 | 0 | 248.29 | € 65,381 |
| A6 | магазин 6 | A | 0 | 420.68 | 0 | 420.68 | € 189,306 |
| A7 | магазин 7 | A | 0 | 220.71 | 0 | 220.71 | € 54,320 |
| A8 | апартамент 1 | A | 1 | 71.31 | 9.27 | 80.58 | € 32,249 |
| A9 | апартамент 2 | A | 1 | 64.54 | 8.39 | 72.93 | € 29,187 |
| A10 | апартамент 3 | A | 1 | 80.23 | 10.43 | 90.66 | € 36,283 |
| A11 | апартамент 4 | A | 1 | 80.23 | 10.43 | 90.66 | € 36,283 |
| A12 | апартамент 5 | A | 1 | 84.27 | 10.96 | 95.23 | € 38,112 |
| A13 | апартамент 6 | A | 1 | 140.22 | 18.24 | 158.46 | € 63,417 |
| A14 | апартамент 7 | A | 1 | 186.94 | 24.31 | 211.25 | € 84,544 |
| A15 | апартамент 1 | A | 2 | 52.47 | 6.82 | 59.29 | € 23,728 |
| A16 | апартамент 2 | A | 2 | 64.54 | 8.39 | 72.93 | € 29,187 |
| A17 | апартамент 3 | A | 2 | 56.48 | 7.35 | 63.83 | € 25,545 |
| A18 | апартамент 4 | A | 2 | 56.48 | 7.35 | 63.83 | € 25,545 |
| A19 | апартамент 5 | A | 2 | 69.17 | 9 | 78.17 | € 31,284 |
| A20 | апартамент 6 | A | 2 | 75.09 | 9.77 | 84.86 | € 33,961 |
| A21 | апартамент 7 | A | 2 | 111.27 | 14.47 | 125.74 | € 50,322 |
| A25 | апартамент 4 | A | 3 | 56.48 | 7.35 | 63.83 | € 26,184 |
| A26 | апартамент 5 | A | 3 | 69.17 | 9 | 78.17 | € 32,066 |
| A27 | апартамент 6 | A | 3 | 75.09 | 9.77 | 84.86 | € 34,811 |
| A28 | апартамент 7 | A | 3 | 111.27 | 14.47 | 125.74 | € 51,580 |
| A30 | апартамент 2 | A | 4 | 64.54 | 8.39 | 72.93 | € 29,917 |
| A32 | апартамент 4 | A | 4 | 56.48 | 7.35 | 63.83 | € 26,184 |
| A33 | апартамент 5 | A | 4 | 69.17 | 9 | 78.17 | € 32,066 |
| A34 | апартамент 6 | A | 4 | 75.09 | 9.77 | 84.86 | € 34,811 |
| A39 | апартамент 4 | A | 5 | 56.48 | 7.35 | 63.83 | € 26,838 |
| A40 | апартамент 5 | A | 5 | 69.17 | 9 | 78.17 | € 32,868 |
| A41 | апартамент 6 | A | 5 | 75.09 | 9.77 | 84.86 | € 35,681 |
| A42 | апартамент 7 | A | 5 | 111.27 | 14.47 | 125.74 | € 52,869 |
| A45 | апартамент 4 | A | 6 | 56.48 | 7.35 | 63.83 | € 26,838 |
| A46 | апартамент 5 | A | 6 | 56.48 | 7.35 | 63.83 | € 26,838 |
| A47 | апартамент 5 | A | 6 | 69.17 | 9 | 78.17 | € 32,868 |
| A48 | апартамент 6 | A | 6 | 75.09 | 9.77 | 84.86 | € 35,681 |
| A50 | апартамент 1 | A | 7 | 52.47 | 6.82 | 59.29 | € 24,929 |
| A51 | апартамент 2 | A | 7 | 64.54 | 8.39 | 72.93 | € 30,665 |
| A52 | апартамент 3 | A | 7 | 56.48 | 7.35 | 63.83 | € 26,838 |
| A53 | апартамент 4 | A | 7 | 56.48 | 7.35 | 63.83 | € 26,838 |
| A54 | апартамент 5 | A | 7 | 69.17 | 9 | 78.17 | € 32,868 |
| A57 | ателие 1 | A | 8 | 93.3 | 12.13 | 105.43 | € 44,330 |
| A58 | ателие 2 | A | 8 | 56.46 | 7.34 | 63.8 | € 26,826 |
| A59 | ателие 3 | A | 8 | 56.46 | 7.34 | 63.8 | € 26,826 |
| A60 | ателие 4 | A | 8 | 69.19 | 9 | 78.19 | € 32,876 |
| A61 | ателие 5 | A | 8 | 190.8 | 24.81 | 215.61 | € 90,957 |

Borrower/Кредитополучател:

Lender/Банка: 

71,10% идеални части от Подземен паркинг в сутерена на вход "А" и вход "Б", състоящ се от следните паркоместа, а именно:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ПМ6 | Паркоместо 6 | А | -1 | 18.26 | 21.36 | 39.62 | € 4,754 |
| ПМ7 | Паркоместо 7 | А | -1 | 18.26 | 21.36 | 39.62 | € 4,754 |
| ПМ8 | Паркоместо 8 | А | -1 | 20.81 | 24.34 | 45.15 | € 5,418 |
| ПМ9 | Паркоместо 9 | А | -1 | 27.35 | 31.99 | 59.34 | € 8,000 |
| ПМ12 | Паркоместо 12 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ13 | Паркоместо 13 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ14 | Паркоместо 14 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ15 | Паркоместо 15 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ16 | Паркоместо 16 | А | -1 | 14.2 | 16.61 | 30.81 | € 4,000 |
| ПМ17 | Паркоместо 17 | А | -1 | 14.2 | 16.61 | 30.81 | € 4,000 |
| ПМ18 | Паркоместо 18 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ19 | Паркоместо 19 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ20 | Паркоместо 20 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ21 | Паркоместо 21 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ22 | Паркоместо 22 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ23 | Паркоместо 23 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ24 | Паркоместо 24 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ25 | Паркоместо 25 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ26 | Паркоместо 26 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ27 | Паркоместо 27 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ28 | Паркоместо 28 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ29 | Паркоместо 29 | А | -1 | 17.1 | 20 | 37.1 | € 4,500 |
| ПМ30 | Паркоместо 30 | А | -1 | 16.22 | 18.97 | 35.19 | € 4,500 |
| Б1 | Магазин 8 | Б | 0 | 52.87 | 0 | 52.87 | € 23,792 |
| Б2 | Магазин 9 | Б | 0 | 38.26 | 0 | 38.26 | € 17,217 |
| Б3 | Магазин 10 | Б | 0 | 29.29 | 0 | 29.29 | € 13,181 |
| Б4 | Магазин 11 | Б | 0 | 53.19 | 0 | 53.19 | € 23,936 |
| Б5 | Магазин 12 | Б | 0 | 77.46 | 0 | 77.46 | € 34,857 |
| Б6 | Апартамент 8 | Б | 1 | 188.2 | 29.42 | 217.62 | € 87,093 |
| Б7 | Апартамент 9 | Б | 1 | 114.61 | 17.91 | 132.52 | € 53,035 |
| Б8 | Апартамент 10 | Б | 1 | 77.66 | 12.14 | 89.8 | € 35,939 |
| Б9 | Ателие 11 | Б | 1 | 71.56 | 11.19 | 82.75 | € 33,117 |
| Б10 | Апартамент 12 | Б | 1 | 64.43 | 10.07 | 74.5 | € 29,815 |
| Б11 | Ателие 13 | Б | 1 | 49.14 | 7.68 | 56.82 | € 22,740 |
| Б12 | Апартамент 8 | Б | 2 | 112.13 | 17.53 | 129.66 | € 51,891 |
| Б13 | Апартамент 9 | Б | 2 | 76.57 | 11.97 | 88.54 | € 35,434 |
| Б14 | Апартамент 10 | Б | 2 | 64.31 | 10.05 | 74.36 | € 29,759 |
| Б15 | Ателие 11 | Б | 2 | 62.82 | 9.82 | 72.64 | € 29,071 |
| Б16 | Апартамент 12 | Б | 2 | 64.43 | 10.07 | 74.5 | € 29,815 |
| Б17 | Ателие 13 | Б | 2 | 49.14 | 7.68 | 56.82 | € 22,740 |
| Б18 | Апартамент 8 | Б | 3 | 112.13 | 17.53 | 129.66 | € 53,188 |
| Б19 | Апартамент 9 | Б | 3 | 76.57 | 11.97 | 88.54 | € 36,320 |
| Б21 | Ателие 11 | Б | 3 | 62.82 | 9.82 | 72.64 | € 29,798 |
| Б22 | Апартамент 12 | Б | 3 | 64.43 | 10.07 | 74.5 | € 30,561 |
| Б23 | Ателие 13 | Б | 3 | 49.14 | 7.68 | 56.82 | € 23,308 |
| Б24 | Апартамент 8 | Б | 4 | 112.13 | 17.53 | 129.66 | € 53,188 |
| Б25 | Апартамент 9 | Б | 4 | 76.57 | 11.97 | 88.54 | € 36,320 |
| Б27 | Ателие 11 | Б | 4 | 62.82 | 9.82 | 72.64 | € 29,798 |
| Б29 | Ателие 13 | Б | 4 | 49.14 | 7.68 | 56.82 | € 23,308 |
| Б30 | Апартамент 8 | Б | 5 | 112.13 | 17.53 | 129.66 | € 54,518 |
| Б31 | Апартамент 9 | Б | 5 | 76.57 | 11.97 | 88.54 | € 37,228 |
| Б33 | Ателие 11 | Б | 5 | 62.82 | 9.82 | 72.64 | € 30,543 |
| Б35 | Ателие 13 | Б | 5 | 49.14 | 7.68 | 56.82 | € 23,891 |
| Б37 | Апартамент 9 | Б | 6 | 76.57 | 11.97 | 88.54 | € 37,228 |
| Б39 | Ателие 11 | Б | 6 | 62.82 | 9.82 | 72.64 | € 30,543 |
| Б40 | Апартамент 12 | Б | 6 | 64.43 | 10.07 | 74.5 | € 31,325 |
| Б41 | Ателие 13 | Б | 6 | 49.14 | 7.68 | 56.82 | € 23,891 |
| Б43 | Апартамент 9 | Б | 7 | 76.57 | 11.97 | 88.54 | € 37,228 |
| Б45 | Ателие 11 | Б | 7 | 62.82 | 9.82 | 72.64 | € 30,543 |
| Б47 | Ателие 13 | Б | 7 | 49.14 | 7.68 | 56.82 | € 23,891 |
| Б48 | Ателие 6 | Б | 8 | 193 | 30.17 | 223.17 | € 93,836 |
| Б49 | Ателие 7 | Б | 8 | 64.22 | 10.04 | 74.26 | € 31,224 |
| Б50 | Ателие 8 | Б | 8 | 62.39 | 9.75 | 72.14 | € 30,332 |
| Б51 | Ателие 9 | Б | 8 | 64.65 | 10.11 | 74.76 | € 31,434 |
| Б52 | Ателие 10 | Б | 8 | 46.2 | 7.22 | 53.42 | € 22,461 |

Подземен паркинг в сутерена на вход "В", състоящ се от следните паркоместа, а именно:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ПМ1 | Паркоместо 1 | В | -1 | 13.8 | 16.45 | 30.25 | € 4,000 |
| ПМ2 | Паркоместо 2 | В | -1 | 13.8 | 16.45 | 30.25 | € 4,000 |
| ПМ3 | Паркоместо 3 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ4 | Паркоместо 4 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ5 | Паркоместо 5 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ6 | Паркоместо 6 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ7 | Паркоместо 7 | В | -1 | 15.26 | 18.19 | 33.45 | € 4,000 |
| ПМ1' | Паркоместо 1' | В | -1 | 15.26 | 18.19 | 33.45 | € 4,000 |
| ПМ8 | Паркоместо 8 | В | -1 | 13.8 | 16.45 | 30.25 | € 4,000 |
| ПМ9 | Паркоместо 9 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ10 | Паркоместо 10 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ11 | Паркоместо 11 | В | -1 | 13.8 | 16.45 | 30.25 | € 4,000 |
| ПМ12 | Паркоместо 12 | В | -1 | 14.1 | 16.81 | 30.91 | € 4,000 |
| ПМ13 | Паркоместо 13 | В | -1 | 28.08 | 33.48 | 61.56 | € 7,966 |
| ПМ14 | Паркоместо 14 | В | -1 | 20.05 | 23.9 | 43.95 | € 7,000 |
| ПМ15 | Паркоместо 15 | В | -1 | 20.94 | 24.96 | 45.9 | € 7,000 |
| ПМ16 | Паркоместо 16 | В | -1 | 22.36 | 26.66 | 49.02 | € 7,000 |
| ПМ17 | Паркоместо 17 | В | -1 | 21.04 | 25.08 | 46.12 | € 7,000 |

| | |
|---|---|
| Мазета №№ 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31 във вход "А" с обща площ от 139.78 м2 | €0 |



| | |
|---|---|
| Мазета №№ 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47 във вход "Б" с обща площ от 211.27 м2 | €0 |

9.07. **Получаване на застрахователни суми.** Застрахователни суми, получени по някой от застрахователните договори по Член 14.03. от настоящия Договор, се изплащат на Банката, считат се за получени плащания по Кредита и се прилагат за погасяване както е описано в Член 9.09. от настоящия Договор.

9.08. **Данъци.** Всички суми, дължими от Кредитополучателя на Банката, следва да бъдат изплатени изцяло на Банката, без от тях да се приспадат или удържат каквито и да било данъци върху сума плащани от Кредитополучателя на Банката, представляващи плащания по Главницата, Лихвата и/или Лихвата за забава (дефиниция по-долу). Всички съществуващи или в бъдеще установени данъци или удържан за данъци върху суми, платени от Кредитополучателя на Банката, представляващи плащания по Главницата, Лихвата и/или Лихвата за забава (дефиниция по-долу), ще са за сметка на Кредитополучателя.

9.09. **Погасително действие на плащанията.** Всички плащания по Кредита и наличните средства по разплащателната сметка на Кредитополучателя се използват за погасяване на задължения по следния ред:
(1) такси, комисионни и разноски на Банката;
(2) Лихва за забава (дефинирана по-долу);
(3) Дължима лихва към датата на дължимото плащане;
(4) Просрочена Главница;
(5) редовна Лихва;
(6) редовна Главница;

9.10. **Начин на плащане.** Всички плащания по този Договор се извършват чрез разплащателната сметка, открита на името на Кредитополучателя при Банката съгласно Член 3.03.(и) по-горе. Банката може да посочи писмено други свои сметки и/или банки в България, по които Кредитополучателят чрез плащане в брой или чрез банков превод да извършва всички плащания по този Договор.

9.11. **Дата на плащане.** Всички плащания от Кредитополучателя на Банката по каквото и да е сума по настоящия Договор се считат изплатени от датата, на която чрез наличните средства постъпят на банковата сметка на Банката, определена в съответствие с Член 9.10. по-горе.

9.12. На датата на Първо предоставяне на средства Кредитополучателят заплаща на Банката еднократна Такса за Управление на Кредита в размер на три процента годишно (3%) от сумата на Кредита, или седемдесет и седем хиляди петстотин и единадесет Евро (77,511 евро), което се удържа от сумата на Кредита, след приспадане на Таксата за ангажимент.

9.13. **Банкови комисионни.** Каквито и да било банкови комисионни, свързани с превода и/или погашенията по Кредита са за сметка и платими от Кредитополучателя. Кредитополучателят се съгласява веднага да възстанови каквото и да било банкови комисионни, които Банката може да е платила от името на Кредитополучателя.

9.14. **Служебно събиране на вземането.** Банката служебно събира всички свои вземания по този Договор от средствата, налични по разплащателната сметка на Кредитополучателя, открита при Банката съгласно Член 3.03.(и) по-горе или по други сметки на Кредитополучателя в национална и в чуждестранна валута, открити при Банката.

9.15 **Съгласие за служебно инкасо.** С подписването на настоящия Договор Кредитополучателят дава неотменимо писменото си съгласие за служебно инкасо в полза на Банката съгласно Наредба No.3 на БНБ за безналичните плащания и националната платежна система, въз основа на което Банката може да събира на Датата на дължимо плащане или след нея изискуемите по този Договор вземания, като задължава служебно сметките на Кредитополучателя в национална и чуждестранна валута, открити при нея, включително, когато това е необходимо, чрез откупуване на чуждестранната валута, съответно арбитрариране по курса на Банката в деня на операцията.

**Раздел X.ПРОДАЖБИ НА ОБЕКТИ ОТ ПРОЕКТА**

10.01. **Задължение да се получи одобрението на Банката.** Кредитополучателят е длъжен да получи одобрението на Банката относно всеки Предварителен договор за продажба преди последното да бъде сключен. Сключването на Предварителния договор за продажба без одобрението на Банката се счита за Случай на неизпълнение по Договора с дата – Датата на Предварителния договор за продажба.

10.02. **Задължение да се информира Купувача.** Кредитополучателят е длъжен да информира всеки Купувач за всички относими съображения във връзка с настоящия Договор. Задължително в Предварителните Договори за продажби да съдържат поне информацията че:
(а) върху Обекта на продажба съществува Ипотека в полза на Банката;
(б) Купувачът има възможността да заплаща всички вноски директно на Банката.

10.03. **Постъпления от Продажби**
(а) Постъпленията от продажби ще се използват от Кредитополучателя за извършване на плащания по Кредита.

9.07. **Insurance Proceeds.** Any insurance proceeds from insurance specified in Article 14.03. hereof will be paid to **Lender** and shall be shall be deemed to be receipt of payment under the **Loan**, and will be applied in the order specified in Article 9.09. hereof.

9.08. **Taxes.** All sums paid by **Borrower** to **Lender** shall be paid to **Lender** in full, free of any deductions or withholdings for any and all present and future taxes on sums paid by **Borrower** to **Lender** representing **Principal, Interest** and/or **Penalty Interest** (hereinafter defined) payments. Any taxes or withholdings for taxes which may be due on sums paid by **Borrower** to **Lender** representing **Principal, Interest** and/or **Penalty Interest** (hereinafter defined) payments, whether present or future, shall be for the account of and at the expense of **Borrower**.

9.09. **Application of Payments.** All payments under the **Loan**, as well as the funds in the **Borrower's** current account shall be applied as follows:
(1) any fees, charges, commissions or other expenses of the Bank;
(2) **Penalty Interest** (hereinafter defined);
(3) Interest due as of the **Payment Due Date**;
(4) Past due **Principal**;
(5) Due **Principal**;
(6) Prepayment of **Principal**.

9.10. **Method of Payment.** All payments are to be made through the current account opened in the name of the **Borrower** with the Bank according to Article 3.03.(и) above. The **Bank** may specify in writing other accounts and/or bank(s) in Bulgaria through which the **Borrower** will make in cash or by bank transfer all **Loan** payments under this **Agreement**.

9.11. **Date of Payment.** All payments from **Borrower** to **Lender** of any amounts due under this **Agreement** will be deemed paid from the date immediately available funds arrive at **Lender's** bank account as per Article 9.10. above.

9.12. On the date of **First disbursement**, **Borrower** shall have paid to **Lender** a **Loan Management Fee** in the amount of three percent per annum (3%) of the amount of the **Loan**, equal to seventy seven thousand five hundred and eleven Euro (EUR 77,511), which is withheld from the **Loan** amount on the **Date of Security** after the **"Commitment Fee"** is deducted.

9.13. **Bank Fees.** Any bank fees related to disbursement and /or payments under the **Loan** are for the account of and at the expense of **Borrower**. **Borrower** agrees to immediately reimburse **Lender** for any bank fees that **Lender** may pay on **Borrower's** behalf.

9.14. **Collection of debt. Bank** shall collect all and any of its receivables under this **Agreement** from the amounts, deposited in the **Borrower's** current account with the **Bank** according to Article 3.03.(и) above, or in any other account in local or foreign currency opened with the **Bank**.

9.15. **Consent for immediate collection. Borrower** hereby provides its unconditional and irrevocable consent for immediate collection in favor of the **Bank** pursuant to Regulation #3 for wire transfers and the national payment system issued by BNB for the right of **Bank** to collect on the **Payment Due Date** or after it all and any of **Bank** receivables under this **Agreement** from the amounts deposited in **Borrower's** accounts opened with the **Bank**, including, when necessary, buying foreign currency at exchange rates of the **Bank** for the date of transaction.

**SECTION X. UNIT SALES**

10.01. **Obligation to obtain Lender's approval. Borrower** is obliged obtain written **Lender's** approval of any and all **Presale Agreements** prior to executing any **Presale Agreement.** Failing to obtain **Lender's** approval is an Event of Default. That Event of Default shall be as of the **Presale Agreement Date.**

10.02. **Obligation to Inform Buyer. Borrower** is obligated to inform any and all **Buyer(s)** of all relevant considerations under this **Loan**. Particularly, **Presale Agreements** must contain at least the information:
a) that **Lender** currently has a mortgage on the available Unit(s);
b) **Buyer** has option to pay all **Sales Proceeds** directly to **Lender.**

10.03. **Sales Proceeds**
a) **Sales Proceeds** shall be used by **Borrower** to make payments under the **Loan.**

Borrower/Кредитополучател: _____    стр. 11 от 21    Lender/Банка: _____

(б) плащанията, от Купувача на един или повече Обекти ще се извършват или директно от Купувача на Банката, или чрез Кредитополучателя на Банката в размер поне на съответната сума за Обекта по Схема на дължимите суми по Обекти. След като съответната сума от дължимите суми по Обекти бъде изплатена, Кредитополучателят може да продължи да превежда Постъпления от Продажби на Банката по собствена преценка.

(b) Payments made by Buyer on a Unit or Units shall be paid to Lender either directly by the Buyer or through the Borrower, at least the amount of the Required Repayment Per Unit Schedule for the relevant Unit. After the Required Repayment Per Unit has been paid, Borrower can continue to pay Sales Proceeds to Lender at his discretion.

(в) Банката има право да откаже поредно Предоставяне на средства по Кредита, след като е получил Постъпления от продажби в резултат на сключен Предварителен договор за продажба без да е превел на Банката съответстващата сума за Обекта от Схемата на дължими суми по обекти по Чл. 9.06. По този начин общата сума на Кредита може да се намали с размера на невнесеното Постъпление от Продажба до указаната сума по Чл. 9.06. за съответния обект.

(v) Lender has the right to refuse to make further Disbursement of Funds under this Loan in case the Lender has received Sales Proceeds resulting from an executed Presale Agreement without transferring them to the Lender in the amount stipulated by the Required Repayment Per Unit Schedule under Article 9.06. Thus, the total amount of the Loan could be reduced by any Sales Proceeds unpaid to Lender up to the stipulated amount under Article 9.06.

(г) Кредитополучателят е длъжен да посочи към кой Обект се прилагат Постъпленията от продажби.

(d) Borrower is obligated to indicate toward which Unit each Payment of Sales Proceeds applies.

(д) В случай че Постъпленията от продажби по сключен Предварителен договор за продажба са по-големи от сумата на дължимите Лихва за забава, Лихва и Главница и за да може това превишение на изплащане на Банката средства да се приложи към Постъпстващата сума от Схемата за дължимите суми по Обекти, Кредитополучателят и Банката се споразумяват по кои Пера от Строителния бюджет това превишение да се приложи. Банката ще откаже поредно Предоставяне на средства по Кредита до момента, в който работите по така определените Пера от Строителния бюджет не са завършени.

(e) If Sales Proceeds from an executed Presale Agreement are greater than the combined Penalty Interest, Interest, and Principal Payments due under the Loan, in order for Sales Proceeds in excess of those paid to Lender to be applied toward the relevant Unit's Required Repayment Per Unit, the Borrower and Lender must agree toward which Budget Line Items the excess Sales Proceeds shall be applied. Lender shall refuse further Disbursement of Funds under the Loan until the identified Budget Line Items are completed.

10.04. Окончателен Договор за Продажба. На Датата на Окончателния договор за Продажба на Обект Кредитополучателят погасява Главница в размер на оставащата сума за изплащане от Дължимите суми по Обекти, както тя е определена в Схема на дължими суми по Обекти за съответния Обект.

10.04. Final Sale Agreements. On Final Sale Agreement Date for the relevant Unit, Borrower must repay Principal in the remaining amount of the Required Repayment Per Unit for the relevant Unit.

(а) в случай че Постъпленията от Продажба за даден Обект са по-малки от Дължимата сума по Обекти, Кредитополучателят се задължава да заплати разлика между Дължимата сума по Обект и Постъпленията от Продажби.

(a) If Sales Proceeds for a given Unit are less than the Required Repayment Per Unit, Borrower must pay the difference between Required Repayment Per Unit and Sales Proceeds.

## РАЗДЕЛ XI. ПРОСРОЧЕНИ ПЛАЩАНИЯ

## SECTION XI. OVERDUE PAYMENTS

11.01. Лихва за забава. В случая на неплащане, забавено или частично плащане на Лихва или Главница, Кредитополучателят дължи допълнителна лихва ("Лихва за забава") в размер на двадесет и пет процента (25%) годишно върху Неизплатената част от Главницата по Кредита. Кредитополучателят дължи Лихва за забава от Датата на дължимото плащане, на която не е извършено пълно плащане на Лихва или Главница, до момента, в който няма повече дължими плащания по Лихвата. Лихвата за забава ще включва плащането на Лихва за деня и за деня на извършване на забавеното плащане.

11.01. Penalty Interest. In the case of non-payment, late payments or partial payments of Interest or Principal, Borrower will be liable for additional penalty interest ("Penalty Interest") of twenty five percent (25%) per annum on the Principal Balance of the Loan. Borrower will be charged Penalty Interest beginning on the Payment Due Date that full payment of Interest or Principal has not been made, until such time as all payments of Interest have been brought current. The Penalty Interest includes Penalty Interest charged for the day the late payment is made.

11.02. Просрочени плащания на Постъпления от Продажби. В случай на неплащане, частично или забавено плащане на Постъпления от Продажби, плащания на Постъпления от продажби, извършени в несъответствие с Член 10.03.(б) към Банката, Кредитополучателят дължи допълнителна Лихва за забава в размер на двадесет и пет процента (25%) годишно върху Главницата, освен в случаите когато лихва се определя със закон.

11.02. Overdue Payment of Sales Proceeds. In the case of non-payment, or late payments of Sales Proceeds to Lender, or partial payments of Sales Proceeds not in compliance with Article 10.03.(b), Borrower will be liable for additional Penalty Interest of twenty five percent (25%) per annum on the Principal Balance of the Loan, unless a lower rate is imposed by law.

(а) Лихва за забава в случай на неплащане, частично или забавено плащане на Постъпления от Продажби по Предварителен договор за продажба се начислява и дължи, считано от установената в Предварителния договор за продажба дата на извършване на плащането. Ако Кредитополучателят не получи плащането от Купувача на гореупоменатата дата, Банката трябва да бъде уведомена писмено.

(a) In the case of non-payment, or late payments of Sales Proceeds to Lender under Presales Agreement the date at which Penalty Interest will start accruing is determined by the date stipulated in the Presales Agreement on which the payment is due. The Lender must be notified in writing if Borrower does not receive from the Buyer the payment on that date.

(б) Постъпленията от Продажби, които надвишават дължимата сума за съответния Обект както тя е определена в Схема на дължими суми по Обекти не са с обект на Лихва за забава.

(b) Sales Proceeds in excess of the Required Repayment Per Unit for that Unit will not be subject to Penalty Interest if not paid by Borrower to Lender.

(в) Лихвата за забава включва начислена Лихва за забава и за деня в който забавеното плащане е направено.

(c) The Penalty Interest includes Penalty Interest charged for the day the late payment is made.

11.03. Лихва за забава в Случай на Неизпълнение. Ако е налице Случай на неизпълнение, както той е определен в Раздел XVI, Кредитополучателят дължи допълнително Лихва за забава в размер от двадесет и пет процента (25%) годишно върху Неизплатената част от Главницата по Кредита.

11.03. Penalty Interest in Event of Default. In the case of any Event of Default as defined in Article 16.03., Borrower will be liable for additional Penalty Interest of twenty five percent (25%) per annum on the Principal Balance of the Loan.

## РАЗДЕЛ XII. ОБЕЗПЕЧЕНИЕ

## SECTION XII. COLLATERAL

12.01. Обезпечение. Кредитополучателят обезпечава всички вземания на Банката по настоящия Договор със следното Обезпечение, надлежно учредено по предвидения в Закона ред в приемливи за Банката форма и съдържание:

12.01. Collateral. This Loan shall be secured by the following Collateral described below, properly executed by the Borrower in the due legal way in form and substance acceptable to Lender:

(а) Запис на заповед издаден в полза на Банката, с падеж на предявяване, без протест, за сумата от 2,659,704 (ДВА МИЛИОНА ШЕСТСТОТИН ПЕТДЕСЕТ И ДЕВЕТ ХИЛЯДИ СЕДЕМСТОТИН И ЧЕТИРИ) евро и лихва за забава в размер на 25% (двадесет и пет процента) годишно, авалиран от Христо Иванов Христов, ЕГН:7107210601, Йордан Павлов Йорданов

(a) Promissory Note issued in favor of Lender, with due date upon submittance, without protest, for the amount of EUR 2,659,704 (TWO MILLION SIX HUNDRED AND FIFTY NINE THOUSAND SEVEN HUNDRED AND FOUR EURO) and penalty interest calculated on yearly basis under twelve five percent (25%) per annum, guaranteed

ЕГН:6403241429 и Милена Бойкова Благева, ЕГН 7412286032 ("Авалисти"). Банката има правото да предяви иска на Кредитополучателя Запис на заповед, издаден от него по настоящия Член 12.01. или Член 12.07., само при възникване на Случай на неизпълнение по настоящия Договор съгласно клаузите на Раздел XVI по-долу.

by Hristo IvanovHristov, UCI #7107210601, Jordan Pavlov Jordanov ("Guarantors"). The Lender has the right to call to the Borrower the Promissory Note issued by the latter under this Article 12.01. and Article 12.07. only in the Event of default under this Agreement pursuant to Section XVI hereunder.

(5) Договорна ипотека за обезпечаване на вземане в размер на 2,659,704 (ДВА МИЛИОНА ШЕСТСТОТИН ПЕТДЕСЕТ И ДЕВЕТ ХИЛЯДИ СЕДЕМСТОТИН И ЧЕТИРИ) Евро, включително дължимите 12% (дванадесет процента) годишна Лихва върху общия размер на Кредита (без Лихвения резерв и Такса за Управление) и Такса за управление на кредита в размер на три процента (3%) върху целия размер на кредита, заедно с двадесет и пет процента (25%) Лихва за забава, учредена върху:

(b) Contractual Mortgage for the amount of EUR 2,659,704 (TWO MILLION SIX HUNDRED AND FIFTY NINE THOUSAND SEVEN HUNDRED AND FOUR EURO) including twelve percent (12%) per annum on the total amount of the Loan (without the Interest reserve and the Loan Management Fee) of regular Interest and Initiation Fee in the amount of three percents (3%) per annum on the total amount of the loan, together with Penalty Interest of twenty five percent (25%) per annum, established on:

(ба) Ателие №В-7, на две нива на кота +16.90м и на кота +19.50 м, находящо се на терасовидния етаж в секция "В" на жилищна сграда в гр. София, Столична община – район "Красно село" на ул. "Пирински проход" №47 в урегулиран поземлен имот VII-347 от кв.288а по плана на гр. София местността "Булевард България – Мотописта", целият с площ от 4 756 кв.м., което ателие е с разгъната застроена площ от 148.14 кв.м., заедно с 3.4657% идеални части от общите части на секция "В" на сградата и 0.9183% идеални части от правото на строеж върху урегулирания поземлен имот, в който е построена сградата, описан подробно в нотариален акт №55 том IV рег.№7908 дело №559/2004г. на нотариус №260 на Нотариалната камара;

(ba) Atelier №В-7, on two levels on level +16.90m and on level +19.50 m, on the terrace floor in section "B" of a residential building in Sofia Stolichna Municipality "Krasno selo" region at 47 Pirinski prohod Street in regulated land plot VII-347 in district 288a as per the city plan of Sofia Blvd. Bulgaria – Motopista zone, the whole with area of 4756 sq.m., which atelier is with total built-up area of 148.14 sq.m., together with 3.4657% Ideal parts of the common parts of the section B of the building and 0.9183% Ideal parts of the right-to-build on the plot on which is located the building, described in details in the notary deed №55 volume IV reg.№7908 file №559/2004 as per the register of the notary №260 of the Notary Chamber.

(бб) Гараж №В-6, находящ се в сутеренния етаж на жилищна сграда в гр. София, Столична община – район "Красно село" на ул. "Пирински проход" №47 в урегулиран поземлен имот VII-347 от кв.288а по плана на гр. София местността "Булевард България – Мотописта", целият с площ от 4 756 кв.м., който гараж е с разгъната застроена площ от 26.33 кв.м., заедно с 0.8251% идеални части от общите части на сградата и 0.2189% идеални части от правото на строеж върху урегулирания поземлен имот, в който е построена сградата, описан подробно в нотариален акт №55 том IV рег.№7908 дело №559/2004г. на нотариус №260 на Нотариалната камара.

(bb) Garage №В-6, located on the basement of a residential building in Sofia Stolichna Municipality "Krasno selo" region at 47 Pirinski prohod Street in regulated land plot VII-347 in district 288a as per the city plan of Sofia Blvd. Bulgaria – Motopista zone, the whole with area of 4756 sq.m., which garage is with built-up area of 26.33 sq.m., together with 0.8251% Ideal parts of the common parts of the section B of the building and 0.2189% Ideal parts of the right-to-build on the plot on which is located the building, described in the notary deed №55 volume IV reg.№7908 file №559/2004 as per the register of the notary №260 of the Notary Chamber.

(бв) Апартамент №11, находящ се в гр. София на ул. "Селиврия"№15-17 на третия етаж на жилищна сграда, със застроена площ 97.42 кв.м., заедно с мазе №11 в сутерена на сградата, заедно с 3.83% идеални части от общите части на сградата и правото на строеж върху урегулирания поземлен имот VIII-238, 239, кв.119 по плана на гр. София местността "Красно село – Плавателен канал", целият с площ от 1000 кв.м., описан подробно в нотариален акт №117 том X, дело №1960/1996г. на нотариус при РС София.

(bc) Apartment №11, located in Sofia 15-17 Selivrija Street on the third floor of the residential building, with built-up area of 97.42 sq.m., together with basement №11 in the basement of the building, together with 3.83% Ideal parts of the common parts of the building and the right-to-build on the plot on which is located the building VIII-238, 239, in district 119 as per the city plan of Sofia "Krasno selo – plavatelen kanal" zone, the whole with area of 1000 sq.m., described in details in the notary deed №117 volume X, file №1960/1996 as per the register on the notary by the regional Court Sofia.

(бг) Гараж №8, находящ се в гр. София на ул. "Селиврия"№15-17 на приземния етаж на жилищна сграда, със застроена площ 18.40 кв.м., заедно с 0.67% идеални части от общите части на сградата и правото на строеж върху урегулирания поземлен имот VIII-238, 239, кв.119 по плана на гр. София местността "Красно село – Плавателен канал", целият с площ от 1000 кв.м., описан подробно в нотариален акт №117 том X, дело №1960/1996г. на нотариус при РС София.

(bd) Garage №8, located in Sofia 15-17 Selivrija Street on the parterre floor of the residential building, with built-up area of 18.40 sq.m., together with 0.67% Ideal parts of the common parts of the building and the right-to-build on the plot on which is located the building VIII-238, 239, in district 119 as per the city plan of Sofia "Krasno selo – plavatelen kanal" zone, the whole with area of 1000 sq.m., described in details in the notary deed №117 volume X, file №1960/1996 as per the register on the notary by the regional Court Sofia.

(бд) 1648/3500 идеални части от УРЕГУЛИРАН ПОЗЕМЛЕН ИМОТ №IV-66, находящ се в гр. София кв. 3Б по плана на гр. София жилищен район ж.к."Овча купел – 2", с площ от 3500 кв.м., описан подробно в нотариален акт №33, том III, дело 401 от 2004г. на нотариус №268 на Нотариалната камара;

(be) 1648/3500 Ideal parts of REGULATED LAND PLOT №IV-66, located in Sofia in district 3B as per the city plan of Sofia, residential area Ovcha kupel -2 zone, with area of 3500 sq.m., described in details in notary deed № 33, volume III, reg. №12122, file 401 dated 2004 as per the register of the notary №268 of the Notary Chamber;

(бе) ПРАВОТО НА СТРОЕЖ за обектите от Проекта, дефиниран в чл.1.06. от настоящия Договор, собственост на "Строителство България" ООД, както следва:

(be) THE TIGHT-TO-BUILD for the units of the Project (defined in Article 1.06) owned by "Strioitelstvo Bulgaria" OOD and in particular:

във вход "А"
на партера: магазин 1, магазин 2, магазин 3, магазин 4, магазин 5, магазин 6, магазин 7,
на първи етаж: апартамент 1, апартамент 2, апартамент 3, апартамент 4, апартамент 5, апартамент 6, апартамент 7,
на втори етаж: апартамент 1, апартамент 2, апартамент 3, апартамент 4, апартамент 5, апартамент 6, апартамент 7,
на трети етаж: апартамент 4, апартамент 5, апартамент 6, апартамент 7,
на четвърти етаж: апартамент 2, апартамент 4, апартамент 5, апартамент 6,
на пети етаж: апартамент 3, апартамент 4, апартамент 6, апартамент 7,
на шести етаж: апартамент 3, апартамент 4, апартамент 5, апартамент 6,
на седми етаж: апартамент 1, апартамент 2, апартамент 3, апартамент 4, апартамент 5,
на подпокривен етаж: ателие 1, ателие 2, ателие 3, ателие 4, ателие 5,

in the entrance "A"
on the parlier: shop 1, shop 2, shop 3, shop 4, shop 5, shop 6, shop 7,
on first floor: apartment 1, apartment 2, apartment 3, apartment 4, apartment 5, apartment 6, apartment 7,
on second floor: apartment 1, apartment 2, apartment 3, apartment 4, apartment 5, apartment 6, apartment 7,
on third floor: apartment 4, apartment 5, apartment 6, apartment 7,
on fourth floor: apartment 2, apartment 4, apartment 5, apartment 6,
on fifth floor: apartment 4, apartment 5, apartment 6, apartment 7,
on sixth floor: apartment 3, apartment 4, apartment 5, apartment 6,
on seventh floor: apartment 1, apartment 2, apartment 3, apartment 4, apartment 5,
on underroof floor: atelier 1, atelier 2, atelier 3, atelier 4, atelier 5,

във вход "Б"
на партера: магазин 8, магазин 9, магазин 10, магазин 11, магазин 12,
на първи етаж: апартамент 8, апартамент 9, апартамент 10, ателие 11, апартамент 12, ателие 13,
на втори етаж: апартамент 8, апартамент 9, апартамент 10, ателие 11, апартамент 12, ателие 13,
на трети етаж: апартамент 8, апартамент 9, ателие 11, апартамент 12, ателие 13,
на четвърти етаж: апартамент 8, апартамент 9, ателие 11, ателие 13,
на пети етаж: апартамент 8, апартамент 9, ателие 11, ателие 13,

in the entrance "B"
on the parlier: shop 8, shop 9, shop 10, shop 11, shop 12,
on first floor: apartment 8, apartment 9, apartment 10, atelier 11, apartment 12, atelier 13,
on second floor: apartment 8, apartment 9, apartment 10, atelier 11, atelier 13,
on third floor: apartment 8, apartment 9, atelier 11, apartment 12, atelier 13,
on fourth floor: apartment 8, apartment 9, atelier 11, atelier 13,
on fifth floor: apartment 8, apartment 9, atelier 11, atelier 13,
on sixth floor: apartment 9, atelier 11, apartment 12, atelier 13,
on seventh floor: apartment 9, atelier 11, atelier 13,



на шести етаж: апартамент 9, ателие 11, апартамент 12, ателие 13,
на седми етаж: апартамент 9, ателие 11, ателие 13,
на подпокривен етаж: ателие 6, ателие 7, ателие 8, ателие 9, ателие 10,
както и 71.10% идеални части от подземен паркинг, състоящ се от тридесет паркоместа във вход "А" в сутерена на сградата, съответни на следните паркоместа:  паркомясто  6, паркомясто  7, паркомясто  8, паркомясто  9, паркомясто  12, паркомясто  13, паркомясто  15, паркомясто  16, паркомясто  17, паркомясто  18, паркомясто  19, паркомясто  21, паркомясто  22, паркомясто  23, паркомясто  25, паркомясто  26, паркомясто  28, паркомясто  30,
както и подземен паркинг, състоящ се от осемнадесет паркоместа във вход "В" в сутерена на сградата,
заедно с прилежащите мазета.

on underroof floor: atelier 6, atelier 7, atelier 8, atelier 9, atelier 10
as well as 71,10% ideal parts of the underground parking lot consisting of thirty parking places in the entrance "A" in the basement of the building, respective to the following parking places: паркомясто 6, паркомясто 7, паркомясто 8, паркомясто 9, паркомясто 12, паркомясто 13, паркомясто 14, паркомясто 15, паркомясто 16, паркомясто 17, паркомясто 18, паркомясто 19, паркомясто 21, паркомясто 22, паркомясто 23, паркомясто 25, паркомясто 26, паркомясто 27, паркомясто 28, паркомясто 29, паркомясто 30,
as well as the underground parking lot consisting eighteen parking places in the entrance "B" in the basement of the building,
together with the respective basements.

12.02. Ако стойността на Обезпечението намалее по някаква причина или Банката счете стойността на Обезпечението за недостатъчна по време на валидността на Кредита, Кредитополучателят се съгласява при първо писмено искане от страна на Банката да осигури допълнително Обезпечение до изискваната от Банката стойност или да намали задължението си по настоящия Договор съгласно изискванията на Банката.

12.02. If the value of Collateral decreases for any reason, or if Lender finds the Collateral value insufficient at any time during the life of the Loan, then upon receipt of the first written request from Lender, Borrower agrees to provide additional Collateral to the value determined by Lender, or to decrease its Loan obligation under this Agreement as requested by Lender.

12.03. Разноски. Всички разноски и такси, свързани с надлежното сключване и изпълнение на договорите, учредяващи Обезпечението, както и всички разходи по освобождаване на Обезпечението, са за сметка на Кредитополучателя.

12.03. Fees. Any costs or fees associated with the proper execution and perfection of the collateral agreements and with the release of the Collateral are for Borrower's expense. Borrower shall be liable for.

12.04. Нито една от разпоредбите на този раздел няма да се счита за ограничаваща правата на Банката да действа в противния смисъл.

12.04. None of the provisions in this Section shall be construed as limiting the powers of Lender in acting to the contrary.

12.05. Кредитополучателят не може да бъде страна в никакви споразумения, които обещават или гарантират Обезпечението на трета страна без предварително писмено съгласие от страна на Банката.

12.05. Lender may not enter into any agreements that promise or guarantee the Collateral to a third party without prior written consent of Lender.

12.06. Банката е длъжна да даде нотариално заверено съгласие за частично заличаване на вписаната по Договорната ипотека по Член 12.01.(б) в частта на отделни Обекти от Проекта единствено и само когато следните условия са изпълнени:

12.06. Lender will issue Approval for a partial mortgage release on collateralized property under 12.01.(b) in the part regarding separate Units from the Project only after the following conditions are met:

(а)   Кредитополучателят не дължи Лихва за забава или Лихва; и

(а)   Borrower has no Penalty Interest or Interest due; and

(б)   Кредитополучателят е намалил дължимата Главница със съответната за дадения Обект сума както тя е определена в Схема на дължимите суми по Обекти; и

(b)   Borrower has reduced Principal Balance by the Required Repayment Per Unit for the relevant Unit; and

(в)   Кредитополучателят е заплатил разходите за нотариалната заверка на заличаването

(c)   The Borrower has paid the notary fee for the mortgage release.

12.07. При поискване както от Банката, така и от Кредитополучателя, последният издава нов Запис на заповед по образец на същия, издаден по Член 12.01.(а) за сума в размер на Неизплатената част от главницата. В този случай Записът на заповед, отнасящ се за цялата сума на Кредита, издаден съгласно Член 12.01.(а) или настоящия Член 12.07., се връща на Кредитополучателя.

12.07. In case of request either from Lender or from Borrower, a new promissory note following the same pattern as the one issued under Article 12.01.(a), for the amount of the Principal Balance on the Loan (hereinafter defined) then outstanding. In this case the promissory note issued by Borrower pertaining to the Loan pursuant to Article 12.01.(a) or this Article 12.07. will be returned to Borrower.

12.08. Банката освобождава напълно ипотека по настоящия договор и връща на Кредитополучателя Записът на заповед, издаден съгласно Член 12.01.(а), или Член 12.07., единствено и само когато всички задължения по настоящия Договор бъдат изпълнени изцяло, Договорът бъде прекратен и Кредитополучателят е представил писмено искане за пълно освобождаване на Обезпечението.

12.08. The Lender will perform a full mortgage release on the above defined property and will return the Promissory Note issued under Article 12.01.(a) or 12.07. only when all obligations under this Agreement have been satisfied in full, this Agreement has been terminated and the Borrower has submitted a written request for full release of Collateral.

РАЗДЕЛ XIII. ДЕКЛАРАЦИИ И ГАРАНЦИИ

SECTION XIII.   REPRESENTATIONS AND WARRANTIES

13.01. Декларации и гаранции. Кредитополучателят декларира и гарантира относно следното към Датата на Сключване:

13.01. Representations and Warranties.   Borrower represents and warrants the following as of the Date of Agreement:

(а)   Цялата информация, предоставена на Банката от Кредитополучателя при кандидатстване за Кредита, е вярна и пълна и Кредитополучателят не е пропуснал да информира Банката относно каквото и да било съществени факти.

(a)   All of the information given to Lender by Borrower to apply for the Loan is true and complete, and Borrower has not omitted or failed to inform Lender of any material facts.

(б)   Средствата, предоставени по този Кредит ще бъдат използвани единствено и само за целите по Член 2.06. от настоящия Договор.

(b)   Proceeds from Disbursement of Funds under the Loan will be used exclusively for the purposes stated in Article 2.06 hereof.

(в)   Средствата по Кредита няма да се използват за производство и продажба на военна продукция, на оборудване за извършване на аборти или за извършване на услуги, свързани с оръжия или аборти.

(c)   Loan proceeds will not be used for the production or sale of munitions, or for abortion equipment, or for the rendering of services linked to weapons or abortion.

(г)   Кредитополучателят е правоспособен за сключването и изпълнението на настоящия Договор и компетентните органи на Кредитополучателя са предприели всички необходими действия, за да бъде налице представителна власт на лицето, което сключва настоящия Договор.

(d)   Borrower has the legal capacity to execute and comply with this Agreement and all necessary corporate actions have been taken in order for the person who is executing this Agreement to have the legal authority to act on behalf of Borrower.

(д)   Кредитополучателят не е страна по съдебни, арбитражни или административни производства и на Кредитополучателя не са известни никакви предстоящи или възможни претенции, които биха могли да окажат съществено неблагоприятно въздействие върху стопанската дейност на Кредитополучателя, както и не са известни предстоящи събития, които биха могли да попречат на Кредитополучателя да изпълнява задълженията си по настоящия Договор.

(e)   Borrower is not involved in any judicial, arbitrage, or administrative proceedings, and Borrower is not aware of any pending or threatened claims, which could have a material adverse impact on the Borrower's business and there are no known forthcoming conditions which could prevent Borrower from performing its obligations under this Agreement.

(е)   Сключването на настоящия Договор и Предоставяне на средства по

(f)   Execution of this Agreement and Disbursement of Funds of funds

него няма да има за резултат неизпълнение на задължения или противоречие с условията по друг кредит или друг договор.

(ж) Кредитополучателят притежава всички удостоверения, разрешения и лицензи, необходими за извършване на стопанска дейност в съответствие с българското законодателство и за получаване на кредити.

(з) На строителната площадка на Кредитополучателя не се намират никакви опасни отпадъци и той няма никакви задължения по приложими нормативни актове и закони по опазване на околната среда.

(и) Кредитополучателят е разкрил писмено пред Банката всички свои дъщерни предприятия и направления на стопанска дейност.

(й) Не се е случило или не е основателно предвидимо събитие или условие, което, с течение на времето или с отправяне на предизвестие, или и с двете, да има за резултат Случай на неизпълнение (дефиниция по-долу) по настоящия Договор.

(к) Кредитополучателят не е в нарушение и не носи гражданска отговорност по нито един закон или наредба за териториално и селищно устройство или с условията на което и да е разрешение за строеж, която биха могли да имат съществено неблагоприятно въздействие върху способността на Кредитополучателя да изпълнява задълженията си по настоящия Договор или по Договорите за обезпечение.

(л) Към Датата на Сключване на Договора Кредитополучателят притежава и поддържа всички разрешения, които се изискват за да се получи Разрешение за ползване на Проекта и за извършване на стопанската му дейност, и се е съобразил с всички условия и изисквания, съдържащи се в тях и с всички други приложими закони, които биха имали съществен неблагоприятен ефект върху способността на Кредитополучателя да изпълнява задълженията си по настоящия Договор, и че не е извършил или позволил извършването на действие или пропуск, в резултат на което което и да е от разрешенията да подлежи на промяна или отмяна.

(м) Кредитополучателят гарантира и декларира, че всички документи, свързани с Проекта, и в частност одобрените архитектурни проекти от Приложение 1 (Проекти), представени на Банката са действителни и валидни.

(н) Кредитополучателят е предоставил на Банката вярна и актуална информация относно Обезпечението на Проекта. Кредитополучателят декларира и гарантира, че няма сключени Договори за предварителни продажби отнасящи се към Обезпечението.

(о) Кредитополучателят декларира, че към момента на сключването на настоящия Договор няма получени други кредити.

## РАЗДЕЛ XIV. ЗАДЪЛЖЕНИЯ НА КРЕДИТОПОЛУЧАТЕЛЯ

От Датата на Сключване до момента на пълното плащане или погасяване на Кредита и на всички други задължения по настоящия Договор Кредитополучателят е съгласен да спазва следните условия:

14.01. При условията на настоящия Договор, Кредитополучателят неотменимо и безусловно се задължава солидарно да изплати всички суми, предоставени по Кредита, и да плати всички лихви, такси и разноски по настоящия Договор, ведно с всички разходи за банково обслужване.

14.02. Плащане на данъци и други задължения. Кредитополучателят ще плаща в срок всички данъци, такси и други държавни вземания. Кредитополучателят ще плаща в срок и всички други задължения, които, ако останат неизплатени, могат да доведат до обременяване на Обезпечението или други активи на Кредитополучателя.

14.03. Застраховка. Кредитополучателят е длъжен да сключи и поддържа за своя сметка през целия срок на Кредита следните застраховки върху общия размер на Кредита:

(а) застраховка строителен риск за Проекта през Периода на строителството, покриваща всички стандартни рискове, и застраховка срещу пожар и природно бедствие (с разширено покритие, с клауза за умишлена вреда и вандализъм, земетресение) за Проекта през Периода на продажби.

(б) застраховка(и) срещу пожар и природно бедствие (с разширено покритие, с клауза с умишлена вреда и вандализъм, земетресение) върху цялото имущество извън Проекта, което по силата на Договор за обезпечение се явява Обезпечение по Кредита.

(в) застраховка "Отговорност трети лица".

(г) застраховката трябва да сочи Банката като единствен бенефициент в случай на застрахователно събитие. Застрахователната сума следва да бъде указана в евро, платима в лева по фиксинга на Българска Народна Банка в деня на изплащане на средствата по застраховката.

(д) Кредитополучателят потвърждава и се съгласява, че Банката има право да плаща застрахователни премии за всяка от застрахователните полици от името и за сметка на Кредитополучателя, в случай на неплащане от

---

hereunder will not create a default under or conflict with any other loan agreement or contract.

(g) Borrower will hold all certificates, permits and licenses required to conduct business in accordance with Bulgarian law and to borrow under the terms hereof.

(h) No hazardous waste is present on Borrower's premises, and there is no environmental liability under any applicable law, regulation or decree for protection of the environment.

(i) Borrower has disclosed in writing to Lender all its subsidiaries and lines of business.

(j) No event or condition has occurred or is reasonably foreseeable which, with the lapse of time or giving of notice or both, would constitute an Event of Default (as hereinafter defined) hereunder.

(k) Borrower is not in breach of and has not incurred or become subject to any civil liability under any law and legislation for regional and urban planning or the terms of any building permit which would have a material adverse effect on the Borrower's ability to perform its obligations under this Agreement or the Collateral Agreements.

(l) Borrower has acquired and maintained all licenses required to obtain Permit for Usage for the Project relevant to the Project as of the Date of Agreement and to conduct its business and has complied with all terms and conditions relating thereto and with all other applicable laws which would have a material adverse effect on the Borrower's ability to perform its obligations under this Agreement and has not done or permitted any act or omission whereby any such license would be liable to be changed or revoked.

(m) Borrower represents that all documents pertaining to the Project, particularly the Plans shown in Exhibit 1 (Plans) and presented to Lender are current and valid.

(n) Borrower has provided Lender accurate and up-to-date information regarding the availability of Collateral within the Project. Borrower declares and guarantees that there are no executed pre-sales agreements pertaining to Collateral.

(o) The Borrower represents that as of the day of signing this Agreement, it has no other liable loans.

## SECTION XIV. AFFIRMATIVE COVENANTS

From the Date of Agreement until such time as the Loan and all other obligations under this Agreement have been paid in full or fulfilled, Borrower agrees to comply with the following:

14.01. Under this Agreement, Borrower irrevocably and unconditionally obligate itself for the repayment of all amounts disbursed under the Loan and payment of all interests, fees and expenses under this Agreement, plus any bank servicing expenses.

14.02. Payment of Taxes and Other Obligations. Borrower will pay when due and payable all taxes, fees and other governmental levies. Borrower shall pay all other claims which if left unpaid might become a lien on the Collateral or any of Borrower's assets.

14.03. Insurance. Borrower, at its own expense, shall obtain and maintain the following insurance for the Loan amount throughout the term of the Loan:

(a) Builder's risk insurance during the Construction Period covering all standard risks and also insurance against fire and natural disaster (with extended coverage malicious mischief, and vandalism endorsements, earthquake) for the Project during the Sales Period.

(b) A policy or policies of insurance against fire and natural disaster (with extended coverage malicious mischief, and vandalism endorsements, earthquake) on all other properties subject to the lien of Collateral or otherwise securing the Loan.

(c) Public liability insurance

(d) The insurance must name Lender as the sole loss payee. The insurance proceeds for the insurance on the Collateral must be expressed in EURO and be payable in Leva at the official Bulgarian National Bank exchange rate on the day of payment of the insurance proceeds.

(e) Under any insurance policy, Borrower hereby acknowledges that Lender shall have the right to pay the insurance premiums in the name and on the account of Borrower, in case of Borrower's

страна на Кредитополучателя. Кредитополучателят неотменимо се съгласява незабавно да възстановява на Банката така направените разноски.

nonpayment thereof. Borrower irrevocably agrees to immediately reimburse Lender for any such payments.

(е) Всички застрахователни договори ще бъдат сключвани със застрахователи и със съдържание задоволително за Банката и няма да могат да бъдат прекратявани освен с 30 дневно писмено предизвестие до Банката.

(f) All policies must be provided by an insurer and in a form satisfactory to Lender and the insurance must name Lender and must be noncancelable except upon thirty- (30) days' written notice to the Lender.

**14.04. Финансови отчети.** Кредитополучателят ще предостави на Банката всяка поискана от Банката финансова информация, подписана и заверена от Управителя и Главния счетоводител. Без да е нужно искане, Кредитополучателят ще предостави на Банката:

**14.04. Financial Statements.** Borrower shall furnish Lender with signed and certified by its Manager and Chief Accountant, any financial information requested by Lender. Without the need for any request Borrower shall furnish Lender with:

(а) шестмесечни финансови отчети за дейността на фирмата (Отчет за приходи и разходи и Счетоводен баланс) изготвени в съответствие със Закона за счетоводството, в срок до тридесет (30) дни след края на всяко календарно шестмесечие.

(a) six-months financial statements (Income Statement and Balance Sheet) made in accordance with the Accountancy Act, within thirty (30) days of the end of each six months.

(б) годишни финансови отчети за фирмата (вкл. Отчет за приходи и разходи и Счетоводен баланс), в срок до сто и двадесет (120) дни след края на всяка данъчна година.

(b) annual financial statements (incl. Income Statement and Balance Sheet), within one hundred and twenty (120) days of the end of each fiscal year.

**14.05. Достъп до помещения и проверки.** Кредитополучателят се задължава да дава на служители и представители на Банката достъп до помещенията, в които осъществява своята дейност, в рамките на нормалното работно време и без за това да е нужно предизвестие, с цел проверка на дейността на Кредитополучателя. Подобна проверка може да включва, освен други действия, и проверка на собствени или взети под наем активи или Обезпечение, или преглед на счетоводните отчети и други финансови документи.

**14.05. Access to Premises and Inspection.** Borrower hereby agrees to allow Lender's employees and representatives to visit its business premises for the purposes of inspecting Borrower's business without notice and at any time during normal business hours. Such inspection may include, but is not limited to, inspection of leased or owned property and equipment or Collateral, or review of accounting records and other financial statements.

**14.06.** При поискване от Банката или от нейни представители Кредитополучателят ще оказва необходимото съдействие, за да го/ги улесни в извършването на такова проучване на правото на собственост върху всяка част от Собствеността и запитвания по въпроси във връзка с него, каквото би предприел всеки добросъвестен кредитор или ипотекарен кредитор, и ще предостави на Банката и/или нейни представители цялата информация, която те смятат за необходима, свързана със строителния процес.

**14.06.** Borrower shall assist the Lender or its representatives on request to enable it or them to carry out such investigation of title to any Property and inquiries into matters in connection with them as would be carried out by a prudent creditor or mortgagee and shall furnish the Lender and/or its representatives with all information which the latter deems necessary connected with the building process.

**14.07. Предизвестие за неизпълнение и други неблагоприятни промени.** Кредитополучателят незабавно ще уведомява Банката за:

**14.07. Notice of Default and Other Adverse Changes.** Borrower shall immediately notify Lender of:

(а) възникване на Случай на неизпълнение (дефиниция по-долу);

(a) the occurrence of any Event of Default (hereinafter defined);

(б) искове срещу Кредитополучателя или насочени към Обезпечението;

(b) any lawsuits against the Borrower, or directed at the Collateral;

(в) възникването на друго обстоятелство или събитие, което има вероятност да окаже съществено неблагоприятно въздействие върху финансовото състояние, стопанската дейност или перспективи, или способността за изпълняване на задълженията на Кредитополучателя; и

(c) the occurrence of any other condition or event that is likely to have a material adverse effect on the Borrower's financial condition, business operations or prospects, or their ability to perform their obligations; and

(г) възникването на друго обстоятелство или събитие, което би могло да засегне стойността на Обезпечението или правата на Банката върху него.

(d) the occurrence of any other condition or event which might impair the Lender's security interest in or value of Collateral.

**14.08. Строителните проекти в Случай на неизпълнение.** В Случай на неизпълнение от страна на Кредитополучателя по настоящия Договор, Кредитополучателят е длъжен в срок до 10 (десет) работни дни след получаване на писмено уведомление от Банката да прехвърли на Банката правата върху одобрените от съответните институции архитектурни чертежи и всички други необходими документи, свързани с Проекта.

**14.08. Construction Drawings in Event of Default.** If the Borrower Defaults under this Agreement, Borrower is obliged to transfer Lender the rights upon the approved by the Authorities drawings and all other necessary documents, relevant to the Project within ten (10) Business Days upon receiving a written notice from Lender.

**14.09.** Дейността на Кредитополучателя ще бъде подчинена на всички изисквания на българските закони за опазване на околната среда и стандартите на Международната Финансова Корпорация от групата на Световната банка за здравни норми и безопасност.

**14.09.** Any activity of Borrower shall comply with the applicable Bulgarian requirements for environment safety and IFC Health and Safety Guidelines.

**14.10.** Кредитополучателят упълномощава Банката да предостави официална информация за Кредитополучателя на Международната Финансова Корпорация и ЕБВР, в случай че бъде поискана.

**14.10.** Borrower authorizes Lender to disclose official information about Borrower to the IFC and EBRD if such is requested.

**14.11. Спазване на законите.** Кредитополучателят е длъжен да съблюдава разпоредбите на всички съществуващи и бъдещи закони и подзаконови нормативни актове, както и всяко уведомление, заповед, указание, разрешение, съгласие или позволение, дадени или направени (включващи без никакво ограничение всички приложими закони за териториално и селищно устройство и разрешителни за строеж), и изискванията на всяка компетентна институция, доколкото всяко едно от тях би могло да се отнася до неговите активи или тяхното ползване или дейности, извършвани в Собствеността.

**14.11. Compliance with the Law.** Borrower shall comply with the provisions of all present or future laws and by-laws and every notice, order, direction, license, consent or permission given or made thereunder (including without limitation all applicable laws and legislation for regional and urban planning and building permits) and the requirements of any competent authority so far as any of the same shall relate to its assets or their use or anything done on the Project.

**14.12.** Кредитополучателят е длъжен да уведомява Банката и да й предостави копие от всеки сключен Предварителен договор за продажба или Окончателен договор за продажба на който и да е Обект.

**14.12.** Borrower is obliged to immediately notify and to provide the Lender with a copy of each Presale Agreement or Final Sale Agreement for any of the Units.

**14.13.** Кредитополучателят е длъжен да удостовери, че всички документи и разрешителни свързани с приемането, строежа и завършването на Проекта са в съответствие с действащото Българско законодателство.

**14.13.** Borrower is obliged to ensure that all documents and permissions related to inception, construction and completion of the Project are in compliance with Bulgarian legislation.

**14.14.** Кредитополучателят е длъжен да актуализира поне веднъж на всеки три

**14.14.** Borrower is obliged to present to Lender on a quarterly basis or upon

месеца или при поискване документите, лицензиите и разрешителните, свързани с Проекта и легализацията на Проекта.

14.15. **Кредитополучателят** е длъжен да завърши Проекта в съответствие с Раздел VI от настоящия Договор, и не по-късно от Изтичане на Периода на Строителство.

14.16. **Независим строителен надзор. Кредитополучателят** е длъжен да определи нуждата за Строителен надзор преди да е определил **Строителния Бюджет** (Член 4.05.). Ако се налага сключване на договор с Строителен надзор, **Кредитополучателят** е длъжен да получи одобрението на **Банката** за сключване на договор за Независим строителен надзор.

14.17. **Задължително информиране на Купувачите на Обекти**. Както е описано в раздел X "**Продажба на Обекти**", **Кредитополучателят** е длъжен да информира Купувача на **Обект(и)** за съучастието на **Банката** в Проекта.

14.18. **Задължение да се получи одобрение на Банката** относно рекламни материали. **Кредитополучателят** е длъжен да получи предварителното одобрение на **Банката** относно всеки рекламен материал във отношение на Проекта, като например постер, разположен на самия Проект.

14.19. **Задължение по обезпечението. Кредитополучателят** е длъжен да предостави на **Банката** Обезпечението по Раздел XII в срок от пет работни дни от **Датата** на сключване.

14.20. **Кредитополучателят** се задължава в срок от три месеца от датата на подписване на този Договор да представи официален документ, издаден от органа, издал разрешението за строеж за Проекта, както и становище от ДНСК, че строежът на вход В от монолитна жилищна сграда с подземни гаражи, магазини, жилища и ателиета, може да бъде завършен като втори етап, както няма да попречи на приемането за ползване на вход А и вход Б на сградата като първи етап на строежа. В случай че **Кредитополучателят** не представи тези документи, **Банката** има право да преустанови отпускането на средства докато **Кредитополучателят** не изпълни със собствени средства строежа на вход В на сградата. Неизпълнението по този член представлява неизпълнението по настоящия Договор.

## РАЗДЕЛ XV. ЗАБРАНИ ЗА КРЕДИТОПОЛУЧАТЕЛЯ

От Датата на сключване до окончателното погасяване и изплащане на всички задължения по Кредита и настоящия Договор, **Кредитополучателят** се съгласява, без да е получил изрично писмено разрешение от страна на **Банката** за всеки отделен случай:

15.01. ДА НЕ учредява ипотека, залог или други тежести върху който и да било от своите активи.

15.02. ДА НЕ извършва инвестиции в или предоставя кредити на свързани с него дружества или други трети страни.

15.03. ДА НЕ променя характера на стопанската си дейност или да извършва друга дейност.

15.04. ДА НЕ променя контрола, управлението или собствеността на Кредитополучателя.

15.05. ДА НЕ продава, прехвърля, отдава под наем или по друг начин се разпорежда с каквато и да е част от дълготрайните активи на Кредитополучателя, освен ако замени съществуващия дълготрайния актив с нови дълготрайни активи с равна или по-голяма стойност.

15.06. ДА НЕ прекратява съществуването си или преустановява дейността си.

15.07. ДА НЕ гарантира дългове, лизингови плащания или каквито и да било други задължения на трети страни.

15.08. ДА НЕ получава допълнителни кредити нито да влиза в лизингови отношения.

15.09. ДА НЕ сключва каквито и да било договори за дружества или за съвместна дейност, или други подобни споразумения, при които доходите или печалбите на Кредитополучателя ще подлежат, или могат да подлежат, на разпределение или подялба с който и да е друго лице.

15.10. ДА НЕ продава, разпорежда или отдава под наем каквато и да било част от Обезпечението или Обектите и да не се съгласява или да предоставя каквото и да било права по отношение на горезазаното, освен разрешеното в настоящия Договор; при условие, че такива продажби, разпореждания или отдавания под наем подобряват условията за плащанията от Кредитополучателя на Банката по настоящия Договор, писмено разрешение от страна на Банката за това не може да бъде отказвано неоснователно.

15.11. ДА НЕ извършва или позволява да бъдат извършени действия върху Проекта, които представляват разрушаване, промяна, добавяне или промяна в използването, както и да не извършва действия, които по мнение на Банката биха намалили стойността на Проекта.

15.12. ДА НЕ обсъжда или посочва пред потенциален Купувач(и) точната сума, срок и условия на Кредита, освен указаните в Чл. 10.02.

## РАЗДЕЛ XVI. СЛУЧАИ НА НЕИЗПЪЛНЕНИЕ

16.01. **Случаи на неизпълнение**. Без да е изключва предвидените в закона или на друго място в настоящия Договор случаи на неизпълнение, настъпването на което и да е от следните събития ("Случаи на неизпълнение") също ще представлява пълно неизпълнение от страна на Кредитополучателя по настоящия Договор:

(a)    Неплащане, изцяло или частично, на което и да е вноска по Главницата или Лихвата продължило повече от петнадесет (15) дни след

---

demand documents, licenses and permits relevant to the construction and legalization of the **Project**.

14.15. **Borrower** is obliged to construct the **Project** according to Section VI and on or before the **Termination of Construction Period**.

14.16. **Independent Construction Supervisor. Borrower** is obliged to identify the potential need for an Independent Construction Supervisor in advance of determining the **Construction Budget** (Article 4.05.). If an Independent Construction Supervisor is to be hired, **Borrower** is obliged to obtain **Lender's** approval for the execution of a contract with the Independent Construction Supervisor.

14.17. **Obligation to Communicate to Buyers of Units.** As prescribed in Unit Sales Section X, **Borrower** is obliged inform the Buyer of **Unit(s)** of **Lender's** involvement in the **Project**.

14.18. **Obligation to Obtain Lender's Approval of Advertising Materials. Borrower** is obligated to obtain **Lender's** prior approval of any advertising materials pertaining to the **Project**, such as a sign located at **Project** site.

14.19. **Obligation concerning Collateral. Borrower** shall arrange the **Collateral** pursuant to Section XII to be given within 5 business days of the Date of Agreement.

14.20. **The Borrower** is obliged within three months of the date of signing of this agreement to present an official document issued by the authority, that has issued the Construction Permit for the Project as well as a statement by DNCC, that the construction of section V of the residential building with underground garages, shops, apartments and ateliers could be executed as a second phase which shall not hinder the certifying for occupancy of the sections A and B of the building representing the first phase of the construction. In the event that the **Borrower** fails to present these documents the Bank shall be entitled to stop the disbursement of amounts until the **Borrower** executes on his own expense the construction of the section V of the building. The default pursuant to this **Article** shall be deemed an event of default under this **Agreement**.

## SECTION XV. NEGATIVE COVENANTS

From the Date of Agreement until such time as the **Loan** and all obligations under this **Agreement** have been paid in full or fulfilled, and without obtaining specific advance written permission to the contrary from the **Lender**, **Borrower** agrees to:

15.01. NOT create any mortgage, pledge, lien or other charges on any of its assets.

15.02. NOT make investments in or loans to affiliates or any other third parties.

15.03. NOT change the nature of its present business or operations or carry on any other business.

15.04. NOT change the control, management or ownership of the **Borrower**.

15.05. NOT sell, assign, lease or otherwise dispose of any fixed assets of **Borrower** other than to replace existing fixed assets with new fixed assets of equal or greater value.

15.06. NOT dissolve or otherwise cease to do business.

15.07. NOT guarantee any third party debt, lease or other obligations.

15.08. NOT take on any additional new loans nor enter any lease agreements without prior written approval by **Lender**.

15.09. NOT enter into any partnership, profit-sharing or royalty agreement or other similar arrangement whereby **Borrower's** income or profits are, or might be, shared with any other person.

15.10. NOT sell, dispose, or rent any part of the **Collateral** or the **Units**, and not agree to or grant any option in respect of any of the foregoing, other than as allowed under this **Agreement**; provided, however, that in the event such selling, disposing, or renting improve conditions for payments by **Borrower** to **Lender** under this **Agreement**, written permission to the contrary from the **Lender** shall not be unreasonably denied.

15.11. NOT do or suffer to be done on the **Project** anything which shall be demolition, alteration, addition or a change of use, nor do any act which in the **Lender's** opinion might adversely affect the value of the **Project**.

15.12. NOT communicate to potential **Buyer(s)** the exact amount and terms of the **Loan**, except for the cases stipulated in Article 10.02.

## SECTION XVI. EVENTS OF DEFAULT

16.01. **Events of Default.** Without prejudice to events of default established under applicable law or in other sections of this **Agreement**, the occurrence of any one of the following events shall also constitute a default by **Borrower** under this **Agreement** ("Event of Default"):

(a)    Nonpayment or partial payment of any **Principal** or **Interest** which continues more than fifteen (15) days after the applicable **Payment**

---

| | | | | |
|---|---|---|---|---|
| | съответната Дата на дължимо плащане. | | | Due Date. |
| (б) | Кредитополучателят наруши някоя договореност по Раздел XIV или XV от настоящия Договор и нарушението продължи повече от петнадесет (15) дни. | | (b) | Borrower violates any Covenant in Section XIV or XV hereof, which violation continues for fifteen (15) days. |
| (в) | Кредитополучателят представи неточни, невалидни или неверни декларации и гаранции, Договора за обезпечение, молбата за кредит, Договора или каквото и да е друг документ, свързан със Кредита или превода или по настоящия Договор. | | (c) | Borrower submits improper, invalid or false representations and warranties, Collateral documents, loan application, the Agreement or any other document related to the Loan or Disbursement of Funds under this Agreement. |
| (г) | Първоначална или последваща неистинност или недействителност на Декларация или Гаранция по Раздел XIII от настоящия Договор, продължила повече от петнадесет (15) дни след узнаване от Кредитополучателя. | | (d) | Any Representation or Warranty in Section XIII hereof turns out to have been or becomes untrue or invalid, and is not cured within fifteen (15) days of Borrower's learning thereof. |
| (д) | Кредитополучателят не предостави и/или учреди Обезпечението по т. 12.01. | | (e) | Borrower fails to mortgage and/or pledge Collateral. |
| (е) | Кредитополучателят изпадне в неплатежоспособност, или бъде обявен в неизпълнение по друг кредит, по който е страна или гарант, или подаде молба за обявяване в несъстоятелност, или срещу него бъде заведено производство за обявяване в несъстоятелност. | | (f) | Borrower becomes insolvent, files for bankruptcy, or bankruptcy proceedings are commenced against Borrower, or Borrower is declared bankrupt. |
| (ж) | Кредитополучателят не осигури допълнително Обезпечение, ако е поискано от Банката съгласно Член 12.02., в рамките на тридесет (30) дни от поискването. | | (g) | Borrower fails to provide additional Collateral if requested by Lender as per Article 12.02. within thirty (30) days of the request. |
| (з) | Кредитополучателят не изпълни своевременно което и да е друго свое задължение към Банката по друг договор или кредит. | | (h) | Borrower fails to perform any of their obligations to Lender under any other agreement or loan. |
| (и) | Кредитополучателят не уведоми своевременно Банката за настъпването на Случай на неизпълнение. | | (i) | Borrower fails to promptly notify Lender of any Event of Default. |
| (к) | Лице, задължено по Обезпечението, не изпълни свое задължение по него или която и да е част от Обезпечението е укрита, преместена, продадена, загубена, отхвърлена, унищожена, или съществено е намалила стойността си и не е заменена в рамките на тридесет (30) дни освен ако Банката не е получил изплащането по застрахователни средства. | | (k) | Any person obligated under the Collateral breaches its duties thereunder or any of the Collateral is hidden, relocated, sold, lost, stolen or destroyed, or has materially decreased in value and is not replaced within thirty (30) days unless Lender has received the insurance proceeds. |
| (л) | Кредитополучателят не изпълни изискванията за застраховане, както е указано в Член 14.03. | | (l) | Borrower fails to abide by insurance requirements in Article 14.03. |
| (м) | Финансовото състояние на Кредитополучателя претърпи съществено неблагоприятно изменение, което, по мнението на Банката, заплашва способността на Кредитополучателя да изплати Кредита. | | (m) | Borrower's financial condition undergoes a material adverse change that, in the opinion of Lender, jeopardizes Borrower's ability to repay the Loan. |
| (н) | Някаква част от активите на Кредитополучателя (независимо дали са част от Обезпечението или не) са прехвърлени извън България без писмено разрешение на Банката. | | (n) | Any assets of the Borrower (whether or not part of Collateral) are relocated outside of Bulgaria without written permission from Lender. |
| (о) | Кредитополучателят представи фалшиви фактури или други документи или използва средствата от Кредита за каквато и да е друга цел, освен одобрените в Член 2.06. | | (o) | Borrower presents fraudulent invoices or other documents, or uses Loan proceeds for any purpose not approved in Article 2.06. |
| (п) | Кредитополучателят или свързани с него лица не изпълнят което и да било задължение по други договори със Банката или свързани с Банката лица. | | (p) | Borrower or entities related to it do not fulfill any obligation under any other contracts that they may have with Lender or related to Lender entities. |
| (р) | Невъзможност да се завърши Проекта. Проектът не е завършен преди или на датата на Прекратяване на периода на строителство или, според изричната преценка на Банката или на Представителя на Банката, Проектът не може да бъде завършен до датата на Прекратяване на периода на строителство. | | (q) | Inability to Complete Project. The Project is not completed on or before the Termination of Construction Period, or, in the exclusive judgment of the Lender or Lender's Representative, cannot be completed on or before the Termination of Construction Period. |
| | Забавяне на строителството. Строителството по Проекта не се извършва в разумни срокове. | | | Delays in Construction. Construction of the Project is not carried on with reasonable dispatch. |
| (т) | Кредитополучателят не получи Разрешение за ползване в срок от 20 (двадесет) месеца от Датата на първо предоставяне на средства по Кредита. | | (s) | Borrower fails to obtain Permit for Usage before the Termination of Construction Period. |
| (у) | Отказ на достъп до информация. Кредитополучателят откаже да предостави информация, свързана с Проекта или откаже достъп до Проекта на служител, на представител на Банката или на упълномощено от Банката лице. | | (t) | Denial of Access or Information. Any employee, agent, or assignee of the Lender is denied any information regarding the Project or is denied access to the Project. |
| (ф) | Кредитополучателят не уведоми Банката за получаването на Разрешението за ползване в срок от пет работни дни след получаването му. | | (u) | Borrower fails to notify Lender of the Project having received the Permit for Usage within five business days. |
| (х) | Кредитополучателят не получи писмено одобрение от Банката на Предварителния договор с всеки Купувач преди Датата на Предварителния Договор. | | (v) | Borrower fails to receive written approval from Lender of Presales Agreement with each Buyer in advance of Presale Agreement Date. |
| (ц) | Кредитополучателят не преведе на Банката получени Постъпления от продажби в размер най-малко на сумата, определена за Обекта в Схема на дължими суми по Обекти, както е описано в Раздел X. | | (x) | Borrower fails to pay Lender Sales Proceeds from an executed Presale Agreement up to at least the Required Repayment Per Unit for the relevant Unit, as outlined in Section X. |
| (ч) | Кредитополучателят не получи всички необходими документи и разрешителни свързани с приемането, строежа и завършването на Проекта в съответствие с изискванията на Българското законодателство. | | (y) | Borrower fails to obtain all documents and permissions related to inception, construction and completion of the Project that are in compliance with Bulgarian legislation. Borrower fails to obtain proper |



Кредитополучателят не получи своевременно съответните документи, лицензии и разрешителни от общинските и разпоредителни органи преди всеки строителен етап или подетап, подлежащ на одобрение или лицензиране.

approvals, licences and permits from municipal and regulatory agencies in advance of the stage or substage of construction relevant to that approval or licensing procedure.

(ш) Кредитополучателят не представи на Банката своевременно всички документи и разрешителни, свързани с приемането, строежа и завършването на Проекта.

(z) Borrower fails to present to Lender on a timely basis all documents and permissions related to inception, construction and completion of the Project.

(аа) Кредитополучателят направи промени в Проекта или в плана на Проекта и спецификациите без писмено одобрение от Банката.

(aa) Borrower made changes to Project or to Project's plans and specifications without prior written approval from Lender.

(бб) Кредитополучателят представи невярна информация относно Проекта и Обезпечението, включително описаното на Обезпечението, съдържащо се в Член 12.01.

(bb) Borrower misrepresented information about the Project and the Collateral, including the description of Collateral contained in Article 12.01.

(вв) Неспазване от страна на Кредитополучателят на указания срок по Член 14.08. за прехвърляне на правата върху одобрението от съответните институции архитектурни чертежи и всички други документи, свързани с Проекта, на Банката.

(cc) The Borrower fails to comply with the required by Article 14.08. term for transferring Lender the rights upon the approved by the Authorities drawings and all other necessary documents, relevant to the Project.

16.02. Известие при Случай на неизпълнение. При възникване на Случай на неизпълнение, Кредитополучателят е длъжен незабавно да уведоми Банката за естеството на неизпълнението, както и за мерките, които Кредитополучателят е предприел и ще предприеме за изправянето му.

16.02. Notification of Events of Default. If an Event of Default occurs, Borrower is obligated to notify Lender immediately the nature of the default and the measures Borrower has taken and will take to cure the default.

16.03. Лихва за забава. Ако възникне Случай на Неизпълнение по настоящия Договор, Кредитополучателят е длъжен да заплати Лихва за забава както е описано в Член 11.03.

16.03. Penalty Interest. If an Event of Default occurs, Borrower is obligated to pay Penalty Interest as outlined in Article 11.03.

16.04. Права при неизпълнение. Ако възникне Случай на неизпълнение, Банката има правото (но не и задължението), в допълнение и кумулативно с правата, дадени й по закон или по други разпоредби на настоящия Договор, без да дава предизвестие на Кредитополучателя или да изчаква определен срок, да предприеме всички или някои от следните действия:

16.04. Remedies. Upon occurrence of an Event of Default, Lender has the right (but not the obligation), in addition and accumulated to the rights given to Lender by law or under this Agreement, without any notice to Borrower or waiting period, to take any or all of the following measures:

(а) Да отмени поетите си ангажименти по предоставяне на каквато и да е средства по Кредита, които не са предоставени на Кредитополучателя до този момент.

(a) Cancel its commitment to disburse any remaining amounts of the Loan not yet disbursed to Borrower.

(б) Да обяви Кредита за незабавно изискуем и да изиска плащане на цялата Неизплатена част от главницата и всички натрупани Лихви и евентуални Лихви за забава.

(b) Accelerate the Loan for immediate repayment of the full Principal Balance and all accrued Interest, and Penalty Interest, if any and to start automatic collection amounts due, as per the present Agreement.

(в) Да изиска от Кредитополучателя да предостави Обезпечението на разположение на Банката за продажба съгласно Закона за Банките, Закона за особените залози, Търговския Закон, ЗЗД, ГПК и всички други актове, уреждащи тези отношения. Кредитополучателят се съгласява, че продажбата на Обезпечението, с изключение на недвижимите имоти, ще се извършва без съдебна намеса.

(c) Require Borrower to assemble Collateral and make it available to Lender for sale according to the Law for Banks, Special Pledges Act, Commercial Law, Law for Obligations and Contracts and Civil Proceedings Code and any other pertinent Bulgarian legislation involved. Borrower agrees that the sale of the Collateral, except for the immovable property, will be carried out without intervention of any court.

(г) Да започне принудително изпълнение върху Обезпечението или да предяви запис на заповед по т. 12.01.(а) или 12.07. от настоящия Договор.

(d) Foreclose on the Collateral or call the Promissory Note under Articles 12.01.(a) or 12.07. of this Agreement.

(д) Да упражни всякакви други права като кредитор, разрешени от закона.

(e) Exercise any other rights as a creditor that are allowed by law.

(е) Кредитополучателят е длъжен да позволи на Банката и нейните представители и адвокати в подходящо време и след предизвестие:

(f) The Borrower will permit the Lender and its representatives and lawyers at reasonable times and upon reasonable notice:

(еа) да влезе в Обекгите и да прегледа състоянието им или състоянието на Обезпечението, и

(fa) to enter into or upon the Project and to view the state and condition thereof or of any of the Collateral, and

(еб) да извърши за сметка на Кредитополучателя всякакви действия свързани с принудително изпълнение, които Банката смете за необходими или желани във връзка с която и да било част от Реалното обезпечение, с цел да се осигури спазване на уговорките и задълженията по настоящия Договор.

(fb) to carry out at the expense of the Borrower any action related to foreclosure, which the Lender shall consider necessary or desirable in connection with any part of the Collateral to procure compliance with any covenant or obligation in this Agreement.

(ж) В Случай на неизпълнение от страна на Кредитополучателя по настоящия Договор, в съответствие с Член 14.08. по-горе Банката има правото да изиска от Кредитополучателя да й прехвърли владението върху одобрението от съответните институции архитектурни чертежи и всички други необходими документи, свързани с Проекта.

(g) In case of default on part of the Borrower under this Agreement , in compliance with Article 14.08. stated above the Lender will have the right to request from the Borrower to submit him all documents, permits and all other papers necessary regarding the Project.

(з) Ако Кредитополучателят изпадне в неизпълнение по настоящия Договор, Банката може сам и по своя собствена преценка да отпусна средства по Кредита пряко на подизпълнители, доставчици на материали и оборудване или на работници по Проекта.

(h) If the Borrower Defaults under this Agreement, the Lender may, in its sole discretion, pay any portion of any Disbursement directly to any subcontractor or supplier of materials, fixtures, equipment, or labor for the Project.

16.05. Без отказ от права. Забавяне от страна на Банката при упражняване нейни права по настоящия Договор или по договора за Обезпечение, не представлява отказ от неговите права или изправителни действия по тези договори.

16.05. No Waiver. Any delay on the part of Lender in exercising its rights or remedies under this Agreement or the Collateral agreements does not constitute a waiver of any of its rights or remedies under such agreements.

16.06. Разноски и хонорари при защита на права. Ако Банката предприеме юридически действия срещу Кредитополучателя или върху Обезпечението, Кредитополучателят поема за всички съдебни и извънсъдебни разходи и адвокатски хонорари по водене на дела или събиране на вземания.

16.06. Legal Fees and Expenses. If Lender takes any legal action against Borrower or against the Collateral, Borrower is liable for any and all in- or out-of-court legal fees, litigation, or collection expenses.

| | |
|---|---|
| **РАЗДЕЛ XVII. ДРУГИ УСЛОВИЯ** | **SECTION XVII. MISCELLANEOUS PROVISIONS** |
| 17.01. Съставни части на Договора. Всички Приложения към настоящия Договор са негови неделими съставни части. | 17.01. Integral Parts of the Agreement. All Exhibits to this Agreement are inseparable parts of this Agreement. |
| 17.02. Без отговорности по управлението. Кредитополучателят удостоверява, че Банката не отговаря за управлението на предприятието на Кредитополучателя. | 17.02. No Managerial Liability. Borrower hereby acknowledges that Lender has no liability for the management of Borrower's business. |
| 17.03. Изменения на настоящия Договор. Измененията на настоящия Договор са действителни, само ако са извършени в писмена форма и са подписани от двете страни. | 17.03. Amendments to this Agreement. Any amendments to this Agreement shall only have effect if made in writing and signed by both Parties. |
| 17.04. Дата на влизане в сила. Настоящият Договор влиза в сила на Датата на сключване, посочена в него и към Датата на сключване Страните поемат всички свои права и задължения, произтичащи от настоящия Договор. | 17.04. Effective Date. The effective date of this Agreement is the Date of Agreement shown herein, and as of the Date of Agreement the Parties hereto shall assume all their rights and obligations resulting from this Agreement. |
| 17.05. Такси. Кредитополучателят поема всички разходи или такси, включително адвокатски и съдебни такси, направени от Банката, във връзка със събиране на каквото и да са суми по настоящия Договор и Кредит. | 17.05. Fees. Borrower shall be liable for any reasonable costs or fees, including legal fees and/or out of pocket expenses, incurred by Lender, associated with the collection of any amounts due under this Agreement or the Loan. |
| 17.06. Описателни заглавия. Заглавията в настоящия Договор са предназначени само за справка и не ограничават или засягат смисъла му. Който и да било документ, упоменат в настоящия Договор (включително настоящия Договор) ще се счита за такъв документ дори да бъде променян от време на време. | 17.06. Descriptive Headings. The headings in this Agreement are for the purpose of reference only and do not limit or affect its meaning. Any document defined or referred to in this Agreement (including this Agreement) shall be considered a reference to such document even if it is amended from time to time. |
| 17.07. Приложим закон. Този Договор се подчинява на, и се тълкува в съответствие със законите на Република България. | 17.07. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Republic of Bulgaria. |
| 17.08. Разрешаване на спорове. Всички спорове между Страните, породени от този Договор или отнасящи се до него, включително споровете, породени от компетентната българска юрисдикция, неизпълнение или прекратяване, ще бъдат разрешавани от компетентния български съд. | 17.08. Dispute Resolution. It is agreed and understood by the Parties, that any disputes arising from this Agreement or concerning it, including disputes arising from or concerning its interpretation, validity, nonperformance or termination, shall be settled by the Competent Bulgarian court. |
| 17.09. Частична недействителност. Ако някоя разпоредба от този Договор бъде обявена за недействителна или неприложима или бъде анулирана или отменена от компетентна юрисдикция, в резултат на такава частична недействителност или неприложимост оставалата част на Договора няма да стане недействителна или неприложима. | 17.09. Severability. If any provision of this Agreement shall be judged invalid or not enforceable or is voided or canceled by a competent jurisdiction, then such partial invalidity or unenforceability shall not cause the remainder of the Agreement to be or become invalid or unenforceable. |
| 17.10. Изчерпателност на Договора. Настоящият Договор, заедно с документите по Обезпечението, съдържа всички задължения и споразумения между Страните в рамките на настоящия Договор и от датата на влизането му в сила той прекратява и обезсилва всички предишни споразумения, договорености и преговори, отнасящи се до Кредита. | 17.10. Entire Agreement. This Agreement, together with the Collateral documents, defines all obligations and agreements of the Parties hereto within the scope of issues that are governed by this Agreement, and on the date of its coming into force, it terminates and supersedes all previous agreements, arrangements and negotiations as they are related to the Loan. |
| 17.11. Правоприемство. Настоящият Договор ще бъде в сила и ще обвързва всички правоприемници на Страните по този Договор. Без предварителното писмено съгласие на Банката, Кредитополучателят няма да има право да прехвърля или делегира каквото и да било част от своите права или задължения по настоящия Договор. | 17.11. Succession. This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Parties hereto. The Borrower shall not, without prior written consent of Lender, assign or delegate all or any part of its interest or obligation hereunder. |
| 17.12. Меродавен език. В случай на противоречие между вариантите на Договора на български и английски език, меродавен е вариантът на български език. | 17.12. Governing Language. In case of contradiction between the Bulgarian and the English language versions of this Agreement, the Bulgarian version shall govern. |
| 17.13. Предизвестия. Всички уведомления, изявления и известия, отнасящи се до настоящия Договор, следва да бъдат давани в писмена форма. Всяка Страна ще уведомява другата относно за промени в адреса за кореспонденция без да се нуждае от подпис от другата Страна. Цялата кореспонденция ще се тълкува за получена, ако се достави лично, изпрати по телекс или по факс с потвърждение на получаването, или чрез препоръчана поща на следните адреси на Страните: | 17.13. Notices. All notifications, statements and information related to the present Agreement shall be in writing. Each Party shall notify the other in writing of changes to contact information without need of signature from the other Party. All correspondence shall be construed as received if delivered personally, sent by telex or telefax with confirmation of delivery, or registered mail to the following addresses of the Parties: |
| На Кредитополучателя:<br>"СТРОИТЕЛСТВО БЪЛГАРИЯ" ООД<br>гр. София, район Овча купел, жк Овча купел, бл.65, вх.А, ет.8, ап.36<br>На вниманието на: Управителя<br>Телефон: 8548164, 8561080, 0898/787844, 0888/520709 | To Borrower:<br>STROITELSTVO BULGARIA, OOD<br>Sofia, Ovcha Coupel, bl.65, entr.A, fl.8, ap.36<br>Attention: Executive Manager<br>Telephone: 8548164, 8561080, 0898/787844, 0888/520709 |
| На Банката:<br>Българо-Американска Кредитна Банка<br>Ул. "Кракра" №16, София 1504, България<br>На вниманието на: Управителен Директор Недвижими имоти<br>Телефон: 9658358, Факс: 9445009 | To Lender:<br>Bulgarian-American Credit Bank<br>16, Krakra Str., Sofia 1504, Bulgaria<br>Attention: Managing Director, Real Estate<br>Telephone: 9658 358, Fax: 944 5009 |
| 17.14. С подписването на настоящия Договор Кредитополучателят приема за задължителни настоящия Общи условия за делова дейност и Тарифата за таксите и комисионните на Банката, както и всички изменения по тях, които Банката си запазва правото да извършва, като промените ще бъдат оповестявани на видно място в салона на Банката. | 17.14. Upon signing of this Agreement Borrower shall be bound by the current General Business Conditions and the List of terms and Conditions of the Bank, as well as by any amendments to them, that the Bank may approve and any such amendments shall be made public on the business premises of the Bank. |
| 17.15. Брой на оригиналите. Настоящият Договор се сключи в три екземпляра – два за Банката и един за Кредитополучателя. | 17.15. Number of Originals. This Agreement was executed in three originals – two for the Lender and one for the Borrower. |
| В УВЕРЕНИЕ НА КОЕТО Страните, представлявани от надлежно | IN WITNESS WHEREOF, each of the Parties hereto has caused this |

Borrower/Кредитополучател:                                          стр. 20 от 21                                          Lender/Банка:

упълномощени представители да ги подпишат настоящия Договор на датата, записана по-горе. | Agreement to be executed and delivered on its behalf by its duly authorized representative on the date first above written.

За КРЕДИТОПОЛУЧАТЕЛЯ/ For BORROWER:

| МЕТОДИ ЛЮБЕНОВ ДИМИТРОВ | METODI LIUBENOV DIMITROV |
| Управител | Manager |
| "СТРОИТЕЛСТВО БЪЛГАРИЯ" ООД | STROITELSTVO BULGARIA, OOD |

За БАНКАТА/ For BANK:

| Димитър Стоянов Вучев / Dimitar Stoyanov Vouchev | Стоян Николов Динчийски / Stoyan Nikolov Dinchiiski |
| Изпълнителен директор / Executive Director | Изпълнителен директор / Executive Director |
| "БЪЛГАРО-АМЕРИКАНСКА КРЕДИТНА БАНКА" АД | BULGARIAN-AMERICAN CREDIT BANK AD |

Изготвил / Prepared by:

| Сабин Симеонов / Sabin Simeonov | Цветомир Тодоров / Tsvetomir Todorov |
| Специалист инвестиции / Investment officer | Адвокат / Attorney at Law |

| | Приложения | Exhibits |
|---|---|---|
| 1 | Одобрен архитектурен проект | Approved Architectural Plan |
| 2 | Разрешение за строеж | Building Permit |
| 3 | Протокол за строителна линия и ниво | Protocol for Construction Line and Levels |
| 4 | Нотариален акт | Notary Deeds |
| 5 | Декларация за свързани лица | Declaration of Related Parties |