## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Stroitelstvo Bulgaria Ltd. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | Case No. 07cv00634 RMC |
| | : | |
| The Bulgarian-American Enterprise Fund, *et al.* | : | |
| | : | |
| Defendants. | : | |

### PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULES 12(b)(2) AND 12(b)(3), OR ALTERNATIVELY BASED ON THE DOCTRINE OF *FORUM NON CONVENIENS*

COMES NOW, plaintiff Stroitelstvo Bulgaria Ltd. (hereinafter "plaintiff"),

by and through undersigned counsel, and pursuant to Rule12 of the Federal Rules of Civil

Procedure, and LCvR 7, and this Court's order entered August 20, 2007, opposes

Defendant Bulgarian American Enterprise Fund's Motion to Dismiss Plaintiff's

Complaint Pursuant to Federal Rules 12(b)(2) and 12(b)(3), or Alternatively Based on the

Doctrine of *Forum Non Conveniens*, and in opposition thereto respectfully refers this

Honorable Court to the annexed memorandum of points and authorities.

WHEREFORE, plaintiff prays that the instant motion be denied.

Respectfully submitted,

Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*: srolinski@rolinski.com

Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*: (202) 466-3883
*Fax*:    (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com


***Attorneys For Plaintiff***

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Stroitelstvo Bulgaria Ltd.     :
             :
   Plaintiff,      :
             :
             :
   vs.        :  Case No. 07cv00634 RMC
             :
The Bulgarian-American Enterprise Fund, *et al.* :
             :
   Defendants.    :

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULES 12(b)(2) AND 12(b)(3) OR ALTERNATIVELY BASED ON THE DOCTRINE OF *FORUM NON CONVENIENS*

## TABLE OF CONTENTS

I. STATEMENT OF PROCEEDINGS ........................................................................... 1

II. THE FACTS ASSERTED BY PLAINTIFF AND BY BAEF ..................................... 1

  A. The Allegations of the Complaint .................................................................... 1

    1. The Defendants and Their Affiliated Companies .................................... 2

    2. The Lending Contract Between Plaintiff and the Bank .......................... 3

    3. Performance and Breach by the Bank ..................................................... 3

    4. The Consequences of the Bank's Improper Suspension of Credit ......... 5

    5. The Bank Utilized the Same Equity Stripping Scheme With Other Borrowers .... 6

  B. The Fact Averments Made By BAEF ............................................................... 6

II. THE PROCEDURES AND THE STANDARDS APPLICABLE TO ........................ 7

MOTIONS TO TRANSFER ............................................................................................ 7

A. The Sequencing of Non-Merits Motions ................................................. 7

B. The Burdens of Proof and Procedures Applicable to The Instant Motion ............... 9

  1. Motions To Dismiss For Lack Of Personal Jurisdiction ....................................... 9

  2. Motions to Dismiss For Improper Venue ....................................................... 10

  3. *Forum Non Conveniens* Motions ................................................................ 10

III.   THIS COURT HAS PERSONAL JURISDICTION OVER BAEF ......................... 11

  A. Personal Jurisdiction Under District of Columbia State Law ................................ 11

  B. Personal Jurisdiction Under RICO ......................................................... 14

IV.   VENUE IN THE DISTRICT OF COLUMBIA IS PROPER ............................... 15

  A. Venue is Proper in the District of Columbia Pursuant to 28 U.S.C. § 1391 .......... 15

  B. Venue is Proper in the District of Columbia Pursuant to 18 U.S.C. § 1965 .......... 19

V.   BAEF FAILED TO MEET ITS BURDEN ON *FORUM NON CONVENIENS* ... 20

  A. The Contract's Forum Selection Clause Does Not Warrant Dismissal ................ 20

    1. The Scope and Construction of the Forum Selection Clause ............................ 20

    2. BAEF Is Not Entitled to Rely on The Forum Selection Clause ......................... 24

    3. There Are Compelling and Countervailing Reasons For Refusing to Enforce the

    Forum Selection Clause…………………………………………………………..26

  B. The Factors Applicable To A *Forum Non Conveniens* Motion Do Not

  Weigh In Favor Of Dismissal. .................................................................. 27

CONCLUSION.......................................................................................... 30

## I.  STATEMENT OF PROCEEDINGS

Plaintiff Stroitelstvo Bulgaria Ltd. (hereinafter "Plaintiff") filed the instant complaint (the "Compl.") against defendant Bulgarian American Enterprise Fund ("BAEF") and defendant the Bulgarian American Credit Bank[1] ( the "Bank," collectively with BAEF the "Defendants") on April 4, 2004. The Complaint asserted:  Violations of the Racketeer Influenced Corrupt Organizations Act ("Civil RICO," at Count One); Breach of Contract (Count Two); Intentional Interference with Contract (Count Three); Intentional Interference With Prospective Advantage (Count Four); Breach of Fiduciary Duty (Count Five); and Abuse of Process (Count Six).  The Complaint also asserted Civil Conspiracy in Count Seven.

BAEF filed three motions on August 8, 2007:  its Motion to Transfer the Action to the Northern District of Illinois Pursuant to 28 U.S.C. § 1404(a) ( the "BAEF Motion to Transfer"), Docket Number 12; a Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rules 12(b)(2) and 12(b)(3), or Alternatively Based on the Doctrine of *Forum Non Conveniens*, Docket Number 10 the ("BAEF Jurisdiction/Venue Motion"); and, a Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rules 9(b) and 12(b)(6), Docket Number 11 ( the "BAEF Pleadings Motion"). [2]

## II.  THE FACTS ASSERTED BY PLAINTIFF AND BY BAEF

### A.  The Allegations of the Complaint

Plaintiff – a Bulgarian business – alleges that the defendants, with funds made available through an American initiative to support private sector development in

---

[1] Service on the Bank was effected on July 4, 2007 by delivery to the Ministry of Justice of Bulgaria pursuant to the Hague Convention On The Service Abroad Of Judicial And Extra-Judicial Documents In Civil And Commercial Matters.  *See* Amended Praecipe Regarding Service, Docket Number 13.

[2] The BAEF Transfer Motion, and the BAEF Pleadings Motion are addressed in separate filings.  And *see* discussion in subsection II.A below on the sequencing by the trial court of non-merits motions.

Bulgaria and elsewhere in Eastern Europe, used wrongful and predatory lending and other practices to achieve improper commercial goals for themselves, including the stripping of Plaintiff's equity and assets. Compl., at ¶ 2. The Complaint specifically alleges that:

## 1. The Defendants and Their Affiliated Companies

BAEF is a not-for-profit corporation established pursuant to the Support for East European Democracy Act, 22 U.S.C. §§ 5402, 5421 ( the "SEED Act"). Its ostensible purpose is and was the promotion of private sector development and entrepreneurship in Bulgaria through, among other things, grants, loans, and equity investments. Compl., at ¶ 6. BAEF commenced its operations in 1992, with fifty eight million dollars ($58,000,000.00) in funding from the American government. Compl., at ¶ 6.

As of the end of fiscal year 2004, BAEF was owner of a 68% interest in BM Leasing ("BML"). Compl., at ¶ 6. BAEF was also the parent company of Bulgarian American Property Management EOOD ("BAPM"), which conducts BAEF's property management operations. Compl., at ¶ 6.

The Bank commenced banking operations in May 1997. Compl., at ¶ 7. The Bank was a wholly-owned subsidiary of BAEF. The main shareholders of the Bank were BAEF and BAPM, which held 99.99% and 0.01% of the shares, respectively. BAEF described the Bank as its major operational subsidiary. Compl., at ¶ 7. The Bank operated primarily as an investing bank in the areas of small and medium size enterprises (SME) lending, construction lending and home mortgage lending. Compl., at ¶ 7.

## 2.  The Lending Contract Between Plaintiff and the Bank

Plaintiff entered into a Loan Agreement with the Bank on or about March 24, 2005, (the "Contract," a copy of which is appended as defendant BAEF's Exhibit A ("DX A") to the instant Jurisdiction/Venue Motion). Compl., at ¶ 8. The Contract obligated the Bank to provide funds to Plaintiff on specified terms and conditions. Compl., at ¶ 9. On March 24, 2005, Plaintiff executed and delivered a Promissory Note (the "Note"), in the amount of two million six hundred fifty nine thousand seven hundred and four Euro (2,659,704 EUR) (the "Total Note Amount"), due and payable according to its terms in 28 months. Compl., at ¶ 10.

As set out in the Contract, the Total Note Amount was comprised of the following:

a) One million eight hundred sixty four thousand one hundred thirty six Euro (1,864,136 EUR) - for drawdown pursuant to application;

b) Five hundred thirty three thousand one hundred forty three Euro (533,143 EUR)- the interest for the total amount of the credit for the entire term of the Note ("Total Note Interest");

c) Seventy seven thousand five hundred eleven Euro (77,511 EUR) -  a one time management fee calculated at 3% per year of the Total Note Amount over the term of the Note ("Management Fee"); and

d) One hundred eighty six four hundred fourteen Euro (186,414 EUR) - a special- purpose reserve ( the "Reserve Amount"). Compl., at ¶ 11.

## 3.  Performance and Breach by the Bank

Pursuant to the terms of the Contract, Plaintiff applied for and the Bank disbursed three hundred sixty one thousand Euro (361,000 EUR) to Plaintiff as part of the draw down amount. Compl., at ¶ 12. Disbursement Number One provided for distribution of the Total Note Interest, the Management Fee, and the Reserve Amount. Compl., at ¶ 13.

On November 11, 2005, the bank wrongfully and without cause suspended credit and asserted an event of default and the right to recover 970,438 EUR, comprised of: a) the drawdown amount of 361,000 EUR; b) the Total Note Interest of 553,143 EUR; and c) the entire Management Fee of 77,511 EUR. The Bank refused to disburse the remaining funds required by the Contract. Compl., at ¶ 15.

The alleged event of default was based on the purported failure of Plaintiff to obtain prior consent of the Bank for certain preliminary contracts, and on Plaintiff's failure to transfer certain advanced payments from the buyers. Compl., at ¶ 16. The alleged breach was groundless and pre-textual. Compl., at ¶ 17. Bank knew that the alleged breach was groundless and pretextual. Compl., at ¶ 18.

The Bank, and thus BAEF, knew that the purpose of the Contract was the provision of funds sufficient to enable Plaintiff to design, construct and sell residential housing in Bulgaria. Compl., at ¶ 59. The Bank, and thus BAEF, knew that Plaintiff had entered into contracts with suppliers, vendors, tradesmen and others for the design and construction of residential housing in Bulgaria. Compl., at ¶ 60. The Bank, and thus BAEF, knew that Plaintiff had entered into contracts of sale for the purchase of residential housing in Bulgaria. Compl., at ¶ 61.

The Bank, and thus BAEF, knew that Plaintiff required the loan funds from the Contract in order to perform under the terms of those contracts, and to receive the benefits of such contracts. Compl., at ¶ 62.

The Bank deliberately, and in bad faith, and in order to strip Plaintiff's assets, including but not limited to its interests in the contracts described above, and in order to interfere with those contracts, failed and refused to provided the funds required by the

4

Contract to Plaintiff,[3] and wrongfully suspended credit, and wrongfully froze and attached and interfered with Plaintiff's assets. Compl., at ¶ 63.

Instead of meeting its obligations under the Contract, on November 15, 2005, the Bank, through BAPM, proposed to purchase from Plaintiff "all available units" for 100,000 EUR plus assumption of the debt. Compl., at ¶ 19.

### 4. The Consequences of the Bank's Improper Suspension of Credit

On November 15, 2005, Plaintiff, in response to the Bank's wrongful action, undertook to secure alternative funding, including funds from preliminary contracts for sale of apartments. Compl., at ¶ 20.

But on December 12, 2005, the Bank, proceeding *ex parte*, pursuant to an Application apparently filed on or about December 6, 2005, wrongly obtained a decree of execution in the amount of 970,438,41 EUR. Compl., at ¶ 21. The Bank utilized that improper ruling to attach and freeze the assets of Plaintiff. Compl., at ¶ 22. The Bank's purpose in initiating the litigation to freeze Plaintiff's assets was to strip Plaintiff of those assets at a forced sale price. Compl., at ¶ 82.

Under the duress created by the improper suspension of credit and the enforcement of the improper judgment, Plaintiff was forced to enter into an Agreement with the Bank (the "Agreement," appended by BAEF as DX B) on or about May 9, 2006. Compl., at ¶ 23. The Agreement required Plaintiff to take on credit from Investbank in the amount of 563,000 EUR and pay the alleged debt to the Bank. As a consequence of its wrongful conduct the Bank improperly extracted 170,000 EUR more than the actual debt. Compl., at ¶ 24. To save its business from the Bank's predatory conduct, Plaintiff

---

[3] Plaintiff does not contend that BAEF was a party to, or had any obligations under, the Contract.

borrowed from Investbank at an annual interest materially in excess of the standard bank rate. Compl., at ¶ 26.

### 5. The Bank Utilized the Same Equity Stripping Scheme With Other Borrowers

The wrongful conduct of the Bank as alleged in the Complaint conforms with the Bank's pattern and practice, and is part of the Bank's overall scheme to strip assets and equity from its borrowers. Compl., at ¶ 28. On at least four other occasions, involving four other small businesses, the Bank has utilized the same pattern of wrongful conduct in an attempt to strip the equity and the assets from those businesses. Compl., at ¶ 29.

Defendants BAEF, the Bank, and BAPM (and any individuals who aided and abetted or otherwise participated in their unlawful activities) are an "enterprise" within the meaning of 18 U.S.C. § 1961(4), ( the "Enterprise") in that they are associated in fact with the common and shared purpose of extorting funds and stripping equity and property from Plaintiff and other small businesses, blackmailing Plaintiff and other small businesses, engaging in predatory and unlawful loan practices and bank fraud, and investing the unlawfully gained capital and advantage in other banking activities with the intent to permanently deprive Plaintiff and others of its monies and business. Compl., at ¶ 39. This racketeering activity was a regular way of conducting the Enterprise and their participation in the Enterprise. Compl., at ¶ 45.

### B. The Fact Averments Made By BAEF

BAEF concedes that the Bank commenced foreclosure proceedings on an alleged claim of 970,000 EUR, and that Plaintiff obtained a partial suspension of that foreclosure. Motion to Transfer, at 5. BAEF also states that the Bank "appealed that decision…," and that, "(i)n the meantime, the Bank and Stroitelstvo entered into a settlement

6

agreement to resolve their disputes (and) agreed to waive further claims and appeals based on the Loan Agreement." *Id.* [4]

BAEF avers that it is a Delaware corporation, with its only U.S. office in Chicago, Illinois, but that it has "semi-annual reporting obligations to the U.S. Agency for International Development ("USAID") [5] as a condition of the original grant agreement between USAID and BAEF." [6]

## II.  THE PROCEDURES AND THE STANDARDS APPLICABLE TO MOTIONS TO TRANSFER

### A. The Sequencing of Non-Merits Motions

The Supreme Court has recently clarified the leeway accorded to a trial court in its sequencing of non-merits motions to deny consideration of a complaint.  In *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*  127 S.Ct. 1184, 1186-87, 167 L.Ed. 2d 15 (2007), the Supreme Court ruled that:

> Although a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the cause (subject-matter jurisdiction) and the parties (personal jurisdiction) ... there is no mandatory sequencing of nonmerits issues ... A court has leeway to choose among threshold grounds for denying audience to a case on the merits....
>
> *Forum non conveniens* is a nonmerits ground for dismissal.... A district court therefore may dispose of an

---

[4] BAEF's proffered expert on "Bulgarian law and the Bulgarian legal system" DX D at ¶ ¶ 1, 2, avers that after the settlement agreement a Bulgarian court nonetheless proceeded with the Bank's appeal. *Id.*, at ¶ 27. BAEF does not contend in any of its motions that the Complaint should be dismissed on the basis of the alleged settlement agreement, nor would the disposition of such an affirmative defense be appropriate on a motion filed under Fed.R.Civ.P. 12. *See, e.g., Perkins ex rel Estate of Perkins v. Ottershaw Investments Ltd.*, 2005 WL 3273747*3 (S.D.Fla. 2005)( release defense should be disposed of in a motion for summary judgment, rather than a motion to dismiss).

The Complaint avers that"Bulgarian Courts are not available to Plaintiffs for the redress of the claims herein." Compl., at ¶ 57. That issue is addressed in Section V below.

[5] USAID is headquartered in the District of Columbia.
[6] *See* declaration of BAEF Managing Director Nancy L Schiller , DX C.

> action by a *forum non conveniens* dismissal, bypassing questions of subject-matter and personal jurisdiction, when considerations of convenience, fairness, and judicial economy so warrant. *Forum non conveniens,* like other threshold issues, may involve a brush with  factual and legal issues of the underlying dispute.... But the critical point, rendering a *forum non conveniens* determination a nonmerits issue that can be determined before taking up jurisdictional inquiries is this: Resolving a *forum non conveniens* motion does not entail any assumption by the court of substantive law-declaring power (internal citations, quotation marks omitted).

Thus, this court has the discretion to dispose of the BAEF Transfer Motion prior to disposing of either this motion, or the BAEF Pleadings Motion.

> The Supreme Court has made clear that a federal court must resolve all "threshold" issues, such as subject matter jurisdiction and personal jurisdiction,[7] before reaching the merits of a case..... The high court has acknowledged, however, that a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits. A venue challenge need not take precedence over a disentitlement inquiry, then, because both are threshold issues (internal citations, brackets, quotation marks omitted).

*U.S. v. $6,976,934.65 Plus Interest,* 486 F.Supp.2d 37, 38 (D.D.C.,2007).

"Jurisdiction to resolve cases on the merits requires both authority over the category of claim in suit (subject-matter jurisdiction) and authority over the parties (personal jurisdiction), so that the court's decision will bind them." *Fasolyak v. The Cradle Society, Inc.,* 2007 WL 2071644*3 (D.D.C.,2007).[8]

This court, thus, should address BAEF's challenge to personal jurisdiction before

---

[7]  In "appropriate circumstances," the trial court may also dispose of challenges to personal jurisdiction prior to disposing of challenges to subject matter jurisdiction, *Int'l Mfg. & Eng'g Servs. Co. v. Semiconductor Energy Lab. Co.* , 2007 WL 2059768*1, n.1 (D.D.C. 2007)

[8]  As the District of Columbia Circuit noted after *Sinochem,* a *forum non conveniens* motion is not a jurisdictional motion. *Public Citizen v. U.S. Dist. Court for Dist. of Columbia,* 486 F.3d 1342, 1348 (D.C. Cir. 2007).

it addresses BAEF's Pleadings Motion. [9]

## B. The Burdens of Proof and Procedures Applicable to The Instant Motion

### 1. Motions To Dismiss For Lack Of Personal Jurisdiction.

The plaintiff bears the burden of establishing a factual basis for exercising personal jurisdiction over the non-resident defendant. *Mwani v. Bin Laden,* 417 F.3d 1, 7 (D.C.Cir.2005); *Crane v. New York Zoological Soc'y,* 894 F.2d 454, 456 (D.C.Cir.1990). "In determining whether such a basis exists, factual discrepancies appearing in the record must be resolved in favor of the plaintiff." *Crane,* 894 F.2d at 456. In the absence of an evidentiary hearing, the plaintiff may carry his burden by making a *prima facie* showing that personal jurisdiction exists. *Edmond v. U.S. Postal Serv. Gen. Counsel,* 949 F.2d 415, 424 (D.C .Cir.1991); *Reuber v. U.S.,* 750 F.2d 1039, 1052 (D.C.Cir .1984). This *prima facie* showing must be premised on specific facts, however, and cannot be based on mere conclusory allegations. *GTE New Media Servs. Inc.,* 199 F.3d 1343, 1349 (D.C.Cir.2000).

"[P]recisely focused discovery [10] aimed at addressing matters related to personal jurisdiction..." is a prerequisite to disposition of the issue of personal jurisdiction. GTE *News Media Services, Inc. 199* F.3d 1352. Plaintiffs are entitled to "... a fair opportunity to inquire ..." into contacts which would support the exercise of personal jurisdiction. *Crane v. Carr,* 814 F.2d 758, 764 (1987). A plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery..." *El-Fadl v. Central Bank of Jordan,* 75 F.3d 668, 676 (1996).

---

[9] To the extent that a motion to dismiss proceeds under Fed.R.Civ.P. 12(b)(6), grant of that motion normally operates as an adjudication on the merits.

[10] Plaintiff will shortly file a motion for leave to conduct discovery on personal jurisdiction and venue.

## 2. Motions to Dismiss For Improper Venue

> Rule 12(b)(3) allows a case to be dismissed for improper venue. *See* Fed.R.Civ.P. 12(b)(3).The plaintiff bears the burden of establishing that venue is proper....In considering a Rule 12(b)(3) motion, the court accepts the plaintiff's well-pled factual allegations regarding venue as true, draws all reasonable inferences from those allegations in the plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor.... A court need not accept the plaintiff's legal conclusions as true; however, to prevail on a motion to dismiss for improper venue, a defendant must present facts sufficient to defeat a plaintiff's assertion of venue (internal citations, brackets, quotation marks omitted).

*Michilin Prosperity Co., Ltd. v. Dudas,* 2007 WL 2225890 *1 (D.D.C.,2007).

> When venue is wrongly or improperly laid, the district court shall dismiss the case, "or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The decision of whether to dismiss or transfer rests within the sound discretion of the district court.... Generally, the interests of justice require transferring such cases to the appropriate judicial district rather than dismissing them.

*Michilin, supra,* at 2.

The trial court can permit discovery on venue issues. *See Gluck v. Ansett Australia Ltd.,* 204 F.R.D. 217, 218 (D.D.C. 2001) ("The scheduling order in this case bifurcated the discovery process into two phases. The first phase of discovery was limited to issues of venue, jurisdiction and whether an accident took place.").

## 3. *Forum Non Conveniens* Motions

Defendant bears "the burden of persuasion on all elements of the *forum non conveniens* analysis." *El-Fadl, supra,* at 676-677.

> At the outset of any *forum non conveniens* inquiry, the court must determine whether there exists an alternative forum. Ordinarily, this requirement will be satisfied when the defendant is "amenable to process" in the other jurisdiction. In rare circumstances, however, where the

remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied. Thus, for example, dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute....[11]

Only if there is an adequate alternative forum must the court then weigh the relative conveniences to the parties against the presumption of the plaintiff's forum selection....Availability of adequate alternative fora is a threshold test ... in the sense that a *forum non conveniens* motion cannot be granted unless the test is fulfilled.... The defendant bears the burden of proving that there is an adequate alternative forum (internal citations, quotation marks omitted). *Id.*

Discovery on *forum non conveniens* motions is appropriate. *See BCCI Holdings (Luxembourg), Societe Anonyme v. Mahfouz,* 828 F.Supp. 92 (D.D.C.,1993) ("the parties were allowed to take discovery on the issues raised in the motions to dismiss, including those relating to *forum non conveniens.*").

## III.  THIS COURT HAS PERSONAL JURISDICTION OVER BAEF

### A.  Personal Jurisdiction Under District of Columbia State Law

The District of Columbia long-arm statute provides that a District of Columbia court can exercise personal jurisdiction over a defendant if the claim arises from the defendant's "transacting any business in the District of Columbia." D.C.Code § 13-423(a)(1). This provision is "given an expansive interpretation" that is "coextensive with the due process clause."

*Helmer v. Doletskaya,* 393 F.3d 201, 205 (D.C. Cir. 2004).

The "transacting any business" formulation applies if the claim arises out of any business transacted between the parties in the District of Columbia, and creates "specific

---

[11] "The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law." Fed.R.Civ.P. 44.1, and *c.f.* Proposed Amendment of Rule 44.1, effective December 1, 2007.

jurisdiction." D.C.Code § 13-423(b), *Gorman v. Ameritrade Holding Corp,.* 293 F.3d

506, 510 (D.C. Cir. 2002). Stated otherwise, "the plaintiff's claims *must be related to* the

acts that form the basis for personal jurisdiction (emphasis added)." *Heller v. Nicholas*

*Applegate Capital Management, LLC,* 2007 WL 2137764*7 (D.D.C.,2007).

   A defendant is transacting any business when its contacts proximately result from

actions by the defendant *himself* that create a 'substantial connection' with the forum

State." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985). "(A) single act, so

long as it creates this 'substantial connection,' is sufficient. *Heller, supra,* at 7.

> District of Columbia law also permits courts to exercise
> "general jurisdiction" over a foreign corporation as to
> claims not arising from the corporation's conduct in the
> District, if the corporation is "doing business" in the
> District. *See* D.C.Code § 13-334(a) ... Under the Due
> Process Clause, such general jurisdiction over a foreign
> corporation is only permissible if the defendant's business
> contacts with the forum district are "continuous and
> systematic." (internal citations omitted).

*Helmer, supra,* at 232-233.

> Even when the literal terms of the long-arm statute have
> been satisfied, a plaintiff must still show that the exercise
> of personal jurisdiction is within the permissible bounds of
> the Due Process Clause. In other words, a plaintiff must
> show "minimum contacts" between the defendant and the
> forum establishing that "the maintenance of the suit does
> not offend traditional notions of fair play and substantial
> justice.

*GTE New Media Services Inc.,* 199 F.3d at 1347.

   BAEF does not dispute that it received $58,000,000.00 in funding from USAID in

the District of Columbia under the SEED Act. Nor does it dispute that the relationship

between plaintiff and the Bank arose out of that funding or the SEED Act. As BAEF

concedes, "(t)he BAEF has semi-annual reporting obligations to ... USAID ... as a

condition of the original grant agreement between USAID and BAEF." DX C, at ¶ 6.

That continuous and multi-million dollar contact with the District of Columbia is a "substantial connection" to the District of Columbia and it is "related to" the claims in this case.

That BAEF's District of Columbia contacts are with the federal government does not defeat personal jurisdiction. As the District of Columbia Court of Appeals [12]described it, the government contacts principle is that "mere entry by nonresidents for the purpose of contacting federal government agencies cannot serve as a basis for in personam jurisdiction." *Rose v. Silver* 394 A.2d 1368, 1370 (D.C., 1978). Emphasizing that "the government contacts principle emerged to protect entities against claims by third parties based on transactions *unrelated to* the entity's special governmental purpose in the District of Columbia (emphasis added)," at 1374, n.6, the *Rose* court explained that:

> The First Amendment provides the only principled basis for exempting a foreign defendant from suit in the District of Columbia, when its contacts are covered by the long-arm statute and are sufficient to withstand a traditional due process attack. Whereas historically the government contacts principle was a way of articulating a limitation on the "doing business" provision of the long-arm statute, having both due process and First Amendment roots, it is clear to us that amendment of the long-arm statute to provide for a "transacting any business" standard, while not erasing the government contacts principle, Lockwood Greene, supra at 813, has shifted its premise solely to the First Amendment.[13]

---

[12]  This Circuit looks to the District of Columbia Court of Appeals for construction of the government contacts exception to District of Columbia jurisdiction statutes. In *Lex Tex Ltd., Inc. v. Skillman,* 1990 WL 147180 (.D.C. Cir.1990), the District of Columbia certified to the District of Columbia Court of Appeals under D.C.Code § 13-423(a)(1), (b), the following question: "does the 'government contacts' exception to the exercise of personal jurisdiction over nonresidents apply when the defendant's contacts with the government themselves constitute the alleged culpable or liability-generating conduct for which plaintiff seeks to recover?" At 1.  The District of Columbia Court of Appeals ruled that "the 'government contacts' principle does *not* apply to the facts of this case (emphasis in original)." *Id.,* at 1.

[13]  *Environmental Research International, Inc. v. Lockwood Greene Engineers, Inc.,* 355 A.2d 808 (D.C. 1976) (en banc).

Because BAEF's contacts with the District of Columbia are related to the claims in this case, the government contacts exception does not apply, and this court has jurisdiction over BAEF.

## B.   Personal Jurisdiction Under RICO

Whether national contacts are sufficient to meet jurisdictional requirements under RICO is a matter of first impression in this Circuit. The other Circuits are split. In *Doe v. Unocal Corp.*, 248 F.3d 915 (9th Cir. 2001), the court ruled that national contacts establish personal jurisdiction if service is effected as provided in the RICO statute. *Accord, Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3rd Cir.2002).  Somewhat more broadly, in *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir.,2004), the Court ruled that:

> When a statute authorizes nationwide service of process, national contacts analysis is appropriate. In such cases, due process demands [a showing of minimum contacts with the United States] with respect to foreign defendants before a court can assert personal jurisdiction....In a statute providing for nationwide service of process, the inquiry to determine minimum contacts is thus whether the defendant has acted within any district of the United States or sufficiently caused foreseeable consequences in this country.

*Accord, In re Automotive Refinishing Paint Antitrust Litigation,* 358 F.3d 288, 298 (3rd Cir.2004) (" We too are persuaded by the reasoning of our prior opinions on the subject, and, consistent with several of our sister courts of appeals, hold that a federal court's personal jurisdiction may be assessed on the basis of the defendant's national contacts when the plaintiff's claim rests on a federal statute authorizing nationwide service of process.").

National contacts tests under RICO do not violate fundamental notions of due

process and fairness. As the court in *Reynolds Tobacco Co. v. Market Basket Food Stores, Inc.,* 2006 WL 2417269*3 (W.D.N.C.2006) explained:

> In this case, the exercise of personal jurisdiction comports with due process. The due process constraint on service under Rule 4(k)(1)(D) and Section 1965(d) is based upon the Fifth Amendment rather than the Fourteenth Amendment....The Fifth Amendment's Due Process Clause limits the extraterritorial scope of *federal* sovereign power whereas the Fourteenth Amendment's Due Process Clause protects *states* in their status as equal sovereigns.... Not unlike the Fourteenth Amendment, the Fifth Amendment's Due Process Clause also protects the liberty interests of individuals against unfair burden and inconvenience.... However, when considering burden and inconvenience factors with respect to a national forum, the constitutional minimum contacts test is more easily satisfied. . As a result, it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern (internal citations, quotation marks omitted).

## IV.  VENUE IN THE DISTRICT OF COLUMBIA IS PROPER

### A.  Venue is Proper in the District of Columbia Pursuant to 28 U.S.C. § 1391

Venue is proper under 28 U.S.C. § 1391(b)(1) and (2). 28 U.S.C. § 1391 (b) provides, in relevant part:

> (b) A Civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in
>
> (1) a judicial district where any defendant resides, if all defendants reside in the same State,
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or
>
> (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

Subsection (b)(1) supports venue in this case. For purposes of the chapter, "a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c) (2007); and "an alien may be sued in any District." 28 U.S.C. § 1391(d); and see *Japan Gas Lighter Ass'n v. Ronson Corp.,* 257 F.Supp. 219, 225, fn. 3 (D.N.J. 1966). As discussed in section III, *supra,* since this Court posses personal jurisdiction over BAEF it is deemed to reside in the District of Columbia for purposes of venue under subsection (b)(1). Because both BAEF and the Bank reside in the District of Columbia, venue is therefore proper under 28 U.S.C. § 1391(b)(1).

Subsection (b)(2) also supports venue in this case. In order for venue to lie pursuant to this subsection, "a substantial part of the events or omissions giving rise to the claim..." must have occurred in the District of Columbia. That is not to say that a more substantial portion of the events must occur in the District or even that the most significant events occurred here. *See Modaressi v. Vedadi,* 441 F.Supp.2d 51, 56-57 (D.D.C. 2006). Nor does it mean that a plaintiff is required to establish that "every event that supports an element of a claim occurred in the district where venue is sought." *Id.* Indeed, "venue may be proper even if a greater part of the events giving rise to a claim happened in another forum." *Id., (*citing *City of N.Y. v. Cyco.Net, Inc.,* 383 F.Supp.2d 526, 543 (S.D.N.Y. 2005)); *See also, Dooley v. United Technologies Corp.,* 786 F.Supp. 65, 80 (D.D.C. 1992) ("[I]t appears that [section 1391(b)(2)] is intended to place venue within the District of Columbia, even where the case also might be brought in another forum."). "In determining 'whether the events or omissions are sufficiently substantial to support venue under the amended statute, a court should not focus only on those matters

16

that are in dispute or that directly led to the filing of the action. Rather, it should review "the entire sequence of events underlying the claim."'" *FC Investment Group LC v. Lichtenstein*, 441 F.Supp.2d 3, 11 (D.D.C. 2007) (quoting *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004) (quoting *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir. 2001)).

Contrary to Defendant's contention that "Stroitelstvo has not alleged that any of the events or omissions giving rise to the claim occurred here" *Defs. Mtn* at 19, Plaintiff has alleged the following events that took place in the District of Columbia: a) Defendant BAEF, with funds made available through an American initiative to support private sector development in Bulgaria and elsewhere in Eastern Europe, used wrongful and predatory lending and other practices to achieve improper commercial goals for themselves. *Compl.* at ¶ 2; b) Defendant BAEF is a not-for-profit corporation established pursuant to the Support for East European Democracy Act, 22 U.S.C. §§ 5402, 5421 (the "SEED Act"). *Compl.* at ¶ 6; c) BAEF commenced its operations in 1992, with fifty eight million dollars in funding from the American government. *Id.;* d) As of the end of fiscal year 2004, BAEF was owner of a 68% interest in BM Leasing ("BML"). *Id.*; e) At all times pertinent to the averments of the Complaint BAEF was the parent company of Bulgarian American Property Management EOOD ("BAPM"), which conducts the Fund's property management operations. *Id.*; f) At all times pertinent to the allegations in the Complaint, the Bank was a wholly owned subsidiary of BAEF. *Compl.* at ¶ 7; g) The Bank was established as an extension of the activities of BAEF, namely lending to small and medium sized enterprises in Bulgaria. The Bank commenced operations in 1997. *Id.*

17

These sequence of events, taken as a totality of the events that took place pursuant to the allegations contained in the Complaint, satisfies the requirements of § 1391(b)(2). *FC Investments Group,* 441 F.Supp.2d at 11-12. BAEF does not dispute that it received fifty eight million dollars from USAID in the District of Columbia under the SEED Act. Nor does it dispute that the relationship between Plaintiff and the Bank arose out of that funding or the SEED Act. In fact, BAEF concedes that "[t]he BAEF has semi-annual reporting obligations to…USAID…as a condition of the original grant agreement between USAID and BAEF." DX C, at ¶ 6. Much as it belies BAEF's assertion that the District of Columbia lacks personal jurisdiction over it, that continuous and multi-million dollar contact with the District of Columbia is a substantial event occurring in the District, related to the claims in this case, giving the District of Columbia a "substantial connection to the claim." *Id.* at 11. Because the funding for the Bank originating in the District of Columbia is a "significant part of the sequence of events underlying the claim, venue is proper here." *Id.* at 12.

As a final matter, subsection (b)(3) does not control venue in this case. Since venue is proper either pursuant to subsection (b)(1) or (b)(2) in the District of Colombia, (b)(3) becomes inapplicable. Subsection (b)(3) is only available when there is no other judicial district within which the claims may be brought. 28 U.S.C. § (b)(3). That is not the case here. Venue is proper in the District of Columbia and therefore subsection (b)(3) is unavailable to establish jurisdiction in any other judicial district, including the Northern District of Illinois.

**B. Venue is Proper in the District of Columbia Pursuant to 18 U.S.C. § 1965**

RICO's venue provision is found at 18 U.S.C. § 1965(a). It provides that an action may "be instituted in the district court of the United States for any district in which [a defendant] resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a) (2007). RICO's specific venue provision is not exclusive, but rather supplements the general venue provision found in 28 U.S.C. § 1391. *See Monarch Normandy Square Partners v. Normandy Square Associates, Ltd.*, 817 F. Supp. 899, 904 (D.Kan. 1993) (The venue provisions of RICO supplement the provisions of § 1391(b)); *Miller Brewing Co. v. Landau*, 616 F.Supp. 1285, 1291 (D. Wisc. 1985); *Farmers Bank of the State of Delaware v. Bell Mortg. Corp.*, 452 F.Supp.1278 (D.Del. 1978) (concluding that the express language and legislative history of section 1965 indicate that "its venue provisions were not intended to be exclusive, but rather, were intended to liberalize the already existent venue provisions found in Title 28").

Because BAEF concedes that it conducts at least some business in the District of Columbia, DXC at ¶ 6, it falls within the purview of section 1965(a). Furthermore, pursuant to 1965(b), the ends of justice would clearly require all defendants bringing both defendants before a District of Columbia forum. *See Monarch Partners,* 817 F. Supp. at 905 (Section 1965(b) was intended to enable a plaintiff to bring before a single court for trial all members of a nationwide RICO conspiracy"); *Bridge v. Invest America, Inc.,* 748 F.Supp. 948, 953 (D.R.I. 1990) (the ends of justice required that non-resident defendant be brought before the court in civil RICO action in order to litigate the entire case in one forum).

19

Defendant's reliance on *Crenshaw* is unavailing. *Crenshaw* concerned an attorney's action against her opposing counsel in prior litigation for bad faith in instituting disciplinary proceedings. The court transferred the action to Indiana because all events giving rise to the attorney's claim occurred in Indiana, both plaintiff and defendants resided in Indiana, and the ends of justice did not require that venue be in the District of Columbia. *Crenshaw*, 287 F. Supp.2d at 43-45. Here, in contrast, a substantial part of the events giving rise to plaintiff's claims occurred in the District of Columbia and, as discussed elsewhere, there is no other appropriate forum within which to try this matter.

## V. BAEF FAILED TO MEET ITS BURDEN ON *FORUM NON CONVENIENS*

### A. The Contract's Forum Selection Clause Does Not Warrant Dismissal

BAEF urges the court to apply in its favor a narrowly- drawn forum selection clause in a contract to which BAEF was not a party and about which it purports to have been totally unaware, DX C, at 8, and to do so according to judicial authority in various American jurisdictions, rather than according to the law selected in the same contract upon which BAEF relies. Its request must be denied both because its demand does not conform to the language of and the scope of the clause and because, even if it did, the factors applicable to a *forum non conveniens* motion do not weigh in favor of dismissal.

#### 1. The Scope and Construction of the Forum Selection Clause

The Agreement between plaintiff and the Bank provided, in pertinent part, that:

> **17.07. Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the Republic of Bulgaria.[14]

---

[14] Though "there is some doubt concerning the appropriate procedural vehicle for giving effect to a forum-selection provision...," *Marra v. Papandreou*, 216 F.3d 1119, 1123, note 3 (.D.C. Cir.,2000), and *see*

**17.08. Dispute Resolution.** It is agreed and understood by the Parties that any disputes arising from this Agreement or concerning it,[15] including disputes arising from or concerning its interpretation, validity, nonperformance or termination, shall be settled by the Competent Bulgarian Court. DX A, Document 10-2, page 21.

While it is undisputed that the forum selection clause covers the breach of contract claim asserted in this case by plaintiff, there is nothing in this express language of the clause which applies to non-contract claims, particularly when viewed against the broader clauses in *Marra, supra*, and *Society of Lloyd's supra.*

As the Second Circuit, applying New York law, ruled in *Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.* 414 F.3d 325, 334,-335 (2nd Cir.2005):

> We turn, therefore, to the leading New York case on the scope of choice-of-law clauses, *Knieriemen v. Bache Halsey Stuart Shields Inc.,* 74 A.D.2d 290, 427 N.Y.S.2d 10 (App. Div. 1st Dep't 1980), *overruled on other grounds, Rescildo v. R.H. Macy's,* 187 A.D.2d 112, 594 N.Y.S.2d 139 (App. Div. 1st Dep't 1993). *Knieriemen* involved a contract between a New Orleans brokerage firm and a customer that contained a choice-of-law clause that "recited that '[t]his contract shall be governed by the laws of the State of New York."'... The broker lost a substantial amount of the customer's money, and the customer sued for fraud, breach of contract, negligence, and churning. The

accompanying text, choice of law provisions are applied to construe forum selection clauses. *Lambert v. Kysar,* 983 F.2d 1110, 1118 (1st Cir.,1993).

"(T)ort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract, even when the contract also includes a broader forum-selection clause. *Latihn America Finance Group, Inc. v. Pareja,* 2006 WL 2032627*7 (S.D.N.Y.,2006).

[15] *See* and *compare Marra, supra* at 1124 (.D.C. Cir.,2000) ("The clause is broadly written, encompassing 'any dispute or disagreement' between the parties 'arising from the application of this license, the interpretation or performance of its terms ... and in general any matter that may occur concerning a license.'); *Society of Lloyd's v. Siemon-Netto,* 457 F.3d 94, 105 (.D.C. Cir.2006). (the forum selection clause provided that "the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business....")

court held that the contractual choice-of-law clause did not reach tort claims: "That the parties agreed that their contract should be governed by an expressed procedure does not bind them as to causes of action sounding in tort ...." *Id.* at 12-13.

*Knieriemen* indicates a reluctance on the part of New York courts to construe contractual choice-of-law clauses broadly to encompass extra-contractual causes of action. More recent decisions reflect a similar tendency. In *Twinlab Corp. v. Paulson,* 283 A.D.2d 570, 724 N.Y.S.2d 496, 496 (App. Div.2d Dep't 2001), a suit by a company against outside consultants for breach-of-contract and tort claims based on Florida's civil RICO statute, the court considered the scope of choice-of-law and forum-selection clauses that provided as follows: "The choice of law provision stated, *inter alia,* that the 'validity, interpretation, construction and performance' of the agreement would be governed by and construed in accordance with New York law. It also designated New York as the forum for any actions 'relating directly or indirectly' to the consultant agreement." *Id.* The court held that the Florida civil RICO claim, which was based on the defendant's "alleged criminal activities, which were unrelated to his duties as a consultant," fell outside the scope of the contractual choice-of-law and forum-selection provisions. *Id.*[16]

The broad construction urged by BAEF, moreover, fails to take into account the express limitations on the scope of its application by the requirement that a Bulgarian court to which claims are to be submitted be "competent." While the meaning of "competent court" may vary with the circumstances, *see, e.g., Blackburn v. Portland Gold Min. Co.,* 175 U.S. 571, 58120 S.Ct. 222 (1900), *Staats v. County of Sawyer,* 220 F.3d 511, 515-516 ( 7th Cir. ,2000) (equating competence of court with jurisdiction over

---

[16] BAEF urges the court to construe the clause to apply to all of the non-contract claims in the Complaint. BAEF Jurisdiction/Venue Motion, at 15-17. But, in *Worldwide Network Services, LLC v. DynCorp Intern,.* 496 F.Supp.2d 59, 63.(D.D.C.,2007), upon which BAEF in part relies, the court identified two different tests for the application of a forum selection clause to non-contract claims. As the court wrote: "courts have developed different tests to determine whether tort claims are within the scope of a broad forum selection clause, such as determining whether the tort claims "ultimately depend on the existence of a contractual relationship" between the parties...), or whether the contract-related tort claims involve the same operative facts as a parallel claim for breach of contract....(internal citations omitted)." BAEF can satisfy neither test.

claim and with willingness to exercise discretion to hear claim), but it can be reasonably construed to mean a court which can actually dispose of the claims made by one party against the other.[17]

As BAEF describes its expert's opinions[18]: "While Bulgaria does not have specific equivalents for each count alleged by Stroitelstvo in its Complaint, several Bulgarian legal theories would apply and a remedy is generally available for the type of conduct alleged." BAEF Jurisdiction/Venue Motion, at 23. BAEF's expert [19]attests specifically that the RICO claim has no "exact Bulgarian equivalent," DX D, at ¶ 21, and notes broad judicial authority for tort claims. DX D, at ¶ 18.

As Plaintiff's expert Vladimir Stefanov Skochev notes:

> 16.    The claims available to parties in Bulgaria are, of course, different in many respects from the claims made in this case. There is no equivalent of any kind in Bulgaria to claims such as those brought under the so-called RICO statute.
>
> 17.    Silvy Chernev's statement in paragraph 18 of his declaration seems to state that the tort claims brought in this case are cognizable against the Bank and BAEF in Bulgaria under Bulgarian law. If that is not what he intended to convey, he should clarify that statement before the court considers the Bulgarian courts to be available for consideration of Stroitelstvo's tort claims.

Declaration of Vladimir Stefanov Skochev, appended hereto as plaintiff's exhibit ("PX") A.

Similarly, as plaintiff's expert Maria Gavrailova Slavova states: "It is doubtful that the Bulgarian courts and the relevant experts might have enough experience to

---

[17] Whether Bulgarian courts are "available" and "adequate" for purposes of enforcement of forum selection clauses and *forum non conveniens* analysis is discussed below.

[18] In the context of its *forum non conveniens* argument.

[19] In assessing the expert's opinion, the court should take into account the likely bias flowing from the expert's acknowledgement that his "law firm has handled a few matters in the past for one of (BAEF's) affiliates, Bulgarian American Property Management." DXD, at ¶ 2. That entity is specifically identified in the Complaint for its direct involvement in the scheme to strip plaintiff of its assets. Compl., ¶¶ 6,7, 19.

analyze the liabilities of both defendants. The pertinent codes do not provide the mechanisms for hearing the racketeering issues raised in the complaint." PX B, at ¶ 11.

There is thus nothing in this record which would permit the court to determine as a matter of law [20] that there is a court in Bulgaria "competent" to dispose of plaintiff's RICO claims against defendants.[21] Nor should the court conclude on the basis of BAEF's expert's opinion that there is a Bulgarian court competent to consider plaintiff's tort claims against these defendants.

### 2. BAEF Is Not Entitled to Rely on The Forum Selection Clause

BAEF contends that:

> The Bank operates independently from BAEF. Among other things, BAEF is not involved in the Bank's loan transactions. BAEF was not involved in any way in the loan transactions between the Bank and Stroitesltvo. In fact, BAEF was unaware of that particular loan (and any of its details) prior to receiving notice of this lawsuit. BAEF maintains no files or records related to the Bank's specific loan transactions, including this one. DX C, at ¶ 8.

Plaintiff has not asserted against BAEF breach of that agreement.

Nonetheless, BAEF argues that it should be entitled to enforce against plaintiff the forum selection clause in an agreement from which it otherwise takes pains to distance itself, and in support of its argument relies on *Manetti-Farrow Inc. v. Gucci Am Inc.,* 858 F.2d 509, 514 (9th Cir. 1988). BAEF Jurisdiction/Venue Motion, at 17. But *Manetti,* relying on *Clinton v. Janger,* 583 F.Supp. 284, 290 (N.D.Ill.1984) and *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190, 202-03 (3d Cir.), *cert. denied,* 464 U.S. 938, (1983), clearly required relationships which are not asserted by BAEF. In

---

[20] *See* subsection II.B.3, above, discussing the standards applicable to determination of foreign law.
[21] The issue of "competency" is a matter of contract construction analytically distinct from, if in some respects overlapping with, issues of court "availability" and "adequacy" under conventional forum selection clause analysis and *forum non conveniens* analysis.

*Clinton*, the non-party was determined to be a third party beneficiary of the contract containing the clause. At 290. In *Coastal Steel*, the claimant to the protection of the clause was also a third party beneficiary. At 202-203.

*Manetti* itself insisted on two linchpins: that the claimant to the clause "be subject to" the clause and that the "alleged conduct of the non-parties is so closely related to the contractual relationship that the forum selection clause applies." At 514, n.5. Unless BAEF is prepared to concede that it is and was subject to the forum selection clause in the Agreement, and thus arguably to the remainder of the provisions of that Agreement, and that BAEF's alleged conduct is very closely related to the contractual relationship, it cannot avail itself of the forum selection clause under *Manetti*. In all events, it cannot take advantage of the forum selection clause under the cases upon which *Manetti* relied.

BAEF's reliance on *Brock v. Entre Computer Centers, Inc.*, 740 F.Supp. 428 (E.D.Tex.,1990), BAEF Jurisdiction/Venue Motion, at 17, n. 9, is also unavailing. As the court in *Brock* made clear, the clause is available to those who "...benefit from, and are subject to..." the clause, at 431, and explained that "the court finds that the forum selection clause applies to all parties to the contract, whether signatories or not." *Id.* BAEF's reliance on *Stephens v. Entre Computer Centers, Inc.,* 696 F.Supp. 636 (N.D.Ga.,1988), BAEF Jurisdiction/Venue Motion, at 17, n. 9, ignores the emphasis placed in *Stephens* on the rationale of *Coastal, supra,* and in particular on the weight *Coastal* gave to the foreseeability of the litigating parties that a third party beneficiary would be entitled to the benefits of, and be subject to, the clause. *Stephens*, at 639. BAEF makes no such foreseeability assertion, nor can it, in light of its characterization of its distance from the Agreement.

### 3. There Are Compelling and Countervailing Reasons For Refusing to Enforce the Forum Selection Clause [22]

Even if a forum selection clause is mandatory on its face, it will not be enforced if there is a "compelling and countervailing reason." *McDonnell Douglas Corp. v. Islamic Republic of Iran,* 758 F.2d 341, 345 (8th Cir. 1985). As the Eighth Circuit observed:

> In *Rockwell International Systems v. Citibank,* 719 F.2d 583 (2d Cir.1983), the Court refused to enforce a contractual provision stipulating that disputes "must be settled in accordance with the rules and laws of Iran via referring to the competent Iranian courts." Viewing the forum clause as mandatory, the Court nevertheless held "[n]either [party] argues that the post-revolutionary Iranian judicial system is capable of affording an adequate remedy; courts that have passed on this contention have consistently rejected it." At 346.

As is set forth above, BAEF has not established that the claims in this case can be heard in a Bulgarian court. Moreover, as plaintiff's experts attest, the Bulgarian judicial system is not yet capable of fairly and effectively resolving the claims. As plaintiff's expert Skochev notes:

> 19. Despite reforms from the socialist era, the reform of the Bulgarian judicial system is not complete. In practice, the necessary legal mechanisms have not been introduced and the required prerequisites have not been met. Such mechanisms and prerequisites are needed in order to guarantee the efficiency, reliability, impartiality and the objectiveness of the Bulgarian judicial system. …

> 23. It must be definitely concluded that, according to the objective expert assessments in the reports and the results from the monitoring of judicial system reform in Bulgaria as of today, and without disregard for the structural achievements made, a mechanism ensuring the evaluation of the operation of the Bulgarian judicial system as an

---

[22] The enforcement of a forum selection clause is further subject to all of the factors to be considered by the court in its assessment of a *forum non conveniens* defense. *Worldwide Network Services, LLC, supra, at* 63. *See* discussion below.

independent, efficient, impartial and objective one capable
of fair and just hearing, is not in operation yet.

PX A, and *see* discussion at ¶¶ 20-22.

Concurring with Mr. Skochev's opinion, Professor Slavova states that: "The

declaration of Vladimir Stefanov Skochev accurately describes the current deficiencies in

the Bulgarian judicial system. Though some progress has been made, an independent,

impartial and objective system capable of a fair and just hearing is not yet in operation."

PX B, at ¶ 12.

The absence of a viable and realistic forum in Bulgaria is a "compelling and

countervailing reason" to refuse to enforce the forum selection clause.

**B. The Factors Applicable To A *Forum Non Conveniens* Motion Do Not
Weigh In Favor Of Dismissal.**

As the Supreme Court made clear in *Piper Aircraft Co. v. Reyno,* 454 U.S. 235,

254, n.22 102 S.Ct. 252 (1981):

> At the outset of any *forum non conveniens* inquiry, the
> court must determine whether there exists an alternative
> forum. Ordinarily, this requirement will be satisfied when
> the defendant is "amenable to process" in the other
> jurisdiction.... In rare circumstances, however, where the
> remedy offered by the other forum is clearly unsatisfactory,
> the other forum may not be an adequate alternative, and the
> initial requirement may not be satisfied. Thus, for example,
> dismissal would not be appropriate where the alternative
> forum does not permit litigation of the subject matter of the
> dispute. Cf. *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*,
> 78 F.R.D. 445 (Del.1978) (court refuses to dismiss, where
> alternative forum is Ecuador, it is unclear whether
> Ecuadorean tribunal will hear the case, and there is no
> generally codified Ecuadorean legal remedy for the unjust
> enrichment and tort claims asserted).

On the basis of *Piper's* threshold inquiry on the availability of an alternative

forum in Bulgaria, BAEF's *forum non conveniens* challenges must be rejected. As is

discussed in detail in subsection III.A above, BAEF's expert on Bulgarian law falls well

27

short of assuring the court that Bulgarian courts will "permit litigation on the subject

matter of the dispute," or that there is a codified Bulgarian legal remedy for the claims

asserted against defendants in this case. Moreover, Bulgarian courts are "clearly

unsatisfactory" if, as plaintiff's experts aver, "the operation of the Bulgarian judicial

system as an independent, efficient, impartial and objective one capable of fair and just

hearing, is not in operation yet. PX A, at ¶¶ 19, 23, and "an independent, impartial and

objective system capable of a fair and just hearing is not yet in operation." PX B, at ¶ 12.

"The district court need not weigh any factors favoring dismissal, however, if no

other forum to which the plaintiff may repair can grant the relief it may obtain in the

forum it chose." *TMR Energy Ltd. v. State Property Fund of Ukraine* 411 F.3d 296, 303

(D.C.Cir.,2005).

Even if Bulgarian courts provided a viable alternative forum for the claims in this

case, the factors applicable to a *forum non conveniens* motion weigh against dismissal. If

the court determines that a viable alternative forum exists, a three-step process follows:

> (T)he trial judge must consider all relevant factors of
> *private* interest, weighing in the balance a strong
> presumption against disturbing plaintiffs' initial forum
> choice. If the trial judge finds this balance of private
> interests to be in equipoise or near equipoise, he must then
> determine whether or not factors of *public* interest tip the
> balance in favor of a trial in a foreign forum. If he decides
> that the balance favors such a foreign forum, the trial judge
> must finally ensure that plaintiffs can reinstate their suit in
> the alternative forum without undue inconvenience or
> prejudice.

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 717 F.2d 602, 606
(D.C. Cir.1983).

As to the factors of private interest upon which BAEF relies, BAEF Jurisdiction/Venue

Motion, at 24-27:

BAEF does not explain how, as a Delaware corporation with its office in Chicago, conduct of the case in Bulgaria will be more convenient to BAEF. BAEF concedes in its Transfer Motion that, "(t)o the extent that they are relevant, BAEF documents and witnesses are located in the Northern District of Illinois," at 9, and not in Bulgaria.

The absence, if any, of compulsory process in this forum must be compared to similar potential deficiencies in Bulgaria. But the record now before the court is barren of any suggestion that Bulgarian procedures include the sorts of provisions for compulsory process that are available in American federal courts.

BAEF's vague reference to the possibility of "inconsistent judgments" is insufficiently explained. To the extent that BAEF is referring to the Bulgarian litigation which has already taken place, this court will undoubtedly address the effect, if any, of those proceedings on this case.

As to translations, the two documents upon which BAEF has relied so far have already been translated, DX A, DX B, and while it may be necessary to have translators for witnesses who speak Bulgarian if the case is litigated in the United States, it seems unlikely that BAEF would not require translators from Bulgarian to English if the case were to be tried in a Bulgarian court.

Thus, private factors do not suggest a level of inconvenience sufficient to warrant dismissal. Nor does the public interest tip the balance in BAEF's favor. As is discussed in Plaintiff's Opposition to BAEF's Transfer Motion, the misuse of the SEED Act is a matter of particular concern to the District of Columbia, and its citizens are well-suited to resolve disputes surrounding the misuse of their own public monies. And while it is true

that Bulgarian law may play a role in the disposition of the case, so will American law.

Federal courts are not unaccustomed to the construction of foreign law.

Accordingly, as with the private factors, the public interest does not support

dismissal under *forum non conveniens.*

## CONCLUSION

On the basis of the foregoing, the instant motion should be denied.

Respectfully submitted,

Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*: srolinski@rolinski.com

Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*: (202) 466-3883
*Fax*:    (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com

**Attorneys For Plaintiff**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Stroitelstvo Bulgaria Ltd.                                    :
                                                              :
        Plaintiff,                                       :
                                                              :
                                                              :
      v.                                               :          Case No. 07cv00634 RMC
                                                              :
The Bulgarian-American Enterprise Fund, *et al.*              :
                                                              :
        Defendants.                                   :

## <u>ORDER</u>

This matter having come before this Court on Defendant Bulgarian American

Enterprise Fund's Motion To Dismiss Plaintiff's Complaint Pursuant To Federal Rules

12(b)(2) And 12(b)(3), Or Alternatively, Based On The Doctrine Of *Forum Non*

*Conveniens*, and opposition thereto, it is this _____ day of _____, 2007, for cause

shown:

      **ORDERED**, that the instant motion be and is hereby denied, and it is

      **FURTHER ORDERED**, that Defendant Bulgarian American Enterprise Fund

shall file and serve an answer to the Complaint within __ days of the date of entry of this

Order.

                        SO ORDERED.

                        _____

                        Rosemary M. Collyer, Judge
                        United States District Court for the
                        District of Columbia

Philip M. Musolino
*Musolino & Dessel*
1615 L Street, NW, Suite 440
Washington, DC 20036

Sylvia Rolinski
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854

Karen N. Walker
Eunnice H. Eun
Samantha A. Gingold
KIRKLAND & ELLIS L.L.P.
655 Fifteenth  Street, N.W.
Washington, D.C. 20005

Brian D. Sieve
Stephanie A. Brennan
KIRKLAND & ELLIS L.L.P.
200 East Randolph Drive
Chicago, Illinois 60601

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Stroitelstvo Bulgaria Ltd.                          :
                                                    :
           Plaintiff,                         :
                                                    :
                                                    :
      vs.                                  :          Case No. 07cv00634 RMC
                                                    :
The Bulgarian-American Enterprise Fund, et al.      :
                                                    :
       Defendants.                       :


## DECLARATION OF VLADIMIR STEFANOV SKOCHEV


  I, Vladimir Stefanov Skochev, state and declare under penalty of perjury under the laws of the United States, 28 U.S.C.§ 1746, that the following is true and correct, based on my personal knowledge and as is set forth below:

1.  I am an attorney at law registered at the Varna Bar.  I am the managing partner of Law Company Skochev and Associates, at the following address: ul. Musala No9, et.2, Varna, Republic of Bulgaria. Our contact numbers are: telephone – 359526644452; facsimile -- + 35952644453.

2.   Skochev and Associates is  registered in compliance with the Bulgarian Attorney Act and is registered at the  Varna District Court - Companies Department, under company case No 813/2006.

3.  I have obtained my Master degree in law at the Sofia University "Sv. Kliment Ohridski" from 1993- 1998.

4.  I specialize in civil and commercial law and I am licensed to practice without limitation before Bulgarian courts.

5.  I am reasonably  fluent in English.

6.  Neither I nor my law firm has represented Stroitelstvo Bulgaria Ltd.("Stroittestvo")

7.   I have been asked by plaintiff's counsel in this case to submit this declaration with respect to Bulgarian law, and the Bulgarian judicial system,  and with respect to legal proceedings in Bulgaria between  Stroitelstvo and the Bulgarian American Credit Bank, (the "Bank") a Bulgarian stock company, ul. Krakra 16,  Sofia, Bulgaria.



EXHIBIT

A

8.    I have reviewed the cases filed by Stroitesltvo and the Bank in Bulgaria. I have also reviewed the complaint in this case, as well as the declaration of Silvy Chernev.

9.    I am familiar with the law of Bulgaria as it relates to the proceedings between Stroitelstvo and the Bank in Bulgaria, and I am familiar with the law of Bulgaria as it relates to the claims in this case. I have based the statements I make in this declaration, including opinions, on information from sources upon which I, as a Bulgarian attorney, would typically rely, including court records, research, and, reports of the European Union, and discussions with Stroitelstvo's counsel, as well as on my professional knowledge and experience, and my regular practice before Bulgarian courts including the Supreme Court of Appeal of the Republic of Bulgaria.

## The Legal Proceedings In Bulgaria

10.    The Bank acted improperly when it obtained *ex parte* its writ of execution in the amount of over 970,000 euros. The Bank improperly included in its *ex parte* claim over 533,000 euros for interest which was only due over the life of the loan agreement and on the assumption of full performance by the Bank, and it improperly included the full amount of a management fee due in consideration for performance over the full life of the loan agreement.

11.    The Bank obtained a writ in an amount far in excess of its entitlement. By doing so, the Bank was able to attach and freeze the assets of Stroitestvo, hindering its ability to operate, and further hindering its ability to effectively pursue its claims in court.

12.    Stroitelstvo succeeded in temporarily suspending through the Sofia Regional Court the effectiveness of the writ with the exception of the sum of approximately 364,000 euros, which equalled the actual construction disbursements. The Regional Court remanded to permit the Bank to initiate a separate action.

13.    The Bank noted its appeal. The appeal was successful on a procedural issue. The court did not conclude that the bank was ultimately entitled to 970,000 euros, or that it was entitled to a writ in that amount. Rather, the court concluded that Stroitelstvo's favourable ruling was incorrectly obtained, and that Stroitelstvo, rather than the Bank, was required to initiate a separate action.

14.    That ruling is significant because the cost for initiating such an action is four percent (4%) of the amount of the claim, and because any such procedure would require years to pursue. Moreover, that procedure would not provide for interim relief or suspension of the original writ.

15.    Because of the Bank's improper initial filing, and because Stroitelstvo's assets were frozen, and because it was under contractual obligations to perform, the Bulgarian legal system did not provide an effective remedy for Stroitelstvo.

**The American Claims**

16.    The claims available to parties in Bulgaria are, of course, different in many respects from the claims made in this case.  There is no equivalent of any kind in Bulgaria to claims such as those brought under the so-called RICO statute.

17.    Silvy Chernev's statement in paragraph 18 of his declaration seems to state that the tort claims brought in this case are cognizable against the Bank and BAEF  in Bulgaria under Bulgarian law. If that is not what he intended to convey, he should clarify that statement before the court considers the Bulgarian courts to be available for consideration of Stroitelstvo's tort claims.

**The Bulgarian Judical System**

18.    The Bulgarian Judicial System in the period of the socialist administration of the country and in the period of the democratic transition after 1989 and to the current moment has  been conceptually organized pursuant to the statutory acts established for that purpose, on the grounds of the continental legal system.

19.    Despite reforms from the socialist era, the reform of the Bulgarian judicial system is not complete. In practice,  the necessary legal mechanisms have not been introduced and the required prerequisites have not been met. Such mechanisms and prerequisites are needed in order to guarantee the efficiency, reliability, impartiality and the objectiveness of the Bulgarian judicial system.

20.    A Monitoring Report on the degree of Bulgaria's and Romania's readiness for EU membership, dated 26 September 2006, prepared by the European Commission, in the section "Safeguards and Other Measures," in the chapter "Judiciary and the Fight against Corruption" sets out benchmarks and measures Bulgaria's performance according to those benchmarks. The Report noted the necessity of the following steps:

> a. Adopt constitutional amendments removing any ambiguity regarding the independence and accountability of the judicial system.
>
> b. Ensure a more transparent and efficient judicial process by adopting and implementing a new judicial system act and the new civil procedure code. Report on the impact of these new laws and of the penal and administrative procedure codes, notably on the pre-trial phase.
>
> c. Continue the reform of the judiciary in order to enhance professionalism, accountability and efficiency. Evaluate the impact of this reform and publish the results annually.

d. Conduct and report on professional, non-partisan investigations into allegations of high-level corruption. Report on internal inspections of public institutions and on the publication of assets of high-level officials.

e. Take further measures to prevent and fight corruption, in particular at the borders and within local government.

f. Implement a strategy to fight organised crime, focussing on serious crime, money laundering as well as on the systematic confiscation of assets of criminals. Report on new and ongoing investigations, indictments and convictions in these areas.

21.   The Bulgarian judicial system has been subjected to continuous analytical criticism by His Excellency the US Ambassador to Bulgaria, Mr. John Byerle. The Ambassador's speeches and statements that have been published in most Bulgarian dailies and media web-sites contain objective observations and recommendations, such as:

a. 9th December 2005, The SEGA Newspaper, online edition, reporting on John Beyrle's statement made in Sofia at the discussion on the judicial reform in Bulgaria:

"The judicial system needs to start operating more efficiently and win the fight with organized crime and corruption on all levels. This is the most pressing task that Bulgaria needs to do today. Good laws are efficient only when good judges are there to enforce them."

An effective court system needs adequate resources to do its job. The U.S. experience also shows that judges need salaries appropriate to their demanding work and high responsibilities. The best guarantee of independence and the best protection against corruption in the judiciary, as in all parts of the legal system, is an adequate salary. Judges must play an important role in reforming the judiciary in Bulgaria. The rule of law in this country is important not just to Bulgarians, but also to the United States. American and European businesses want to know that there is an effective, predictable and fair legal system before they invest and do business in Bulgaria. They want to know that contracts will be enforced and that rules will be applied consistently. They want to be sure that, if they have to go to court, they will get a fair and impartial hearing.

b.   27th March 2007, The Bulgarian Post, reporting on John Beyrle's speech on the Bulgarian National Radio 27th March 2007 :

" As long as citizens believe that bribing public officers is the usual practice or that you can 'buy' justice, corruption will flourish on all levels. There are encouraging signs of a change effected in the judicial system in Bulgaria and, however, the problems that the Bulgarian judicial system is facing have a direct influence in the USA."

4

and, however, the problems that the Bulgarian judicial system is facing have a direct influence in the USA."

c. 28th March.2005., the official website of the USA Embassy in Sofia, Bulgaria, reporting excerpts from John Byerle's address to the US Chamber of Commerce in Bulgaria:

"First, as was already noted by the EU and the USA, and by the Bulgarians themselves as well, the need for further reform in the Bulgarian judiciary is still pressing. All experts agree that the judicial system must be efficient, transparent and fair. EU experts, as well as US and Bulgarian ones have given guidelines as to what needs to be done…there are some good laws indeed, but most of them appear to exist only on paper."

22. The judicial system in Bulgaria has been subjected to systematic criticism by the American Association of Jurists. Their Central and East European Initiative (ABA/CEELI) evaluated the judicial reform in Bulgaria for 2006 for the third time in sequence. As reported on 27 June 2007 in the Dnevnik Newspaper, the Bulgarian system received good ratings for only 10 of 30 criteria, with 18 neutral ratings. The report noted that:

"The raise in magistrates' salaries have reached the level on which one of the most persistent justifications for corruption is no longer valid. Nevertheless, the expectations that the public opinion on the high level of corruption among magistrates will change to a more favourable one, have not been met. We have found no progress at all and this is what undermines the credibility of the judicial system. In order to improve the situation the law must be strictly enforced against all corrupt magistrates.

In the 2006 index the unlawful influence exercised on the magistrates is one of the few factors that have been persistently assessed as negative. Analyzers have found the view that court decisions result from corruption, pulling of strings and interceding with superior magistrates is widely spread. The Index also says that the fact that appointment of judges and career progress depend on certain prosecutors and investigators is a sign for ill-practiced institutional influence on the part of the prosecution. This may also lead to exercising influence on individual cases."

23. It must be definitely concluded that, according to the objective expert assessments in the reports and the results from the monitoring of judicial system reform in Bulgaria as of today, and without disregard for the structural achievements made, a mechanism ensuring the evaluation of the operation of the Bulgarian judicial system as an independent, efficient, impartial and objective one capable of fair and just hearing, is not in operation yet.

16 September 2007

Vladimir Stefanov Skochev

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Stroitelstvo Bulgaria Ltd.      :

    Plaintiff,     :
            :
            :
   vs.       :  Case No. 07cv00634 RMC
            :
The Bulgarian-American Enterprise Fund, et al. :
            :
    Defendants.    :


### DECLARATION OF  MARIA GAVRAILOVA SLAVOVA

I, Maria Gavrailova Slavova, state and declare under penalty of perjury under the laws of the United States, 28 U.S.C.§ 1746, that the following is true and correct, based on my personal knowledge and as is set forth below:

1.  I am an  attorney at law registered at the Sofia Bar.  My address and contact numbers are: 1373 Sofia,"Zapaden Park", bl.100, ent. 2, tel : + 35929282704, cell phone : +359888846289, E-mai:l mslavova@pc-link,net

2.  A true and accurate copy of my curriculum vitae is annexed hereto.

3.  I have obtained my Master degree in law at the Sofia University "St. Kliment Ohridski" in 1976 and my Ph.D. in 1985.

4.  I specialize in administrative, civil and commercial law, and anti-corruption and human rights law and I am licensed to practice without limitation before Bulgarian courts.

5.  I am reasonably  fluent in English. I have travelled in and worked in the United States and Great Britain and have co-authored a book with Professor Sam Jacobson of the Willamette School of Law in Salem, Oregon.

6.  I have never  represented Stroitelstvo Bulgaria Ltd.("Stroittestvo").

7.   I have been asked by plaintiff's counsel in this case to submit this declaration with respect to Bulgarian law and with respect to legal proceedings in Bulgaria between Stroitelstvo and the Bulgarian American Credit Bank, (the "Bank") a Bulgarian stock company, ul. Krakra 16,  Sofia, Bulgaria, and with respect to the Bulgarian judicial system.



EXHIBIT

B

8.   I have reviewed the cases filed by Stroitesltvo and the Bank in Bulgaria. I have also reviewed the complaint in this case, as well as the declaration of Silvy Chernev.  I have consulted with Vladimir Stefanov Skochev, and have reviewed his affidavit.

9.   I am familiar with the law of Bulgaria as it relates to the proceedings between Stroitelstvo and the Bank in Bulgaria, and I am familiar with the law of Bulgaria as it relates to the claims in this case. I have based the statements I make in this declaration, including opinions, on information from sources upon which I, as a Bulgarian attorney, would typically rely, including court records, research, and, reports of the European Union, and discussions with Stroitelstvo's counsel, as well as on my professional knowledge and experience, and my regular practice before Bulgarian courts including the Supreme Court of Cassation of the Republic of Bulgaria.

10.   The liability for compensation of the damages, caused by impermissible actions (tort) under Bulgarian law is regulated by The Contracts and Obligations Act. Bulgarian law though does not permit the liability to be effected towards legal entities. The very concept of The Contract and Obligations Act differs substantially from the provisions the RICO Act. The consistent practice of Bulgarian Supreme Courts has enough evidence to support this conclusion. Detailed explanation of the impossibility a legal entity to be held liable for tort due to delictual fault is found in Decision № 6 of 08.01.1973, enacted pursuant to civil case № 2384/1972 of First Civil Department of the Supreme Court, as well as Decree № 7/29.12.1958 of The Plenum of The Supreme Court.

11. It is doubtful that the Bulgarian courts and the relevant experts might have enough experience to analyze the liabilities of both defendants. The pertinent codes do not provide the mechanisms for  hearing the racketeering issues raised in the complaint.

12.   The declaration of Vladimir Stefanov Skochev accurately describes the current deficiencies in the Bulgarian judicial system.  Though some progress has been made, an independent, impartial and objective system capable of a fair and just hearing is not yet in operation.


16 September 2007                                          _____
                                                                      Maria Gavrailova Slavova

2

# *Curriculum vitae*

## Proposed role in the project:

**Family name:**   Slavova
**First names:**   Maria Gavrailova
**Nationality:**   Bulgarian
**Education:**

| Institution: Date from – date to | Degree(s) or Diploma(s) obtained: |
|---|---|
| English Language School, Plovdiv; 09/1967 – 06/1972; | English language School Diploma |
| Sofia University Law Faculty, Sofia; 09/1972 – 12/1976 | Master's Degree in Law |
| Bulgarian Academy of Sciences Institute for State and Law, Sofia; 01/1980 – 10/1983 | Ph.D., Dissertation thesis "Management of Innovation Processes" |
| St. Anthony College, Oxford, UK, 09/1989-09/1990 | Visiting fellow - Integrated study in Law, Economics and Sociology |
| University of Birmingham, UK, 09/1997-12/1997 | Protection of Human Rights Diploma |

**Language skills: Indicate competence on a scale of 1 to 5 (1 – excellent; 5 – basic)**

| Language | Reading | Speaking | Writing |
|---|---|---|---|
| Bulgarian (Mother tongue) | 1 | 1 | 1 |
| English | 1 | 1 | 1 |
| Russian | 1 | 1 | 2 |
| German | 5 | 5 | 5 |
| French | 5 | 5 | 5 |

**Membership of**
**Professional bodies:**
Member of the Lawyers' Union, Bulgaria; Member of the Scientists' Union, Bulgaria; Member of the Council of Honour of Paneuropa, Bulgaria; Member of Vital Voices /Women in Democracy/ International Movement

**Other skills:**   Computer Literacy: MS WINDOWS, MS OFFICE, DATABASE, COREL etc;
Legal due diligence in connection with strategic management and building administrative capacity; civil service, judicial review

**Present position:**
- Professor on Administrative Law and Administrative Process at the Law Faculty of Sofia University;
- Professor on Administrative Law and Administrative Process and Public-Private Partnership at the Philosophy Faculty of Sofia University,
- Chief External Expert to the Parliamentarian Committee on Civil Society, Bulgarian Parliament
- Lecturer on: Administrative Law and Administrative Process, Public Administration, Drafting, Comparative Administrative Law, European Administrative Law, Media Law, Comparative Administration and Public-Private Partnership at Burgas Free University

**Years within firm:** 23 years in Law Faculty, Bulgaria University
8 years with Bulgarian Parliament
**Key qualifications**
**(relevant to the project):**
- Sound experience in Project Management and co-ordination of EU-funded projects. Project Development practice, team organisation and management.
- Sound experience in Project Monitoring and Evaluation.
- Many years experience in Company Organisation and Public Administration.
- Management Techniques, Management of human resources
- Training needs assessments and development of training activities, materials incl. Curricula; Development of Training's and tailored projects for young unemployed and women to support self-employment
- Lecturing/training on/in Public Administration, Law and European Studies.
- Well acquainted with the requirements of pre-accession and Structural Funds programmes.
- Practical knowledge of Legislative Process, Law and Economics, Civil Service and Accession Process, SME, Local Government and Management of Social Services.
- Jurisprudence (Public Law, Protection of Human Rights, Privatisation).
- Public administration, Political and Administrative Science

**Specific experience in the region:**

| Country | Date from – date to |
|---|---|
| Bulgaria | 09/1991–12/1993,09/1997–10/2000,09/2001-ongoing,03/2004-08/2004,07/2005– 0/2005 |
| Greece | 06/2000 |
| Croatia | 07/1999 |

MARIA SLAVOVA

## Professional experience record:

| Date from / Date to: | Location | Company | Position | Description |
|---|---|---|---|---|
| 01/1991- 30/11/1993 | Sofia, Bulgaria | | Consultant | Analysis of Bulgarian Legislation for the Start of the Phare Programme upon request of EU Commission Services |
| 09/1991- 12/1992 | Sofia, Bulgaria | Council of Ministers, Bulgaria National Assembly | Legal Adviser to the Prime Ministers Office | Draft bylaws, Opinions, Decision making, Development of an Institutional Building Plan for the Public Administration |
| 1990 – ongoing | Sofia, Bulgaria | | External Consultant | Opinions on the draft laws in the sphere of civil service, administrative reform, accession process to EU. Consultations under request for the drafts, submitted to the National Assembly, which includes written opinions and participation in discussions. |
| 2006 ongoing | Sofia, Bulgaria | Ministry of State Administration and Administrative Reform | External Consultant | Opinions on sub-law legislation, proposed by the Ministry of State Administration and Administrative Reform in the capacity of University professor. |
| 01/1991- 31.11.1992 | Sofia, Bulgaria- Paris, France | Council of Ministers, Bulgaria | National Co-ordinator for Bulgaria to OECD- "SIGMA" Programme | Administrative Reform Training. Creation of the first Profile of Republic of Bulgaria, according to the Constitution1991. Public Procurement Strategy, PPP Strategy, Participation in activities, organised by "SIGMA" Programme, within the framework of PUMA. National Coordination included representation of Bulgaria with "SIGMA", tuning the tasks of "SIGMA" with the strategy of Bulgarian Government, namely in the sphere of Administrative Reform and Public Procurement, organising seminars in Bulgaria and organising Bulgarian participation abroad, analysing and presenting Bulgaria needs of expert a technical assistance in transition processes. |
| 06/1994 - ongoing | Bulgaria | Sofia City Bar | Lawyer | Legal Representation before courts on matters, concerning Planning for cities in transition as part of EU corridor # 4 and ISPA Measure 2001 BG 16 P PT 004. Interpretation of the agreement, concerning the grant of assistance from the Instrument for Structural Policies for Pre-accession – Ljulin Motorway- Sofia aring Road to Daskalovo Junction, located in Western and Central Region in Bulgaria. The Project concerns Environmental Impact Analysis as covered by Annex I of the EIA Directive 85/337/EEC, amended by Directive 97/11/EEC. Impact Assessment of Legislation in the sphere of judicial review, citizens, control over Central and Local administration, expressed in publications and discussions. |
| 04/1996- 10/2003 | Sofia, Bulgaria | Sofia University Law Faculty, Open society Fund, American Bar Association | Manager, Project consultant | US Embassy Democracy Commission, USAID and Open Society Institute Funded Project. Last Contact № 333/31.07.2001. Management, Training Trainers, Organisation of the first students' Law Clinic. Working with live clients, Street Law, Dispute Resolution, Legal aid pro bono. |
| 02/1998- | Sofia, | Ministry of | Expert - Acquis | Phare Programme funded project on the Harmonisation of Bulgarian Legislation with Community Law. Expert opinions |

2

MARIA SLAVOVA

| Date from Date to: | Location | Company | Position | Description |
|---|---|---|---|---|
| 05/1999 | Bulgaria | Justice and European Integration | Communautaire | on the Draft laws on Combating Corruption. Protection of Children's' Rights, Protection of Personal Data. Impact Assessment of Legislation in regard of the new legal instruments in Public Administration, Fighting Corruption, Protection of Human Rights and Personal Data Protection. |
| 10/1996-10-1998 | Budapest Hungary | COLPY, Open Society Institute | Member of the Steering Committee, Author | Open Society Fund financed project on Comparative study of Administrative Justice in the Countries in Transition in the field of Education, Waste Sites, Protection of Children's rights and Judicial review. The study was published in English and Russian by Oxford University Press. Administrative Justice in the New European Democracies, Centre for Socio-Legal Studies, University of Oxford, COLPI, 1998, 386 p. |
| 10/1998-10/1999 | Sofia, Bulgaria | Local Government Initiative | Expert | USAID funded project for analysis of the local government legal framework. Study of the opportunities for local consultancy centres and encouragement of foreign investors, orientated to local initiatives. |
| 03/2004 – 08/2004 | Sofia, Bulgaria | BARDA, Ministry of Regional development of Bulgaria | Expert- Bylaws Drafting | Creating a concept on Administrative capacity building strategy for the needs of the regional administration to serve the EU funds management, Outsourcing public sector activities, Legislation review and Institutional development. Sub-legislation to the 2004 Law on Regional Development on the EU Funds Absorption. |
| 05/2003-ongoing | Sofia, Bulgaria | Bulgarian-Flemish Friendship Club | Member of Steering Committee, Expert, Lecturer | Project: BUL/002/03. Entrepreneurship evening and weekend training centres for Bulgaria. Development of the SME Sector in Bulgaria. Development of a Business plan Strategy for the new Businesses for the Bulgarian Chamber of Commerce and Industry Lectures in PPP Objectives, Needs Assessments, Implementation of Investments Projects, Public Procurement |
| 05/2004 – ongoing | Sofia, Bulgaria | Institute for Public Administration and European Integration to the Council of Ministers, Bulgaria | Lecturer | Public Private Partnership in Administrative services, Concessions, Administrative Capacity, Administrative Reform, Public Administration, European Administrative Law, European Standards for Social Services, European Ombudsman, European Charter for Local Self-Government. Bulgarian and European Business law, Legislation review, Strengthening of Administrative Capacity |
| 1991 – on going | Bourgas, Bulgaria | Bourgas Free University | Professor, Lecturer | Public Administration, Comparative European Administration |
| 1996 – on | Sofia, | Sofia University | Professor, Lecturer | Administrative Law and Administrative Process, Comparative European Administration |

3

MARIA SLAVOVA

| Date from Date to: | Location | Company | Position | Description |
|---|---|---|---|---|
| going | Bulgaria | „St. Ohridsky" Programme Public Administration Kl. | | Monitoring of the implementation of The National Phare Programme BG 0204.02 "Development of Civil Society", BG 2003/004-937.01.02 "Development of Civil Society" and the Sector Indicative Programme for 2004-2006. |
| 12/2004-05/2005 | Sofia, Bulgaria | Ministry of Foreign Affairs, Bulgaria | Expert | |
| 09/2004-ongoing | Gent, Belgium | University of Gent, Sofia University | Manager, Lecturer | Socrates/Erasmus Exchanging Programme in the field of education for fighting corruption. The project covers fraud and corruption concerning public procurement, public-private partnership, European subventions, etc. |
| 07/2005-10/2005. | Sofia, Bulgaria | Ministry of Economy and Energy | Expert | Project BG 2004/016-711.11.04, Contract Number Koldamova 1 – PHARE – BG - PAO Support for Increasing the Competitiveness of Bulgarian Enterprises, Public-Private Partnership/PPP/ Grant Scheme The Project management included participation in the Steering Committee and organizing Bulgarian participation/financing in the project. The impact of the project was reported in the activities of the Ministry of Agriculture bodies and in the activities of the branches of the Bulgarian Chamber of Commerce and Industry. |

4