**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Stroitelstvo Bulgaria Ltd. | : | |
| Plaintiff, | : | |
| v. | : | Case No. 07cv00634 RMC |
| The Bulgarian-American Enterprise Fund, *et al.* | : | |
| Defendants. | : | |

**FIRST AMENDED COMPLAINT**

COMES NOW Plaintiff, Stroitelstvo Bulgaria Ltd. (hereinafter "Stroitelstvo" or "Plaintiff"), by and through undersigned counsel, and, pursuant to F.R.Civ.P. 7 and 15(a), and *Confederate Memorial Ass'n, Inc. v. Hines* 995 F.2d 295, 299 *reh and reh en banc den* (D.C.Cir. 1993), for a demand states and avers as follows:

**JURISDICTION AND VENUE**

1. Subject Matter Jurisdiction is founded on 28 USC §§ 1331 and 1332(a) (1) and (2), 18 U.S.C. § 1964 (a) and (c). The matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs. Personal Jurisdiction is founded on 18 U.S.C. § 1965(b) and (d). Venue is proper pursuant to 28 USC § 1391(a), (b), (c), and (d) and 18 U.S.C. § 1965 (b).

**NATURE OF THE CLAIM**

2. Plaintiff – a Bulgarian business -- seeks recovery of damages arising from injury to its business and property caused by the Bulgarian American Enterprise Fund ("BAEF")and the Bulgarian American Credit Bank ( the "Bank," collectively with BAEF the

"Defendants"). The Defendants, with funds made available through an American initiative to support private sector development in Bulgaria and elsewhere in Eastern Europe, used wrongful and predatory lending and other practices to achieve improper commercial goals for themselves, including the stripping of Plaintiff's equity and its control over its own assets, and caused serious financial injury to Plaintiff.

3.       Defendants' conduct violated the provisions of civil RICO.

4.       In addition, Defendants' conduct constituted common law violations including breach of contract, intentional interference with contract, intentional interference with prospective advantage, breach of fiduciary duty, and abuse of process.

**The Parties**

5.   Plaintiff is a for profit corporation organized under the laws of the Republic of Bulgaria.

6.   Defendant BAEF is a not-for-profit corporation established pursuant to the Support for East European Democracy Act, 22 U.S.C. §§ 5402, 5421 ( the "SEED Act"). Its ostensible purpose is and was the promotion of private sector development and entrepreneurship in Bulgaria through, among other things, grants, loans, and equity investments.

BAEF commenced its operations in 1992, with fifty eight million dollars ($58,000,000.00) in funding from the American government, and has at all times been based in Chicago, Illinois. BAEF at all times pertinent to this Amended Complaint had an office in Sofia, Bulgaria.

Pursuant to the SEED Act, BAEF reports every six months to the United States Agency for International Development in the District of Columbia. BAEF failed to report

to USAID or otherwise that the Bank engaged in, and was continuing to engage in the wrongful conduct described in this Amended Complaint.

As of the end of fiscal year 2004, BAEF was owner of a 68% interest in BM Leasing ("BML"). BML was established in 2003 as a joint venture with a small Bulgarian leasing firm.

At all times pertinent to the averments of the Complaint BAEF was the parent company of Bulgarian American Property Management EOOD ("BAPM"), which conducts the Fund's property management operations.

7. Defendant Bank was registered as a Bulgarian joint stock company under the requirements of the Bulgarian Trade Act on 3 December 1996.

The Bank was, at all times pertinent to the averments of the Amended Complaint, a wholly-owned subsidiary of BAEF. At times pertinent to the averments of the Amended Complaint, the main shareholders of the Bank were BAEF and BAPM, which held 99.99% and 0.01% of the shares, respectively. BAEF described the Bank as its major operational subsidiary.

BAEF asserts that the Bank operates independently from BAEF.

BAEF asserts that it maintains no files or records related to the bank's specific loan transactions.

BAEF asserts that it is not involved in the Bank's loan transactions.

The Bank was established as a limited-purpose bank whose operations were an extension of the activities of BAEF, namely lending to small and medium size enterprises in Bulgaria. The Bank commenced banking operations in May 1997.

The Bank expanded its range of banking operations and on 30 December 1998, the Bank received a full banking license to operate both locally and abroad in local and foreign currency.

The Bank operated primarily as an investing bank in the areas of small and medium size enterprises (SME) lending, construction lending and home mortgage lending. The Bank began attracting deposits in the year 2000 primarily from banks and other institutional investors. In 2002 the Bank expanded its operations and began to offer other banking services.

The Bank was funded by BAEF, which in turn received funding through the SEED Act.

**FACTS COMMON TO ALL COUNTS**

8. Plaintiff adopts and incorporates herein by reference as if specifically set forth herein the averments of paragraphs one through seven of the Amended Complaint.

**The Lending Contract Between Plaintiff and the Bank**

9. Plaintiff designed and undertook a residential construction project ( the "Project")for a building or buildings with underground garages, shops, apartments, and other amenities, improvements and features in District 3B in Sofia Bulgaria.

10. Plaintiff entered into a relationship with the Bank pursuant to a Loan Agreement with the Bank dated March 24, 2005, ( the "Contract"). A true and correct copy of the Contract is appended hereto as Exhibit A, and is adopted and incorporated herein by reference as if specifically set forth herein. The Contract obligated the Bank to provide funds to Plaintiff on specified terms and conditions.

11.   On March 24, 2005, Plaintiff executed and delivered a Promissory Note ( the "Note"), in the amount of two million six hundred fifty nine thousand seven hundred and four Euro (2 659 704 EUR) ( the "Total Note Amount"), due and payable according to its terms in 28 months.

12.   As set out in the Contract, the Total Note Amount was comprised of the following:

      a) One million eight hundred sixty four thousand one hundred thirty six Euro (1 864 136 EUR) - for drawdown pursuant to application;

      b) Five hundred thirty three thousand one hundred forty three Euro (533 143 EUR)- the interest for the total amount of the credit for the entire term of the Note ("Total Note Interest");

      c)  Seventy seven thousand five hundred eleven Euro (77 511 EUR) -  a one time management fee calculated at 3% per year of the Total Note Amount over the  term of the Note ("Management Fee"); and

      d) One hundred eighty six four hundred fourteen Euro (186 414 EUR) - a special-purpose reserve ( the "Reserve Amount").

13.   Plaintiff invested approximately eight hundred fifty thousand euros (850,000 EUR) in the Project.

**Performance and Breach by the Bank**

14.   Plaintiff informed the Bank of the names of the contract purchasers ( the "Project Unit Purchasers") and provided to the Bank the contract information pertinent to the Project Unit Purchasers.

15.   Plaintiff informed the Bank of the names of the contractors, subcontractors, suppliers, tradesmen and mechanics assigned to or employed to or hired to do the construction work on the Project ("the Construction Team"). As part of its development of a Construction Team, plaintiff entered into a written  agreement on or about March 25, 2005 with  subcontractor Ekostroi OOD for the construction of the building. Ekostroi engaged approximately 45 persons to work on the Project, and  entered into written agreements for concrete delivery

with "Sofstroi" OOD and for steel framework delivery with "Makland" EOOD for the Project.

16.    Pursuant to the terms of the Contract, Plaintiff applied for and the Bank disbursed three hundred sixty one thousand Euro (361 000 EUR) to Plaintiff as part of the draw down amount.

17.    Disbursement Number One provided for distribution of the Total Note Interest, the Management Fee, and the Reserve Amount.

18.    Additional requests included:  An Advance Request in the amount of 65,583.30 EUR; Disbursement Number Three in the amount of 78,967.26 EUR; and Disbursement Number Four in the amount of 33,320.25 EUR.

19.    On November 11, 2005, the bank wrongfully and without cause suspended credit and asserted an event of default and the right to recover 970 438 EUR, comprised of:  a) the drawdown amount of 361 000 EUR; b) the Total Note Interest of 553 143 EUR; and c) the entire Management Fee of 77 511 EUR.  The Bank thereupon refused to disburse the remaining funds required by the Contract.

20.    The alleged event of default was based on the purported failure of Plaintiff to obtain prior consent of the Bank for certain preliminary contracts, and on Plaintiff's failure to transfer certain  advanced payments from  the buyers.

21.    The alleged breach was groundless and pre-textual.

22.    Bank knew that the alleged breach was groundless and pretextual.

**The Consequences of the Bank's Improper Suspension of Credit**

23.    On November 15, 2005, the Bank, through BAPM, proposed to purchase from Plaintiff "all available units" for 100,000 EUR plus assumption of the debt. BAPM failed to disclose that it was associated with or affiliated with the Bank.

24.  BAPM's offer was in an amount substantially below the value of the assets that BAPM sought to purchase.

25.  In or about November 2005, in Sofia, Bulgaria, The Bank contacted the Project Unit Purchasers and the Construction Team.

26.  The Bank, through its employee Sabin Simeonov and others,  falsely, and maliciously, and with intent to damage plaintiff, and disrupt plaintiff's ability to perform under the Project, and to disrupt plaintiff's  construction of the Project, and to interfere with plaintiff's ability to obtain sales revenue from the Project, advised the  Project Unit Purchasers, by telephone and otherwise, including without limitation Simeon Hajiev, Boris Petrov and Boika Dimova, and the Construction Team, that plaintiff was in default under the Contract, and that the Bank intended to put plaintiff in bankruptcy, and that the investment of the Project Unit Purchasers was unsafe, and that the Construction Team would be faced with financial losses on the Project.  The Bank failed to disclose to the Project Unit Purchasers, or the Construction Team, that the alleged events of default were mere pretexts.

27.  On or about November 15, 2005, the Bank falsely, and with intent to deceive and to mislead, directed a letter to Milena Boikova Blateva in Sofia and wrongly and with deception demanded payment in the amount of 970,438.41 EUR, and falsely claimed that that sum was due to the Bank under the terms of the Promissory Note.

28.  As a direct and consequential and foreseeable result of the Bank's failure to meet its obligations under the Contract, and its statements to Project Unit Purchasers and the Construction Team,  Project Unit Purchasers withdrew from their contracts, or elected to assign their contracts to less creditworthy purchasers, and  members of the Construction Team withdrew from participation in the Project.

29.   As a direct and consequential and foreseeable result of the Bank's failure to meet its obligations under the Contract, and its statements to Project Unit Purchasers and the Construction Team, plaintiff's contract with Ekostroi was suspended, and interfered with, and plaintiff incurred losses, costs and charges, including default related costs and charges in excess of 100,000 EUR.

30.   On November 15, 2005, Plaintiff, in response to the Bank's wrongful action, undertook to secure alternative funding, including funds from preliminary contracts for sale of apartments.

31.   On December 12, 2005, the Bank, proceeding *ex parte*, pursuant to an Application apparently filed on or about December 6, 2005, wrongly obtained a decree of execution in the amount of 970,438,41 EUR. The Bank utilized that improper ruling to attach and freeze the assets of Plaintiff.

32.   Though plaintiff obtained an interim suspension of the execution, the Bank immediately appealed, and plaintiff continued to be denied access to its funds. In order to undo the wrongful freeze on its assets, plaintiff would have been required to initiate a separate action, and to pay a filing fee of four percent of the amount claimed. That action would have taken two to three years to reach final decision.

33.   The Bank knew that its wrongful filing and its wrongful attachment and it wrongful freeze of plaintiff's assets could not be timely modified or undone by plaintiff.

34.   Under the duress created by the improper suspension of credit and the enforcement of the improper judgment, Plaintiff was forced to enter into an Agreement with the Bank (the "Agreement") on or about May 9, 2006.

35.   The Agreement required Plaintiff to take on credit from Investbank in the amount of 563 000 EUR and pay the alleged debt to the Bank. As a consequence of its wrongful

conduct the Bank improperly extracted from plaintiff 170 000 EUR more than plaintiff owed to the Bank.

36.   BAEF contends that the Agreement required the Bank to dismiss an appeal to the Sofia City Court.

37.   BAEF contends that, notwithstanding the ostensible agreement o dismiss the appeal, the Sofia City Court issued a decision.

38.   These actions by the Bank   amount to extortion, blackmail, bank fraud and predatory lending practices as defined under the applicable criminal statutes, and constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961 (1).

39.   To save its business from the Bank's predatory conduct, Plaintiff borrowed from Investbank at an annual interest materially, in excess of the standard bank rate.

40.   Plaintiff suffered consequential damages as a result of the Bank's improper suspension of disbursements in the amount of 950 000 EUR, as follows:  penalties for delayed construction; increases in  labor costs and the cost of the materials, including costs associated with new contracts for  steel framework delivery with "Hela-Borislavov" OOD and for concrete delivery with "Ekobetonovi Ivarovi raztvori" EOOD;  loss of income from Project Unit Purchasers; and, the increased cost of borrowing.

41.   The conduct of the Bank as alleged in the Complaint conforms with the Bank's pattern and practice, and is part of the Bank's overall scheme to strip assets and equity from its borrowers.

42.   On at least four other occasions, involving four other small businesses, no earlier than 2001 and on at least two occasions at approximately the same time as the events set out in this Amended Complaint with respect to plaintiff,  the Bank  utilized the same

pattern of wrongful conduct in an attempt to strip the equity and the assets from those businesses.

43.    The Bank utilized other companies during the course of and as an integral part of that conduct, including Ameta Holding JSC, registered under company case number 506/202 in the district court in Razgrad. The Bank and/or BAEF utilized Ameta Holding JSC, in conjunction with predatory and wrongful lending practices directed at a small agricultural company in or around 2003 to 2005 to wrongly acquire control of the assets of that agricultural company.

**The Relationship Between the Bank's Conduct and BAEF**

44.    The conduct of the Bank as alleged in the Amended Complaint constitutes the conduct of BAEF.

45.    At all times pertinent to the averments of the Amended Complaint, the Bank acted as and held itself out as a department of BAEF.

46.    At all times pertinent to the averments of the Amended Complaint, BAEF identified the Bank as its major operational subsidiary.

47.    BAEF contends that it neither reviewed, nor supervised, nor participated, in any of the Bank's lending activities.

48.    The Bank's actions and decisions were subject to the control and the direction of BAEF.

49.    The Bank's actions and decisions were subject to the supervision of BAEF.

50.    The Bank's actions and decisions were subject to the policies and the demands of BAEF.

51.    BAEF ratified and affirmed the conduct of the Bank as alleged in the Amended Complaint, and  BAEF failed to repudiate the wrongful conduct of the Bank.

52.  In failing to supervise the actions of the Bank, and in failing to review the actions of

the Bank, and by failing to monitor the use of federal monies for its intended purposes,

and in failing to take any steps to ensure that the SEED Act funds were properly utilized

by the Bank for the purposes set out in the SEED Act, BAEF acted with willful blindness,

and deliberate ignorance and conscious avoidance.

53.  By failing to supervise the actions of the Bank, and by failing to review the actions

of the Bank, and by failing to monitor the use of federal monies for its intended purposes,

and by failing to take any steps to ensure that the SEED Act funds were properly utilized

by the Bank for the purposes set out in the SEED Act, and by failing to report the Bank's

wrongful activities to USAID and others, BAEF permitted the wrongful scheme of the

Bank to be implemented, and to continue, and to be commenced against plaintiff, and to

continue against plaintiff and others.

54.  Bulgarian courts are not available to Plaintiffs for the redress of the claims herein.


**COUNT ONE**
**(VIOLATION OF 18 USC § 1661(c))**
**(CIVIL RICO)**

55.  Plaintiff adopts and incorporates herein by reference as if specifically set forth herein

the averments of paragraphs one through 54 of the Amended Complaint.

56.  Plaintiff is a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. §

1964(c) and brings this action pursuant to 18 U.S.C. § 1964(c).

57.  Each of the Defendants is a "person" within the meaning of 18 U.S.C. § 1961(3).

58.  Defendants BAEF, the Bank, and BAPM, as well as Ameta Holding JSC,  (and any

individuals or entities who aided and abetted or otherwise participated in their unlawful

activities, including those companies used by the Bank and/or BAEF and/or BAPM to wrongly acquire control over Bulgarian companies ) are an "enterprise" within the meaning of 18 U.S.C. § 1961(4), ( the "Enterprise") in that they are associated in fact with the common and shared purpose of extorting funds and stripping equity and property from Plaintiff and other small businesses, blackmailing Plaintiff and other small businesses, engaging in predatory and unlawful loan practices and bank fraud, investing the unlawfully gained capital and advantage in other banking activities with the intent to permanently deprive Plaintiff and others of its monies and business. At all times relevant to the allegations in the Amended Complaint, the Enterprise engaged in, or its activities affected, interstate and/or foreign commerce. BAEF applied for, and received, and accounted for, and reported on monies received from the government of the United States under the SEED Act for the express purpose of fostering commerce in Bulgaria, and transferred such funds to the Bank for the express purpose of fostering commerce in Bulgaria, and for the further benefit of the United States as contemplated by the SEED Act.

59. At all times relevant to the allegations of the Amended Complaint, Defendants were associated with the Enterprise.

60.  BAEF contends that the Bank operated independently of BAEF with respect to Bank's lending activities.  Bank did not participate in or otherwise secure, nor was it authorized or entitled to secure funds under the SEED Act.  Bank did not participate in the filing of reports with USAID. Bank did not participate in the direct acquisition of SEED Act funds.

61.  At all times relevant to the allegations of the Complaint, Defendants conducted and participated, directly and indirectly, in the racketeering activity complained herein, and

accepted directly and indirectly in the United States the monies and the increased equity

generated as a result of that racketeering activity, including without limitation the monies,

or some portion of the monies, wrongly demanded from and in part paid by plaintiff.

BAEF's direct and indirect conduct and participation included its transmission of funds to

the Bank without appropriate safeguards, and without appropriate oversight, and without

appropriate review, and included its failure to properly or fully report the conduct of

Bank, while accepting without inquiry, review or supervision the benefits of the Bank's

wrongful conduct.

62.   The said racketeering activity consisted of two or more incidents of racketeering

activity committed by the Defendants. The predicate acts, including the scheme

undertaken against no fewer than four other  small businesses in Bulgaria, were

committed within 10 years of each other, had continuity, and were related pursuant to 18

U.S.C. § 1961(5).

63.   The racketeering activity, as described in 18 U.S.C. § 1961(1), includes but is not

limited to:

      a. Repeated acts of extortion within the meaning of 18 U.S.C. § 1951;
      b. Repeated acts of extortionate credit transactions within the meaning of 18
U.S.C. §§ 891-894;
      c. Repeated acts of racketeering within the meaning of 18 U.S.C. § 1952.
      d. Repeated acts of extortion and blackmail within the meaning of the applicable
state law.

64.   These acts of racketeering constituted a pattern of racketeering activity within the

meaning of 18 U.S.C. § 1961(5) and were interrelated by distinguishing characteristics, in

that they had the same purpose, results, participants, victim, and methods of commission,

and in part were directed at the same victim or victims.

65.   This racketeering activity was a regular way of conducting the Enterprise and their

participation in the Enterprise.

66. Plaintiff was injured in its business or property by reason of this violation of 18 USC § 1962(c), in that, as a direct and proximate cause of Defendants' acts, Plaintiff suffered damages, including the loss of the benefit of its bargain, increased costs, expenses and fees, loss of profits, loss of business opportunity and loss of business reputation and relationships, and fear of economic loss.

67. By reason of the Defendants' violations of 18 USC § 1962(c), Plaintiff is entitled to treble the amount of damages proven at trial, plus interest, and reasonable attorneys fees.

**COUNT TWO**
**(BREACH OF CONTRACT)**

68. Plaintiff adopts and incorporates herein by reference as if specifically set forth herein the averments of paragraphs one through 67 of the Amended Complaint.

69. The terms of the Contract required the Bank to extend to Plaintiff as a loan the sums set forth therein.

70. The terms of the Contract, and the obligations of Defendants, and each of them, were subject to the provisions of the Seed Act, and such understandings, and directions issued pursuant to the SEED Act.

71. There is an implied duty of good faith in the performance of the Contract.

72. The Bank failed and refused to meet its obligations under the Contract, and breached the Contract, by failing to extend or deliver to Plaintiff the loan funds required by the Contract, and by wrongfully suspending credit.

73. The Bank failed and refused to meet its obligations under the Contract, and breached the Contract, as defined by the SEED Act and such understandings and directions issued pursuant to the SEED Act, by failing to extend or deliver to Plaintiff the loan funds required by the Contract, and by wrongfully suspending credit, and by taking such steps, including the freezing and the attachment of assets, which interfered with

Plaintiff's ability to perform under the Contract and which interfered with Plaintiff's ability to use the funds for the commercial purpose for which they were intended.

74. The Bank failed and refused to meet its obligations of good faith under the Contract, and breached its obligation of good faith under the Contract, by failing to extend or deliver to Plaintiff the loan funds required by the Contract, and by wrongfully suspending credit, and by taking such steps, including the freezing and the attachment of assets, which interfered with Plaintiff's ability to perform under the Contract and which interfered with Plaintiff's ability to use the funds for the commercial purpose for which they were intended.

75. Those breaches were material.

76. As a direct and foreseeable and consequential result of those breaches, Plaintiff sustained injury and damage, including the loss of the benefit of its bargain, increased costs, expenses and fees, and loss of profits.

**COUNT THREE**
**(Intentional Interference With Contract)**

77. Plaintiff adopts and incorporates herein by reference as if specifically set forth herein the averments of paragraphs one through 76 of the Amended Complaint.

78. Defendants knew that the purpose of the Contract was the provision of funds sufficient to enable Plaintiff to design, construct and sell residential housing in Bulgaria.

79. Defendants knew that Plaintiff had entered into contracts with suppliers, vendors, tradesmen and others for the design and construction of residential housing in Bulgaria, and knew of the contracts and of the contract terms.

80. Defendants knew that Plaintiff had entered into contracts of sale for the purchase of residential housing in Bulgaria and knew the contract terms.

81. Defendants knew that Plaintiff required the loan funds from the Contract in order to perform under the terms of the contracts described herein, and to receive the benefits of such contracts.

82. Defendants deliberately, and in bad faith, and in order to strip Plaintiff's assets, including but not limited to its interests in the contracts described herein, and in order to interfere with those contracts, failed and refused to provided the funds required by the Contract to Plaintiff, and wrongfully suspended credit, and wrongfully froze and attached and interfered with Plaintiff's assets.

83 Such wrongful conduct was a willful and intentional interference with Plaintiff's contracts, and violated the provisions of and the policies of the SEED Act, and the understandings and the directions issued pursuant to the SEED Act.

84. As a direct, foreseeable and consequential result of that wrongful conduct, Plaintiff sustained injury and damage, including the loss of the benefit of its bargain, increased costs, expenses and fees, loss of profits, loss of business opportunity and loss of business reputation and relationships, including the loss of contracts with Project Unit Purchasers and the Construction Team.

**COUNT FOUR**
**(Intentional Interference With Prospective Advantage)**

85. Plaintiff adopts and incorporates herein by reference as if specifically set forth herein the averments of paragraphs one through 84 of the Amended Complaint.

86. Defendants knew that the purpose of the Contract was the provision of funds sufficient to enable Plaintiff to design, construct and sell residential housing in Bulgaria.

87. Defendants knew that Plaintiff had developed a business plan and a business model for such construction through the use of the funds required by the Contract, and that the

business plan and the business model, when implemented, constituted a prospective commercial advantage for Plaintiff (the "Prospective Advantage").

88. Defendants knew that Plaintiff required the loan funds from the Contract in order to implement the Prospective Advantage.

89. Defendants deliberately, and in bad faith, and in order to strip Plaintiff's assets, including but not limited to the Prospective Advantage, failed and refused to provided the funds required by the Contract to Plaintiff, and wrongfully suspended credit, and wrongfully froze and attached and interfered with Plaintiff's assets.

90. Such wrongful conduct was a willful and intentional interference with Plaintiff's Prospective Advantage, and violated the provisions of and the policies of the SEED Act, and the understandings and the directions issued pursuant to the SEED Act.

91. As a direct, foreseeable and consequential result of that wrongful conduct, Plaintiff sustained injury and damage, including the loss of the benefit of its bargain, increased costs, expenses and fees, loss of profits, loss of business opportunity and loss of business reputation and relationships.

**COUNT FIVE**
**(Breach of Fiduciary Duty)**

92. Plaintiff adopts and incorporates herein by reference as if specifically set forth herein the averments of paragraphs one through 91 of the Amended Complaint.

93. Defendants and each of them owed a fiduciary duty to Plaintiff. That fiduciary duty arose out of the terms, conditions, policies, understandings and instructions which resulted from their acceptance of funds under the SEED Act.

94. Plaintiff had a special relationship with Bank.

95. Defendants and each of them owed to Plaintiff a duty of good faith, diligence, and fair dealing, and were precluded from self-dealing.

96. Defendants and each of them failed to act in good faith or with diligence, and failed to deal fairly with Plaintiff, and engaged in self-dealing, by: failing and refusing to deliver the loaned funds, suspending credit, interfering with and freezing plaintiff's assets, and attempting to strip Plaintiff's assets.

97. As a direct and foreseeable and consequential result of that wrongful conduct, Plaintiff sustained injury and damage, including the loss of the benefit of its bargain, increased costs, expenses and fees, loss of profits, loss of business opportunity and loss of business reputation and relationships.

**COUNT SIX**
**(Abuse of Process)**

98. Plaintiff adopts and incorporates herein by reference as if specifically set forth herein the averments of paragraphs one through 97 of the Amended Complaint.

99. The Bank proceeded ex parte and otherwise to attach and freeze Plaintiff's assets by falsely alleging the amount of the debt.

100. The Bank's purpose in initiating the litigation to freeze Plaintiff's assets was to strip Plaintiff of those assets at a forced sale price.

101. The Bank's conduct was wrongful and its intent was wrongful.

102. As a direct and foreseeable and consequential result of that wrongful conduct, Plaintiff sustained injury and damage, including the loss of the benefit of its bargain, increased costs, expenses and fees, loss of profits, loss of business opportunity and loss of business reputation and relationships.

**COUNT SEVEN**
**(Violation of Bulgarian Law)**

103. Plaintiff adopts and incorporates herein by reference as if specifically set forth herein the averments of paragraphs one through 102 of the Amended Complaint.

104. The Bank breached the terms of the Obligations and Contracts Act, Article 20a.

105. The Bank breached the terms of the Obligations and Contracts Act by utilizing duress to obtain economic advantage.

106. The Bank breached the terms of the Obligations and Contracts Act by failing to negotiate in good faith and by failing to fulfill its obligations in good faith.

107. The Bank breached the terms of the Obligations and Contracts Act by refusing to accept performance and by failing to provide necessary assistance for performance.

108. The Bank's abuse of process abused plaintiff's procedural rights.

109. Defendants guiltily caused damages in tort to plaintiff.

**COUNT EIGHT**
**(Civil Conspiracy and Vicarious Liability)**

110. Plaintiff adopts and incorporates herein by reference as if specifically set forth herein the averments of paragraphs one through 109 of the Amended Complaint.

111. BAEF and the Bank agreed to undertake the wrongful conduct described herein, including the breaches described herein, or, in the alternative, BAEF knew of, or should have known of, and recklessly disregarded the wrongful conduct of the Bank, and failed to supervise, review or report on the wrongful conduct of the Bank, and facilitated the wrongful conduct of the Bank by such failures.

112. Such conduct was overt and unlawful, and included lawful conduct performed in an unlawful manner.

113. Such conduct caused injury to Plaintiff including the loss of the benefit of its bargain, increased costs, expenses and fees, loss of profits, loss of business opportunity and loss of business reputation and relationships, pursuant to and in furtherance of the common scheme and agreement of Defendants.

WHEREFORE, by all these presents, counsel for Plaintiff demands:

1. Judgment in the amount of US$10,000,000.00 or such other amount as may be proven at trial in favor of Plaintiff and against Defendants, jointly and severally, plus an award of attorneys fees, interest and costs;

2. Treble damages, attorney's fees, and the costs of this action pursuant to 18 U.S.C. § 1961(1) *et seq.* and 18 U.S.C. 1964(c).

3. As to Counts three, four, five and six, an award of punitive damages against Defendants, and each of them, in an amount to be determined at trial.

4. Prejudgment interest and costs; and

5. Such other relief as may be just and proper.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

Philip M. Musolino, Esq. #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*: (202) 466-3883
*Fax*: (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com

SJR by

Sylvia J. Rolinski, Esq. # 430573
Danielle M. Espinet, Esq. 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*: (240) 632-0906
*Email*: srolinski@rolinski.com
*Email*: despinet@rolinski.com

**CERTIFICATE OF SERVICE**

I certify that I caused a true copy of this motion to be served by electronic mail this 17th day of September 2007 to the following:

Eunnice H. Eun
KIRKLAND & ELLIS L.L.P.
655 Fifteenth Street, N.W.
Washington, D.C. 20005

Stephanie A. Brennan
KIRKLAND & ELLIS L.L.P.
200 East Randolph Drive
Chicago, Illinois 60601

I certify that a copy of the First Amended Complaint was sent, US postage prepaid, this 17th day of September 2007, to the following:

The Bulgarian-American Credit Bank
16 Krakra Str.
Sofia, Bulgaria

Ministry of Justice
1, "Slavianska" Street
1040 Sofia, Bulgaria

Philip M. Musolino

# ДОГОВОР ЗА БАНКОВ КРЕДИТ

Днес, 24.03.2005г. ("Дата на сключване"), в гр. София, бе сключен следният Договор за банков кредит, наричан по-долу ("Договор") между:

1. "СТРОИТЕЛСТВО БЪЛГАРИЯ" ООД, със седалище и адрес на управление гр. София, район Изгрев, ул."Самоков" 11А, рег. по ф.д. №11749/2003г. на Софийски градски съд, вписано в Регистър за търговски дружества под №80176, том 956, стр.92, БУЛСТАТ 131159857, данъчен №1220179725, представлявано от **МЕТОДИ ЛЮБЕНОВ ДИМИТРОВ**, ЕГН:5604186661, с лична карта №162000676, издадена на 29.09.2000г. от МВР София, в качеството му на управител, наричан по-долу "Кредитополучател";

и

2. **БЪЛГАРО – АМЕРИКАНСКА КРЕДИТНА БАНКА АД**, регистрирана със съдебно решение от 3 декември 1996 г. на Софийски градски съд, по дело номер 12567/1996, партида номер 35659, том 397, регистър 1, стр. 180, със седалище и адрес на управление, гр. София, район Средец, ул. Кракра № 16, представлявано от изпълнителните директори Стоян Николов Динчийски с ЕГН 7006114488, с л.к. No. 159358248, издадена на 02.09.2002г. от МВР София, и Димитър Стоянов Вучев, ЕГН:5910266685, л.к. №159148938, изд. на 25.04.2000г. от МВР- София, наричана по-долу "Банката",

Наричани общо "Страните" или поотделно "Страна".

**ПРЕДПОСТАВКИ:**

**С ОГЛЕД НА ТОВА**, че Кредитополучателят е дружество с ограничена отговорност с предмет на дейност покупка, строеж и обзавеждане на недвижими имоти и др.

**С ОГЛЕД НА ТОВА**, че Кредитополучателят е поискал от Банката и Банката се е съгласила да предостави на Кредитополучателя кредит в размер до 2,659,704 Евро (ДВА МИЛИОНА ШЕСТСТОТИН ПЕТДЕСЕТ И ДЕВЕТ ХИЛЯДИ СЕДЕМСТОТИН И ЧЕТИРИ ЕВРО) при условията на настоящия Договор;

**ВЪЗ ОСНОВА НА** взаимните обещания, уверения, гаранции и декларации, съдържащи се в настоящия Договор, Страните се споразумяха, както следва:

**Раздел I. ДЕФИНИЦИИ**

Всички термини в настоящия Договор, които са подчертани и започват с главна буква имат следното значение:

1.01. "Работен ден" означава всеки ден без събота, неделя и официалните празници в България.

1.02. "Строителен бюджет" означава бюджета за завършване на Проекта (определен по-долу), представен от Кредитополучателя на Банката и одобрен от нея, съдържащ се в Член 4.05, по-долу.

1.03. "Дата на първо предоставяне на средства" означава първата дата, на която ще бъде извършено Предоставяне на средства по Кредита (дефинирано по-долу). Дата на Първо предоставяне на средства определя започването на Периода на строителство (дефиниран по-долу).

1.04. "Преценка на Банката" означава, че Банката има право периодично и по свое усмотрение да прави и променя преценката си за бъдещите разходи по всяко перо от Строителния бюджет, които Кредитополучателят ще понесе във връзка със завършването на Проекта (дефиниран по-долу).

1.05. "Представител на Банката" означава който и да е представител или представители, който /които/ Банката може да назначи по собствено усмотрение да представлява(т) Банката и да контролира(т) процеса на строителство и неговото завършване.

1.06. "Проект" означава вход "А", вход "Б" и сутерена на вход "В" на монолитна жилищна сграда с подземни гаражи, магазини, ходници и ателиета, която ще бъде построена в **УРЕГУЛИРАН ПОЗЕМЛЕН ИМОТ №IV-66**, находящ се в гр. София кв. 35 по плана на гр. София местността ж.к."Овче купел – 2", с площ от 3500 кв.м., която сграда се изгражда съгласно нотариален акт №34, том III, рег. №12130, дело 402 от 2004г. на нотариус №265 на НК, одобрен архитектурен проект от 02.12.2004г., Разрешение за строеж №984 от 11.12.2004г., като копия от всички изброени документи са приложени към този Договор.

1.07. "Обект" означава който и да е апартамент, ателие, подземен гараж или магазин от Проекта, включващ прилежащите им мазета и съответните идеални части от общите части на сградата.

1.08. "Разрешение за ползване" означава документа за въвеждане в експлоатация, издаден в съответствие със Закона за устройство на територията и другите нормативни актове, който ще удостовери приемането и въвеждането в експлоатация на Проекта и Обектите, и който ще бъде осигурен от Кредитополучателя.

# LOAN AGREEMENT

On this day of March 24, 2005 ("Date of Agreement") in Sofia, Bulgaria, the following loan agreement, hereinafter referred to as the "Agreement", was made by and between:

1. STROITELSTVO BULGARIA, OOD with headquarters in Sofia, Izgrev zone 11A Samokov Street, with company registration №11749/2003 as per Commercial Register of Sofia City Court, batch 80176, volume 956, page 92, BULSTAT 131159857, tax №1220179725, represented by its manager **METODI LIUBENOV DIMITROV**, UCI#5604186661, identity card №162000676, issued on 29.09.2000 by Police Department Sofia, hereinafter referred to as the "Borrower",

And

2. **BULGARIAN-AMERICAN CREDIT BANK AD**, registered with a court decision from December 3rd, 1996 of the Sofia City Court, Company File 12567/1996, Batch 35659, Volume 397, register 1, page 180, located in Sofia, Municipality Sredetz, 16 Krakra Street, represented by its Executive Directors Stoyan Nikolov Dinchiiski, CI#7006114488, identity card #159358248, issued on September 2, 2002 by Police Department Sofia, and Dimitar Stoyanov Vouichev, CI#5910266685, identity card #159148938, issued April 25, 2000 by Police Department, Sofia, hereinafter referred to as the "Bank",

Collectively hereinafter referred to as the "Parties" or singularly as a "Party".

**WITNESSETH:**

**WHEREAS**, the Borrower is a Limited Liability Company, established to design architectural drawings, to construct industrial and non-industrial buildings, to buy real estate properties and to carry out renovations, etc.

**WHEREAS**, the Borrower has requested from Lender and Lender has agreed to provide to Borrower a loan in the amount of up to TWO MILLION SIX HUNDRED AND FIFTY NINE THOUSAND SEVEN HUNDRED AND FOUR EURO (EUR 2,659,704) subject to the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the promises, representations, warranties and agreements contained herein, the Parties hereby agree as follows:

**SECTION I. DEFINITIONS**

Capitalized and bold terms in this Agreement shall have the meanings set forth below:

1.01. "**Business Day**" means any day other than a Saturday, Sunday or official holiday in Bulgaria.

1.02. "**Construction Budget**" means the budget for completion of the Project (hereinafter defined) which Borrower has submitted to Lender, and Lender has approved, contained below in Article 4.05.

1.03. "**Initial Disbursement Date**" means the first date on which a Disbursement of Funds (hereinafter defined) is made. It marks the beginning of the Construction Period, as defined below.

1.04. "**Lender's Estimate**" means that from time to time Lender shall have the right to make and/or revise, in its good faith judgment, an estimate of the future costs and expenses of each line item of the Construction Budget which may be incurred by Borrower to complete Project (hereinafter defined).

1.05. "**Lender's Representative**" means any representative or representatives which Lender may appoint, contract or employ in its sole discretion to represent Lender and to monitor the construction process and its completion.

1.06. "**Project**" means section "A", section "B" and the basement of section "V" of the residential building with underground garages, shops, apartments and ateliers, which shall be constructed in **REGULATED LAND PLOT №IV-66**, located in Sofia in district 35 as per the city plan of Sofia, residential area Ovcha kupel -2 zone, with area of 3500 sq.m., which building shall be constructed pursuant to the notary deed № 34, volume III, reg. №12130, file 402 dated 2004 as per the register of the notary №265 of the NC, architectural design approved on 02.12.2004 and Construction Permit № 984 dated 11.12.2004, all represented as Exhibits to this Agreement.

1.07. "**Unit**" means any one of the apartments, ateliers, the underground garages or shops of the Project, including assigned storage spaces and ideal parts of the common parts of the building.

1.08. "**Permit for Usage**" means Occupancy Permit issued pursuant to the Zoning act and the other applicable regulations, which shall certify the acceptance and bringing into use of the Project and the permission to use the Units, and shall be provided by the Borrower.

Borrower/Кредитополучател: ____

Lender/Банка: ____

PENGAD 800-631-6989 PLAINTIFF'S EXHIBIT A

1.09. "Акт 15" означава Приложение Образец 15, издаден в съответствие с Наредба №3 от 31.07.2003г. за съставяне на актове и протоколи по време на строителство, издадена от МРРБ, ДВ бр. 72 от 15.08.2003г. който ще удостовери завършването на Проекта, и който ще бъде осигурен и подписан от Кредитополучателя.

1.10. "Дата на уведомяване" означава датата, на която Кредитополучателят уведомява Банката за получаването на Разрешението за ползване. Това уведомяване следва да се извършва в срок от пет Работни дни, считано от датата на издаване на Разрешението за ползване. В противен случай ще се счита, че е настъпил Случай на неизпълнение (дефинирано по-долу).

1.11. "Период на строителство" е периодът от време между Датата на първо предоставяне на средства по Кредита и датата на Изтичане на Периода на строителство (дефинирано по-долу). По време на Периода на строителството, Кредитополучателят има право да подава Искания за предоставяне на средства (дефинирано по-долу) за целите на Член 2.06. от настоящия Договор.

1.12. "Изтичане на Периода на строителство" е по-ранната от следните две дати: датата, на която изтичат 20 (двадесет) календарни месеца от датата на Първо предоставяне на средства, или Датата на уведомяване. След тази дата Кредитополучателят няма право да иска Предоставяне на средства по Кредита (дефинирано по-долу), освен в случаите, когато се използва Лихвения резерв (дефиниран по-долу). След Изтичане на Периода на строителството започва Периода на продажби (дефиниран по-долу).

1.13. "Период на продажби" е срок от 6 (шест) календарни месеца, считано от датата на Изтичане на Периода на строителство, по време на който, но не по-късно от Падежа (дефиниран по-долу) Кредитът трябва да бъде напълно изплатен.

1.14. "Лихвен резерв" е сума в размер до 533,143 (петстотин тридесет и три хиляди сто четиридесет и три) Евро, която Кредитополучателят може да използва по Кредита (дефиниран по-долу) единствено с цел да покрие задължението си за плащане на Лихва по Кредита. С използваните средства от Лихвения резерв се увеличава размера на Неизплатената част от главницата по Кредита, считано от съответната дата на предоставяне на средства.

1.15. "Купувач" означава купувача на който и да е Обект от Проекта

1.16. "Дължима сума за Обекта" означава сумата от Главницата, която Кредитополучателят трябва да погаси за да даде Банката съгласие за заличаване на ипотеката върху съответния Обект. Дължимата сума за Обекта е определена в Схема на дължими суми по Обекти в Член 9.06.

1.17. "Предварителен Договор за Продажба" означава всеки предварителен договор за продажба в съответствие с член 19 от Закона за Задълженията и Договорите, сключен между Кредитополучателя и Купувач на един или повече Обекти от Проекта.

1.18. "Дата на Предварителния Договор за Продажба" означава датата на сключване на предварителния договор.

1.19. "Окончателен Договор за Продажба" означава договор във формата на Нотариален Акт за продажба на един или повече Обекта от Проекта.

1.20. "Дата на Окончателния Договор за Продажба" означава датата на сключване на окончателния договор за продажба на Обекта.

1.21. "Постъпления от Продажби" означават приходите на Кредитополучателя от продажба на Обект от Проекта. Постъпленията от продажби могат да са в резултат както на Предварителния Договор за Продажба, така и на Окончателния Договор за Продажба.

1.22. "Такса за ангажимент" означава плащане в размер на 1,500 Евро (ХИЛЯДА И ПЕТСТОТИН ЕВРО), преведени от Кредитополучателя по сметка на Банката преди подписване на настоящия Договор.

1.23. "Дата на обезпечение" означава датата, на която обезпечението по Раздел XII е надлежно учредено в полза на Банката съгласно този Договор и нормативните актове.

Раздел II. ОБЩИ УСЛОВИЯ

2.01. Кредит. Банката се е съгласила да предостави на Кредитополучателя кредит в размер до 2,659,704 Евро (ДВА МИЛИОНА ШЕСТСТОТИН ПЕТДЕСЕТ И ДЕВЕТ ХИЛЯДИ СЕДЕМСТОТИН И ЧЕТИРИ ЕВРО), наричан по-долу "Кредит", при условията на настоящия Договор.

2.02. Валута. Кредитът се предоставя в евро и всички пресмятания на Главницата (дефиниция по-долу), Лихвата (дефиниция по-долу) и Лихвата за забава (дефиниция по-долу) се извършват в евро. Всички плащания се извършват в евро. КРЕДИТОПОЛУЧАТЕЛЯТ РАЗБИРА И ПОЕМА ИЗЦЯЛО РИСКА ОТ ПРОМЕНИ ВЪВ ВАЛУТНИЯ КУРС.

1.09. "Act 15" means Exhibit Form 15 issued in accordance with Regulation No. 3 from 31.07.2003 for any penalties and protocols during the construction period issued by the Ministry of Construction and Urban Development, State Gazette Issue No72 or 15.08.2003 which shall certify the termination of the Project and shall be provided and signed by the Borrower.

1.10. "Notification Date" means the date on which Borrower notifies Lender of the receipt by the Project of the Permit for Usage. Failing to notify Lender within five business days of the Project's receipt of the Permit for Usage or the Loan (hereinafter defined) is an Event of Default (hereinafter defined).

1.11. "Construction Period" is the term between the Initial Disbursement Date and the Termination of Construction Period (hereinafter defined). During the Construction Period the Borrower has the right to make Disbursement Requests (hereinafter defined) according to Article 2.06 of this Agreement.

1.12. "Termination of Construction Period" is defined as the date earlier of twenty (20) months after the Initial Disbursement Date or the Notification Date. After that date Borrower shall not have the right to request Disbursements (hereinafter defined) under the Loan (hereinafter defined), except for advances under the Interest Reserve (hereinafter defined) line item. After the Termination of Construction Period, the Sales Period (hereinafter defined) applies.

1.13. "Sales Period" shall mean a period of six (6) calendar months following the Termination of Construction Period during which the Loan must be fully repaid not later than Final Maturity Date (hereinafter defined).

1.14. "Interest Reserve" shall mean an amount of up to €533,143 (five hundred and thirty three thousand one hundred and fourty three Euro), which Borrower can use under the Loan (hereinafter defined) only for payment of interest under the Loan. The outstanding Principal Balance (hereinafter defined) under the Loan (hereinafter defined) shall be increased by the amount used under the Interest Reserve as of the date of disbursement.

1.15. "Buyer" shall mean the Buyer of a Unit of the Project.

1.16. "Required Repayment Per Unit" shall mean the amount of Principal that the Borrower must repay in order for the Lender to give consent for the mortgage release of the relevant Unit. The Required Repayment Per Unit is listed in Article 9.06.

1.17. "Presale Agreement" shall mean any presale agreement executed between the Borrower and Buyer of one or more Units in the Project.

1.18. "Presale Agreement Date" shall mean the Agreement Date under the Presale Agreement.

1.19. "Final Sale Agreement" shall mean the agreement in the form of a Notary Deed for sale one or more Units from the Project.

1.20. "Final Sale Agreement Date" shall mean the date under the Sale Agreement.

1.21. "Sales Proceeds" refers to the proceeds from selling a Unit in the Project. Sales Proceeds may result from either a Presale Agreement or Final Sale Agreement.

1.22. "Commitment Fee" refers to payment of EUR 1,500 (one thousand and five hundred Euro), transferred to Lender's bank account prior to signing this Agreement.

1.23. "Security date" refers to the date on which the Collateral pursuant to Section XII is properly secured in favor of the Lender pursuant to this Contract and the applicable laws.

SECTION II. GENERAL TERMS AND CONDITIONS

2.01. The Loan. Lender has agreed to provide to Borrower a loan in the amount of up to TWO MILLION SIX HUNDRED AND FIFTY NINE THOUSAND SEVEN HUNDRED AND FOUR EURO (EUR 2,659,704), hereinafter referred to as the "Loan", subject to the terms and conditions set forth herein.

2.02. Currency. The Loan is being granted in EURO, and all calculations of Principal (hereinafter defined), Interest (hereinafter defined), and Penalty Interest (hereinafter defined) shall be made in EURO. ALL PAYMENTS ARE TO BE MADE IN EURO. Borrower understands and acknowledges that Borrower bears all foreign exchange risk.

Заемател/Кредитополучател: ________

Lender/Банка: ________ 

**2.03. Лихвен процент.** Кредитополучателят изплаща на Банката лихва ("Лихва") върху целия размер на Кредита (без Лихвения резерв и Таксата за Управление) в размер на 12% (дванадесет процента) годишно. Лихвата се начислява, дължи и плаща в съответствие с Раздел IX от настоящия Договор.

**2.03. Interest.** Borrower shall pay simple interest ("Interest") to Lender on the full Loan amount (without the Interest reserve and the Loan Management fee) at a fixed rate of twelve percent (12%) per annum. Interest shall accrue, be charged, and paid as provided for in Section IX, hereof.

**2.04. Лихва за забава.** Съгласно Раздел XI от настоящия договор, в случай на неплащане, забавено или частично плащане по Договора за кредит Кредитополучателят дължи Лихва за забава в размер на двадесет и пет процента (25%) годишно върху Неизплатената част от Главницата по Кредита.

**2.04. Penalty Interest.** Pursuant to Section XI of this agreement, in the case of non-payment, late payments or partial payments of interest, Borrower will be liable for additional penalty interest ("Penalty Interest"), which will be determined as twenty five (25%) per annum on the Principal Balance of the Loan.

**2.05. Падеж.** Цялата Главница по Кредита, (дефиниция по-долу) ведно с Лихвата и евентуалната Лихва за забава (дефиниции по-долу), следва да бъдат изплатени в съответствие с Раздел IX, X и XI от настоящия Договор не по-късно от по-ранната от двете дати ("Падеж") – датата на изтичането на 26 (двадесет и шест) месеца от Датата на обезпечението и датата на изтичане на 6 (шест) месеца от Датата на уведомяване.

**2.05. Final Maturity Date.** The full Principal (hereinafter defined) amount of the Loan, plus interest and Penalty Interest (hereinafter defined), if any, must be paid in accordance with Sections IX X, and XI hereof no later than the earlier of twenty six (26) months after Date of Security or six (6) months after the Notification Date ("Final Maturity Date").

**2.06. Предназначение на средствата.** Средствата, предоставени от Банката по настоящия Договор следва да се използват единствено за:

**2.06. Use of Funds.** Funds disbursed by Lender hereunder are to be used exclusively for:

(а) За извършването на строителните работи по Проекта - до 1,864,136 Евро (един милион осемстотин шестдесет и четири хиляди сто тридесет и шест Евро);

(a) For execution of construction works for Project – up to ONE MILLION EIGHT HUNDRED AND SIXTY FOUR THOUSAND ONE HUNDRED AND THIRTY SIX EUR (1,864,136);

(б) Заплащане на дължима лихва ("Лихвен резерв") по Кредита – 533,143 (петстотин тридесет и три хиляди сто четиридесет и три) Евро, които се начисляват и удържат еднократно от сумата на Кредита на Датата на обезпечение.

(b) For interest payments ("Interest reserve") – up to 533,143 (five hundred and thirty three thousand one hundred and fourty three) Euro, which is accrued and withheld from the Loan amount on the Date of Security.

(в) Резерви по Строителния бюджет – до 186,414 Евро (сто осемдесет и шест хиляди четиристотин и четиринадесет Евро).

(c) Contingency Reserve (hereinafter defined) – up to EUR 186,414 (one hundred and eighty six thousand four hundred and fourteen EURO)

(г) Заплащане на Такса за Управление на Кредита в размер на три процента (3%) от сумата на Кредита, или седемдесет и седем хиляди петстотин и единадесет ЕВРО (€77,511), които се начислява и удържа еднократно от сумата на Кредита на датата на Първо предоставяне на средства по Кредита след приспадане на Таксата за ангажимент.

(d) For payment of Loan Management Fee in the amount of three percent (3%) of the amount of the Loan, equal to seventy seven thousand five hundred and eleven EUR (€77,511), which is withheld from the Loan amount on the First Disbursement Date after the "Commitment Fee" is deducted.

## Раздел III. ПРЕДОСТАВЯНЕ НА СРЕДСТВА

## SECTION III. DISBURSEMENT OF FUNDS

**3.01. Предоставяне на средства.**

**3.01. Disbursements of Funds:**

(а) Кредитополучателят може да иска Предоставяне на средства по Член 2.06.(а) единствено за позициите, включени в Строителния бюджет, които са завършени и изпълнени според стандартите, изисквани за Проекта. Кредитополучателят може да иска Предоставяне на средства за Проекта за извършване на строителните работи само по време на Периода на строителството.

(a) Borrower shall only request Disbursements of Funds for works according to the line items of the Construction Budget and which have been completed and are finished according to the standards required for the Project. Borrower may only request for disbursement of funds under the Construction Budget only during the Construction Period.

(б) Средствата от Резервите по Строителния бюджет могат да бъдат използвани след тяхното преразпределение за Строителния бюджет, по реда на Раздел IV от Договора.

(b) The funds from the Contingency can be used only after their allocation or reallocation under the Construction Budget according to Section IV of this Agreement.

(в) Кредитополучателят може да иска Предоставяне на средства от Лихвения резерв до размера, предвиден в чл. 2.06.(б) от настоящия Договор с цел заплащане на дължимата Лихва и/или Такса за ангажимент към Датата на плащане (дефинирано по-долу).

(c) Borrower may only request for Disbursement of funds from the Interest Reserve up to the amount provided in Article 2.06.(b) from this Agreement for payment of the interest and/or Commitment fee due as of the Maturity Date (defined hereunder).

(г) Средствата по Член 2.06.(г) ще бъдат усвоени еднократно, безкасово чрез превод по сметка на Банката.

(d) The funds under Article 2.06.(d) will be transferred directly to a bank account of the Bank.

**3.02. Срок за Първо предоставяне на средства.** Кредитополучателят следва да учреди Обезпечението по настоящия Договор и да поиска Първо предоставяне на средства в срок от 30 (тридесет) дни от Датата на сключване. В случай, че Обезпечението не бъде учредено и такова предоставяне на средства не бъде извършено в този срок поради това, че Кредитополучателят не е поискал или не е изпълнил условията за предоставяне на средства, както е описано в Член 3.03. по-долу, настоящия Договор се прекратява. В този случай Банката не дължи връщане на получената Такса за Ангажимент и Кредитополучателят трябва да заплати незабавно цялата Лихва и Такса за управление.

**3.02. Deadline for Initial Disbursement of Funds.** Borrower must establish the Collateral under this Agreement and request First Disbursement of Funds within thirty (30) days from the Date of Agreement. In case that the Collateral is not established and no First Disbursement of Funds is made in the due term, or Borrower has not fulfilled the conditions for Disbursement of Funds as outlined in Article 3.03. below, this Agreement shall terminate. In this case the Lender will not refund the already received Commitment Fee and the Borrower owes immediately the interest due and the Management Fee.

**3.03. Условия за Предоставяне на средства.** Банката не е длъжна да предостави каквито и да било средства по Кредита докато не бъдат изпълнени следните условия:

**3.03. Conditions for Disbursement of Funds.** Lender shall not be obligated to make any Disbursement of Funds under the Loan until all of the following conditions shall have been met:

(а) Кредитополучателят е подал писмено Искане за Предоставяне на средства по Кредита най-малко пет (5) работни дни преди желаната дата на Предоставяне на средства, удостоверявайки, че декларациите и гаранциите, от раздел XIII, са верни и в сила. Искането за предоставяне на средства трябва да е по форма одобрено от Банката. Кредитополучателят трябва сам да попълни Искането за предоставяне на средства и поема всички рискове и разходи, произтичащи от неправилно попълнени Искания за предоставяне на средства.

(a) Borrower shall have executed a written request for Disbursement of Funds under the Loan at least five (5) Business Days before the desired date for disbursing the funds, certifying that the Representations and Warranties in Section XIII hereof are true and remain in effect. The Disbursement Request must be in a form approved by Lender. The Disbursement Request must be completed by the Borrower; Borrower bears all risks and costs stemming from incorrectly completed Disbursement Requests.

(б) Банката е придобила права върху Обезпечението съгласно Член 12.01. на настоящия Договор, надлежно учредено от

(b) Lender shall have acquired a security interest and rights under the Collateral under Article 12.01. of this Agreement, properly established

| Bulgarian | English |
|---|---|
| Кредитополучателя по предвидения в Закона ред в приемливи за Банката форма и съдържание, придобила е права като бенефициент по всички договори за застраховка, изисквани по Член 14.03. от настоящия Договор и всички споразумения по тези раздели, са в сила и по тях не е налице неизпълнение. | by the Borrower in the due legal way in form and substance acceptable to Lender, and shall have acquired rights as a beneficiary under all insurance agreements required under Article 14.03. of this Agreement and all agreements required by the same sections are in effect without default. |
| (в) Кредитополучателят е предоставил на Банката декларация за свързани лица съгласно изискванията на банковото законодателство (приложена в настоящия Договор като Приложение 5). Кредитополучателят се задължава на всеки шест месеца и при всяка промяна да актуализира данните по декларацията. | (c) Borrower shall have presented to Lender a Declaration of Related Parties as required by Banking Act (attached hereto as Exhibit 5). Borrower is obliged to update the Declaration every six months and upon any change to the required Declaration. |
| (г) Не е настъпил Случай на неизпълнение или случай, който с даване на предизвестие и/или с течение на времето може да се превърне в Случай на неизпълнение (дефинирано по-долу) по Раздел XVI от настоящия Договор. | (d) No Event of Default or event that with notice and/or lapse of time would become an Event of Default (hereinafter defined) under Section XVI of this Agreement shall have occurred and be continuing. |
| (д) От Датата на сключване, или от датата на предходното Предоставяне на средства (в случай, че е извършено такова): (а) не е възникнало нищо, което може да се отрази неблагоприятно на финансовото състояние или бизнес перспективи на Кредитополучателя, или което може да намали вероятността, че Кредитополучателят ще бъде в състояние да изпълни всички свои задължения по настоящия Договор, и (б) не са възникнали никакви значителни загуби или задължения за или по отношение на Кредитополучателя (освен задълженията, които може да са възникнали при условията на съответните разпоредби на настоящия Договор). | (e) Since the Date of Agreement or, as the case may be, the date of the previous Disbursement of Funds: (i) nothing shall have occurred which might materially and adversely affect the Borrower's business prospects or financial condition, or which shall make it improbable that the Borrower will be able to fulfil any of its obligations under this Agreement; and (ii) the Borrower shall not have incurred any material loss or liability (except such liabilities as may be incurred by the Borrower in accordance with the relevant provisions of this Agreement). |
| (е) Кредитополучателят е представил на Банката и периодично актуализира необходимите разрешителни за иницииране, строеж и завършване на Проекта, които се изискват според българското законодателство и от съответните институции. | (f) Borrower has presented to the Lender and periodically updates all required permits and licenses necessary for inception, construction and completion of the Project as required by current Bulgarian legislation and relevant authorities. |
| (ж) Преди всяко Предоставяне на средства, частта от Проекта, която е била завършена към датата на подаване на Искането за предоставяне на средства трябва да е била прегледана и одобрена от Банката или от Представители на Банката. | (g) Before any Disbursement of Funds is made, the portion of the Project that has been completed at the time of the Disbursement Request shall have been inspected and approved by the Lender or Lender's Representative. |
| (з) Едновременно с всяко Искане за предоставяне на средства, Кредитополучателят е представил и актуализиран Строителен бюджет (по образеца от Член 4.05.), от който да е видно отражението на това Предоставяне на средства върху оставащите разходи за строителство. | (h) Borrower shall have provided with each Disbursement Request an updated Construction Budget (as in Article 4.05.) reflecting effect of that Disbursement of Funds on remaining costs. |
| (и) Кредитополучателят е открил при Банката разплащателна сметка, чрез която Банката предоставя средствата по Кредита, а Кредитополучателят изплаща всички предоставени по Кредита средства, както и всички Лихви и Лихва за забава (дефиниция по-долу) така, както това е предвидено в този Договор, ведно с всички разходи за обслужване. | (и) Borrower has opened a current account, through which the Bank disburses Loan funds, and Borrower repays all amounts disbursed under the Loan as well as pays the due Interest and Penalty Interest (hereinafter defined) according to the provisions of this Agreement, along with all service expenses. |
| (й) Кредитополучателят е открил при Банката разплащателна сметка, чрез която Банката предоставя средствата по Кредита, а Кредитополучателят изплаща всички предоставени по Кредита средства, както и всички Лихви и Лихва за забава (дефиниция по-долу) така, както това е предвидено в този Договор, ведно с всички разходи за обслужване. | (п) Borrower has opened a current account, through which the Bank disburses Loan funds, and Borrower repays all amounts disbursed under the Loan as well as pays the due Interest and Penalty Interest (hereinafter defined) according to the provisions of this Agreement, along with all service expenses. |
| 3.04. Всяко Искане за предоставяне на средства трябва да: | 3.04. Each Disbursement Request shall: |
| (а) показва към датата на издаването му всяко перо от Строителния бюджет, което е завършено и за което се иска Предоставяне на средства и/или да указва, че Кредитополучателят иска да погаси задължението си по Лихвата със средствата предвидени в Лихвения резерв. | (a) show each line item of the Construction Budget that has been completed and for which Disbursement of Funds is requested as of the date of the Disbursement Request and/or state that the Borrower wishes to cover Borrower's interest expenses from the Loan and is requesting a drawdown from the Interest Reserve. |
| (б) бъде придружено от такава допълнителна документация, подготвена от Кредитополучателя, заедно с всички приложения и подкрепяща информация, споменати в документацията, каквато Банката по своя преценка може да изисква и чиято форма и съдържание са приемливи за нея. | (b) be accompanied by such supporting documents as Lender may require, the form and content of which must be satisfactory to Lender in exercise of its good faith judgment, executed by Borrower, together with the attachments and back-up information referred to therein. |
| 3.05. Банката има право да откаже Предоставяне на средства по Кредита в описаните по-долу случаи, но без да е ограничен само до тях: | 3.05. Lender Shall Have Right to Refuse Disbursement of Funds, in cases including but not limited to the following: |
| (а) Кредитополучателят може единствено да иска Предоставяне на средства от Строителния бюджет за работи, включени в Строителния бюджет, които са завършени и изпълнени според стандартите, изисквани за Проекта. Банката ще има правото да откаже Предоставяне на средства за пера, работата по които не е завършена или е изпълнена в отклонение от изискваните стандарти по нейна преценка или не е прегледана и одобрена от Банката или от Представителя на Банката. | (a) Borrower shall only request Disbursement of Funds from the Construction Budget for works according to the Construction Budget and which have been completed and are finished according to the standards required for the Project. Lender shall have the right to refuse to make any Disbursement for the line items, which have not, in the good faith opinion of Lender, been completed or are not completed to the required standards or which have not been inspected and approved by Lender or by Lender's Representative. |
| (б) В случай че Кредитополучателят не съдейства на Банката, например като отказва да оправдае строителни разходи или без причина не се съобразява с изискванията на Банката, Банката има право да откаже Предоставяне на средства по Кредита. | (b) If Borrower refuses to cooperate with Lender, for example by refusing to justify construction expenditures or by failing without reason to comply with Lender's requests, Lender shall have the right to refuse Disbursement under the Loan. |
| (в) В случаите, описани в Член 3.03.(г), 3.06., 5.02., 10.03.(в), 10.03.(д) и 16.04.(а). Банката има право да откаже Предоставяне на средства по Кредита. | (c) In the cases under Articles 3.03.(d), 3.06., 5.02., 10.03.(c), 10.03.(e) and 16.04.(a). Lender shall have the right to refuse Disbursement of Funds under the Loan. |

Borrower/Кредитополучател: [signature]

Lender/Банка: [signature]

**3.06. Съответствие на Строителния бюджет.** Кредитът ще бъде контролиран на принципа на "балансиране достатъчност на средствата". Ако в някой момент по мнение на Банката, остатъкът от одобрените средства по Кредита не е достатъчен за довършване на Проекта, Банката може да откаже Предоставяне на средства по Кредита, докато не бъде възстановен Баланс на Строителния бюджет (дефинирано по-долу) по Кредита. Неоправдано забавяния ще се считат за Забавяне на Строителството по Член 18.01(с).

**3.06. Adherence to Construction Budget.** The Loan will be monitored on a balance-to-complete basis. If at any time in the Lender's opinion, the remaining Loan proceeds are not sufficient to complete the Project, the Lender shall have the right to refuse Disbursement of Funds under the Loan until the Construction Budget (hereinafter defined) is in Balance (hereinafter defined). Unreasonable delays, however, may be judged a Delay in Construction under Article 18.01(f).

**3.07. Дата на предоставяне.** За дата на предоставяне на средства се счита датата, на която разплащателната сметка на Кредитополучателя, открита при Банката съгласно член 3.03.(и) по-горе, бъде заверена със сумата, указана в съответното Искане за предоставяне на средства.

**3.07. Date of Disbursement.** The date of disbursement is considered to be the date the requested funds are transferred to the Borrower's account with the Bank as per Article 3.03(и), pursuant to the instructions on the respective Disbursement Request.

**3.08.** Кредитът се отчита по отделна заемна сметка и средствата по Кредита се предоставят по разплащателната сметка, открита на името на Кредитополучателя при Банката, така както е предвидено в член 3.03 (и) по-горе.

**3.08.** The Loan will be accounted by a separate account and the Loan funds will be disbursed to the current account opened in the name of the Borrower with the Bank, as provided in Article 3.03.(и) above.

**Раздел IV. СТРОИТЕЛЕН БЮДЖЕТ**

**SECTION IV. CONSTRUCTION BUDGET**

**4.01.** Кредитополучателят декларира и гарантира, че по неговата добросъвестна преценка:

(а) общите разходи за завършване на Проекта няма да надхвърлят Строителния бюджет (Член 4.05.);

(б) Кредитополучателят ще спазва Строителния бюджет.

**4.01.** The Borrower represents and warrants that in Borrower's best estimate:

(a) the total cost of constructing the Project shall not exceed the Construction Budget (Article 4.05.);

(b) The Borrower shall adhere to the Construction Budget.

**4.02. <u>ИНВЕСТИЦИЯ НА КРЕДИТОПОЛУЧАТЕЛЯ. ПРЕДИ ДАТАТА НА ПЪРВО ПРЕДОСТАВЯНЕ НА СРЕДСТВА, КРЕДИТОПОЛУЧАТЕЛЯТ ТРЯБВА ДА Е НАПРАВИЛ ТАКЪВ РАЗМЕР ОТ СЪВКУПНИТЕ РАЗХОДИ ЗА СТРОИТЕЛСТВОТО, КОЙТО ДА Е ДОСТАТЪЧЕН ЗА ДА ОСИГУРИ, ЧЕ ОСТАВАЩИТЕ РАЗХОДИ ЗА СТРОИТЕЛСТВО ПО ПРОЕКТА НЕ НАДВИШАВАТ РАЗМЕРА НА КРЕДИТА.</u>**

**4.02. <u>THE BORROWER'S INVESTMENT. BEFORE THE INITIAL DISBURSEMENT DATE, THE BORROWER SHALL HAVE PAID A SUFFICIENT AMOUNT OF THE TOTAL CONSTRUCTION COSTS SO THAT THE REMAINING CONSTRUCTION COSTS OF THE PROJECT DO NOT EXCEED THE LOAN AMOUNT.</u>**

**4.03.** Кредитополучателят е представил на Банката и Банката е одобрила Строителния бюджет (Член 4.05.) за завършване на Проекта. Всички промени в Строителния бюджет подлежат на предварително писмено одобрение от Банката. Кредитополучателят може, с разрешение на Банката, да разпределя Резервите по Строителния бюджет (дефинирани по-долу) по перата на Строителния бюджет. Одобрението от Банката на Строителния бюджет не означава приемането или съгласието на последната, че всички разходи са точно или правилно отразени в Строителния бюджет, като отговорността за това остава изцяло на Кредитополучателя.

**4.03.** Borrower has submitted to Lender, and Lender has approved, the Construction Budget (Article 4.05.) for completion of the Project. All changes to the Construction Budget shall in all respects be subject to the prior written consent and approval of Lender. Borrower may with Lender's approval allocate the Contingency Reserve (hereinafter defined) to line items in the Construction Budget. Lender's approval of the Construction Budget does not constitute a representation or agreement by Lender that all such costs are accurate or properly reflected in the Construction Budget, the responsibility thereof being solely that of the Borrower.

**4.04. Бюджетни пера.** Строителният бюджет включва следните пера: подробно изчислена разбивка на преките разходи по Проекта, включително всички разходи за инсталации и оборудване, всички плащания по строителни подизпълнителски договори.

**4.04. Budget Line Items.** The Construction Budget includes the following line items: an itemized breakdown of all direct costs of the Project, including all costs of fixtures and equipment for the same, all construction contractors payments, general overhead, and reimbursements.

**4.05. Строителен бюджет:**

**4.05. Construction Budget:**

| Stage of Construction | Етап на строителството | Unit<br>Мярка | Quantity<br>Количество | Unit Cost<br>Единична цена (в Евро) | Estimated Cost in EUR after ADVANCE<br>Цена в Евро след АВАНС |
|---|---|---|---|---|---|
| ADVANCE | АВАНС | | | | 188,413.60 |
| Stage 1: organizing construction | Етап 1: Организация на строителството | | | | - |
| [illegible] | Скеле | m2 | | | - |
| [illegible] | Повдигачи /кранове, асансьори/ | мсм | | | - |
| Fencing | Ограждане и временна ограда | м | | | - |
| Demolition and garbage removal | Събаряне на постройки и извозване на отпадъци | бр. | | | - |
| Temporary traffic organization | Временна организация на движението | сума | | | - |
| Removal of trees | Изсичане на дърветата | бр. | | | - |
| Temporary construction | Временни постройки | бр. | | | - |
| Stage 2: excavation | Етап 2: Земни работи | | | | - |
| Excavation | Изкопни работи | м3 | | | - |
| Soil removal | Извозване на земни маси | м3 | | | - |
| Stage 3: concrete rough construction | Етап 3: Бетонови работи и грубо строителство | | | | - |
| Foundations 1) Forms | Фундаменти 1) Кофражи | м2 | | | - |
| Foundations 2) Steel reinforcement | Фундаменти 2) Армировка | кг | | | - |
| Foundations 3) Concrete | Фундаменти 3) Бетонови работи | м3 | 1783.00 | € 60.00 | 96,292.00 |
| Slabs 1) forms | Плочи 1) Кофражи | м2 | 11334.93 | € 12.82 | 125,703.44 |
| Slabs 2) steel reinforcement | Плочи 2) Армировка | кг | 158868.97 | € 0.80 | 113,915.48 |
| Slabs 3) concrete | Плочи 3) Бетонови работи | м3 | 2266.62 | € 60.00 | 122,406.64 |
| Columns 1) forms | Колони 1) Кофражи | м2 | 2709.11 | € 7.00 | 17,067.41 |
| Columns 2) steel reinforcement | Колони 2) Армировка | кг | 58998.45 | € 0.80 | 42,352.28 |
| Columns 3) concrete | Колони 3) Бетонови работи | м3 | 842.84 | € 60.00 | 45,513.09 |
| Beams 1) forms | Греди 1) Кофражи | м2 | 0.00 | € 0.00 | - |
| Beams 2) steel reinforcement | Греди 2) Армировка | кг | 0.00 | € 0.00 | - |
| Beams 3) concrete | Греди 3) Бетонови работи | м3 | 0.00 | € 0.00 | - |
| Bearing walls 1) forms | Носещи стени и шайби 1) Кофражи | м2 | 10695.64 | € 6.00 | 47,680.39 |
| Bearing walls 2) steel reinforcement | Носещи стени и шайби 2) Армировка | кг | 80659.31 | € 0.80 | 57,901.59 |
| Bearing walls 3) concrete | Носещи стени и шайби 3) Бетонови работи | м3 | 1151.87 | € 60.00 | 62,201.22 |
| Stage 4: brick rough construction | Етап 4: Зидарски работи | | 0.00 | € 0.00 | - |
| Bottom half of building | Зидария в щазе и сутерен | м2 | 687.58 | € 9.26 | 4,899.30 |
| Top half of building - external | Етажна зидария - външна | м3 | 476.00 | € 78.46 | 34,049.31 |

Borrower/Кредитополучател: ____________

Lender/Банка: ____________

| Top half of building - internal | Етажна зидария - вътрешна | m2 | 5447.12 | € 12.18 | 59,711.35 |
|---|---|---|---|---|---|
| Architectural masonry (if it exists) | Фугирана фасадна зидария | м3 | 0.00 | € 0.00 | - |
| Stage 5: roof | Етап 5 : Покриви | | 0.00 | € 0.00 | - |
| Roof structure from wood | Покривна конструкция от дърво | м3 | 0.00 | € 0.00 | - |
| Concrete on roof | Керамзитобетон покрив | м2 | 0.00 | € 0.00 | - |
| Wood on roof (if it exists) | Дъсчена обшивка | м2 | 0.00 | € 0.00 | - |
| Roof sheeting | Покривна обшивка от ламарина | м2 | 0.00 | € 0.00 | - |
| Plaster | Замазки | м2 | 0.00 | € 0.00 | - |
| Roof plastic cover | Покривна мушама | м2 | 1420.78 | € 8.28 | 10,584.85 |
| Roof cover | Покривно покритие | м2 | 1420.78 | € 10.13 | 12,958.11 |
| Thermoinsulation | Топлоизолация | м2 | 1420.78 | € 12.66 | 16,062.63 |
| Chimneys | Комини | бр. | 26.90 | € 100.00 | 2,600.75 |
| Gutters | Улуци и улеи | м | 139.87 | € 7.91 | 994.85 |
| Stage 6: hydro insulation | Етап 6: хидроизолации | | 0.00 | € 0.00 | - |
| Hydroinsulation - balconies | Хидроизолация - тераси | м2 | 1664.67 | € 8.68 | 14,358.72 |
| Hydroinsulation - foundations | Хидроизолации - основи | м2 | 738.48 | € 5.33 | 3,539.92 |
| Thermoinsulation | Топлоизолация | м2 | 8105.34 | € 11.78 | 64,843.60 |
| Stage 7: plaster | Етап 7: мазилки | | 0.00 | € 0.00 | - |
| Internal | Вътрешни | м2 | 23383.06 | € 4.83 | 101,725.59 |
| External | Външни | м2 | 2292.51 | € 6.65 | 17,849.38 |
| [illegible] | Шпакловки | м2 | 22976.68 | € 3.03 | 62,559.61 |
| Decorative elements | Декоративни елементи | м | 0.00 | € 0.00 | - |
| Stage 8: flooring | Етап 8: настилки | | 0.00 | € 0.00 | - |
| Plaster | Замазки | м2 | 10696.64 | € 2.60 | 24,793.80 |
| [illegible] | Паркети | м2 | 0.00 | € 0.00 | - |
| [illegible] | Теракоти | м2 | 0.00 | € 0.00 | - |
| Marble | Мрамори | м2 | 0.00 | € 0.00 | - |
| [illegible] | Гранитогрес | м2 | 0.00 | € 0.00 | - |
| [illegible] | Мозайки | м2 | 873.68 | € 11.67 | 10,139.36 |
| Stage 9: windows and doors | Етап 9: Дограма | | 0.00 | € 0.00 | - |
| Windows | Прозорци | м2 | 1311.07 | € 115.38 | 136,122.80 |
| External doors | Външни врати | бр. | 27.29 | € 238.82 | 6,516.60 |
| Garage doors | Гаражни врати | бр. | 12.04 | € 457.48 | 4,957.22 |
| Internal doors | Вътрешни врати | бр. | 524.16 | € 51.08 | 28,816.20 |
| Storage areas' doors | Врати - мазета | бр. | 72.24 | € 48.90 | 3,178.41 |
| Stage 10: painting | Етап 10: боядисване | | 0.00 | € 0.00 | - |
| Latex | Латекс | м2 | 22976.68 | € 4.31 | 89,126.61 |
| [illegible] | Постно | м2 | 0.00 | € 0.00 | - |
| Oil paint windows | Блажна боя прозорци | м2 | 0.00 | € 0.00 | - |
| Oil paint doors | Блажна боя врати | м2 | 0.00 | € 0.00 | - |
| Radiators, pipes | Радиатори, тръби | м2 | 0.00 | € 0.00 | - |
| [illegible] | Парапети | м2 | 0.00 | € 0.00 | - |
| Stage 11: ironware | Етап 11: железарски работи | | 0.00 | € 0.00 | - |
| [illegible] | Парапети | м | 568.31 | € 37.19 | 19,022.56 |
| [illegible] on balconies | Обшивка балкони | м2 | 0.00 | € 0.00 | - |
| [illegible] | Капаци | бр. | 0.00 | € 0.00 | - |
| Metal frames | Метални рамки | бр. | 0.00 | € 0.00 | - |
| [illegible] | Обшивки | м2 | 0.00 | € 0.00 | - |
| Other | Други | м2 | 0.00 | € 0.00 | - |
| Stage 12: outside | Етап 12: вертикална планировка | | 0.00 | € 0.00 | - |
| [illegible] | Настилки | м2 | 235.98 | € 14.13 | 3,001.58 |
| [illegible] | Външно отводняване | м2 | 0.00 | € 0.00 | - |
| Landscaping | Озеленяване | м2 | 0.00 | € 0.00 | - |
| Stage 13: water supply and sewerage system | Етап 13: ВиК инсталации | | 0.00 | € 0.00 | - |
| Water supply connection | Външна водопроводна връзка | м | 60.20 | € 30.02 | 1,626.44 |
| Sewerage connection | Външна канална връзка | м | 60.20 | € 32.03 | 1,735.31 |
| Vertical inside pipes - water | Вертикални разводки - водопровод | м | 2145.82 | € 5.19 | 10,018.63 |
| Horizontal inside pipes - water | Хоризонтални разводки - водопровод | м | 821.96 | € 4.49 | 3,322.97 |
| Vertical inside pipes - sewage | Вертикални разводки - канал | м | 716.21 | € 5.61 | 3,545.37 |
| Horizontal inside pipes - sewage | Хоризонтални разводки - канал | м | 346.37 | € 4.79 | 1,602.26 |
| [illegible] | Смесителни батерии | бр. | 0.00 | € 0.00 | - |
| Sanitary units | Санитарен фаянс | бр. | 0.00 | € 0.00 | - |
| [illegible] | Душ-кабини/вани | бр. | 0.00 | € 0.00 | - |
| Bathroom cupboards | Тоалетни шкафчета | бр. | 0.00 | € 0.00 | - |
| Water meters | Водомери, кранове | бр. | 960.22 | € 12.24 | 10,677.82 |
| Stage 14: electrical transformer with connections | Етап 14: трафопост и външни ел връзки | | 0.00 | € 0.00 | - |
| Construction of transformer hut | Трафопост - АС част | м2 | 9.63 | € 123.78 | 1,073.10 |
| Equipment | Оборудване | бр. | 0.80 | € 36,420.01 | 27,755.76 |
| Cable lines | Кабелни линии | м | 240.81 | € 27.70 | 6,002.67 |
| Stage 15: electrical installation, including telephone | Етап 15: ел инсталация, включително телефон | | 0.00 | € 0.00 | - |
| Apartment panels | Апартаментни табла | бр. | 122.01 | € 48.00 | 5,270.65 |
| Main panel | Главно ел. табло | компл. | 3.21 | € 2,033.92 | 5,877.46 |
| Switches, sockets | Ел. обзавеждане | бр. | 2440.21 | € 2.66 | 6,839.04 |
| Cables | Кабели | м | 30952.11 | € 0.89 | 24,728.15 |
| TV and/or computer cables | TV / компютърни и нисковолтови връзки | м | 6100.52 | € 1.60 | 8,809.06 |
| Stage 16: heating and ventilation | Етап 16: отопление и вентилация | | 0.00 | € 0.00 | - |
| [illegible] exchanger | Абонатна станция | бр. | 1.61 | € 8,876.65 | 12,825.81 |
| Radiators | Радиатори | бр. | 3852.96 | € 7.26 | 25,181.85 |
| Pipes | Комплект разводки | м | 429.64 | € 5.83 | 7,248.61 |
| Air-conditioning | Климатизатор-комплект | компл. | 0.00 | € 0.00 | - |
| Stage 17: extra finishes | Етап 17: Допълнително обзавеждане | | 0.00 | € 0.00 | - |
| Kitchen | Кухни | компл. | 0.00 | € 0.00 | - |
| common area fixtures (e.g. Cabinets) | Коридорни гардероби и шкафове | компл. | 0.00 | € 0.00 | - |
| Stage 18: elevator | Етап 18: асансьор | | 0.00 | € 0.00 | - |
| Supply | Доставка | компл. | 4.01 | € 13,695.00 | 49,468.39 |

Вентовит/Кредитополучател: __________

Lender/Банка: __________

| Installation | Монтаж | компл. | 4.01 | € 2,139.00 | 7,726.39 |
|---|---|---|---|---|---|
| TOTAL | ОБЩО | | | | 1,854,136.00 |

**4.06. Разпределение на Резервите по Строителния бюджет и икономии.** Кредитополучателят има право (но не е задължен):

(а) периодично да разпределя и преразпределя Резервите по Строителния бюджет по перата на Строителния бюджет.

(б) при наличие на икономии (по усмотрение на Банката, след отчитане, заедно с всяка друга релевантна информация, състоянието на завършеност на работата по съществуващи договори, подизпълнителски договори и други споразумения, както и съветите на Представителя на Банката по някое или някои от перата на Строителния бюджет. Банката се съгласява да разрешава разпределяне и преразпределяне на такива икономии между други пера на Строителния бюджет по писмено искане на Кредитополучателя (отправено не по-често от един път месечно). Заедно с всяко такова искане Кредитополучателят ще представя на Банката цялата документация и информация, която служи за доказване на икономиите.

**4.06. Allocation of Contingency Reserve and cost savings.** Borrower shall be entitled (but shall not be obligated):

(a) to allocate and reallocate from time to time the Contingency Reserve among the various line items of the Construction Budget.

(b) if there shall be demonstrated cost savings (as determined in good faith by Lender after taking into account, among other relevant information, the state of completion of the work under existing contracts, subcontracts, and other agreements, the provisions of such contracts, and the advice of the Lender's Representative) in any one or more line item(s) of the Construction Budget, Lender agrees to permit allocation and reallocation of such cost savings among other line items of the Construction Budget, upon written request from Borrower (submitted not more frequently than once a month). With any such request Borrower shall provide Lender all documentation and information on which Borrower intends to rely to show such demonstrated cost savings.

4.07. В случай, че непредоставените по Кредита средства по определено перо от Строителния бюджет са недостатъчни за завършване на работите по това перо, то Банката има право да разпредели оставащите на разположение Резерви по Строителния бюджет за покриване на този недостиг. Ако Резервите по Строителния бюджет са недостатъчни за покриване на недостига, то Кредитополучателят е длъжен да финансира със собствени средства недостига по това перо до пълното завършване на работите по него.

4.07. If the aggregate amount not yet disbursed under the Loan under any line item from the Construction Budget is not enough to complete construction works under this line item, Lender has the right to apply the remaining available Contingency Reserve to this line item to cover the shortfall. If the Contingency Reserve is not enough to cover the shortfall, Borrower shall cover the shortfall through investing his own funds until the construction works under this line item are fully completed.

## Раздел V. БАЛАНСИРАНЕ НА КРЕДИТА

**5.01. Балансиран Кредит.**

(а) Кредитът е балансиран ("Балансиран"), когато по Преценка на Банката цялата неизползвана сума по Кредита в частта на Строителния бюджет или отделни негови пера, е достатъчна за финансиране на завършването на всички работи по Строителния бюджет и по всяко отделно негово перо.

(б) Независимо от всякакви други условия и уговорки по настоящия Договор, Кредитът трябва във всеки момент да е Балансиран. В случай, че Кредитът не е Балансиран, се прилагат разпоредбите и изискванията на Член 4.07.

5.02. Банката се освобождава от задължението си да предоставя каквито и да е средства по Кредита по което и да е перо, докато Кредитът не е Балансиран. Ако в даден момент се появи Недостиг на средства, като резултат от завишаване на Преценката на Банката, налагащ Кредитополучателят да извърши Плащане при недостиг на средства, тогава Преценката на Банката трябва да се изрази в писмен вид, включващ детайлиране на основанията за Преценката на Банката.

5.03. По всяко време размерът на Предоставените средства по Кредита, увеличен с размера на оставащите разходи за строителство трябва да е по-малък от размера на Кредита. Винаги, когато по Преценка на Банката (дефинирано по-долу), размерът на средствата по Кредита, които все още не са предоставени, не е достатъчен, за да покрие оставащите разходи по Проекта, Кредитополучателят ще депозира при Банката такава сума, която, добавена към все още непредоставените средства по Кредита ще е достатъчна, за да покрие оставащите разходи по Проекта. Всички такива депозирани средства при Банката ще бъдат предоставени при условията на настоящия Договор и ще бъдат предоставяни от Банката при условията за Предоставяне на средства по настоящия Договор преди предоставянето на останалите средства по Кредита.

5.04. Кредитополучателят приема, че Банката има право периодично и по свое усмотрение да прави и променя преценката си за бъдещите разходи по всяко перо от Строителния бюджет, които Кредитополучателят ще понесе във връзка с Проекта ("Преценка на Банката"). Що се отнася до стойността на строителните работи, Преценката на Банката ще взема под внимание съветите на Представителя на Банката, съществуващите условия по сключени договори и писмени търгове с приемливи партньори и доставчици на материалите, приемливи за Банката, процентът на завършеност на работите, както и такива разпределения за резерви, каквито Банката прецени за подходящи по нейна преценка.

5.05. Преценката на Банката включва още и съображения, които Банката по свое усмотрение счете за релевантни или можещи да окажат влияние върху Строителния Бюджет, като текущи анализи, разходи за материали и наличност на материали, доставчици, сегашни и бъдещи пазарни очаквания, както и способността на трети лица да изпълняват задълженията си по сключени договори и писмени търгове.

## SECTION V. LOAN BALANCING

**5.01. Loan to be in Balance**

(b) The Loan shall be determined to be in balance ("In Balance") only if the aggregate amount not yet disbursed under the Loan in the part of the Construction Budget or certain line items from it is enough to support the completion of all construction works under the Construction Budget and the separate line items.

(a) Anything contained in this Agreement to the contrary notwithstanding, it is expressly understood and agreed that the Loan must at all times be in balance. If at any time the Loan is not in Balance, Borrower shall be complying with the requirements of Article 4.07. hereof).

5.02. Lender shall be under no obligation to make any Disbursements under the Loan for any line item as long as the Loan is not in Balance. If, at any time or times, an increase in the Lender's Estimate would result in a Deficiency requiring Borrower to make a Deficiency Payment, then Lender's Estimate shall be in writing and shall set forth in reasonable detail the basis for Lender's Estimate.

5.03. At no time shall the total amount of Disbursements made by the Lender to the Borrower under this Agreement, when added to the remaining costs to complete the Project exceed the Loan Amount. If at any time, in the reasonable Lender's Estimate, the then undisbursed portion of the Loan shall be insufficient to defray the remaining cost of the Project, the Borrower shall deposit funds with the Lender that, when added to the undisbursed portion of the Loan, will be sufficient, in the Lender's opinion, to satisfy the remaining cost of completing the Project. All funds so deposited with the Lender shall be disbursed under the terms of this Agreement and shall be advanced by the Lender under the terms for Disbursement of Funds set in this Agreement before advancing any proceeds of the Loan.

5.04. Borrower agrees that from time to time Lender shall have the right to make and/or revise, in its good faith judgment, an estimate of the future costs and expenses of each line item of the Construction Budget which may be incurred by Borrower in connection with the Project ("Lender's Estimate"). Lender's Estimate as it relates to cost of construction, shall take into consideration the advice of Lender's Representative, the existence and terms of any executed contracts or written bids with responsible contractors and materials suppliers satisfactory to Lender, the percentage of completion of the work, and such allowances for reserves as Lender shall deem appropriate, in Lender's good faith judgment.

5.05. In addition, Lender's Estimate shall take into account other considerations which Lender, in its good faith judgment, deems relevant or likely to have an impact upon the Construction Budget, including current costs for and availability of materials, and suppliers, current and expected future market considerations, and the ability of third parties to perform in accordance with the terms of executed contracts or written bids.

## Раздел VI. ОСЪЩЕСТВЯВАНЕ НА ПРОЕКТА

6.01. Кредитополучателят за своя сметка ще предприеме всички необходими действия за да завърши Проекта и да получи Разрешение за Ползване своевременно, преди изтичане на Периода на

## SECTION VI. CONSTRUCTION OF PROJECT

6.01. The Borrower shall, at its expense, take all necessary actions to construct the Project and obtain the Permit for Usage in a timely manner, no later than the Termination of Construction Period. The

Borrower/Кредитополучател: ____________

Lender/Банка: ____________

Строителство. Проектът трябва да бъде завършен професионално и при спазване на изискванията на строителните норми и правила, на Българския Държавен Стандарт, на архитектурния проект и на другите спецификации, които са били предоставени на Банката и са били одобрени от нея (приложени като Приложение 1). Освен това, Проектът трябва да бъде построен законно при спазване на всички изисквания за строителство, безопасност, териториално устройство, опазване на околната среда и всички други изисквания на съответните общински или държавни органи.

Project shall be completed in a workmanlike manner and in compliance with statutory construction rules and norms, the Bulgarian State Standards, and the Plans and specifications previously submitted to and approved by the Lender (attached as Exhibit 1). In addition, the Project shall be legally constructed in compliance with all building, safety, zoning, environmental, and any other requirements of any municipal, or government authority.

6.02. Промяна на архитектурните проекти. Банката има право по всяко време да изисква стриктно спазване на одобрените архитектурни проекти.

6.02. Changes to the Plans. The Lender shall at all times have the right to require strict compliance with the Plans.

6.03. Спазване на одобрените архитектурни проекти. Всички средства, материали и оборудване използвани за завършване на Проекта следва да съответстват на одобрените архитектурни проекти и на техните изменения (ако има такива), одобрени от Банката. Освен това, работата по Проекта не може да нарушава никакви нормативни актове или други рестриктивни условия.

6.03. Compliance with the Plans. All materials, fixtures, equipment and other articles used in the construction or equipping of the Project shall comply with the Plans, as modified by any changes approved by the Lender. In addition, the Project shall not be constructed in violation of any restrictive covenants, laws, statutes, ordinances, or other governmental rules or regulations.

6.04. Ако Кредитополучателят или негов съдружник участват като контрагент, доставчик или оказват услуги от свое име или чрез друго лице, в което те или друго лице, свързано с тях, притежават дял в него или го управляват ("Свързан интерес"), като между Кредитополучателя и това друго лице, участващо като контрагент, доставчик или оказващо услуги или по друг начин, е сключен договор, то настоящият договор между страните, между Свързани интереси, ще се смята само и единствено като приблизителна оценка за целите на настоящия член. Кредитополучателят е длъжен да уведомява незабавно Банката при възникване, по какъвто и да е повод, на свързан интерес.

6.04. Restriction on Related Interest. If Borrower or any affiliate of Borrower shall act as a contractor or supplier or service provider in its own name or through a separate entity in which it or any entity related to it has an ownership interest or control ("Related Interest") between Borrower and any party acting as a contractor, supplier, service provider or otherwise, any contract between parties having such identity of interest shall be regarded solely as an estimate for the purposes of this article. Borrower is obliged to immediately inform Lender whenever a Related Interest arises.

## Раздел VII. ДОПЪЛНЕНИЯ И ПРОМЕНИ НА ПРОЕКТА

## SECTION VII. EXTRAS AND PROJECT CHANGES

7.01. Кредитополучателят е длъжен да информира Банката относно намеренията си за промени в плановете и спецификациите на Проекта и да получи предварително писмено съгласие от Банката за всяка промяна в плановете и спецификациите на Проекта.

7.01. Borrower has the obligation to inform Lender of intentions to change plans and specifications. The prior written consent of Lender shall always be required for any changes in the plans and specifications for the Project.

(а) Ако Кредитополучателят не получи преди промените писмено одобрение от Банката и извърши тези промени, счита се че е налице Случай на Неизпълнение по настоящия Договор.

(a) Failing to receive prior written consent and still carrying out the changes will be considered an Event of Default.

7.02. Кредитополучателят ще представя предложените промени в плановете или спецификациите не по-късно от десет (10) Работни дни преди началото на строителството на съответния етап, засягащ промените. Кредитополучателят е длъжен да се увери и да удостовери, че тези предложени промени са съобразени с изискванията на закона. Кредитополучателят своевременно ще представя на Банката всички промени в спецификациите по Проекта.

7.02. Borrower shall submit any proposed changes in the plans and specifications at least ten (10) Business Days prior to commencement of the construction stage relating to such change. Borrower is responsible for ensuring the legality of such a change. Borrower shall deliver promptly to Lender all changes in the specifications of the Project.

## Раздел VIII. ПРАВО НА БАНКАТА ДА НАЗНАЧИ СВОЙ ПРЕДСТАВИТЕЛ

## SECTION VIII. LENDER'S RIGHT TO EMPLOY LENDER'S REPRESENTATIVE

8.01. Банката има право да назначи и/или наеме за своя сметка Представител на Банката, който да преглежда плановете, спецификациите, документите и всички други материали по Проекта, както и да инспектира всички действия, свързани със строежа и неговия напредък. Банката има право да участвува в издаването на всички необходими документи в процеса на строителството.

8.01. Lender shall have the right to appoint and/or employ at its expense Lender's Representative to review the plans, specifications, documents, and all other Project materials and to inspect all matters related to the construction and progress of the same. Lender shall have the right to participate during issuance of all documents relevant to the construction process.

8.02. Кредитополучателят ще съдейства (като осигури и съдействието на трети лица - договорни партньори) на Банката при организирането на инспекциите на строителните работи от Представител на Банката, както и от всички други представители на Банката, упълномощени в даден момент.

8.02. Borrower will cooperate (and will cause third-party contractors to cooperate) with Lender in arranging for inspections of the progress of the construction by Lender's Representative and other representatives of Lender, from time to time.

## РАЗДЕЛ IX. ИЗПЛАЩАНЕ НА ЛИХВИТЕ, ГЛАВНИЦАТА И ТАКСИТЕ ПО КРЕДИТА

## SECTION IX. PAYMENT OF INTEREST, PRINCIPAL AND TAXES DUE ON THE LOAN

9.01. Задължение на Кредитополучателя за плащане. При условията на настоящия Договор, Кредитополучателят неотменимо и безусловно се задължава да плати всички суми, действително предоставени по Кредита ("Главница") и да плати всички Лихви и Лихва за забава (дефинирани по-долу) така, както това е предвидено в настоящия Договор, заедно с всички разходи за обслужване.

9.01. Scope of Borrower's Obligation for Payment. Under this Agreement, Borrower irrevocably and unconditionally obligates itself to repay all amounts actually disbursed under the Loan ("Principal"), and payment of all Interest and Penalty Interest (hereinafter defined), as required under this Agreement, plus any servicing expenses.

9.02. Начисляване на Лихва.

(а) Плащане на Лихвата. ЦЯЛАТА ЛИХВА В РАЗМЕР НА 533,143 ЕВРО (ПЕТСТОТИН ТРИДЕСЕТ И ТРИ ХИЛЯДИ СТО ЧЕТИРИДЕСЕТ И ТРИ ЕВРО) ИЗЧИСЛЕНА СЪГЛАСНО ЧЛ. 2.03. И ЧЛ. 9.02. СЕ ДЪЛЖИ НАВЕДНЪЖ ОТ КРЕДИТОПОЛУЧАТЕЛЯ И СЕ УДЪРЖА ОТ ЛИХВЕНИЯ РЕЗЕРВ НА ДАТАТА НА ПЪРВО ПРЕДОСТАВЯНЕ НА СРЕДСТВА, КАТО АКО ТАКОВА НЕ БЪДЕ ИЗВЪРШЕНО В СРОКА ПО ЧЛЕН 3.02, КРЕДИТОПОЛУЧАТЕЛЯТ НЕ МОЖЕ ДА ИЗВЪРШВА ПОВЕЧЕ УСВОЯВАНИЯ И ЛИХВАТА СЕ ДЪЛЖИ НА ПЪРВИЯ ДЕН СЛЕД ИЗТИЧАНЕ НА ТОЗИ СРОК.

9.02. Interest Accrual.

(a) Interest Payment. THE INTEREST IN THE FULL AMOUNT OF 533,143 (FIVE HUNDRED AND THIRTY THREE THOUSAND ONE HUNDRED AND FOURTY THREE EURO) SHALL BE DUE FROM BORROWER AT ONCE AND IS WITHHELD FROM THE INTEREST RESERVE ON THE DATE OF FIRST DISBURSEMENT OF FUNDS WHEREAS IF SUCH A DISBURSEMENT IS NOT MADE WITHIN THE DUE TERM PURSUANT TO ART. 3.02, THE BORROWER CAN NOT REQUEST FURTHER DISBURSEMENT OF FUNDS AND INTEREST IS DUE ON THE FIRST DATE AFTER THE TERMINATION OF THE PERIOD.

9.03. Плащания

9.03. Payment

(а) Плащане на Лихвата. ЦЯЛАТА ЛИХВА В РАЗМЕР НА 533,143 ЕВРО (ПЕТСТОТИН ТРИДЕСЕТ И ТРИ ХИЛЯДИ СТО ЧЕТИРИДЕСЕТ И ТРИ

(a) Interest Payment. THE INTEREST IN THE FULL AMOUNT OF 533,143 (FIVE HUNDRED AND THIRTY THREE THOUSAND ONE

Borrower/Кредитополучател: ____

Lender/Банка: ____

[illegible] ЕВРО) НАЧИСЛЕНА СЪГЛАСНО ЧЛ. 3.03. И ЧЛ. 9.02. СЕ ДЪЛЖИ НАВЕДНЪЖ ОТ КРЕДИТОПОЛУЧАТЕЛЯ НА ДАТАТА НА ОБЕЗПЕЧЕНИЕ НА ТОЗИ ДОГОВОР.

HUNDRED AND FOURTY THREE EURO) SHALL BE DUE FROM BORROWER ON THE DATE OF SECURITY.

(б) Плащане на Главницата.

(b) Principal Payment.

(ба) Изплащането на Главницата се извършва както през Периода на Строителство, така и през Периода на Продажби и не по-късно от датата на Падежа.

(ba) Repayment of Principal shall be made during either the Construction Period or the Sales Period, no later than Final Maturity Date.

(бб) Изплащане на Главницата може да става периодично по време на Кредита, според изискванията, описани в Член 9.08. и Раздел X.

(bb) Repayment of Principal can occur periodically throughout the Loan, subject to the requirements outlined in Article 9.08. and Section X.

9.04. [illegible] платени съгласно член 9.03. е окончателна и не подлежи на промени, нито на връщане, дори и в случаите когато Кредитополучателят независимо от причината не усвои пълният размер на Главницата или изобщо не направи усвояване по този Договор.

9.04 The interest paid pursuant to article 9.03. is final and subject to no changes, nor reimbursement, even in cases whereas the Borrower does not use the full amount of the Principal or does not use any amount of the Principal, for whatever reason.

9.05. Постъпления от продажби. Всички Постъпления от продажби се [illegible] от Кредитополучателя на Банката до пълно изплащане на дължимите суми по Кредита. Постъпления от продажба на всеки отделен Обект се изплащат на Банката най-малко до размера на Дължимата сума за съответния Обект както тя е определена в Член 9.06 по-долу. Купувачът също може да плаща директно на Банката.

9.05 Sales Proceeds. All Sales Proceeds must be paid by Borrower to Lender, until the amount due under the Loan is fully repaid. Sales Proceeds from each Unit must be paid up to at least the Required Repayment Per Unit defined in Article 9.06. below. Buyer can also pay Lender directly.

(а) Постъпленията от продажби ще се прилагат за погасяване така както е описано в Член 9.09.

(a) Sales Proceeds shall be applied in the order outlined in Article 9.09.

(б) Постъпленията от продажби са предмет на допълнителни условия, описани в Раздел X.

(b) Sales Proceeds are subject to additional conditions outlined in Section X.

9.06. Схемата на дължимите суми по Обекти, приложена по-долу, установява сумата на минимално задължително плащане на Главница, за да разреши Банката частично освобождаване на Обезпечението (дефинирано по-долу), отнасящо се единствено за дадения Обект.

9.06. Required Repayment Per Unit Schedule. The Required Repayment Per Unit Schedule below shall establish the minimum Principal repayment due in order for the Lender to permit a partial release of the Collateral pertaining solely to the specified Unit.

Схема на дължими суми по Обекти / Required Repayment Per Unit Schedule

| Част | Вид | Секция | Етаж | Застроена площ (м2) | Ид.части (м2) | Общо (м2) | Дължими суми по Обекти В Евро |
|---|---|---|---|---|---|---|---|
| Unit | Type | Entrance | Floor | Bult Area | Common Areas | Total Area | Required Repayment Per Unit in EURO |
| A1 | [illegible] 1 | A | 0 | 113,64 | 0 | 113,64 | € 51,138 |
| [illegible] | [illegible] 2 | A | 0 | 80,23 | 0 | 80,23 | € 36,104 |
| [illegible] | [illegible] 3 | A | 0 | 80,23 | 0 | 80,23 | € 36,104 |
| [illegible] | [illegible] 4 | A | 0 | 56,21 | 0 | 56,21 | € 25,295 |
| [illegible] | [illegible] 5 | A | 0 | 248,29 | 0 | 248,29 | € 65,361 |
| [illegible] | [illegible] 6 | A | 0 | 420,66 | 0 | 420,66 | € 189,306 |
| [illegible] | [illegible] 7 | A | 0 | 220,71 | 0 | 220,71 | € 54,320 |
| [illegible] | [illegible] 1 | A | 1 | 71,31 | 9,27 | 80,58 | € 32,249 |
| [illegible] | [illegible] 2 | A | 1 | 64,54 | 8,39 | 72,93 | € 29,187 |
| A10 | [illegible] 3 | A | 1 | 80,22 | 10,43 | 90,66 | € 36,263 |
| A11 | [illegible] 4 | A | 1 | 80,22 | 10,45 | 90,66 | € 36,263 |
| A12 | [illegible] 5 | A | 1 | 84,27 | 10,96 | 95,23 | € 38,112 |
| [illegible] | [illegible] 6 | A | 1 | 140,22 | 18,24 | 158,46 | € 63,417 |
| [illegible] | [illegible] 7 | A | 1 | 186,94 | 24,31 | 211,25 | € 84,544 |
| [illegible] | [illegible] 1 | A | 2 | 52,47 | 6,82 | 59,29 | € 23,729 |
| [illegible] | [illegible] 2 | A | 2 | 64,54 | 8,39 | 72,93 | € 29,187 |
| A17 | [illegible] 3 | A | 2 | 56,49 | 7,35 | 63,83 | € 25,545 |
| [illegible] | [illegible] 4 | A | 2 | 56,49 | 7,35 | 63,83 | € 25,545 |
| [illegible] | [illegible] 5 | A | 2 | 69,17 | 9 | 78,17 | € 31,284 |
| [illegible] | [illegible] 6 | A | 2 | 75,09 | 9,77 | 84,86 | € 33,961 |
| [illegible] | [illegible] 7 | A | 2 | 111,27 | 14,47 | 125,74 | € 50,322 |
| [illegible] | [illegible] 4 | A | 3 | 56,48 | 7,35 | 63,83 | € 26,104 |
| [illegible] | [illegible] 5 | A | 3 | 69,17 | 9 | 78,17 | € 32,066 |
| [illegible] | [illegible] 6 | A | 3 | 75,09 | 9,77 | 84,86 | € 34,811 |
| [illegible] | [illegible] 7 | A | 3 | 111,27 | 14,47 | 125,74 | € 51,590 |
| [illegible] | [illegible] 3 | A | 4 | 64,54 | 8,39 | 72,93 | € 29,917 |
| [illegible] | [illegible] 4 | A | 4 | 56,48 | 7,35 | 63,83 | € 26,104 |
| [illegible] | [illegible] 5 | A | 4 | 69,17 | 9 | 78,17 | € 32,069 |
| [illegible] | [illegible] 6 | A | 4 | 75,09 | 9,77 | 84,86 | € 34,811 |
| [illegible] | [illegible] 4 | A | 5 | 56,48 | 7,35 | 63,83 | € 26,839 |
| [illegible] | [illegible] 5 | A | 5 | 69,17 | 9 | 78,17 | € 32,869 |
| [illegible] | [illegible] 6 | A | 5 | 75,09 | 9,77 | 84,86 | € 35,681 |
| [illegible] | [illegible] 7 | A | 5 | 111,27 | 14,47 | 125,74 | € 52,669 |
| [illegible] | [illegible] 3 | A | 6 | 56,48 | 7,35 | 63,83 | € 26,839 |
| [illegible] | [illegible] 4 | A | 6 | 56,48 | 7,35 | 63,83 | € 26,839 |
| [illegible] | [illegible] 5 | A | 6 | 69,17 | 9 | 78,17 | € 32,869 |
| [illegible] | [illegible] 6 | A | 6 | 75,09 | 9,77 | 84,86 | € 35,881 |
| [illegible] | [illegible] 1 | A | 7 | 52,47 | 6,82 | 59,29 | € 24,929 |
| [illegible] | [illegible] 2 | A | 7 | 64,54 | 8,39 | 72,93 | € 30,695 |
| [illegible] | [illegible] 3 | A | 7 | 56,48 | 7,35 | 63,83 | € 26,834 |
| [illegible] | [illegible] 4 | A | 7 | 56,48 | 7,35 | 63,83 | € 26,836 |
| [illegible] | [illegible] 5 | A | 7 | 69,17 | 9 | 78,17 | € 32,669 |
| [illegible] | [illegible] 1 | A | 8 | 93,3 | 12,13 | 105,43 | € 44,330 |
| [illegible] | [illegible] 2 | A | 8 | 56,46 | 7,34 | 63,8 | € 26,826 |
| [illegible] | [illegible] 3 | A | 8 | 56,46 | 7,34 | 63,8 | € 26,826 |
| [illegible] | [illegible] 4 | A | 8 | 69,19 | 9 | 78,19 | € 32,876 |
| A51 | [illegible] 5 | A | 8 | 190.8 | 24,81 | 215,61 | € 90,657 |

[illegible]/Кредитополучател: ____

Lender/Банка: ____

| 71. 10% идеални части от Подземен паркинг в сутерена на вход "А" и вход "Б", състоящ се от следните паркоместа, а именно: | | | | | | | |
|---|---|---|---|---|---|---|---|
| ПМ6 | Паркомясто 6 | А | -1 | 18.26 | 21.36 | 39.62 | € 4,754 |
| ПМ7 | Паркомясто 7 | А | -1 | 18.26 | 21.36 | 39.62 | € 4,754 |
| ПМ8 | Паркомясто 8 | А | -1 | 20.81 | 24.34 | 45.15 | € 5,418 |
| ПМ9 | Паркомясто 9 | А | -1 | 27.36 | 31.98 | 59.34 | € 8,000 |
| ПМ12 | Паркомясто 12 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ13 | Паркомясто 13 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ14 | Паркомясто 14 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ15 | Паркомясто 15 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ16 | Паркомясто 16 | А | -1 | 14.2 | 16.61 | 30.81 | € 4,000 |
| ПМ17 | Паркомясто 17 | А | -1 | 14.2 | 16.61 | 30.81 | € 4,000 |
| ПМ18 | Паркомясто 18 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ19 | Паркомясто 19 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ20 | Паркомясто 20 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ21 | Паркомясто 21 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ22 | Паркомясто 22 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ23 | Паркомясто 23 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ24 | Паркомясто 24 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ25 | Паркомясто 25 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ26 | Паркомясто 26 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ27 | Паркомясто 27 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ28 | Паркомясто 28 | А | -1 | 13.2 | 15.44 | 28.64 | € 4,000 |
| ПМ29 | Паркомясто 29 | А | -1 | 17.1 | 20 | 37.1 | € 4,800 |
| ПМ30 | Паркомясто 30 | А | -1 | 16.22 | 18.97 | 35.19 | € 4,500 |
| [illegible] | Магазин 8 | Б | 0 | 52.87 | 0 | 52.87 | € 23,792 |
| [illegible] | Магазин 9 | Б | 0 | 38.26 | 0 | 38.26 | € 17,217 |
| [illegible] | Магазин 10 | Б | 0 | 29.26 | 0 | 29.26 | € 13,161 |
| [illegible] | Магазин 11 | Б | 0 | 53.19 | 0 | 53.19 | € 23,936 |
| [illegible] | Магазин 12 | Б | 0 | 77.46 | 0 | 77.46 | € 34,857 |
| [illegible] | Апартамент 8 | Б | 1 | 189.2 | 28.42 | 217.62 | € 97,093 |
| [illegible] | Апартамент 9 | Б | 1 | 114.61 | 17.91 | 132.52 | € 63,035 |
| [illegible] | Апартамент 10 | Б | 1 | 77.86 | 12.14 | 89.9 | € 35,939 |
| [illegible] | Ателие 11 | Б | 1 | 71.68 | 11.18 | 82.76 | € 33,117 |
| Б10 | Апартамент 12 | Б | 1 | 64.43 | 10.07 | 74.5 | € 29,816 |
| Б11 | Ателие 13 | Б | 1 | 49.14 | 7.68 | 56.82 | € 22,740 |
| Б12 | Апартамент 8 | Б | 2 | 112.13 | 17.63 | 129.66 | € 51,891 |
| Б13 | Апартамент 9 | Б | 2 | 76.67 | 11.97 | 88.64 | € 35,454 |
| Б14 | Апартамент 10 | Б | 2 | 64.31 | 10.05 | 74.36 | € 29,759 |
| Б15 | Ателие 11 | Б | 2 | 62.82 | 9.82 | 72.64 | € 28,071 |
| Б16 | Апартамент 12 | Б | 2 | 64.43 | 10.07 | 74.5 | € 29,816 |
| Б17 | Ателие 13 | Б | 2 | 49.14 | 7.68 | 56.82 | € 22,740 |
| Б18 | Апартамент 8 | Б | 3 | 112.13 | 17.63 | 129.66 | € 53,189 |
| Б19 | Апартамент 9 | Б | 3 | 76.67 | 11.97 | 88.54 | € 36,320 |
| Б21 | Ателие 11 | Б | 3 | 62.82 | 9.82 | 72.64 | € 29,796 |
| Б22 | Апартамент 12 | Б | 3 | 64.43 | 10.07 | 74.5 | € 30,561 |
| [illegible] | Ателие 13 | Б | 3 | 49.14 | 7.68 | 56.82 | € 23,309 |
| [illegible] | Апартамент 8 | Б | 4 | 112.13 | 17.53 | 129.66 | € 53,186 |
| [illegible] | Апартамент 9 | Б | 4 | 76.67 | 11.97 | 88.64 | € 36,320 |
| [illegible] | Ателие 11 | Б | 4 | 62.82 | 9.82 | 72.64 | € 29,799 |
| [illegible] | Ателие 13 | Б | 4 | 49.14 | 7.68 | 56.82 | € 23,308 |
| [illegible] | Апартамент 8 | Б | 5 | 112.13 | 17.53 | 129.66 | € 54,518 |
| [illegible] | Апартамент 9 | Б | 5 | 76.67 | 11.97 | 88.64 | € 37,228 |
| [illegible] | Ателие 11 | Б | 5 | 62.82 | 9.82 | 72.64 | € 30,543 |
| [illegible] | Ателие 13 | Б | 5 | 49.14 | 7.68 | 56.82 | € 23,891 |
| [illegible] | Апартамент 9 | Б | 6 | 76.67 | 11.97 | 88.64 | € 37,228 |
| [illegible] | Ателие 11 | Б | 6 | 62.82 | 9.82 | 72.64 | € 30,543 |
| Б40 | Апартамент 12 | Б | 6 | 64.43 | 10.07 | 74.5 | € 31,325 |
| Б41 | Ателие 13 | Б | 6 | 49.14 | 7.68 | 56.82 | € 23,891 |
| [illegible] | Апартамент 9 | Б | 7 | 76.67 | 11.97 | 88.64 | € 37,228 |
| [illegible] | Ателие 11 | Б | 7 | 62.82 | 9.82 | 72.64 | € 30,543 |
| [illegible] | Ателие 13 | Б | 7 | 49.14 | 7.68 | 56.82 | € 23,891 |
| [illegible] | Ателие 6 | Б | 8 | 193 | 30.17 | 223.17 | € 93,838 |
| [illegible] | Ателие 7 | Б | 8 | 64.22 | 10.04 | 74.26 | € 31,224 |
| [illegible] | Ателие 8 | Б | 8 | 62.36 | 9.78 | 72.14 | € 30,332 |
| [illegible] | Ателие 9 | Б | 8 | 64.65 | 10.11 | 74.76 | € 31,434 |
| [illegible] | Ателие 10 | Б | 8 | 46.2 | 7.22 | 53.42 | € 22,461 |
| Подземен паркинг в сутерена на вход "В", състоящ се от следните паркоместа, а именно: | | | | | | | |
| ПМ1 | Паркомясто 1 | В | -1 | 13.8 | 16.45 | 30.25 | € 4,000 |
| ПМ2 | Паркомясто 2 | В | -1 | 13.8 | 16.45 | 30.25 | € 4,000 |
| ПМ3 | Паркомясто 3 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ4 | Паркомясто 4 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ5 | Паркомясто 5 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ6 | Паркомясто 6 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ7 | Паркомясто 7 | В | -1 | 15.26 | 18.19 | 33.45 | € 4,000 |
| ПМ7' | Паркомясто 7' | В | -1 | 15.26 | 18.19 | 33.45 | € 4,000 |
| ПМ8 | Паркомясто 8 | В | -1 | 13.8 | 16.45 | 30.25 | € 4,000 |
| ПМ9 | Паркомясто 9 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ10 | Паркомясто 10 | В | -1 | 13.2 | 15.74 | 28.94 | € 4,000 |
| ПМ11 | Паркомясто 11 | В | -1 | 13.8 | 16.45 | 30.25 | € 4,000 |
| ПМ12 | Паркомясто 12 | В | -1 | 14.1 | 16.81 | 30.91 | € 4,000 |
| ПМ13 | Паркомясто 13 | В | -1 | 28.08 | 33.48 | 61.56 | € 7,986 |
| ПМ14 | Паркомясто 14 | В | -1 | 20.06 | 23.9 | 43.96 | € 7,000 |
| ПМ15 | Паркомясто 15 | В | -1 | 20.94 | 24.96 | 45.9 | € 7,000 |
| ПМ16 | Паркомясто 16 | В | -1 | 22.36 | 26.66 | 49.02 | € 7,000 |
| ПМ17 | Паркомясто 17 | В | -1 | 21.04 | 25.08 | 46.12 | € 7,000 |
| Места №№ 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31 във вход "А" с обща площ от 139,78 м2 | | | | | | | €0 |

Borrower/Кредитополучател: ______

Lender/Банка: ______



**9.07. Получаване на застрахователни суми.** Застрахователни суми, получени по някой от застрахователните договори по Член 14.03. от настоящия Договор, се изплащат на Банката, считат се за получени плащания по Кредита и се прилагат за погасяване както това е описано в Член 9.09. от настоящия Договор.

**9.08. Данъци.** Всички суми, дължими от Кредитополучателя на Банката, следва да бъдат изплатени изцяло на Банката, без от тях да се приспадат или удържат каквито и да било данъци върху суми платени от Кредитополучателя на Банката, представляващи плащания по Главницата, Лихвата и/или Лихвата за забава (дефиниция по-долу). Всички съществуващи или в бъдеще установени данъци или удръжки за данъци върху суми, платени от Кредитополучателя на Банката, представляващи плащания по Главницата, Лихвата и/или Лихвата за забава (дефиниция по-долу), ще са за сметка на Кредитополучателя.

**9.09. Погасително действие на плащанията.** Всички плащания по Кредита и наличните средства по разплащателната сметка на Кредитополучателя се използват за погасяване на задълженията по следния ред:

(1) такси, комисионни и разноски на Банката;
(2) Лихва за забава (дефинирана по-долу);
(3) Дължима лихва към датата на дължимо плащане;
(4) Просрочена Главница;
(5) редовна Лихва;
(6) редовна Главница;

**9.10. Начин на плащане.** Всички плащания по този Договор се извършват чрез разплащателната сметка, открита на името на Кредитополучателя при Банката съгласно Член 3.03.(и) по-горе. Банката може да посочи писмено други свои сметки и/или банки в България, по които Кредитополучателят чрез плащане в брой или чрез банков превод да извършва всички плащания по този Договор.

**9.11. Дата на плащане.** Всички плащания от Кредитополучателя на Банката на каквито и да е суми по настоящия Договор се считат изплатени от датата, на която наличните средства постъпят по банковата сметка на Банката, определена в съответствие с Член 9.10. по-горе.

**9.12.** На датата на Първо предоставяне на средства Кредитополучателят заплаща на Банката еднократна Такса за Управление на Кредита в размер на три процента годишно (3%) от сумата на Кредита, или седемдесет и седем хиляди петстотин и единадесет Евро (77,511 евро), която се удържа от сумата на Кредита, след приспадане на Таксата за ангажимент.

**9.13. Банкови комисионни.** Каквито и да било банкови комисионни, свързани с превода и/или погашенията по Кредита са за сметка и платими от Кредитополучателя. Кредитополучателят се съгласява веднага да възстанови каквито и да било банкови комисионни, които Банката може да е платила от името на Кредитополучателя.

**9.14. Служебно събиране на вземането.** Банката служебно събира всички свои вземания по този Договор от средствата, налични по разплащателната сметка на Кредитополучателя, открита при Банката съгласно Член 3.03.(и) по-горе или по други сметки на Кредитополучателя в национална и в чуждестранна валута, открити при Банката.

**9.15 Съгласие за служебно инкасо.** С подписването на настоящия Договор Кредитополучателят дава неотменимо писменото си съгласие за служебно инкасо в полза на Банката съгласно Наредба No.3 на БНБ за безналичните плащания и националната платежна система, въз основа на което Банката може да събира на Датата на дължимо плащане или след нея изискуемите по този Договор вземания, като задължава служебно сметките на Кредитополучателя в национална и чуждестранна валута, открити при нея, включително, когато това е необходимо, чрез откупуване на чуждестранна валута, съответно арбитражиране по курса на Банката в деня на операцията.

**Раздел X. ПРОДАЖБИ НА ОБЕКТИ ОТ ПРОЕКТА**

**10.01. Задължение да се получи одобрението на Банката.** Кредитополучателят е длъжен да получи одобрението на Банката относно всеки Предварителен договор за продажба преди последния да бъде сключен. Сключването на Предварителен договор за продажба без одобрението на Банката се счита за Случай на неизпълнение по Договора с дата – Датата на Предварителния договор за продажба.

**10.02. Задължение да се информира Купувача.** Кредитополучателят е длъжен да информира всеки Купувач за всички относими съображения във връзка с настоящия Договор. Задължително в Предварителните Договори за продажби да съдържат поне информацията че:

(а) върху Обекта на продажба съществува Ипотека в полза на Банката;
(б) Купувачът има възможност да заплаща всички вноски директно на Банката.

**10.03. Постъпления от Продажби**

(а) Постъпления от продажби ще се използват от Кредитополучателя за извършване на плащания по Кредита.

**9.07. Insurance Proceeds.** Any insurance proceeds from insurance specified in Article 14.03. hereof will be paid to Lender and shall be shall be deemed to be receipt of payment under the Loan, and will be applied in the order specified in Article 9.09. hereof.

**9.08. Taxes.** All sums paid by Borrower to Lender shall be paid to Lender in full, free of any deductions or withholdings for any and all present and future taxes on sums paid by Borrower to Lender representing Principal, Interest and/or Penalty Interest (hereinafter defined) payments. Any taxes or withholdings for taxes which may be due on sums paid by Borrower to Lender representing Principal, Interest and/or Penalty Interest (hereinafter defined) payments, whether present or future, shall be for the account of and at the expense of Borrower.

**9.09. Application of Payments.** All payments under the Loan, as well as the funds in the Borrower's current account shall be applied as follows:

(1) any fees, charges, commissions or other expenses of the Bank;
(2) Penalty Interest (hereinafter defined);
(3) Interest due as of the Payment Due Date;
(4) Past due Principal;
(5) Due Principal;
(6) Prepayment of Principal.

**9.10. Method of Payment.** All payments are to be made through the current account opened in the name of the Borrower with the Bank according to Article 3.03.(и) avobe. The Bank may specify in writing other accounts and/or bank(s) in Bulgaria through which the Borrower will make in cash or by bank transfer all Loan payments under this Agreement.

**9.11. Date of Payment.** All payments from Borrower to Lender of any amounts due under this Agreement will be deemed paid from the date immediately available funds arrive at Lender's bank account as per Article 9.10. above.

**9.12.** On the date of First dibusement, Borrower shall have paid to Lender a Loan Management Fee in the amount of three percent per annum (3%) of the amount of the Loan, equal to seventy seven thousand five hundred and eleven Euro (EUR 77,511), which is withheld from the Loan amount on the Date of Security after the "Commitment Fee" is deducted.

**9.13. Bank Fees.** Any bank fees related to disbursement and /or payments under the Loan are for the account of and at the expense of Borrower. Borrower agrees to immediately reimburse Lender for any bank fees that Lender may pay on Borrower's behalf.

**9.14. Collection of debt.** Bank shall collect all and any of its receivables under this Agreement from the amounts, deposited in the Borrower's current account with the Bank according to Article 3.03.(и) above, or in any other account in local or foreign currency opened with the Bank.

**9.15. Consent for immediate collection.** Borrower hereby provides its unconditional and irrevocable consent for immediate collection in favor of the Bank pursuant to Regulation #3 for wire transfers and the national payment system issued by BNB for the right of Bank to collect on the Payment Due Date or after it all and any of Bank receivables under this Agreement from the amounts deposited in Borrower's accounts opened with the Bank, including, when necessary, buying foreign currency at exchange rates of the Bank for the date of transaction.

**SECTION X. UNIT SALES**

**10.01. Obligation to obtain Lender's approval.** Borrower is obliged obtain written Lender's approval of any and all Presale Agreements prior to executing any Presale Agreement. Failing to obtain Lender's approval is an Event of Default. That Event of Default shall be as of the Presale Agreement Date.

**10.02. Obligation to inform Buyer.** Borrower is obligated to inform any and all Buyer(s) of all relevant considerations under this Loan. Particularly, Presale Agreements must contain at least the information:

a) that Lender currently has a mortgage on the available Unit(s);
b) Buyer has option to pay all Sales Proceeds directly to Lender.

**10.03. Sales Proceeds**

a) Sales Proceeds shall be used by Borrower to make payments under the Loan.

(б) плащанията, от Купувача на един или повече Обекти ще се извършват или директно от Купувача на Банката, или чрез Кредитополучателя на Банката в размер поне на съответната сума за Обекта по Схема на дължими суми по Обекти. След като съответната сума от дължимите суми по Обекти бъде изплатена, Кредитополучателят може да продължи да превежда Постъпления от Продажби за Обекта на Банката по собствена преценка.

(в) Банката има право да откаже поредно Предоставяне на средства по Кредита, след като Кредитополучателят е получил Постъпления от продажби в резултат на сключен Предварителен договор за продажба без да е превел на Банката съответстващата на продадения Обект сума от Схемата на дължими суми по обекти по Чл. 9.06. По този начин общата сума на Кредита може да се намали с размера на невнесеното Постъпление от Продажба до указаната сума по Чл. 9.06. за съответния обект.

(г) Кредитополучателят е длъжен да посочи към кой Обект се прилагат Постъпленията от продажби.

(д) В случай че Постъпленията от продажби по сключен Предварителен договор за продажба са по-големи от сумата на дължимите Лихва за забава, Лихва и Главница и за да може това превишение на изплатени на Банката средства да се приложи към съответстващата сума от Схемата за дължимите суми по Обекти, Кредитополучателят и Банката се споразумяват по кои Пера от Строителния бюджет това превишение да се приложи. Банката ще откаже поредно Предоставяне на средства по Кредита до момента, в който работите по така определените Пера от Строителния бюджет не са завършени.

10.04. Окончателен Договор за Продажба. На Датата на Окончателния Договор за Продажба на Обект Кредитополучателят погасява Главница в размер на оставащата сума за изплащане от Дължими суми по Обекти, както тя е определена в Схема на дължими суми по Обекти за съответния Обект.

(а) в случай че Постъпленията от Продажба на даден Обект са по-малки от Дължимата сума по Обекти, Кредитополучателят се задължава да заплати разликата между Дължимата сума по Обект и Постъпленията от Продажби.

**РАЗДЕЛ XI. ПРОСРОЧЕНИ ПЛАЩАНИЯ**

11.01. Лихва за забава. В случай на неплащане, забавено или частично плащане на Лихва или Главница, Кредитополучателят дължи допълнителна лихва ("Лихва за забава") в размер на двадесет и пет процента (25%) годишно върху Неизплатената част от Главницата по Кредита. Кредитополучателят дължи Лихва за забава от Датата на дължимото плащане, на която не е извършено пълно плащане по Лихва или Главница, до момента, в който няма повече дължими плащания по Лихвата. Лихвата за забава ще включва плащането на Лихва за забава и за деня на извършване на забавеното плащане.

11.02. Просрочени плащания на Постъпления от Продажби. В случай на неплащане, частично или забавено плащане на Постъпления от Продажби, плащания на Постъпления от продажби, извършени в несъответствие с Член 10.03.(б) към Банката, Кредитополучателят дължи допълнително Лихва за забава в размер на двадесет и пет процента (25%) годишно върху Неизплатената част на Главницата, освен в случаите когато по-ниска лихва се определя със закон.

(а) Лихва за забава в случай на неплащане, частично или забавено плащане на Постъпления от Продажби по Предварителен договор за продажба се начислява и дължи, считано от установената в Предварителен договор за продажба дата на извършване на плащането. Ако Кредитополучателят не получи плащането от Купувача на предупоменатата дата, Банката трябва да бъде уведомена писмено.

(б) Постъпленията от Продажби, които надвишават дължимата сума за съответния Обект както тя е определена в Схема на дължими суми по Обекти не са обект на Лихва за забава.

(в) Лихвата за забава включва начислена Лихва за забава и за деня в който забавеното плащане е направено.

11.03. Лихва за забава в Случай на Неизпълнение. Ако е налице Случай на неизпълнение, както той е определен в Раздел XVI, Кредитополучателят дължи допълнително Лихва за забава в размер на двадесет и пет процента (25%) годишно върху Неизплатената част от Главница по Кредита.

**РАЗДЕЛ XII. ОБЕЗПЕЧЕНИЕ**

12.01. Обезпечение. Кредитополучателят обезпечава всички вземания на Банката по настоящия Договор със следното Обезпечение, надлежно учредено по предвидения в Закона ред в приемливи за Банката форма и съдържание:

(а) Запис на заповед издаден в полза на Банката, с падеж на предявяване, без протест, за сумата от 2,659,704 (ДВА МИЛИОНА ШЕСТСТОТИН ПЕТДЕСЕТ И ДЕВЕТ ХИЛЯДИ СЕДЕМСТОТИН И ЧЕТИРИ) Евро и лихва за забава в размер на 25% (двадесет и пет процента) годишно, авалиран от Христо Иванов Христов, ЕГН:7107210601, Йордан Павлов Йорданов

b) Payments made by Buyer on a Unit or Units shall be paid to Lender either directly by the Buyer or through the Borrower, at least the amount of the Required Repayment Per Unit Schedule for the relevant Unit. After the Required Repayment Per Unit has been paid, Borrower can continue to pay Sales Proceeds to Lender at his discretion.

c) Lender has the right to refuse to make further Disbursement of Funds under this Loan in case the Lender has received Sales Proceeds resulting from an executed Presale Agreement without transferring them to the Lender in the amount stipulated by the Required Repayment Per Unit Schedule under Article 9.06. Thus, the total amount of the Loan could be reduced by any Sales Proceeds unpaid to Lender up to the stipulated amount under Article 9.06.

d) Borrower is obligated to indicate toward which Unit each Payment of Sales Proceeds applies.

e) If Sales Proceeds from an executed Presale Agreement are greater than the combined Penalty Interest, Interest, and Principal Payments due under the Loan, in order for Sales Proceeds in excess of those paid to Lender to be applied toward the relevant Unit's Required Repayment Per Unit, the Borrower and Lender must agree toward which Budget Line Items the excess Sales Proceeds shall be applied. Lender shall refuse further Disbursement of Funds under the Loan until the identified Budget Line Items are completed.

10.04. Final Sale Agreements. On Final Sale Agreement Date for the relevant Unit, Borrower must repay Principal in the remaining amount of the Required Repayment Per Unit for the relevant Unit.

(a) If Sales Proceeds for a given Unit are less than the Required Repayment Per Unit, Borrower must pay the difference between Required Repayment Per Unit and Sales Proceeds.

**SECTION XI. OVERDUE PAYMENTS**

11.01. Penalty Interest. In the case of non-payment, late payments or partial payments of Interest or Principal, Borrower will be liable for additional penalty interest ("Penalty Interest") of twenty five percent (25%) per annum on the Principal Balance of the Loan. Borrower will be charged Penalty Interest beginning on the Payment Due Date that full payment of Interest or Principal has not been made, until such time as all payments of Interest have been brought current. The Penalty Interest includes Penalty Interest charged for the day the late payment is made.

11.02. Overdue Payment of Sales Proceeds. In the case of non-payment, or late payments of Sales Proceeds to Lender, or partial payments of Sales Proceeds not in compliance with Article 10.03.(b), Borrower will be liable for additional Penalty Interest of twenty five percent (25%) per annum on the Principal Balance of the Loan, unless a lower rate is imposed by law.

(a) In the case of non-payment, or late payments of Sales Proceeds to Lender under Presales Agreement the date at which Penalty Interest will start accruing is determined by the date stipulated in the Presales Agreement on which the payment is due. The Lender must be notified in writing if Borrower does not receive from the Buyer the payment on that date.

(b) Sales Proceeds in excess of the Required Repayment Per Unit for that Unit will not be subject to Penalty Interest if not paid by Borrower to Lender.

(c) The Penalty Interest includes Penalty Interest charged for the day the late payment is made.

11.03. Penalty Interest in Event of Default. In the case of any Event of Default as defined in Article 16.03., Borrower will be liable for additional Penalty Interest of twenty five percent (25%) per annum on the Principal Balance of the Loan.

**SECTION XII. COLLATERAL**

12.01. Collateral. This Loan shall be secured by the following Collateral described below, properly executed by the Borrower in the due legal way in form and substance acceptable to Lender:

(a) Promissory Note issued in favor of Lender, with due date upon submittance, without protest, for the amount of EUR 2,659,704 (TWO MILLION SIX HUNDRED AND FIFTY NINE THOUSAND SEVEN HUNDRED AND FOUR EURO) and penalty interest calculated on yearly basis under twelve five percent (25%) per annum, guaranteed 

ЕГН:6403241429 и Милена Бойкова Блатева, ЕГН 7412286032 ("Авалисти"). Банката има правото да предяви на Кредитополучателя Записа на заповед, издаден от него по настоящия Член 12.01. или Член 12.07., само при възникване на Случай на неизпълнение по настоящия Договор съгласно клаузите на Раздел XVI по-долу.

by Hristo IvanovHristov, UCI #7107210801, Jordan Pavlov Jordanov UCN: 6403241429 and Milena Bojkova Blateva, UCI#7412286032 ("Guarantors"). The Lender has the right to call to the Borrower the Promissory Note issued by the latter under this Article 12.01. and Article 12.07. only in the Event of default under this Agreement pursuant to Section XVI hereunder.

(б) Договорна ипотека за обезпечаване на вземане в размер на 2,659,704 (ДВА МИЛИОНА ШЕСТСТОТИН ПЕТДЕСЕТ И ДЕВЕТ ХИЛЯДИ СЕДЕМСТОТИН И ЧЕТИРИ) Евро, включително дължимите 12% (дванадесет процента) годишна Лихва върху общия размер на Кредита (без Лихвения резерв и Таксата за Управление) и Такса за управление на кредита в размер на три процента (3%) върху целия размер на кредита, заедно с двадесет и пет процента (25%) Лихва за забава, учредена върху:

(b) Contractual Mortgage for the amount of EUR 2,659,704 (TWO MILLION SIX HUNDRED AND FIFTY NINE THOUSAND SEVEN HUNDRED AND FOUR EURO) including twelve percent (12%) per annum on the total amount of the Loan (without the interest reserve and the Loan Management fee) of regular interest and Initiation Fee in the amount of three percents (3%) per annum on the total amount of the loan, together with Penalty interest of twenty five percent (25%) per annum, established on:

(ба) Ателие №В-7, на две нива на кота +16.90м и на кота +19.50 м, находящо се на терасовидния етаж в секция "В" на жилищна сграда в гр. София, Столична община – район "Красно село" на ул. "Пирински проход" №47 в урегулиран поземлен имот VII-347 от кв.288а по плана на гр. София местността "Булевард България – Мотописта", целият с площ от 4 756 кв.м., което ателие е с разгъната застроена площ от 148.14 кв.м., заедно с 3.4557% идеални части от общите части на секция "В" на сградата и 0.9183% идеални части от правото на строеж върху урегулирания поземлен имот, в който е построена сградата, описан подробно в нотариален акт №55 том IV рег.№7908 дело №559/2004г. на нотариус №260 на Нотариалната камара.

(ba) Atelier №B-7, on two levels on level +16.90м and on level +19.50 м, on the terrace floor in section "B" of a residential building in Sofia Stolichna Municipality "Krasno selo" region at 47 Pirinski prohod Street in regulated land plot VII-347 in district 288a as per the city plan of Sofia Blvd. Bulgaria – Motopista zone, the whole with area of 4756 sq.м., which atelier is with total built-up area of 148.14 sq.м., together with 3.4557% ideal parts of the common parts of the section B of the building and 0.9183% ideal parts of the right-to-build on the plot on which is located the building, described in details in the notary deed №55 volume IV reg.№7908 file №559/2004 as per the register of the notary №260 of the Notary Chamber.

(бб) Гараж №В-6, находящ се в сутеренния етаж на жилищна сграда в гр. София, Столична община – район "Красно село" на ул. "Пирински проход" №47 в урегулиран поземлен имот VII-347 от кв.288а по плана на гр. София местността "Булевард България – Мотописта", целият с площ от 4 756 кв.м., който гараж е със застроена площ от 26.33 кв.м., заедно с 0.8251% идеални части от общите части на секция "В" на сградата и 0.2189% идеални части от правото на строеж върху урегулирания поземлен имот, в който е построена сградата, описан подробно в нотариален акт №55 том IV рег.№7908 дело №559/2004г. на нотариус №260 на Нотариалната камара.

(bb) Garage №B-6, located on the basement of a residential building in Sofia Stolichna Municipality "Krasno selo" region at 47 Pirinski prohod Street in regulated land plot VII-347 in district 288a as per the city plan of Sofia Blvd. Bulgaria – Motopista zone, the whole with area of 4756 sq.м., which garage is with built-up area of 26.33 sq.м., together with 0.8251% ideal parts of the common parts of the section B of the building and 0.2189% ideal parts of the right-to-build on the plot on which is located the building, described in details in the notary deed №55 volume IV reg.№7908 file №559/2004 as per the register of the notary №260 of the Notary Chamber.

(бв) Апартамент №11, находящ се в гр. София на ул. "Селиврия"№15-17 на третия етаж на жилищна сграда, със застроена площ 97.42 кв.м., заедно с мазе №11 в сутерена на сградата, заедно с 3.83% идеални части от общите части на сградата и правото на строеж върху урегулирания поземлен имот VIII-238, 239, кв.119 по плана на гр. София местността "Красно село – Плавателен канал", целият с площ от 1000 кв.м., описан подробно в нотариален акт №117 том X, дело №1960/1996г. на нотариус при РС София.

(bc) Apartment №11, located in Sofia 15-17 Selvrija Street on the third floor of the residential building, with built-up area of 97.42 sq.м., together with basement №11 in the basement of the building, together with 3.83% ideal parts of the common parts of the building and the right-to-build on the plot on which is located the building VIII-238, 239, in district 119 as per the city plan of Sofia "Krasno selo – plavatelen kanal" zone, the whole with area of 1000 sq.м., described in details in the notary deed №117 volume X, file №1960/1996 as per the register on the notary by the regional Court Sofia.

(бг) Гараж №8, находящ се в гр. София на ул. "Селиврия"№15-17 на приземния етаж на жилищна сграда, със застроена площ 18.40 кв.м., заедно с 0.67% идеални части от общите части на сградата и правото на строеж върху урегулирания поземлен имот VIII-238, 239, кв.119 по плана на гр. София местността "Красно село – Плавателен канал", целият с площ от 1000 кв.м., описан подробно в нотариален акт №117 том X, дело №1960/1996г. на нотариус при РС София.

(bd) Garage №8, located in Sofia 15-17 Selvrija Street on the partelr floor of the residential building, with built-up area of 18.40 sq.м., together with 0.67% ideal parts of the common parts of the building and the right-to-build on the plot on which is located the building VIII-238, 239, in district 119 as per the city plan of Sofia "Krasno selo – plavatelen kanal" zone, the whole with area of 1000 sq.м., described in details in the notary deed №117 volume X, file №1960/1996 as per the register on the notary by the regional Court Sofia.

(бд) 1848/3500 идеални части от УРЕГУЛИРАН ПОЗЕМЛЕН ИМОТ №IV-48, находящ се в гр. София кв. 3Б по плана на гр. София местността ж.к."Овча купел – 2", с площ от 3500 кв.м.,, описан подробно в нотариален акт №33, том III, рег. №12122, дело 401 от 2004г. на нотариус №268 на Нотариалната камара;

(be) 1848/3500 ideal parts of REGULATED LAND PLOT №IV-48, located in Sofia in district 3B as per the city plan of Sofia, residential area Ovcha kupel -2 zone, with area of 3500 sq.м., described in details in notary deed № 33, volume III, reg. №12122, file 401 dated 2004 as per the register of the notary №268 of the Notary Chamber;

(бе) ПРАВОТО НА СТРОЕЖ за обектите от Проекта, дефиниран в чл.1.06. от настоящия Договор, собственост на "Строителство България" ООД, както следва:

(bf) THE TIGHT-TO-BUILD for the units of the Project (defined in Article 1.06) owned by "Stroitelstvo Bulgaria" OOD and in particular:

във вход "А"
на партера: магазин 1, магазин 2, магазин 3, магазин 4, магазин 5, магазин 6, магазин 7,
на първи етаж: апартамент 1, апартамент 2, апартамент 3, апартамент 4, апартамент 5, апартамент 6, апартамент 7,
на втори етаж: апартамент 1, апартамент 2, апартамент 3, апартамент 4, апартамент 5, апартамент 6, апартамент 7,
на трети етаж: апартамент 4, апартамент 5, апартамент 6, апартамент 7,
на четвърти етаж: апартамент 2, апартамент 4, апартамент 5, апартамент 6,
на пети етаж: апартамент 4, апартамент 5, апартамент 6, апартамент 7,
на шести етаж: апартамент 3, апартамент 4, апартамент 5, апартамент 6,
на седми етаж: апартамент 1, апартамент 2, апартамент 3, апартамент 4, апартамент 5,
на подпокривен етаж: ателие 1, ателие 2, ателие 3, ателие 4, ателие 5,

във вход "Б"
на партера: магазин 8, магазин 9, магазин 10, магазин 11, магазин 12,
на първи етаж: апартамент 8, апартамент 9, апартамент 10, ателие 11, апартамент 12, ателие 13,
на втори етаж: апартамент 8, апартамент 9, апартамент 10, ателие 11, апартамент 12, ателие 13,
на трети етаж: апартамент 8, апартамент 9, ателие 11, апартамент 12, ателие 13,
на четвърти етаж: апартамент 8, апартамент 9, ателие 11, ателие 13,
на пети етаж: апартамент 8, апартамент 9, ателие 11, ателие 13,

In the entrance "A"
on the partier: shop 1, shop 2, shop 3, shop 4, shop 5, shop 6, shop 7,
on first floor: apartment 1, apartment 2, apartment 3, apartment 4, apartment 5, apartment 6, apartment 7,
на second floor: apartment 1, apartment 2, apartment 3, apartment 4, apartment 5, apartment 6, apartment 7,
на third floor: apartment 4, apartment 5, apartment 6, apartment 7,
on fourth floor: apartment 2, apartment 4, apartment 5, apartment 6,
on fifth floor: apartment 4, apartment 5, apartment 6, apartment 7,
on sixth floor: apartment 3, apartment 4, apartment 5, apartment 6,
on sevath floor: apartment 1, apartment 2, apartment 3, apartment 4, apartment 5,
on underroof floor: atelier 1, atelier 2, atelier 3, atelier 4, atelier 5,

In the entrance "Б"
on the partier: shop 8, shop 9, shop 10, shop 11, shop 12,
on first floor: apartment 8, apartment 9, apartment 10, atelier 11, apartment 12, atelier 13,
on second floor: apartment 8, apartment 9, apartment 10, atelier 11, apartment 12, atelier 13,
on third floor: apartment 8, apartment 9, atelier 11, apartment 12, atelier 13,
на четвърти floor: apartment 8, apartment 9, atelier 11, atelier 13,
on fifth floor: apartment 8, apartment 9, atelier 11, atelier 13,
on sixth floor: apartment 9, atelier 11, apartment 12, atelier 13,
on sevath floor: apartment 9, atelier 11, atelier 13,

Borrower/Кредитополучател: ______

Lender/Банка: ______ 

на шести етаж: апартамент 9, ателие 11, апартамент 12, ателие 13,
на седми етаж: апартамент 9, ателие 11, ателие 13,
на подпокривен етаж: ателие 6, ателие 7, ателие 8, ателие 9, ателие 10,
както и 71.10% идеални части от подземен паркинг, състоящ се от тридесет паркоместа във вход "А" в сутерена на сградата, съответни на следните паркоместа: паркомясто 6, паркомясто 7, паркомясто 8, паркомясто 9, паркомясто 12, паркомясто 13, паркомясто 14, паркомясто 15, паркомясто 16, паркомясто 17, паркомясто 18, паркомясто 19, паркомясто 20, паркомясто 21, паркомясто 22, паркомясто 23, паркомясто 24, паркомясто 25, паркомясто 26, паркомясто 27, паркомясто 28, паркомясто 29, паркомясто 30,
както и подземен паркинг, състоящ се от осемнадесет паркоместа във вход "В" в сутерена на сградата,
заедно с прилежащите мазета.

12.02. Ако стойността на Обезпечението намалее по някаква причина или Банката счете стойността на Обезпечението за недостатъчна по време на валидността на Кредита, Кредитополучателят се съгласява при първо писмено искане от страна на Банката да осигури допълнително Обезпечение до изискваната от Банката стойност или да намали задължението си по настоящия Договор съгласно изискванията на Банката.

12.03. Разноски. Всички разноски и такси, свързани с надлежното сключване и изпълнение на договорите, учредяващи Обезпечението, както и всички разходи по освобождаване на Обезпечението, са за сметка на Кредитополучателя.

12.04. Нито едно от разпоредбите на този раздел няма да се счита за ограничаваща правата на Банката да действа в противния смисъл.

12.05. Кредитополучателят не може да бъде страна в никакви споразумения, които обещават или гарантират Обезпечението на трета страна без предварително писмено съгласие от страна на Банката.

12.06. Банката е длъжна да даде нотариално заверено съгласие за частично заличаване на вписването на Договорната ипотека по Член 12.01.(б) в частта на отделни Обекти от Проекта единствено и само когато следните условия са изпълнени:

(а) Кредитополучателят не дължи Лихва за забава или Лихва; и

(б) Кредитополучателят е намалил дължимата Главница със съответната за дадения Обект сума както тя е определена в Схема на дължимите суми по Обекти; и

(в) Кредитополучателят е заплатил разходите за нотариалната заверка на заличаването.

12.07. При поискване както от Банката, така и от Кредитополучателя, последният издава нов Запис на заповед по образец на същия, издаден по Член 12.01.(а) за сума в размер на Неизплатената част от главницата. В този случай Записът на заповед, отнасящ се за цялата сума на Кредита, издаден съгласно Член 12.01.(а) или настоящия Член 12.07., се връща на Кредитополучателя.

12.08. Банката освобождава изцяло ипотеката по настоящия договор и връща на Кредитополучателя Записът на заповед, издаден съгласно Член 12.01.(а), или Член 12.07., единствено и само когато всички задължения по настоящия Договор бъдат изпълнени изцяло, Договорът бъде прекратен и Кредитополучателят е представил писмено искане за пълно освобождаване на Обезпечението.

## РАЗДЕЛ XIII. ДЕКЛАРАЦИИ И ГАРАНЦИИ

13.01. Декларации и гаранции. Кредитополучателят декларира и гарантира относно следното към Датата на Сключване:

(а) Цялата информация, предоставена на Банката от Кредитополучателя при кандидатстване за Кредита, е вярна и пълна и Кредитополучателят не е пропуснал да информира Банката относно каквито и да било съществени факти.

(б) Средствата, предоставени по този Кредит ще бъдат използвани единствено и само за целите по Член 2.06. от настоящия Договор.

(в) Средствата по Кредита няма да се използват за производство и продажба на военна продукция, на оборудване за извършване на аборти или за извършване на услуги, свързани с оръжия или аборти.

(г) Кредитополучателят е правоспособен за сключването и изпълнението на настоящия Договор и компетентните органи на Кредитополучателя са предприели всички необходими действия, за да бъде налице представителна власт на лицата, които сключва настоящия Договор.

(д) Кредитополучателят не е страна по съдебни, арбитражни или административни производства и на Кредитополучателя не са известни никакви предстоящи или възможни претенции, които биха могли да окажат съществено неблагоприятно въздействие върху стопанската дейност на Кредитополучателя, както и не са известни предстоящи събития, които биха могли да попречат на Кредитополучателя да изпълнява задълженията си по настоящия Договор.

(е) Сключването на настоящия Договор и Предоставяне на средства по

on underroof floor: atelier 6, atelier 7, atelier 8, atelier 9, atelier 10
as well as 71.10% ideal parts of the underground parking lot consisting of thirty parking places in the entrance "A" in the basement of the building, respective to the following parking places: паркомясто 6, паркомясто 7, паркомясто 8, паркомясто 9, паркомясто 12, паркомясто 13, паркомясто 14, паркомясто 15, паркомясто 16, паркомясто 17, паркомясто 18, паркомясто 19, паркомясто 20, паркомясто 21, паркомясто 22, паркомясто 23, паркомясто 24, паркомясто 25, паркомясто 26, паркомясто 27, паркомясто 28, паркомясто 29, паркомясто 30,
as well as the underground parking lot consisting eighteen parking places in the entrance "B" in the basement of the building,
together with the respective basements.

12.02. If the value of Collateral decreases for any reason, or if Lender finds the Collateral value insufficient at any time during the life of the Loan, then upon receipt of the first written request from Lender, Borrower agrees to provide additional Collateral to the value determined by Lender, or to decrease its Loan obligation under this Agreement as requested by Lender.

12.03. Fees. Any costs or fees associated with the proper execution and perfection of the collateral agreements and with the release of the Collateral are for Borrower's expense. Borrower shall be liable for.

12.04. None of the provisions in this Section shall be construed as limiting the powers of Lender in acting to the contrary.

12.05. Borrower may not enter into any agreements that promise or guarantee the Collateral to a third party without prior written consent of Lender.

12.06. Lender will issue Approval for a partial mortgage release on collateralized property under 12.01.(b) in the part regarding separate Units from the Project only after the following conditions are met:

(a) Borrower has no Penalty Interest or Interest due; and

(b) Borrower has reduced Principal Balance by the Required Repayment Per Unit for the relevant Unit; and

(c) The Borrower has paid the notary fee for the mortgage release.

12.07. In case of request either from Lender or from Borrower, a new promissory note following the same pattern as the one issued under Article 12.01.(a), for the amount of the Principal Balance on the Loan (hereinafter defined) then outstanding. In this case the promissory note issued by Borrower pertaining to the Loan pursuant to Article 12.01.(a) or this Article 12.07. will be returned to Borrower.

12.08. The Lender will perform a full mortgage release on the above defined property and will return the Promissory Note issued under Article 12.01.(a) or 12.07. only when all obligations under this Agreement have been satisfied in full, this Agreement has been terminated and the Borrower has submitted a written request for full release of Collateral.

## SECTION XIII. REPRESENTATIONS AND WARRANTIES

13.01. Representations and Warranties. Borrower represents and warrants the following as of the Date of Agreement:

(a) All of the information given to Lender by Borrower to apply for the Loan is true and complete, and Borrower has not omitted or failed to inform Lender of any material facts.

(b) Proceeds from Disbursement of Funds under the Loan will be used exclusively for the purposes stated in Article 2.06 hereof.

(c) Loan proceeds will not be used for the production or sale of munitions, or for abortion equipment, or for the rendering of services linked to weapons or abortion.

(d) Borrower has the legal capacity to execute and comply with this Agreement and all necessary corporate actions have been taken in order for the person who is executing this Agreement to have the legal authority to act on behalf of Borrower.

(e) Borrower is not involved in any judicial, arbitrage, or administrative proceedings, and Borrower is not aware of any pending or threatened claims, which could have a material adverse impact on the Borrower's business and there are no known forthcoming conditions which could prevent Borrower from performing its obligations under this Agreement.

(f) Execution of this Agreement and Disbursement of Funds of funds

него няма да има за резултат неизпълнение на задължения или противоречие с условията по друг кредит или друг договор.

(ж) Кредитополучателят притежава всички удостоверения, разрешения и лицензи, необходими за извършване на стопанска дейност в съответствие с българското законодателство и за получаване на кредити.

(з) На строителната площадка на Кредитополучателя не се намират никакви опасни отпадъци и той няма никакви задължения по приложими нормативни актове и закони по опазване на околната среда.

(и) Кредитополучателят е разкрил писмено пред Банката всички свои дъщерни предприятия и направления на стопанска дейност.

(й) Не се е случило или не е основателно предвидимо събитие или условие, което, с течение на времето или с отправяне на предизвестие, или и с двете, да има за резултат Случай на Неизпълнение (дефиниция по-долу) по настоящия Договор.

(к) Кредитополучателят не е в нарушение и не носи гражданска отговорност по нито един закон или наредба за териториално и селищно устройство или с условията на което и да е разрешение за строеж, които биха могли да имат съществено неблагоприятно въздействие върху способността на Кредитополучателя да изпълнява задълженията си по настоящия Договор или по Договорите за обезпечение.

(л) Към Датата на Сключване на Договора Кредитополучателят притежава и поддържа всички разрешения, които се изискват за да се получи Разрешение за ползване на Проекта и за извършване на стопанската му дейност, и се е съобразил с всички условия и изисквания, съдържащи се в тях и с всички други приложими закони, които биха имали съществен неблагоприятен ефект върху способността на Кредитополучателя да изпълнява задълженията си по настоящия Договор, и че не е извършил или позволил извършването на действие или пропуск, в резултат на които което и да е от разрешенията да подлежи на промяна или отмяна.

(м) Кредитополучателят гарантира и декларира, че всички документи, свързани с Проекта, и в частност одобрените архитектурни проекти от Приложение 1 (Проекти), предоставени на Банката са действителни и валидни.

(н) Кредитополучателят е предоставил на Банката вярна и актуална информация относно Обезпеченията на Проекта. Кредитополучателят декларира и гарантира, че няма сключени Договори за предварителни продажби отнасящи се към Обезпечението.

(о) Кредитополучателят декларира, че към момента на сключването на настоящия Договор няма получени други кредити.

## РАЗДЕЛ XIV. ЗАДЪЛЖЕНИЯ НА КРЕДИТОПОЛУЧАТЕЛЯ

От Датата на Сключване до момента на пълното плащане или погасяване на Кредита и на всички други задължения по настоящия Договор Кредитополучателят е съгласен да спазва следните условия:

14.01. При условията на настоящия Договор, Кредитополучателят неотменимо и безусловно се задължава солидарно да изплати всички суми, предоставени по Кредита, и да плати всички лихви, такси и разноски по настоящия Договор, ведно с всички разходи за банково обслужване.

14.02. Плащане на данъци и други задължения. Кредитополучателят ще плаща в срок всички данъци, такси и други държавни вземания. Кредитополучателят ще плаща в срок и всички други задължения, които, ако останат неизплатени, могат да доведат до обременяване на Обезпечението или други активи на Кредитополучателя.

14.03. Застраховка. Кредитополучателят е длъжен да сключи и поддържа за своя сметка през целия срок на Кредита следните застраховки върху общия размер на Кредита:

(а) застраховка строителен риск за Проекта през Периода на строителство, покриваща всички стандартни рискове, и застраховка срещу пожар и природно бедствие (с разширено покритие, с клаузи за умишлена вреда и вандализъм, земетресение) за Проекта през Периода на продажби.

(б) застраховка(и) срещу пожар и природно бедствие (с разширено покритие, с клаузи за умишлена вреда и вандализъм, земетресение) върху цялото имущество извън Проекта, което по силата на Договор за обезпечения се явява Обезпечение по Кредита.

(в) застраховка "Отговорност трети лица".

(г) застраховката трябва да сочи Банката като единствен бенефициент в случай на застрахователно събитие. Застрахователната сума следва да бъде указана в евро, платима в лева по фиксинга на Българска Народна Банка в деня на изплащане на средствата по застраховката.

(д) Кредитополучателят потвърждава и се съгласява, че Банката има право да плаща застрахователни премии по всяка от застрахователните полици от името и за сметка на Кредитополучателя, в случай на неплащане от

hereunder will not create a default under or conflict with any other loan agreement or contract.

(g) Borrower has all certificates, permits and licenses required to conduct business in accordance with Bulgarian law and to borrow under the terms hereof.

(h) No hazardous waste is present on Borrower's premises, and there is no environmental liability under any applicable law, regulation or decree for protection of the environment.

(i) Borrower has disclosed in writing to Lender all its subsidiaries and lines of business.

(j) No event or condition has occurred or is reasonably foreseeable which, with the lapse of time or giving of notice or both, would constitute an Event of Default (as hereinafter defined) hereunder.

(k) Borrower is not in breach of and has not incurred or become subject to any civil liability under any law and legislation for regional and urban planning or the terms of any building permit which would have a material adverse effect on the Borrower's ability to perform its obligations under this Agreement or the Collateral Agreements.

(l) Borrower has acquired and maintained all licenses required to obtain Permit for Usage for the Project relevant to the Project as of the Date of Agreement and to conduct its business and has complied with all terms and conditions relating thereto and with all other applicable laws which would have a material adverse effect on the Borrower's ability to perform its obligations under this Agreement and has not done or permitted any act or omission whereby any such license would be liable to be changed or revoked.

(m) Borrower represents that all documents pertaining to the Project, particularly the Plans shown in Exhibit 1 (*Plans*) and presented to Lender are current and valid.

(n) Borrower has provided Lender accurate and up-to-date information regarding the availability of Collateral within the Project. Borrower declares and guarantees that there are no executed pre-sales agreements pertaining to Collateral.

(o) The Borrower represents that as of the day of signing this Agreement, it has no other liable loans.

## SECTION XIV. AFFIRMATIVE COVENANTS

From the Date of Agreement until such time as the Loan and all other obligations under this Agreement have been paid in full or fulfilled, Borrower agrees to comply with the following:

14.01. Under this Agreement, Borrower irrevocably and unconditionally obligate itself for the repayment of all amounts disbursed under the Loan and payment of all interests, fees and expenses under this Agreement, plus any bank servicing expenses.

14.02. Payment of Taxes and Other Obligations. Borrower will pay when due and payable all taxes, fees and other governmental levies. Borrower shall pay all other claims which if left unpaid might become a lien on the Collateral or any of Borrower's assets.

14.03. Insurance. Borrower, at its own expense, shall obtain and maintain the following insurance for the Loan amount throughout the term of the Loan:

(a) Builder's risk insurance during the Construction Period covering all standard risks and also insurance against fire and natural disaster (with extended coverage malicious mischief, and vandalism endorsements, earthquake) for the Project during the Sales Period.

(b) A policy or policies of insurance against fire and natural disaster (with extended coverage malicious mischief, and vandalism endorsements, earthquake) on all other properties subject to the lien of the Collateral or otherwise securing the Loan.

(c) Public liability insurance

(d) The insurance must name Lender as the sole loss payee. The insurance proceeds for the insurance on the Collateral must be expressed in EURO and be payable in Leva at the official Bulgarian National Bank exchange rate on the day of payment of the insurance proceeds.

(e) Under any insurance policy, Borrower hereby acknowledges that Lender shall have the right to pay the insurance premiums in the name and on the account of Borrower, in case of Borrower's

страна на Кредитополучателя. Кредитополучателят неотменимо се съгласява незабавно да възстановява на Банката така направените разноски.

(е) Всички застрахователни договори ще бъдат сключвани със застрахователи и със съдържание задоволително за Банката и няма да могат да бъдат прекратявани освен с 30 дневно писмено предизвестие до Банката.

14.04. Финансови отчети. Кредитополучателят ще предоставя на Банката всяка поискана от Банката финансова информация, подписана и заверена от Управителя и Главния счетоводител. Без за това да е нужно искане, Кредитополучателят ще предоставя на Банката:

(а) шестмесечни финансови отчети за дейността на фирмата (Отчет за приходи и разходи и Счетоводен баланс) изготвени в съответствие със Закона за счетоводството, в срок до тридесет (30) дни след края на всяко календарно шестмесечие.

(б) годишни финансови отчети на фирмата (вкл. Отчет за приходи и разходи и Счетоводен баланс), в срок до сто и двадесет (120) дни след края на всяка финансова година.

14.05. Достъп до помещения и проверки. Кредитополучателят се задължава да дава на служители и представители на Банката достъп до помещенията, в които осъществява своята дейност, в рамките на нормалното работно време и без за това да е нужно предизвестие, с цел проверка на дейността на Кредитополучателя. Подобна проверка може да включва, освен други действия, и проверка на собствените или взети под наем активи или Обезпечението, или преглед на счетоводните книги и други финансови документи.

14.06. При искане от Банката или от нейни представители Кредитополучателят ще оказва необходимото съдействие, за да го/ги улесни в извършването на такова проучване на правото на собственост върху която и да е част от Собствеността и запитвания по въпроси във връзка с нея, каквито би предприел всеки добросъвестен кредитор или ипотекарен кредитор, и ще предоставя на Банката и/или нейни представители цялата информация, която те считат за необходима, свързана със строителния процес.

14.07. Предизвестие за неизпълнение и други неблагоприятни промени. Кредитополучателят незабавно ще уведомява Банката за:

(а) възникване на Случай на неизпълнение (дефиниция по-долу);

(б) искове срещу Кредитополучателя или насочени към Обезпечението;

(в) възникването на друго обстоятелство или събитие, което има вероятност да окаже съществено неблагоприятно въздействие върху финансовото състояние, стопанската дейност или перспективи, или способността за изпълнение на задълженията на Кредитополучателя; и

(г) възникването на друго обстоятелство или събитие, което би могло да засегне стойността на Обезпечението или правата на Банката върху него.

14.08. Строителните проекти в Случай на неизпълнение. В Случай на неизпълнение от страна на Кредитополучателя по настоящия Договор, Кредитополучателят е длъжен в срок до 10 (десет) работни дни след получаване на писмено уведомление от Банката да прехвърли на Банката правата върху одобрените от съответните институции архитектурни чертежи и всички други необходими документи, свързани с Проекта.

14.09. Дейността на Кредитополучателя ще бъде подчинена на всички изисквания на българските закони за опазване на околната среда и стандартите на Международната Финансова Корпорация от групата на Световната Банка за здравни норми и безопасност.

14.10. Кредитополучателят упълномощава Банката да предоставя официална информация за Кредитополучателя на Международната Финансова Корпорация и ЕБВР, в случай че бъде поискана.

14.11. Спазване на законите. Кредитополучателят е длъжен да съблюдава разпоредбите на всички съществуващи и бъдещи закони и подзаконови нормативни актове, както и всяко уведомление, заповед, указание, разрешение, съгласие или позволение, дадени или направени (включително без никакво ограничение всички приложими закони за териториално и селищно устройство и разрешителни за строеж), и изискванията на всяка компетентна институция, доколкото всяко едно от тях би могло да се отнася до неговите активи или тяхното ползване или действия, извършвани в Собствеността.

14.12. Кредитополучателят е длъжен да уведомява Банката и да ѝ предоставя копие от всеки сключен Предварителен договор за продажба или Окончателен договор за продажба на който и да е Обект.

14.13. Кредитополучателят е длъжен да удостовери, че всички документи и разрешителни свързани с приемането, строежа и завършването на Проекта са в съответствие с действащото Българско законодателство.

14.14. Кредитополучателят е длъжен да актуализира поне веднъж на всеки три

nonpayment thereof. Borrower irrevocably agrees to immediately reimburse Lender for any such payments.

(f) All policies must be provided by an insurer and in a form satisfactory to Lender and the insurance must name Lender and must be noncancelable except upon thirty- (30) days' written notice to the Lender.

14.04. Financial Statements. Borrower shall furnish Lender with signed and certified by its Manager and Chief Accountant, any financial information requested by Lender. Without the need for any request Borrower shall furnish Lender with:

(a) six-months financial statements (Income Statement and Balance Sheet) made in accordance with the Accountancy Act, within thirty (30) days of the end of each six months.

(b) annual financial statements (incl. Income Statement and Balance Sheet), within one hundred and twenty (120) days of the end of each fiscal year.

14.05. Access to Premises and Inspection. Borrower hereby agrees to allow Lender's employees and representatives to visit its business premises for the purposes of inspecting Borrower's business without notice and at any time during normal business hours. Such inspection may include, but is not limited to, inspection of leased or owned property and equipment or Collateral, or review of accounting records and other financial statements.

14.06. Borrower shall assist the Lender or its representatives on request to enable it or them to carry out such investigation of title to any Property and inquiries into matters in connection with them as would be carried out by a prudent creditor or mortgagee and shall furnish the Lender and/or its representatives with all information which the latter deems necessary connected with the building process.

14.07. Notice of Default and Other Adverse Changes. Borrower shall immediately notify Lender of:

(a) the occurrence of any Event of Default (hereinafter defined);

(b) any lawsuits against the Borrower, or directed at the Collateral;

(c) the occurrence of any other condition or event that is likely to have a material adverse effect on the Borrower's financial condition, business operations or prospects, or their ability to perform their obligations; and

(d) the occurrence of any other condition or event which might impair the Lender's security interest in or value of Collateral.

14.08. Construction Drawings in Event of Default. If the Borrower Defaults under this Agreement, Borrower is obliged to transfer Lender the rights upon the approved by the Authorities drawings and all other necessary documents, relevant to the Project within ten (10) Business Days upon receiving a written notice from Lender.

14.09. Any activity of Borrower shall comply with the applicable Bulgarian requirements for environment safety and IFC Health and Safety Guidelines.

14.10. Borrower authorizes Lender to disclose official information about Borrower to the IFC and EBRD if such is requested.

14.11. Compliance with the Law. Borrower shall comply with the provisions of all present or future laws and by-laws and every notice, order, direction, license, consent or permission given or made thereunder (including without limitation all applicable laws and legislation for regional and urban planning and building permits) and the requirements of any competent authority so far as any of the same shall relate to its assets or their use or anything done on the Project.

14.12. Borrower is obliged to immediately notify and to provide the Lender with a copy of any Presale Agreement or Final Sale Agreement for any of the Units.

14.13. Borrower is obligated to ensure that all documents and permissions related to inception, construction and completion of the Project are in compliance with Bulgarian legislation.

14.14. Borrower is obliged to present to Lender on a quarterly basis or upon

месеца или при поискване документите, лицензите и разрешителните, свързани с Проекта и легализацията на Проекта.

demand documents, licenses and permits relevant to the construction and legalization of the Project.

14.15. Кредитополучателят е длъжен да завърши Проекта в съответствие с Раздел VI от настоящия Договор, и не по-късно от Изтичане на Периода на Строителство.

14.15. Borrower is obliged to construct the Project according to Section VI and on or before the Termination of Construction Period.

14.16. Независим строителен надзор. Кредитополучателят е длъжен да определи нуждата за Строителен надзор преди да е определил Строителния Бюджет (Член 4.05.). Ако се налага сключване на договор с Строителен надзор, Кредитополучателят е длъжен да получи одобрението на Банката за сключване на договор за Независим строителен надзор.

14.16. Independent Construction Supervisor. Borrower is obliged to identify the potential need for an independent Construction Supervisor in advance of determining the Construction Budget (Article 4.05.). If an Independent Construction Supervisor is to be hired, Borrower is obliged to obtain Lender's approval for the execution of a contract with the independent Construction Supervisor.

14.17. Задължително информиране на Купувачите на Обекти. Както е описано в раздел X "Продажба на Обекти", Кредитополучателят е длъжен да информира Купувача на Обект(и) за съучастието на Банката в Проекта.

14.17. Obligation to Communicate to Buyers of Units. As prescribed in Unit Sales Section X, Borrower is obliged inform the Buyer of Lender's involvement in the Project.

14.18. Задължение да се получи одобрението на Банката относно рекламните материали. Кредитополучателят е длъжен да получи предварителното одобрение на Банката относно всеки рекламен материал по отношение на Проекта, като например постер, разположен на самия Проект.

14.18. Obligation to Obtain Lender's Approval of Advertising Materials. Borrower is obligated to obtain Lender's prior approval of any advertising materials pertaining to the Project, such as a sign located at Project site.

14.19. Задължение по обезпечението. Кредитополучателят е длъжен да предостави на Банката Обезпечението по Раздел XII в срок от пет работни дни от Датата на сключване.

14.19. Obligation concerning Collateral. Borrower shall arrange the Collateral pursuant to Section XII to be given within 5 business days of the Date of Agreement.

14.20. Кредитополучателят се задължава в срок от три месеца от датата на подписване на този Договор да представи официален документ, издаден от органа, издал разрешението за строеж на Проекта, както и становище от ДНСК, че строежът на вход В от монолитна жилищна сграда с подземни гаражи, магазини, жилища и ателиета, може да бъде извършен като втори етап, което няма да попречи на приемането за ползване на вход А и вход Б на сградата като първи етап на строежа. В случай че Кредитополучателят не представи тези документи, Банката има право да преустанови отпускането на средства докато Кредитополучателят не изпълни със собствени средства строежа на вход В на сградата. Неизпълнението по този член представлява неизпълнение по настоящия Договор.

14.20. The Borrower is obliged within three months of the date of signing of this agreement to present an official document issued by the authority, that has issued the Construction Permit for the Project as well as a statement by DNCC, that the construction of section V of the residential building with underground garages, shops, apartments and ateliers could be executed as a second phase which shall not hinder the certifying for occupancy of the sections A and B of the building representing the first phase of the construction. In the event that the Borrower fails to present these documents the Bank shall be entitled to stop the disbursement of amounts until the Borrower executes on his own expense the construction of the section V of the building. The default pursuant to this Article shall be deemed an event of default under this Agreement.

## РАЗДЕЛ XV. ЗАБРАНИ ЗА КРЕДИТОПОЛУЧАТЕЛЯ

## SECTION XV. NEGATIVE COVENANTS

От Датата на сключване до окончателното погасяване и изплащане на всички задължения по Кредита и настоящия Договор, Кредитополучателят се съгласява, без да е получил изрично писмено разрешение от страна на Банката за всеки отделен случай:

From the Date of Agreement until such time as the Loan and all obligations under this Agreement have been paid in full or fulfilled, and without obtaining specific advance written permission to the contrary from the Lender, Borrower covenants and agrees to:

15.01. ДА НЕ учредява ипотека, залог или други тежести върху който и да било от своите активи.

15.01. NOT create any mortgage, pledge, lien or other charges on any of its assets.

15.02. ДА НЕ извършва инвестиции в или предоставя кредити на свързани с него дружества или други трети страни.

15.02. NOT make investments in or loans to affiliates or any other third parties.

15.03. ДА НЕ променя характера на стопанската си дейност или да извършва друга дейност.

15.03. NOT change the nature of its present business or operations or carry on any other business.

15.04. ДА НЕ променя контрола, управлението или собствеността на Кредитополучателя.

15.04. NOT change the control, management or ownership of the Borrower.

15.05. ДА НЕ продава, прехвърля, отдава под наем или по друг начин се разпорежда с каквато и да е част от дълготрайните активи на Кредитополучателя, освен ако замени съществуващи дълготрайни активи с нови дълготрайни активи с равна или по-голяма стойност.

15.05. NOT sell, assign, lease or otherwise dispose of any fixed assets of Borrower other than to replace existing fixed assets with new fixed assets of equal or greater value.

15.06. ДА НЕ прекратява съществуването си или преустанови дейността си.

15.06. NOT dissolve or otherwise cease to do business.

15.07. ДА НЕ гарантира дългове, лизингови плащания или каквито и да било други задължения на трети страни.

15.07. NOT guarantee any third party debt, lease or other obligations.

15.08. ДА НЕ получава допълнителни кредити нито да влиза в лизингови отношения.

15.08. NOT take on any additional new loans nor enter any lease agreements without prior written approval by Lender.

15.09. ДА НЕ сключва каквито и да било договори за дружества или за съвместна дейност, или други подобни споразумения, при които доходите или печалбите на Кредитополучателя ще подлежат, или могат да подлежат, на разпределение или подялба с което и да е друго лице.

15.09. NOT enter into any partnership, profit-sharing or royalty agreement or other similar arrangement whereby Borrower's income or profits are, or might be, shared with any other person.

15.10. ДА НЕ продава, разпорежда или отдава под наем каквато и да било част от Обезпечението или Обектите и да не се съгласява или да предоставя каквито и да било права по отношение на горепосоченото, освен разрешеното в настоящия Договор; при условие, че такива продажби, разпореждания или отдавания под наем подобряват условията за плащанията от Кредитополучателя на Банката по настоящия Договор, писмено разрешение от страна на Банката за това не може да бъде отказано неоснователно.

15.10. NOT sell, dispose, or rent any part of the Collateral or the Units, and not agree to or grant any option in respect of any of the foregoing, other than as allowed under this Agreement; provided, however, that in the event such selling, disposing, or renting improve conditions for payments by Borrower to Lender under this Agreement, written permission to the contrary from the Lender shall not be unreasonably denied.

15.11. ДА НЕ извършва или позволява да бъдат извършени действия върху Проекта, които представляват разрушаване, промяна, добавяне или промяна в използването, както и да не извършва действия, които по мнение на Банката биха намалили стойността на Проекта.

15.11. NOT do or suffer to be done on the Project anything which shall be demolition, alteration, addition or a change of use, nor do any act which in the Lender's opinion might adversely affect the value of the Project.

15.12. ДА НЕ обсъжда или посочва пред потенциален Купувач(и) точната сума, срок и условия на Кредита, освен указаните в Чл. 10.02.

15.12. NOT communicate to potential Buyer(s) the exact amount and terms of the Loan, except for the cases stipulated in Article 10.02.

## РАЗДЕЛ XVI. СЛУЧАИ НА НЕИЗПЪЛНЕНИЕ

## SECTION XVI. EVENTS OF DEFAULT

16.01. Случаи на неизпълнение. Без да изключва предвидените в закона или на друго място в настоящия Договор случаи на неизпълнение, настъпването на което и да е от следните събития ("Случаи на неизпълнение") също ще представлява пълно неизпълнение от страна на Кредитополучателя по настоящия Договор:

16.01. Events of Default. Without prejudice to events of default established under applicable law or in other sections of this Agreement, the occurrence of any one of the following events shall also constitute a default by Borrower under this Agreement ("Event of Default"):

(a) Неплащане, изцяло или частично, на която и да е вноска по Главницата или Лихвата продължило повече от петнадесет (15) дни след

(a) Nonpayment or partial payment of any Principal or Interest which continues more than fifteen (15) days after the applicable Payment

Borrower/Кредитополучател: ____________

Lender/Банка: ____________

| | | | |
|---|---|---|---|
| | съответната Дата на дължимо плащане. | | Due Date. |
| (б) | Кредитополучателят наруши някоя договореност по Раздел XIV или XV от настоящия Договор и нарушението продължи повече от петнадесет (15) дни. | (b) | Borrower violates any Covenant in Section XIV or XV hereof, which violation continues for fifteen (15) days. |
| (в) | Кредитополучателят представи неточни, невалидни или неверни декларации и гаранции, Договори за обезпечение, молбата за кредит, Договора или който и да е друг документ, свързан със Кредита или превода на средства по настоящия Договор. | (c) | Borrower submits improper, invalid or false representations and warranties, Collateral documents, loan application, the Agreement or any other document related to the Loan or Disbursement of Funds under this Agreement. |
| (г) | Първоначална или последваща неистинност или недействителност на Декларации или Гаранция по Раздел XIII от настоящия Договор, продължила повече от петнадесет (15) дни след узнаване от Кредитополучателя. | (d) | Any Representation or Warranty in Section XIII hereof turns out to have been or becomes untrue or invalid, and is not cured within fifteen (15) days of Borrower's learning thereof. |
| (д) | Кредитополучателят не предостави и/или учреди Обезпечението по т. 12.01. | (e) | Borrower fails to mortgage and/or pledge Collateral. |
| (е) | Кредитополучателят изпадне в неплатежоспособност, или бъде обявен в неизпълнение по друг кредит, по който е страна или гарант, или подаде молба за обявяване в несъстоятелност, или срещу него бъде заведено производство за обявяване в несъстоятелност. | (f) | Borrower becomes insolvent, files for bankruptcy, or bankruptcy proceedings are commenced against Borrower, or Borrower is declared bankrupt. |
| (ж) | Кредитополучателят не осигури допълнително Обезпечение, ако е изискано от Банката съгласно Член 12.02., в рамките на тридесет (30) дни от искането. | (g) | Borrower fails to provide additional Collateral if requested by Lender as per Article 12.02. within thirty (30) days of the request. |
| (з) | Кредитополучателят не изпълни своевременно което и да е друго свое задължение към Банката по друг договор или кредит. | (h) | Borrower fails to perform any other of their obligations to Lender under any other agreement or loan. |
| (и) | Кредитополучателят не уведоми своевременно Банката за настъпването на Случай на неизпълнение. | (i) | Borrower fails to promptly notify Lender of any Event of Default. |
| (к) | Лице, задължено по Обезпечението, не изпълни свое задължение по него или която и да е част от Обезпечението е укрита, преместена, продадена, загубена, открадната, унищожена, или съществено е намалила стойността си и не е заменена в рамките на тридесет (30) дни освен ако Банката не е получила изплатените по застраховката средства. | (k) | Any person obligated under the Collateral breaches its duties thereunder or any of the Collateral is hidden, relocated, sold, lost, stolen or destroyed, or has materially decreased in value and is not replaced within thirty (30) days unless Lender has received the insurance proceeds. |
| (л) | Кредитополучателят не изпълни изискванията за застраховане, както е указано в Член 14.03. | (l) | Borrower fails to abide by insurance requirements in Article 14.03. |
| (м) | Финансовото състояние на Кредитополучателя претърпи съществено неблагоприятно изменение, което, по мнението на Банката, застрашава способността на Кредитополучателя да изплати Кредита. | (m) | Borrower's financial condition undergoes a material adverse change that, in the opinion of Lender, jeopardizes Borrower's ability to repay the Loan. |
| (н) | Някаква част от активите на Кредитополучателя (независимо дали са част от Обезпечението или не) са прехвърлени извън България без писмено разрешение на Банката. | (n) | Any assets of the Borrower (whether or not part of Collateral) are relocated outside of Bulgaria without written permission from Lender. |
| (о) | Кредитополучателят представи фалшиви фактури или други документи или използва средствата от Кредита за каквато и да е друга цел, освен одобрените в Член 2.06. | (o) | Borrower presents fraudulent invoices or other documents, or uses Loan proceeds for any purpose not approved in Article 2.06. |
| (п) | Кредитополучателят или свързани с него лица не изпълнят което и да било задължение по други договори със Банката или свързани с Банката лица. | (p) | Borrower or entities related to it do not fulfill any obligation under any other contracts that they may have with Lender or related to Lender entities. |
| (р) | Невъзможност да се завърши Проекта. Проектът не е завършен преди или на датата на Прекратяване на периода на строителството или, според крайната преценка на Банката или на Представителя на Банката, Проектът не може да бъде завършен до датата на Прекратяване на периода на строителство. | (q) | Inability to Complete Project. The Project is not completed on or before the Termination of Construction Period, or, in the exclusive judgment of the Lender or Lender's Representative, cannot be completed on or before the Termination of Construction Period. |
| (с) | Забавяне на строителството. Строителството по Проекта не се извършва в разумни срокове. | (r) | Delays in Construction. Construction of the Project is not carried on with reasonable dispatch. |
| (т) | Кредитополучателят не получи Разрешение за ползване в срок от 20 (двадесет) месеца от Датата на първо предоставяне на средства по Кредита. | (s) | Borrower fails to obtain Permit for Usage before the Termination of Construction Period. |
| (у) | Отказ на достъп до информация. Кредитополучателят откаже да предостави информация, свързана с Проекта или откаже достъп до Проекта на служител, на представител на Банката или на упълномощено от Банката лице. | (t) | Denial of Access or Information. Any employee, agent, or assignee of the Lender is denied any information regarding the Project or is denied access to the Project. |
| (ф) | Кредитополучателят не уведоми Банката за получаването на Разрешението за ползване в срок от пет работни дни след получаването му. | (u) | Borrower fails to notify Lender of the Project having received the Permit for Usage within five business days. |
| (х) | Кредитополучателят не получи писмено одобрение от Банката на Предварителния договор с всеки Купувач преди Датата на Предварителния Договор. | (v) | Borrower fails to receive written approval from Lender of Presales Agreement with each Buyer in advance of Presale Agreement Date. |
| (ц) | Кредитополучателя не преведе на Банката получени Постъпления от продажби в размер най-малко на сумата, определена за Обекта в Схема на дължими суми по Обекти, както е описано в Раздел X. | (x) | Borrower fails to pay Lender Sales Proceeds from an executed Presale Agreement up to at least the Required Repayment Per Unit for the relevant Unit, as outlined in Section X. |
| (ч) | Кредитополучателят не получи всички необходими документи и разрешителни свързани с приемането, строежа и завършването на Проекта в съответствие с изискванията на Българското законодателство. | (y) | Borrower fails to obtain all documents and permissions related to inception, construction and completion of the Project that are in compliance with Bulgarian legislation. Borrower fails to obtain proper |

Borrower/Кредитополучател: ____________

Lender/Банка: ____________

| | |
|---|---|
| Кредитополучателят не получи своевременно съответните документи, лицензии и разрешителни от общините и разпоредителни органи преди всеки строителен етап или подетап, подлежащ на одобрение или лицензиране. | approvals, licences and permits from municipal and regulatory agencies in advance of the stage or substage of construction relevant to that approval or licensing procedure. |
| (щ) Кредитополучателят не представи на Банката своевременно всички документи и разрешителни, свързани с приемането, строежа и завършването на Проекта. | (z) Borrower fails to present to Lender on a timely basis all documents and permissions related to inception, construction and completion of the Project. |
| (аа) Кредитополучателят направи промени в Проекта или в плана на Проекта и спецификациите без писмено одобрение от Банката. | (aa) Borrower made changes to Project or to Project's plans and specifications without prior written approval from Lender. |
| (бб) Кредитополучателят предстваи невярна информация относно Проекта и Обезпечението, включително описанието на Обезпечението, съдържащо се в Член 12.01. | (bb) Borrower misrepresented information about the Project and the Collateral, including the description of Collateral contained in Article 12.01. |
| (вв) Неспазване от страна на Кредитополучателят на указания срок по Член 14.08. за прехвърляне на правата върху одобрените от съответните институции архитектурни чертежи и всички други документи, свързани с Проекта, на Банката. | (cc) The Borrower fails to comply with the required by Article 14.08. term for transferring Lender the rights upon the approved by the Authorities drawings and all other necessary documents, relevant to the Project. |
| 16.02. Известие при Случай на неизпълнение. При възникване на Случай на неизпълнение, Кредитополучателят е длъжен незабавно да уведоми Банката за естеството на неизпълнението, както и за мерките, които Кредитополучателят е предприел и ще предприеме за напрвянето му. | 16.02. Notification of Events of Default. If an Event of Default occurs, Borrower is obligated to notify Lender immediately of the nature of the default and the measures Borrower has taken and will take to cure the default. |
| 16.03. Лихва за забава. Ако възникне Случай на Неизпълнение по настоящия Договор, Кредитополучателят е длъжен да заплати Лихва за забава както е описано в Член 11.03. | 16.03. Penalty Interest. If an Event of Default occurs, Borrower is obligated to pay Penalty Interest as outlined in Article 11.03. |
| 16.04. Права при неизпълнение. Ако възникне Случай на неизпълнение, Банката има правото (но не и задължението), в допълнение и кумулативно с правата, дадени ѝ по закон или по други разпоредби на настоящия Договор, без да дава предизвестие на Кредитополучателя или да изчаква определен срок, да предприеме всички или някои от следните действия: | 16.04 Remedies. Upon occurrence of an Event of Default, Lender has the right (but not the obligation), in addition and accumulated to the rights given to Lender by law or under this Agreement, without any notice to Borrower or waiting period, to take any or all of the following measures: |
| (а) Да оттегли поетите си ангажименти по предоставянето на каквито и да е средства по Кредита, които не са предоставени на Кредитополучателя до този момент. | (a) Cancel its commitment to disburse any remaining amounts of the Loan not yet disbursed to Borrower. |
| (б) Да обяви Кредита за незабавно изискуем и да изиска плащане на цялата Неизплатена част от главницата и всички натрупани Лихви и евентуални Лихви за забава. | (b) Accelerate the Loan for immediate repayment of the full Principal Balance and all accrued interest, and Penalty Interest, if any and to start automatic collection amounts due, as per the present Agreement. |
| (в) Да изиска от Кредитополучателя да предостави Обезпечението на разположение на Банката за продажба съгласно Закона за Банките, Закона за особените залози, Търговския Закон, ЗЗД, ГПК и всички други актове, уреждащи тези отношения. Кредитополучателят се съгласява, че продажбата на Обезпечението, с изключение на недвижимите имоти, ще се извършва без съдебна намеса. | (c) Require Borrower to assemble Collateral and make it available to Lender for sale according to the Law for Banks, Special Pledges Act, Commercial Law, Law for Obligations and Contracts and Civil Proceedings Code and any other pertinent Bulgarian legislation involved. Borrower agrees that the sale of the Collateral, except for the immovable property, will be carried out without intervention of any court. |
| (г) Да започне принудително изпълнение върху Обезпечението или да продаде записа на заповед по т. 12.01.(а) или 12.07. от настоящия Договор. | (d) Foreclose on the Collateral or sell the Promissory Note under Articles 12.01.(a) or 12.07. of this Agreement. |
| (д) Да упражни всякакви други права като кредитор, разрешени от закона. | (e) Exercise any other rights as a creditor that are allowed by law. |
| (е) Кредитополучателят е длъжен да позволи на Банката и нейните представители и адвокати в подходящо време и след предизвестие: | (f) The Borrower will permit the Lender and its representatives and lawyers at reasonable times and upon reasonable notice: |
| (еа) да влиза в Обектите и да преглежда състоянието им или състоянието на Обезпечението, и | (fa) to enter into or upon the Project and to view the state and condition thereof or of any of the Collateral, and |
| (еб) да извърши за сметка на Кредитополучателя всякакви действия свързани с принудително изпълнение, които Банката сметне за необходими или желани във връзка с която и да било част от Реалното обезпечение, с цел да се осигури спазване на уговорките и задълженията по настоящия Договор. | (fb) to carry out at the expense of the Borrower any action related to foreclosure, which the Lender shall consider necessary or desirable in connection with any part of the Collateral to procure compliance with any covenant or obligation in this Agreement. |
| (ж) В Случай на неизпълнение от страна на Кредитополучателя по настоящия Договор, в съответствие с Член 14.08. по-горе Банката има правото да изисква от Кредитополучателя да ѝ прехвърли владението върху одобрените от съответните институции архитектурни чертежи и всички други необходими документи, свързани с Проекта. | (g) In case of default on part of the Borrower under this Agreement, in compliance with Article 14.08. stated above the Lender will have the right to request from the Borrower to submit him all documents, permits and all other papers necessary regarding the Project. |
| (з) Ако Кредитополучателят изпадне в неизпълнение по настоящия Договор, Банката може сам и по своя собствена преценка да отпуска средства по Кредита пряко на подизпълнители, доставчици на материали и оборудване или на работници по Проекта. | (h) If the Borrower Defaults under this Agreement, the Lender may, in its sole discretion, pay any portion of any Disbursement directly to any subcontractor or supplier of materials, fixtures, equipment, or labor for the Project. |
| 16.05. Без отказ от права. Забавяне от страна на Банката при упражняване нейни права по настоящия Договор или по договори за Обезпечение, не представлява отказ от неговите права или изправителни действия по тези договори. | 16.05. No Waiver. Any delay on the part of Lender in exercising its rights or remedies under this Agreement or the Collateral agreements does not constitute a waiver of any of its rights or remedies under such agreements. |
| 16.06. Разноски и хонорари при защита на права. Ако Банката предприеме юридически действия срещу Кредитополучателя или върху Обезпечението, Кредитополучателят поема за всички съдебни и извънсъдебни разходи и адвокатски хонорари по водене на дела или събиране на вземания. | 16.06. Legal Fees and Expenses. If Lender takes any legal action against Borrower or against the Collateral, Borrower is liable for any and all in- or out-of-court legal fees, litigation, or collection expenses. |

Borrower/Кредитополучател: [signature]

Lender/Банка: [signature]

**РАЗДЕЛ XVII. ДРУГИ УСЛОВИЯ**

**17.01. Съставни части на Договора.** Всички Приложения към настоящия Договор са негови неделими съставни части.

**17.02. Без отговорности по управлението.** Кредитополучателят удостоверява, че Банката не отговаря за управлението на предприятието на Кредитополучателя.

**17.03. Изменения на настоящия Договор.** Измененията на настоящия Договор са действителни, само ако са извършени в писмена форма и са подписани от двете страни.

**17.04. Дата на влизане в сила.** Настоящият Договор влиза в сила на Датата на сключване, посочена в него и към Датата на сключване Страните поемат всички свои права и задължения, произтичащи от настоящия Договор.

**17.05. Такси.** Кредитополучателят поема всички разходи или такси, включително адвокатски и съдебни такси, направени от Банката, във връзка със събирането на каквито и да са суми по настоящия Договор и Кредит.

**17.06. Описателни заглавия.** Заглавията в настоящия Договор са предназначени само за справка и не ограничават или засягат смисъла му. Който и да било документ, упоменат в настоящия Договор (включително настоящия Договор) ще се счита за такъв документ дори ако бъде променен от време на време.

**17.07. Приложими закони.** Този Договор се подчинява на, и се тълкува в съответствие със законите на Република България.

**17.08. Разрешаване на спорове.** Всички спорове между Страните, породени от този Договор или отнасящи се до него, включително спорове, породени от или отнасящи се до неговото тълкуване, недействителност, неизпълнение или прекратяване, ще бъдат разрешавани от компетентния Български съд.

**17.09. Частична недействителност.** Ако някоя разпоредба от този Договор бъде обявена за недействителна или неприложима или бъде анулирана или отменена от компетентна юрисдикция, в резултат на такава частична недействителност или неприложимост останалата част на Договора няма да стане недействителна или неприложима.

**17.10. Изчерпателност на Договора.** Настоящият Договор, заедно с документите по Обезпечението, съдържа всички задължения и споразумения между Страните в рамките на настоящия Договор и от датата на влизането му в сила той прекратява и обезсилва всички предишни споразумения, договорености и преговори, отнасящи се до Кредита.

**17.11. Правоприемство.** Настоящият Договор ще бъде в сила и ще обвързва всички правоприемници на Страните по този Договор. Без предварително писмено съгласие на Банката, Кредитополучателят няма да има право да прехвърля или делегира каквато и да било част от своите права или задължения по настоящия Договор.

**17.12. Меродавен език.** В случай на противоречие между вариантите на Договора на български и английски език, меродавен е вариантът на български език.

**17.13. Предизвестия.** Всички уведомления, изявления и известия, отнасящи се до настоящия Договор, следва да бъдат дадени в писмена форма. Всяка Страна ще уведомява другата писмено за промени в адреса за кореспонденция без да се нуждае от подпис от другата Страна. Цялата кореспонденция ще се счита за получена, ако се достави лично, изпрати по телекс или по факс с потвърждаване на получаването, или чрез препоръчана поща на следните адреси на Страните:

На Кредитополучателя:
"СТРОИТЕЛСТВО БЪЛГАРИЯ" ООД
гр. София, район Овча купел, кв Овча купел, бл.65, вх.А, ет.8, ап.36
На вниманието на: Управителя
Телефон: 8548164, 8581060, 0898/787844, 0888/520709

На Банката:
Българо-Американска Кредитна Банка
Ул. "Кракра" №16, София 1504, България
На вниманието на: Управляващ Директор Недвижими имоти
Телефон: 9658358, Факс: 9445009

**17.14.** С подписването на настоящия Договор Кредитополучателят приема за задължителни действащите Общи условия за делова дейност и Тарифата за таксите и комисионите на Банката, както и всички изменения по тях, които Банката си запазва правото да извършва, като промените ще бъдат оповестявани на видно място в салона на Банката.

**17.15. Брой на оригиналите.** Настоящият Договор се сключи в три екземпляра – два за Банката и един за Кредитополучателя.

В УВЕРЕНИЕ НА КОЕТО Страните, представлявани от надлежно

**SECTION XVII. MISCELLANEOUS PROVISIONS**

**17.01. Integral Parts of the Agreement.** All Exhibits to this Agreement are inseparable parts of this Agreement.

**17.02. No Managerial Liability.** Borrower hereby acknowledges that Lender has no liability for the management of Borrower's business.

**17.03. Amendments to this Agreement.** Any amendments to this Agreement shall only have effect if made in writing and signed by both Parties.

**17.04. Effective Date.** The effective date of this Agreement is the Date of Agreement shown herein, and as of the Date of Agreement the Parties hereto shall assume all their rights and obligations resulting from this Agreement.

**17.05. Fees.** Borrower shall be liable for any reasonable costs or fees, including legal fees and/or out of pocket expenses, incurred by Lender, associated with the collection of any amounts due under this Agreement or the Loan.

**17.06. Descriptive Headings.** The headings in this Agreement are for the purpose of reference only and do not limit or affect its meaning. Any document defined or referred to in this Agreement (including this Agreement) shall be considered a reference to such document even if it is amended from time to time.

**17.07. Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the Republic of Bulgaria.

**17.08. Dispute Resolution.** It is agreed and understood by the Parties, that any disputes arising from this Agreement or concerning it, including disputes arising from or concerning its interpretation, validity, nonperformance or termination, shall be settled by the Competent Bulgarian court.

**17.09. Severability.** If any provision of this Agreement shall be judged invalid or not enforceable or is voided or canceled by a competent jurisdiction, then such partial invalidity or unenforceability shall not cause the remainder of the Agreement to be or become invalid or unenforceable.

**17.10. Entire Agreement.** This Agreement, together with the Collateral documents, defines all obligations and agreements of the Parties hereto within the scope of issues that are governed by this Agreement, and on the date of its coming into force, it terminates and supersedes all previous agreements, arrangements and negotiations as they are related to the Loan.

**17.11. Succession.** This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Parties hereto. The Borrower shall not, without prior written consent of Lender, assign or delegate all or any part of its interest or obligation hereunder.

**17.12. Governing Language.** In case of contradiction between the Bulgarian and the English language versions of this Agreement, the Bulgarian version shall govern.

**17.13. Notices.** All notifications, statements and information related to the present Agreement shall be in writing. Each Party shall notify the other in writing of changes to contact information without need of signature from the other Party. All correspondence shall be construed as received if delivered personally, sent by telex or telefax with confirmation of delivery, or registered mail to the following addresses of the Parties:

To Borrower:
STROITELSTVO BULGARIA, OOD
Sofia, Ovcha Coupel, bl.65, entr.A, fl.8, ap.36
Attention: Executive Manager
Telephone: 8548164, 8581060, 0898/787844, 0888/520709

To Lender:
Bulgarian-American Credit Bank
16, Krakra Str., Sofia 1504, Bulgaria
Attention: Managing Director, Real Estate
Telephone: 9658 358, Fax: 944 5009

**17.14.** Upon signing of this Agreement Borrower shall be bound by the current General Business Conditions and the List of terms and Conditions of the Bank, as well as by any amendments to them, that the Bank may approve and any such amendments shall be made public on the business premises of the Bank.

**17.15. Number of Originals.** This Agreement was executed in three originals – two for the Lender and one for the Borrower.

IN WITNESS WHEREOF, each of the Parties hereto has caused this



упълномощени представители настоящия Договор на датата, записана по-горе. | Agreement to be executed and delivered on its behalf by its duly authorized representative on the date first above written.

За КРЕДИТОПОЛУЧАТЕЛЯ/ For BORROWER:

МЕТОДИ ЛЮБЕНОВ ДИМИТРОВ
Управител
"СТРОИТЕЛСТВО БЪЛГАРИЯ" ООД

METODI LIUBENOV DIMITROV
Manager
STROITELSTVO BULGARIA, OOD

За БАНКАТА/ For BANK:

Димитър Стоянов Вучев / Dimitar Stoyanov Vouchev — Стоян Николов Динчийски / Stoyan Nikolov Dinchiiski
Изпълнителен директор / Executive Director — Изпълнителен директор / Executive Director
"БЪЛГАРО-АМЕРИКАНСКА КРЕДИТНА БАНКА" АД / BULGARIAN-AMERICAN CREDIT BANK AD

Изготвили / Prepared by:

Сабин Симеонов / Sabin Simeonov — Специалист инвестиции / Investment officer
Цветомир Тодоров / Tsvetomir Todorov — Адвокат / Attorney at Law

| | Приложения | Exhibits |
|---|---|---|
| 1 | Одобрен архитектурен проект | Approved Architectural Plan |
| 2 | Разрешение за строеж | Building Permit |
| 3 | Протокол за строителна линия и ниво | Protocol for Construction Line and Levels |
| 4 | Нотариален акт | Notary Deeds |
| 5 | Декларация за свързани лица | Declaration of Related Parties |

[illegible] - БАКБ - АД
[illegible]

Borrower/Кредитополучател: ______ стр. 21 от 21 Lender/Банка: ______