**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STROITELSTVO BULGARIA LTD., | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| THE BULGARIAN-AMERICAN ENTERPRISE FUND and THE BULGARIAN-AMERICAN CREDIT BANK, | ) ) ) |
| Defendants. | ) ) ) |

Case No.: 1:07-CV-00634-RMC

Hon. Rosemary M. Collyer

**ORAL ARGUMENT REQUESTED**

**DEFENDANT BULGARIAN-AMERICAN ENTERPRISE FUND'S MOTION AND
MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S
AMENDED COMPLAINT PURSUANT TO FEDERAL RULES 12(b)(2) AND 12(b)(3),
OR ALTERNATIVELY BASED ON THE DOCTRINE OF *FORUM NON CONVENIENS***

# Table of Contents

FACTUAL BACKGROUND ..................................................................................3

    I.      The Parties. ....................................................................................3

    II.     The Loan Agreement. .....................................................................4

    III.    Suspension Of Credit Under The Agreement. ....................................5

    IV.    Bulgarian Resolution Of The Dispute..............................................6

    V.     Stroitelstvo Files This Lawsuit. ......................................................7

    VI.    Availability And Adequacy Of Bulgarian Courts...............................8

ARGUMENT ...............................................................................................9

    I.      BAEF Is Not Subject To Personal Jurisdiction In The District Of
         Columbia....................................................................................9

         A.    Plaintiff's Burden Of Proof To Demonstrate A Factual Basis For
             Asserting Personal Jurisdiction Over BAEF...............................10

         B.    This Court Lacks Specific Jurisdiction Over BAEF Because None
             Of The Conduct At Issue Occurred In The District Of Columbia. ...........11

         C.    This Court Lacks General Jurisdiction Over BAEF Because BAEF
             Does Not Have A Sufficient Connection To This District. .......................14

         D.    In Any Event, This Court Cannot Exercise Personal Jurisdiction
             Over BAEF Consistent With Due Process....................................16

         E.    The RICO Statute Does Not Establish Personal Jurisdiction Over
             BAEF. ....................................................................................17

    II.     Venue Is Not Proper In This District. ..............................................19

         A.    The Forum Selection Clause Should Be Enforced. ...................20

         B.    Venue Is Not Proper Under Either Statute Cited By Stroitelstvo. ...............24

             1.    Venue Is Not Proper Here Under 28 U.S.C. § 1391....................24

             2.    Venue Is Not Proper Under 18 U.S.C. § 1965............................26

    III.    The Amended Complaint Should Be Dismissed Based On The Doctrine
         Of *Forum Non Conveniens*. ...........................................................28

         A.    Bulgaria Is Both Available And Adequate As An Alternate Forum. ........28

         B.    The Private Interests Of The Litigants Strongly Favor Dismissal............32

             1.    Sources Of Proof Are Located In Bulgaria (Factor 1)..................33

             2.    Bulgarian Witnesses Would Not Be Subject To
                 Compulsory Process For Testimony In This District And
                 Their Presence Would Be Costly  (Factors 2 and 3)....................34

|   |   | 3. | Enforcement Of A Judgment Could Be An Issue Due To The Potential For Inconsistency (Factor 4)....................................35 |
|---|---|---|---|
|   |   | 4. | The Need For Translation Creates Expense And Inefficiency (Factor 5). ................................................................36 |
|   | C. |   | The Public Interest Factors Strongly Favor Dismissal. ............................37 |
|   |   | 1. | This Is A Bulgarian Controversy That Belongs In Bulgaria (Factor 1).................................................................................37 |
|   |   | 2. | District Of Columbia Citizens Should Not Be Burdened With Resolving This Dispute (Factor 2). .......................................39 |
|   |   | 3. | This Court Should Not Be Burdened With Applying Bulgarian Law (Factor 3)...............................................................39 |
|   | D. |   | Plaintiff's Chosen Forum Is Not A Significant Factor. ............................41 |
| CONCLUSION..................................................................................................................1 |

# Table of Authorities

**Cases**                                                                                     **Page**

*AGS Int'l Servs. S.A. v. Newmont USA Ltd.*,
    346 F. Supp. 2d 64 (D.D.C. 2004) ....................................................................... 15, 17, 19

*Allen v. Russian Fed'n*,
    --- F. Supp. 2d ----, Civil Action No. 05-2077 (CKK), 2007 WL 4145596 (D.D.C.
    Nov. 26, 2007) ........................................................................................................ 11

*Armco Steel Co., L.P. v. CSX Corp.*,
    790 F. Supp. 311 (D.D.C. 1991) .......................................................................... 26, 38

*Asahi Metal Indus. v. Super. Ct. of Cal.*,
    480 U.S. 102 (1987) ................................................................................................ 17

*Asociacion de Reclamantes v. United Mexican States*,
    735 F.2d 1517 (D.C. Cir. 1984) .............................................................................. 11

*Atlantigas Corp. v. Nisource, Inc.*,
    290 F. Supp. 2d 34 (D.D.C. 2003) .......................................................................... 11

*Baltierra v. W. Va. Bd. of Medicine*,
    253 F. Supp. 2d 9 (D.D.C. 2003) ............................................................................ 16

*BCCI Holdings (Luxembourg), Societe Anonyme v. Mahfouz*,
    828 F. Supp. 92 (D.D.C. 1993) .................................................................... 34, 35, 40

*Blanco v. Banco Indus. de Venezuela, S.A.*,
    997 F.2d 974 (2d Cir. 1993) ................................................................................... 31

*BPA Int'l, Inc. v. Kingdom of Sweden*,
    281 F. Supp. 2d 73 (D.D.C. 2003) ............................................................... 28, 32, 35

*Bridge v. Invest. Am., Inc.*,
    748 F. Supp. 948 (D.R.I. 1990) .............................................................................. 26

*Brock v. Entre Computer Ctrs., Inc.*,
    740 F. Supp. 428 (N.D. Tex. 1990) ........................................................................ 23

*Brown v. Wachovia Bank*,
    Civil Action No. 06-0153 (RMC), 2007 WL 1378491 (D.D.C. May 10, 2007) ............. 11

*Brunson v. Kalil & Co.*,
    404 F. Supp. 2d 221 (D.D.C. 2005) ............................................................. 10, 12, 14

*Butcher's Union Local No. 498, United Food & Commercial Workers v. SDC Inv., Inc.,*
788 F.2d 535 (9th Cir. 1986) ............................................................... 18

*\*Capital Bank Int'l Ltd. v. Citigroup, Inc.,*
276 F. Supp. 2d 72 (D.D.C. 2003) ................................... 10, 11, 14, 15

*Carnival Cruise Lines v. Shute,*
499 U.S. 585 (1991)............................................................... 20

*Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,*
709 F.2d 190 (3d Cir. 1983)......................................... 21, 24

*Cory v. Aztec Steel Bldg., Inc.,*
468 F.3d 1226 (10th Cir. 2006) ............................................. 18

*Crane v. N.Y. Zoological Soc'y,*
894 F.2d 454 (D.C. Cir. 1990) ............................................ 10

*Crenshaw v. Antokol,*
287 F. Supp. 2d 37 (D.D.C. 2003) ..................................... 27

*Crescent Int'l, Inc. v. Avatar Cmtys., Inc.,*
857 F.2d 943 (3d Cir. 1988)................................................. 21

*Dooley v. United Techs. Corp.,*
786 F. Supp. 651 (D.D.C. 1992) .................................. 18, 19

*Eacho v. N D Res., Inc.,*
No. 83-2903, 1984 WL 2398 (D.D.C. Feb. 2, 1984) ..................... 27

*Edmond v. United States Postal Serv. Gen. Counsel,*
949 F.2d 415 (D.C. Cir. 1991) ............................................ 12

*El-Fadl v. Cent. Bank of Jordan,*
75 F.3d 668 (D.C. Cir. 1996) ....................................... 14, 29

*Eze v. Yellow Cab Co. of Alexandria, Va., Inc.,*
782 F.2d 1064 (D.C. Cir. 1986) ......................................... 24

*Fandel v. Arabian Am. Oil Co.,*
345 F.2d 87 (D.C. Cir. 1965) ....................................... 15, 16

*\*FC Inv. Group LC v. IFX Markets, Ltd.,*
479 F. Supp. 2d 30 (D.D.C. 2007) ......................... 12, 13, 18, 19

*First Chicago Int'l v. United Exch. Co.,*
836 F.2d 1375 (D.C. Cir. 1988) .......................................... 14

iv

*Friedman v. World Transp., Inc.,*
    636 F. Supp. 685 (N.D. Ill. 1986) ................................................................. 24

*Gorman v. Ameritrade Holding Corp.,*
    293 F.3d 506 (D.C. Cir. 2002) ...................................................................... 12

*GTE New Media Servs. Inc. v. BellSouth Corp.,*
    199 F.3d 1343 (D.C. Cir. 2000) .............................................................. 10, 12

*Gulf Oil Corp. v. Gilbert,*
    330 U.S. 501 (1947) ......................................................................... 28, 32, 37

*\*Helicopteros Nacionales de Colom., S.A. v. Hall,*
    466 U.S. 408 (1984) .............................................................................. 10, 17

*In re Arbitration between Monegasque de Reassureances S.A.M. v. Nak Naftogaz of*
    *Ukraine,*
    311 F.3d 488 ................................................................................................ 31

*In re Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980,*
    540 F. Supp. 1141 (D.D.C. 1982) ............................................................ 29, 38

*Irwin v. World Wildlife Fund, Inc.,*
    448 F. Supp. 2d 29 (D.D.C. 2006) ..................................................... 35, 36, 40

*Japan Gas Lighter Ass'n v. Ronson Corp.,*
    257 F. Supp. 219 (D.N.J. 1966) .................................................................... 25

*L&L Constr. Assocs., Inc. v. Slattery Skanska, Inc.,*
    No. CIV 05-1289, 2006 WL 1102814 (D.D.C. Mar. 31, 2006) ................. 20, 41

*Lambert v. Kysar,*
    983 F.2d 1110 (1st Cir. 1993) .................................................................. 21, 24

*Lescs v. Martinsburg Police Dept.,*
    No. Civ. A. 00-2404 (GK), 2002 WL 215511 (D.D.C. Jan. 28, 2002) ........... 27

*M/S Bremen v. Zapata Off-Shore Co.,*
    407 U.S. 1 (1972) ......................................................................................... 20

*Manetti-Farrow, Inc. v. Gucci Am., Inc.,*
    858 F.2d 509 (9th Cir. 1988) ............................................................ 21, 23, 24

*Marra v. Papandreou,*
    59 F. Supp. 2d 65 (D.D.C. 1999) ................................................................. 20

*\*Modaressi v. Vedadi,*
    441 F. Supp. 2d 51 (D.D.C. 2006) ..................................................... 19, 20, 26, 27

*Moncrief v. Lexington Herald-Leader Co.*,
    807 F.2d 217 (D.C. Cir. 1986) ............................................................................ 15

\*\**Pain v. United Techs. Corp.*,
    637 F.2d 775 (D.C. Cir. 1980) .................................................................... passim

\*\**Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981) .................................................................................. passim

*PT United Can Co. v. Crown Cork & Seal Co.*,
    138 F.3d 65 (2d Cir. 1998) ............................................................................... 18

*Rush v. Savchuk*,
    444 U.S. 320 (1980) ........................................................................................ 11

*Shawnee Tribe v. United States*,
    298 F. Supp. 2d 21 (D.D.C. 2002) .................................................................... 37

*Shields v. Mi Ryung Constr. Co.*,
    508 F. Supp. 891 (S.D.N.Y. 1981) .................................................................... 30

*Southmark Prime Plus, L.P. v. Falzone*,
    768 F. Supp. 487 (D. Del. 1991) ...................................................................... 26

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
    Civil Action Nos. 83-1958 & 83-2978, 1984 WL 2929 (D.D.C. Jan. 24, 1984) .............. 25

*Stephens v. Entre Computer Ctrs, Inc.*,
    696 F. Supp. 636 (N.D. Ga. 1988) .................................................................... 23

\*\**Stromberg v. Marriott, Int'l, Inc.*,
    474 F. Supp. 2d 57 (D.D.C. 2007) ........................................................... 34, 39, 40

*Terra Int'l, Inc. v. Miss. Chem. Corp.*,
    922 F. Supp. 1334 (N.D. Iowa 1996) ................................................................ 21

*Textile Museum v. F. Eberstadt & Co.*,
    440 F. Supp. 30 (D.D.C. 1977) ........................................................................ 13

*Travelers Indem. Co. v. S/S Alca*,
    710 F. Supp. 497 (S.D.N.Y. 1989) .................................................................... 31

*Turedi v. Coca Cola Co.*,
    460 F. Supp. 2d 507 (S.D.N.Y. 200) .................................................................. 31

*United States v. Philip Morris Inc.*,
    116 F. Supp. 2d 116 (D.D.C. 2000) .............................................................. 10, 11

*United States v. Smithfield Foods, Inc.,*
    332 F. Supp. 2d 55 (D.D.C. 2007) .................................................................. 37

*Vijuk Equip., Inc. v. Otto Hohner KG,*
    728 F. Supp. 1368 (N.D. Ill. 1990) ............................................................... 22

*Willis v. Willis,*
    655 F.2d 1333 (D.C. Cir. 1981) ..................................................................... 12

*World Wide Minerals v. Republic of Kazakhstahn,*
    116 F. Supp. 2d 98 (D.D.C. 2000) ................................................................ 19

*Worldwide Network Servs., LLC v. DynCorp Int'l,*
    496 F. Supp. 2d 59 (D.D.C. 2007) ......................................................... 21, 23

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980) ....................................................................................... 17

**Statutes**

18 U.S.C. § 1965 ........................................................................................... passim

22 U.S.C. § 5402 ................................................................................................... 1

22 U.S.C. § 5421 ................................................................................................... 1

28 U.S.C. § 1391 ............................................................................... 20, 24, 25, 26

D.C. Code § 13-334 ............................................................................................ 14

D.C. Code § 13-422 ............................................................................................ 14

D.C. Code § 13-423(a) ....................................................................................... 12

D.C. Code § 13-423(b) ....................................................................................... 12

**Rules**

Fed. R. Civ. P. 12(b)(2) ............................................................................. 2, 10, 1

Fed. R. Civ. P. 12(b)(3) ......................................................................... 2, 19, 24, 1

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 2

This case should never have been filed in this Court, or indeed anywhere in the United States, because the entire action relates to a dispute between two Bulgarian companies about a loan agreement that was executed in Bulgaria, pertains to a Bulgarian construction project, and is governed by Bulgarian law. The plaintiff in this action, Stroitelstvo Bulgaria Ltd. ("Stroitelstvo" or "plaintiff"), is a Bulgarian company with no known ties to the United States. In March 2005, plaintiff entered into a "Loan Agreement," attached as Ex. A to plaintiff's Amended Complaint, with defendant Bulgarian-American Credit Bank (the "Bank"). The Bank is a Bulgarian company that does business only in Bulgaria. (Schiller Decl., Ex. 1 ¶ 7)

The Loan Agreement is governed by Bulgarian law, Am. Compl. Ex. A ¶ 17.07, and includes a forum selection clause that requires "*any disputes arising from this Agreement or concerning it . . . [to] be settled by the Competent Bulgarian court*." (*Id.* ¶ 17.08) Plaintiff defaulted on the Loan Agreement, and the Bank refused to extend further credit. As plaintiff admits, after plaintiff and the Bank availed themselves of legal process in Bulgaria concerning the debt, plaintiff and the Bank entered into a settlement agreement in Bulgaria to resolve all disputes between them. (Am. Compl. ¶¶ 34-35)

Apparently unhappy with that settlement agreement, plaintiff sued both the Bank and its parent company, the Bulgarian-American Enterprise Fund ("BAEF"), in this Court.[1] BAEF is a not-for-profit corporation that was established under Delaware Law pursuant to the Support for East European Democracy Act of 1989 (the "SEED Act"), 22 U.S.C. §§ 5402, 5421, to promote private sector development in Bulgaria. (Ex. 1 ¶ 3) BAEF, which is a majority owner of the Bank, has its only U.S. office in Chicago (its other office is in Bulgaria), and has no

---

[1]   The Bank has not yet been properly served with plaintiff's Amended Complaint pursuant to the Hague Convention, and thus this motion is being filed only on behalf of BAEF.

ongoing or regular business contacts with the District of Columbia.  (*Id.* ¶¶ 4-5)  The Bank operates independently from BAEF, and BAEF had no involvement whatsoever in the loan transaction between plaintiff and the Bank.  (*Id.* ¶ 8)

Plaintiff's Amended Complaint suffers from a host of jurisdictional and venue problems, and must be dismissed for at least three reasons:

- *First*, BAEF has not transacted any business in this District that relates to this action and has no office or agent in the District, BAEF does not have "continuous and systematic" contacts with the District of Columbia, and plaintiff cannot otherwise establish that BAEF should be subject to the personal jurisdiction of this Court.  The Amended Complaint, therefore, must be dismissed pursuant to Federal Rule 12(b)(2).

- *Second*, even assuming that BAEF is subject to the jurisdiction of this Court, venue is not proper in the District of Columbia. BAEF is not a resident of the District of Columbia and the action did not arise here.  Thus, this action must be dismissed pursuant to Federal Rule 12(b)(3).

- *Third*, even if venue is arguably proper in this district, this action should be dismissed based on the doctrine of *forum non conveniens* because the entire dispute relates to Bulgaria.  *See, e.g.*, *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981).

At bottom, this is a classic case of forum shopping.  Plaintiff's action has no meaningful connection to either BAEF or the District of Columbia.  It is wholly improper for plaintiff to burden BAEF and this Court with a lawsuit that has absolutely nothing to do with the United States.  Accordingly, this action should be dismissed.[2]

---

[2]  Plaintiff's Amended Complaint also fails to state a claim upon which relief can be granted, and thus should be dismissed pursuant to Federal Rule 12(b)(6).  BAEF has therefore filed a separate Motion to Dismiss Pursuant to Rule 12(b)(6).  Of course, if this Court agrees that this action should be dismissed for any one of the jurisdiction and venue issues raised in this motion, then it need not address the issues presented in BAEF's Rule 12(b)(6) Motion to Dismiss.  Furthermore, and pursuant to this Court's December 19, 2007 Minute Order, should this Court deny both Motions to Dismiss, BAEF respectfully requests that its Motion to Transfer, which has been fully briefed, be resuscitated and that this action be transferred to the Northern District of Illinois.

## FACTUAL BACKGROUND

### I.    The Parties.

Plaintiff Stroitelstvo is a company organized under the laws of Bulgaria, commercially registered in Sofia City Court, and headquartered in Sofia, Bulgaria. (Am. Compl. ¶ 8; *id.* at Ex. A ¶ 1)   Plaintiff engages in construction projects in Bulgaria, including the development and construction of residential buildings and the sale of residential units in Sofia. (*See* Am. Compl. Ex. A ¶ 1.06)  Plaintiff alleges no business connections in the United States (or outside of Bulgaria) in its Amended Complaint. (*See* Am. Compl. ¶¶ 2, 5)

The Bank is located in Bulgaria and is registered as a Bulgarian joint stock company. (*Id.* ¶ 7; *id.* at Ex. A ¶ 2)  BAEF is the majority owner of the Bank. (Am. Compl. ¶ 7; Ex. 1 ¶ 7)  Among other things, the Bank operates as an investing bank in the areas of small and medium-size enterprise lending, construction lending, and home mortgage lending.   (Am. Compl. ¶ 7; Ex. 1 ¶ 7)

BAEF is a private, not-for-profit U.S. corporation based in Chicago, Illinois. (Am. Compl. ¶ 6; Ex. 1 ¶ 4)  BAEF was originally funded by the United States Congress through the SEED Act, which was passed by Congress in 1989 (and expanded in 1991) to support the development of free markets and private enterprise in the former Soviet bloc following the collapse of the Berlin Wall. (Am. Compl. ¶ 6; Ex. 1 ¶ 3)  BAEF's purpose is to participate in the development and expansion of the economy in Bulgaria by investing in the Bulgarian private sector. (Am. Compl. ¶ 6; Ex. 1 ¶ 3)  BAEF is incorporated under the laws of Delaware and has its registered agent for service of process in Delaware. (Ex. 1 ¶ 4)  BAEF has its only U.S. office in Chicago; it has a second office in Sofia, Bulgaria. (*Id.*)  BAEF regularly transacts business in Chicago and Bulgaria. (Am. Compl. ¶ 4; Ex. 1 ¶ 4)  BAEF's Chicago office is where BAEF's records are kept and where its office administrator is located. (Schiller Tr., Ex. 2 at 43:2-3,

33:10-14)  BAEF is not a resident of the District of Columbia and maintains no office or registered agent there.  (Ex. 1 ¶ 5)  BAEF transacts no business in the District.  (*Id.*)  The only connection between the District of Columbia and BAEF alleged in the Amended Complaint is that BAEF mails semi-annual reports to a government agency located in the District of Columbia.  (Am. Compl. ¶ 6)

## II.    The Loan Agreement.

The Loan Agreement was entered into by plaintiff and the Bank on March 24, 2005, in Sofia, Bulgaria.  (Am. Compl. ¶ 9; *id.* at Ex. A, Preamble)  The Loan Agreement was signed by Bulgarians — Metodi Liubenov Dimitrov for plaintiff and Stoyan Nikolov Dinchiiski and Dimitar Stoyanov Voutchev for the Bank.  (*Id.*)  BAEF had no involvement in the Loan Agreement and was not even aware of it until it received notice of plaintiff's Amended Complaint.  (Ex. 1 ¶ 8)

Under the Agreement, the Bank agreed to loan 2,659,704 EUR (including interest and a management fee that were payable in advance) to plaintiff for the design and construction of a residential real estate project in Sofia.  (Am. Compl. Ex. A ¶¶ 1.06 (defining project), 2.01, 2.06 (funds to be used exclusively for the project))  The Bank agreed to disburse loan funds periodically to plaintiff, subject to various conditions.  (*Id.* ¶¶ 3.01, 3.03(d))  Plaintiff was required to notify the Bank immediately of certain events of default.  (*Id.* ¶ 14.07)

The Loan Agreement anticipated that presales of residential units would occur prior to their completion.  (*Id.* ¶ 1.17)  Plaintiff was required to notify the Bank and obtain its approval for any such presales.  (*Id.* ¶ 14.12)  Plaintiff also had to transfer proceeds from presale agreements to the Bank as loan repayments until the loan was fully repaid.  (*Id.* ¶¶ 9.05, 9.06, 10.01, 10.03)  Any failure to obtain the Bank's approval for presale agreements was an "Event of Default," as was a failure to transfer presale proceeds to the Bank.  (*Id.* ¶¶ 10.01, 16.01(x); *see*

4

*also id.* ¶ 10.03(c) (stating that the Bank could refuse to make further disbursements of funds if plaintiff failed to transfer sales proceeds)) In the event of a default, the Bank had the right, among other things, to: (1) cancel its commitment to disburse any remaining amounts of the loan not yet disbursed; (2) accelerate the loan for immediate repayment; (3) foreclose on collateral; and, (4) seek legal fees incurred to take legal action against plaintiff. (*Id.* ¶¶ 16.04, 16.06)

The Loan Agreement is governed by Bulgarian law. (*Id.* ¶ 17.07) The Bulgarian language version of the Agreement controls in the event of any conflict with the English language version. (*Id.* ¶ 17.12) Significantly, the Loan Agreement includes a forum selection clause that states that, *"any disputes arising from this Agreement or concerning it . . . shall be settled by the Competent Bulgarian Court.*[3] (*Id.* ¶ 17.08)

## III.    Suspension Of Credit Under The Agreement.

After making disbursements under the Loan Agreement, the Bank learned that plaintiff had failed to obtain the Bank's prior consent for presale contracts and failed to transfer presale agreement payments to the Bank in violation of the Loan Agreement. (Am. Compl. ¶ 20; *id.* at Ex. A ¶¶ 14.12, 9.05, 9.06, 10.01, 10.03) The Bank ultimately suspended further disbursements, Am. Compl. ¶ 19, but in effort to resolve the dispute, offered to have its affiliated property management company purchase the project from plaintiff and assume the loan. (*Id.* ¶ 23) Plaintiff declined the offer. (*Id.* ¶ 30) After efforts to resolve the default failed, the Bank asserted its right to recover the full amount of the loan. (*Id.* ¶¶ 23, 31)

---

[3]    Unless otherwise indicated, all *emphasis* is added and internal citations and quotation marks omitted.

## IV.     Bulgarian Resolution Of The Dispute.

On December 12, 2005, the Bank obtained an immediate decree of execution from the Sofia Regional Court (the first instance court) for 970,000 EUR.  (*Id.* ¶ 31; Chernev Decl., Ex. 3 ¶¶ 10, 24; Settlement Agreement, Ex. 4 at I.3)  On December 15, 2005, the Bank initiated foreclosure proceedings with an execution officer to the Sofia Regional Court and attached the assets of plaintiff that had been mortgaged to secure the loan.  (Ex. 3 ¶ 25)

In March 2006, plaintiff challenged the amount of the writ of execution, and the Sofia Regional Court ruled for partial cessation of the foreclosure proceedings.  (*Id.* ¶ 26; Ex. 4 at I.4)  The Bank then appealed that decision to the Sofia City Court (the second instance court and the district court for the Sofia district).  (Ex. 3 ¶ 27; Ex. 4 at I.4)  In June 2006, the Sofia City Court ruled in favor of the Bank by repealing the order stopping foreclosure and stating that the Bank had the right to foreclose and collect the full amount (970,000 EUR).  (Ex. 3 ¶ 27)  Prior to this decision, however, on May 9, 2006 (one month after the Sofia Regional Court ruling and prior to the decision from the Sofia City Court), plaintiff entered into a settlement agreement with the Bank ("Settlement Agreement").[4]  (Ex. 4; Am. Compl. ¶¶ 32, 34; Ex. 3 ¶ 28)  Under the Settlement Agreement, plaintiff agreed to pay the Bank 563,000 EUR.  (Am. Compl. ¶ 35; Ex. 3 ¶ 29; Ex. 4 at II. Art. 1)  The Bank and plaintiff also each agreed to waive further claims and appeals based on the Loan Agreement.  (Ex. 4 at II. Arts. 2-4, 5)

Plaintiff never commenced an adversarial process in Bulgaria to determine the validity of the debt claimed by the Bank, Chernev Tr., Ex. 5 at 103:9-13, 106:8-11, despite the fact that such a process was available to plaintiff.  (Am. Compl. ¶ 32)  In fact, plaintiff could

---

[4]     Plaintiff now alleges that it entered into the Settlement Agreement under duress.  (Am. Compl. ¶ 34)  But none of plaintiff's claims relates to the validity of the Settlement Agreement, despite its contention that it was "forced to enter into [the Settlement Agreement] with the Bank." (*Id.*)

have filed a negative declaratory action in Bulgaria to establish that the debt claimed by the Bank did not exist. (Ex. 5 at 106:18-21)  To do so, plaintiff would have had to file a separate action and pay the standard four percent court tax on the value of its claim (a tax applied to all civil claims in Bulgaria). (*Id.* at 108:4-8; Am. Compl. ¶ 32)  Plaintiff would have been entitled to recover the tax from the Bank if it had prevailed (as would any other plaintiff who prevails in a civil lawsuit in Bulgaria). (Ex. 5 at 135:17-22)  Moreover, after filing a negative declaratory action, plaintiff could have obtained an injunction to stop the execution on the original writ while the negative declaratory action was pending. (Ex. 5 at 109:3-12)  Plaintiff claims that it did not seek such relief because "plaintiff would have been required to initiate a separate action, and to pay a filing fee of four percent of the amount claimed" and because "[t]hat action would have taken two to three years to reach final decision."[5]  (Am. Compl. ¶ 32)

**V.    Stroitelstvo Files This Lawsuit.**

On April 4, 2007, plaintiff filed this action.  BAEF was served on June 18, 2007, through its registered agent in Delaware.  BAEF filed various motions to dismiss the original complaint, and plaintiff responded by filing an Amended Complaint.  Plaintiff then requested, and BAEF agreed, to take limited discovery on the issues of jurisdiction and venue.  That discovery is now complete.

In its Amended Complaint, plaintiff purports to assert six claims against BAEF: (1) a RICO claim under 18 U.S.C. § 1961(c), Am. Compl. ¶¶ 55-67; (2) intentional interference with various contracts purportedly entered into by plaintiff with third parties pertaining to the construction project in Bulgaria, *id.* ¶¶ 77-84; (3) intentional interference with prospective

---

[5]    Plaintiff states that it would have taken a Bulgarian court "two to three years" to reach a final decision had it filed suit there.  But it does not cite anything to support the inference that it will be granted quicker resolution here.  In fact, it is worth noting that plaintiff filed the instant action eight months ago, and the Bank has not yet even been served with the Amended Complaint pursuant to the Hague Convention.

advantage arising from the Bulgarian construction project, *id.* ¶¶ 85-91; (4) breach of fiduciary duty, *id.* ¶¶ 92-97; (5) violation of Bulgarian law, *id.* ¶¶ 103-109; and (6) civil conspiracy and vicarious liability, *id.* ¶¶ 110-113.[6] Plaintiff alleges that nonspecified "actions by ***the Bank*** . . . amount to extortion, blackmail, bank fraud and predatory lending practices . . . and constitute a pattern of racketeering activity" under civil RICO. (*Id.* ¶ 38) Plaintiff seeks consequential damages resulting from the Bank's suspension of disbursements. (*Id.* ¶ 40)

The Loan Agreement entered into by plaintiff and the Bank is the basis of plaintiff's RICO claim, as well as each and every one of plaintiff's common law tort claims. (*See id.* ¶¶ 66, 97, 102, 113 (damages include plaintiff's loss of benefit of the bargain); 68-76 (breach of contract claim); and 82-83, 89-90 (refusal to provide funds under the contract was intentional interference with plaintiff's third-party contracts and prospective advantage)

## VI.    Availability And Adequacy Of Bulgarian Courts.

Bulgarian courts provide an alternative forum that is both available and adequate to resolve all of plaintiff's claims against BAEF (and the Bank). (Ex. 5 at 71:1-17-72:2) Both BAEF and the Bank would be subject to service of process in Bulgaria. The Bank, a Bulgarian entity, is subject to process in the Sofia District Court because the Bank is located in Sofia. (*Id.* at 57:10-15) Likewise, BAEF is subject to jurisdiction in Bulgaria on various grounds. (Ex. 3 ¶¶ 16-18)

Additionally, the claims alleged in the Amended Complaint could have been filed in Bulgaria's second level district. (Ex. 5 at 55:11-19) Bulgarian law has comparable remedies to those sought by plaintiff in this forum. (*Id.* at 73:2-6; 78:15-79:1) Plaintiff's contractual

---

[6]    Plaintiff has also asserted claims for breach of the loan agreement, Am. Compl. ¶¶ 68-76, and abuse of process, *id.* ¶¶ 98-102, but those claims apparently are alleged only against the Bank. (*See, e.g., id.* ¶¶ 73-74 (alleging only that "[t]he Bank failed and refused to meet its obligations under the Contract . . . .") 101 ("The Bank's conduct was wrongful and its intent was wrongful.").

claims are governed by contract law under Bulgaria's Obligations and Contracts Act.  (*Id.* at 73:16-74:4)  Plaintiff's other claims likely would be governed by Bulgarian tort law, which allows claimaints to bring tort claims against corporations under Articles 49 and 50 of the Obligations and Contracts Act.  (*Id.* at 74:5-10, 87:20-88:5, 89:2-21, 136:19-22, 138:6-11)

Bulgarian courts are also an adequate alternative forum to the District.  Bulgaria was accepted into the European Union ("E.U.") on January 1, 2007.  (Skochev Tr., Ex. 6 at 20:8-10)  Importantly, in order to gain admission into the E.U., the country-applicant must satisfy the Copenhagen Criteria.  (Slavova Tr., Ex. 7 at 19:21-20:2)  The Copenhagen Criteria requires, among other things, that a country have stable institutions that guarantee the rule of law.  (Ex. 6 at 20:4-7)  The E.U. has obviously found that the Bulgarian judicial system meets this standard, as it granted Bulgaria admittance one year ago.  (Ex. 5 at 114:5-11)  Moreover, and as is standard for newly-admitted countries, the E.U. is monitoring Bulgaria's judicial system for its first three years of membership.  (Ex. 5 at 124:12-20)

The adequacy of Bulgaria's judicial system is further illustrated by the fact that plaintiff's Bulgarian law experts have long litigated, and continue to litigate, cases in Bulgarian courts.  (Ex. 6 at 10:21-11:6; Ex. 7 at 27:13-19)  Vladimir Stefanov Skochev currently is working on fifteen cases in various Bulgarian courts.  (Ex. 6 at 10:21-11:6)  Plaintiff's other Bulgarian law expert, Maria Slavova, has litigated over 200 cases in Bulgarian courts.  (Ex. 7 at 27:13-19)  Bulgarian courts are thus available and adequate to adjudicate this matter.

## ARGUMENT

## I.    BAEF Is Not Subject To Personal Jurisdiction In The District Of Columbia.

A court may exercise personal jurisdiction over a non-resident defendant in the District of Columbia "by finding specific jurisdiction based on conduct connected to the suit, or by finding general jurisdiction [over the party]."  *United States v. Philip Morris Inc.*, 116 F.

Supp. 2d 116, 120 n.4 (D.D.C. 2000); *see also Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 (1984).   To establish specific jurisdiction over a defendant, plaintiff must show that its claims are "based on acts of a defendant that touch and concern the forum." *Brunson v. Kalil & Co.*, 404 F. Supp. 2d 221, 227 (D.D.C. 2005).   General jurisdiction, on the other hand, requires a showing that a defendant's contacts with the forum are "continuous and systematic."   *Helicopteros Nacionales*, 466 U.S. at 415.   Under both specific and general jurisdiction, the exercise of personal jurisdiction must comply with constitutional due process. *See, e.g., GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).

In this case, plaintiff has not asserted (and cannot assert) any factual basis that would warrant this Court's exercise of either specific or general personal jurisdiction over BAEF.   None of the conduct at issue in this lawsuit "touches" or "concerns" this jurisdiction, as is required to exercise specific jurisdiction.   And BAEF has nothing even remotely approaching the continuous and systematic dealings with the District of Columbia that are required to justify the exercise of general jurisdiction.   In addition, this Court cannot exercise personal jurisdiction over BAEF consistent with due process, nor is plaintiff's RICO claim sufficient to establish personal jurisdiction over BAEF.   Plaintiff's Amended Complaint must therefore be dismissed for lack of personal jurisdiction over BAEF.

A.    **Plaintiff's Burden Of Proof To Demonstrate A Factual Basis For Asserting Personal Jurisdiction Over BAEF.**

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing a factual basis for the court's exercise of personal jurisdiction over the defendant.   *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).   Plaintiff must, therefore, allege specific facts connecting the defendant with the forum. *Capital Bank Int'l Ltd. v. Citigroup, Inc.*, 276 F. Supp. 2d 72, 74 (D.D.C. 2003).   But "plaintiff

cannot aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant." *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003) (citing *Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980)).  And bare allegations and conclusory statements are insufficient to establish personal jurisdiction.  *Capital Bank*, 276 F. Supp. 2d at 74.

While factual allegations are ordinarily presumed to be true for purposes of ruling on a motion to dismiss, "[i]n determining whether a plaintiff has demonstrated that the defendant's contacts with the forum suffice to justify the exercise of personal jurisdiction . . . the Court is no longer bound to treat all of plaintiff's allegations as true." *Philip Morris Inc.*, 116 F. Supp. 2d at 120 n.4 (citing *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1519 n.1 (D.C. Cir. 1984) ("holding that on motions to dismiss for lack of subject matter jurisdiction, courts are not required to adopt plaintiffs' versions of controverted jurisdictional facts")).  Thus, the court "may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts." *Philip Morris*, 116 F. Supp. 2d at 120 n.4.  *See also Brown v. Wachovia Bank*, Civil Action No. 06-0153 (RMC), 2007 WL 1378491, at *7 (D.D.C. May 10, 2007).  Plaintiff's failure to plead sufficient, specific facts to support exercise of personal jurisdiction over a defendant may result in dismissal of the action.  *See, e.g., Allen v. Russian Fed'n*, --- F. Supp. 2d ----, Civil Action No. 05-2077 (CKK), 2007 WL 4145596 (D.D.C. Nov. 26, 2007) (granting defendants' motions to dismiss complaint for failure to establish personal jurisdiction against Russian companies and citizens regarding activity centered in Russia).

**B.     This Court Lacks Specific Jurisdiction Over BAEF Because None Of The Conduct At Issue Occurred In The District Of Columbia.**

To determine whether it may exercise specific personal jurisdiction over a defendant, a court must first examine whether jurisdiction is available under the applicable long-

11

arm statute,[7] and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process.[8] *GTE New Media Servs.*, 199 F.3d at 1347. The District of Columbia long-arm statute provides in pertinent part:

> A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's
>
> (1) transacting any business in the District of Columbia . . . .

D.C. Code § 13-423(a) (2007). Because a court in the District may exercise jurisdiction over a non-resident defendant under its long arm statute "only [for] a claim for relief arising from acts enumerated in [the statute] . . . ," *id.* § 13-423(b), any claims unrelated to the acts forming the basis for personal jurisdiction are barred. *See, e.g.*, *Willis v. Willis*, 655 F.2d 1333, 1336 (D.C. Cir. 1981). In other words, specific personal jurisdiction allows only those claims "based on acts of a defendant that touch and concern the forum," *Brunson*, 404 F. Supp. 2d at 227, and a plaintiff relying on this provision must show both that the defendant transacted business in the District of Columbia and that the claim arose from the business transacted in the District. *FC Inv. Group LC v. IFX Markets, Ltd.*, 479 F. Supp. 2d 30, 39 (D.D.C. 2007).

In its Amended Complaint, plaintiff has alleged no business transactions by BAEF in the District of Columbia, much less any business transactions from which any of its claims arise. (*See* Am. Compl.) In fact, the ***only*** action by BAEF that plaintiff alleges occurred in the District of Columbia is that, "[p]ursuant to the SEED Act, BAEF reports every six months

---

[7]    Where, as here, a plaintiff alleges federal question jurisdiction and no federal long-arm statute applies, the court must apply the jurisdictional law of the state in which it resides. *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509 (D.C. Cir. 2002); *Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991). Accordingly, this Court should apply District of Columbia law in determining whether personal jurisdiction exists.

[8]    D.C. Code § 13-423(a)(1)'s "transacting any business" clause generally has been interpreted to be coextensive with the Constitution's due process requirements and thus may merge into a single inquiry. *GTE New Media Servs.*, 199 F.3d at 1347.

to the United States Agency for International Development in the District of Columbia." (*Id.* ¶ 6)  But BAEF did not make any reports to the United States Agency for International Development ("USAID") in the District of Columbia.  (*See* Oct. 26, 2007 Letter from E. Eun to P. Musolino, Ex. 8)  At best, written copies of these reports were mailed to USAID's offices in D.C. and Sofia, Bulgaria in advance of BAEF's meetings with USAID (which took place either on the phone or face-to-face in Sofia, Bulgaria).  (*See* Ex. 2, at 29:20-22, 30:1-3)  Periodic mailings to D.C. can in no way be regarded as a "business transaction" sufficient to establish specific jurisdiction over BAEF.  *Cf. FC Inv. Group*, 479 F. Supp. 2d at 39 (holding that "the defendant's regular phone calls into the District of Columbia from elsewhere [did] not constitute transacting business in the District of Columbia.").  And even if these mailings could be regarded as "business transactions," plaintiff fails to show that its claims in any way arose from BAEF's mailing of these reports to D.C.  *Textile Museum v. F. Eberstadt & Co.*, 440 F. Supp. 30, 32 (D.D.C. 1977) (holding that "initiation of telephone calls and letters by defendant in New York to plaintiff in the District" was not sufficient to subject defendant to specific jurisdiction).

Furthermore, BAEF, at plaintiff's request, produced expense reports documenting travel to the District of Columbia by BAEF's two U.S. officers from January 2005 to present. (*See* Ex. 8)  But, as BAEF's Managing Director testified, out of the five reports produced (documenting expenses for four trips to D.C.), *none* documented travel to the District of Columbia for BAEF business.  In fact, three of these trips were for business related to BAEF's legacy institution, the America for Bulgaria Foundation, *see, e.g.*, Ex. 2 at 54:19-22, 56:5-8, 62:13-15, and the fourth trip was for a meeting of the Enterprise Fund Association, which happened to be held in Washington, D.C. in 2007.  (*See* Ex. 2 at 66:9-67:3; 68:4-5)  The discovery taken, therefore, further demonstrates that BAEF did not transact any business in D.C.,

13

much less any business related to plaintiff's claims in this case.   (*See also* Ex. 1 ¶ 5)

Accordingly, specific jurisdiction cannot be asserted over BAEF in the District of Columbia. *See*

*First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988) (holding that there

was "no basis on which to hold that [the defendants] purposefully directed their activities in any

way towards the District.").

### C.    This Court Lacks General Jurisdiction Over BAEF Because BAEF Does Not Have A Sufficient Connection To This District.

The District's general jurisdiction statutes confer jurisdiction over a defendant

corporation "without regard to the underlying claim's relationship to the defendant's activity in

the forum . . . ." *Brunson*, 404 F. Supp. 2d at 227.   But in order to establish general jurisdiction

over BAEF in the District of Columbia, plaintiff must demonstrate that BAEF is either

"domiciled in, organized under the laws of, or maintain[s] . . . its principal place of business in,

the District of Columbia . . ." D.C. Code § 13-422, or in the case of non-residents, that BAEF

"carries on a consistent pattern of regular business activity within the jurisdiction," pursuant to

D.C. Code § 13-334.  *See Capital Bank*, 276 F. Supp. 2d at 75.

As stated above, BAEF is a Delaware corporation with its principal office in

Chicago. (*See supra* at 1)  In fact, plaintiff itself concedes that BAEF is a non-resident of the

District.   (Am. Compl. ¶ 6 (BAEF "has at all times been based in Chicago, Illinois."))

Accordingly, plaintiff cannot establish general jurisdiction over BAEF under D.C. Code § 13-

422.   Thus, plaintiff must demonstrate that this Court has general jurisdiction pursuant to

Section 13-334. But it cannot.

Plaintiff cannot demonstrate that BAEF has a "continuing corporate presence in

the [District] . . . directed at advancing [BAEF's] objectives," *El-Fadl v. Cent. Bank of Jordan*,

75 F.3d 668, 675 (D.C. Cir. 1996), which requires a showing of a more "systematic and

continuous course of conduct for jurisdictional reach than the transacting any business standard in the present § 13-423(a)(1) . . . ." *Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d 217, 222 n.9 (D.C. Cir. 1986). *See also AGS Int'l Servs. S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 74 (D.D.C. 2004) (stating that the "doing business" test of Section 13-334(a) of the D.C. Code "requires an examination of the frequency and volume of the [defendant's] transactions with the District . . . .") Here, plaintiff has not alleged any conduct by BAEF that remotely resembles "a consistent pattern of regular business activity." *Capital Bank*, 276 F. Supp. 2d at 75. In fact, any conceivable contact with D.C. can only be characterized as infrequent and sporadic.

The sole contact with the District alleged in plaintiff's Amended Complaint is that, "[p]ursuant to the SEED Act, BAEF reports every six months to the United States Agency for International Development in the District of Columbia." (Am. Compl. ¶ 6) But, as shown above, BAEF did not make any reports to USAID in the District of Columbia. *See supra* at 12. Additionally, and as explained above, the handful of business trips by BAEF executives over the past three years were generally made for the purpose of conducting business for the America for Bulgaria Foundation, not for BAEF. These contacts, therefore, are insufficient to establish general jurisdiction over BAEF.

Moreover, the fact that BAEF was established and funded by Congress under the SEED Act *over fifteen years ago*, *see* Am. Compl. ¶ 6, is not adequate to subject BAEF to the general jurisdiction of this Court. *Cf. AGS Int'l Servs.*, 346 F. Supp. 2d at 76-77 (federal district court did not have general personal jurisdiction, under District of Columbia long-arm statute, over mining joint venture based in Peru when contacts consisted of trips to District by employees to discuss details of funding with bank located in District); *Fandel v. Arabian Am. Oil Co.*, 345

F.2d 87, 88-89 (D.C. Cir. 1965) (Delaware corporation which produced, refined, and sold oil and gas in Saudi Arabia was not doing business within District of Columbia where it maintained an office used solely for the purpose of maintaining continuing relationships with and exchanging information with State Department, other federal agencies, diplomatic missions, and public and private educational and international organizations).  As the D.C. Circuit explained in *Fandel*:

> [I]t appears that the Washington office of appellee is, if not the sole, at least a significant element in its diplomatic and intelligence apparatus. But that element is centered in Washington simply because of what Washington is, namely the capital city where public and private persons, with interests or responsibilities in the Middle East, foregather and make their contribution, real or fancied, to the formulation of official policies . . . .
>
> [W]ashington presents many business organizations with special needs for a continuous and ponderable physical presence there, which needs are not those customarily associated with strictly commercial operations; and that the purpose of Congress was not to make that presence in every case a base for the assertion of personal jurisdiction.

*Id.*  Limited contact with a governmental agency that happens to be located in the District of Columbia simply is not sufficient to confer general jurisdiction over a party.  *See Baltierra v. W. Va. Bd. of Medicine*, 253 F. Supp. 2d 9, 14 (D.D.C. 2003) (rejecting attempt to establish "doing business" general jurisdiction in the District of Columbia because defendant "maintain[s] close communications with the SECRETARY OF DHHS . . . .").  Because BAEF has no continuous or systematic activity in the District, it is not subject to general jurisdiction under Section 13-334 of the D.C. Code.

**D.    In Any Event, This Court Cannot Exercise Personal Jurisdiction Over BAEF Consistent With Due Process.**

Both the "transacting business" provision of the District of Columbia long-arm statute and the "doing business" provision of the District of Columbia general jurisdiction statute are "coextensive in reach with the personal jurisdiction allowed by the due process clause of the

United States Constitution." *See, e.g., AGS Int'l Servs.*, 346 F. Supp. 2d at 74, 78.  Due process concerns are satisfied only where a nonresident corporate defendant "has certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *See Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 (1984).  These minimum contacts must be grounded in "some act by which the defendant purposefully avails itself of the privilege of conducting activities with the forum state, thus invoking the benefits and privileges of its laws." *Asahi Metal Indus. v. Super. Ct. of Cal.*, 480 U.S. 102, 109 (1987).  In other words, "the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

In this case, asserting jurisdiction in the District of Columbia would offend traditional notions of fair play and substantial justice given BAEF's lack of any meaningful connection to the District.  As established above, BAEF's limited and intermittent contacts with the District cannot be considered affirmative acts by which BAEF purposefully availed itself of the privilege of conducting business within the District of Columbia.  It follows, then, that BAEF could not have reasonably anticipated being haled into court in the District of Columbia.  Therefore, it would be unfair to require BAEF to litigate this dispute in the District of Columbia.

**E.    The RICO Statute Does Not Establish Personal Jurisdiction Over BAEF.**

Plaintiff apparently recognizes that it cannot successfully assert either specific or general personal jurisdiction over BAEF in the District of Columbia, because it alleges that this Court has personal jurisdiction over BAEF pursuant to 18 U.S.C. §§ 1965(b) and (d).  (Am. Compl. ¶ 1)  Plaintiff is wrong.

The majority of federal appellate courts that have addressed this issue have rejected the argument that the nationwide service of process provision of RICO creates

nationwide personal jurisdiction over all defendants. Instead, the majority of courts have held that a court must establish personal jurisdiction over at least one defendant before it can impose nationwide service pursuant to RICO on other defendants. *See, e.g., Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1231 (10th Cir. 2006) ("When a civil RICO action is brought in a district court where personal jurisdiction can be established over at least one defendant, summonses can be served nationwide on other defendants if required by the ends of justice"); *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998) ("[A] civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant."); *Butcher's Union Local No. 498, United Food & Commercial Workers v. SDC Inv., Inc.*, 788 F.2d 535 (9th Cir. 1986) (for nationwide service to be imposed under section of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965(b), court must have personal jurisdiction over at least one participant in alleged multidistrict conspiracy).

Consistent with these cases, all but one court in this district have rejected similar attempts to use the RICO statute to create nationwide personal jurisdiction over a defendant. For example, in *FC Inv. Group LC v. IFX Markets, Ltd.*, 479 F. Supp. 2d 30, 43-44 (D.D.C. 2007), the court noted that plaintiffs appeared to assert personal jurisdiction based on the nationwide service of process provision of the RICO statute, 18 U.S.C. § 1965 (the same provision plaintiff cites here). The court explained that District of Columbia courts have recently rejected that argument:

> The basic question regarding the scope of Section 1965 is whether it permits a court to consider a defendant's *nationwide* contacts in analyzing jurisdiction. Judge Green concluded in *Dooley* that a plaintiff's jurisdictional burden is met under Section 1965 "by showing that a defendant has contacts with the United States. Minimum contacts with the forum . . . [are] not necessary [and a] defendant's contact with the United States is sufficient to satisfy the requirements of due process." *Dooley v. United Techs. Corp.*,

18

786 F. Supp. [65,] 71 [(D.D.C. 1992)] (Green, J.). More recently, however, Judges Lamberth and Walton have rejected the nationwide contacts test of *Dooley*, and held that Section 1965(a) requires the Court to determine whether at least one defendant had minimum contacts within the forum. *See World Wide Minerals v. Republic of Kazakhstahn*, 116 F. Supp. 2d 98, 107-08 (D.D.C. 2000) (Lamberth, J.), remanded on other grounds, 296 F.3d 1154; *see also AGS Int'l Services S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d at 86-87 (Walton, J). Thus, under Judge Lamberth's and Judge Walton's approach, Section 1965(a) still requires sufficient minimum contacts within the district.

*FC Investment Group*, 479 F. Supp. 2d at 44. The court, "persuaded by the analysis of Judge Lamberth in *World Wide Minerals* and Judge Walton in *AGS International Services*," then read the RICO statute "to require that ***at least one defendant*** have had minimum contacts with the District of Columbia." *Id.* (granting motion to dismiss, holding that plaintiffs had failed to meet their jurisdictional burden under the RICO statute). Thus, the more logical, and widely accepted, interpretation of personal jurisdiction under RICO is that a plaintiff must show that at least one defendant has minimum contacts with the District of Columbia. *Id.* Because, as explained above, plaintiff has not alleged, and cannot allege, that BAEF has sufficient contacts with the District of Columbia to warrant the exercise of personal jurisdiction, BAEF's motion to dismiss should be granted.

## II.    Venue Is Not Proper In This District.

Venue statutes "protect[ ] a defendant from the inconvenience of having to defend an action in a trial court that is either remote from the defendant's residence or from the place where the acts underlying the controversy occurred." *Modaressi v. Vedadi*, 441 F. Supp. 2d 51, 53 (D.D.C. 2006). Rule 12(b)(3), therefore, permits a defendant at the outset of litigation to test whether plaintiff has brought the case in a venue that the law deems appropriate. *Id.* (citing Fed. R. Civ. P. 12(b)(3) (2007)). "Because it is the plaintiff's obligation to institute the action in a

permissible forum, the plaintiff usually bears the burden of establishing that venue is proper." *Modaressi*, 441 F. Supp. 2d at 53.

Plaintiff alleges that venue is proper in the District of Columbia under both 28 U.S.C. § 1391 and 18 U.S.C. § 1965. Plaintiff is wrong again. Because plaintiff agreed with the Bank in the Loan Agreement that the proper venue is Bulgaria, venue is not proper in this district. But even if for some reason the forum selection clause were not enforced here, venue would still not be proper in this district under either 28 U.S.C. § 1391 or 18 U.S.C. § 1965.

**A.**    **The Forum Selection Clause Should Be Enforced.**

When there is a valid forum selection clause in place, the court must defer to the expressed intent of the parties unless plaintiff can demonstrate that enforcement would be unjust or that the contract is invalid. *See, e.g.*, *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972). Courts routinely enforce such agreements. *See, e.g.*, *Carnival Cruise Lines v. Shute*, 499 U.S. 585, 591-92 (1991) (a court is unlikely to set aside a forum selection clause even when the designated forum is remote); *L&L Constr. Assocs., Inc. v. Slattery Skanska, Inc.*, No. CIV 05-1289, 2006 WL 1102814, at *4 (D.D.C. Mar. 31, 2006) (conclusory allegations that the clause was obtained by fraud were insufficient to overcome the strong presumption in favor of enforcing forum selection clauses).

In this case, plaintiff does not allege that the clause was secured by fraud or that it is otherwise unenforceable under the law.[9] Thus, the central issue facing this Court is whether the clause applies to all of the claims in this dispute. *See, e.g.*, *Marra v. Papandreou*, 59 F. Supp. 2d 65 (D.D.C. 1999). The answer to that question is clearly "yes."

---

[9]    Plaintiff makes a vague allegation in its Amended Complaint that Bulgarian courts are not available for redress of its contract claim. (Am. Compl. ¶ 54) However, that conclusory assertion is wrong (*see* Ex. 3 ¶¶ 9-22), and does not demonstrate that the forum selection clause is invalid or should not be enforced.

There can be no dispute that plaintiff's breach of contract claim against the Bank falls squarely within the scope of the clause. (Am. Compl. Ex. A ¶ 17.08 ("any disputes under the [Loan Agreement], including interpretation, validity, nonperformance or termination, *shall be settled by the Competent Bulgarian Court*.") The forum selection clause applies to plaintiff's RICO and tort claims as well, because those claims are all related (directly or indirectly) to the contractual relationship. (*See id.* (stating that "any disputes arising from this Agreement or concerning it . . . shall be settled by the Competent Bulgarian Court.")

Whether a forum selection clause in a contract also requires dismissal of non-contract claims depends on "whether the non-contract claims asserted are directly or indirectly related to the contractual relationship of the parties." *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 922 F. Supp. 1334, 1379 (N.D. Iowa 1996); *see also Worldwide Network Servs., LLC v. DynCorp Int'l*, 496 F. Supp. 2d 59, 63 (D.D.C. 2007) (citing *Terra Int'l* with approval, "because plaintiff's claims turn on the existence and performance of the contract at issue, the Court finds that plaintiff's claims fall within the forum selection clause."). Courts have thus applied forum selection clauses to non-contractual claims where, for instance: (1) the non-contract claims "involv[e] the same operative facts as a parallel claim for breach of contract," *Lambert v. Kysar*, 983 F.2d 1110, 1121-22 (1st Cir. 1993); (2) "resolution of the [non-contract] claims relates to interpretation of the contract," *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 (9th Cir. 1988); or (3) the non-contract claims "ultimately depend on the existence of a contractual relationship." *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 203 (3d Cir. 1983).[10]

---

[10]   *See also Crescent Int'l, Inc. v. Avatar Cmtys., Inc.*, 857 F.2d 943 (3d Cir. 1988) (enforcing forum selection clause as to RICO violation, fraud, unfair competition, and tortious interference claims where although only one claim was based on a breach of contract theory, all claims involved allegations arising out of the contract and
(Continued...)

Here, plaintiff's non-contract claims are inextricably related to the contractual relationship between the Bank and plaintiff. Plaintiff's tortious interference claims are based on purported breaches of the Loan Agreement, including refusal to provide funds under that Agreement. (See, e.g., Am. Compl. ¶¶ 78, 86, 88 (alleging that defendants knew plaintiff required loan funds under the Loan Agreement); id. ¶¶ 82, 89 (alleging that defendants wrongfully "failed and refused to provide the funds required by the [Loan Agreement] with plaintiff, wrongfully suspended credit, and wrongfully froze and attached and interfered with Plaintiff's assets.")) Plaintiff's breach of fiduciary duty claim is based on these same acts, id. ¶ 96, and the RICO claim is based on the Bank's lending practices — namely its performance under the Loan Agreement and under a handful of similar agreements with others (although none are specifically alleged). (Id. ¶ 58 (alleging "stripping equity and property from Plaintiff," "engaging in predatory and unlawful loan practices and bank fraud," and intending to "permanently deprive Plaintiff" of money and business)) Plaintiff's violation of Bulgarian law claim is based on the Bank's "breaching" the terms of the Obligations and Contracts Act, see id. ¶¶ 104-107, which is the law that governs the Loan Agreement. Finally, plaintiff's conspiracy and vicarious liability claim simply alleges a conspiracy to undertake all of the foregoing actions. (Id. ¶ 111) For **each claim**, plaintiff maintains that its damages include "the loss of the benefit of its bargain." (Id. ¶¶ 66, 84, 91, 97, 113) In short, these claims all center around activities related to, involve the same operative facts as, require interpretation of, and depend upon the Loan Agreement.[11]

---

implicating its terms); *Vijuk Equip., Inc. v. Otto Hohner KG*, 728 F. Supp. 1368, 1371 (N.D. Ill. 1990) ("It is well settled that forum selection clauses such as this one apply not only to strictly breach of contract claims but also to tort claims which require interpretation of the contract.").

[11]    Although not asserted against BAEF, plaintiff's abuse of process claim is likewise based on the Bank's execution of remedies under (and upon termination of) the Loan Agreement. (Am. Compl. ¶¶ 98-102)

It is immaterial to this analysis that BAEF is not a party to the Loan Agreement. In *Manetti-Farrow*, the plaintiff brought several tort claims related to a contract between the plaintiff and one of several defendants.    858 F.2d at 514.    The contract included a forum selection clause which provided that Florence, Italy would be the forum for resolving disputes regarding "interpretation" and "fulfillment" of the contract.    Plaintiff argued that his tort claims were not subject to the clause, but the court rejected that argument, finding that the close relationship between the conduct complained of and the contractual relationship of the plaintiff and one of the defendants established that the forum selection clause applied to "all defendants." *Id.* n.5.    Therefore, all claims in the plaintiff's lawsuit were dismissed as having been brought in the wrong forum. *Id.*[12]    The court also dismissed plaintiff's concern that the clause should not be enforced because an Italian court would not "adequately safeguard is rights against all the defendants" as "speculative," and "reflect[ing] something of a provincial attitude regarding the fairness of [an Italian] tribunal."    *Id.* at 515 (further stating that plaintiff's concern was one "which the parties presumably thought about and resolved when they included the forum selection clause in their contract.").

No amount of "artful pleading" can change this result.    *See Worldwide Network Servs., LLC*, 496 F. Supp. 2d at 63 ("strategic or artfully drawn pleadings will not be permitted to circumvent an otherwise applicable forum selection clause, because narrowly interpreting a forum selection clause may permit parties to avoid it by simply pleading non-contractual claims;

---

[12]    *See also Brock v. Entre Computer Ctrs., Inc.*, 740 F. Supp. 428, 430 (N.D. Tex. 1990) (forum selection clause applies to tort claims as well as contract claims, and also applies to "transaction participants" even if they were not parties to the contract); *Stephens v. Entre Computer Ctrs, Inc.*, 696 F. Supp. 636, 638 (N.D. Ga. 1988) (rejecting argument that forum selection clause did not apply to non-signatories of contract).

an outcome that runs counter to the law favoring forum selection clauses.").[13]   Otherwise, a plaintiff could avoid its contractual obligation to litigate in an agreed-upon forum simply by joining persons not party to its contract.  *See, e.g.*, *Friedman v. World Transp., Inc.*, 636 F. Supp. 685, 690-91 (N.D. Ill. 1986) (a party cannot escape his contractual obligation to sue in a specified forum merely by joining additional parties who did not sign the contract).  The bottom line is that plaintiff agreed to litigate in Bulgaria the disputes it has raised in this case.  This Court should hold plaintiff to its commitment and dismiss this case for improper venue.  *See Manetti-Farrow*, 858 F.2d at 515 (upholding the lower court's enforcement of the parties' forum selection clause, stating that "[plaintiff] now wants to change the bargain.  To permit it to do so would completely contradict the policy of enforcing forum selection clauses.").

### B.    Venue Is Not Proper Under Either Statute Cited By Stroitelstvo.

Even if the forum selection clause does not apply here, this action must still be dismissed pursuant to Federal Rule 12(b)(3) because venue is not proper in the District of Columbia.  Neither statute cited by plaintiff establishes proper venue in this district.

### 1.    Venue Is Not Proper Here Under 28 U.S.C. § 1391.

Plaintiff alleges that venue is proper under 28 U.S.C. § 1391(a)[14], (b), (c)[15] and (d)[16].  But the only applicable provision is 28 U.S.C. § 1391(b), which provides in relevant part:

---

[13] *See also Lambert*, 983 F.2d at 1121 ("We cannot accept the invitation to reward attempts to evade enforcement of forum selection agreements through 'artful pleading of [tort] claims' in the context of a contract dispute"); *Coastal Steel*, 709 F.2d at 203 (the same public policy that favors enforcement of forum selection clauses "requires that they not be defeated by 'artful pleading of [tort] claims.'").

[14] Subsection (a) applies to civil actions "wherein jurisdiction is founded only on diversity of citizenship" and is thus inapplicable here.  (*See* Am. Compl. ¶ 1 asserting subject matter jurisdiction based on both diversity and federal question statutes))  Furthermore, plaintiff mistakenly asserts that subject matter jurisdiction exists on the basis of diversity, but "[a] diversity suit . . . may not be maintained in federal court by an alien against a citizen of a state and a citizen of some other foreign country." *Eze v. Yellow Cab Co. of Alexandria, Va., Inc.*, 782 F.2d 1064, 1065 (D.C. Cir. 1986)

> (b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in
>
> (1) a judicial district where any defendant resides, if all defendants reside in the same State,
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or
>
> (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

Subsection (b)(1) is inapplicable because BAEF and BACB do not reside in the "same State" (here, the District of Columbia). For purposes of this chapter, "a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c) (2007). Because BAEF is not subject to personal jurisdiction in the District of Columbia, it does not "reside" there under Section 1391(b)(1). Moreover, plaintiff has made no allegations that would suggest that the Bank is subject to personal jurisdiction in the District.

Subsection (b)(2) is likewise inapplicable because the District of Columbia is not "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2). The allegations in plaintiff's Amended Complaint make clear that none of the relevant events giving rise to its claims took place in the District of Columbia. Tellingly, out of

---

[15] Subsection (c) simply defines "residence" for purposes of the chapter and does not provide an independent basis for venue.

[16] Subsection (d), which provides that "an alien may be sued in any district," does not render the District of Columbia a proper venue where one defendant (BAEF) is a non-alien. *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, Civil Action Nos. 83-1958 & 83-2978, 1984 WL 2929, at *3-5 (D.D.C. Jan. 24, 1984) (where an alien and a nonalien are joined as defendants, venue for the entire action is proper in any district where it is correct as to nonalien defendant); *Japan Gas Lighter Ass'n v. Ronson Corp.*, 257 F. Supp. 219 (D.N.J. 1966) (same).

113 paragraphs in the Amended Complaint, only *one* paragraph alleges conduct in the District of Columbia.[17]  (*See* Am. Compl. ¶ 6)  Nor has plaintiff alleged that any of the property at issue is situated here.

Finally, subsection (b)(3) does not apply.  Being "found" in a district means "having a presence" or "engaging in continuous local activity" there.  *See, e.g., Armco Steel Co., L.P. v. CSX Corp.*, 790 F. Supp. 311, 319 (D.D.C. 1991).  As explained above, neither BAEF nor the Bank has an office or registered agent in the District, and neither engages in any kind of continuous local activity here.  (*See* Ex. 1 ¶ 5)  The only potential districts that might arguably fit the bill under subsection (b)(3) are the Northern District of Illinois, where BAEF resides and transacts business, and the District of Delaware, where BAEF is incorporated.  But none of the provisions of Section 1391(b) suggest that venue is proper in the District of Columbia.

### 2.    Venue Is Not Proper Under 18 U.S.C. § 1965.

Plaintiff also asserts that venue is proper under a provision of the RICO statute, 18 U.S.C. § 1965(b).  But the only potential basis for RICO-based venue is Section 1965(a).[18] *See, e.g., Modaressi v. Vedadi*, 441 F. Supp. 2d 51, 54-55 (D.D.C. 2006) (RICO's venue provision is found at Section 1965(a)).  Section 1965(a) provides that an action may "be

---

[17]    Moreover, BAEF's original receipt of funding *over fifteen years ago* by United States Congress through the SEED Act does not bear any relationship to, much less a "substantial part" of, the underlying events giving rise to plaintiff's claims.

[18]    18 U.S.C. § 1965(b) pertains only to hauling additional defendants into the district once venue is properly established for at least one defendant. *See, e.g., Southmark Prime Plus, L.P. v. Falzone*, 768 F. Supp. 487, 491 (D. Del. 1991) ("ends of justice" required district court to exercise jurisdiction over all RICO conspiracy defendants, even though not all defendants were otherwise subject to venue in district); *Bridge v. Invest. Am., Inc.*, 748 F. Supp. 948 (D.R.I. 1990) (jurisdiction over nonresident defendant was proper under ends of justice determination where, among other things, several defendants were associated with Rhode Island, only the defendant who was contesting jurisdiction had not dealt directly in Rhode Island, and assertion of jurisdiction and venue would serve the purpose of having the entire action litigated in one court).  Because plaintiff cannot establish venue for either defendant in the District, this subsection is inapplicable here.

instituted in the district court of the United States for any district in which [a defendant] resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a) (2007).

Here, the Amended Complaint does not allege that either defendant resides, is found, has an agent, or transacts its affairs in the District of Columbia. In fact, neither defendant fits any of these categories. (*See* Ex. 1 ¶¶ 4-5, 7) Thus, venue is not proper in this district under Section 1965. *See Modaressi*, 441 F. Supp. 2d at 54-55 (case could not proceed in District of Columbia based on RICO venue provision where the allegations of the complaint did not support a finding that any defendant resides, is found, has an agent, or transacts affairs in the District of Columbia); *Eacho v. N D Res., Inc.*, No. 83-2903, 1984 WL 2398, at *3 (D.D.C. Feb. 2, 1984) (venue would not lie pursuant to RICO provision where no defendant was located or could be found in the District of Columbia or transacted any business there).

Furthermore, even if one defendant transacted business in the District of Columbia, venue still would not be proper under RICO. The ends of justice do not require bringing both defendants before a District of Columbia forum where, as here, the dispute is centered in Bulgaria. *Cf. Crenshaw v. Antokol*, 287 F. Supp. 2d 37 (D.D.C. 2003) (venue not proper in District of Columbia although two defendants transact affairs in the District, because the ends of justice do not favor extending venue to all defendants where most defendants have no ties whatsoever to the District and none of the events in dispute took place there); *Lescs v. Martinsburg Police Dept.*, No. Civ. A. 00-2404 (GK), 2002 WL 215511, at *2 (D.D.C. Jan. 28, 2002) (it would not serve the ends of justice to find proper venue in the District where the majority of the alleged acts or omissions took place in West Virginia and the majority of witnesses and applicable records are in West Virginia). Plaintiff, therefore, cannot establish the District of Columbia as the proper venue for this case under the RICO statute.

**III.    The Amended Complaint Should Be Dismissed Based On The Doctrine Of *Forum Non Conveniens.***

Even assuming that this Court can assert personal jurisdiction over BAEF, and that venue is proper here, the case must still be dismissed.  The doctrine of *forum non conveniens* permits a court to dismiss an action over which it has jurisdiction when there is an adequate alternative forum in which the case can be more conveniently heard.  *BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 86 (D.D.C. 2003) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504 (1947)).  The threshold inquiry is whether there is an adequate alternative forum where the plaintiff may bring its claims.  *BPA Int'l*, 281 F. Supp. 2d at 86 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n.22 (1981)).  If there is such an alternative forum, a court should then balance the private interests of the litigants and the public interest to determine whether a motion to dismiss should be granted.  *BPA Int'l*, 281 F. Supp. 2d at 86 (citing *Gulf Oil Corp.*, 330 U.S. at 508).  The weight of either the private interest factors or the public interest factors alone may be cause for dismissal.  *BPA Int'l*, 281 F. Supp. 2d at 86.

In this case, Bulgarian courts provide an alternative forum that is both available and adequate.  Furthermore, virtually all of the relevant public and private interest factors suggest that Bulgaria is the appropriate forum for resolution of this litigation.  Accordingly, this action should be dismissed based on the doctrine of *forum non conveniens*.[19]

**A.    Bulgaria Is Both Available And Adequate As An Alternate Forum.**

The first issue is whether an alternative forum is available.  *See, e.g., Piper Aircraft Co.*, 454 U.S. at 255 n.22.  A foreign forum is ordinarily deemed available when the

---

[19] Defendant BAEF has submitted limited, directed affidavits in support of its motion, attached hereto as Exhibits 1 and 3.  *See, e.g., Piper Aircraft Co.*, 454 U.S. at 258-59 (detailed affidavits are not required, but a defendant seeking *forum non conveniens* dismissal must provide enough information to allow the court to apply the *forum non conveniens* factors).

defendant is subject to process in that forum. *Id.* The Bank, a Bulgarian entity, is of course subject to process in Bulgaria (and indeed specifically agreed in the Loan Agreement to litigate there). Likewise, BAEF is subject to jurisdiction in Bulgaria on various grounds. (Ex. 3 ¶¶ 16-18) Moreover, if there is any doubt that BAEF is subject to the jurisdiction of the Bulgarian courts, BAEF is willing to consent to the exercise of jurisdiction by Bulgarian courts as a condition of dismissal. *See Pain v. United Techs. Corp.*, 637 F.2d 775, 785 (D.C. Cir. 1980) (entering dismissal on the condition that the defendant agree to submit to the jurisdiction of the foreign courts); *In re Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980*, 540 F. Supp. 1141, 1145 (D.D.C. 1982) (granting dismissal where "[d]efendants have attempted to remove all contention over this threshold issue by agreeing to submit themselves to the jurisdiction of the national courts in either Saudi Arabia [or various other foreign courts].").

The second issue is whether an alternative forum is adequate. *See, e.g., Piper Aircraft Co.*, 454 U.S. at 255 n.22. An alternate forum is considered adequate in all but rare cases — even where it does not offer the same theories of recovery as do courts in the United States. *See id.* at 250-54 (the Court of Appeals erred in holding that plaintiffs may defeat a motion to dismiss on the ground of *forum non conveniens* merely by showing that the substantive law that would be applied in the alternative forum is less favorable to the plaintiffs); *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 678 (D.C. Cir. 1996) (foreign forum not inadequate where it has less favorable substantive law or adjudicative procedures); *In Re Disaster at Riyadh Airport*, 540 F. Supp. at 1145 (a potentially smaller damage award and an inability to rely on a particular theory of liability do not render a forum inadequate). Indeed, a forum is inadequate only where

"the remedy provided in the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper Aircraft Co.*, 454 U.S. at 254.[20]

Bulgaria is an adequate forum to adjudicate this dispute. According to BAEF's Bulgarian legal expert, who is a practicing attorney and professor of Civil Procedure in Bulgaria, Bulgaria has an independent judiciary that is available to hear commercial disputes between parties. (Ex. 3 ¶ 9) Bulgaria's legal system has multiple levels of appellate review and procedures to enforce judgments. (*Id.* ¶ 11) Indeed, and as plaintiff's expert agrees, the structure of Bulgarian courts does not differ in any meaningful way from the European standard. (Ex. 6 at 19:1-6; Ex. 3 ¶ 13) Nor does Bulgarian commercial law differ significantly from European norms. (Ex. 3 ¶ 20) Countries seeking admittance into the E.U. must satisfy the Copenhagen Criteria, which, among other things, requires a country to have stable institutions and a judicial system that guarantees the rule of law. (Ex. 6 at 20:4-7; Ex. 7, at 19:21-20:2) And, as plaintiff's expert acknowledges, Bulgaria was accepted into the European Union ("E.U.") on January 1, 2007. (*See* Ex. 6 at 20:8-10) Despite any purported deficiencies in the Bulgarian legal system, Bulgaria's judicial system, therefore, at a minimum, satisfies E.U. standards. Moreover, the E.U. is monitoring, and will continue to monitor, the judicial system of Bulgaria (as is standard with any newly-admitted country) for the next two years. (Ex. 5 at 124:12-20) Such continued EU oversight ensures continued improvement and stability within the Bulgarian legal system.

Even countries without stable democratic institutions, including one yet to be admitted to the E.U., have been found to be adequate alternative fora. *See, e.g.*, *Shields v. Mi Ryung Constr. Co.*, 508 F. Supp. 891, 897 (S.D.N.Y. 1981) (dismissing action on grounds of

---

[20]  It should be noted that the Court of Appeals for the District of Columbia has observed that American courts should recognize "the ability of foreign courts to perform their adjudicatory functions fully as well as do the courts of the United States." *Pain*, 637 F.2d at 797.

*forum non conveniens* where Saudi Arabia was found to be an adequate alternative forum); *Travelers Indem. Co. v. S/S Alca*, 710 F. Supp. 497 (S.D.N.Y. 1989) (holding that Turkey was an adequate alternative forum); *Turedi v. Coca Cola Co.*, 460 F. Supp. 2d 507, 526 (S.D.N.Y. 200) (holding that Turkey was an adequate alternative forum); *Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 981-82 (2d Cir. 1993) (finding Venezuela to be an adequate alternative forum despite claims of systematic corruption and bias in favor of defendants).   Indeed, in evaluating the adequacy of an alternative forum in a foreign country, federal courts are reluctant to find foreign courts to be "corrupt" or "biased." *See In re Arbitration between Monegasque de Reassureances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 499 (emphasizing the reluctance of federal courts to find foreign courts to be "corrupt" or "biased" in evaluating the adequacy of the alternative forum). *See also Turedi*, 460 F. Supp. 2d at 524 ("The Second Circuit repeatedly has cautioned against judges giving serious consideration to such conclusory attacks, underscoring the concerns that censures of this kind raise if endorsed by our courts, especially when based on bare aspersions and expansive generalizations [of corruption and bias].").

In any regard, Bulgarian courts are equipped to address plaintiff's claims and Bulgarian law provides comparable remedies to those sought by plaintiff in this forum.  (Ex. 5 at 73:2-6; 78:15-79:1)  Plaintiff's contractual claims relating to the Loan Agreement are governed by contract law under Bulgaria's Obligations and Contracts Act.  (*Id.* at 73:16-74:4)  Plaintiff's other claims likely would be governed by Bulgarian tort law, which allows claimants to bring tort claims against corporations under Articles 49 and 50 of the Obligations and Contracts Act. (*Id.* at 74:5-10, 87:20-88:5, 89:2-21, 136:19-22, 138:6-11)  Thus, plaintiff can achieve a full and fair resolution in the Bulgarian court system.  (Ex. 3 ¶ 13)

Any assertions by plaintiff that Bulgaria does not provide an adequate alternative forum for the relief that it seeks is contradicted by plaintiff and plaintiff's legal experts' own acts. Tellingly, plaintiff has already conceded that Bulgarian courts are adequate, because it agreed to resolve in Bulgaria "any disputes arising from . . . or concerning" the Loan Agreement (Am. Compl. Ex. A ¶ 17.08)   Additionally, plaintiff amended its Complaint to allege a "Violation of Bulgarian Law" claim, asserting a violation of the very Act that would be applicable to its claims if brought in Bulgaria. (Am. Compl. ¶¶ 103-109)  What is more, both of plaintiff's Bulgarian legal experts have litigated and continue to litigate cases in Bulgarian courts. (Ex. 6 at 10:21-11:6; Ex. 7 at 27:13-19)   Vladimir Stefanov Skochev is working currently on fifteen cases in various Bulgarian courts. (Ex. 6 at 10:21-11:6)  And plaintiff's other Bulgarian legal expert, Maria Slavova, has litigated over 200 cases in Bulgarian courts. (Ex. 7 at 27:13-19)   Plaintiff, therefore, cannot seriously contend that Bulgarian courts are unavailable or inadequate under these circumstances.

**B.     The Private Interests Of The Litigants Strongly Favor Dismissal.**

Having established that Bulgaria is an adequate alternative forum, the Court must balance the private interests of the litigants and the public interest to determine whether a motion to dismiss should be granted. *BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 86 (D.D.C. 2003). The private interest factors weigh heavily in favor of dismissal. Relevant private interest factors include:  (1) relative ease of access to sources of proof; (2) availability of compulsory process for attendance of unwilling witnesses; (3) cost of attendance of witnesses; (4) enforceability of a judgment, if obtained; and, (5) other practical problems that make trial of a case easy, expeditious, and inexpensive. *See, e.g.*, *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).

## 1.    Sources Of Proof Are Located In Bulgaria (Factor 1).

Essentially all of the sources of proof in this case are in Bulgaria.  The key documents related to the loan transaction are in the custody of the Bank and/or plaintiff (the parties to the Loan Agreement) in Bulgaria.  Documents related to presale agreements (one of the alleged events of default) would be located in Bulgaria in the possession of either plaintiff and/or the Bulgarian purchaser(s).  Other potentially relevant documents include those related to the construction project in Bulgaria, documents concerning internal management and corporate issues at Stroitelstvo and Bulgarian police investigations into such issues, documents related to the Bank's offer to have its affiliate purchase the building and assume the loan, Bulgarian court pleadings, and documents concerning plaintiff's new loan — all of which would be available only in Bulgaria.  By contrast, BAEF, the only party located in the United States, maintains no documents concerning this matter, as it had no involvement in the loan.  (*See* Ex. 3 ¶ 8; Ex. 2 at 37:9-15, 38:1-6, 39:15-22)  To the extent that it is relevant, BAEF's Chicago office is where its records are kept and where its office administrator is located.  (*See* Ex. 2 at 43:2-3, 33:10-14)  The only fact alleged in the Amended Complaint remotely suggesting the location of documents in the District of Columbia is plaintiff's assertion that BAEF mails a report semi-annually to a governmental agency located in the District of the Columbia.  (Am. Compl. ¶ 6)  But there is no indication that such reports would be relevant to any claim alleged in the Amended Complaint.

In addition, the witnesses to the events alleged in the Amended Complaint are Bulgarian citizens and residents.  Owners and/or employees of plaintiff and the Bank, including those who signed the Loan Agreement, would be the key witnesses to this dispute, and all are located in Bulgaria.  For example, Sabin Simeonov is a Bulgarian employee of the Bank who resides in Sofia; he was involved in the loan transaction and will be a witness.  Other potential witnesses are Bulgarian citizens and residents, including persons who entered presales

agreements with plaintiff, employees of the Bank's related entity who participated in the alleged purchase offer, Sofia construction project subcontractors, and so forth. (*See Id.* ¶¶ 15, 26, 27) Tellingly, plaintiff's Amended Complaint now identifies, by name, a number of these potential witnesses, including Simeon Hajiev, Boris Petrov, Boika Dimova, and Milena Boikova Blateva, all of whom are presumably Bulgarian. (*Id.* ¶¶ 26, 27) By contrast, BAEF employees, who had no involvement in the Loan Agreement, are either in Chicago or Bulgaria, not in the District of Columbia. (Ex. 2 at 33:10-35:2)

The location of documents and witnesses in Bulgaria is a key factor warranting dismissal. *See, e.g., Stromberg v. Marriott, Int'l, Inc.*, 474 F. Supp. 2d 57, 63 (D.D.C. 2007) (granting *forum non conveniens* dismissal where, "[alt]hough some defense witnesses, who would testify regarding the nature of the franchise relationship between [Marriott's franchisee] and Marriott, are located near the District, the bulk of the evidence and testimony would revolve around Marriott's dealings with and supervision of [the franchisee] in Mexico."); *BCCI Holdings (Luxembourg), Societe Anonyme v. Mahfouz*, 828 F. Supp. 92, 97 (D.D.C. 1993) (granting *forum non conveniens* dismissal in a RICO case where the majority of the material acts of fraud mentioned in the complaint were alleged to have occurred abroad, the Procurement Deed at the heart of the complaint was drafted in England, executed in England and Luxembourg, and contained choice of law provisions referring to English and Luxembourg law, and resolution of the matter would therefore require examination of a majority of documents and witnesses located in England).

### 2. Bulgarian Witnesses Would Not Be Subject To Compulsory Process For Testimony In This District And Their Presence Would Be Costly (Factors 2 and 3).

Because most witnesses to the events alleged in the Amended Complaint are Bulgarian citizens and residents, availability of compulsory process for attendance of unwilling

witnesses and the cost of attendance of witnesses are important concerns that weigh in favor of dismissal. This Court lacks the ability to compel testimony from these witnesses, and even if they were willing to testify, the cost of obtaining their testimony would be prohibitive. In *BPA International, Inc.*, 281 F. Supp. 2d at 86, for example, the court granted *forum non conveniens* dismissal where "[m]any, if not most, of the potential witnesses and much of the evidence will likely be located in Sweden and therefore will likely be beyond the reach of this Court's compulsory process" and "obtaining witnesses' attendance will be significantly less costly if the case were heard in Sweden rather than the District." Similarly, in *Irwin v. World Wildlife Fund, Inc.*, 448 F. Supp. 2d 29, 34 (D.D.C. 2006), the court granted *forum non conveniens* dismissal where most witnesses were located in Gabon, creating concerns about the court's ability to compel testimony and the cost of attendance for willing witnesses. Here too, the location of the evidence and associated difficulties warrants dismissal in favor of a Bulgarian resolution.[21]

### 3.    Enforcement Of A Judgment Could Be An Issue Due To The Potential For Inconsistency (Factor 4).

Allowing this lawsuit to go forward could create enforcement problems because it would risk inconsistent judgments. Indeed, the fact that the Bank and plaintiff have already engaged in legal proceedings under the Loan Agreement in Bulgaria and entered a settlement agreement there to resolve their disputes, weighs heavily in favor of dismissal. *Cf. BCCI Holdings*, 828 F. Supp. at 98 ("Yet another private interest factor supporting dismissal of this

---

[21] Furthermore, the cost of making witnesses and evidence located in Bulgaria available to a court in the United States would be substantial. This is evidenced, in small part, by BAEF's costs related to the limited jurisdictional discovery recently conducted at the request of plaintiffs. Here, the parties took depositions of the three experts retained by the parties (all located in Bulgaria) over the course of two days. The travel expenses related to the taking of these depositions for one attorney alone was approximately $9000. And this figure does not even take into account additional expenses, such as BAEF's cost to hire an interpreter (the best estimate for which was around $1900 per day), and attorneys' fees. It is easy, then, to imagine how much more costly it would be to conduct discovery in Bulgaria of all the Bulgarian witnesses should these proceedings continue in the District of Columbia.

case for *forum non conveniens* is the existence of the virtually identical proceeding in England. Dismissal of this suit in favor of the English litigation clearly will relieve the defendants of the burdens of litigating parallel proceedings and will negate the possibility of inconsistent judgments.").

4.    **The Need For Translation Creates Expense And Inefficiency (Factor 5).**

An additional practical problem that would make trying this case in this forum more difficult, inefficient and expensive, is the need for translation of Bulgarian documents and interpretation of Bulgarian witnesses.  Most, if not all, of the relevant documents are written in Bulgarian, requiring translation for use by an American trier of fact.  Moreover, because most witnesses are Bulgarian, it is reasonable to anticipate that translation of testimony would also be required.  As the court noted in *Irwin*:

> administrative difficulties of trying this case in a forum thousands of miles away from the majority of witnesses and the evidence are obvious . . . . As French is the national language of Gabon and the language of the legal system, it is likely that many of the witnesses and much of the evidence would need to be translated from French. Thus, the administrative difficulties of trying the case in the District of Columbia weigh in favor of dismissal.

*Irwin*, 448 F. Supp. 2d at 35-36.  Indeed, both parties have already invested significant time and money translating the limited number of documents related to this briefing.  For example, translation of the three-and-a-half page Settlement Agreement alone, *see* Ex. 4, cost $500. Should this case continue in this forum, and should the parties search for, review, and produce all the relevant Bulgarian documents described above, this cost would rise quickly and exponentially.

C.    **The Public Interest Factors Strongly Favor Dismissal.**

Relevant public interest factors include:  (1) the preference for deciding local controversies at home; (2) the burden of jury duty on citizens of a forum unrelated to the case, and; (3) the familiarity of the forum with applicable state law.  *Gulf Oil*, 330 U.S. at 508-09. These factors all favor dismissal as well.

1.    **This Is A Bulgarian Controversy That Belongs In Bulgaria (Factor 1).**

The Loan Agreement was entered into in Bulgaria between Bulgarian parties for purposes of financing a Bulgarian residential construction project that would result in sales of residential units to Bulgarians.  Obligations under the Loan Agreement were to be performed in Bulgaria, and any breaches of the Loan Agreement occurred there.  Plaintiff has even amended its complaint to bring a violation of Bulgarian law claim.  This controversy arises from and centers around the relationship between the two Bulgarian parties that entered into the Loan Agreement:  plaintiff and the Bank.  Accordingly, Bulgarian courts have a clear interest in policing this dispute.

By contrast, the only arguable tie to the District of Columbia is the fact that BAEF, the Bank's parent company, received its initial funding through the SEED Act.  But this controversy has nothing to do with either the source of funding or the United States, let alone the District of Columbia.  It is certainly not the law that any complaint filed in American courts alleging a violation of a statute adopted by Congress is a matter of concern to the courts of the District of Columbia.  *Cf. United States v. Smithfield Foods, Inc.*, 332 F. Supp. 2d 55, 61 n.3 (D.D.C. 2007) (finding that the filing of tax returns and a corporate report in the District of Columbia does not constitute transacting business of a continuous and systematic nature to give rise to personal jurisdiction in the District); *Shawnee Tribe v. United States*, 298 F. Supp. 2d 21, 25-26 (D.D.C. 2002) (granting motion to transfer because "mere involvement on the part of

federal agencies, or some federal officials who are located in Washington, D.C., is not determinative" as to venue in D.C.); *Armco Steel Co., L.P. v. CSX Corp.*, 790 F. Supp. 311, 322 (D.D.C. 1991) (finding that defendants' contacts with membership and participation in a trade association located in D.C. was not sufficient to establish a substantial connection with the District). Moreover, the only United States resident (BAEF) is a nominal party at best. It had no involvement in the Loan Agreement and was not even aware of its existence until after this Amended Complaint was filed. (Ex. 1 ¶ 8) And plaintiff has even affirmatively stated that it "does not contend that BAEF was a party to, or had any obligations under, the Contract. (Pls.' Opp'n to Mot. to Transfer at 7 n.4; *see also* Am. Compl. ¶¶ 47, 52, 43) Under the circumstances, the United States in general and this forum in particular do not have sufficiently strong interests in this dispute.

Courts will not hesitate to find that controversies such as this one are localized in a foreign jurisdiction and should be decided there. In *Pain*, for example, the court considered "the most striking feature of this case" to be "the lack of any significant contacts between the event in dispute and the forum chosen by the plaintiffs in which to litigate the consequences of that event." 637 F.2d at 792. The two contacts with the United States, the residence of the decedent's mother and the crashed helicopter's manufacturer, were insufficient to justify resolution in the District of Columbia. *Id.* Similarly in *In re Disaster at Riyadh Airport*, the court found that a dispute arising out of a plane crash in Saudi Arabia involving a plane operated by a Saudi Arabian national corporation and an intra-Saudi Arabian flight should not be heard in the United States because "Saudi Arabia's interest in resolving a controversy occurring within its borders and involving one of its nationally owned corporations is clearly superior to the insignificant American interest in prosecuting these actions." *In re Disaster at Riyadh Airport*,

*Saudi Arabia, on Aug. 19, 1980*, 540 F. Supp. 1141, 1153 (D.D.C. 1982). Here too, Bulgaria's interest in resolving a controversy occurring within its borders and involving two Bulgarian corporations is clearly superior to the American interest in the case.

### 2. District Of Columbia Citizens Should Not Be Burdened With Resolving This Dispute (Factor 2).

Given the lack of connection of this dispute to the District of Columbia, it would be unfair to require this Court and the citizens of the District to expend valuable resources to resolve the dispute. *Cf. Stromberg v. Marriott, Int'l*, 474 F. Supp. 2d 57, 63 (D.D.C. 2007) ("[T]he court is sensitive to the desirability of avoiding the unnecessary review of foreign disputes. The District's highly burdened jury pool would also benefit by not bearing the responsibility of hearing this case, which relates in only the slightest degree to the District and to the interests of its citizens."); *Pain*, 637 F.2d at 792 ("As the trial judge quite properly determined, jury duty for this matter ought not be imposed upon the people of the District of Columbia, nor should local dockets be clogged by appeals in this case.").

### 3. This Court Should Not Be Burdened With Applying Bulgarian Law (Factor 3).

Under the Loan Agreement, Bulgarian law governs disputes. (Am. Compl. Ex. A ¶ 17.07) The core claims at issue in this case all stem from that Loan Agreement, including allegations that the Bank improperly determined under the Loan Agreement that an event of default had occurred, that the Bank improperly suspended plaintiff's credit under the Loan Agreement, and that the Bank improperly exercised its rights of recovery under the Loan Agreement. Tellingly, plaintiff amended its complaint to add a violation of Bulgarian law claim against BAEF. All of these claims are therefore governed by Bulgarian law. Moreover, even if the Loan Agreement's choice of law provisions were somehow inapplicable to tort claims, Bulgarian law would still apply since Bulgaria has the most significant relationship to the

dispute. *See, e.g., Stromberg*, 474 F. Supp. 2d at 61 ("[T]he court must determine which forum has a more substantial interest in the resolution of the issues presented" in determining which law to apply).

The need to apply Bulgarian law weighs heavily in favor of dismissal. *See, e.g., Piper Aircraft Co.*, 454 U.S. at 260 n.29 (many *forum non conveniens* decisions have held that the need to apply foreign law favors dismissal); *Irwin v. World Wildlife Fund, Inc.*, 448 F. Supp. 2d 29, 36 (D.D.C. 2006) ("Many of the legal questions require interpretation of Gabonese law, and Gabon is in the best position to interpret and apply its own law.")[22]

Even if United States federal law could somehow apply to isolated claims — such as plaintiff's RICO claim — Bulgarian law would still predominate. In *BCCI Holdings*, for example, the court granted a *forum non conveniens* dismissal where "resolution of some counts of the complaint . . . necessitate[d] inquiry into the law of England, Luxembourg, or other foreign countries, notwithstanding the fact that plaintiffs' claims are based in large part on RICO." *BCCI Holdings (Luxembourg), Societe Anonyme v. Mahfouz*, 828 F. Supp. 92, 100 (D.D.C. 1993); *see also Pain*, 637 F.2d at 793 n.101 ("We believe that Norwegian substantive law will predominate the trial of this case and that the mere presence of a count pleaded under Connecticut law but which may have little chance of success does not warrant a different conclusion. If we were to hold otherwise, the plaintiff could avoid dismissal on forum non conveniens grounds by the inclusion of a substantive count based on American law regardless of the merits of that claim."). And, to the extent that it is relevant, Bulgarian courts are competent to make decisions based upon American law. (Ex. 5 at 69:19-70:6)

---

[22] Moreover, this Court faces not just the need to interpret Bulgarian law, but also the need to decipher the scope and precedential significance of Bulgarian legal processes and a Bulgarian settlement. That additional layer of complexity weighs further in favor of dismissal.

### D.     Plaintiff's Chosen Forum Is Not A Significant Factor.

Plaintiff's choice of forum does not counter-balance the overwhelming weight of the private and public interest factors.  In a case commenced by a foreign plaintiff, United States courts will not presume that the plaintiff has chosen the forum for its convenience, and the plaintiff's choice of forum will not be afforded the normal deference.  *Piper Aircraft Co.*, 454 U.S. at 255-56.  Instead, it is reasonable to infer that a plaintiff that selects such a forum has done so simply to take advantage of more favorable law or to harass the defendant, each of which warrants a *forum non conveniens* dismissal.  *Id.*; *see also Pain*, 637 F.2d at 784 (a plaintiff who chooses a competent but clearly inappropriate forum in which to bring suit should be required to show some reasonable justification for his institution of the action in the forum state).

That is especially true here, where plaintiff conceded the convenience of Bulgarian courts when it agreed to the Loan Agreement's forum selection clause.  *See L&L Constr. Assocs., Inc. v. Slattery Skanska, Inc.*, No. CIV 05-1289, 2006 WL 1102814, at *4 (D.D.C. Mar. 31, 2006) (the forum selection clause is the dominant factor in the determination of convenience).  Thus, plaintiff's choice of this forum should be given little deference, if any, and this action should be dismissed on *forum non conveniens* grounds.

## CONCLUSION

This case has no business in the United States courts, and it certainly has no business in the District of Columbia. It also has no business being filed against BAEF, and BAEF's inclusion appears to be a desperate attempt to find some tie (however insignificant) to the United States. For the reasons explained above, this Court lacks personal jurisdiction over BAEF, and thus dismissal under Federal Rule 12(b)(2) is required. Moreover, venue is not proper in this district, so dismissal is also required under Federal Rule 12(b)(3). Finally, even assuming that plaintiff could somehow overcome these jurisdictional and venue problems, it is clear that dismissal is proper under the doctrine of *forum non conveniens*. For all these reasons, this action should be dismissed with prejudice.[23]

Dated: January 4, 2008

Respectfully submitted,

Brian D. Sieve, P.C. (*pro hac vice*)
Stephanie A. Brennan (*pro hac vice*)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
Tel. (312) 861-2000
Fax (312) 861-2200

Karen N. Walker (D.C. Bar No. 412137)
Eunnice H. Eun (D.C. Bar No. 500203)
Samantha A. Gingold (D.C. Bar No. 977743)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Tel. (202) 879-5000
Fax (202) 879-5200

*Attorneys for The Bulgarian-American Enterprise Fund*

---

[23] Because plaintiff has already amended once in an effort to cure the deficiencies identified by BAEF, and because the parties have conducted and concluded discovery related to the issues presented in this motion, BAEF states that any further amendment of plaintiff's complaint and discovery related to jurisdiction and venue would be futile. This Court should therefore dismiss the Amended Complaint with prejudice.

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2008, I caused a true and complete copy of

Defendant's Motion and Memorandum in Support of its Motion to Dismiss Plaintiff's Amended

Complaint Pursuant to Federal Rules 12(b)(2) and 12(b)(3), or Alternatively Based on the

Doctrine of *Forum Non Conveniens* to be served on the following counsel of record by ECF.

Karen N. Walker

Recipients:

Philip M. Musolino
MUSOLINO & DESSEL
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
Tel.  (202) 466-3883

Sylvia J. Rolinski
Danielle M. Espinet
ROLINSKI & SUAREZ, LLC
14915 River Road
Potomac, Maryland 20854
Tel.  (240) 632-0903

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STROITELSTVO BULGARIA LTD., ) | |
| ) | |
| ) | |
| ) | |
| Plaintiff, ) | Case No.: 1:07-cv-00634 |
| ) | |
| v. ) | |
| ) | Hon. Rosemary M. Collyer |
| THE BULGARIAN-AMERICAN ENTERPRISE ) | |
| FUND, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**DECLARATION OF NANCY L. SCHILLER**

I, Nancy L. Schiller, do hereby certify and declare as follows:

**PERSONAL BACKGROUND**

1.    My name is Nancy L. Schiller.  I submit this declaration in support of Defendant the Bulgarian American Enterprise Fund's ("BAEF") Motion to Dismiss Plaintiff Stroitelstvo Bulgaria's ("Stroitelstvo") Complaint Pursuant to Federal Rules 12(b)(2) and 12(b)(3) or Alternatively Based on the Doctrine of *Forum Non Conveniens* ("Motion to Dimsiss").  The facts set forth in this Declaration are based on my personal knowledge.

2.    I am Managing Director for BAEF in its Chicago, Illinois office and have held that position for the past 15 years.  In that capacity, my responsibilities include interaction with the Board of Directors, government relations, and human resources.

3.    In 1989, Congress passed the Support for East European Democracy Act ("SEED Act"), 22 U.S.C. ¶¶§§ 5402, 5421, to promote private sector development in Poland and Hungary. The SEED Act was later expanded to provide funding for the establishment of additional enterprise funds (such as BAEF) that would promote private sector development in Eastern Europe.

4.    BAEF is a private, not-for-profit U.S. corporation established in 1991 under the Delaware General Corporation Law.  BAEF is based in Chicago, Illinois.  BAEF has its only U.S. office in Chicago and regularly transacts its business in Chicago.  BAEF also maintains an office in Sofia, Bulgaria and regularly transacts its business in Bulgaria.  BAEF's registered agent is located in Delaware.

5.    BAEF has no ongoing or regular contacts with the District of Columbia.  BAEF is not a resident of the District of Columbia and maintains no office or registered agent there. BAEF is not organized under the laws of the District of Columbia.  Nor does BAEF regularly transact any business in the District.

6.    The BAEF has semi-annual reporting obligations to the U.S. Agency for International Development ("USAID") as a condition of the original grant agreement between USAID and BAEF.  Howeveer, BAEF is not (and has never been) under the supervision of Congress.  Moreover, BAEF has not received any funding from USAID within the past five years.

7.    The  Bulgarian-American Credit Bank ("the Bank") is a majority-owned subsidiary of BAEF that operates exclusively in Bulgaria.  The Bank operates as an investment bank in the areas of small and medium size enterprise lending, construction lending and home

2

mortgage lending. The bank also offers other commercial banking services. The Bank has no office in the United States, has no registered agent here, and does not regularly transact any business here.

8.      The Bank operates independently from BAEF. Among other things, BAEF is not involved in the Bank's loan transactions. BAEF was not involved in any way in the loan transaction between the Bank and Stroitelstvo. In fact, BAEF was unaware of that particular loan (and any of its details) prior to receiving notice of this lawsuit. BAEF maintains no files or records related to the Bank's specific loan transactions, including this one.

9.      After receiving notice of this lawsuit, BAEF requested and obtained from the Bank's in-house attorney a true and correct copy of the March 24, 2005 Loan Agreement referenced in the Complaint, which is attached to BAEF's Motion to Dismiss as Exhibit A. BAEF also requested and obtained from the Bank's in-house attorney a true and correct copy of the May 9, 2006 Settlement Agreement between the Bank and Stroitelstvo (also referenced in the Complaint), which is attached to BAEF's Motion to Dismiss as Exhibit B.

3

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on  8 | 6 | 07

Nancy L. Schiller

# EXHIBIT 2

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
---------------------------:
STROITELSTVO BULGARIA, LTD  :
                            :
     Plaintiff,             :
vs.                         : Case No.:
                            : 1:07-cv-00634
THE BULGARIAN-AMERICAN      :
ENTERPRISE FUND, et al      :
                            :
     Defendant.             :
---------------------------:
```

Washington D.C.

Thursday, November 15, 2007

Telephone deposition of:

NANCY SCHILLER

called for oral examination by counsel for

Plaintiff, pursuant to notice, at the offices

of Musolino & Dessel, 1615 L Street, N.W.,

Suite 440, Washinton, D.C., before Jodi Scheffel,

a Notary Public in and for the District of

Columbia, beginning at 12:40 p.m., When were

present on behalf of the parties:

**Capital Reporting Company**

Page 29

1    financial statements, any major accomplishments

2    that took place during the prior six months, and

3    any political developments that might be of

4    interest or that might impact the ability to do

5    business in the country.

6         Q    If you look at the October 26, 2007

7    letter where it refers to the March 28, 2007

8    report, it says conducted by phone.  Do you see

9    that?

10        A    Yes.

11        Q    So I take it that on occasion these

12   reports are not written reports.  They're oral

13   reports either delivered by phone or face-to-face,

14   as opposed to a written report?

15        A    They are written reports that we then

16   discuss either by phone or in person.

17        Q    I see.  So there is a semiannual written

18   report that BAEF submits to USAID, right?

19        A    Yes.

20        Q    How do you transmit them to USAID?  Do

21   you mail them?

22        A    Mail them.

**Capital Reporting Company**

Page 30

1        Q     Do you mail them to the Sofia office of

2   USAID or the D.C. office or some other office?

3        A     Both.

4        Q     You mean, each semiannual report goes

5   both places?

6        A     Yes.

7        Q     Is there a particular person at USAID who

8   is now the contact person for these reports?

9        A     Yes.

10       Q     Who would that be?

11       A     His name is Steve Eastham, E-a-s-t-h-a-m.

12       Q     E-a-s-t-h --

13       A     -- a-m.

14       Q     -- h-a-m.   And he's located at USAID's

15   office here in Washington?

16       A     Yes.

17       Q     I take it then he got a copy of the

18   March 8, 2007 -- let me just say he got a copy of

19   the March 2007 report, right?

20       A     Yes.

21       Q     And who is currently at the USAID office

22   in Sofia to whom you would get in touch if you had

**Capital Reporting Company**

Page 33

```
1    communicate with USAID; for another business?

2         A    Yes.

3         Q    You're full time with the Fund, correct?

4         A    No.

5         Q    Oh, you're not.  Are you part time?

6         A    Yes.

7         Q    Can you tell me how many employees the

8    Fund has in Chicago who are full time?

9         A    Zero.

10        Q    Can you tell me how many employees the

11   Fund has in Chicago who are part time?

12        A    One.

13        Q    And that would be who?

14        A    Trudy Genitis, Office Administrator.

15        Q    How many full time employees does the

16   Fund have outside of Chicago in the United States?

17        A    Did you ask me full time?

18        Q    Yes.

19        A    Zero.

20        Q    Are you the only part-time employee

21   outside of Chicago for the Fund?

22        A    Yes.
```

**Capital Reporting Company**

Page 34

1      Q      Do you know how many employees the Fund

2  has in full time or part time in Bulgaria?

3      A      Are you asking me about persons or

4  Bulgarians or both?

5      Q      Well, that's a good question.  Let's try

6  the entire -- let's try all, both American's and

7  Bulgarians.

8      A      For the Fund?

9      Q      For the Fund, right.

10      A      I'm not exactly correct on this, but I

11  would guess it's no more than 10.

12      Q      Of those 10 -- and I know you're just

13  approximating and that's fine -- can you tell me

14  about how many of those employees would be

15  Bulgarian nationals?

16      A      Seven.

17      Q      Of those 10 employees, can you tell me

18  how many of them also are employed by the bank?

19      A      None.

20      Q      So there are -- let me make sure I

21  understood this -- there are approximately 10 full-

22  time Fund employees in -- I take it they're in

Page 35

1    Sofia, Bulgaria?

2        A    Yes.

3        Q    -- in Sofia Bulgaria, none of whom are

4    also employed by the bank.  Did I get that right?

5        A    Yes.

6        Q    This March 28, 2007 report conducted by

7    phone, were you a participant in that phone

8    conversation?

9        A    Yes.

10       Q    Was there any discussion at all, to the

11   best of your recollection, about the bank's

12   operations?

13       A    Limited, if any, about the bank.

14       Q    Did you have any counsel on the phone for

15   that conversation, any lawyers, for either the bank

16   or anyone?

17       A    No.

18       Q    Was there any discussion -- and I'm not

19   going to press this -- but as a general subject did

20   this lawsuit come up?

21       A    We weren't aware of it in March 2007, to

22   my recollection.

Page 37

1        Q      You think that's an accurate sentence,

2    right?

3        A      Yes.

4        Q      When you say operates independently, I

5    take it you mean that the bank -- well, let me ask

6    you, what did you mean when you wrote the bank

7    operates independently from BAEF?

8              MS. EUN:  Objection; vague.

9        A      The bank is a separate entity.  It is a

10    Bulgarian corporation.  It has its own management

11    and it operates independent of the Fund.

12        Q      Meaning that the bank can make its own

13    loans without approval from the Fund, among other

14    things, correct.

15        A      Yes.

16        Q      Are you familiar with whatever

17    underwriting requirements, if any, the bank has for

18    purposes of the loans it makes?  By "you", I just

19    mean you yourself, not BAEF.

20        A      I am not familiar with their

21    documentation and what they go through in

22    underwriting their loans.

**Capital Reporting Company**

Page 38

1      Q      Your next sentence reads, among other

2    things, BAEF is not involved in the bank's loan

3    transactions.  Do you see that sentence?

4      A      Yes.

5      Q      You think that's correct also, right?

6      A      Yes.

7      Q      Do you know whether, at any point, the

8    bank reports to BAEF about individual loan

9    transactions?

10     A      On occasion there might be a situation

11   where the bank will tell us if there's a troubled

12   loan of a significant size.

13     Q      Why would they report that to BAEF; do

14   you know?

15            MS. EUN:  Objection; foundation.

16     A      It's a significant size.  It could have

17   an impact on their financial statements.

18     Q      Do you know -- well, let me ask you this:

19   Have you had a chance to read the complaint in this

20   case, in our case here?

21     A      Yes.

22     Q      Can you tell me whether the loans that

**Capital Reporting Company**

Page 39

1    are discussed in this lawsuit, if you know, would

2    have fallen into that category of the type of loan

3    that might be discussed or might be reported by the

4    bank to BAEF?

5              MS. EUN:  Objection; vague.

6        A    No.

7        Q    Because of the loan size?

8        A    Yes.

9        Q    Is there a threshold amount that

10    typically would trigger that kind of report, that

11    is a report of a nonperforming -- my word, not your

12    word -- or a trouble loan?

13              MS. EUN:  Objection; vague.

14        A    Typically if it's over one million euro.

15        Q    The sentence that begins with, in fact,

16    BAEF was unaware of that particular loan -- now

17    we're talking about the loan that's in the

18    lawsuit -- and any of its details prior to

19    receiving notice of the lawsuit.  Do you see that

20    sentence?  Do you believe that sentence is

21    accurate?

22        A    Yes.

Page 43

1      Q    About the Fund and the bank's operations?

2      A    No.  I did not say that.  I said the Fund

3   files the 501c3 and keeps its records in Chicago.

4   As a subsidiary, the bank is peripherally included

5   in the 501c3 -- I mean, in the IRS form.

6      Q    No.  I know that.  What I was asking you

7   is, given what you said about the absence of other

8   information about the bank, whether the only

9   documentary source of information, if any, about

10  the bank would be contained in those filings?

11           MS. EUN:  Objection; vague.

12     A    I imagine you could assume that.  I think

13  I've already answered.

14     Q    I guess, here's the question:  I'm trying

15  to make sure, other than the USAID filings and the

16  501c3 filings, as I understand your testimony, you

17  don't know of any regularly maintained database or

18  file in Chicago or elsewhere devoted to the bank's

19  operations?

20     A    No.

21     Q    In other words, that statement is

22  correct?

**Capital Reporting Company**

Page 54

1      Q      Who did you meet with at Congress?    Any
2   staffers or any representatives or senators?
3      A      Representative Colby.
4      Q      Who from BAEF was in attendance generally
5   on this trip.    I see your initials and then I
6   see --
7      A      Myself, Joseph Borgatti, Carl
8   Pforzheimer, Steve Filo and Gary MacDougal.
9      Q      And you're getting all of that from
10  reading these notes, right?
11     A      From reading my notes and from my
12  recollection.
13     Q      I don't see separate expense reports for
14  some of those people.    Is that because they didn't
15  make any expense claims; do you know?
16     A      I paid for their hotel accommodations and
17  their meals to allow them not to have to file
18  reports.
19     Q      Oh, good, okay.    Do you remember
20  specifically what the subject was for that trip?
21     A      It was to discuss the Foundation's
22  purposes and financing.

Page 56

```
1       A       The Foundation --

2       Q       The Foundation, okay.

3       A       -- would receive 100 percent of the

4   Fund's proceeds or a lesser amount.

5       Q       And the Foundation is what?

6       A       The foundation is the America for

7   Bulgaria Foundation, which will be the legacy

8   institution that survives the Fund.

9       Q       Is the Fund wrapping up?

10              MS. EUN:  Objection, vague.

11      A       Yes.

12      Q       Does it have a termination or a closing

13  date?

14      A       It has a termination commencement date

15  but not a date certain as to when we will dispose

16  of our assets.

17      Q       When is the termination commencement

18  date?

19      A       September 30th, 2006.

20      Q       So you're in the process of terminating,

21  the Fund is?

22      A       Correct.
```

**Capital Reporting Company**

Page 62

1   the bank's operations?

2           MS. EUN:  Objection; vague.

3       A   The majority is probably from the bank

4   but that could change.

5       Q   Let's go to the next exhibit or the next

6   Bates stamp number 0004.  I'm showing the date at

7   the bottom when it was filled out of 12/20/06.  Do

8   you see that?

9       A   Yes.

10      Q   It looks like you took a bus up to

11  Washington; is that right?

12      A   I did.

13      Q   Is that also for a trip that was for

14  meetings with the State Department and/or USAID?

15      A   Yes, regarding the Foundation.

16      Q   And that took place it looks like, if I

17  read this right, in October of 2006; is that right?

18      A   Yes.

19      Q   At this meeting was the same subject

20  matter generally discussed, in this case, the

21  transition or the evolution from the Fund to the

22  Foundation?

Page 66

1    Foundation?

2        A    I don't know.

3        Q    The last document, 0005, reflects a

4    meeting or travel in May of 2007; is that right?

5        A    Yes.

6        Q    Again, this was you driving to

7    Washington, I guess?

8        A    Yes, a long day.

9        Q    It looks like a long day.  Was anyone

10   else from BAEF meeting with you on this trip?

11       A    No.  This was the Enterprise Fund

12   Association meeting that I attended.

13       Q    What's the Enterprise Fund Association?

14       A    It is an association of executives

15   involved in the Enterprise Fund throughout Europe

16   and Central Asia and Eastern Europe.

17       Q    When was that association formed; do you

18   know?

19       A    I can't say for sure but I think it was

20   probably about 10 years ago, 11 years.

21       Q    Are you member of that association or is

22   BAEF a member of that association?

**Capital Reporting Company**

Page 67

1      A    It's not a formal association.  We attend

2  the conferences occasionally.  It's a fairly loose

3  association of people.  It's not a formal group.

4      Q    Did anybody from the State Department or

5  USAID attend that meeting or that conference; do

6  you know?

7           MS. EUN:  Objection; foundation.

8      A    I believe so, yes.

9      Q    Were there any guest speakers?

10     A    Yes.

11     Q    Do you remember who they were?

12     A    I believe Senator Lugar was there --

13     Q    L-u-g-a-r?

14     A    Yes, the senator from Indiana.  Oh boy, I

15  don't recall the other speakers' names.  One was

16  from the State Department.  The balance of the

17  speakers were all, for the most part, Enterprise

18  Fund people over the years whether they're still

19  involved or retired, you know, various.

20     Q    And this was the only time since 2005

21  that you attended one of these association meetings

22  in Washington.  Is that a fair statement?

**Capital Reporting Company**

Page 68

1      A     This was in 2007.

2      Q     I'm sorry, in 2007.  Had you attended

3  any association meetings in Washington?

4      A     This was the only time that it was held

5  in Washington.

6      Q     Okay.  These three years that you were

7  kind enough to pull these records for, would they

8  be typical of the amount of time that BAEF officers

9  would spend in Washington for the preceding years?

10         MS. EUN:  Objection; vague.

11     A     I would say it closely approximates.  You

12  know, we haven't had much business in Washington

13  that would take us there.  So this foundation work

14  has actually had me in Washington more than I had

15  been in the past.

16     Q     Why is that; just to get it up and

17  running, you mean?

18     A     Yes.

19     Q     When did that start, if I might ask?

20  When did the Foundation work you just referred to

21  actually start requiring to devote some time to it?

22         MS. EUN:  Objection, vague.

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STROITELSTVO BULGARIA LTD., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:07-cv-00634 |
| | ) | |
| v. | ) | |
| | ) | Hon. Rosemary M. Collyer |
| THE BULGARIAN-AMERICAN ENTERPRISE | ) | |
| FUND, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF SILVY CHERNEV**

I, SILVY CHERNEV, do hereby certify and declare as follows:

**BACKGROUND AND RETENTION**

1.      My name is Silvy Chernev.  I submit this declaration in support of Defendant the

Bulgarian American Enterprise Fund's ("BAEF") Motion to Dismiss Plaintiff Stroitelstvo

Bulgaria's ("Stroitelstvo") Complaint Pursuant to Federal Rules 12(b)(2) and 12(b)(3) or

Alternatively Based on the Doctrine of *Forum Non Conveniens*.  The facts set forth in this

Declaration are true and correct to the best of my information and belief.  I have drawn from my

professional expertise and general familiarity with Bulgarian courts and Bulgarian law in

preparing this Declaration.  I speak and write English fluently.

2.      I have been retained in this matter by BAEF to act as an expert consultant on

Bulgarian law and the Bulgarian legal system.  I am charging my standard hourly consultation

fee of 120 EURO per hour for work done in this matter. I have not done any previous work for BAEF, although my law firm has handled a few matters in the past for one of its affiliates, Bulgarian American Property Management.

## QUALIFICATIONS AND EXPERIENCE

3.     I am a licensed attorney in Bulgaria and am currently a partner in the law firm of Chernev Komitova and Partners. I have more than 25 years of experience practicing commercial law, civil litigation, and arbitration in Bulgaria.

4.     I earned an LLM in 1977 from Sofia University. I earned my PhD in law at the Center for Legal Studies of the Bulgarian Academy of Science and Sofia University with a specialization in Civil Procedure in 1987.

5.     I have served as a Professor of Civil Procedure at several universities in Bulgaria over the past 25 years (since 1984), including Sofia University (for 6-7 years), Bourgas University (since 1993), Plovdiv University (for the past 2 years), and Varna University (for 6-7 years). I have numerous publications in Bulgarian Civil Procedure, including a 350-page book entitled, "The Instances in the Civil Procedure of the Republic of Bulgaria (Problems of Reform in the Civil Procedure Law)" (which addresses the jurisdiction of courts at different levels), and numerous other articles and studies.

6.     For the past 8 years, I have served as President of the Court of Arbitration of the Bulgarian Chamber of Commerce and Industry. The Court of Arbitration of the Bulgarian Chamber of Commerce and Industry was established more than 50 years ago and is the oldest and most respected court of arbitration in Bulgaria. As President, as an arbitrator, and as an

2

attorney, I participate in high profile international arbitrations and domestic disputes. I also train university students and young lawyers in arbitration techniques.

7.     I have advocated for numerous legal and judicial reform initiatives in Bulgaria and have drafted several laws. Many of my proposals have been adopted into law in Bulgaria.

8.     A copy of my curriculum vitae is attached hereto.

## ADEQUACY OF BULGARIAN COURTS

9.     In Bulgaria, there is an independent judiciary that is available to hear commercial disputes between parties. In fact, under the Second Article of Bulgaria's Code of Civil Procedure, Bulgarian courts are obliged to hear and resolve any complaint or petition concerning personal or monetary rights filed before them.

10.     Bulgaria has a state court system comprised of general courts that are available to hear both criminal and civil matters. The system is a four-tier system, which consists of: (1) regional courts; (2) district courts; (3) appellate courts; and (4) the Supreme Court of Cassation. Most cases begin at the regional court, although some begin at the district court level (depending on the sum involved, type of case, and so forth). The Sofia Regional Court is a regional, first instance court. The Sofia City Court is a district court performs both as first and second instance court.

11.     In general, each commercial case may go through at least three levels of consideration, including two levels of review. At the first level of appellate review, the reviewing court considers the case *de novo*. At the second level of review, the case may be heard twice. Thus, the process allows for an ample consideration of each case.

3

12.     In Bulgaria, the regular court procedure ends with a final decision (*res judicata* decision), which may serve as grounds for forced execution.  Bulgaria has extensive procedures in place for execution and enforcement of judgments.

13.     The Bulgarian courts are fully developed and operating at full capacity. Commercial litigants can achieve full and fair resolution of their disputes in the Bulgarian court system.  Bulgaria's court system is consistent with the continental European tradition and its structure and procedures do not deviate in any significant way from those of other European courts.

14.     I have reviewed the March 2005 "Loan Agreement" between the Bulgarian American Credit Bank ("the Bank") and Stroitelstvo Bulgaria ("Stroitelstvo").  The Loan Agreement is a standard agreement of the type that is widely used in commercial practice in Bulgaria.  As such, disputes related to this type of Loan Agreement are frequently encountered and addressed by Bulgarian courts.

## JURISDICTION OF BULGARIAN COURTS OVER FOREIGN LITIGANTS

15.     There are at least four means by which Bulgarian courts could assert jurisdiction over BAEF in this case.

16.     First, Bulgarian courts have jurisdiction if the claimant is a Bulgarian person. Chapter 2, Article 4, Paragraph 2 of Bulgaria's International Private Law Code ("ILPC") provides that:  "The international competence of the Bulgarian courts and of other bodies shall be existing, if: 2. the claimant . . . . is a Bulgarian citizen or is a legal person, registered in the Republic of Bulgaria."  Here, the claimant (Stroitelstvo) is a Bulgarian person, thus, the Bulgarian courts would have jurisdiction over BAEF and the dispute.

4

17.    Second, Bulgarian law provides for jurisdiction over corporations that reside and/or transact business in Bulgaria. ILPC Chapter 2, Article 4, Paragraph 1 provides that: "The international competence of the Bulgarian courts and of other bodies shall be existing, if the defendant has a customary residence seat . . . . or a location of the actual management in the Republic of Bulgaria." Here, BAEF has an office and regularly does business in Sofia, Bulgaria; thus, the Bulgarian courts would have jurisdiction over BAEF and the dispute.

18.    Third, Bulgarian law provides for jurisdiction over any civil litigant who has caused damage in tort to a party in Bulgaria. ILPC Chapter 2, Article 18, Paragraph 1 provides that: "The Bulgarian courts shall be competent upon claims for damages from tort [with exceptions not applicable here], and if the damaging act has been committed in the Republic of Bulgaria or the damages or part of them have occurred in the Republic of Bulgaria." Here, Stroitelstvo claims that it was damaged in Bulgaria; thus, the Bulgarian courts would have jurisdiction over BAEF and the dispute.

19.    Fourth, under ILPC Chapter 2, Article 23, Paragraph 2, even if the Bulgarian court does not have jurisdiction, if there is an agreement between the parties, the Bulgarian courts may exercise jurisdiction.

## CLAIMS AVAILABLE UNDER BULGARIAN LAW

20.    Bulgarian civil and commercial law contain no significant deviations from European continental tradition.

21.    I have reviewed the general allegations made in the Complaint in this matter. Although not all of the specific claims asserted have exact Bulgarian equivalents (such as the "RICO" claim), a remedy is available under Bulgarian law for the type of conduct alleged in the

Complaint. Thus, the Bank and Stroitelstvo's understanding as set forth in the Loan Agreement that Bulgarian courts would be available to resolve "any disputes under the agreement, including interpretation, validity, nonperformance or termination" was correct. (*See* Loan Agreement § 17.08)

22.     Several provisions of Bulgarian law could potentially apply to the allegations at issue in the Complaint. Governing law includes the Bulgarian Obligations and Contracts Act, which is the general law in civil matters. Specifically:

a.     Bulgarian law recognizes and enforces contractual obligations between parties. (*See* Obligations and Contracts Act, Article 20a ("Contracts shall have the force of law for the parties which have concluded them."))

b.     The Bulgarian Obligations and Contracts Act contains provisions to allow contract invalidation for circumstances such as fraud, coercion, and duress. (*See, e.g.,* Obligations and Contracts Act, Article 26 (absolute invalidity), Article 27 (causes for relative invalidity), Article 29 (fraud))

c.     Under Bulgarian law, good faith is required in behavior between commercial parties, including pre-contractual and post-contractual behavior. Specifically, the Code provides: "The parties shall act in good faith in conducting negotiations and concluding contracts. Otherwise, they shall owe damages." (Obligations and Contracts Act, Article 12; *see also id.,* Article 63, ¶ 1 ("Each of the parties to the contract must fulfill its obligations arising from it accurately and in good faith . . . ."))

    d.    Under Bulgarian law, "a creditor shall be in default when he refuses without justification to accept the performance offered by the debtor or fails to provide the necessary assistance without which the debtor is unable to perform his obligation." (*Obligations and Contracts Act, Article 95*)

    e.    Bulgaria recognizes a cause of action for abuse of existing rights. (*See* Bulgarian Constitution Article 57, ¶ 2; Law on Commerce Article 289 (abuse of rights); Civil Procedure Code, Article 3 (abuse of procedural rights may lead to liability))

    f.    Under Bulgarian law, "each person must redress the damages he has guiltily caused to another person." (*Obligations and Contracts Act, Article 45*). That is Bulgaria's general tort liability provision that would apply to disputes between commercial parties.

    g.    Under Bulgarian law, a settlement must include "mutual concessions." (*Obligations and Contracts Act, Article 365*).

## LEGAL PROCEEDINGS TO DATE IN BULGARIA

23.    I have reviewed relevant Bulgarian legal documents related to the Loan Agreement, including court acts and some of the motions those acts were based upon. Such documents make clear that both Stroitelstvo and the Bank have already availed themselves of the Bulgarian legal system.

24.    On December 12, 2005, the Bank obtained an immediate decree of execution on the loan from the Sofia City Court in the amount of 970,000 EURO by showing a statement of accounts. Such a procedure does not require court adjudication and is a normal, appropriate

mechanism for obtaining this type of writ in Bulgaria. (*See* Civil Procedure Code, Article 237, ¶ 1c; Law on Credit Institutions, Article 60, ¶ 2)

25.     On December 15, 2005, the Bank initiated foreclosure proceedings with an execution officer and attached the assets of Stroitelstvo that had been mortgaged to secure the loan.

26.     In March 2006, Stroitelstvo challenged the writ of execution in the Sofia Regional Court (claiming that it only owed 360,000 EURO), and the Sofia Regional Court ruled for partial suspension of the foreclosure proceedings.  To successfully challenge a writ of execution before the Sofia Regional Court, the debtor need only present prima facie evidence that he does not owe the amount under the writ of execution.

27.     The Bank then appealed that decision to the Sofia City Court.   In June 2006, the Sofia City Court ruled in favor of the Bank by repealing the order stopping the foreclosure and stating that the Bank had the right to foreclose and collect the full amount (970,000 EURO).

28.     Prior to the decision from the Sofia City Court, however, the Bank and Stroitelstvo had entered into negotiations that led to an agreement to resolve the proceedings and settle disputes between them ("Settlement Agreement").

29.     Under the Settlement Agreement, Stroitelstvo agreed to pay 563,000 EURO (less than the amount being sought by the Bank and more than that Stroitelstvo was conceding it owed) to the Bank. (Ex. B to Motion to Dismiss, Settlement Agreement, at § II., Art. I)  In addition, the Bank and Stroitelstvo each agreed to waive further claims and appeals based on the Loan Agreement. (*Id.*, § II, Articles II, IV & VI)

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _Aug 2, 2007_ _____
Silvy Chernev

# EXHIBIT 4

## СПОРАЗУМЕНИЕ

Днес, **09.05.2006** /девети май две хиляди и шеста/ година (**"Дата на сключване"**), в гр. София, бе сключено следното споразумение (**"Споразумение"**) между:

1. **"БЪЛГАРО-АМЕРИКАНСКА КРЕДИТНА БАНКА" АД**, със седалище и адрес на управление гр. София 1504, Община "Средец", ул. "Кракра" N 16, регистрирано в Софийски градски съд по ф.д. 12587/1996 г. и вписано в търговския регистър под парт. N 35659, рег. I, том. 397, стр. 180, данъчен №1223073227, БУЛСТАТ №Ю121246419, представлявано от **ДИМИТЪР СТОЯНОВ ВУЧЕВ**, ЕГН 5910266685, л.к. № 159148938, издадена на 25.04.2000г. от МВР - София - Изпълнителен директор и **Мария Светославова Шейтанова**, ЕГН 7004186956, л.к. №163150006, издадена на 16.10.2000 г. от МВР – София, действаща като пълномощник на Изпълнителните директори **ДИМИТЪР СТОЯНОВ ВУЧЕВ** и **СТОЯН НИКОЛОВ ДИНЧИЙСКИ**, ЕГН 7006114488, съгласно нотариално заверено пълномощно с рег №1462/27.04.2006 и №1486/28.04.2006 г. по описа на Нотариус Слава Пилякова с рег. №344 на НК с район СРС, наричано по-долу „**Банка- ВЗИСКАТЕЛ**"

**И**

2. **"СТРОИТЕЛСТВО БЪЛГАРИЯ" ЕООД**, със седалище и адрес на управление гр. София, район Триадица, ж.к. "Бокар" 16А, рег. по ф.д. №11749/2003г. на Софийски градски съд, вписано в Регистър за търговски дружества под №80176, том 956, стр.92, БУЛСТАТ 131169857, данъчен №1220179725, представлявано от Управителя **МЕТОДИ ЛЮБЕНОВ ДИМИТРОВ**, ЕГН:5604186661, с лична карта №162000676, издадена на 29.08.2000г. от МВР София, в качеството му на длъжник по изп. дело № 33205/2005г. по описа на СИС при Софийски районен съд, наричано по-долу „**ДЛЪЖНИК**";

наричани заедно **"СТРАНИ"**,
се сключи настоящето извънсъдебно споразумение за следното:

### I. КОНСТАТАЦИИ:

**Страните установиха и констатираха следното:**

1. Банката- ВЗИСКАТЕЛ и ДЛЪЖНИКЪТ са сключили Договор за банков кредит от 24 март 2005г. (наричан по-долу „**Договор за банков кредит**") за предоставяне на банков кредит в общ договорен размер до 2 659 704 евро (два милиона шестстотин петдесет и девет хиляди седемстотин и четири) евро, от който са отпуснати средства в размер на 970 438.41 евро (деветстотин и седемдесет хиляди четиристотин тридесет и осем евро и четиридесет и един евро цента);

2. За обезпечаване на вземанията на Банката- ВЗИСКАТЕЛ, произтичащи от Договора за банков кредит е учредена договорна ипотека в полза на Банката- ВЗИСКАТЕЛ по силата на Нотариален акт № 73, том I, рег. № 760, дело 67/2005 по описа на нотариус Слава Пилякова с рег. № 344 на НК, вписан в Служба по вписванията- гр. София с вх. рег. №12902/28.03.2005г., акт №53; том X, дело 9227/2005г.;

Длъжник: _____            1            Банка-Взискател: _____

3. Длъжникът е осъден да заплати на Взискателя, съгласно изпълнителен лист от 12.12.2005г., изд. от Софийски районен съд, 79- ти състав, сумите както следва: 970 438.41 Евро (деветстотин и седемдесет хиляди четиристотин тридесет и осем евро и четиридесет и един евро цента), представляваща *главница по Договор за банков кредит от 24 март 2005г.*, ведно със *законната лихва* върху главницата, считано от 06.12.2005г. до окончателно и изплащане, както и сумата от 57 260.25 лева (петдесет и седем хиляди двеста и шестдесет лева и двадесет и пет стотинки), представляващи *извършени разноски по делото;*

4. С определение от 04.04.2006г. Софийски районен съд, 50- ти състав се е произнесъл с определение по гр. д № 6340/2006г. по описа на СРС, с което е постановил частично спиране на изпълнителните действия по изп. дело №33205/2005г. по описа на СИС при СРС, уважавайки по този начин предявеното от Длъжника възражение по чл. 250 от ГПК. **Банката- ВЗИСКАТЕЛ** е обжалвала пред СГС това определение.

5. Към дата 09.05.2006г. общият размер на задължението на **ДЛЪЖНИКА** по изпълнителното дело към **ВЗИСКАТЕЛЯ** възлиза на 1,022,558.84 евро (един милион двадесет и две хиляди петстотин петдесет и осем евро и осемдесет и четири евро цента) и 57 221,27 лв. (петдесет и седем хиляди двеста двадесет и един лева и двадесет и седем стотинки), от които Присъдена главница – 970,438.41 Евро (деветстотин и седемдесет хиляди четиристотин тридесет и осем евро и четиридесет и един евро цента), Законна лихва, начислена за периода от 06.12.2006г. до 09.05.2006г. върху размера на присъдената главница - 52.120,43 евро (петдесет и две хиляди сто и двадесет евро и четиридесет и три евро цента); и съдебни разноски по принудителното събиране на вземането- 57 221,27 лева (петдесет и седем хиляди двеста двадесет и един лева и двадесет и седем стотинки);

## II. СТРАНИТЕ СЕ СПОРАЗУМЯХА ЗА СЛЕДНОТО:

**Чл. 1.** Длъжникът се задължава да изплати на Банката- ВЗИСКАТЕЛ сумата от 563 000 (петстотин шестдесет и три хиляди) Евро, както следва:

(a). за сумата от *500 000 (петстотин хиляди) евро* в деня на подписване на това споразумение е открит неотменяем акредитив в полза на Банката- ВЗИСКАТЕЛ от ТБ „Инвестбанк" АД, плащането по който се извършва със средства, предоставени по Договор No.КЦ-67/2006-В за банков кредит във валута, сключен между ДЛЪЖНИКА и ТБ „Инвестбанк" АД;

(б) остатъкът от сумата в размер на *63 000 (шестдесет и три хиляди) евро* ДЛЪЖНИКЪТ изплаща на Банката- ВЗИСКАТЕЛ в срок до 11.05.2006г. по банкова сметка № 1499999900, банков код 16091603 при БАКБ АД, с бенефициент- „Българо-американска кредитна банка" АД, а като основание за извършеното плащане да бъде посочено- плащане по настоящето Споразумение. В деня на подписване на този договор ДЛЪЖНИКЪТ представя на Банката- ВЗИСКАТЕЛ копие от платежното нареждане.

**Чл.2.** Страните по настоящето Споразумение се съгласяват, че единствено след като Банката- ВЗИСКАТЕЛ получи пълния размер на сумата по чл. 1 чрез плащане в срок до 11.05.2006г. на *63 000 (шестдесет и три хиляди) евро* по сметката, посочена в б.(б) на член 1 по-горе и чрез плащане по открития акредитив по б.(а) на член 1 по- горе, то Банката- ВЗИСКАТЕЛ ще счита *задължението на ДЛЪЖНИКА,* произтичащо от Договора за банков кредит, *за напълно изплатено,* а вземането на Банката- ВЗИСКАТЕЛ, за събирането на което Банката- ВЗИСКАТЕЛ е инициирала принудително изпълнение по изп. дело №33205/2005г. по описа на СИС при Софийски районен съд, *за напълно погасено.*

Длъжник:                          2                Банка-Взискател:

**Чл. 3. ДЛЪЖНИКЪТ** заявява, че се отказва от всякакви свои претенции и възражения по повод инициираното от **Банката- ВЗИСКАТЕЛ** принудително изпълнение по изп. Дело №33205/2006г. по описа на СИС при СРС, заявени с предявеното на основание чл. 250 от ГПК искане за спиране на горецитираното изпълнително дело.

При подписване на настоящето **Споразумение ДЛЪЖНИКЪТ** предоставя на **Банката- ВЗИСКАТЕЛ** нотариално заверена молба за отказ от възражението по чл. 250 от ГПК, за прекратяване на гражданското дело, образувано по подадената от **Банката – ВЗИСКАТЕЛ** жалба срещу определение от 04.04.2006г. на Софийски районен съд, 50- ти състав по гр. д № 6340/2006г., както за обезсилване на така цитираното определение.

**Чл. 4.** При условие, че **ДЛЪЖНИКЪТ** изплати изцяло и в срок в полза на **Банката- ВЗИСКАТЕЛ** сумата от 563 000 /петстотин шестдесет и три хиляди/ евро, по начина, посочен в чл. 1 по- горе, то **Банката- ВЗИСКАТЕЛ** няма да има каквито и да било претенции спрямо Длъжника във връзка с и по повод на Договора за банков кредит.

**Чл.5. (1)** В срок до пет работни дни след получаване на пълната сума по член 1 по-горе, **Банката-ВЗИСКАТЕЛ** се ангажира със следното:

1. упълномощено от нея лице да депозира молба до съдия изпълнител при СИС при Софийски районен съд за прекратяване на изпълнителните действия и вдигане на наложените възбрани по изпълнително дело №33205/2005г. по описа на СИС при Софийски районен съд.

2. да изготви нотариално заверено съгласие за заличаване на договорната ипотека върху недвижимите имоти, учредена с *Нотариален акт № 73, том I, рег. № 760, дело 67/2005 по описа на нотариус Слава Пилякова с рег. № 344 на НК, вписан в Служба по вписванията при СРС с вх. рег. №12902/28.03.2005г.; акт №53, том X, дело №9227/2005г.* Нотариално завереното съгласие ще бъде на разположение за получаване от **ДЛЪЖНИКА** след изтичане на уговорения по-горе срок в централния офис на Банката: гр.София, ул."Кракра" No.16.

**(2)** Разноските, дължими във връзка с посочените в предходната алинея правни и фактически действия (включително нотариални такси и други държавни такси) са изцяло за сметка на **ДЛЪЖНИКА**. Нотариалната такса, дължима за нотариално заверено съгласие за заличаване на договорната ипотека следва да бъде депозирана при **Банката- ВЗИСКАТЕЛ** в срок не по- късно от 3 (три) работни дни от датата, на която **Банката- ВЗИСКАТЕЛ** е извършил плащане на сумата от 563 000 /петстотин шестдесет и три хиляди/ евро. Неплащането на дължимите разноски, препятстващо **Банката- ВЗИСКАТЕЛ** от точно изпълнение на поетите по ал. 1 по- горе задължения, не съставлява случай на забава от страна на **Банката- ВЗИСКАТЕЛ.**

**Чл.6.** Страните се задължават да спазват занапред такова поведение, което отговаря на установеното с настоящето *Споразумение* правно положение и се задължават да се въздържат занапред от всякакво негово оспорване и да избягват и каквито и да са възможни бъдещи спорове свързани с предмета на настоящето *Споразумение* или произтичащи от права, задължения или правоотношения, предмет на разглеждане и разрешаване от същото.

**Чл.7.** Настоящето споразумение влиза в сила и обвързва страните при условие, че **ДЛЪЖНИКЪТ** е извършил в полза на **Банката- ВЗИСКАТЕЛ**, а **Банката- ВЗИСКАТЕЛ** е получила, пълно плащане на сумата от 563 000 /петстотин шестдесет и три хиляди/ евро, по начина и в сроковете, посочени в член 1 по-горе. При забавено или непълно плащане; при неизвършване на плащане или при неспазване на реда и начина за извършване на

Длъжник:                                      3            Банка-Взискател:

плащане в полза на Банката- ВЗИСКАТЕЛ, определен съгласно чл. 1 по- горе, настоящето **Споразумение** не влиза в сила и никоя от **Страните** по него не може да черпи права от текста на **Споразумението**, нито да се позовава на същото.

**Чл.8.** С влизане в сила на настоящето **Споразумение** и с пълното и точно изпълнение на задълженията, поети от **Страните** по това **Споразумение**, всички отношения между тях, възникнали от и във връзка с **Договора за кредит** и описаната и установена по-горе фактическа обстановка се считат за окончателно и безусловно уредени и всяка една от **Страните** по настоящето **Споразумение** декларира и гарантира, че няма каквито и да било претенции, възникнали от и/или във връзка с **Договора за кредит**, както и констатациите и договореностите, описани в настоящето **Споразумение**.

**Чл.9.** Настоящето споразумение може да се променя само с писменото съгласие на двете **Страни**.

**Чл.10.** Настоящето споразумение се сключи в 4 /четири/ еднообразни екземпляра, два за Банката-Взискател, един за Длъжника и един за ТБ,,Инвестбанк"АД.

**За Банката- ВЗИСКАТЕЛ:**

Димитър Вучев                           Мария Шейтанова
Изпълнителен директор              Пълномощник
„Българо- американска кредитна банка" АД

**За ДЛЪЖНИКА:**

Методи Любенов Димитров
Управител
"СТРОИТЕЛСТВО БЪЛГАРИЯ" ЕООД

Длъжник:                    4        Банка-Взискател:

## AGREEMENT

Today, **May 9, 2006** (the ninth day of May, in the year two thousand six) (hereinafter referred to as "**Date of Signing**"), in Sofia, the following Agreement (hereinafter referred to as "**Agreement**") was entered into between:

**1. BULGARIAN AMERICAN CREDIT BANK JSC,** with a principal place of business and registered office at 16 Krakra Street, Sredets Municipality, 1504 Sofia, registered with the Sofia City Court under Company Case No. 12587/1996 and entered into the Commercial Registry under No. 35659, Reg. I, Volume 397, Page 180, Tax ID No. 1223073227, BULSTAT No. IU121246419, represented by **DIMITAR STOIANOV VUCHEV,** Executive Director, Personal Citizenship No. 5910266685, Personal ID Card No. 159148938 issued on April 25, 2000 by the Sofia Department of Internal Affairs, and **Maria Svetoslavova Sheitanova,** Personal Citizenship No. 7004186956, Personal ID Card No. 163150006 issued on October 16, 2000 by the Sofia Department of Internal Affairs, acting as a representative of Executive Directors **DIMITAR STOIANOV VUCHEV** and **STOIAN NIKOLOV DINCHIISKI, Personal Citizenship No. 7006114488,** pursuant to notarized authorization of Reg. No. 1462 of April 27, 2006 and No. 1486 of April 28, 2006, in accordance with the inventory of Slava Piliakova, Notary Public, Notary Chamber Registration No. 344, acting within the jurisdiction of the Sofia District Court, hereinafter referred to as "**CLAIMANT Bank**"

**AND**

**2. STROITELSTVO BULGARIA LTD.,** with a principal place of business and registered office at 16A Bokar Residential Complex, District of Triaditsa, Sofia, registered with the Sofia City Court under Company Case No. 11749/2003 and entered into the Commercial Registry under No. 80176, Vol. 956, Page 92, BULSTAT No. 13[illegible]169857, Tax ID No. 1220179725, represented by Manager **METODI LIUBENOV DIMITROV,** Personal Citizenship No. 5604186661, Personal ID Card No. 162000676 issued on August 29, 2000 by the Sofia Department of Internal Affairs, in its capacity as debtor under Execution Case No. 33205/2005, in accordance with the docket of the Sofia District Court, hereinafter referred to as "**DEBTOR**";

**Jointly to be referred to as "PARTIES,"**
which have entered into the present Settlement Agreement regarding the following:

### I. FINDINGS:

**The Parties have established and find as follows:**

**1. CLAIMANT Bank** and **DEBTOR** signed a Bank Loan Agreement dated March 24, 2005 (hereinafter referred to as "**Bank Loan Agreement**") to grant a bank loan in the total contractual amount of up to EUR 2,659,704 (two million six hundred fifty-nine thousand seven hundred four euro), under which funds in the amount of EUR 970,438.41 (nine hundred seventy thousand four hundred thirty-eight euro and forty-one euro cents) has been paid;
**2.** For purposes of securing receivables for **CLAIMANT Bank** under the **Bank Loan Agreement,** a conventional mortgage for the benefit of **CLAIMANT Bank** was recorded pursuant to *Deed No. 73, Vol. I, Reg. No. 760, Case No. 67/2005, in accordance with the inventory of Slava Piliakova, Notary Public, Notary Chamber Registration No. 344, entered into the Sofia Registry Agency under Reg. No. 12902 dated March 28, 2005, Deed No. 53, Vol. X, Case No. 9227/2005;*

Debtor: [Illegible Signature]                    Claimant Bank: [Illegible Signature] [Illegible Signature]

1

3. Pursuant to a writ of execution dated December 12, 2005 issued by the Sofia District Court, 79th Panel, **Debtor** was obligated to pay **Claimant** the following amounts: EUR 970,438.41 (nine hundred seventy thousand four hundred thirty-eight euro and forty-one euro cents), constituting *the principal under the Bank Loan Agreement dated March 24, 2005*, along with *legal interest* on the principal as of December 6, 2005 and until final repayment thereof, as well as the amount of BGN 57,260.25 (fifty-seven thousand two hundred sixty leva and twenty-five stotinkas), constituting *expenses in connection with the case*;

4. On April 4, 2006, the Sofia District Court, 50th Panel, ruled (ruling regarding Civil Case No. 6340/2006, in accordance with the docket of the Sofia District Court) partial suspension of execution under Execution Case No. 33205/2005 in accordance with the docket of the Judicial Execution Service of Sofia District Court, thereby honoring the objection filed by Debtor under Article 250 of the Code of Civil Procedure. **CLAIMANT Bank** appealed this ruling before the Sofia City Court.

5. As of May 9, 2006, the total amount of **DEBTOR'S** liability toward **CLAIMANT** under the execution case amounted to EUR 1,022,558.84 (one million twenty-two thousand five hundred fifty-eight euro and eighty-four euro cents), and BGN 57,221.27 (fifty-seven thousand two hundred twenty-one leva and twenty-seven stotinkas), of which the awarded principal – EUR 970,438.41 (nine hundred seventy thousand four hundred thirty-eight euro and forty-one euro cents), legal interest accrued for the period from December 6, 2006 until May 9, 2006 on the amount of the awarded principal – EUR 52,120.43 (fifty-two thousand one hundred twenty euro and forty-three euro cents), and legal expenses related to the enforcement of liability – BGN 57,221.27 (fifty-seven thousand two hundred twenty-one leva and twenty-seven stotinkas);

## II. THE PARTIES AGREE AS FOLLOWS:

**Article 1. Debtor** shall be obligated to pay to **CLAIMANT Bank** the amount of **EUR 563,000 (five hundred sixty-three thousand euro)**, as follows:

(a) An irrevocable letter of credit in the amount of *EUR 500,000 (five hundred thousand euro)*, as of the date of signing hereof, has been opened for the benefit of **CLAIMANT Bank** by Investbank Commercial Bank JSC, and payment thereunder shall be made with funds provided pursuant to Foreign Currency Bank Loan Agreement No. KTs-67/2006, entered into between **DEBTOR** and Investbank Commercial Bank JSC;

(b) The remainder in the amount of *EUR 63,000 (sixty-three thousand euro)*, shall be paid by **DEBTOR** to **CLAIMANT Bank** by May 11, 2006 into Bank Account No. 1499999900, Banking Code 16091603 with BACB JSC, with Bulgarian American Credit Bank JSC as beneficiary, and payment pursuant to the present **Agreement** shall be indicated as basis for the payment. As of the date of signing of the present agreement, **DEBTOR** shall present to **CLAIMANT Bank** a copy of the payment order.

**Article 2.** The **Parties** to the present **Agreement** agree that only after **CLAIMANT Bank** has received the full amount under Article 1, via payment by May 11, 2006 of *EUR 63,000 (sixty-three thousand euro)* into the account specified in Section (b) of Article 1 above and via payment under the letter of credit opened pursuant to Section (a) of Article 1 above, shall **CLAIMANT Bank** consider the *liability of* **DEBTOR** under the **Bank Loan Agreement** *to have been fully disbursed, and the receivables of* **CLAIMANT Bank**, for the collection of which **CLAIMANT Bank** has initiated enforcement under Execution Case No. 33205/2005, in accordance with the docket of the Judicial Execution Service of the Sofia District Court, *to have been fully discharged.*

Debtor: [Illegible Signature]          Claimant Bank: [Illegible Signature] [Illegible Signature]

2

**Article 3.  DEBTOR** hereby states that it waives any claims and objections in relation to the enforcement under Execution Case No. 33205/2006 in accordance with the docket of the Judicial Execution Service of the Sofia District Court initiated by **CLAIMANT Bank** and stated in the request to suspend the aforementioned execution case filed pursuant to Article 250 of the Code of Civil Procedure.

Upon signing the present **Agreement, DEBTOR** shall provide **CLAIMANT Bank** with a notarized request to waive the objection, pursuant to Article 250 of the Code of Civil Procedure, to terminate the civil action initiated by the appeal of **CLAIMANT Bank** against the April 4, 2006 ruling of the Sofia District Court, 50th Panel, on Civil Case No. 6340/2006, as well as to invalidate the ruling cited above.

**Article 4.**  Provided that **DEBTOR** pays in full and on time to **CLAIMANT Bank** the amount of EUR 563,000 (five hundred sixty-three thousand euro) in the manner as set forth in Article 1 above, **CLAIMANT Bank** shall have no claims towards **Debtor** in connection with the **Bank Loan Agreement**.

**Article 5.  (1)**  Within five business days upon receipt of the full amount under Article 1 above, **CLAIMANT Bank** shall undertake the following steps:

1. An authorized representative of **CLAIMANT Bank** shall file with an executory officer of the Judicial Execution Service of the Sofia District Court a request to terminate the enforcement actions and lift the injunctions imposed under Execution Case No. 33205/2005 in accordance with the docket of the Judicial Execution Service of the Sofia District Court.

2. Prepare a notarized consent to delete the conventional real estate mortgage recorded pursuant to *Deed No. 73, Vol. I, Reg. No. 760, Case No. 67/2005, in accordance with the inventory of Slava Piliakova, Notary Public, Notary Chamber Registration No. 344, entered into the Sofia Registry Agency under Reg. No. 12902 of March 28, 2005, Deed No. 53, Vol. X, Case No. 9227/2005.*  The notarized consent shall be available to be received by **DEBTOR** upon expiration of the above timeframe agreed upon at the central office of the Bank at:  16 Krakra Street, Sofia.

**(2)**  The expenses due in connection with the legal and factual actions described in the previous paragraph (including notarization fees and other administrative fees) shall be paid in full by **DEBTOR**. The notarization fee due for a notarized consent to delete the conventional mortgage must be deposited with **CLAIMANT Bank** no later than within three (3) business days of the date on which **CLAIMANT Bank** [sic] has made a payment in the amount of EUR 563,000 (five hundred sixty-three thousand euro).  Failure to cover the expenses due, which would prevent **CLAIMANT Bank** from strictly discharging the obligations undertaken in accordance with Par. 1 above, shall not constitute a case of default on the part of **CLAIMANT Bank.**

**Article 6.** The Parties shall be obligated to comply in the future with conduct in accordance with the legal situation established by the present Agreement and shall be obligated to refrain from any future challenges thereof and to avoid any future disputes associated with the subject of the present **Agreement** or arising from rights, obligations or legal relationships that are subject to examination and resolution thereof.

**Article 7.**  The present Agreement shall become effective and binding for the Parties provided that **DEBTOR** has made payment for the benefit of **CLAIMANT Bank** and **CLAIMANT Bank** has received full payment in the amount of EUR 563,000 (five hundred sixty-three thousand euro), in the manner and within the timeframe set forth in Article 1 above.  In the event of a delayed or incomplete payment, failure to make payment or failure to comply with the procedure for making payment for the benefit of CLAIMANT Bank, as defined in accordance with Article 1 above, the present **Agreement** shall not enter into effect and neither Party shall benefit from any rights set forth in the present **Agreement** nor shall it have the right to refer hereto.

Debtor:  [Illegible Signature]                         Claimant Bank:  [Illegible Signature] [Illegible Signature]

3

**Article 8.** As of the effective date of the present **Agreement,** and as a result of full and strict discharge of the obligations undertaken by the **Parties** to the present **Agreement,** all relationships between the **Parties** that have arisen in connection with the **Loan Agreement** and the facts as described and established above shall be deemed finally and unconditionally settled and each **Party** of the present **Agreement** hereby declares and guarantees that it shall have no claims arising from and / or in connection with the **Loan Agreement** as well as the findings and arrangements described in the present **Agreement.**

**Article 9.** The present Agreement may be amended only upon written consent of both **Parties.**

**Article 10.** The present Agreement is signed in four (4) identical copies, of which two shall be for the Claimant Bank, one for the Debtor and one for Investbank Commercial Bank JSC.

### On behalf of CLAIMANT Bank:

L.S. [Legal Seal: Bulgarian American Credit Bank JSC [Emblem]]

[Illegible Signature]                     [Illegible Signature]
Dimitar Vuchev                            Maria Sheitanova
Executive Director                        Authorized Representative
        BULGARIAN AMERICAN CREDIT BANK JSC


### On behalf of DEBTOR:

L.S. [Legal Seal: Stroitelstvo Bulgaria, Ltd.]

[Illegible Signature]
Metodi Liubenov Dimitrov
[Illegible]
STROITELSTVO BULGARIA LTD.


Debtor: [Illegible Signature]            Claimant Bank: [blank] [blank]

4

# EXHIBIT 5

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


------------------------------------+

STROITELSTVO BULGARIA, LTD,                :

         Plaintiff,                          :

                            : CASE NO.

vs.                                        : 1:07-CV-00634

THE BULGARIAN-AMERICAN ENTERPRISE          :

FUND, et al,                               :

         Defendant.                          :

------------------------------------+


                         Tuesday, December 5, 2007


Telephonic Deposition of:

                SILVY CHERNEV

called for telephonic oral examination by counsel for

Plaintiff, pursuant to notice at before Janie Arriaga of

Capital Court Reporting Company, a Notary Public in and

for the District of Columbia, beginning at 8:00 a.m.,

when were present on behalf of the respective parties:

**Capital Reporting Company**

Page 55

1      Q    The same for all four levels?

2      A    Yes, except for the top person, the justice --

3    not justice, but the president of the supreme court.  So

4    all of them are.  All of them are.

5          (Thereupon, Exhibit Number 2 was marked for

6          identification.)

7    BY MR. MUSOLINO:

8      Q    The complaint that I showed you -- it was

9    filed in Washington -- Exhibit 2 here, where was that

10   complaint properly filed?  In Bulgaria?

11     A    It's a complex complaint.  It's a combination

12   of a number of claims.  So it might have been filed

13   at the second level district, because usually the

14   distinction in jurisdiction between the law in lowest

15   and the second level is the summit issue, so I

16   think here it normally be the district court.

17     Q    Which particular district court -- Sofia -- in

18   this particular case?

19     A    Sofia City Court.

20     Q    Can you, in your experience, point me to any

21   cases with which you are familiar, either in your

22   professional experience or as a professor that were

**Capital Reporting Company**

Page 57

1    proceeding.

2        Q    But you haven't seen it before?

3        A    It's not usual to combine torts and

4    contractual claims in the same procedure.  The

5    contractual claims here, we have between two different

6    defendants.  So usually the claim against the bank would

7    be in one proceeding, and the claims against the other

8    defendant be in a different proceeding, I mean, those

9    types of claims.

10        Q    Let me ask you then with respect to this

11    complaint.  This complaint, if it would be filed in

12    Bulgaria, it would be filed in the Sofia District Court;

13    am I correct?

14        A    Yes, because the defendant, who would be the

15    bank, the bank has its office in Sofia.

16        Q    What about the claim against the fund?

17        A    The claim against the fund would not be a

18    contractual claim.  It would be a tort claim.  So it

19    would be, again, on the place where -- where the tort

20    occurred or

21    the result of where the tort occurred.

22        Q    But it would still be at the same level of

## Capital Reporting Company

Page 69

```
 1        A     Under the current law, the case would be when

 2   there is no procedural -- so-called procedural

 3   prerequisite of the process.  There are a set of issues

 4   that are

 5   decided before going to the merits of the case.

 6   So

 7   there are such examples of such a procedure.  If the

 8   venue is not complied with, then the defendant might

 9   request that the case be dismissed, or if there is res

10   judicata also.  So there are a number of different

11   issues that might lead to the termination of the case

12   before going to the substance.

13           And the second question, the plaintiff cannot

14   ask for a summary judgment, but under the new court, he

15   will have discretion.

16        Q     Have you ever been involved in a case in

17   Bulgaria where American law had to be applied?

18        A     No.

19        Q     Are Bulgarian courts competent to make

20   decisions based upon American law?

21           MR. SIEVE:  I'm going to object; that's

22   overbroad.
```

## Capital Reporting Company

Page 70

1    A    Well, in general, there are procedures

2    whenever the applicable law is different from Bulgaria

3    law.  When the foreign law is to be applied, under the

4    the old law, the parties had to prove the foreign law.

5    I don't exactly remember what was the solution was, but

6    it was a simplified procedure.

7    BY MR. MUSOLINO:

8    Q    Q    Now, when, hypothetically, this case is

9    filed in Sofia, would the case be resolved by a single

10   judge?

11   A    At the first instance, yes.  In the second

12   instance, three judges.  Third instance, three judges.

13   Q    And during the resolution of the first

14   instance -- you had mentioned magistrates before.  Do

15   magistrates get involved at all?

16   A    No.  Magistrate is a word that involves

17   judges, and prosecutors and investigators are treated as

18   such while cases are heard only by judges.

19   Q    And no magistrate would have a role in the

20   disposition?

21   A    No, always the judge.

22   Q    Can you turn to paragraph 13 on page four of

Page 71

1    your declaration.  You said:  Bulgarian courts are fully

2    developed and operating at full capacity.  Is that an

3    accurate statement?

4        A    Yes.

5        Q    And by "fully developed," can you tell me what

6    you mean?

7        A    A    Well, this is a court system that has

8    existed for more than 120 years.  And I say fully

9    developed it covers all sorts of human behavior and

10   human relationships, that's what I mean.

11       Q    Are the Bulgarian courts operating you say at

12   full capacity, what do you mean by "full capacity"?

13       A    Well, they should again mean that they can

14   cover -- all

15   possible relationships, legal

16   relationships.

17       Q    Are the Sofia regional courts capable of

18   addressing all issues in the complaint in Washington?

19       A    Yes, all sorts of behavior and legal

20   relationships have a certain equivalent under Bulgarian

21   Law is not

22   the same, but all sorts of human

## Capital Reporting Company

Page 72

1   relationships should have coverage and some issues

2   however would be treated by criminal courts.  I'm not an

3   expert in criminal law.

4        Q    What issues --

5        A    Well, some of the issues to --

6        Q    Let's go through the complaint.  We'll start

7   with count one.

8        A    The initial complaint or the amended

9   complaint?

10       Q    The initial complaint.  I want to go through

11  the violation that you mentioned in your --

12       A    Which number?

13       Q    Count one on page seven paragraph 36 reference

14  of paragraph of the complaint.  In your declaration, you

15  mentioned the RICO claim in paragraph 21 of your

16  declaration --

17       A    No, I did not mean the particular factual

18  composition of the RICO claim, but I relate to the fact

19  of the --

20            MR. SIEVE:  Why don't you review 21, so we are

21  all on the same page.

22       A    I referred to the facts that are claimed and

# Capital Reporting Company

Page 73

1  what I said, but there is a remedy for these types of

2  behavior.  I have reviewed the general allegations made

3  in the complaint, although not all of the specific

4  claims asserted have exact Bulgarian equivalents. But

5  the type of remedies available for the type of conduct

6  for each type of set of facts.  There is an equivalent

7  including criminal law.  Of course, it is different

8  legal system, different

   approach, different formulation

9  of the factual composition of the law norms.

10      Q     The RICO claim --

11      A     The RICO claim, I admit that I don't know, but

12  I reviewed the facts of the claim, and those facts can

13  find under Bulgarian law, not under the RICO.

14      Q     Well, where would the remedy be under

15  Bulgarian law?

16      A     Different laws.  First of all, a great part of

17  the claim would be in contractual law.  A number of

18  claims would be covered

19  by law of obligations and

20  contracts.  It will refer to all

21  relations, all sort of

22  behavior, improper claims by the

**Capital Reporting Company**

Page 74

1    complainant, related to

2    that agreement and the

3    infringement of this agreement

4    explained by the claimant infringement by the bank.

5    This would be one set.  The second set would be covered

6    probably by

7    torts, which is, again, under Bulgarian law

8    considered

     to be a part of obligation law, but a

9    different source

10   of obligation.  I'm sure that -- I am

11   not an expert of

12   criminal law.

13           Some of the behaviors that quantified as tort,

14   those will constitute the composition of a certain kind.

15   I cannot say for sure which kind, and I cannot make the

16   proper quantification, but I have to stress on the fact

17   that the Bulgarian notion on tort and the formulation of

18   the tort is very, very broad.  Anybody could have done

19   any damage to anyone should repair.  It means this

20   covers

21   all sorts of improper behavior outside an

22   agreement

Page 78

1    proceeding.   There is a lot of possibilities.

2         Q     That means what?

3         A     That means that even the criminal court can

4    award damages resulting from a criminal activity.

5         Q     Can a criminal court awarded damages --

6         A     Resulting from a crime, but from a crime that

7    is the scope of the criminal procedure -- proceeding --

8         Q     -- of violation of American law, would the

9    court in Bulgaria --

10        A     I have not tried to assess the result of the

11   violation of the American law since I am not familiar

12   with the American law, but I am trying to give my

13   testimony on alleged behavior.   I don't know what may

14   happen under any

15   other law.   But this type of behavior

16   that is being

     alleged should be -- should be possible,

17   and maybe -- it

18   is possible to address it in Bulgarian

19   court.   More or

20   less, Bulgarian can be fully

21   comprehensive legal system giving access

22   to all sorts of

Page 79

1   human behavior

2       Q    When you say Bulgarian courts, are you talking

3   just about civil courts or civil and criminal?

4       A    Well, there are some differences.  In general,

5   criminal law is comparable, up to my knowledge.  I'm not

6   an expert.

7       Q    Tell me if the plaintiff in this case had

8   nothing but Count 1, the facts in Count 1.

9       A    Now you are trying to make me say something

10  that I don't say.  It's not the

11  RICO claim, but it is a

12  claim constituted for the facts that the claimant is

13  claiming.  And if the claimant says

14  this is a breach of

15  the agreement, this was a conspiracy to strip me of my

16  assets, this and this and this and this, this would be

17  remedied in Bulgaria.  I don't say anything about the

18  legal thing because I don't

19  know.

20      Q    So let's take the claim of conspiracy.  That

21  may be filed as what in Bulgarian court?  A tort claim?

22  If it's a result of activity as explained here, it's a

**Capital Reporting Company**

Page 87

1       A     Normally, I go for commercial cases arising

2    from contractual relations.   So my knowledge of tort is

3    more general.

4       Q     Going through the complaint as a whole, is it

5    fair to say that if this complaint got filed in this

6    form

7    incorporating Bulgarian law to the extent you

8    testified

9    would be applicable, that it would be a case

10   that would

11   be unlike most of the cases that found their

12   way into a Sofia court?

13      A     I told you it would not be one case.

14      Q     It would not be one case; it would be split up

15   into different cases?

16      A     Most probably, and especially those two

17   defendants.   I don't see -- apart from the allegations

18   of conspiracy between the two defendants, it's not the

19   normal one to put one and the same proceeding.

20      Q     Let me ask you about the tort claims, and

21   against whom they can be brought.   Can a tort claim be

22   brought in Bulgaria against a corporation like the fund

## Capital Reporting Company

Page 88

1    or the bank?

2        A    Yes.  That was presented by my colleague.  For

3    example, Article 45 are normally brought against

4    physical persons should be brought under Articles 49 and

5    50.

6        Q    And the difference between them is what?

7        A    The difference comes from a French theory,

8    which is based on the personal attitude of the wrong

9    doer due to

10   wrongful action.  So the original idea was

11   the physical

12   person would bear liability.

13       Q    Can I interrupt you for one second?  When you

14   say "typical person," you mean natural person?

15       A    It would be the same.

16       Q    Thank you.

17       A    The reason for liability should be the

18   physical person to understand and guide their actions or

19   omissions.  It can reflect the court decisions and

20   decrees that were applied here if you believe that a

21   corporation, not

     being an actual person, cannot have

22   such type of

Page 89

1    attitude.

2           So the corporation, under the design of this

3    law, which was adopted around early '50's in the 20th

4    Century, liability of a person is based on the concept

5    of guaranteed liabilities, not of liabilities that one

6    is responsible for guilt.

7           But in any case, I have carefully reviewed the

8    corporate position, and physical persons have shared

9    responsibility under Article 45, but legal persons or

10   political persons are responsible under Article 49.  So

11   in the case

12   is no person.  There is no action -- nothing can be

13   performed

14   on behalf of a juridical person, but through

15   physical persons.  That is why even

16   any wrongdoing or

17   any wrongful act on behalf of the

18   person is done, then

19   the people representing the forming on

20   behalf of the

21   juridical person would be liable under 45.

22        Q    When you say "the person," you mean the

**Capital Reporting Company**

Page 103

1   only enough

2   to have the facial correction of the title,

3   then the

4   writ of execution is issued.  And in this case,

5   the

6   debtor did not challenge the issue of the writ of

7   execution itself.

8       Q     Who issued the writ?

9       A     The court.  But the court is not adversarial

10  process-- it is normal checkup.

11      Q     A clerical entry or judge or what?

12      A     It's a judge, but it's not a before the

13  adversarial procedure, only facial procedure.

14      Q     Did there ever come a point in these

15  proceedings when the power of the bank to execute its

16  970,000 euros writ was suspended or modified?

17      A     The first instance, it was partially

18  suspended.  Then the second instance decided the whole

19  writ was rightfully issued.  I have to explain what is

20  reviewed by the court.  It is restricted only to the

21  context of the

22  title.  So in this case, when the

Page 106

```
1    paragraph 27 -- stating that the banks have a right to

2    foreclose and collect on the full amount?  Do you have a

3    copy of

4    that?

5         A    Yes.

6         Q    What was the rationale -- what was the

7    rationale of the appellate court?

8         A    I told you that this was the regional court,

9    and this is the second instance court.  They do not

10   check up the existence of the debt itself.  They only

11   check up whether the title exists.  If there was an

12   argument -- if the debt exists, there is two possible

13   ways to develop the procedure.  If the debtor had

14   applied a suspension in the case, then the creditor

15   would have been compelled to file a positive declaratory

16   action to prove that whole amount, what else was owed to

17   him, the creditor.

18            In our case, when the debtor did not acquire a

19   suspension, because it was his burden to file an

20   action -- a negative declaratory action to prove that it

21   did not exist.  And this did not happen.

22        Q    Where would that have been have filed?
```

**Capital Reporting Company**

Page 108

1       A   Which is a normal proceeding.

2       Q   What, if anything, is required to file a such

3  an action?  Do you have to post a bond?

4       A   No.  You just file it and you pay the court,

5  which it would have been 4 percent tax, which is the

6  normal tax.  In this country, the tax on all civil --

7  with very few exceptions, the tax for all claims is 4

8  percent of the value.

9       Q   So it's correct then that while the negative

10  declaratory procedure that you're talking about in this

11  case --

12       A   In any case.

13       Q   Including this one?

14       A   Yes.

15       Q   And the description you just gave a second

16  ago, the limitation on the ability of a court to look

17  beyond the face of the title, was that the basis for the

18  reversal by the Sofia City Court?

19       A   Yes, it's a formal proceeding, and it does not

20  have anything to do with the real existence of the debt.

21  This is only concerned with the lawful issuance of the

22  writ of execution, which is a summary judgment.  This is

## Capital Reporting Company

Page 109

1    the form of the summary judgment in Bulgaria legal

2    system.

3        Q    Does the filing -- the successful filing of

4    the negative declaratory request, does that stop the

5    execution on the original writ?

6        A    One might seek for an injunction and stop.

7        Q    But the mere filing alone doesn't affect --

8        A    Yeah, but the injunction is generally

9    available.  But in both cases, in the first attempt to

10   suspend the foreclosure and in seeking the injunction,

11   one should apply some credible evidence that he doesn't

12   owe or pay a guarantee in order to get the suspension.

13       Q    Do you know why the appellate court issued its

14   ruling after the settlement agreement appeared to be

15   signed -- do you understand the sequence of events in

16   this case?

17       A    Most probably, because it was not seized -- I

18   mean, whoever was going to -- the court was not informed

19   the

20   settlement existed.

21       Q    You're speculating?

22       A    No, I'm not.  If the court knew that the

Page 114

1           Now I want to make a strict distinction

2    between the political and commonplace view of the system

3    and the professional view that I have given.  I have

4    yesterday shared with counsel certain aspects and

5    performance.  But the mere fact that this came apart

6    from the European judicial system, because now it is

7    such, that means that the judicial system, in general,

8    is meeting the standards of a European judicial standard

9    for with its flaws, it's normal that the courts in D.C.

10   or in New York perform far better than the courts of

11   some off the road state.

12           So in this case, the Bulgarian legal system,

13   being part of the European system, should be assessed as

14   a legal system meets the criteria, and on a particular

15   level has certain aspects that are desired to be

16   improved in order to reach a better performance.

17   Q     Is it necessary for the Bulgarian judicial

18   system to meet certain benchmarks demanded by the

19   European Union in order to satisfy Bulgarian

20   obligations to the European Union?

21   A     There is law to be desired.  As I told you, as

22   of January 1st, 2007, Bulgaria is part of the judicial

## Capital Reporting Company

Page 124

1    fields that are under surveillance because the European

2    Union has certain remarks for certain dissatisfaction

3    with the function.   So it is one of these fields in the

4    judicial system.

5         Q    And the European Union is following the same

6    general monitoring approach with Romania; you're saying

7    general monitoring approach would remain in --

8         A    Yes.   It's more or less parallel at certain

9    time in Romania.   At certain times they say it's better.

10   And other times

11   they say it's worse and it's similar.

12        Q    Does the European Union monitor the judicial

13   system of all of the members?

14        A    These are newly accepted members.   This is for

15   the first three years after the acceptance.   Romania and

16   Bulgaria are the only members that have less than three

17   years membership.   I don't know how they -- I have heard

18   that in Italy that they are having problems with the

19   judicial system, but I think they are out of monitoring

20   now.

21        Q    Let me ask you one more time to see if there

22   was, in fact, there was a copy of the appellate court --

Page 135

1      Q      What about the third benchmark:  Continue to

2    reform the judiciary in order to enhance professionalism

3    and accountability and efficiency.   Is that benchmark

4    underway?

5      A      It's too broad and vague to have.

6    Professionalism means all time purpose of any legal

7    system.

8      Q      Okay.

9      A      So it's a lot of measurements are being taken,

10   especially in-house education.

11     Q      Mr. Musolino asked you earlier a question

12   about if someone in Bulgaria wants to file a lawsuit, do

13   they have to pay a fee or a tax.  I think you said there

14   is ordinarily a 4 percent tax?

15     A      That is a tax what you pay to the state.  It's

16   a court tax.

17     Q      If the winner -- if the person who files the

18   lawsuit prevails, are they entitled to recover the tax

19   back from the losing party?

20     A      Yes, certainly, and they are also entitled to

21   recover the reasonable enumeration they pay for

22   lawyers.

## Capital Reporting Company

Page 136

```
1       Q    So there's a loser pays rule?

2       A    Yes, 100 percent applicable loser pays, except

3   for very few cases, like in divorce cases, it's not 100

4   percent applicable, and in partition cases.

5       Q    Let's look at your declaration again,

6   paragraph --

7       A    But, otherwise, the general court tax is 4

8   percent.

9       Q    Okay.

10      A    As a matter of fact, if you let me be precise,

11  in real estate cases, it's a little bit lower,

12  one-fourth of the 4 percent.  It's not the real price of

13  the real estate, but one-fourth part of the real price.

14      Q    Earlier, Mr. Musolino was asking you some

15  questions about whether under Bulgarian law a corporate

16  entity could be held liability to tort.  Do you remember

17  that?

18      A    Yes.

19      Q    I think you mentioned that a corporate entity

20  could be held liable under Article 49 of the

21  Obligations and Contracts Act; is that right?

22      A    Yes.
```

## Capital Reporting Company

Page 138

1    designation we use for tort in general, 45 formerly.

2         Q    Well, let's --

3         A    I will get verified when I say Article, but I

4    mean, execution tort in general.

5         Q    Let me find that declaration on page --

6         A    It said in the decree of the supreme court

7    that physical persons are held liable under 45 of the

8    Obligations and Contracts Acts, while juridical persons

9    are held liable

10   for tort under 49 and 50 of the same

11   act.

12        Q    Let me refer specifically to page seven of

13   your declaration, paragraph 22F.

14        A    Here I mean Article 45, and following this

15   is the general designation for tort.

16        Q    I just want to make sure the record is clear.

17   I think it is.  But in 45 -- on page seven, paragraph

18   22F, you cited to Article 45 and said -- I'm quoting:

19   That it is Bulgarian's general tort liability provision

20   that would apply to the disputes between commercial

21   parties.

22        A    Article 45 is the general provision, and then

# EXHIBIT 6

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-------------------------------------+

STROITELSTVO BULGARIA, LTD,          :

        Plaintiff,                   :

                                  :

                                  : CASE NO.

vs.                                  : 1:07-CV-00634

                                  :

THE BULGARIAN-AMERICAN ENTERPRISE    :

FUND, et al,                         :

        Defendant.                   :

-------------------------------------+

                  Wednesday, December 6, 2007

Telephonic Deposition of:

        VLADIMIR STEFANOV SKOCHEV

called for telephonic oral examination by counsel for

Plaintiff, pursuant to notice at before Janie Arriaga of

Capital Court Reporting Company, a Notary Public in and

for the District of Columbia, beginning at 5:00 a.m.,

when were present on behalf of the respective parties:

**Capital Reporting Company**

Page 10

1       A       Yes.

2       Q       That is your profession or occupation?  You

3   are an attorney?

4       A       Yes.

5       Q       Are you registered in the Varna Bar; is that

6   correct?

7       A       Yes.

8       Q       And do you -- according to your declaration,

9   you specialize in civil and commercial litigation?

10      A       Yes.

11      Q       So you represent clients in court in civil and

12  commercial litigation?

13      A       Yes.

14      Q       Do you represent both claimants and

15  defendants?

16      A       Yes, I do represent both, but not at the same

17  time.  I represent either the defendant or plaintiff,

18  but not at the same time.

19      Q       Right, but how many cases do you currently

20  have, approximately?

21      A       I don't know exact statistics, but at the

22  moment, I am working simultaneously in about 15 cases.

Page 11

1    Q    Are all 15 cases in Varna Court or other

2  courts in Bulgaria?

3    A    Under Bulgarian Court, because our system is

4  allowing us, regardless to which attorney bar he's

5  registered, to be representative in different Bulgarian

6  courts.

7    Q    Do you have some cases right now in Sofia

8  Court?

9    A    Presently, I have a case that was completed in

10  Sofia City Court, and the decision of the court has been

11  appealed before the Sofia Appeals Court.

12    Q    In that Sofia case, were you representing the

13  claimant, plaintiff or the defendant?

14    A    The defendant.

15    Q    You said you have approximately 15 cases that

16  you are handling right now.  Can you tell me

17  approximately how many of them are on behalf of the

18  plaintiff?

19    A    Maybe approximately ten of the cases,

20  approximately.

21    Q    I know it's approximately.  In those

22  approximately ten cases, are you the lead lawyer?

Page 19

1      Q    Am I correct that the Bulgarian courts are

2  organized on the basis of the continental legal system?

3      A    Yes.

4      Q    So it is the same basic legal structure that

5  exists in the other European countries?

6      A    Yes.

7      Q    Do you know what the requirements are for

8  countries to be accepted in the European Union?

9      A    They are complex requirements because the EU

10  has its own criteria concerning different fields.  The

11  agricultural, the financial policy, legal system,

12  ecology and so on.

13      Q    Fair point.  Let me rephrase my question.  Do

14  you know what the requirements are with respect to a

15  country's justice system to be admitted into the

16  European Union?

17      A    Yes.

18      Q    Have you ever heard of the Copenhagen

19  criteria?

20      A    No.

21      Q    Would it be a fair summary to say that 12

22  order for a country to be admitted into the European

**Capital Reporting Company**

Page 20

1  Union, they have to show that its justice system and

2  institutions guaranteeing the rule of law?

3      A    Repeat it.

4      Q    Would it be a fair summary that the European

5  Union requires a country that is being admitted to have

6  stable institutions that guaranteed the rule of law?

7      A    Yes.

8      Q    Am I correct that Bulgaria was accepted in the

9  EU earlier this year?

10     A    Yes.

11     Q    That was on January 1 of 2007; correct?

12     A    Yes.

13     Q    Take a look at paragraph -- let's look at your

14  declaration.  Take a look at paragraph 19, please.  I am

15  not quite sure I understand what you are saying in this

16  paragraph.  The first sentence says:  Despite reforms

17  from the socialist era, the reform of the Bulgarian

18  judicial system is not complete.

19     A    This means that since the end of the 1980s

20  until now, the Bulgarian legal system is working based

21  on completely different grounds compared to those during

22  the Socialist era until -- but, these processes have not

# EXHIBIT 7

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

--------------------------------------+

STROITELSTVO BULGARIA, LTD,            :

        Plaintiff,                     :

                                       :

                                       : CASE NO.

vs.                                    : 1:07-CV-00634

                                       :

THE BULGARIAN-AMERICAN ENTERPRISE      :

FUND, et al,                           :

        Defendant.                     :

--------------------------------------+

Wednesday, December 6, 2007


Telephonic Deposition of:

MARIA SLAVOVA,

called for oral examination by counsel for Plaintiff,

pursuant to notice before Janie Arriaga of Capital Court

Reporting Company, a Notary Public in and for the

District of Columbia, beginning at 7:30 a.m., when were

present on behalf of the respective parties:

**Capital Reporting Company**

Page 19

1   bodies to the Ministry of Justice, but still the fact is

2   that there are quite a number of judges that are

3   obviously willing to violate, if you allow me

4   to use this phrase for judges.  It adds to this

5   perception other than saying that there are

6   opportunities for corruption and there are judges that

7   are using those opportunities

8   Q     But not all of them?

9   A     Of course.

10  Q     In fact, would you agree that the majority of

11  judiciary based on your experience is not corrupt?

12  A     The majority of judiciary is afraid to accept that

13  there are a quite a number of judges that are corrupt.

14  Q     You don't know how many or what percentage?

15  A     Unfortunately, I think it's the problem for

16  most of the countries in the world.

17  Q     Have you heard of the Copenhagen criteria?

18  A     I do.

19  Q     Do you know what those are?

20  A     Yes.

21  Q     It's accurate, isn't it, that in order for

22  Bulgaria to be admitted into the EU, it's judiciary had

**Capital Reporting Company**

Page 20

```
 1    to satisfy the Copenhagen Criteria?

 2    A    Yes.

 3    Q    And they did at least with respect to the EU?

 4    A    We have to be thankful that the European Commission

 5    considered us at least being able to satisfy the

 6    Copenhagen criteria, but, if the bodies of the European

 7    Commission were more precise, if they have aimed to

 8    detect whether we really answered the Copenhagen

 9    Criteria, the answer very possibly would be no.

10    Q    In your opinion?

11    A    Of course.

12    Q    But in the EU commission opinion, you satisfied

13    them because they admitted Bulgaria to the EU; correct?

14    A    It is formal conclusion.

15    Q    Are you familiar with the World Bank

16    evaluation of the Bulgaria legal system?

17    A    Well, there were quite a number of those.

18    Q    Have you ever looked at the World Bank ratings

19    on how countries perform on the criteria of enforcing

20    contracts?

21    A    I used to, but I don't know what you are

22    referring to.
```

## Capital Reporting Company

Page 27

1    A    My entire career comes to 13 years because we

2    were not allowed to practice in courts.  It was only

3    after the changes that the law of our activity allowed

4    us to practice, so I became a member of Sofia Bar the

5    very moment it was allowed.  But it's still a very short

6    career.

7    Q    13 years.  That's pretty good.  I know you would

8    like it to be longer.  Did I understand you to say that

9    over the 13 years you have been allowed to be an

10    advocate, a practicing lawyer, you have had two

11    arbitrations?

12    A    Yes.

13    Q    How many cases during that 13 years have you

14    litigated in the Bulgarian court?

15    A    All of them.

16    Q    Like 500 or --

17    A    Less.  I am not very active.

18    Q    More than 200?

19    A    Probably.

20    Q    You spent time in the U.S. in an exchange program?

21    A    A number of exchange programs, and participation in

22    the work of an NGO, for a Non Governmental Organization.

# EXHIBIT 8

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Eunnice H. Eun
To Call Writer Directly:
202 879-5159
eeun@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200
Dir. Fax: 202 654-9484

October 26, 2007

**Via Electronic Mail and First Class Mail**                    **Confidential**

Philip M. Musolino
Musolino & Dessel
1615 L Street, N.W., Suite 440
Washington, D.C. 20036

Re:     *Stroitelstvo Bulgaria Ltd. v. The Bulgarian-American Enterprise Fund, et al.*,
Civ. Action No. 1:07-CV-00634-RMC

Dear Phil:

Pursuant to the Joint Statement Regarding Jurisdictional Discovery filed on October 15, 2007, please find enclosed the hotel and flight records reflecting travel to the District of Columbia by BAEF's two U.S. officers from January 2005 to present.  The dates and locations of BAEF's reports to USAID from January 2005 to present are as follows:

- March 28, 2007          Conducted by phone
- September 18, 2007     Sofia, Bulgaria
- June 20, 2006            Scheduled for Chicago; cancelled.
- September 20, 2006     Sofia, Bulgaria
- March 30, 2005          Package submitted; meeting did not take place as scheduled in New York.
- September 30, 2005     Sofia, Bulgaria

The enclosed documents and the information provided above are designated as Confidential.  Please let me know if you have any questions.

Sincerely,

*Eunnice H. Eun/hmf*

Eunnice H. Eun

Enclosures
EHE/hmf

Chicago       Hong Kong       London       Los Angeles       Munich       New York       San Francisco

# BULGARIAN AMERICAN ENTERPRISE FUND EXPENSE REPORT

| DATE | BUSINESS PURPOSE | TRAVEL | MEALS & ENT | LODGING | TAXIS | OTHER | TOTAL |
|------|-----------------|--------|-------------|---------|-------|-------|-------|
| 14 | Wash DC | REDACTED | | | | | 377⁴ |
| 14/1 | Wash DC/Chi mileage 4.5 | $112.70 | | $376.84 | $30 | 1 | 1437⁰ |
| | | 34.95 | | | 35 | 1 | 742.6⁴ |

REDACTED

TOTALS

EMPLOYEE NAME: Frank L. Bauer
DATE:
EMPL. SIGNATURE:
RECEIVED BY:
APPROVED BY:

BAEF 00001

CONFIDENTIAL

## BULGARIAN AMERICAN ENTERPRISE FUND EXPENSE REPORT



| DATE | BUSINESS PURPOSE | TRAVEL | MEALS & ENT. | LODGING | TAXIS | OTHER | TOTAL |
|------|------------------|--------|--------------|---------|-------|-------|-------|
| 5/21/05 | US Embassy/Dinner MDC | | | | | 85.46 | 396 |
| 5/18 | Dinner some business w/SE | | 321.00 | 315.24 | | | 240 |
| 5/19 | Breakfast/business w/SE & JC | | 118.15 | | | | 143 |
| 5/11 | Lunch business w/OK & JC | | 119.71 | | | | 132 |
| 5/20 | Taxis | | | | 130.00 | | 36 |
| 5/21/05 | Airfare HU/Sofia w/DC JC | | 2,511 | | | 18.00 | 125 |

REDACTED

$ 1,082

LESS ADVANCE
AM'T TO BE REIMBURSED    $ 1,082

BAEF 00002

CONFIDENTIAL

EMPLOYEE NAME: Nina Schiller
DATE: 4/13/05
EMPL. SIGNATURE:
RECEIVED BY:
APPROVED BY:

TOTALS



BAEF 00003

CONFIDENTIAL

REDACTED



BULGARIAN AMERICAN ENTERPRISE FUND EXPENSE REPORT

| DATE | BUSINESS PURPOSE | TRAVEL | MEALS | LODGING | TAXIS | OTHER | TOTAL |
|---|---|---|---|---|---|---|---|

REDACTED

TOTALS

EMPLOYEE NAME:
DATE:
EMPL. SIGNATURE:
RECEIVED BY:
APPROVED BY:

REDACTED

AMT. TO BE REIMBURSED

BAEF 00004

CONFIDENTIAL

BULGARIAN AMERICAN ENTERPRISE FUND EXPENSE REPORT

| DATE | BUSINESS PURPOSE | TRAVEL | MEALS & ENT. | LODGING | TAXIS | OTHER | TOTAL |
|------|------------------|--------|--------------|---------|-------|-------|-------|
| | REDACTED | | | | | 25 | 240 |
| | | 19.74 | | 215.90 | | | 119 |
| | | | | | | 20.00 | .90 |

REDACTED

AMT. TO BE REIMBURSED

DATE:
EMPL SIGNATURE:
RECEIVED BY:
APPROVED BY:

BAEF 00005

CONFIDENTIAL