# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Stroitelstvo Bulgaria Ltd.                              :

        Plaintiff,                              :

                                       :

        v.                              :        Case No. 07cv00634 RMC

                                         :

The Bulgarian-American Enterprise Fund, *et al.*    :

        Defendants.                              :

## PLAINTIFF'S OPPOSITION TO MOTION OF BULGARIAN-AMERICAN ENTERPRISE FUND'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO FEDERAL RULE 12(b)(6)

COMES NOW, plaintiff Stroitelstvo Bulgaria Ltd. (hereinafter "plaintiff"),

by and through undersigned counsel, and pursuant to Rule12 of the Federal Rules of Civil

Procedure, and LCvR 7, and this Court's order entered January 16, 2008, opposes

Defendant Bulgarian American Enterprise Fund's Motion to Dismiss Plaintiff's

Amended Complaint Pursuant to Federal Rule 12(b)(6), and in opposition thereto

respectfully refers this Honorable Court to the annexed memorandum of points and

authorities and exhibits.

WHEREFORE, plaintiff prays that the instant motion be denied.

Respectfully submitted,

Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*: srolinski@rolinski.com

Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*:  (202) 466-3883
*Fax*:    (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com

**Attorneys For Plaintiff**

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Stroitelstvo Bulgaria Ltd. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | Case No. 07cv00634 RMC |
| | : | |
| The Bulgarian-American Enterprise Fund, *et al*. | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO FEDERAL RULES 12(b)(6)

# TABLE OF CONTENTS

I.  STATEMENT OF PROCEEDINGS .................................................................. 1

II. THE FACTS ASSERTED BY PLAINTIFF AND BY BAEF ................................ 3

  A. THE ALLEGATIONS OF THE AMENDED COMPLAINT ................................. 3
    1. The Defendants and Their Affiliated Companies ................................. 4
    2. The Lending Contract Between Plaintiff and the Bank ........................ 5
    3. Performance and Breach by the Bank ................................................. 5
    4. The Consequences of the Bank's Misconduct .................................... 8
    5. The Bank Utilized the Same Equity Stripping Scheme With Other Borrowers .... 9
    6. The Bank Worked With Other Companies to Implement the Same Equity ..........
       Stripping Scheme With Other Borrowers ............................................ 9
    7. BAEF's Misconduct, and Its Liability for the Bank's Misconduct ................... 10
  B. THE FACT AVERMENTS MADE BY BAEF ............................................. 12
    1. The Organization, Ostensible Purpose, Management and Termination of
       BAEF .................................................................................................12
    2. BAEF's Relationship to and Control of the Bank ............................... 13
    3. BAEF and Congress Discuss Taxpayer Receipt of BAEF Profits ..................... 14
  C. FACTS SUBJECT TO JUDICIAL NOTICE ................................................ 15

III. THE STANDARDS, PROCEDURES AND LAW APPLICABLE TO THIS
MOTION ...................................................................................................... 16

  A. THE STANDARDS APPLICABLE TO A MOTION TO DISMISS ..................... 16
  PURSUANT TO FED.R.CIV.P. 12(B)(6) ...................................................... 16
  B. CHOICE OF LAW .............................................................................. 16
  C. SUBJECT MATTER JURISDICTION ....................................................... 17

IV. ARGUMENT ............................................................................................ 20

  A. BAEF'S LIABILITY IS BASED ON ITS CONDUCT AND ITS ....................... 20
  RELATIONSHIP WITH THE BANK ............................................................ 20
    1. BAEF's Direct Liability .................................................................... 20
    2. BAEF's Derivative or Vicarious Liability ........................................... 22
    3. The Bank as Agent of BAEF ............................................................ 23
    4. Department Liability ....................................................................... 24
    6. Instrumentality Liability ................................................................. 25
    5. A Single Business Enterprise ............................................................24
    7. The "Alter Ego" Test ...................................................................... 25
    8. The "Integrated Enterprise" Test ..................................................... 26
    9. Liability Through Failure to Repudiate ............................................. 26
  B. THE ALLEGATIONS OF THE FIRST AMENDED COMPLAINT ARE WELL-PLEADED ..... 26
    1. The First Amended Complaint Properly Pleads Civil RICO ( Count One)........ 26
       a. BAEF's RICO Violations Proximately Caused the Harms to Plaintiff.......27
       b. Plaintiff Has Sufficiently Alleged An Enterprise...............................30
       c. Plaintiff Suggiciently Alleged an Effect on Interstate Commerce............33

i

     d. Plaintiff Has Sufficiently Pled Each of the Required Predicate Acts..........35
        (1) Extortion Under 18 U.S.C. § 1951.......................................36
        (2) Extortionate Credit Transactions Under 18 U.S.C. §§ 891-894.......37
        (3) Racketeering Under 18 U.S.C. § 1952..................................37
        (4) Extortion and Blackmail Under D.C. Law..............................38
     e. Plaintiff Has Sufficiently Alleged A Pattern of Racketeering Activity ......38
2. The First Amended Complaint Properly Pleads Intentional Interference with Contract (Count Three)...................................................................40
3. The First Amended Complaint Properly Pleads Intentional Interference With Prospective Advantage (Count Four)..................................................41
4. The First Amended Complaint Properly Pleads Breach of Fiduciary Duty ....... 42 (Count Five)............................................................................. 42
5. The First Amended Complaint Properly Pleads Violation of Bulgarian Law(Count Seven)....................................................................43
6. The First Amended Complaint Properly Pleads  Civil Conspiracy and Vicarious Liability in Count Eight..............................................................44

**CONCLUSION** ..................................................................... **45**

# I. STATEMENT OF PROCEEDINGS

Plaintiff Stroitelstvo Bulgaria Ltd. (hereinafter "Plaintiff") filed the initial

complaint against defendant Bulgarian American Enterprise Fund ("BAEF") and

defendant the Bulgarian American Credit Bank[1] (the "Bank," collectively with BAEF the

"Defendants") on April 4, 2004.

BAEF filed three motions on August 8, 2007: its Motion to Transfer the Action

to the Northern District of Illinois Pursuant to 28 U.S.C. § 1404(a) (the "BAEF Motion to

Transfer"), Docket Number 12; a Motion to Dismiss Plaintiff's Complaint Pursuant to

Federal Rules 12(b)(2) and 12(b)(3), or Alternatively Based on the Doctrine of *Forum*

*Non Conveniens*, Docket Number 10 the ("First BAEF Jurisdiction/Venue Motion"); and,

a Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rules 9(b) and 12(b)(6),

Docket Number 11 (the " First BAEF Pleadings Motion").

On September 17, 2007, plaintiff filed its opposition to the BAEF Motion to

Transfer.  Docket # 19, and its opposition to the First BAEF Jurisdiction/Venue Motion.

On September 17, 2007, plaintiff also filed its First Amended Complaint (the

"Am. Compl."), docket # 22, pursuant to *Confederate Memorial Association, Inc. v.*

*Hines* 995 F.2d 295, 299 *reh and reh en banc den.* (D.C. Cir. 1993) (addressing the filing

of an amended complaint as a matter of right following the filing of a motion to dismiss).

The Amended Complaint asserted:  Violations of the Racketeer Influenced

Corrupt Organizations Act ("Civil RICO," at Count One); Breach of Contract (Count

Two); Intentional Interference with Contract (Count Three); Intentional Interference With

---

[1] Service on the Bank was effected on July 4, 2007 by delivery to the Ministry of Justice of Bulgaria pursuant to the Hague Convention On The Service Abroad Of Judicial And Extra-Judicial Documents In Civil And Commercial Matters. *See* Amended Praecipe Regarding Service, Docket Number 13. Counsel for BAEF declined to accept service on behalf of the Bank by electronic mail on June 25, 2007.

Prospective Advantage (Count Four); Breach of Fiduciary Duty (Count Five); Abuse of

Process (Count Six); and Violation of Bulgarian Law (Count Seven). The Complaint also

asserted Civil Conspiracy and Vicarious Liability in Count Eight.

Plaintiff also filed on September 17, 2007 an opposition to the First BAEF

Pleadings Motion. Docket # 20. That opposition relied in part on the filing of the First

Amended Complaint. *Id.*, at Memorandum, pp. 9-10.

On September 24, 2007, this court denied without prejudice as moot the First

BAEF Jurisdiction/Venue Motion, and the First BAEF Pleadings Motion.

Pursuant to this court's minute order entered October 1, 2007, plaintiff and BAEF

filed a Joint Statement Regarding Jurisdictional Discovery on October 15, 2007. That

statement described the following contemplated discovery: Plaintiff would depose BAEF

witness Nancy L. Shiller ("Ms. Shiller") by telephone and BAEF expert Silvy Chernev

("Mr. Chernev") in Bulgaria. BAEF would depose plaintiff's experts Vladimir Stefanov

Skochev ("Mr. Skochev") Maria Gavrailova Slavova ("Ms. Slavova") in Bulgaria. The

parties also agreed to exchange limited categories of documents pertaining to

jurisdictional defenses.

The deposition of Ms. Shiller was conducted by telephone on November 15,

2005. Excerpts of the transcript of that deposition are appended hereto as **Plaintiff's**

**Exhibit ("PX") 1A**. The deposition of Mr. Chernev was conducted and videotaped in

Sofia Bulgaria on December 5, 2007. Excerpts of the transcript of that deposition are

appended hereto as Plaintiff's Exhibit **PX 2**. The deposition of Mr. Skochev was

conducted and videotaped in Sofia Bulgaria on December 6, 2007. Excerpts of the

transcript of that deposition are appended hereto as **PX 3**. The deposition of Ms. Slavova

was also conducted and videotaped in Sofia Bulgaria on December 6, 2007. Excerpts of the transcript of that deposition are appended hereto as **PX 4**.

The parties also produced and exchanged documents as described in the October 15, 2007 Joint Statement.

On December 19, 2007, the trial court entered a minute order as follows:

> According to Defendant Bulgarian-American Enterprise Fund ("BAEF") in its Reply in Support of its Motion to Transfer [25], the parties have completed jurisdictional discovery and BAEF intends to file motions to dismiss on January 4, 2008, with responses and replies to follow. Defendant BAEF has requested that the Court review the motions to dismiss before ruling on the pending Motion to Transfer. In light of that request, Defendant BAEF's Motion to Transfer [12] is DENIED without prejudice, but may be resuscitated, if necessary, following resolution of the motions to dismiss.

BAEF filed on January 4, 2008 a Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Federal Rules 12(b)(2) and 12(b)(3), or Alternatively Based on the Doctrine of Forum Non Conveniens (the "Second BAEF Jurisdiction/Venue Motion"), docket # 26, and the instant motion (the "BAEF 12(b)(6) Motion"), docket # 27.

Defendant the Bank has made no appearance in this case.

For the reasons set forth below, the BAEF 12(b)(6) Motion must be denied.

## II.  THE FACTS ASSERTED BY PLAINTIFF AND BY BAEF

### A. The Allegations of the Amended Complaint

Plaintiff – a Bulgarian business – alleges that the defendants, with funds made available through an American initiative to support private sector development in Bulgaria and elsewhere in Eastern Europe, used wrongful and predatory lending and other practices to achieve improper commercial goals for themselves, including the

stripping of Plaintiff's equity and assets. Am. Compl., at ¶ 2. The Amended Complaint specifically alleges that:

### 1. The Defendants and Their Affiliated Companies

BAEF is a not-for-profit corporation established pursuant to the Support for East European Democracy Act, 22 U.S.C. §§ 5402, 5421 (the "SEED Act"). Its ostensible purpose is and was the promotion of private sector development and entrepreneurship in Bulgaria through, among other things, grants, loans, and equity investments. Am. Compl., at ¶ 6. BAEF commenced its operations in 1992, with fifty eight million dollars ($58,000,000.00) in funding from the American government. Am. Compl., at ¶ 6.

As of the end of fiscal year 2004, BAEF was owner of a 68% interest in BM Leasing ("BML"). Am. Compl., at ¶ 6. BAEF was also the parent company of Bulgarian American Property Management EOOD ("BAPM"), which conducts BAEF's property management operations. Am. Compl., at ¶ 6.

The Bank commenced banking operations in May 1997. Am. Compl., at ¶ 7. The Bank was a wholly-owned subsidiary of BAEF. The main shareholders of the Bank were BAEF and BAPM, which held 99.99% and 0.01% of the shares, respectively. BAEF described the Bank as its major operational subsidiary. Am. Compl., at ¶ 7. The Bank operated primarily as an investing bank in the areas of small and medium size enterprises (SME) lending, construction lending and home mortgage lending. Am. Compl., at ¶ 7.

The Bank was funded by BAEF, which in turn received funding through the SEED Act. Am. Compl., at ¶ 7.

## 2. The Lending Contract Between Plaintiff and the Bank

Plaintiff entered into a Loan Agreement with the Bank on or about March 24, 2005, (the "Contract," a copy of which is appended as Exhibit A to the Amended Complaint. Am. Compl., at ¶ 10. The Contract obligated the Bank to provide funds to Plaintiff on specified terms and conditions. Am. Compl., at ¶ 10. On March 24, 2005, Plaintiff executed and delivered a Promissory Note (the "Note"), in the amount of two million six hundred fifty nine thousand seven hundred and four Euro (2,659,704 EUR) (the "Total Note Amount"), due and payable according to its terms in 28 months. Am. Compl., at ¶ 11.

As set out in the Contract, the Total Note Amount was comprised of the following:

a) One million eight hundred sixty four thousand one hundred thirty six Euro (1,864,136 EUR) - for drawdown pursuant to application;

b) Five hundred thirty three thousand one hundred forty three Euro (533,143 EUR)- the interest for the total amount of the credit for the entire term of the Note ("Total Note Interest");

c) Seventy seven thousand five hundred eleven Euro (77,511 EUR) - a one time management fee calculated at 3% per year of the Total Note Amount over the term of the Note ("Management Fee"); and

d) One hundred eighty six four hundred fourteen Euro (186,414 EUR) - a special- purpose reserve ( the "Reserve Amount"). Am. Compl., at ¶ 12.

## 3. Performance and Breach by the Bank

Plaintiff informed the Bank of the names of the contract purchasers, Am. Compl., at ¶ 14, and Plaintiff engaged contractors, subcontractors, suppliers, tradesmen and mechanics to work on the Project, Am. Compl., at ¶ 15.

Pursuant to the terms of the Contract, Plaintiff applied for and the Bank disbursed three hundred sixty one thousand Euro (361,000 EUR) to Plaintiff as part of the draw

down amount. Compl., at ¶ 16. Disbursement Number One provided for distribution of the Total Note Interest, the Management Fee, and the Reserve Amount. Compl., at ¶ 17.

On November 11, 2005, the bank wrongfully and without cause suspended credit and asserted an event of default and the right to recover 970,438 EUR, comprised of: a) the drawdown amount of 361,000 EUR; b) the Total Note Interest of 553,143 EUR; and c) the entire Management Fee of 77,511 EUR. The Bank refused to disburse the remaining funds required by the Contract. Am. Compl., at ¶ 19.

The alleged event of default was based on the purported failure of Plaintiff to obtain prior consent of the Bank for certain preliminary contracts, and on Plaintiff's failure to transfer certain advanced payments from the buyers. Am. Compl., at ¶ 20. The alleged breach was groundless and pre-textual. Am. Compl., at ¶ 21. Bank knew that the alleged breach was groundless and pretextual. Am. Compl., at ¶ 22.

The Bank, and thus BAEF, knew that the purpose of the Contract was the provision of funds sufficient to enable Plaintiff to design, construct and sell residential housing in Bulgaria. Am. Compl., at ¶ 78. The Bank, and thus BAEF, knew that Plaintiff had entered into contracts with suppliers, vendors, tradesmen and others for the design and construction of residential housing in Bulgaria. And knew of the contracts and the contract terms. Am. Compl., at ¶ 79. The Bank, and thus BAEF, knew that Plaintiff had entered into contracts of sale for the purchase of residential housing in Bulgaria and knew the contract terms. Am. Compl., at ¶ 80. The Bank, and thus BAEF, knew that Plaintiff required the loan funds from the Contract in order to perform under the terms of the contracts entered into for the Project, and to receive the benefits of such contracts. Am. Compl., at ¶ 81.

6

The Bank deliberately, and in bad faith, and in order to strip Plaintiff's assets, including but not limited to its interests in the contracts described above, and in order to interfere with those contracts, failed and refused to provided the funds required by the Contract to Plaintiff, and wrongfully suspended credit, and wrongfully froze and attached and interfered with Plaintiff's assets. Am. Compl., at ¶ 82.

Instead of meeting its obligations under the Contract, on November 15, 2005, the Bank, through BAPM, proposed to purchase from Plaintiff "all available units" for 100,000 EUR plus assumption of the debt. Am. Compl., at ¶ 23. That proposed purchase price was in an amount substantially below the value of the assets that BAPM sought to purchase. Am. Compl., at ¶ 24. BAPM failed to disclose that it was affiliated or associated with the Bank. Am. Compl., at ¶ 23.

Instead of meeting its obligations under the Contract the Bank commenced a campaign to interfere with Plaintiff's Project.

The Bank falsely, and maliciously, and with intent to damage plaintiff, and disrupt plaintiff's ability to perform under the Project, and to disrupt plaintiff's construction of the Project, and to interfere with plaintiff's ability to obtain sales revenue from the Project, advised the Project unit purchasers and plaintiff's construction team, that plaintiff was in default under the Contract, and that the Bank intended to put plaintiff in bankruptcy, and that the investment of the Project unit purchasers was unsafe, and that the construction team would be faced with financial losses on the Project. Am. Compl., at ¶ 26.

On or about November 15, 2005, the Bank falsely, and with intent to deceive and to mislead, directed a letter to Milena Boikova Blateva in Sofia and wrongly and with

7

deception demanded payment in the amount of 970,438.41 EUR, and falsely claimed that that sum was due to the Bank under the terms of the Promissory Note. Am. Compl., at ¶ 27.

### 4. The Consequences of the Bank's Misconduct

As a direct and consequential and foreseeable result of the Bank's failure to meet its obligations under the Contract, and its statements to Project unit purchasers and the construction team, Project unit purchasers withdrew from their contracts, or elected to assign their contracts to less creditworthy purchasers, and members of the construction team withdrew from participation in the Project. Am. Compl., at ¶ 28.

On November 15, 2005, Plaintiff, in response to the Bank's wrongful action, undertook to secure alternative funding, including funds from preliminary contracts for sale of apartments. Am. Compl., at ¶ 30.

But on December 12, 2005, the Bank, proceeding *ex parte*, pursuant to an Application apparently filed on or about December 6, 2005, wrongly obtained a decree of execution in the amount of 970,438,41 EUR. Am. Compl., at ¶ 31. The Bank utilized that improper ruling to attach and freeze the assets of Plaintiff. Am. Compl., at ¶ 31. The Bank's purpose in initiating the litigation to freeze Plaintiff's assets was to strip Plaintiff of those assets. Am. Compl., at ¶ 31.

Under the duress created by the improper suspension of credit and the enforcement of the improper judgment, Plaintiff was forced to enter into an Agreement with the Bank (the "Agreement,") on or about May 9, 2006. Am.Compl., at ¶ 34. The Agreement required Plaintiff to take on credit from Investbank in the amount of 563,000 EUR and pay the alleged debt to the Bank. As a consequence of its wrongful conduct the Bank improperly extracted 170,000 EUR more than the actual debt. Am. Compl., at ¶ 35.

To save its business from the Bank's predatory conduct, Plaintiff borrowed from Investbank at an annual interest materially in excess of the standard bank rate. Am. Compl., at ¶ 39.

### 5. The Bank Utilized the Same Equity Stripping Scheme With Other Borrowers

The wrongful conduct of the Bank as alleged in the Amended Complaint conforms with the Bank's pattern and practice, and is part of the Bank's overall scheme to strip assets and equity from its borrowers. Am. Compl., at ¶ 41. On at least four other occasions, involving four other small businesses, the Bank has utilized the same pattern of wrongful conduct in an attempt to strip the equity and the assets from those businesses. Am. Compl., at ¶ 42.

### 6. The Bank Worked With Other Companies to Implement the Same Equity Stripping Scheme With Other Borrowers

The Bank utilized other companies, including Ameta Holding JSC, during the course of and as an integral part of that pattern and practice and scheme, and in conjunction with predatory and wrongful lending practices. Am. Compl., at ¶ 43.

Defendants BAEF, the Bank, and BAPM, as well as Ameta Holding JSC (and any individuals who aided and abetted or otherwise participated in their unlawful activities) are an "enterprise" within the meaning of 18 U.S.C. § 1961(4), (the "Enterprise") in that they are associated in fact with the common and shared purpose of extorting funds and stripping equity and property from Plaintiff and other small businesses, blackmailing Plaintiff and other small businesses, engaging in predatory and unlawful loan practices and bank fraud, and investing the unlawfully gained capital and advantage in other banking activities with

the intent to permanently deprive Plaintiff and others of its monies and business. Am. Compl., at ¶ 58.

At all times relevant to the allegations in the Amended Complaint, the Enterprise engaged in, or its activities affected, interstate and/or foreign commerce. BAEF applied for, and received, and accounted for, and reported on monies received from the government of the United States under the SEED Act for the express purpose of fostering commerce in Bulgaria, and transferred such funds to the Bank for the express purpose of fostering commerce in Bulgaria, and for the further benefit of the United States as contemplated by the SEED Act. Am. Compl., at ¶ 58.

At all times relevant to the allegations of the Amended Complaint, Defendants were associated with the Enterprise. Am. Compl., at ¶ 59.
This racketeering activity was a regular way of conducting the Enterprise and their participation in the Enterprise. Am. Compl., at ¶ 65

### 7. BAEF's Misconduct, and Its Liability for the Bank's Misconduct [2]

At all times relevant to the allegations of the Complaint, Defendants conducted and participated, directly and indirectly, in the racketeering activity complained herein, and accepted directly and indirectly in the United States the monies and the increased equity generated as a result of that racketeering activity, including without limitation the monies, or some portion of the monies, wrongly demanded from and in part paid by plaintiff. BAEF's direct and indirect conduct and participation included its transmission of funds to the Bank without appropriate safeguards, and without appropriate oversight,

---

[2] BAEF asserts that plaintiff's contentions about BAEF's conduct contradict other averments of the First Amended Complaint. BAEF 12(b)(6) Motion, at 14-15, 24, at n.11. But the averments to which BAEF refers explicitly describe assertions made by BAEF. Am. Compl., at ¶ 7 ("BAEF asserts that ..."). And *see* Am. Compl., at ¶ 47 ("BAEF contends that...").

and without appropriate review, and included its failure to properly or fully report the conduct of Bank, while accepting without inquiry, review or supervision the benefits of the Bank's wrongful conduct. Am. Compl., at ¶ 61.

The conduct of the Bank as alleged in the Amended Complaint constitutes the conduct of BAEF.

At all times pertinent to the averments of the Amended Complaint, the Bank acted as and held itself out as a department of BAEF. Am. Compl., at ¶ 45.

At all times pertinent to the averments of the Amended Complaint, BAEF identified the Bank as its major operational subsidiary. Am. Compl., at ¶ 46.

BAEF contends that it neither reviewed, nor supervised, nor participated, in any of the Bank's lending activities. Am. Compl., at ¶ 47.

The Bank's actions and decisions were subject to the control and the direction of BAEF. Am. Compl., at ¶ 48. The Bank's actions and decisions were subject to the supervision of BAEF. Am. Compl., at ¶ 49. 50. The Bank's actions and decisions were subject to the policies and the demands of BAEF. Am. Compl., at ¶ 50.

BAEF ratified and affirmed the conduct of the Bank as alleged in the Amended Complaint, and BAEF failed to repudiate the wrongful conduct of the Bank. Am. Compl., at ¶ 51.

In failing to supervise the actions of the Bank, and in failing to review the actions of the Bank, and by failing to monitor the use of federal monies for its intended purposes, and in failing to take any steps to ensure that the SEED Act funds were properly utilized by the Bank for the purposes set out in the SEED Act, BAEF acted with willful blindness, and deliberate ignorance and conscious avoidance. Am. Compl., at ¶ 52. By failing to

11

supervise the actions of the Bank, and by failing to review the actions of the Bank, and by failing to monitor the use of federal monies for its intended purposes, and by failing to take any steps to ensure that the SEED Act funds were properly utilized by the Bank for the purposes set out in the SEED Act, and by failing to report the Bank's wrongful activities to USAID and others, BAEF permitted the wrongful scheme of the Bank to be implemented, and to continue, and to be commenced against plaintiff, and to continue against plaintiff and others. Am. Compl., at ¶ 53.

## B.  The Fact Averments Made By BAEF

### 1.  The Organization, Ostensible Purpose, Management and Termination of BAEF

BAEF is a corporation organized under the laws of Delaware. Declaration of Nancy Shiller ("Shiller, Decl."), appended as Exhibit 1 to BAEF's Second Jurisdiction/Venue Motion, at ¶ 4.  Ms. Shiller is BAEF's managing director.  Deposition of Nancy Shiller, ("Shiller dep."), **PX 1A,** at 5, and she conducts BAEF business from Charlottesville, Virginia.  *Id.*, at 10.  BAEF has its U.S. office in Chicago, Illinois, and regularly transacts business in Chicago.

BAEF operates under a Board of Directors.  Shiller, dep., **PX 1A,** at 13-16.

In 1992, BAEF received, through the U.S. Agency for International Development, ("U.S.AID") approximately $55,000,000.00 in funding under the SEED Act, and a subsequent modification adding three million dollars.  Shiller, Decl., at ¶¶ 3, 6, and Shiller dep., **PX 1A,** at 8-9.  The purpose of the grant is to promote private sector development in Eastern Europe.  Shiller, decl., at ¶ 3.

BAEF must report in writing to USAID every six months as a condition of the original grant agreement between USAID and BAEF."  Shiller, decl., at ¶ 6, Shiller dep.,

**PX 1A**, at 29.  Those reports must include BAEF's financial statements, any major accomplishments in the preceding six months, and any political developments that might be of interest or have an impact on the ability to do business in Bulgaria. Shiller dep., **PX 1A**, at 28-29.

BAEF has a contact person at USAID for the semi-annual reports.  Shiller dep., **PX 1A**, at 30.

BAEF personnel travel to Washington, D.C. to meet with representatives of USAID, the Department of State ("DOS") and members of Congress.  Shiller dep., **PX 1A**, at 56.

BAEF has a "termination commencement date" of September 30, 2006.  Shiller dep., **PX 1A**, at 49.  An entity called the America for Bulgaria Foundation has been incorporated by BAEF as its "legacy institution."  Shiller dep., **PX 1A**, at 56, 65.  There is no one on the board of directors of the America for Bulgaria Foundation who is not on the BAEF Board of Directors.

### 2.  BAEF's Relationship to and Control of the Bank

BAEF was a 99.99% shareholder of the Bank at the time of its formation.  Shiller dep., **PX 1A**, at 22.

The Bank operates under a Supervisory Board.  Shiller dep., **PX 1A**, at 19.  At least over the last three to four years, at least two of the banks' supervisory Board Members have also been members of the BAEF Board of Directors.  Shiller dep., **PX 1A**, at 19-21.

On BAEF's own website, at baefinvest.com, BAEF lists seven persons under "Management." Shiller dep., **PX 1A**, at 14-19, **PX 1B**. (Shiller deposition exhibit 2). The reference to "Management" on BAEF's website refers to "overall management" of BAEF and the Bank. Shiller dep., **PX 1A**, at 18-19. BAEF has approximately ten employees in Sofia, Bulgaria. **PX 1A**, at 18-19.

The Bank is and was BAEF's "major operational subsidiary." *Id*. The Bank is BAEF's principal asset. *Id*. "The majority" of BAEF's profits have come from the Bank's operations. Shiller dep., **PX 1A**, at 61-61.

BAEF includes the Bank's financial statement in the back of BAEF's financial statement, and includes no other entities in that financial statement other than its own. Shiller dep., **PX 1A**, at 22.

The Bank is a debtor of BAEF. Shiller dep., **PX 1A**, at 26.

The Bank reports to BAEF "if there is a troubled loan of significant size (because it) could have a significant impact on their financial statements." Shiller dep., **PX 1A**, at 38.

### 3. BAEF and Congress Discuss Taxpayer Receipt of BAEF Profits

BAEF, through the operations of the Bank, including the misconduct alleged in this Amended Complaint, has amassed "profits" of as much as $200,000,000.00. Shiller dep., **PX 1A**, at 61. The profits are the result of "investing in Bulgaria for the past 15 plus years with U.S. taxpayer dollars." Shiller dep., **PX 1A**, at 61.

BAEF is or was in negotiations with Congress over whether a portion of BAEF's profits should be returned to the United States, or transferred to the America for Bulgaria Foundation "legacy institution."

14

C.    **Facts Subject to Judicial Notice**

In its 2004 Annual Report, **PX 5**, BAEF discloses that:

> The Audit Committee continues its regular quarterly meetings plus ad hoc sessions when required. The Bank Oversight Committee, created last year to monitor the BACB more closely, also meets with great frequency. Board members who serve on these committees spend substantial time discharging their duties, including attending frequent meetings and conferences, and making additional in-country visits. At p.5.

> Grants received from AID are conditioned upon the Fund's compliance with the requirements of the Grant agreement with AID and the SEED Act, which impose certain U.S. policy objectives and reporting obligations. At p.12.

> Certain administrative support in the normal course of operations is shared by the Fund and BACB. At p. 17. [3]

The 2004 BAEF Annual Report, **PX 5**, was obtained by plaintiff on the Internet at *www.baefinvest/com/eng/annuals* and is subject to judicial notice. *See Communications Satellite Corp. v. F.C.C.* 611 F.2d 883, 902, n. 31 (D.C., 1977) (court may take judicial notice of publicly-filed annual reports).

BAEF has previously been sued in the United States District Court for the District of Columbia for actions arising out of a real estate development project in Bulgaria. *Novecon Ltd. v. Bulgarian-American Enterprise Fund* 190 F.3d 556 (D.C. Cir. 1999). *Novecon* was brought by a "Washington D.C. firm," according to BAEF's own description. At 563. A court, in disposing of a motion to dismiss for failure to state a claim, may take judicial notice of published court opinions. *Covad Communications Co. v. Bell Atlantic Corp.* 407 F.3d 1220, 1222 (D.C. Cir. 2005).

---

[3] The 2004 BAEF Report also revealed that BAEF held an equity stake in Ameta Holding, AD. See Am. Compl., at ¶ 43.

### III.  THE STANDARDS, PROCEDURES AND LAW
### APPLICABLE TO THIS MOTION

**A.    The Standards Applicable to A Motion to Dismiss
Pursuant to Fed.R.Civ.P. 12(b)(6)**

> In general, against a motion to dismiss, once a claim has been stated
> adequately, it may be supported by showing any set of facts consistent
> with the allegations in the complaint...construing the complaint liberally
> in the plaintiff's favor with the benefit of all reasonable inferences derived
> from the facts alleged (internal citations, quotation marks, omitted).

*In re Sealed Case* 494 F.3d 139, 145 (C.A.D.C.,2007), citing *Bell Atl. Corp. v. Twombly*.
127 S.Ct. 1955, 1965 (2007).

BAEF does not assert that plaintiff must meet any elevated pleading standard.

Plaintiff thus, must only satisfy the minimal notice pleading standards of Federal Rule of

Civil Procedure 8. *See* Fed.R.Civ.P. 8(a)(2) (requiring only a "short and plain statement

of the claim"); *see also Swierkiewicz v. Sorema,* 534 U.S. 506, 512, 122 S.Ct. 992, 997,

152 L.Ed.2d 1 (2002) ("Such a statement must simply give the defendant fair notice of

what the plaintiff's claim is and the grounds upon which it rests." (internal quotation

marks omitted)).

**B.    Choice of Law**

BAEF suggests that Bulgarian law should apply, but defers argument on that issue

to its Second Jurisdiction/Venue Motion. BAEF 12(b)(6) Motion, at 9.[4]  Plaintiff

addresses that issue in its opposition to BAEF's Second Jurisdiction/Venue Motion, but

addresses Bulgarian law briefly below with respect to Count Seven.

---

[4] BAEF does not suggest that principles of *renvoi*—that is, deferral to the foreign jurisdiction's choice of law principles – is appropriate, and such an approach appears to be disfavored in the foreign state context. *See, e.g., Sosa v. Alvarez-Machain* 542 U.S. 692, 756-757, 124 S.Ct. 2739, 2779-2780 (2004) (Ginsburg, J., concurring).

Where appropriate, plaintiff submits authority from both the District of Columbia Circuit and the Seventh Circuit. As BAEF notes, there appear to be no material conflicts between those Circuits' treatment of the issues raised in BAEF's 12(b)(6) motion.

## C.    Subject Matter Jurisdiction

Plaintiff asserted subject matter jurisdiction pursuant to 28 USC §§ 1331 and 1332(a) (1) and (2), 18 U.S.C. § 1964 (a) and (c). BAEF does not dispute the availability of subject matter jurisdiction under the RICO provisions set out in 18 U.S.C. § 1964 (a) and (c), but contends that, in the event that the RICO claim is dismissed[5], this court should decline to exercise jurisdiction over the state claims. BAEF 12(b)(6) Motion, at 25-26.

BAEF does not address the availability of statutory "arising under" jurisdiction under Section 1331.[6] As the Supreme Court has declared, Section 1331

> is invoked by and large by plaintiffs pleading a cause of action created by federal law ( *e.g.,* claims under 42 U.S.C. § 1983). There is, however, another longstanding, if less frequently encountered, variety of federal "arising under" jurisdiction, this Court having recognized for nearly 100 years that in certain cases federal question jurisdiction will lie over state-law claims that implicate significant federal issues. ...The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues.... (internal citations omitted).

*Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg.,* 545 U.S. 308, 312 (2005).

"A federal right of action is not a *necessary* condition for 'arising under' jurisdiction, even under § 1331 , but it is certainly a *sufficient* one (emphasis in original)." *See* Young,

---

[5]   As is set forth below, there is no basis for dismissal of plaintiff's RICO claim.

[6]   BAEF addresses only the absence of diversity jurisdiction. While diversity jurisdiction is impeded by the presence of aliens on each side of the case, that defect is cured and the court retains jurisdiction if the alien party precluding diversity jurisdiction is dismissed. *Saadeh v. Farouki* 107 F.3d 52, 56 (D.C. Cir. 1997).

17

EA, *Sosa And The Retail Incorporation Of International Law* 120 HVLRF 28, n.24

(February 2007), relying on Richard H. Fallon, Jr., Daniel J. Meltzer & David L. Shapiro,

Hart and Wechsler's The Federal Courts and the Federal System. 864 (5th ed. 2003).

In *Bender v. Jordan* --- F.Supp.2d ----, 2007 WL 4268766 (D.D.C.,2007), this

court determined that a "case arises under federal law if "a well-pleaded complaint

establish[es] either that federal law creates the cause of action or that plaintiff's right to

relief necessarily depends on resolution of a substantial question of federal law. (brackets

in original)" At 5. In *Bender*:

> Defendants argue that the cross claim only asserts common law claims of
> breach of contract and unjust enrichment as its causes of action, which are
> not found in federal law, with only a passing reference to the federal
> Regulation. Therefore, they contend, "the Bank's reimbursement claims,
> as pled, do not necessarily depend on resolution of a substantial question
> under the Regulation as required to establish subject matter jurisdiction."
> … They add that "[t]he Bank is not suing to enforce the Regulation,
> rather, it has brought suit for reimbursement based on written agreements
> with the Defendants."

Addressing the Supreme Court decisions in *Empire Healthcare Assurance, Inc.*

*v. McVeigh,* --- U.S. ----, 126 S.Ct. 2121, 165 L.Ed.2d 131 (2006), and *Merrell Dow*

*Pharmaceuticals Inc. v. Thompson,* 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650

(1986), this court wrote that:

> This argument mis-perceives the central role of the OTS Regulation to this
> scheme, both at the lending end and the collection end. Without a bylaw
> that covers the situation, the Bank could *only* advance fees and costs to its
> officers and directors pursuant to the Regulation and its particular
> procedures. The Defendants are entitled to retain the monies advanced
> only if they meet the criteria of the Regulation. Similarly, the documents
> which represent the Bank's promise to advance monies and the
> Defendants' promises in return to repay those monies under certain
> conditions are required by federal law. At 5.

As alleged in the First Amended Complaint, the SEED Act is at the core of the claims of misconduct in this case. It is the source of the money utilized by defendants to strip the equity from Bulgarian companies including Plaintiff. Am. Compl., at ¶ ¶6, 7, 58, 61. The SEED Act provides its funds for "the promotion of private sector development and entrepreneurship in Bulgaria through, among other things, grants, loans, and equity investments." Am. Compl., at ¶ 6.

The First Amended Complaint alleges that BAEF failed to meet its SEED Act reporting requirements, Am. Compl., at ¶ 6, and failed to take steps to ensure that the SEED Act funds were properly utilized by the Bank for the purposes set out in the SEED Act, BAEF permitted the Bank's wrongful scheme to be implemented. Am. Compl., at ¶ ¶ 52, 53, 58. The First Amended Complaint alleges that BAEF acted "with deliberate blindness, and deliberate ignorance and conscious avoidance," Am. Compl., at ¶ 52, and profited directly from its failure to meet its obligations, as set out at least in part under the SEED Act. Am. Compl., at ¶ ¶ 58, 61.

Assessment of Plaintiff's common law claims against BAEF, therefore, invokes a "substantial question of federal law" – the construction of and the obligations imposed on BAEF by the SEED Act. Even in the absence of a RICO claim, therefore, this court has original jurisdiction of the remaining counts.

Even assuming *arguendo* that there is no section 1331 jurisdiction, the dismissal of the RICO claim does not mandate dismissal of the common law counts. Under 28 U.S.C. § 1367(c)(3), a district court "*may* decline to exercise supplemental jurisdiction over a claim under subsection (a)[7] if ... the district court has dismissed all claims over

---

[7] "Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over

which it has original jurisdiction (emphasis added)." There is ample reason to retain

jurisdiction under § 1367(c)(3).

"In deciding whether to exercise its discretion to try the remaining cause of

action, the Supreme Court has directed district courts to consider factors such as judicial

economy, convenience, fairness to the parties, and comity between the federal and state

judiciary (internal brackets, internal citations omitted)." *Stevenson v. Severs* 158 F.3d

1332, 1334 (D.C. Cir.1998). Those factors, particularly in light of the central issue of

federal programs and expenditures, weigh in favor of the retention of supplemental

jurisdiction even if the RICO claim is dismissed.

## IV. ARGUMENT

### A.    BAEF'S Liability Is Based On Its Conduct And Its Relationship With The Bank

As is discussed in II.A.7 above, the First Amended Complaint sets out in detail at

paragraphs 44-53 the bases for BAEF's liability. The First Amended Complaint also

alleges BAEF liability under RICO, as well as pursuant to theories of civil conspiracy

and vicarious liability. Am. Compl., at 110-113. Those allegations include both direct

liability for its own conduct, and derivative liability for the misconduct of the Bank. *See*

*Columbia Plaza Corp. v. Security Nat. Bank* 676 F.2d 780, 788 (D.C. Cir., 1982)

(discussing distinctions between direct liability and vicarious liability).

### 1. BAEF's Direct Liability

As is discussed above, the First Amended Complaint sets out in detail the failures

and the misconduct of BAEF. Paragraph 53 avers:

all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."

By failing to supervise the actions of the Bank, and by failing to review the actions of the Bank, and by failing to monitor the use of federal monies for its intended purposes, and by failing to take any steps to ensure that the SEED Act funds were properly utilized by the Bank for the purposes set out in the SEED Act, and by failing to report the Bank's wrongful activities to USAID and others, BAEF permitted the wrongful scheme of the Bank to be implemented, and to continue, and to be commenced against plaintiff, and to continue against plaintiff and others.

The First Amended Complaint also avers that, at paragraph 111, that "BAEF knew of, or should have known of, and recklessly disregarded the wrongful conduct of the Bank, and failed to supervise, review or report on the wrongful conduct of the Bank, and facilitated the wrongful conduct of the Bank by such failures." The First Amended Complaint also alleges that "BAEF acted with willful blindness, and deliberate ignorance and conscious avoidance." At ¶ 52. BAEF, with approximately 10 employees in Sofia, Bulgaria, should have known of the Bank's misconduct.

BAEF's own 2004 Annual Report, **PX 5**, discloses that a "Bank Oversight Committee, created last year to monitor the BACB more closely, also meets with great frequency. Board members who serve on these committees spend substantial time discharging their duties, including attending frequent meetings and conferences, and making additional in-country visits."

BAEF certainly cannot escape, at the pleadings stage, the consequences of those failures by contending that BAEF simply did not know the details of the Bank's misconduct. Actual knowledge "…includes a willful blindness or a failure to investigate because one "was afraid of what the inquiry would yield." *Louis Vuitton v. Lee,* 875 F.2d 584, 590 (7th Cir.1989). "…(T)he law does not permit a defendant deliberately to 'close his eyes to the obvious' and then plead ignorance of such readily ascertainable facts." *U.S. v. Quinn* 403 F.Supp.2d 57, 68, n.11 (D.D.C.,2005).

21

Nor can BAEF shift to the Bank the SEED Act reporting requirements, or BAEF's duty to ensure that the SEED Act funds were used for their designated purposes. BAEF's direct actions -- including in particular its willful omissions -- caused the injury and loss sustained by plaintiff and other small Bulgarian companies, and, as a consequence, BAEF is directly liable to plaintiff.

## 2. BAEF's Derivative or Vicarious Liability

As is discussed above, BAEF dominates in every meaningful way the policies and practices of the Bank.  BAEF is both the controlling shareholder and creditor of the Bank. BAEF's directors control the Bank's Supervisory Board.

BAEF's financial statement incorporates the Bank's financial statement, and includes no other entities.  BAEF's profits come from the Bank, which is its major operational subsidiary and principal asset.

The public description of "Management" refers to "overall management" of both BAEF and the Bank.  BAEF and the Bank share some administrative expenses.  The Bank is expected to report to BAEF "if there is a troubled loan of significant size (because it) could have a significant impact on their financial statements."[8]

Plaintiff has thus met its pleading obligation under Rule 8(a) under any of seven different approaches to BAEF's liability for the misconduct of the Bank.

---

[8] As noted above, a Bank Oversight Committee closely monitors the Bank's activities.

### 3. The Bank as Agent of BAEF [9]

Courts have long struggled, often with confusing results, to explain how much control is required before parent and subsidiary may be deemed principal and agent. *Cf. Berkey v. Third Avenue Railway Co.*, 244 N.Y. 84, 155 N.E. 58, 61 (1926) ("The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor"); RESTATEMENT (SECOND) OF AGENCY § 14M reporter's notes ("When liability is fastened upon the parent it is said that the subsidiary is a 'mere agent' [which has resulted in] a weakening and muddying of the term 'agent' and a failure by courts to state the real reasons for their decisions"). The question defies resolution by "mechanical formula[e]," for the inquiry is inherently fact-specific.... At a minimum, however, we can confidently state that the relationship of principal and agent does not obtain unless the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors (internal citation omitted).

*Transamerica Leasing, Inc. v. La Republica de Venezuela* 200 F.3d 843, 849(D.C. Cir. 2000). The First Amended Complaint pleads the elements sufficient to invoke principal-agent liability. Indeed, *Transamerica* does not require that the principal exercise control; it is only necessary that the parent have "the right to exercise control." Moreover, "the control need not be exclusive in a hypertechnical or day-to-day sense (internal quotation marks omitted)." *Material Supply Intern., Inc. v. Sunmatch Industrial Co ., Ltd.* 62 F.Supp.2d 13, 20 (D.D.C.,1999).

In all events, the "inquiry is inherently fact-specific" and is not susceptible to disposition under Rule 12(b)(6).

---

[9] Though the tests for parent and subsidiary relationships are applied both for liability and personal jurisdiction issues, there is a substantial difference in the burdens of proof, and inferences, and the liberality of the construction of the supporting facts. Under 12(b)(6), as opposed to 12(b)(2), plaintiff is entitled to the benefit of all inferences, and liberal construction, and need not prevail on the facts but need only show "any set of facts consistent with the allegations in the complaint."

### 4. Department Liability

The First Amended Complaint alleges that the Bank held itself out and acted as a department of BAEF. Am. Compl., at ¶ 45. "...(I)f one corporation is "operated as a division of another,' then the latter may be held responsible for the acts of the former." *Transamerica Leasing, Inc.,* supra, at 848. In the analogous context of debt liability, "where a holding company directly intervenes in the management of its subsidiaries so as to treat them as mere departments of its own enterprise, it is responsible for the obligations of those subsidiaries incurred or arising during its management. *Consolidated Rock Products Co. v. Du Bois* 312 U.S. 510, 524, 61 S.Ct. 675 (1941).

### 5. A Single Business Enterprise

As the facts set forth above suggest, BAEF and the Bank constitute a "single business enterprise," and, as a result, the liability of the Bank attaches to BAEF.

> Generally, a single business enterprise is deemed to exist "when two or more corporations associate together and, rather than operate as separate entities, integrate their resources to achieve a common business purpose." ... Relevant indicia ... include: "common employees; common offices; centralized accounting; payment of wages by one corporation to another corporation's employees; common business name; services rendered by the employees of one corporation on behalf of another corporation; undocumented transfers of funds between corporations; and unclear allocation of profits and losses between corporations." Importantly, the single business enterprise theory has been interpreted more expansively than the alter ego theory. As stated by one Texas appellate court: "[t]o recover under a finding of a single business enterprise, no proof of [actual or constructive] fraud is required; instead, the single business enterprise theory relies on equity analogies to partnership principles of liability."

Steinberg, MI, *Alter Ego And Single Business Enterprise In The Texas Contractual Debt Context* 41-SPG Tex. J. Bus. L. 1, 3 (Spring 2005), and *see Transamerica Leasing, Inc.,* supra, at 848.

### 6. Instrumentality Liability

The fact that MSI is owned solely by Jewett "is not by itself sufficient" to show the two are alter egos, "although it is certainly not irrelevant." *Valley Finance,* 629 F.2d at 172. Rather, to assess whether Jewett so controlled MSI as to render it a mere instrumentality, the court will consider a host of factors, none of which is dispositive: whether parent and subsidiary have common business departments; whether the parent finances the subsidiary; whether the parent incorporated the subsidiary; whether the subsidiary is inadequately capitalized; whether parent and subsidiary file consolidated financial statements and tax returns; whether they have a joint accounting and payroll system; whether the subsidiary is operated as a mere division of the parent; whether the subsidiary depends on the parent for substantially all of its business; whether the subsidiary's obligations are assumed to be those of the parent; whether the subsidiary's property is used by the parent as its own; and whether the subsidiary is operated exclusively in the interest of the parent.

*Material Supply Intern., Inc., supra* at 20. (D.D.C.,1999). Many of those factors, including financing by BAEF, consolidated financial statements, and Bank operations in the exclusive interest of BAEF, are alleged by plaintiff.

### 7. The "Alter Ego" Test

"The "alter ego" test, which is founded in equity and permits the court to pierce the corporate veil when the court must prevent fraud, illegality or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability from a crime." *Diamond Chemical Co., Inc. v. Atofina Chemicals, Inc.* 268 F.Supp.2d 1, 14 (D.D.C.,2003). Each of those concerns – the prevention of fraud, illegality and injustice, and the need to vindicate the public policy established by the SEED Act, as well as the prospect of shielding the defendants from liability for criminal acts – warrants piercing of any corporate veil.

25

### 8. The "Integrated Enterprise" Test

Under the "integrated enterprise" test which the court considers (a) interrelation of operations, (b) centralized control of labor relations, (c) common management, and (d) common ownership or financial control. *Diamond Chemical Co., Inc., supra,* at 14. The Amended Complaint, as well as BAEF's own website and the testimony of Ms. Shiller, provide evidence of the interrelation of operations and common management, as well as common ownership or financial control.

### 9. Liability Through Failure to Repudiate

The Amended Complaint establishes that BAEF failed to repudiate the Bank's misconduct. Am. Compl., at ¶ 51. *See* Restatement (3d) Agency § 4.01(2006) (defining ratification and its effects on principal liability). "An affirmance of an unauthorized transaction can be inferred from a failure to repudiate it." Restatement (2d) Agency § 94 (2006).

### B.    The Allegations of the First Amended Complaint Are Well-Pleaded

### 1.   The First Amended Complaint Properly Pleads Civil RICO (Count One)

To bring a cause of action under Section 1962(c) of the RICO statute, plaintiff must have alleged that "(1) a person or persons (2) associated with an enterprise (3) conducted (4) the affairs of that enterprise (4) through a pattern (5) of racketeering activity." *Bates v. Nw. Human Servs., Inc.,* 466 F.Supp.2d 69, 78 (D.D.C. 2006).

A civil RICO conspirator need only

> intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopted the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense....

In order to prove a RICO conspiracy...the Government need only establish that: (1) that two or more people agreed to commit a substantive RICO offense, and (2) that the defendant knew of and agreed to the overall objective of the RICO offense.

*U.S. v. Morrow* 2005 WL 1389256*11-12 (D.D.C.,2005). applying *Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997).

A RICO defendant may also be liable through vicarious liability. "(A)lthough some courts have recognized a narrow exception to vicarious liability under RICO, that exception has been created in order to preserve the non-identity rule (that under § 1962(c), the RICO defendant and the RICO enterprise cannot be one and the same). *Cox v. Administrator U.S. Steel & Carnegie* 17 F.3d 1386, 1404 (11th Cir. 1994). Of course, section 1962(c) provides for indirect participation. And *see U.S. v. Philip Morris USA, Inc.* 449 F.Supp.2d 1, 907, n.78 (D.D.C.,2006)(discussing lesser standard for a RICO aider and abettor claim), and *see United States v. Shifman,* 124 F.3d 31, 36 (1st Cir. 1997) ("Aiding and abetting one of the activities listed in § 1961(1) as racketeering activities makes one punishable as a principal and amounts to engaging in that racketeering activity."); *First American, supra,* 17 F.Supp. at 24 (stating that with respect to RICO, Congress intended there to be aiding and abetting liability in civil actions).

Defendant identifies five alleged infirmities with Plaintiff's RICO pleading. As is set forth below, each of BAEF's RICO challenges lack merit, and must be rejected

### a. BAEF's RICO Violations Proximately Caused The Harms to Plaintiff

A plaintiff whose injuries are proximately caused by a defendant's RICO activities can recover for their loss. 18 U.S.C. § 1964(c). Under RICO, "a defendant's

acts proximately cause Plaintiff's injuries when such acts are a substantial factor in the

sequence of responsible causation, and where the plaintiff's injury was reasonable

foreseeable or anticipated as a natural consequence of those acts." *BCCI Holdings (Lux),*

*S.A. v. Khalil*, 56 F.Supp.2d 14, 56 (D.D.C. 1999), *aff'd in part and reversed in part on*

*other grounds*, 214 F.3d 168 (D.C. Cir. 2000).

In *First Am. Corp. v. Al-Nahyan*, 17 F. Supp.2d 10, 22 (D.D.C 1998), the court

explained that:

> Proximate cause requires a direct relation between the defendant's conduct
> and the plaintiff's harm, but the degree of directness cannot be stated as a
> general rule and must be determined by reference to the context of a
> specific case. Consequently, while the concept of proximate cause is a
> "judicial tool" for limiting liability, the context-dependent nature of its
> application means that it generally is not amenable to summary
> adjudication. At 22.

Properly cast, then, the proximate cause requirement for purposes of RICO is

satisfied when the RICO predicate acts "are a substantial factor in the sequence of

responsible causation, and where a plaintiff's injury was reasonably foreseeable or

anticipated as a natural consequence of those acts. *BCCI*, 56 F. Supp.2d at 56.

BAEF argues that it did not participate in the "formation, performance, or breach

of the Loan Agreement that forms the basis of plaintiff's RICO claim." BAEF 12(b)(6)

Motion[10]. But that characterization of plaintiff's RICO claim simply ignores BAEF's

critical participation in the scheme to strip Bulgarian companies of their assets and

equity.

At the stark outset, BAEF acquires from the SEED Act program the money

through which the Bank operates, and which the Bank purports to lend. Am. Compl., at

---

[10] Plaintiff does not reiterate here the conduct attributable to BAEF through theories of conspiracy,
vicarious liability and aider and abettor status.

¶ 6. That money was allocated for a particular purpose – "the promotion of private sector development and entrepreneurship in Bulgaria through ...loans...." *Id.* The Bank was not involved in the procurement of the SEED Act money. Am. Compl., at ¶ 60.

As is discussed above, the SEED Act money was provided to BAEF under various conditions, including the duty to accurately report, and the duty to ensure that the funds were used for their particular purpose. And *see* discussion IV.B.4 below (addressing duties of diligence and proper administration of federal funds for intended purpose). The First Amended Complaint repeatedly alleges, and BAEF does not deny for purposes of the instant motion, that the SEED Act funds were misused by the Bank.

Nor does BAEF dispute for purposes of this motion that BAEF failed to disclose in its reports information about the Bank's loans which, if disclosed, would have led to the end of the Bank's equity stripping schemes. Am. Compl., at ¶¶ 52, 53. BAEF does not contend that it properly monitored the SEED Act monies, or properly supervised the Bank's use of those monies. But, as the First Amended complaint avers:

> 48. The Bank's actions and decisions were subject to the control and the direction of BAEF.
>
> 49. The Bank's actions and decisions were subject to the supervision of BAEF.
>
> 50. The Bank's actions and decisions were subject to the policies and the demands of BAEF.

Indeed, BAEF's own 2004 Annual Report describes its Bank Oversight Committee, created to monitor the Bank "more closely", meeting "with great frequency," and reports on "Board members who serve on these committees spend substantial time discharging their duties, including attending frequent meetings and conferences, and making additional in-country visits."

BAEF's unsupervised and mismanaged distribution of funds to the Bank, coupled with BAEF's failure to properly report to USAID or the Department of State, and BAEF's – at best – willful blindness toward the Bank's misconduct were "substantial factor in the sequence of responsible causation."[11] Particularly in light of the general tort premise that proximate cause of an injury is a question for the jury. *Smith v. D.C.*, 413 F.3d 86, 102-103 (D.C. Cir. 2005) (citations omitted); and *see FDIC v. Refco Group*, 989 F.Supp. 1052, 1068 (D. Colo. 1997) (Proximate cause is a question of fact except in the clearest of cases), BAEF's pleadings causation challenge must be rejected.

### b. Plaintiff has Sufficiently Alleged An Enterprise

A RICO enterprise may be

> any union or group of individuals associated in fact although not a legal entity," 18 U.S.C. § 1961(4), so long as it involves 'some structure, to distinguish an enterprise from a mere conspiracy.' *U.S. v. Richardson*, 167 F.3d 621, 625, citing *United States v. Korando*, 29 F.3d 1114, 1117 (7th Cir.1994) (internal quotation omitted). Under the test we set out in *United States v. Perholtz,*[12] the enterprise is established by (1) a common purpose among the participants, (2) organization, and (3) continuity...." Furthermore, the alleged "enterprise must be legally distinct from the RICO person or persons who are alleged to be engaging in a pattern of racketeering activity through the enterprises affairs (internal citation omitted)

*U.S. v. Richardson*, 167 F.3d 621, 625, (D.C. Cir. 1999). Furthermore, the alleged "enterprise must be legally distinct from the RICO person or persons who are alleged to be engaging in a pattern of racketeering activity through the enterprises affairs." *Bates v. Northwestern Human Servs., Inc.*, 466 F.Supp.2d 69, 79 (D.D.C. 2006).

To the contrary, however, the First Amended Complaint sets out in detail the

---

[11] BAEF does not identify a superseding cause that breaking the chain of causation. *See First Am. Corp.* 17 F.Supp.2d at 23.

[12] 842 F.2d 343, 362 (D.C.Cir.1988).

structure and organization of the enterprise.[13]

Plaintiff alleges that BAEF was a 68% interest holder in BML and the parent

company of BAPM, which conducts BAEF's property management operations. Am.

Compl. at ¶ 6. Plaintiff further alleges that the Bank is a wholly owned subsidiary of

BAEF, that the Bank is its operational subsidiary, that the Bank's activities were an

extension of the activities of BAEF, namely lending to small and medium size enterprises

in Bulgaria, and that the Bank's activities were funded by BAEF. Am. Compl. at ¶7.

Plaintiff further sets out the roles and relationships among the Bank, BAEF and

Ameta Holdings, Am. Comp. at ¶ 43[14], as well as the relationship between the Bank's

conduct and BAEF. Am. Compl. at ¶ ¶ 44- 54. Moreover, Plaintiff makes clear that the

enterprise as described had a common and shared purpose to extort funds, strip equity

and property, engage in predatory and unlawful lending practices and blackmail. Am.

Compl. at ¶58.

The pleading of a RICO enterprise need only meet 8(a) pleading requirements --

that is, Plaintiff need only plead a clear and concise statement of the enterprise. *See*

*Center Cadillac v. Bank Leumi Trust Co.*, 808 F.Supp. 213, 235 (S.D.N.Y.1992)

(association enterprise sufficiently alleged where plaintiffs claimed individual defendants

functioned as a unit with a banking entity to perpetrate fraud and extortion on plaintiffs);

*Azurite Corp. Ltd. v. Amster & Co.*, 730 F.Supp. 571, 577 (S.D.N.Y.1990);[15] and *see Ago*

*v. Begg, Inc.*, 1988 WL 75224 at * 2 (D.D.C. 1988) (noting that proof of a separate

---

[13] The enterprise as alleged in the Amended Complaint at 58 is an association in fact enterprise comprised of BAEF, the Bank, BAPM, as well as Ameta Holding JSC and others. An enterprise may either be an ongoing organization or an association-in-fact of individuals or entities acting as a group for the common purpose of engaging in racketeering activity. *See Procter & Gamble v. Big Apple Industry Buildings, Inc.*, 879 F.2d 10, 15 (2d Cir.1989), *cert. denied*, 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990)

[14] The conduct Plaintiff complains is described in detail at Am. Compl. 14-42.

[15] Here, the enterprise is comprised of related entities, some of which are closely affiliated. BAEF's 2004 Annual Report discloses that it holds equity in a company called Ameta.

enterprise to prevail under RICO has no place in the motion to dismiss stage of litigation).

Similarly, BAEF's lack of distinctiveness argument fails. Relying on *Bates v. Nw Human Servs.,* 446 F.Supp.2d 69 (D.D.C. 2006), BAEF notes that it is impermissible to name the same entity as both the person and the enterprise.

The plaintiff in *Bates* had alleged in the alternative, that defendants "each simultaneously [were] a RICO person acting through the other entities in their roles as RICO enterprises *and* a RICO enterprise through which the other entities act as RICO persons." *Bates,* 466 F.Supp.2d at 87. That is not the case here. Plaintiff has alleged but one formulation of the RICO enterprise, consisting of BAEF, the Bank, BAPM and Ameta Holdings JSC, Am. Compl. at ¶58.

BAEF points to no authority for the proposition that a single defendant in a RICO action cannot also be part of an association in fact enterprise in the same action. *See U.S. v. Fairchild,* 189 F.3d 769, 777 (8th Cir. 1999); and *see Cullen v. Margiotta,* 811 F.2d 698, 729-30 (2nd Cir. 1987) (citations omitted)("[W]e see no reason why a single entity could not be both the RICO 'person' and one of a number of members of the RICO 'enterprise.'"). BAEF's reliance on *Yellow Bus Lines v. Drivers, Chauffeurs & Helpers Union,* 883 F.2d 132 (D.C. Cir. 1989) is misplaced, especially in light of the Supreme Court's decision in *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 163 (2001) (Court stated without qualification that Section 1962(c)'s distinctiveness requirement is satisfied when the alleged RICO person and the alleged RICO enterprise are "legally different entit[ies] with different rights and responsibilities due to [their] different legal status.") As the *Bates* court wrote:

32

> It is nonsensical to suppose that a parent corporation and its wholly owned subsidiary, each duly and separately incorporated, may be considered distinct legal entities from one another in the ordinary course of events, but *not*, as a categorical matter, in the context of Section 1962(c), despite the Supreme Court's clear statement that it is the "different legal status" of a sole shareholder and his closely held corporation that properly distinguishes a RICO person from a RICO enterprise. *Kushner*, 533 U.S. at 162, 121 S.Ct. 2087. ... *Kushner* thus stands most reasonably for the proposition that as long as the *same* corporation is not playing both the role of a person and an enterprise in a plaintiff's RICO claim, the distinctiveness requirement of Section 1962(c) is presumptively satisfied. *See Kushner*, 533 U.S. at 161, 121 S.Ct. 2087.

*Bates*, 466 F.Supp.2d. at 83 (holding that a parent corporation and its subsidiary may satisfy the distinctiveness requirement).[16] (and *see* note 12 for a discussion of how the court resolved any perceived conflict between *Kushner* and *Yellow Bus*).

Given the proper legal context in which Plaintiff's allegations belong, since BAEF, the Bank and BAPM are all legally separate entities, Am. Compl at ¶¶ 6-7, under the construction of either *Kushner* or *Yellow Bus*, it is presumptively permissible for these entities to be both a person and a member of the enterprise under the RICO statute. Moreover, the addition of Ameta Holding, JSC (and any individuals or entities who aided and abetted or otherwise participated in their unlawful activities, including those companies used by the Bank and/or BAEF and/or BAPM) only serves to further distinguish the persons and the enterprise as required by the statute.

Accordingly, Plaintiff has adequately pled an enterprise under RICO.

### c.    Plaintiff Sufficiently Alleged an Effect on Interstate Commerce

A RICO plaintiff must identify an enterprise "engaged in, or the activities of which affect interstate or foreign commerce." 18 U.S.C. § 1962(c).

---

[16]    The Bates court also addresses any perceived conflict between *Kushner* and *Yellow Bus*. At n. 12.

The effect on commerce is an essential element of a RICO violation, but the required nexus need not be great. A minimal effect on interstate commerce satisfies this jurisdictional element. *United States v. Barton*, 647 F.2d 224, 233 (2d Cir. 1981). *U.S. v. Murphy*, 768 F.2d 1518, 1531 (7th Cir.1985), *cert. denied,* 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986) (Circuit Court of Cook County affected commerce by buying goods to operate and by affecting lawyers and litigants); *Accord, Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497 (1985) (plaintiff need only allege the required elements in order to state a claim). Whether or not a Plaintiff has satisfied the affecting commerce element of RICO is a question for the trier of fact. *U.S. v. DeFries*, 129 F.3d 1293, 1311 (D.C. Cir. 1997); and *see United States v. Parker*, 73 F.3d 48, 51 (5th Cir.1996) (holding interstate commerce element of RICO is a jury question)*; United States v. Aramony*, 88 F.3d 1369, 1386-88 (4th Cir.1996) (same).

Moreover, the RICO statute requires the activities of the enterprise, not each predicate act, or each individual defendant to affect interstate or foreign commerce. *United States v. Rone*, 598 F.2d 564, 573 (9th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *accord, United States v. Stratton*, 649 F.2d 1066, 1075 (5th Cir. 1981).

In paragraph 58 of its Amended Complaint Plaintiff alleges that the enterprise engaged in, or its activities affected, interstate and/or foreign commerce. That averment alone satisfies the pleading requirement with regard to the effect on interstate commerce or foreign commerce. *See Seville Industrial Machinery v. Southmost Machinery,* 742 F.2d 786, 790 (3rd Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985).

34

Even assuming *arguendo* that more is required, the First Amended Complaint is replete with evidence of the effect on interstate commerce and on foreign commerce of the activities of the enterprise. BAEF, a Chicago-based corporation chartered in Delaware, repeatedly engages in commercial transactions with the other members of the enterprise, including BAEF. Those transactions include the transfer of approximately $58,000,000.00 in federal funds from Washington to Chicago to Bulgaria, including the funds used to finance the enterprise and implement the equity stripping scheme in Bulgaria. BAEF's misconduct, including its failure to properly report to USAID and the Department of State, takes place in Virginia, Washington, Chicago and Bulgaria.

The fully-pled interstate and international transfer of monies, interstate and international travel, and interstate and international reporting all constitute and have an effect on interstate commerce. BAEF's suggestion that the movement of $58,000,000 of taxpayer money to Bulgaria through Chicago does not involve either interstate commerce or foreign commerce defies support, and is belied by the continuing discussions in Washington over the allocation of BAEF's profits.

Plaintiff has satisfied its pleading burden on affecting interstate or foreign commerce and Defendant's motion must be denied.

### d. Plaintiff Has Sufficiently Pled Each of the Required Predicate Acts

BAEF does not dispute that the predicate acts alleged in the Amended Complaint are proper under 1961(1). BAEF merely challenges the adequacy of Plaintiff's factual assertions. However, as explained above Plaintiff is under no obligation to plead any of the asserted predicate acts with particularity. *See SMS Marketing & Telecommunications, Inc. v. H.G. Telecom, Inc.,* 949 F.Supp. 134, 143 (E.D.N.Y.,1996)

35

(Those predicate acts which sound in fraud must comply with Fed.R.Civ.P. 9(b) which provides that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally.").

### (1). Extortion Under 18 U.S.C. § 1951[17]

Extortion is defined as the "obtaining of property from another with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Fear of economic, rather than physical harm, is sufficient to establish an extortion claim under § 1951. *BCCI Holdings, supra,* 56 F.Supp.2d at 54; *United States v. Tomblin,* 46 F.3d 1369, 1382 (5th Cir.1995).

Here, Plaintiff alleges that the Bank obtained equity and assets of the Plaintiff through a fear of economic harm, Am. Compl. At ¶¶ 14-43, and that BAEF conspired with, participated in, was vicariously liable for and/or aided and abetted the extortion as described. Am. Compl at ¶¶ 44-54, 58, 61.

BAEF's argument that Plaintiff is required to plead that BAEF *personally* obstructed "commerce" by "robbery or extortion," BAEF 12(b)(6) Motion at 20, is unaccompanied by any authority. Indeed, § 1951(a) explicitly applies to conspirators.

BAEF's direct and indirect conduct as described above, falls well within the broad meaning of "commerce" set out in 18 U.S.C. § 1951 (b)(3).

---

[17]    *McLaughlin v. Anderson,* 962 F.2d 187 (2nd Cir. 1992) (Stringent pleading requirements for fraud or mistake did not apply to RICO extortion allegation)

### (2).    Extortionate Credit Transactions Under 18 U.S.C. §§ 891-894

In order to state a claim under 18 U.S.C. §§ 891-894, Plaintiff need only generally allege that defendant either made an extortionate extension of credit, conspired to make an extortionate extension of credit, collected an extension of credit by extortionate means or financed an extortionate extension of credit. *See* 18 U.S.C. §§ 891-894. An extortionate extension of credit is any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person. 18 U.S.C. § 891(6).

Plaintiff has properly alleged that a loan was made, that it was extortionate by its terms and in its collection and that BAEF funded the loan through the Bank. This is enough to satisfy Plaintiff's general pleading requirements under Rule 8.

### (3).    Racketeering Under 18 U.S.C. § 1952

Violation of the Travel Act requires; (1) travel in interstate or foreign commerce or use of a facility in foreign or interstate commerce; (2) with the intent to promote an unlawful activity; and (3) the performance or attempted performance or the facilitation of the performance of an overt act in furtherance of the unlawful activity. *United States v. Childress,* 58 F.3d 693, 719 (D.C.Cir.1995) (citations omitted). The "use of a facility in commerce" includes use of the United States mails, *United States v. Heacock,* 31 F.3d 249, 255 (5th Cir.1994); the making of interstate telephone calls and telegraphs, *United States v. Jenkins,* 943 F.2d 167, 172-73 (2d Cir.1991); and the interstate wire transfer of funds, *United States v. Antonick,* 481 F.2d 935, 938 (9th Cir.1973).

BAEF again unduly circumscribes the allegations related to its conduct. Plaintiff does not allege that BAEF's only conduct took place in Bulgaria. BAEF 12(b)(6) Motion at 21. ("the only allegations that plaintiff make with regard to BAEF's commercial activities connect BAEF to Bulgaria.") BAEF's commercial activities cover multiples states in the United States, and the District of Columbia.

BAEF concedes that "unlawful activity" includes extortion. BAEF 12(b)(6) Motion at 22. *See* discussion above. Further, 18 U.S.C.A. § 641, which covers persons who convert public monies, property or records is incorporated by 18 U.S.C.A. § 1956 (c)(7)(D).

### (4).    Extortion and Blackmail Under D.C. Law

Assuming *arguendo*, that as BAEF suggests the applicable state law for extortion and blackmail is District of Columbia law, BAEF 12(b)(6) Motion at 22-23, the first Amended Complaint clearly alleges "threat of economic injury." BAEF's insistence on allegations that "BAEF personally carried out any elements of these crimes" is not as discussed above, an element of Plaintiff's pleadings burden.

Plaintiff has therefore properly pled violation of extortion under applicable state law.

### e.    Plaintiff Has Sufficiently Alleged A Pattern of Racketeering Activity [18]

In *Western Associates Ltd. Partnership v. Market Square Associates* 235 F.3d 629 (D.C. Cir. 2001), the District of Columbia Circuit explained that:

> The Supreme Court has interpreted the pattern requirement to include two additional elements: relatedness and continuity. *H.J. Inc. v. Northwestern*

---

[18] BAEF contends that the First Amended Complaint only identifies a single "act" of BAEF. BAEF 12(b)(6) Motion, at 24. Plaintiff adopts and incorporates herein its discussion, *supra*, of BAEF's direct and vicarious conduct and liability.

*Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). "To prove a pattern of racketeering a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id.* The Court further described the relatedness element as criminal acts that share "similar purposes, results, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics." *Id.* at 240, 109 S.Ct. 2893. Continuity, the most relevant prong in the instant case, may be proved by establishing either a "closed period of repeated conduct" or a threat of future criminal activity.

The First Amended Complaint effectively alleges "similar purposes" – equity stripping for profit; "results" – equity stripping and profit; "victims" – small Bulgarian companies seeking loans; "methods of commission" – predatory lending; and "distinguishing characteristics" – using SEED Act money. Moreover, plaintiffs allege both "a closed period of repeated conduct" – from 2001 to 2005 – and" the threat of future criminal activity" – BAEF has accumulated enormous profits and has continued to acquire equity stakes, including stakes in co-conspirators.

Comparing the facts before it with those in *Edmondson & Gallagher v. Alban Towers Tenants Association,* 48 F.3d 1260 (D.C.Cir.1995),[19] and incorporating the Supreme Court's admonition to interpret the RICO Act "broadly," at 264, the *Western* court cautioned that "(n)either the instant case nor *Edmondson* establishes a *per se* rule for RICO pattern analysis. Instead, the court continues to endorse a case-by-case, fact-specific approach. The six factors prescribed in *Edmondson*[20] should be applied in a manner that is fluid, flexible, and commonsensical, rather than rigid or formulaic." At

---

[19]    Both *Western* and *Edmondson* focused on the allegation of a single transaction. The *Edmondson* plaintiff was a developer suing a tenants' association for "holding the building sale hostage," *Western*, at 633, and the *Western* defendant's "conduct is more accurately characterized as a single effort to diminish the value of Western's partnership interest, primarily by concealing cost overruns or shifting the burden of financing them." At 634.

    BAEF does not contend, and it cannot contend, that the First Amended Complaint relates to a single transaction, or a single victim.

[20] BAEF lists those factors in its memorandum, at 25.

265.

Under the *H.J.Inc.*, formulation, or a commonsensical application of the

*Edmondson* factors, plaintiff has effectively pled the relatedness and continuity

components of RICO's pattern requirements. BAEF's challenge, therefore, must be

rejected.

### 2. The First Amended Complaint Properly Pleads Intentional Interference with Contract  (Count Three)

In the District of Columbia, "(e)stablishing a prima facie case of intentional

interference with contractual relations requires that Futrell show "(1) the existence of a

contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the

contract; and (4) damages resulting from the breach." *Futrell v. Department of Labor*

*Federal Credit Union* 816 A.2d 793, 807 (D.C.,2003).

The First Amended Complaint avers that:

23.    On November 15, 2005, the Bank, through BAPM, proposed to
purchase from Plaintiff "all available units" for 100,000 EUR plus
assumption of the debt. BAPM failed to disclose that it was associated
with or affiliated with the Bank.

24.    BAPM's offer was in an amount substantially below the value of the
assets that BAPM sought to purchase.

25.    In or about November 2005, in Sofia, Bulgaria, The Bank contacted
the Project Unit Purchasers and the Construction Team.

26.    The Bank, through its employee Sabin Simeonov and others,  falsely,
and maliciously, and with intent to damage plaintiff, and disrupt plaintiff's
ability to perform under the Project, and to disrupt plaintiff's  construction
of the Project, and to interfere with plaintiff's ability to obtain sales
revenue from the Project, advised the  Project Unit Purchasers, by
telephone and otherwise, including without limitation Simeon Hajiev,
Boris Petrov and Boika Dimova, and the Construction Team, that plaintiff
was in default under the Contract, and that the Bank intended to put
plaintiff in bankruptcy, and that the investment of the Project Unit
Purchasers was unsafe, and that the Construction Team would be faced

with financial losses on the Project. The Bank failed to disclose to the Project Unit Purchasers, or the Construction Team, that the alleged events of default were mere pretexts.

As BAEF acknowledges, the First Amended Complaint alleges defendants' knowledge of the contracts and of the importance of the contracts to plaintiff's construction project. Am. Comp., at ¶ 79-81.[21]

The allegations of the First Amended Complaint are clear: the Bank devised a scheme to strip plaintiff's assets, submitted a "lowball" price, and tried to pressure plaintiff to accept the offer by interfering with plaintiff's construction contracts and purchase contracts. That misconduct constitutes intentional interference with contract as defined by *Futrell, supra*.[22]

While BAEF correctly contends that the First Amended Complaint does not identify particular interfering conduct by BAEF, BAEF does not dispute that principles of vicarious liability and civil conspiracy are applicable to intentional torts such as intentional interference with contract. *See* discussion in IV.A.2, *supra*.

### 3. The First Amended Complaint Properly Pleads Intentional Interference With Prospective Advantage (Count Four)

The tort of intentional interference with prospective advantage is similar in most respects to intentional interference with contract. The elements of the prospective advantage tort are: "existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional

---

[21] BAEF refers to those averments as "bare allegations," BAEF 12(b)(6) Motion, at 27-28, but offers no explanation for that characterization. The contracts are described with specificity. The Bank's communication with the contracting parties is set out in detail.

[22] Nothing in *Washington Hosp. Center Corp. v. Waters* 1992 WL 23746 (D.D.C.,1992), cited by BAEF, at 28, supports BAEF's contention that the intentional interference cannot survive because "it merely restates the breach of contract claim...." In *Washington Hosp. Center Corp* the trial court simply noted that an ostensible tort claim against the government arising out of its obligation to pay hospital bills was identical to the contract count asserting the same claim. At 3.

interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage." *Browning v. Clinton,* 292 F.3d 235, 242 (D.C. Cir. 2002). BAEF does not dispute that the First Amended Complaint identifies a "prospective advantage."

Rather, it reiterates the knowledge and intent arguments made with respect to plaintiff's claim of intentional interference with contract. Therefore, for the reasons set forth in IV.B.2, supra, BAEF's challenge to Count Four must be rejected.

### 4. The First Amended Complaint Properly Pleads Breach of Fiduciary Duty (Count Five)

BAEF challenges plaintiff's assertion of a Breach of Fiduciary Duty by contending only that the First Amended Complaint fails to allege a fiduciary duty owed by BAEF to plaintiff. BAEF 12(b)(6) Motion, at 30-31.[23] But BAEF's receipt of federal funds for a particular purpose created that fiduciary duty.

*In City of Kansas City, Mo v. Housing & Economic Development Financial Corporation* 2007 WL 714882 (W.D.Mo.,2007), the court entered judgment, ruling that:

> Because the funds loaned by HEDFC to BHTP were federal funds provided by HUD designated for assisting eligible low income residents to obtain affordable housing, for constructing and rehabilitating such affordable housing, and for redeveloping blighted neighborhoods and HEDFC owed a fiduciary duty to the City to at a minimum exercise good faith and due diligence in administering and using such funds, HEDFC was required to administer and use such funds according to their designated purpose. At 12.

As the First Amended Complaint alleges, BAEF failed to act with good faith or diligence, at ¶¶ 95, 96. BAEF's failure to supervise, monitor or accurately report, as is

---

[23] BAEF does not appear to argue that the Bank owed no fiduciary duty to plaintiff. Most courts permit claims of vicarious liability for an agent's breach of fiduciary duty. *See e.g., Davis v. Mutual Life Ins. Co.,* 6 F.3d 367 (6th Cir.1993) (Ohio law), *cert. denied,* 114 S.Ct. 1298 (1994); *Kral, Inc. v. Southwestern Life Ins. Co.,* 999 F.2d 101 (5th Cir.1993) (federal law). Because plaintiff asserts that BAEF is vicariously liable for the Bank's misconduct, BAEF's challenge to Count Four must be rejected on that basis alone.

discussed in detail above, breached its fiduciary duty to administer SEED Act funds for their intended purpose.

### 5. The First Amended Complaint Properly Pleads Violation of Bulgarian Law (Count Seven)

Count Seven of the First Amended Complaint identifies, at paragraphs 104-107, the misconduct of the Bank in violation of the Bulgarian Obligations and Contracts Act. At paragraph 108, the First Amended Complaint refers to the Bank's abuse of process as a violation of plaintiff's procedural rights. The sole reference to BAEF under the Bulgarian law count is paragraph 109, which states: "Defendants guiltily caused damages in tort to plaintiff."

According to BAEF's expert on Bulgarian law: "(T)he Bulgarian notion on tort and the formulation on tort is very, very broad. Anybody could have done any damage to anyone should repair." Deposition of Silvy Chernev, **PX 2**, at 74.[24] And *see* Deposition of Vladimir Skochev, **PX 3**, at 35-36 (discussing appropriate defendants in a corporate tort action), and *see* Deposition of Maria Slavova, **PX 4**, at 24-26 (discussing the difference between theoretical and practical availability of claims).

BAEF contends that the First Amended Complaint inadequately identifies the applicable Bulgarian tort law. As BAEF's expert opines, Bulgarian tort law is "very, very broad." It is arguably, set out in Article 49 of the Contracts and Obligations Act. Deposition of Maria Slavova, **PX 4**, at 24-26.[25]

---

[24] Mr. Silvy further discussed tort law in various respects elsewhere in his deposition. **PX 2**, at word index.

[25] BAEF suggests that the addition of a count sounding in Bulgarian law gives weight to its *forum non conveniens* venue challenge. BAEF 12(b)96) Motion, at 31, n. 17. Plaintiff will address that contention in its opposition to the Second BAEF Jurisdiction/Venue Motion, where the contention is discussed in more detail by BAEF. Plaintiff notes, nonetheless, that the expert testimony on Bulgarian law and courts makes

BAEF's reliance on *Walton v. Arabian American Oil Company* 233 F.2d 541 (2d Cir. 1956) is misplaced because the decision in *Walton* was made after failure to prove the foreign law at trial. While *Toshoku, Ltd. v. Blackmar* 431 P.2d 599 (Wah. 1967), and *Iafrate v. Compagnie Generale Transatlantique* 106 F.Supp. 619 (S.D.N.Y. 1952), cited by BAEF at 31, both broadly note that foreign law must be pleaded, *Iafrate* provides leave to amend as a matter of course. At 622.

To the extent necessary, plaintiff is prepared to amend the First Amended complaint accordingly. But in light of the extensive evidence of Bulgarian law already in this record, BAEF can hardly argue that "it has no notice of what plaintiff's claim is." BAEF 12(b)(6) Motion, at 32.

### 6. The First Amended Complaint Properly Pleads Civil Conspiracy and Vicarious Liability in Count Eight.[26]

Civil conspiracy is not a separate cause of action, but rather a means of establishing liability for underlying torts. *Halberstam v. Welch,* 705 F.2d 472, 479 (D.C.Cir.1983). The two essential elements of civil conspiracy are (1) "an agreement to take part in an unlawful action or a lawful action in an unlawful manner;" and (2) "an overt tortious act in furtherance of the agreement that causes injury." *Id.* at 479.

BAEF relies on *Dooley v. United Technologies Corp.*, 1992 WL 167053 (D.D.C.,1992) for the proposition that the First Amended Complaint contains only "vague and conclusory" allegations. At 33. But Judge Green rejected the civil conspiracy claim in *Dooley* because:

> Dooley's civil conspiracy count fails to identify any specific tort which the civil conspirators allegedly committed. Rather, Dooley identifies all the

---

clear that American courts are far more suited to determining and applying the relatively simple Bulgarian law on contracts and torts than a Bulgarian court seeking to determine and apply the claims in this case.
[26] Vicarious liability is discussed in IV.A.2, *supra*.

actions alleged in the Complaint as a basis for civil conspiracy liability. These allegations do not give the defendants sufficient notice of the actions for which Dooley seeks to hold them vicariously liable under a civil conspiracy theory. At 14.

That is, the *Dooley* plaintiff failed to delineate among the alleged civil conspirators the actions of each conspirator. Quite to the contrary here, plaintiff sets out in detail the actions and the inactions of BAEF, as well as the particular misconduct of the Bank.

BAEF relies on *Ellipso, Inc. v. Mann* 2006 WL 1126814 (D.D.C.,2006) and *Graves v. United States* 961 F.Supp.314 (D.D.C. 1997) to support its uncontroversial contention that civil conspiracy requires an agreement to take part in an unlawful action or a lawful action in an unlawful manner. The Amended Complaint avers that:

> BAEF and the Bank agreed to undertake the wrongful conduct described herein, including the breaches described herein, or, in the alternative, BAEF knew of, or should have known of, and recklessly disregarded the wrongful conduct of the Bank, and failed to supervise, review or report on the wrongful conduct of the Bank, and facilitated the wrongful conduct of the Bank by such failures. Am. Compl., at ¶ 111.

The Amended Complaint therefore satisfies the pleading requirements for civil conspiracy.

## CONCLUSION

On the basis of the foregoing, the instant motion should be denied.

45

Respectfully submitted,

_____
Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*: srolinski@rolinski.com


_____
Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*: (202) 466-3883
*Fax*:    (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com

***Attorneys For Plaintiff***

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Stroitelstvo Bulgaria Ltd.                          :

        Plaintiff,                             :

        v.                                     :       Case No. 07cv00634 RMC

                                               :

The Bulgarian-American Enterprise Fund, *et al.*    :

        Defendants.                            :

## <u>ORDER</u>

This matter having come before this Court on Defendant Bulgarian American Enterprise Fund's Motion To Dismiss Plaintiff's Amended Complaint Pursuant To Federal Rule12(b)(6), and opposition thereto, it is this _____ day of _____, 2008, for cause shown:

      **ORDERED**, that the instant motion be and is hereby denied, and it is

      **FURTHER ORDERED**, that Defendant Bulgarian American Enterprise Fund shall file and serve an answer to the Amended Complaint within __ days of the date of entry of this Order.

                        SO ORDERED.

                        _____

                        Rosemary M. Collyer, Judge
                        United States District Court for the
                        District of Columbia

Philip M. Musolino
*Musolino & Dessel*
1615 L Street, NW, Suite 440
Washington, DC 20036

Sylvia Rolinski
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854

Karen N. Walker
Eunnice H. Eun
Samantha A. Gingold
KIRKLAND & ELLIS L.L.P.
655 Fifteenth Street, N.W.
Washington, D.C. 20005

Brian D. Sieve
Stephanie A. Brennan
KIRKLAND & ELLIS L.L.P.
200 East Randolph Drive
Chicago, Illinois 60601

2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Stroitelstvo Bulgaria Ltd. | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 07cv00634 RMC |
| | : | |
| The Bulgarian-American Enterprise Fund, *et al.* | : | |
| Defendants. | : | |

## PLAINTIFF'S EXHIBITS IN OPPOSITION TO DEFENDANT BULGARIAN-AMERICAN ENTERPRISE FUND'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO FEDERAL RULE 12(b)(6)

| | |
|---|---|
| Exhibit 1A | Deposition Transcript of Nancy Shiller |
| Exhibit 1B | Board of Directors List from BAEF Website |
| Exhibit 2 | Deposition Transcript of Silvy Chernev |
| Exhibit 3 | Deposition Transcript of Vladimir Stefanov Skochev |
| Exhibit 4 | Deposition Transcript of Professor Maria Slavova |
| Exhibit 5 | BAEF 2004 Annual Report |

# EXHIBIT 1A

Capital Reporting Company

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


-----------------------------:

STROITELSTVO BULGARIA, LTD   :

                             :

     Plaintiff,              :

vs.                          : Case No.:

                             : 1:07-cv-00634

THE BULGARIAN-AMERICAN       :

ENTERPRISE FUND, et al       :

                             :

     Defendant.              :

-----------------------------:


                          Washington D.C.

               Thursday, November 15, 2007


Telephone deposition of:

                    NANCY SCHILLER

called for oral examination by counsel for

Plaintiff, pursuant to notice, at the offices

of Musolino & Dessel, 1615 L Street, N.W.,

Suite 440, Washinton, D.C., before Jodi Scheffel,

a Notary Public in and for the District of

Columbia, beginning at 12:40 p.m., When were

present on behalf of the parties:


**(866) 448-DEPO**
**www.capitalreportingcompany.com**

EXHIBIT

A

PENGAD 800-631-6989

**Capital Reporting Company**

Page 2

APPEARANCES

On behalf of the Plaintiff:
PHILIP M. MUSOLINO, ESQUIRE
Musolino & Dessel
1615 L Street, N.W.
Suite 440
Washington, D.C. 20036
(202) 466-3883

On behalf of the Defendant:
(via telephone)

EUNNICE EUN, ESQUIRE
Kirkland & Ellis, LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5159

* * * * *

Page 3

CONTENTS

EXAMINATION BY:                    PAGE
Counsel for Plaintiff              4

EXHIBITS

PLAINTIFF'S DEPOSITION EXHIBITS:
1 Declaration of Nancy Schiller        43
2 Bulgarian Advisory Board Members     43
3 10/26/07 Letter                      43

(*Exhibits attached to transcript.)

Page 4

PROCEEDINGS
Whereupon,
NANCY SCHILLER,
called as a witness, and having been first duly
sworn, was examined and testified as follows:
MR. MUSOLINO: Good afternoon, my name is
Phil Musolino, counsel for Plaintiff, Stroitelstvo
Bulgaria versus Bulgarian-American Enterprise Fund,
Case Number 07-cv-00634 in the District of
Columbia, United States District Court.
Ms. Schiller, good morning. We're here
for your deposition.
Eunnice, if you could identify yourself.
MS. EUN: Eunnice Eun from Kirkland &
Ellis, counsel for The Bulgarian-American
Enterprise Fund.
MR. MUSOLINO: Thank you, Eunnice. I'm
counsel for Plaintiff in this case.
EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. MUSOLINO:
Q  Ms. Schiller, let me ask you if you could
just put your name and spell it for us on the

Page 5

record, please.
A  Nancy Schiller, N-a-n-c-y, Schiller,
S-c-h-i-l-l-e-r.
Q  Thank you, Ms. Schiller. And you're the
managing director of the Bulgarian-American
Enterprise Fund?
A  Yes.
Q  Can I, for convenience, refer to that as
BAEF during the course of this deposition? Would
that be all right with you?
A  Yes.
Q  Can I ask you what your responsibilities,
just broadly, are as managing director?
A  I interact and respond to the Board of
Directors, I deal with human relations issues,
human resources issues, and I do government
relations.
Q  And are you familiar at least with the
fact that there's some litigation between
Stroitelstvo Bulgaria and BAEF?
A  I've been made aware of it, yes.
Q  You, in the course of that litigation,

2  (Pages 2 to 5)

**Page 6**

1  signed a declaration dated August 6, 2007; is that
2  correct?
3     A   Yes.
4     Q   Do you have a copy of that declaration in
5  front of you?
6     A   Yes, I do.
7     Q   If I refer to the declaration, that's
8  what I'll be referring to. I'm not going to have
9  it marked as an exhibit. Your declaration reflects
10  that you've been the managing director for 15
11  years. Does that take us back to when or a little
12  after BAEF was formed in Delaware?
13     MS. EUN: Objection; vague.
14  BY MR. MUSOLINO:
15     Q   When was your actual starting time with
16  BAEF?
17     A   January 15th, 1992.
18     Q   1992, all right. Had BAEF already been
19  formed at that time?
20     MS. EUN: Objection; vague.
21  BY MR. MUSOLINO:
22     Q   Do you know the answer to that, though?

**Page 7**

1  At the time you started had BAEF been incorporated
2  in Delaware?
3     A   Yes.
4     Q   Was your starting position managing
5  director or did you start as something else?
6     A   I started as director of finance and
7  administration.
8     Q   How long were you in that position?
9     A   Best I can recall it was about four
10  years. I could be wrong but roughly four years
11  before the title change.
12     Q   The title change was when; roughly 1995,
13  1996.
14     A   I would say that's roughly about correct.
15     Q   You were with BAEF when it got its
16  initial funding, I take it?
17     MS. EUN: Objection; vague.
18  BY MR. MUSOLINO:
19     Q   Is that right? Do you know what I'm
20  talking about when I say initial funding?
21     A   You're requesting to know when we first
22  got funding for the BAEF?

**Page 8**

1     Q   Well, I'm asking if you were there with
2  BAEF when it's got initial funding with or through
3  USAID?
4     A   I was there when we received our initial
5  funding.
6     Q   That was in 1992?
7     A   Correct.
8     Q   Was it in the approximate amount of
9  58 million dollars?
10     A   No.
11     Q   How many was the initial funding for, do
12  you remember, in 1992?
13     A   The initial grant was for 55 million
14  dollars.
15     Q   Was there any additional funding received
16  by BAEF, other than that initial grant?
17     A   There was subsequent modification of
18  approximately three million dollars.
19     Q   When you say "modification", was that
20  additional funding or was that in the form of an
21  additional grants or a loan, if you know?
22     MS. EUN: Objection; compound.

**Page 9**

1     Just to be clear, you can answer the
2  question when I object. I'm just going to
3  interject periodically with objections.
4     A   It was an additional grant.
5     Q   As I understand your declaration, BAEF
6  has not received any funding in the last five years
7  from USAID. Is that a fair statement?
8     A   Yes.
9     Q   You are not employed, are you, by the
10  Bulgarian-American Credit Bank; are you?
11     A   I am not.
12     Q   You know what the Bulgarian-American
13  Credit Bank is, though, correct?
14     A   Yes, I do.
15     Q   For purposes of this deposition, if we
16  just refer to it as the bank, is that agreeable to
17  you?
18     A   Yes.
19     Q   In your declaration you say you're
20  managing director for BAEF in the Chicago, Illinois
21  office at paragraph two. Is that where you spend
22  your day-to-day activities in Chicago, or are you

3 (Pages 6 to 9)

Page 10

1  located in elsewhere?
2      A   I am now located in Charlottesville,
3  Virginia.
4      Q   Do you conduct business for BAEF out of
5  Charlottesville.
6      A   Yes, I do.
7      Q   Do you also travel to Chicago on occasion
8  to transact BAEF business?
9      A   Yes.
10     Q   What's the breakdown, if you can tell me,
11 over the course of an average month?  How often
12 would you be in Virginia?  How often would you be
13 in Chicago?  Can you give me a rough approximation?
14     A   I couldn't really do that by month, but I
15 could say that I travel to Chicago approximately
16 six times a year for business.
17     Q   And you also travel to Washington on
18 occasion for BAEF business?
19         MS. EUN:  Objection; vague.
20     A   I travel occasionally to Washington for
21 fund meetings.
22     Q   In the course of this litigation, have

Page 11

1  you been asked -- just answer this question yes or
2  no without giving me the details -- have you been
3  asked to assemble some travel and lodging records
4  to see who from BAEF has traveled to Washington in
5  the period of time from 2005 through 2007?
6          MS. EUN:  I'm just going to instruct the
7  witness to not reveal any privileged communication
8  in answering the question.
9          You can go ahead and answer.
10     A   Yes.
11     Q   Do you have in front of you a letter from
12 Eunnice to me dated October 26, 2007?
13     A   Yes.
14     Q   Is attached to that letter documents that
15 are Bates stamped 0001, 0002, 3, 4 and 5?  Is that
16 what you have in front you?
17     A   Yes.
18     Q   The Bates stamp numbers 01 through 05,
19 did you participate in the search for and the
20 assembly of that information?
21     A   Yes.
22     Q   Would it be correct to say that to the

Page 12

1  best of your ability you've assembled the
2  information among BAEF's records that would show
3  travel to Washington and lodging in Washington over
4  the period of time we're talking about?
5      A   Yes.
6      Q   On the cover letter, the October 26, 2007
7  cover letter, there's some information with respect
8  to the dates and locations of BAEF's reports to
9  USAID.  Do you see that?
10     A   Yes.
11     Q   Did that information come from you?  Do
12 you see the six days there that have bullet points
13 after them?
14     A   Yes.
15     Q   That information came from you also.  Let
16 me ask you a question about these reports.  Are
17 they typically oral reports or written reports?
18         MS. EUN:  Objection; vague.
19         MR. MUSOLINO:  I'll rephrase it.
20 BY MR. MUSOLINO:
21     Q   Your declaration suggests that BAEF files
22 semiannually or makes semiannual reports to USAID.

Page 13

1  Is that accurate as best you recollect?
2      A   As best I recollect, yes.
3      Q   Give or take a month or two since 2005,
4  has BAEF, in fact, provided those reports to USAA?
5      A   Yes.
6      Q   Typically, the reports seem to be done
7  in -- one in March and one in September.  Is that
8  generally what takes place?
9      A   Generally.
10     Q   And there was one in June of 2006 that, I
11 take it, was the first half 2006 report that would
12 otherwise have been done in March; is that fair?
13     A   I don't know that it would otherwise have
14 been done in March, but it was scheduled for June
15 and did not take place.
16     Q   When you say scheduled for June, who did
17 the scheduling; do you know?  Is it done by USAID?
18 Is it done by BAEF?  Is it jointly done?
19         MS. EUN:  Objection; compound.
20         You can answer.
21     A   We have our Board meetings.  USAID tries
22 to accommodate our schedule and come to us when we

4  (Pages 10 to 13)

**Capital Reporting Company**

| Page 14 | Page 16 |
|---|---|
| 1 have Board members present. They try to work | 1     MS. EUN: Okay. We're there. |
| 2 within our schedule. | 2 BY MR. MUSOLINO: |
| 3   Q All three of the September meetings or | 3   Q Ms. Schiller, do you have in front of you |
| 4 reports are identified as having taken place in | 4 now a screen from BAEF's Web site? |
| 5 Sofia, Bulgaria. Do you see that on the cover | 5   A I do. |
| 6 letter? | 6   Q And do you see the Board of Directors |
| 7   A Yes. | 7 list on the left-hand side of that screen? |
| 8   Q Typically, does BAEF have a Board meeting | 8   A I do, yes. |
| 9 in Bulgaria in September of each year? | 9   Q I don't want you to take an hour doing |
| 10   A Yes. | 10 this but, generally, does that look like an |
| 11   Q Do you attend those Board meetings | 11 accurate description of the members of the Board or |
| 12 yourself? | 12 identification of the members of the Board as it's |
| 13   A Yes. | 13 currently constituted? |
| 14   Q There is a list on your Web site of your | 14   A The Board of Directors listing is |
| 15 Board of Directors. Have you had a chance to look | 15 correct. |
| 16 at your Web site recently to see if the | 16   Q On the right-hand side of that screen |
| 17 identification of the Board of Directors is | 17 you'll see something called Bulgarian Advisory |
| 18 accurate? | 18 Board Members and there are a series of names |
| 19   A I have not looked at the Web site for | 19 beginning with Valentine, V-a-l-e-n-t-i-n-e, |
| 20 quite some time, so I can't state that it's | 20 Braykov, B-r-a-y-k-o-v. Do those names look to be |
| 21 accurate. | 21 correct so far as you know? |
| 22   Q Let me run down some names quickly for | 22   A There are two members of the Advisory |

| Page 15 | Page 17 |
|---|---|
| 1 you and we can just see if these sound familiar to | 1 Board. |
| 2 you under Board of Directors -- the court reporter | 2   Q And that would be Braykov, B-r-a-y-k-o-v |
| 3 has a copy of this but I'll spell it out anyway -- | 3 and Penko, P-e-n-k-o, Dinev, D-i-n-e-v? |
| 4 Stephen, S-t-e-p-h-e-n, middle initial W, Filo -- I | 4   A Yes. |
| 5 may be mispronouncing that -- | 5   Q Do you deal with the Advisory Board in |
| 6   A Filo. | 6 the course of your responsibilities as managing |
| 7   Q -- Filo, F-i-l-o, is listed as the | 7 director? |
| 8 chairman. Is that correct, do you know, to this | 8     MS. EUN: Objection; vague. |
| 9 day? | 9   A I do. |
| 10   A It is. | 10   Q Are both of those members of the Advisory |
| 11     MS. EUN: Phil, why don't I inject here. | 11 Board located in Bulgaria? |
| 12 Actually, if you could give us the Web site, the | 12   A No. |
| 13 actual Web page that you're looking at -- | 13   Q Is Braykov located in Sofia, Bulgaria? |
| 14     MR. MUSOLINO: Sure. | 14   A Yes. |
| 15     MS. EUN: -- so we can have it on the | 15   Q What about Dinev, D-i-n-e-v? |
| 16 record and also so that we can look at it. That | 16   A He's not in Bulgaria. |
| 17 might make it easier, too. | 17   Q He's in Eastern Europe somewhere but not |
| 18     MR. MUSOLINO: It's www.baefinvest -- in | 18 Bulgaria? |
| 19 other words, baefinvest.com and there's a like to | 19   A No. He's not in Eastern Europe. |
| 20 the Board off on the left side. Do you want to | 20   Q Where is he? |
| 21 pull that up, Eunnice, before we go on. That will | 21   A He's in Vienna. |
| 22 make it a lot easier. | 22   Q There's another heading here, management. |

5 (Pages 14 to 17)

**Capital Reporting Company**

Page 18

1    Management. Do you see that?
2        A   I do.
3        Q   Is that management of BAEF? Is that what
4    that indicates?
5        A   No. It's overall management, not just of
6    BAEF.
7        Q   It's management -- when you say overall,
8    BAEF, what other entities?
9        A   It's the bank.
10       Q   Your name is here as managing director
11   but you're not managing director of the bank,
12   correct?
13       A   Correct; I am not.
14       Q   Can I assume that where we see management
15   and it refers to the management of the Bulgarian
16   American Bank, that person is identified as such
17   under his or her name? For instance, under Dimiter
18   S. Voutchev, D-i-m-i-t-e-r, middle initial S,
19   V-o-u-t-c-h-e-v, it says Executive Director
20   Bulgarian American Credit Bank, if there is no
21   reference to Bulgarian American Credit Bank on this
22   list, should we assume it's a reference to

Page 19

1    responsibilities for BAEF only?
2        A   Yes.
3        Q   Do you know who the directors are of the
4    bank?
5        A   I do not know all of the directors of the
6    bank.
7        Q   Are any of the members of the BAEF Board
8    of Directors also a member of the bank's Board of
9    Directors; do you know?
10       A   The bank does not have a Board of
11   Directors.
12       Q   Well, how are its operations directed
13   then if not by the Board of Directors?
14       A   There is a Supervisory Board.
15       Q   And do you know who the members of the
16   bank's Supervisory Board are?
17       A   I do not know the complete list. I know
18   some of them.
19       Q   Are any of the members of the BAEF Board
20   on the Supervisory Board of the bank?
21       A   Yes.
22       Q   On this list can you tell me, with any

Page 20

1    degree of confidence, which of the members of the
2    BAEF Board of Directors are on the bank's
3    Supervisory Board?
4        MS. EUN:   Objection; vague. Just to
5    clarify, the list that you're referring to is on
6    the Web site, the Bulgarian-American Enterprise
7    Fund.
8        MR. MUSOLINO:   That's right, Eunnice,
9    thank you.
10   BY MR. MUSOLINO:
11       Q   With that clarification, Ms. Schiller,
12   can you go down that list and tell me who on the
13   list of the Board of Directors as enumerated
14   operate on the Web site is also a member of the
15   Supervisory Board of the bank?
16       A   To the best of my knowledge, it's Steve
17   Filo and Marshall Lee Miller.
18       Q   Are there additional members of the
19   bank's Supervisory Board who are not members of the
20   BAEF's Board of Directors?
21       A   Yes.
22       Q   Do you know how many?

Page 21

1        A   I believe there's one more.
2        Q   Do you know who that is?
3        A   Yes, and I'm trying to recall his name.
4    He's a new member. I'll remember before the end of
5    our conversation.
6        Q   Over the course of your time as managing
7    director, let's say of BAEF since the bank's
8    formation, has BAEF always had two out of three --
9    let me rephrase that. Since the bank was formed,
10   has the Supervisory Board of the bank always been
11   comprised of two members who are also members of
12   the BAEF Board of Directors?
13       A   I can't answer that because I can't
14   recall back, in the formative stages, if the
15   structure was the same or not.
16       Q   In the last five years or so has that
17   been the case, though.
18       A   I could probably answer to the last three
19   to four years that that's been the case, but I
20   cannot state beyond that with confidence.
21       Q   Is it fair to say that the bank commenced
22   its operations in 1997?

6 (Pages 18 to 21)

Page 22

1     A    Yes.
2     Q    And BAEF was a 99.99 percent shareholder
3  at least at the time of the bank's formation. Does
4  that sound right to you?
5     A    Yes.
6     Q    Plaintiffs allege that BAEF described the
7  bank as -- and this is a quote -- it's -- meaning
8  BAEF's -- major operational subsidiary. Does that
9  sound like an accurate description of the bank as
10  it related to BAEF? The phrase was major
11  operational subsidiary. Does that sound right?
12     A    Yes.
13     Q    I take it BAEF doesn't have an interest
14  in any other banks in Eastern Europe. Is that
15  correct or not correct?
16        MS. EUN: Objection; vague.
17     A    Correct.
18     Q    Is it fair to characterize the bank
19  currently as the principal asset of BAEF?
20        MS. EUN: Objection; vague.
21     A    Yes.
22     Q    Does BAEF file -- BAEF is a for profit

Page 23

1  corporation, correct?
2     A    No.
3     Q    Oh, it's not for profit?
4     A    Yes, 501c3.
5     Q    Does it file annual reports -- let me ask
6  you this -- does it file reports, other than it's
7  reports with USAID, with any other federal agency?
8        MS. EUN: Objection; vague.
9     A    BIRS.
10     Q    I take it those are annual 501c3 filings?
11     A    Yes.
12     Q    Do you play any role at all in the
13  preparation of those filings?
14        MS. EUN: Objection; vague.
15     A    A minor role.
16     Q    Who would principally be responsible for
17  that at BAEF?
18     A    The chief financial officer.
19     Q    Do you know whether the bank files annual
20  reports or statements with any Bulgarian government
21  agency?
22     A    I don't have a role in that. I don't

Page 24

1  know what reports they're required to file. I
2  would presume there's legislation that states what
3  they have to file.
4     Q    You wouldn't be involved in that at all?
5     A    I am not involved in that.
6     Q    Have you seen the tax forms that get
7  filed by BAEF annually?
8        MS. EUN: Objection; vague.
9     A    Yes.
10     Q    Do they disclose, if you know, income
11  received by the bank?
12     A    I don't know that it singles out the
13  bank. I can't recall. It does state the Fund's
14  income.
15     Q    All right. And the Fund's income, I take
16  it, includes income received by the bank?
17     A    That's a general statement that's not
18  factually correct.
19     Q    Tell me what's wrong with it.
20     A    What's wrong with it is we don't receive
21  the bank's income. The bank pays us back for the
22  loans.

Page 25

1     Q    Thank you. So BAEF receives the grant
2  from USAID and BAEF, in turn, loaned money to the
3  bank. Is that how it worked at the beginning? I
4  should say -- let me rephrase it. Is that how it
5  worked in 1997?
6        MS. EUN: Objection; misstates testimony.
7     A    If you're talking about 1997, it was an
8  equity investment and loans.
9     Q    So the equity investment and the loans
10  were financed by the grant from USAID, correct?
11     A    They were financed by the Bulgarian-
12  American Enterprise Fund.
13     Q    Which in turn, I take it -- well, let me
14  ask you, did it have a source of income or assets
15  or funds other than the grants that it received via
16  through USAID?
17     A    Yes.
18     Q    Can you just tell me generally what that
19  source is or that source was?
20     A    There are other multi-national lending
21  agencies.
22     Q    When the bank was formed in 1997, BAEF

7 (Pages 22 to 25)

Page 26

1 took both an equity interest in the bank as we
2 previously described and was a creditor or lender
3 for the bank, correct?
4    A   Yes.
5    Q   The loans that were made or the loan that
6 was made by BAEF to the bank in 1997, has any of
7 them been paid off?
8        MS. EUN: Objection; vague.
9    A   Yes, I believe so.
10   Q   Is this an area a little bit outside of
11 your area of familiarity? I won't pursue it if you
12 feel you have to guess a little bit.
13   A   I won't guess. It is not within my areas
14 of responsibility.
15   Q   Does the bank currently have any
16 outstanding obligations, current or not current, to
17 BAEF in the form of a loan?
18   A   Yes.
19   Q   Do you happen to know the amount that's
20 outstanding, the unpaid principal balance?
21   A   No.
22   Q   Do you know whether those loans are

Page 27

1 secured by anything or are they unsecured?
2        MS. EUN: Objection; vague.
3    A   I believe they're unsecured, but I cannot
4 state that factually.
5    Q   Do you know whether any consolidated
6 financial statements are filed by and between both
7 the bank and BAEF? By that, I mean, a single
8 financial statement setting out the financial
9 status of both the bank and BAEF?
10       MS. EUN: Objection; vague.
11   A   The Fund and the bank have separate
12 audits.
13   Q   Can you tell me who audits for the Fund?
14   A   The Fund is now -- we've changed. I'm
15 not recalling if it's PWC or Deloitte. I would
16 have to look.
17   Q   Do you know who does the audit for the
18 bank?
19   A   I believe it's Deloitte.
20   Q   So far as you know, there's no
21 consolidated financial statement produced for both
22 the bank and the Fund; is that fair?

Page 28

1    A   The Fund does include the bank's
2 statement in the back of its financial statement.
3    Q   Does the bank include the financial
4 statement of any other entities but the bank and,
5 of course, itself?
6        MS. EUN: Objection; foundation.
7    A   Repeat your question, please?
8    Q   Sure.
9    A   I want to go back, if I might, before you
10 repeat. It's Deloitte that's doing that BAEF
11 audit.
12   Q   Okay, thanks. The BAEF audit, you said,
13 includes the financial statement of the bank?
14   A   Yes.
15   Q   Does it also include any financial
16 statements from any other entities or is it just
17 the bank and, of course, it's own statement?
18   A   It's just the bank.
19   Q   In the reports, the semiannual reports to
20 USAID, can you just broadly tell me what kind of
21 information gets communicated to USAID?
22   A   We provide them with the Fund's

Page 29

1 financial statements, any major accomplishments
2 that took place during the prior six months, and
3 any political developments that might be of
4 interest or that might impact the ability to do
5 business in the country.
6    Q   If you look at the October 26, 2007
7 letter where it refers to the March 28, 2007
8 report, it says conducted by phone. Do you see
9 that?
10   A   Yes.
11   Q   So I take it that on occasion these
12 reports are not written reports. They're oral
13 reports either delivered by phone or face-to-face,
14 as opposed to a written report?
15   A   They are written reports that we then
16 discuss either by phone or in person.
17   Q   I see. So there is a semiannual written
18 report that BAEF submits to USAID, right?
19   A   Yes.
20   Q   How do you transmit them to USAID? Do
21 you mail them?
22   A   Mail them.

8 (Pages 26 to 29)

## Page 30

1  Q  Do you mail them to the Sofia office of
2  USAID or the D.C. office or some other office?
3  A  Both.
4  Q  You mean, each semiannual report goes
5  both places?
6  A  Yes.
7  Q  Is there a particular person at USAID who
8  is now the contact person for these reports?
9  A  Yes.
10  Q  Who would that be?
11  A  His name is Steve Eastham, E-a-s-t-h-a-m.
12  Q  E-a-s-t-h --
13  A  -- a-m.
14  Q  -- h-a-m. And he's located at USAID's
15  office here in Washington?
16  A  Yes.
17  Q  I take it then he got a copy of the
18  March 8, 2007 -- let me just say he got a copy of
19  the March 2007 report, right?
20  A  Yes.
21  Q  And who is currently at the USAID office
22  in Sofia to whom you would get in touch if you had

## Page 31

1  a matter to discuss with respect to the reports
2  themselves?
3  A  As of October, AID no longer has a
4  presence in Bulgaria.
5  Q  Oh, okay. Is there an office anywhere in
6  Eastern Europe, a USAID office in Eastern Europe
7  that's going to be your contact office?
8  A  Well, contact office, there is really no
9  contact outside of sending the report. There would
10  be really no need.
11  Q  When BAEF wanted to communicate with
12  USAID, would it typically communicate with the
13  office in Washington?
14        MS. EUN: Objection; vague.
15  A  It would depend on the subject matter.
16  Q  If the subject matter is the semiannual
17  report, would it typically contact someone in
18  Washington at USAID?
19        MS. EUN: Objection; asked and answered.
20  A  We would submit the report to USAID in
21  Washington and in Bulgaria. There were really no
22  questions that we would have with regard to it.

## Page 32

1  Q  How often would you say you are in, say,
2  telephonic communication with USAID over the course
3  of a month or so if at all?
4  A  Regarding what topic?
5  Q  BAEF or the bank.
6  A  Never for the bank. That's not my role.
7  Q  What about BAEF?
8  A  Infrequently.
9  Q  Is there any way you can be more
10  specific, or is that as far as you feel comfortable
11  going?
12  A  That's about as comfortable as I feel I
13  should answer.
14  Q  Do you communicate in writing -- by "you"
15  I mean, you not BAEF generally -- do you
16  communicate in writing with USAID's office in
17  Washington other than what you've already described
18  with respect to these reports?
19        MS. EUN: Objection; vague.
20  A  Not with regard to the Fund's business,
21  no.
22  Q  What other reason would you have to

## Page 33

1  communicate with USAID; for another business?
2  A  Yes.
3  Q  You're full time with the Fund, correct?
4  A  No.
5  Q  Oh, you're not. Are you part time?
6  A  Yes.
7  Q  Can you tell me how many employees the
8  Fund has in Chicago who are full time?
9  A  Zero.
10  Q  Can you tell me how many employees the
11  Fund has in Chicago who are part time?
12  A  One.
13  Q  And that would be who?
14  A  Trudy Genitis, Office Administrator.
15  Q  How many full time employees does the
16  Fund have outside of Chicago in the United States?
17  A  Did you ask me full time?
18  Q  Yes.
19  A  Zero.
20  Q  Are you the only part-time employee
21  outside of Chicago for the Fund?
22  A  Yes.

9 (Pages 30 to 33)

Page 34

1    Q   Do you know how many employees the Fund
2   has in full time or part time in Bulgaria?
3    A   Are you asking me about persons or
4   Bulgarians or both?
5    Q   Well, that's a good question. Let's try
6   the entire -- let's try all, both American's and
7   Bulgarians.
8    A   For the Fund?
9    Q   For the Fund, right.
10   A   I'm not exactly correct on this, but I
11  would guess it's no more than 10.
12   Q   Of those 10 -- and I know you're just
13  approximating and that's fine -- can you tell me
14  about how many of those employees would be
15  Bulgarian nationals?
16   A   Seven.
17   Q   Of those 10 employees, can you tell me
18  how many of them also are employed by the bank?
19   A   None.
20   Q   So there are -- let me make sure I
21  understood this -- there are approximately 10 full-
22  time Fund employees in -- I take it they're in

Page 35

1   Sofia, Bulgaria?
2    A   Yes.
3    Q   -- in Sofia Bulgaria, none of whom are
4   also employed by the bank. Did I get that right?
5    A   Yes.
6    Q   This March 28, 2007 report conducted by
7   phone, were you a participant in that phone
8   conversation?
9    A   Yes.
10   Q   Was there any discussion at all, to the
11  best of your recollection, about the bank's
12  operations?
13   A   Limited, if any, about the bank.
14   Q   Did you have any counsel on the phone for
15  that conversation, any lawyers, for either the bank
16  or anyone?
17   A   No.
18   Q   Was there any discussion -- and I'm not
19  going to press this -- but as a general subject did
20  this lawsuit come up?
21   A   We weren't aware of it in March 2007, to
22  my recollection.

Page 36

1    Q   In the course of that telephone
2   conversation, was there any discussion at all about
3   any individual transactions by the bank?
4    A   No.
5    Q   As I understand your declaration, you
6   weren't aware of the particular transaction that's
7   discussed in this lawsuit until such time as you or
8   BAEF received a copy of the complaint, I think it
9   is, from in-house counsel for the bank, correct?
10       MS. EUN: Objection. That misstates the
11  declaration. The declaration actually states that
12  the Fund, BAEF, was unaware of the transaction
13  prior to receiving notice of the lawsuit, not Nancy
14  Schiller personally, which was your question.
15       MR. MUSOLINO: That's fine.
16  BY MR. MUSOLINO:
17   Q   Let's look at paragraph eight of your
18  declaration. Do you have it? It's on page three.
19   A   Yes.
20   Q   The first line says the bank operates
21  independently from BAEF. Do you see that?
22   A   Yes.

Page 37

1    Q   You think that's an accurate sentence,
2   right?
3    A   Yes.
4    Q   When you say operates independently, I
5   take it you mean that the bank -- well, let me ask
6   you, what did you mean when you wrote the bank
7   operates independently from BAEF?
8        MS. EUN: Objection; vague.
9    A   The bank is a separate entity. It is a
10  Bulgarian corporation. It has its own management
11  and it operates independent of the Fund.
12   Q   Meaning that the bank can make its own
13  loans without approval from the Fund, among other
14  things, correct.
15   A   Yes.
16   Q   Are you familiar with whatever
17  underwriting requirements, if any, the bank has for
18  purposes of the loans it makes? By "you", I just
19  mean you yourself, not BAEF.
20   A   I am not familiar with their
21  documentation and what they go through in
22  underwriting their loans.

10   (Pages 34 to 37)

**Capital Reporting Company**

Page 38

1    Q    Your next sentence reads, among other
2    things, BAEF is not involved in the bank's loan
3    transactions. Do you see that sentence?
4    A    Yes.
5    Q    You think that's correct also, right?
6    A    Yes.
7    Q    Do you know whether, at any point, the
8    bank reports to BAEF about individual loan
9    transactions?
10    A    On occasion there might be a situation
11    where the bank will tell us if there's a troubled
12    loan of a significant size.
13    Q    Why would they report that to BAEF; do
14    you know?
15        MS. EUN: Objection; foundation.
16    A    It's a significant size. It could have
17    an impact on their financial statements.
18    Q    Do you know -- well, let me ask you this:
19    Have you had a chance to read the complaint in this
20    case, in our case here?
21    A    Yes.
22    Q    Can you tell me whether the loans that

Page 39

1    are discussed in this lawsuit, if you know, would
2    have fallen into that category of the type of loan
3    that might be discussed or might be reported by the
4    bank to BAEF?
5        MS. EUN: Objection; vague.
6    A    No.
7    Q    Because of the loan size?
8    A    Yes.
9    Q    Is there a threshold amount that
10    typically would trigger that kind of report, that
11    is a report of a nonperforming -- my word, not your
12    word -- or a trouble loan?
13        MS. EUN: Objection; vague.
14    A    Typically if it's over one million euro.
15    Q    The sentence that begins with, in fact,
16    BAEF was unaware of that particular loan -- now
17    we're talking about the loan that's in the
18    lawsuit -- and any of its details prior to
19    receiving notice of the lawsuit. Do you see that
20    sentence? Do you believe that sentence is
21    accurate?
22    A    Yes.

Page 40

1    Q    It also says, BAEF maintains no files or
2    records related to the bank's specific loan
3    transactions including this one. Does that seem
4    correct to you?
5    A    Yes.
6    Q    I take it -- let me ask you this
7    question: Does BAEF maintain anywhere in the U.S.
8    any broader records about bank loan transactions as
9    opposed to records related to a specific
10    transaction?
11        MS. EUN: Objection; vague.
12    A    Rephrase the question. I don't really
13    understand it.
14    Q    Well, let me give you an example. It
15    might be better. Does BAEF maintain, anywhere in
16    the United States, records which, for instance,
17    would identify the number of loans that the bank
18    has made in a given year, or the total amount of
19    loans that bank has made in a given year, or the
20    percentage of non-performing loans, those kinds of
21    broader statistical bits of information?
22        MS. EUN: Objection; foundation.

Page 41

1    A    No, not specific.
2    Q    What type of information, if any, does
3    BAEF maintain about the bank's loan portfolio?
4        MS. EUN: Objection; vague.
5    A    We don't maintain records about its
6    portfolio.
7    Q    At all. So if you wanted to find out how
8    many loans the bank was currently servicing, how
9    would you find that out?
10        MS. EUN: Objection; calls for
11    speculation.
12    A    I would speculate that I'd pick up the
13    phone and ask.
14    Q    Who would you ask?
15    A    I would likely call one of the executive
16    directors of the bank.
17    Q    In Sofia?
18    A    Yes.
19    Q    Do you know of any data that BAEF
20    maintains in the United States with respect to the
21    Bank's operations other than what you've already
22    described, mainly whatever goes in the USAID

11 (Pages 38 to 41)

**Capital Reporting Company**

Page 46

1  there a BAEF Board meeting taking place in Sofia,
2  Bulgaria in September 2007?
3      A   Yes.
4      Q   Sometime on September 18th, 2007, was
5  there a face-to-face meeting between BAEF and
6  someone from USAID?
7      MS. EUN: Phil, I'm going to ask if we
8  can take a quick break?
9      MR. MUSOLINO:  Yes.  Do you want to take
10  about five minutes?
11      MS. EUN: Let's just pause for a second.
12      (Recess taken.)
13      MS. EUN: We're ready to go now.
14  BY MR. MUSOLINO:
15      Q   On September 18th, 2007, was there a
16  face-to-face meeting between BAEF and USAID in
17  Sofia, Bulgaria?
18      A   Yes.
19      Q   The report, the semiannual report, was
20  given in that face-to-face meeting, correct?
21      A   That was actually given prior to the
22  meeting.

Page 47

1      Q   Oh, you mean, the actual written report
2  was handed over prior to the meeting and then you
3  discussed the report at the meeting?
4      A   Among other things, yes.
5      Q   Was this lawsuit among the subjects of
6  discussion at the September 2007 meeting?
7      A   No.
8      Q   Was there any discussion in the
9  September 2007 meeting about any individual loans
10  of the bank?
11      A   No.
12      Q   Did anyone from the bank attend the
13  September 2007 meeting?
14      A   No.
15      Q   Let me ask you about June 20, 2006.  Do
16  you see that entry; it says schedule for Chicago
17  cancelled?
18      A   Yes.
19      Q   Do you know who cancelled it?  Was it
20  USAID or was it BAEF?
21      A   USAID.
22      Q   I take it, consistent with your earlier

Page 48

1  testimony, a written report was transmitted to both
2  Sofia and to USAID's office in Washington,
3  correct?
4      A   Yes.
5      Q   Can you recall what was in that written
6  report?
7      A   The same --
8      Q   The same subject matter as you talked
9  about before?
10      A   The same subject matter as I talked about
11  earlier, yes.
12      Q   Can you look at the entry for
13  September 20, 2006 where it says Sofia, Bulgaria.
14  Same procedure; that is to say that the written
15  reports were delivered to Washington and Sofia and
16  then there was a face-to-face meeting in Sofia with
17  USAID?
18      A   Yes.
19      Q   March 30, 2005, it says package
20  submitted.  Do you know what that reference is?
21      A   The same report I referred to earlier.
22      Q   Package just refers to the report?

Page 49

1      A   Yes.
2      Q   September 30, 2005, same basic procedure
3  as in 2006 and 2007.  Is that a fair statement?
4      A   Yes.
5      Q   Can you turn to the attachment, to
6  Plaintiff's Exhibit No. 3.  I take it, if we look
7  at Bates stamps 1 through 5, these are typical
8  records maintained in the ordinary course of
9  business by BAEF, correct?
10      A   Yes.
11      Q   For the most part I guess these are all
12  expense reports, which typically reflect travel and
13  lodging expenses.
14      A   Yes.
15      Q   I'm just asking whether these are typical
16  records and your answer is yes, they are, right?
17      A   Yes, they are.
18      Q   And they reflect travel by Mr. Baur --
19  Frank. L. Bauer, B-a-u-e-r -- and you to
20  Washington, right?
21      A   Yes.
22      Q   The materials redacted out, I take it,

13 (Pages 46 to 49)

**(866) 448-DEPO**
**www.capitalreportingcompany.com**                    (C) 2007

Page 54

1  Q   Who did you meet with at Congress? Any
2  staffers or any representatives or senators?
3  A   Representative Colby.
4  Q   Who from BAEF was in attendance generally
5  on this trip. I see your initials and then I
6  see --
7  A   Myself, Joseph Borgatti, Carl
8  Pforzheimer, Steve Filo and Gary MacDougal.
9  Q   And you're getting all of that from
10 reading these notes, right?
11 A   From reading my notes and from my
12 recollection.
13 Q   I don't see separate expense reports for
14 some of those people. Is that because they didn't
15 make any expense claims; do you know?
16 A   I paid for their hotel accommodations and
17 their meals to allow them not to have to file
18 reports.
19 Q   Oh, good, okay. Do you remember
20 specifically what the subject was for that trip?
21 A   It was to discuss the Foundation's
22 purposes and financing.

Page 55

1  Q   What particularly about the financing was
2  discussed in this trip?
3  A   We were talking about whether the
4  Foundation would receive 100 percent of the Fund's
5  proceeds or a lesser amount.
6  Q   Which Funds, though? When you say
7  100 percent of the proceeds, what proceeds are you
8  talking about?
9  A   Of the Bulgarian-American Enterprise
10 Fund.
11 Q   Now, you've lost me. You were at a
12 meeting with -- was that subject included among
13 your discussions with the Congressman?
14 A   Yes.
15 Q   When you say 100 percent, what were the
16 alternatives to the Fund receiving 100 percent?
17 MS. EUN: Objection; misstates testimony.
18 MR. MUSOLINO: I may have misunderstood.
19 BY MR. MUSOLINO:
20 Q   You said you were discussing funding. I
21 thought you said you were discussing whether the
22 Fund would receive 100 percent of something?

Page 56

1  A   The Foundation --
2  Q   The Foundation, okay.
3  A   -- would receive 100 percent of the
4  Fund's proceeds or a lesser amount.
5  Q   And the Foundation is what?
6  A   The foundation is the America for
7  Bulgaria Foundation, which will be the legacy
8  institution that survives the Fund.
9  Q   Is the Fund wrapping up?
10 MS. EUN: Objection, vague.
11 A   Yes.
12 Q   Does it have a termination or a closing
13 date?
14 A   It has a termination commencement date
15 but not a date certain as to when we will dispose
16 of our assets.
17 Q   When is the termination commencement
18 date?
19 A   September 30th, 2006.
20 Q   So you're in the process of terminating,
21 the Fund is?
22 A   Correct.

Page 57

1  Q   Can you tell me whether the directors who
2  operate the successor legacy organization, the
3  Foundation, will be similar to the current Board of
4  BAEF?
5  MS. EUN: Objection; vague and
6  foundation.
7  A   Yes, there will be a similar Board.
8  Q   Can you tell me what the reason is for
9  the change?
10 A   The reason -- it's not a change. It's an
11 evolution that is part of what we planed on -- "we"
12 being the Fund -- as we wind down. The question
13 is, after investing in Bulgaria for the past 15
14 plus years with U.S. taxpayer dollars and doing it
15 at a profit, is it justified to take all of those
16 funds back out of Bulgaria and return them to the
17 U.S. Treasury. The Answer, if you were to ask our
18 Board, if you were to ask the State Department and
19 if you were to ask the Bulgarian representatives,
20 would be no because the profits were made in
21 Bulgaria.
22 The purpose of this meeting was to

15 (Pages 54 to 57)

Page 58

1 discuss how much of the Fund's returns remain in
2 Bulgaria as part of this Foundation and how much go
3 back to the United States.
4 Q Has that decision been made now?
5 A It's not final but we're approaching that
6 answer.
7 Q When you were discussing the subject, did
8 anyone take into account or did anyone discuss a
9 return of the original grant amount of 55 million
10 plus?
11 MS. EUN: Objection; vague.
12 A Did anyone? Yes.
13 Q Was that part of the discussion mainly
14 that the U.S. taxpayer -- as you referred to him or
15 her -- should at least get back, in the form of
16 profits or otherwise, the initial grant?
17 MS. EUN: Objection; misstates testimony.
18 A Could you restate that, please.
19 Q Sure. In the course of the discussion,
20 did someone -- you or the Congressman or someone
21 else -- suggest that before a decision is made to
22 leave some of these funds or proceeds in Bulgaria,

Page 59

1 the initial funding should be returned to the
2 United States?
3 MS. EUN: Objection; misstates testimony.
4 A That was one course of discussion that
5 the parties had that was a consideration. The
6 question is, is it all or part.
7 Q When do you think the final decision will
8 be made on the allocation of these proceeds?
9 A Very soon.
10 Q Within 12 months?
11 A I hope so. It's not over until it's
12 over, but I hope so.
13 Q Can you tell me, over the course of the
14 15 years of operations that you've described,
15 whether 55 million dollars in profits has been
16 received by BAEF?
17 MS. EUN: Objection; misstates testimony.
18 The witness testified that 55 million was the
19 grant --
20 MR. MUSOLINO: I know that.
21 MS. EUN: -- the original grant
22 agreement, not profit.

Page 60

1 MR. MUSOLINO: I know that.
2 BY MR. MUSOLINO:
3 Q Since there are profits being
4 generated -- at least sort of the colloquial sense
5 of the word -- my question was, was whether the
6 profits that have, in fact, been generated have
7 equalled the 55 million dollars that I understand
8 was the original grant amount?
9 A Are you asking me if we've made more than
10 we've spent?
11 Q Well, I guess I could have asked it that
12 way so I will.
13 A Then ask it that way and I will respond.
14 Q I will. Have you made more than you've
15 spent?
16 A Yes.
17 Q Have you made more in profits than
18 55 million dollars?
19 MS. EUN: Objection.
20 BY MR. MUSOLINO:
21 Q -- and when I say "you", I take it you
22 and I both understand we're referring to BAEF.

Page 61

1 correct?
2 A That's the only thing I'm referring to,
3 yes.
4 Q Can you say that BAEF's profit on its 15
5 years of operation has exceeded 55 million dollars?
6 A Yes.
7 Q Do you know what that number is?
8 A Not exactly, no.
9 Q Is it over 100 million?
10 A Possibly.
11 Q Is it possibly over 200 million?
12 A Possibly.
13 Q This may take me a while.
14 A I don't think it will take you a while.
15 You know, when you're dealing with fluid currencies
16 and you're dealing with fluid prices on stock
17 shares and things of that nature, I can't say
18 definitively what it is.
19 Q Under 500 million?
20 A Yes.
21 Q These profits that have been generated
22 over these 15 years, have they been primarily from

16 (Pages 58 to 61)

Page 62

1    the bank's operations?
2         MS. EUN: Objection; vague.
3         A    The majority is probably from the bank
4    but that could change.
5         Q    Let's go to the next exhibit or the next
6    Bates stamp number 0004. I'm showing the date at
7    the bottom when it was filled out of 12/20/06. Do
8    you see that?
9         A    Yes.
10        Q    It looks like you took a bus up to
11   Washington; is that right?
12        A    I did.
13        Q    Is that also for a trip that was for
14   meetings with the State Department and/or USAID?
15        A    Yes, regarding the Foundation.
16        Q    And that took place it looks like, if I
17   read this right, in October of 2006; is that right?
18        A    Yes.
19        Q    At this meeting was the same subject
20   matter generally discussed, in this case, the
21   transition or the evolution from the Fund to the
22   Foundation?

Page 63

1         A    It was regarding the return of funding
2    and the amount that the Foundation would retain.
3         Q    The amount that the Foundation would
4    receive or that the Fund --
5         A    The amount that the Foundation would
6    receive from the Fund and retain -- I'm sorry, I
7    may be confusing the language there -- that the
8    Fund would provide to the Foundation.
9         Q    Okay. To the extent that the Fund has
10   cash, does it maintain its cash in accounts in
11   Chicago?
12        MS. EUN: Objection; vague.
13        A    Among other places.
14        Q    Does it have any assets or any bank
15   accounts in Washington?
16        A    No.
17        Q    Among other places, does that include
18   other places in the United States?
19        A    No.
20        Q    So among other places includes Bulgaria,
21   I take it?
22        A    Yes.

Page 64

1         Q    Who else from BAEF besides you was on
2    this October 2006 trip?
3         A    Just me.
4         Q    Do you remember who you met with
5    specifically from the State Department or USAID?
6         A    I can't name definitively all of the
7    people from the State Department. There were
8    probably five people from State and separately two
9    or three from USAID.
10        Q    Now, the Foundation that you've
11   described, does it currently exist?
12        A    It is formed as a Delaware 501c3.
13        Q    Was there a representative in any formal
14   sense of the Foundation at these meetings --
15        MS. EUN: Objection; vague.
16   BY MR. MUSOLINO:
17        Q    -- or this meeting in October of 2006?
18        MS. EUN: Same objection.
19        A    No.
20        Q    Can you tell me who its incorporators or
21   organizers are?
22        MS. EUN: Objection; vague.

Page 65

1         A    It was incorporated by the Fund as its
2    legacy institution. I think I've answered your
3    question.
4         Q    Has it already formed a Board of
5    Directors?
6         A    No. We have submitted the
7    documentation -- it's formed as far as the IRS is
8    concerned, but we're not formally started yet.
9         Q    Is there anyone on the current BAEF Board
10   who is not on the Board of the new Foundation?
11        A    Yes.
12        Q    Who would that be?
13        A    Leonard Harlan.
14        Q    Anyone else?
15        A    Not to my knowledge.
16        Q    Is there anyone on the Foundation's Board
17   who is not on the BAEF Board?
18        A    No.
19        Q    And are you going to be the managing
20   director of the Foundation?
21        A    No.
22        Q    Are you going to have any role in the

# EXHIBIT 1B



# Board Of Directors

## Board of Directors

**Stephen W. Fillo**
*Chairman*

*President*
*Fillo & Co.,Inc.*

*Corporate Director*
*Trustee of Foundations*

**Frank L. Bauer**
*President & Chief Executive Officer*

**Joseph J. Borgatti**
*President*
*J.J.Borgatti Associates*

**Lynn M. Daft**
*Corporate Director*

**Leonard M. Harlan**
*President*
*Castle Harlan, Inc.*

**Gary E. MacDougal**
*Chairman Emeritus*
*Bulgarian-American Enterprise Fund*

*Corporate Director*
*Trustee of Foundations*

**Anthony R. Manno, Jr.**
*Managing Director*
*Security Capital Management Group, Inc.*

**Chris J. Matlon**
*Corporate Director*

**Marshall Lee Miller**
*Partner*
*Baise & Miller, P.C.*

**Carl H. Pforzheimer III**
*Managing Partner*
*Carl H.Pforzheimer & Co.*

## Bulgarian Advisory Board Members

**Valentin Braykov**
*Braykov's Legal Office*
*Sofia,Bulgaria*

**Penko Dinev**
*Manager of Eastern Europen Operations*
*IBM CEMA*

## Management

**Frank L. Bauer**
*President & Chief Executive Officer*

**Dennis E. Fiehler**
*Chief Financial Officer*
*Sofia,Bulgaria*

**Dimiter S. Voutchev**
*Executive Director*
*Bulgarian American Credit Bank*

**Maria Sheytanova**
*Chief Operating Officer*
*Bulgarian American Credit Bank*

**Michael Hunsberger**
*Managing Director ,*
*Real Estate & Mortgage Finance*
*Sofia,Bulgaria*

**Nancy L. Schiller**
*Managing Director*
*Chicago,Illinois*

**Stoyan Dinchiiski**
*Executive Director*
*Bulgarian American Credit Bank*



EXHIBIT

_1B_

PENGAD 800-631-6989

# EXHIBIT 2

**Capital Reporting Company**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
-----------------------------------+
```

STROITELSTVO BULGARIA, LTD,                :

    Plaintiff,                :

           : CASE NO.

vs.                                         : 1:07-CV-00634

THE BULGARIAN-AMERICAN ENTERPRISE           :

FUND, et al,                                :

    Defendant.                :

```
-----------------------------------+
```

         Tuesday, December 5, 2007

Telephonic Deposition of:

      SILVY CHERNEV

called for telephonic oral examination by counsel for

Plaintiff, pursuant to notice at before Janie Arriaga of

Capital Court Reporting Company, a Notary Public in and

for the District of Columbia, beginning at 8:00 a.m.,

when were present on behalf of the respective parties:

EXHIBIT

2

| | Page 2 |
|---|---|
| | A P P E A R A N C E S |
| 1 | |
| 2 | |
| 3 | On behalf of the Plaintiff: |
| 4 | PHILIP M. MUSOLINO, ESQUIRE |
| 5 | Musolino & Dessel |
| 6 | 1615 L Street, Northwest, Suite 440 |
| 7 | Washington, D.C., 20036 |
| 8 | (202) 466-3883 |
| 9 | |
| 10 | On behalf of the Defendant: |
| 11 | SYLVIA ROLINSKI, ESQUIRE |
| 12 | Rolinski and Suarez, LLC |
| 13 | 14915 River Road |
| 14 | Potomac, Maryland 20854 |
| 15 | (240) 632-0903 |
| 16 | |
| 17 | On behalf of the Defendant: |
| 18 | BRIAN D. SIEVE, ESQUIRE |
| 19 | Kirkland & Ellis, LLP |
| 20 | 200 East Randolph Drive |
| 21 | Chicago, Illinois, 60601 |
| 22 | (312) 861-2197 |

**Page 3**

C O N T E N T S

EXAMINATION BY:                    PAGE
3  
4    Counsel for Plaintiff           5
5    Counsel for Defendant          123
6    Counsel for Plaintiff          134
7
8
9
10            EXHIBITS
11
12  Number 1       Declaration           7
13  Number 2       Complaint            150
14  Number 3       Bates-stamped 1 - 90    101
15
16
17
18
19
20
21
22  (EXHIBITS ATTACHED TO TRANSCRIPT)

**Page 4**

PROCEEDINGS

1
2        MR. MUSOLINO: This is Philip M-u-s-o-l-i-n-o,
3    Counsel for Plaintiff in [SUL] Bulgarian Enterprise Fund
4    Case Number 1:07CV00634, in the
5    United States Court for
6    the District of Columbia
7    first. I'm going to ask them
8    to introduce themselves including videographer and then
9    he will and still
10    Bulgaria.
11        MS. ROLINSKI: S-y-l-v-i-a, R-o-l-i-n-s-k-i.
12        MS. SLAVOVA: M-a-r-i-a, S-l-a-v-o-v-a.
13        MR. SKOCHEV: V-l-a-d-i-m-i-r,
14    S-k-o-c-h-e-v.
15        MR. TOMOV: V-a-h-a-r-i, T-o-m-o-v.
16        MS. YAKOVA: P-e-t-y-a, Y-a-k-o-v-a.
17        MR. SIEVE: Can somebody give me the
18    videographer's name, for the record.
19        THE VIDEOGRAPHER: (Inaudible) Shavanov.
20        MR. SIEVE: This is Brian Sieve, counsel for
21    the Defendant. I'll ask you the swear in the witness.
22        SILVY CHERNEV,

**Page 5**

1    having been duly sworn, testified as follows:
2        EXAMINATION BY COUNSEL FOR PLAINTIFF:
3    BY MR. MUSOLINO:
4        Q   Could you state and spell your full name.
5        A   Silvy Chernev, S-i-l-v-y, C-h-e-r-n-e-v.
6        Q   What is your current occupation?
7        A   I'm an attorney for Chernev, Komitova, and
8    Partners.
9        Q   How long have you been an attorney in
10    Bulgaria?
11        A   An attorney, I've been for 15 years. A Lawyer
12    I've been for
13    29 or 30 years.
14        Q   And the difference between the two is what?
15        A   A lawyer in my youth, a jurist, a person who
16    has graduated law and who has been admitted to
17    practice
18    the law professionally. As a lawyer and as an attorney,
19    an attorney can counsel to parties and
20    represent parties
21    before court.
22        Q   Are there some steps that you have to take or

Page 74

1    complainant, related to
2    that agreement and the
3    infringement of this agreement
4    explained by the claimant infringement by the bank.
5    This would be one set. The second set would be covered
6    probably by
7    torts, which is, again, under Bulgarian law
8    considered
     to be a part of obligation law, but a
9    different source
10   of obligation. I'm sure that -- I am
11   not an expert of
12   criminal law.
13       Some of the behaviors that quantified as tort,
14   those will constitute the composition of a certain kind.
15   I cannot say for sure which kind, and I cannot make the
16   proper quantification, but I have to stress on the fact
17   that the Bulgarian notion on tort and the formulation of
18   the tort is very, very broad. Anybody could have done
19   any damage to anyone should repair. It means this
20   covers
21   all sorts of improper behavior outside an
22   agreement

Page 75

1    sophisticated modern approach
2    would even admit that
3    between parties in a certain existing
4    relationship,
5    contractual, also some tort claims may
6    arise if those
7    torts are not necessarily related to the
8    breach of the
9    contract, but to some other behavior of a party to a
10   contract.
11       Q   In Count 1 or the facts related to Count 1,
12   can you tell me whether you participated in a case in
13   the Bulgarian Judicial System similar to the factual
14   allegations that are in Count 1?
15       A   What would be the complex of facts.
16       Q   My question to you is whether the facts which
17   support the regional claim, not the law, whether the
18   facts support the regional claim as alleged in the
19   complaint? Can you tell me whether you can think of a
20   case where you were involved in similar type of facts?
21       A   I can tell you that for sure I participated in
22   things that are related to infringement and improper

Page 76

1    behavior related to parties to an agreement. I have not
2    been involved in many tort cases.
3        Q   In the course of your lectures, can you tell
4    me whether you've identified cases in your lectures
5    which involve the sort of facts that plaintiff alleges
6    to support RICO claims?
7        A   Yes, but not extensive.
8        Q   Would it be fair to characterize the facts
9    related to this case as unusual in the experience of
10   judges in Bulgarian court?
11       MR. SIEVE: Object; overbroad; no foundation.
12       A   Well, concerning the contractual claims, it's
13   quite usual. It's all very usual. While the tort
14   claims, there
     is not -- no widespread practice in
15   Bulgaria, and, also, some of the torts may also be
16   criminal law.
17   BY MR. MUSOLINO:
18       Q   When you say some of the tort claims are also
19   criminal law, do you mean that it's more likely that
20   the tort claims would be addressed in criminal
21   proceedings rather -- rather than civil proceedings or
22   both in civil and criminal?

Page 77

1        A   Under our legal system, if there is a criminal
2    proceeding pending in the respective civil proceeding,
3    it should be
4    suspended. If there is a coincidence to a
5    law
6    ongoing
7    criminal proceeding, it will be suspended until
8    the case
     is decided by the criminal court. And then the
9    verdict
10   would be compulsory for the civil court
11   concerning the subject of
12   the crime and the factual
13   composition.
14       Q   When you testified that each of the claims in
15   this case have available remedy somewhere in the
16   Bulgarian judicial system, are you taking into account
17   the availability of criminal prosecution as one of those
18   remedies?
19       A   Also, I have to add that even each person who
20   has suffered damage as a result of the criminal activity
21   can
22   also participate as a civil claimant in the criminal

131:14 132:6,15
133:16 135:13
136:19 138:17
141:20 142:20
146:13
**third** 13:16,20 70:12
135:1
**third-party** 14:4
66:20 67:4
**thought** 46:5 83:16
84:11 140:19
**thousands** 144:8,9,22
146:17
**three** 16:21 17:8
20:12,15,16 21:6
26:11,14 51:19 53:7
53:9 65:8 70:12,12
81:10,12 112:16
124:15,16 133:10
133:22 134:5
143:17,19
**three-and-a-half**
20:16
**Thursday** 150:12
**time** 6:4,9 17:10,11
17:15 18:14,22 21:9
31:10 35:1,3 36:5,9
36:10,15 37:1,4,18
37:21 42:12 46:8
47:11 48:10 50:6,16
51:1 60:22 67:11,17
97:17 100:19
111:10,12 115:20
122:2 124:9,21
135:6 141:7 146:7
151:6
**times** 20:12,15 21:5
96:8 124:9,10
**tiny** 144:16
**title** 11:9,12,16,18,19
11:21 13:12 100:12
101:10,13 102:7,10
102:11,22 103:2,22
106:11 107:5,6

108:17 125:2,4
**titles** 102:14,17
142:19
**today** 8:8
**told** 22:4 42:9,15
48:2,16 65:5 87:13
106:8 114:21
117:12 131:18
137:12
**TOMOV** 4:15
**top** 55:2
**topic** 139:8
**tort** 57:18,19,21
74:13,17,18 75:5
76:2,13,18,20 79:21
80:1,6,7 81:2,6,8
87:2,20,21 93:8,12
93:12,17,20 94:15
94:19 136:16
137:14,16 138:1,4
138:10,15,19 139:6
**torts** 57:3 74:7 75:7
76:15
**tortuous** 94:19
**totally** 25:19
**tradition** 85:20 86:3
86:4
**transaction** 82:17
83:2
**transcribed** 121:6
**transcript** 3:22 145:3
147:19 150:11,16
151:6
**transcription** 121:11
149:7
**translated** 22:7 125:1
**transmitted** 48:14
**transparent** 134:16
**transportation**
128:20
**travel** 19:20
**treat** 113:16
**treated** 33:4 37:20
54:19 56:5 64:8,12

70:17 72:2 81:21
104:7 132:17
**trial** 58:6 62:11 63:11
63:12 65:2,12,15
120:9
**tribunal** 29:11
**tried** 12:3 78:10
113:15
**true** 52:2 93:8 95:4
116:2 148:8 149:7
**trust** 128:7
**trusting** 128:14
**try** 15:9 18:8 110:19
121:21
**trying** 15:8,12 28:17
30:12 78:12 79:9
84:9 113:14 115:20
123:4 137:17
**Tuesday** 1:14
**Turkey** 143:17
**turn** 51:13,19 70:22
81:10 84:18 96:14
97:8 111:17 112:14
115:16 118:21
126:14,16 127:16
131:9 139:8
**twice** 12:16
**two** 5:14 6:11,14 8:12
8:15 9:10,11,20
10:15 12:22 14:14
15:15,22 16:3,5
17:8 20:11,13 21:5
22:20 24:7,20 26:10
26:13 54:6 57:5
58:11 61:21 62:12
63:13 65:7 87:16,18
99:1 101:6,6,11
106:12 112:15,16
120:4 126:8 127:12
133:10 134:4
143:19 144:1
**two-minute** 119:18
**type** 8:17 11:11 13:18
22:19 56:14 63:13

73:5,5,6 75:20
78:15 84:14 85:3
88:22 100:4 105:2
130:7
**types** 56:5 57:9 62:12
63:13 73:1
**typewriting** 148:7
**typical** 88:14 144:6
**typically** 29:2 30:8
61:2 147:6
**typists** 120:13
**T-o-m-o-v** 4:15

──────────
**U**

**ultimately** 47:14
145:2
**underlying** 49:6
99:12
**understand** 31:6 84:8
88:18 91:15 109:15
140:20 142:12
145:1,6
**understanding** 54:13
**understood** 137:18
**underway** 135:4
**unfavorable** 64:9
**Unfortunately** 36:4
**union** 25:13 26:6,9
112:22 114:19,20
123:9,16 124:2,5,12
127:17 129:8
**Union's** 113:10
**United** 1:1 4:5 19:17
20:1,3,7 41:6,10
130:5 145:19
**universities** 6:12,14
**University** 6:12,13
21:8 22:7,12
**unsuccessful** 133:19
**unusual** 76:9
**USA** 122:5
**use** 22:19 31:19 61:5
65:12,13,14 107:18
113:10 116:3
130:15 138:1 139:6

# EXHIBIT 3

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-------------------------------------+

STROITELSTVO BULGARIA, LTD,          :

        Plaintiff,          :

                           :

                           : CASE NO.

vs.                                  : 1:07-CV-00634

                           :

THE BULGARIAN-AMERICAN ENTERPRISE    :

FUND, et al,                         :

        Defendant.          :

-------------------------------------+

                  Wednesday, December 6, 2007

Telephonic Deposition of:

        VLADIMIR STEFANOV SKOCHEV

called for telephonic oral examination by counsel for

Plaintiff, pursuant to notice at before Janie Arriaga of

Capital Court Reporting Company, a Notary Public in and

for the District of Columbia, beginning at 5:00 a.m.,

when were present on behalf of the respective parties:

EXHIBIT

3

**Capital Reporting Company**

2 (Pages 2 to 5)

| Page 2 | Page 4 |
|---|---|
| 1       A P P E A R A N C E S | 1       P R O C E E D I N G S |
| 2 | 2     MR. SIEVE: My name is Brian Sieve, I |

**Capital Reporting Company**

2 (Pages 2 to 5)

### Page 2

1        A P P E A R A N C E S

2

3   On behalf of the Plaintiff:

4       PHILIP M. MUSOLINO, ESQUIRE

5       Musolino & Dessel

6       1615 L Street, Northwest, Suite 440

7       Washington, D.C., 20036

8       (202) 466-3883

9

10   On behalf of the Defendant:

11       SYLVIA ROLINSKI, ESQUIRE

12       Rolinski and Suarez, LLC

13       14915 River Road

14       Potomac, Maryland 20854

15       (240) 632-0903

16

17   On behalf of the Defendant:

18       BRIAN D. SIEVE, ESQUIRE

19       Kirkland & Ellis, LLP

20       200 East Randolph Drive

21       Chicago, Illinois, 60601

22       (312) 861-2197

### Page 3

1        C O N T E N T S

2

3   EXAMINATION BY:         PAGE

4     Counsel for Defendant     4

5     Counsel for Plaintiff     39

6

7

8        EXHIBITS

9

10   Number 1     Declaration     4

11

12

13

14

15

16

17

18

19

20

21

22

### Page 4

1        P R O C E E D I N G S

2     MR. SIEVE: My name is Brian Sieve, I

3 represent the Bulgarian-American Enterprise Fund, one of

4 the Defendants in this action. We are here for the

5 deposition of Vladimir Skochev.

6     MR. MUSOLINO: Philip Musolino and Sylvia

7 Rolinski, Counsel for plaintiff. The court reporter is

8 the same from yesterday. We have an interpreter whose

9 name is Pteya Yakova.

10     VLADIMIR STEFANOV SKOCHEV

11 Having been duly sworn, testified as follows:

12     MR. SIEVE: And Mr. Tomov, who was here

13 yesterday for Mr. Chernev's deposition, is here as well.

14     (Thereupon, Exhibit Number 1 was marked for

15 identification.)

16     EXAMINATION BY COUNSEL FOR THE DEFENDANT

17 BY MR. SIEVE:

18     Q   Mr. Skochev, please forgive me in advance. In

19 your declaration, which I'm going to hand you, has been

20 marked BAEF Exhibit Number 1. Do you have copy of it?

21     A   Yes.

22     Q   In your declaration, you state that you are

### Page 5

1 reasonably fluent in English; is that correct?

2     A   Yes.

3     Q   But for your own comfort, you have asked to

4 have an interpreter here?

5     A   Yes.

6     Q   If you don't understand my question, sir,

7 please let me know and I will be happy to try to

8 rephrase it. Okay?

9     A   Yes, no problem.

10     Q   And would you commit to me that you would make

11 a best effort to give me full and complete answers to my

12 question?

13     A   Yes, of course.

14     Q   You understand that your testimony today here

15 is under oath and has the same effect as if it was in

16 the United States Court?

17     A   Yes.

18     Q   Mr. Skochev, you have been retained by one of

19 the lawyers on behalf of the Plaintiff in this action to

20 give some opinions in this case; is that right?

21     A   Yes, exactly.

22     Q   Who retained you?

Page 34

1  sure, but Stroiteslstvo was able to suspend the
2  execution, except 364,000 euros?
3      A  Yes.
4      Q  And then the bank appealed that decision; is
5  that right?
6      A  Yes.
7      Q  And ultimately the appellate court ruled that
8  the decision to suspend the difference between the
9  364,000 euros and 970,000 euros was improper?
10     A  Yes.
11     Q  Was there any further appeal from that
12 decision?
13     A  Not to my knowledge.
14     Q  So would it be a fair summary that the
15 appellate court ruled that the lower court erred in
16 reducing the amount of the writ?
17     A  Yes.
18     Q  You were here yesterday when Mr. Chernev
19 discussed the legal proceedings in Bulgaria?
20     A  Yes.
21     Q  Was there anything that Mr. Chernev said that
22 you disagreed with that you can recall?

Page 35

1      MR. MUSOLINO: Objection; overbroad; asking
2  him to comment on several hours of deposition testimony.
3  You can answer. I am just noting my objection on being
4  overbroad.
5  BY MR. SIEVE:
6      Q  Let me see if I can help you. I'm not trying
7  to ask you to remember word for word. I'm asking if you
8  recall anything substantive about Mr. Chernev's
9  discussion, in general, in the legal proceedings in
10 Bulgaria? Is there anything that you disagreed with?
11     A  Regarding the court procedure, my disagreement
12 with what Mr. Chernev said yesterday was a complex
13 matter.
14     Q  Give me the summary form, if you can.
15     A  First of all, I don't think that the Bulgarian
16 law could assist in solving a complex issue as set forth
17 in the present case. The remedies that can be given
18 could be partial, but not complete.
19     I also disagree with Mr. Chernev that by
20 virtue of Article 49 of the Bulgarian Contracts and
21 Obligations Act, this issue can be resolved because by
22 virtue of this paragraph, a bulgarian company can be

Page 36

1  liable only when it is clear that a person, a physical
2  person working in the same company has committed a tort
3  and this natural person must be specifically named. I
4  disagree. When that tends to be impossible, the six
5  liabilities should be born by the directors of the
6  company. Therefore, a claim based on Article 49 should
7  contain the full name of the person committing the tort.
8      Besides that, in Bulgaria, in the major part,
9  similar types of torts are hidden behind a decision of
10 collective body, and that person who acts based on the
11 decision of the collective body has no liabilities at
12 all.
13     Therefore, based on Article 49 of the
14 Contract and Obligations Act, we cannot have a fair
15 litigation of the facts. On the second hand, the case
16 that was presented before the American court is a
17 complex case because it contains different types of
18 facts.
19     (Thereupon, at this point, there were
20     technical difficulties and testimony was
21     resumed.)
22     MR. SIEVE: We have the video. We can get the

Page 37

1  video and transcribe the answer from there, as opposed
2  to somebody trying to remember what was said two minutes
3  ago.
4  BY MR. SIEVE:
5      Q  My question has to do with what Mr. Chernev
6  testified about the legal proceedings in Bulgaria
7  between the bank and the plaintiff. That is what my
8  question was about. My question was: Mr. Chernev's
9  testimony about the bank seeking an ex parte writ of
10 execution. Was there anything about the proceeding that
11 you disagreed with?
12     MR. MUSOLINO: What you're trying to say, I
13 think, makes reference to the litigation in Bulgaria. I
14 understand that you now want to focus on specifically
15 the litigation that actually took place as that was
16 described by Mr. Chernev.
17     THE WITNESS: I would like to finish answering
18 the question.
19     MR. SIEVE: Well, I was going to strike your
20 answer as nonresponsive.
21 BY MR. SIEVE:
22     Q  If I could, try to focus on this narrow part

# EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-------------------------------------+

STROITELSTVO BULGARIA, LTD,                :

        Plaintiff,                         :

                                           :

                                           : CASE NO.

vs.                                        : 1:07-CV-00634

                                           :

THE BULGARIAN-AMERICAN ENTERPRISE          :

FUND, et al,                               :

        Defendant.                         :

-------------------------------------+

                       Wednesday, December 6, 2007

Telephonic Deposition of:

        MARIA SLAVOVA,

called for oral examination by counsel for Plaintiff,

pursuant to notice before Janie Arriaga of Capital Court

Reporting Company, a Notary Public in and for the

District of Columbia, beginning at 7:30 a.m., when were

present on behalf of the respective parties:

EXHIBIT
4

## Page 2

APPEARANCES

On behalf of the Plaintiff:
    PHILIP M. MUSOLINO, ESQUIRE
    Musolino & Dessel
    1615 L Street, Northwest, Suite 440
    Washington, D.C., 20036
    (202) 466-3883

On behalf of the Defendant:
    SYLVIA ROLINSKI, ESQUIRE
    Rolinski and Suarez, LLC
    14915 River Road
    Potomac, Maryland 20854
    (240) 632-0903

On behalf of the Defendant:
    BRIAN D. SIEVE, ESQUIRE
    Kirkland & Ellis, LLP
    200 East Randolph Drive
    Chicago, Illinois, 60601
    (312) 861-2197

## Page 3

CONTENTS

EXAMINATION BY:    PAGE
    Counsel for Plaintiff    4
    Counsel for Defendant    6

EXHIBITS

Number 1    Declaration    30

(EXHIBIT ATTACHED TO TRANSCRIPT)

## Page 4

PROCEEDINGS

MARIA SLAVOVA,

having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. SIEVE:

Q  State your full name for the record.

A  Maria Slavova, S-l-a-v-o-v-a.

Q  You state in your declaration, you indicate that you are reasonably fluent in English. Do you request an interpreter?

A  No, I do not request an interpreter.

Q  Do you understand you are under oath?

A  Yes, I do.

Q  Do you understand your testimony has the same effect as if you are in the court in Washington

A  Yes.

Q  If I ask you a question that you don't understand, if there is a translation issue, we can get the interpreter involved to help us. What is your occupation?

A  I am a professor at Sofia University Law School.

Q  Do you also practice in the Bulgarian court?

## Page 5

A  I do.

Q  Do you work at a law firm?

A  No, I don't have a law firm, I work on my own or with colleagues without a registered law firm.

Q  What bar are you registered in?

A  Sofia bar.

Q  Do you litigate cases in Sofia Court?

A  I do.

Q  Both on behalf of Plaintiffs and defendants?

A  Yes.

Q  Approximately, how many cases do you have in the Sofia Court?

A  Ten.

Q  Do you also litigate in other courts in Bulgaria?

A  Yes, I do. 50 all together, in the country, 50 all together.

Q  Approximately, what percentage of those are plaintiffs versus defendants that you represent?

A  Define "plaintiff."

Q  The person that files the suit.

A  Half.

Q  Equally?

| Page 22 |
|---|

1  A   I would have to admit that.
2  Q   You think you would or wouldn't?
3  A   I would. I would try to explain what it means;
4  that it is not an easy conclusion, but it is a fact.
5  Q   But not in all cases?
6  A   Of course not in all cases, but you see corruption
7  is such an event that when you have several cases, it's
8  more than enough.
9  Q   The problem is you don't know or have any
10  evidence that any particular judge is actually corrupt?
11  A   That is a not a question that I think anybody
12  could really answer without having final results of the
13  process that are taking place. We have two judges, one
14  prosecutor, and three investigators that are under
15  investigation now. Maybe later I will be able to give
16  you some names, but for now this is not a convenient
17  question.
18  Q   How many magistrates are there in Bulgaria?
19  A   1,500 magistrates.
20  Q   I think you said four people are under
21  investigation?
22  A   I can give you some other examples of the work of

| Page 23 |
|---|

1  the Supreme Judicial Council where there was a lot of
2  evidence that those people were suspected for some good
3  reasons for corruption, but the process had started.
4  Q   Let me ask you, if you look at paragraph 11 of
5  your declaration, the last sentence says: The pertinent
6  codes do not provide the mechanisms for hearing the
7  racketeering issues raised in the complaint. Do I
8  understand you to be saying that there is no Bulgarian
9  equivalent to the RICO act, a claim that was asserted by
10  the plaintiff in Washington.
11  A   Correct.
12  Q   There are a variety of different remedies
13  or claims that are available to the plaintiff who is
14  going to sue in Bulgaria on the claims that are asserted
15  in the plaintiff's complaint?
16  A   That is true, that you can find pieces of
17  provisions here and that they could serve as grounds for
18  at least part of the claims.
19  Q   For at least part of the claims. And there are
20  remedies for that? They could get damages?
21  A   Yes. If they are very patient.
22  Q   But at the end of the process, if they were to

| Page 24 |
|---|

1  sue in Bulgaria and if they were to prevail, they would
2  get damages from the defendants?
3  A   Generally, this is a correct presumption, but
4  you have to take into consideration that some of the
5  cases take more that ten years, and by that time, the
6  business is over.
7  Q   Even in the United States, there are cases
8  that have lasted more than ten years?
9  A   The U.S. is not a country in transition. You
10  should keep in consideration that this country is
11  enduring a very heavy transition, politically,
12  economically, and socially, and the people are trying to
13  establish their own businesses. They are hardly
14  surviving. We are a nation of survivors. We're the
15  oldest nation in Europe.
16  Q   You're using the Bulgarian courts on behalf of your
17  clients right now; correct?
18  A   I would say that is very much a question of
19  interpretation. It's more talk about that it does not
20  prove that.
21  Q   You were here yesterday for Mr. Chernov's
22  Deposition; correct?

| Page 25 |
|---|

1  A   Yes.
2  Q   And do you remember his discussion and view that
3  the corporate defendants in this case could have
4  liability under a tort theory, under Article 49 of the
5  Contracts and Obligations Act?
6  A   I do.
7  Q   Do you agree that as a general matter, Article
8  49 would apply to claims against the corporate
9  defendants here?
10  A   No, I don't
11  Q   You don't think it has any application?
12  A   I would say that it is very much a question of
13  interpretation. And the interpretation that was given
14  by Mr Chernov is more or less probably talking about the
15  theory of it, but the actual application and the
16  practice of the Bulgarian courts doesn't proof that.
17  Q   All right. You agree that as a theoretical matter
18  that Mr. Chernov was correct, Article 49 would apply?
19  A.   Theoretically
20  Q.   But you're saying that in your view, as a practical
21  matter, it might not apply?
22  A   I'm saying that there is enough evidence that in

**Capital Reporting Company**

Page 26

1  practice it is not applying.
2  Q   But it could if somebody wanted to try and sue
3  under Article 49?
4  A   After an obligation of 65 years, I doubt that.
5  Q.  But it's available?
6  A   It is available.
7  Q   Do you do any arbitration?
8  A   I was a member of the first established in Bulgaria
9  Administrative Arbitration Code, but unfortunately, it
10 existed only six months and it was closed down.  So I
11 had never had any chance to practice as an arbitrator
12 really, but I would gladly do it.  It is a very
13 modern and reliable procedure.
14 Q   I appreciate your clarification.  You've never
15 acted as an arbitrator, which is sort of like a judge?
16 A   Never.
17 Q.  Have you ever litigated in an arbitration where you
18 have been an advocate?
19 A.  Yes, I have
20 Q   How many of these have you done?
21 A   Two.
22 Q   Two?  Over the course of your entire career?

Page 27

1  A   My entire career comes to 13 years because we
2  were not allowed to practice in courts.  It was only
3  after the changes that the law of our activity allowed
4  us to practice, so I became a member of Sofia Bar the
5  very moment it was allowed.  But it's still a very short
6  career.
7  Q   13 years.  That's pretty good.  I know you would
8  like it to be longer.  Did I understand you to say that
9  over the 13 years you have been allowed to be an
10 advocate, a practicing lawyer, you have had two
11 arbitrations?
12 A   Yes.
13 Q   How many cases during that 13 years have you
14 litigated in the Bulgarian court?
15 A   All of them.
16 Q   Like 500 or --
17 A   Less.  I am not very active.
18 Q   More than 200?
19 A   Probably.
20 Q   You spent time in the U.S. in an exchange program?
21 A   A number of exchange programs, and participation in
22 the work of an NGO, for a Non Governmental Organization

Page 28

1  An NGO Registered in Bulgaria but started this
2  initiative in America
3  Q   Can you tell me generally what you did?  I am just
4  curious more than anything else.
5  A   I had been in an exchange program to assist law
6  schools, so I visited several states' universities.
7  I've been to California, Colorado, and Oregon, and
8  mainly to Washington several times as a chair of
9  Bulgarian Organization Vital Voice in Democracy.
10      I used to visit Washington.  On a number of
11 occasions, those conferences exchanging experience and
12 Democracy problems, like trafficking in women and
13 protecting human rights, those kinds of issues.
14 Q   What percentage of your time do you think you
15 spent on human rights and anti-corruption issues as
16 opposed to actually practicing law?
17 A   I wouldn't say practice is the main core of this
18 activity.  It is more or less theoretical activity, it's
19 writing books and discussing the issues.  But I work at
20 three Non Government Organizations, which are
21 anti-corruption organizations.  So I would say that it's
22 one-fifth of my time.

Page 29

1  Q   One-fifth on anti-corruption and human rights
2  issues, and the rest is practicing law?
3  A   Teaching mainly.
4  Q   What percentage is teaching?
5  A   The main part of my activity is teaching.  I would
6  say half of my time.
7  Q   And so maybe 30 percent or a third of your
8  time is actually practicing in courts?
9  A   Yes.
10 Q   Was there a book you co-authored with a
11 professor?  In your declaration you state you
12 co-authored a book with Professor Sam Jacobson of the
13 Willamette School of Law in Salem, Oregon.  I should
14 know that because that is a famous wine region.  What
15 was the name of the book?  And just tell me generally
16 what it was.  This book was published when?
17 A   Last year.  Democracy Against Corruption is the
18 name of the, book and it's part of a trilogy aiming at
19 covering all the branches of government.  This is on the
20 executive, because we thought that this is the most
21 important because we both teach administrative law, and
22 we're working now on fighting corruption in the

# EXHIBIT 5

BULGARIAN AMERICAN ENTERPRISE FUND

2004 ANNUAL REPORT



BULGARIAN
AMERICAN
ENTERPRISE
FUND



EXHIBIT

5

The Fund was created by the US Congress through the Support for East European Democracy (SEED) Act, which authorizes the US government to disburse up to $58 million to the Bulgarian-American Enterprise Fund ("BAEF" or the "Fund") for investment in the private sector of Bulgaria. The BAEF also may raise additional amounts from the private sector and foundations.

Based in Sofia, Bulgaria and Chicago, Illinois, USA, the BAEF received its initial funding on January 14, 1992. Under the direction of a volunteer board of directors, the Fund makes equity investments in and loans to private businesses in Bulgaria, considering proposals and originating activities that will help develop Bulgaria's private sector.

## BAEF PORTFOLIO GROWTH          (in Millions of Dollars)



**THE FUND'S ACTIVITIES INCLUDE:**

- Starting new businesses and encouraging entrepreneurship in Bulgaria

- Establishing joint ventures

- Promoting Bulgaria's investment opportunities to US and other Western investors

- Providing management and assistance to Bulgarian businesses

- Assisting in the privatization of state enterprises

- Broadening the understanding of private enterprise among managers, government, and the Bulgarian public.

1

LETTER FROM THE CHAIRMAN

This, our twelfth annual report since commencing operations in 1992 summarizes the financial results and operating highlights for the Bulgarian-American Enterprise Fund (BAEF, or the Fund), its major operational subsidiary Bulgarian-American Credit Bank (BACB), its real estate portfolio, and its new entity, BM Leasing. All realized significant achievements for fiscal year 2004.

## BULGARIA

The country made considerable economic progress in 2003 and 2004, according to preliminary data. It was accepted into NATO and took significant steps toward entry into the European Union (EU) in 2007, to include signing the European Union Accession Treaty in Luxembourg on April 25, 2005.

Economic data are especially encouraging. Bulgaria's GDP increased by more than 5 percent for the second consecutive year; inflation remained subdued at approximately 2 percent, and the government's budget deficit decreased to less than 1 percent of GDP (much lower than most of its peers, including those already members of the EU). Both Standard & Poor's and Fitch's increased the country's credit rating to investment grade. Most impressively, foreign direct investment – up 42 percent to $2.4 billion – increased for the third year in a row. Most of this increase was in "greenfield" private investments (as opposed to privatization proceeds) by commercial firms, an encouraging sign that its stability and economic advantages are being recognized in other countries. A further acknowledgement of Bulgaria's progress is the increasing number of tourists, up 14.4 percent in 2004, following a similar rise the previous year. Tourism has risen by double digit amounts since 2000.

**FINANCIAL RESULTS**

BAEF concluded its twelfth full year of operations showing a net increase in fund balance from operations of $1.8 million on total investment income of $3.5 million. The total portfolio grew 17 percent during 2003, from $50.0 million to $60.1 million, with reflows (interest + principal + rental income + dividends + proceeds from the sales of investments) increasing from $5.3 million in 2003 to $15.4 million in 2004. During the year, BAEF disbursed $20.4 million in the form of new loans and equity investments. Since 1992, BAEF and its affiliates have made over $380 million in loans and equity investments to more than 4,500 companies across the country.

**EQUITY PORTFOLIO**

The Fund continues realizations via sales of its equity positions. Two such transactions took place in FY 04 and generated attractive internal rates of return. The Fund's equity holdings now include ten companies with a cost basis of $20.6 million, the largest of which are BACB, AMETA (an integrated poultry producer), and SANITA (a pharmaceutical distributor and retailer). The latter is undergoing a restructuring that should be concluded in FY 05.

**REAL ESTATE & PROPERTY MANAGEMENT**

This group expanded its lending and development activities in FY 04. Most notable was the completion of two large "build-to-suit" complexes for leading western European companies: Praktiker, a large German do-it-yourself chain, and Oriflame, a Swedish cosmetics company. Both originally leased their facilities from BAEF but have subsequently been sold as part of a special purpose vehicle (SPV) to ERG Capital 1 (Enterprise Realty Group), which was sponsored by the Fund.

Another important development included the acquisition of several parcels along the Black Sea, and in Sofia and Varna, two of Bulgaria's three largest cities. Bulgarian-American Property Management (BAPM) is in the process of developing a large shopping center on the Varna property. The others will be developed as joint ventures with experienced construction firms.

BACB is used by the real estate group for its construction lending activity, and is the only entity presently offering real estate project financing in Bulgaria. During FY 04, this group committed to 23 loans in the amount of €17 million, an increase of 62 percent over FY 03. Credit experience and repayment in this sector also remain strong.

Finally, the group sold two properties at a healthy profit.

**BM LEASING**

BM Leasing (BML) was established in FY 03 as a joint venture between BAEF and a small leasing firm needing a strategic financial partner to expand its portfolio. An experienced BACB loan officer was transferred to BML and is now its Executive Director. The company has been successful in expanding its activity across several market niches and had a second profitable year.

TOTAL INVESTMENTS BY SECTOR



Long-term financing, a necessity in this business, remains a challenge for BML, as the BAEF has concluded its existing capital investments, and loan guarantees to BML constitute sufficient exposure at this time. The company is still small, but management has successfully begun to obtain outside capital sources to fund its future expansion.

**BACB**

The BACB now issues its own annual report for its fiscal year ending 12/31/04 (as opposed to 9/30/04 used by the Fund) and will report outstanding results. Total assets increased 40 percent to €153 million and net profits increased 55 percent to €7.2 million. Standard & Poor's increased BACB's credit rating from B+ to BB-. Of all banks in Bulgaria, it remains the number one performer in return on assets and return on equity and has one of the highest efficiency ratios among its peers.

Additional long-term funding was received in FY 04 from the EBRD (€10 million), FMO, the Dutch development bank (€7 million), and DEG, the German development bank (€6 million). All three institutions have provided financing to the BACB in past years.

Several new financing sources were developed in FY 04, including BACB's first syndicated loan of €12 million, in which seven West European banks from five countries participated. In addition, in November 2004, BACB completed the first-ever loan securitization transaction in Bulgaria for €2.9 million through Kapital Direct-1 (KD-1). KD-1 is a publicly traded SPV registered under the Special Purpose Investment Vehicle Act (SPV). BACB is a servicer for the SPV assets and acted as an underwriter of a €2.6 million senior secured bond issued by KD-1. The bond issue was subsequently purchased by Bulgarian pension funds.

## INTERNAL INVESTMENTS

During the fiscal year, BACB completed stage-one installation of its new IT system, with stage-two implementation planned for FY 05. The internal audit function established last year began its work and identified several areas for improvement, which have since been addressed to strengthen the control environment. Expanded employee training and personnel performance evaluations systems were expanded and fully deployed.

Maria Sheytanova, a senior banker with international experience, joined BACB as Chief Operating Officer and has since assumed responsibility for operations, human resources, and marketing. Credit processing will shortly be added to her portfolio. BACB has two Bulgarian Executive Directors and a total of 121 employees, all but one of whom are Bulgarians. We are proud of this accomplishment and of our talented staff of leaders and innovators.

## OTHER

The Audit Committee continues its regular quarterly meetings plus ad hoc sessions when required. The Bank Oversight Committee, created last year to monitor the BACB more closely, also meets with great frequency. Board members who serve on these committees spend substantial time discharging those duties, including attending frequent meetings and conferences, and making additional in-country visits.

As usual, I would like to thank the Board of Directors for its considerable contribution of time, vigilant oversight, and valuable experience to the work of the BAEF and the BACB.

Stephen W. Fillo
*Chairman*

5

# MANAGEMENT'S RESPONSIBILITIES FOR FINANCIAL STATEMENTS AND THE INTERNAL CONTROL SYSTEM

## FINANCIAL STATEMENTS

The financial statements of the Bulgarian-American Enterprise Fund (the "Fund" or "BAEF") were prepared by management which is responsible for their reliability and objectivity. The statements have been prepared in conformity with accounting principles generally accepted in the U.S. and, as such, include amounts based on informed estimates and judgments of management. Financial information appearing throughout this annual report is consistent with that in the financial statements.

The Board of Directors, operating through its Audit Committee, which is composed entirely of directors who are not officers or employees of the Fund, provides oversight of the financial reporting process and safeguarding of assets against unauthorized acquisition, use or disposition. The Audit Committee annually recommends the appointment of independent public accountants and submits its recommendation to the Board of Directors for approval.

The Audit Committee meets with management and the independent public accountants to review and approve the overall scope of audit work and related fee arrangements; to review audit reports and findings; and to discuss the adequacy of the Fund's internal control system, the quality of its financial reporting, and the safeguarding of assets against unauthorized acquisition, use or disposition. In addition, the Audit Committee has direct and private access to the independent public accountants.

The financial statements have been audited by an independent public accounting firm, PricewaterhouseCoopers Bulgaria, which was given unrestricted access to all financial records and related data, including minutes of all meetings of the Board of Directors and committees of the Board. The Fund believes that all representations made to the independent public accountants during their audits were valid and appropriate. The report of the independent public accountants is presented herein.

## INTERNAL CONTROL SYSTEM

Management is also responsible for establishing and maintaining an internal control system over financial reporting and safeguarding of assets against unauthorized acquisition, use or disposition which is designed to provide reasonable assurance regarding the preparation of reliable financial statements and the safeguarding of assets. The Fund's internal control system includes a documented organizational structure, a division of responsibility, and established policies and procedures, including a code of conduct, to foster a strong ethical climate.

There are inherent limitations in the effectiveness of any system of internal control, including the possibility of human error and the circumvention or overriding of controls. Accordingly, even the most effective internal control system can provide only reasonable assurance with respect to financial statement preparation and the safeguarding of assets. Furthermore, the effectiveness of an internal control system can change with circumstances. PricewaterhouseCoopers Bulgaria obtains an understanding of the Fund's internal control system and procedures for financial reporting and conducts such tests and other auditing procedures as they consider necessary in the circumstances to express the opinion in their report presented herein.

Frank L. Bauer
*President & Chief Executive Officer*

Dennis E. Fiehler
*Chief Financial Officer*

# REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

**TO THE BOARD OF DIRECTORS OF THE BULGARIAN–AMERICAN ENTERPRISE FUND:**

We have audited the accompanying consolidated statement of assets and liabilities, including the consolidated schedule of investments of the Bulgarian-American Enterprise Fund ("the Fund") as of September 30, 2004, and the related consolidated statement of operations and changes in fund balance and of cash flows for the year then ended. These financial statements are the responsibility of the Bulgarian-American Enterprise Fund's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We have conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Bulgarian-American Enterprise Fund as of September 30, 2004, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 2 to the financial statements, the financial statements include investments valued at $52,165,848, whose values have been estimated by management and adopted by the Board of Directors in the absence of readily ascertainable market values. We have reviewed the procedures used by the management in arriving at its estimate of values of such investments and have inspected the underlying documentation and, in the circumstances, we believe the procedures are reasonable and the documentation appropriate. However, because of the inherent uncertainty of valuation, these estimated values may differ significantly from the values that would have been used had a ready market for the investments existed.

*PricewaterhouseCoopers Bulgaria*

PricewaterhouseCoopers Bulgaria
*March 16, 2005*
*Sofia*

7

## CONSOLIDATED STATEMENTS OF ASSETS AND LIABILITIES

As of September 30, 2004 and 2003
Expressed in US Dollars

| | 2004 | 2003 |
|---|---|---|
| **ASSETS** | | |
| Investments, at fair value (Notes 2, 3, 4 & 12) | $ 52,165,848 | $ 42,512,588 |
| (Cost at September 30, 2004 $60,083,718) | | |
| (Cost at September 30, 2003 $49,994,555) | | |
| Cash and cash equivalents (Note 2) | 5,567,399 | 956,227 |
| Other assets | 1,624,695 | 81,837 |
| Interest receivable | 18,708 | 7,324 |
| Fixed assets, net (Notes 2 & 5) | 48,438 | 49,700 |
| **Total assets** | $ 59,425,088 | $ 43,607,676 |
| **LIABILITIES AND FUND BALANCE** | | |
| Accounts payable, accrued expenses & other liabilities | $ 5,061,127 | $ 592,108 |
| Loans and debt securities (Note 6) | 9,147,271 | 0 |
| Minority interest in SIPCs (Note 2) | 618,027 | 0 |
| Fund balance | 44,598,663 | 43,015,568 |
| **Total liabilities and fund balance** | $ 59,425,088 | $ 43,607,676 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

8

## CONSOLIDATED STATEMENTS OF OPERATIONS AND CHANGES IN FUND BALANCE

For the years ended September 30, 2004 and 2003
Expressed in US Dollars

| | 2004 | 2003 |
|---|---|---|
| **INVESTMENT INCOME** | | |
| Interest income | $ 2,358,812 | $ 1,960,108 |
| Interest expense | (90,014) | 0 |
| Net interest income | 2,268,798 | 1,960,108 |
| | | |
| Rental income | 1,409,686 | 990,263 |
| Direct rental expenses and depreciation | (353,114) | (604,944) |
| Income from rental properties | 1,056,572 | 385,319 |
| Dividends | 140,859 | 148,083 |
| Interest on cash deposits | 62,217 | 35,300 |
| **Total investment income** | 3,528,446 | 2,528,810 |
| | | |
| **EXPENSES** | | |
| Employee compensation and benefits | 1,482,582 | 1,379,903 |
| Employee business expenses | 131,161 | 80,596 |
| Professional services | 270,443 | 182,079 |
| Occupancy and telecommunications | 131,969 | 104,489 |
| General and administrative | 294,935 | 267,029 |
| **Total expenses** | 2,311,090 | 2,014,096 |
| | | |
| **Net investment income** | 1,217,356 | 514,714 |
| | | |
| **Realized and unrealized gain (loss)** | | |
| Provision for unrealized losses on investments | (127,318) | (1,842,393) |
| Realized gains on investments | 506,657 | 711,772 |
| Net exchange gains on investments | 271,181 | 1,246,971 |
| Net exchange loss on loans and debt securities | (43,676) | 0 |
| **Net realized and unrealized gain** | 606,844 | 116,350 |
| | | |
| **Net increase in fund balance from operations** | 1,824,200 | 631,064 |
| | | |
| Technical assistance (Note 2) | (231,159) | (186,318) |
| US Government grant revenue (Notes 1 & 2) | 0 | 452,715 |
| Minority interest in SIPCs (Note 2) | (38,626) | 0 |
| **Net increase in fund balance** | 1,554,415 | 897,461 |
| | | |
| **Fund balance at beginning of year** | 43,015,568 | 42,118,107 |
| Cumulative translation adjustment | 28,680 | 0 |
| **Fund balance at end of year** | $ 44,598,663 | $ 43,015,568 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

## CONSOLIDATED STATEMENTS OF CASH FLOWS

For the years ended September 30, 2004 and 2003
Expressed in US Dollars

| | 2004 | 2003 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net increase in fund balance from operations | $    1,824,200 | $      631,064 |
| Adjustments to reconcile net increase in fund balance from operations to net cash used in operating activities: | | |
| Investment disbursements | (20,401,620) | (5,150,386) |
| Loan repayments | 8,760,005 | 1,009,160 |
| Proceeds from sales of investments, net of realized gains | 1,600,418 | 752,800 |
| Disposal of fixed assets net of purchases | (13,544) | (40,013) |
| Provision for unrealized losses on investments | 127,318 | 1,842,393 |
| Depreciation of rental properties | 260,619 | 269,227 |
| Depreciation of fixed assets | 14,806 | 11,305 |
| Net changes in operating assets and liabilities | 3,895,583 | 109,228 |
| **Net cash used in operating activities** | (3,932,215) | (565,222) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Bank loan | 4,963,600 | 0 |
| Increase in debt securities | 3,202,865 | 0 |
| Minority interest in SIPCs (Note 2) | 579,401 | 0 |
| Cumulative translation adjustments | 28,680 | 0 |
| Cash received from US Government grants (Notes 1 & 2) | 0 | 452,715 |
| Technical assistance (Note 2) | (231,159) | (186,318) |
| **Net cash provided by financing activities** | 8,543,387 | 266,397 |
| **Net increase (decrease) in cash and cash equivalents** | 4,611,172 | (298,825) |
| **Cash and cash equivalents at beginning of year** | 956,227 | 1,255,052 |
| **Cash and cash equivalents at end of year** | $    5,567,399 | $      956,227 |

The accompanying notes to consolidated financial statements are an integral part of these statements.

## CONSOLIDATED SCHEDULE OF INVESTMENTS

As of September 30, 2004
Expressed in US Dollars

| INVESTMENT AND INDUSTRY* | | EQUITY | RENTAL PROPERTY | DEBT | TOTAL COST | FAIR VALUE | % OWNED |
|---|---|---|---|---|---|---|---|
| **AGRIBUSINESS/FOOD PROCESSING** | **8.2%** | | | | | | |
| Ameta Holding AD (Note 3) | | $ 4,542,597 | | $ 3,046,371 | $ 7,588,968 | $ 3,271,968 | 100% |
| Devin AD | | 550,000 | | | 550,000 | 400,000 | 10% |
| Aves 94 AD | | 122,500 | | | 122,500 | 0 | 11% |
| | | | | | 8,261,468 | 3,671,968 | |
| **DISTRIBUTION** | **1.0%** | | | | | | |
| Sanita Trading & Sanita Franchising AD | | 1,033,640 | | 26,314 | 1,059,954 | 371,954 | 33% |
| Active Animation | | | | 125,000 | 125,000 | 62,000 | |
| | | | | | 1,184,954 | 433,954 | |
| **FINANCIAL SERVICES** | **68.3%** | | | | | | |
| BACB AD (Note 12) | | 10,903,552 | | 16,900,000 | 27,803,552 | 27,803,552 | 100% |
| BM Leasing AD (Note 3) | | 1,215,962 | | 1,631,783 | 2,847,745 | 2,598,745 | 68% |
| Jobtiger OOD | | 136,365 | | | 136,365 | 56,365 | 100% |
| | | | | | 30,787,662 | 30,458,662 | |
| **HOTEL & TOURISM** | **8.0%** | | | | | | |
| P.M.K. AD | | | | 2,854,067 | 2,854,067 | 2,854,067 | |
| Estrea OOD | | | | 707,312 | 707,312 | 707,312 | |
| | | | | | 3,561,379 | 3,561,379 | |
| **MANUFACTURING** | **0.1%** | | | | | | |
| S.C.Policolor S.A. | | 200,943 | | | 200,943 | 65,943 | 1% |
| Embedded Software Tech. LLC | | 45,090 | | | 45,090 | 0 | 10% |
| | | | | | 246,033 | 65,943 | |
| **REAL ESTATE** | **31.3%** | | | | | | |
| BAPM EOOD (Note 3) | | 1,802,061 | | 2,239,862 | 4,041,923 | 3,166,423 | 100% |
| Drujba retail building | | | 5,659,984 | | 5,659,984 | 5,659,984 | 100% |
| Enterprise Building Complex | | | 3,802,571 | | 3,802,571 | 2,737,367 | 100% |
| Mladost office / warehouse building | | | 1,227,875 | | 1,227,875 | 1,227,875 | 100% |
| Financial Leases – 4 investments | | | 810,886 | | 810,886 | 760,886 | 100% |
| Pharmacies– 3 investments | | | 498,983 | | 498,983 | 421,407 | 100% |
| | | | | | 16,042,222 | 13,973,942 | |
| **TOTAL INVESTMENTS** | **117.0%** | | | | $ 60,083,718 | 52,165,848 | |
| Other assets less liabilities | (15.6%) | | | | | (6,949,158) | |
| Minority interest in SIPCs (Note 2) | (1.4%) | | | | | (618,027) | |
| **FUND BALANCE** | | | | | | $ 44,598,663 | |

* Percentages indicated are based on the fund balance as of September 30, 2004.
The accompanying notes to consolidated financial statements are an integral part of these statements.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

September 30, 2004 and 2003

## 1. ORGANIZATION OF THE FUND

The Bulgarian-American Enterprise Fund (the "Fund" or "BAEF") is a not-for-profit corporation pursuant to the Support for East European Democracy Act of 1989 (the "SEED Act") for the primary purpose of promoting the development of the Bulgarian private sector and policies and practices conducive to such development. The United States Congress has authorized appropriations of $57.8 million, which has been granted to the Fund by the Agency for International Development ("AID") for program purposes, administrative expenditures and technical assistance up to $5 million (the "Grant"). As of September 30, 2004 AID has disbursed $57.8 million of the Grant to the Fund, including the Grant amendment discussed below. Grants received from AID are conditioned upon the Fund's compliance with the requirements of the Grant agreement with AID and the SEED Act, which impose certain U.S. policy objectives and reporting obligations.

In March, 2002 AID amended the Grant to provide additional funding in the amount of $250,000 to undertake a feasibility assessment for establishing and operating a mortgage banking activity in the Republic of Serbia, Federal Republic of Yugoslavia. The amount obligated under this amendment could not be commingled with other Fund assets and required separate accounting. In 2003 the feasibility assessment was concluded and the unused portion of the Grant was returned to AID.

The Fund is engaged in a broad private investment program in Bulgaria, which, through equity investments, loans, grants, technical assistance and other measures, emphasizes a commitment to small-to-medium sized businesses. The Fund provides technical assistance to businesses in the Bulgarian private sector, including those in which the Fund has invested. Through its direct role in investments in the Bulgarian private sector, the Fund seeks to generate profits that will further support its activities and attract investments by others. As part of its investment operations, the Fund may obtain representation on management and supervisory boards of investee companies. In the normal course of business, entities in which the Fund invests may enter into business transactions with each other.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Basis of Accounting

The consolidated financial statements of the Fund are prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") and include the accounts of the Fund and its majority-owned special investment purpose companies ("SIPC") Kapital Direct-1 ADSIP ("KD") and ERG Capital-1 ADSIP ("ERG").

KD was established in September, 2003 and is 54% owned by the Fund, 23% by BAPM and 23% by BACB. ERG was established in August, 2004 and is 70% owned by the Fund and 30% by employees of the Fund. Under the license that KD and ERG received from the Bulgarian Financial Supervision Commission, they are allowed to invest in receivables and real estate, and are exempt from corporate income taxes provided that they distribute at least 90% of their annual earnings to shareholders each year.

The Fund follows investment company specialized accounting practices contained in the American Institute of Certified Public Accountants ("AICPA") Audit and Accounting Guide - Audits of Investment Companies (the "Guide"), which requires investment companies to account for their majority-owned investments at fair value, as opposed to consolidation or equity methods, as such method provides more useful information to users of the financial statements regarding performance of an investment company, or in the case of the Fund, a private investment program.

The Financial Accounting Standards Board ("FASB" or the "Board") is currently working on finalization of its Statement of Position Clarification of the Scope of the Audit and Accounting Guide - Audits of Investment Companies and Accounting by Parent Companies and Equity Method Investors for Investments in Investment Companies (the "SOP"), which is to become effective for fiscal years beginning after December 15, 2004, with earlier application encouraged. The Fund will reconsider its accounting policy once the SOP becomes effective.

On January 17, 2003, the Board issued a FASB Interpretation No. 46 ("FIN No. 46"), Consolidation of Variable Interest Entities, an interpretation of ARB 51. The primary objectives of FIN No. 46 are to provide guidance on the identification

of entities for which control is achieved through means other than through voting rights ("variable interest entities" or "VIEs") and how to determine when and which business enterprise should consolidate the VIEs. In the initial version, FIN No. 46 included private equity funds in its scope.

On October 9, 2003, the Board issued FASB Staff Position, deferring the effective date for applying the provisions of FIN No. 46 for nonregistered investment companies until the finalization of the SOP.

### Cash and Cash Equivalents

For purposes of the consolidated financial statements, the Fund considers all highly liquid financial instruments purchased with maturity of three months or less to be cash equivalents.

### Investment Valuation

The Fund's investments, as set forth in the accompanying consolidated schedule of investments, are not readily marketable and are not listed on an exchange or quoted in an open market. These investments are stated at cost less provisions for estimated losses as determined by management. In determining carrying value, management considers relevant qualitative and quantitative information available. In general, the Fund's policy is to carry investments at cost except where a change in the investee company's circumstances warrants a lower valuation. The values assigned to investments are based on available information and do not necessarily represent amounts that might ultimately be realized, since such amounts depend on future development inherent in long-term investments. These values are subject to change over time and are reviewed periodically. As adjustments become necessary, they are reported in the period in which they become known. Due to the inherent uncertainty of the valuation, those estimated carrying values may differ significantly from the values that would have been used had a ready market for the investments existed, and the differences could be material. There is limited precedent for valuing such investments in the region. Therefore, there is little experience upon which to base the estimate of risk and amount of possible losses. Management's investment valuations are reviewed by the Audit Committee of the Board of Directors (the "Board") and are then adopted by the Board annually, and more often if deemed necessary by management or the Board.

Interest earned on loans is accrued at the contractual rate and credited to income based upon the principal amount outstanding. It is the policy of management to discontinue the accrual of interest and reverse any accrued interest receivable in the event that the quality of the loan has deteriorated to the extent that collectibility of all interest and/or principal cannot be reasonably expected or when it is 90 days past due. Collections of interest and principal on loans in non-accrual status and considered impaired are generally applied as a reduction to the outstanding principal. Once future collectibility has been established, interest income may be recognized on a cash basis.

### Grant Revenue Recognition

The Fund accounts for its Grant activities when funds are received except for the feasibility assessment grant, discussed in Note 1, which is accounted for as related expenses are incurred.

### Depreciation and Amortization

Computer equipment, furniture and equipment, and automobiles are depreciated on a straight-line basis over their estimated useful lives. Leasehold improvements are amortized on a straight-line basis over the lesser of their useful lives or the term of the lease.

### Translation of Foreign Currency

The Fund's functional currency is the U.S. dollar. Generally, the Fund's operating transactions are initiated in U.S. dollars. At September 30, 2004 and 2003 the Fund's assets and liabilities were principally denominated in U.S. dollars at the year-end exchange rate. Revenues and expenses transacted in other currencies are translated into U.S. dollars at historical rates.

The functional currency of KD and ERG is the Bulgarian Lev. For purposes of consolidation their financial statements are translated into U.S. dollars by using period-end, period average, and historical exchange rates for assets and liabilities, income, and equity accounts, respectively. The resulting translation gain or loss is reflected in the consolidated statement of operations and changes in fund balance.

### Lease Financing

The Fund's investments in financial leases are stated at minimum lease payments to be received less unearned

income. Income is recognized by a method which produces a constant periodic rate of return over the life of each lease.

### Rental Property

Rents are recorded as they become due in accordance with the rental contracts. Real estate assets are stated at cost less accumulated depreciation, which, in the opinion of management, are not in excess of each property's estimated undiscounted future cash flows, including estimated proceeds from disposition. Depreciation is computed using the straight-line method, generally over estimated useful lives of 25 years. The cost of leasehold improvements that are not directly billed to lessees are amortized over the term of the applicable leases.

### Donated Services

Members of the Board donate significant amounts of their time to the Fund's programs and receive no compensation or fees for serving as directors. No amounts have been reflected in the accompanying financial statements for such donated services, inasmuch as no objective basis is available to measure the value of such services.

### Technical Assistance

The Fund generally disburses funds for Technical Assistance grants as expenses for the projects are incurred. Since inception the Fund has disbursed technical assistance grants of approximately $2.9 million. In addition, the Bulgarian-American Credit Bank provides technical assistance for its investees but accounts for the costs as normal operating expenses.

### Use of Estimates

The preparation of the consolidated financial statements in conformity with accounting principles generally accepted in the U.S. requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results may differ from those estimates.

### Contingencies

The Fund is subject, from time to time, to administrative and legal proceedings incidental to its business. It is management's opinion that the resolution of these proceedings will not have a material effect on the Fund's consolidated financial statements.

### Concentration of Risk

In accordance with the Grant agreement, all of the Fund's investments are in business activities conducted in Bulgaria. As such, these investments are subject to the political and economic uncertainties associated with doing business in this country.

## 3. INVESTMENTS IN MAJORITY OWNED COMPANIES

The BAEF is the majority owner, and in some cases sole owner, of several investee companies as reflected in the consolidated schedule of investments. Summarized unaudited financial information for the three largest such investments, other than BACB (Note 12) is included in the table below.

Some of these companies, such as BAPM, have been established to facilitate certain investment transactions. For example, Bulgarian law prohibits direct ownership of land by foreign entities such as the Fund. Therefore, in any real estate investment that includes land, such as the Enterprise Building Complex, the Fund must use BAPM or another of its Bulgarian companies to purchase the land in a separate transaction. Other than BAPM, which holds several land and other real estate investments, investments in other such companies are reported based on the underlying investment. If a company holds no investments, the Fund's initial capital contribution to establish the company, adjusted for any income and expenses, is reported in other assets. At September 30, 2004 and 2003 two companies were included in other assets totalling $6,000 and $5,000, respectively.

As reflected in the consolidated schedule of investments the Fund owns 68% of BM Leasing AD ("BML"). In 2004, the Fund issued letters of comfort to three Bulgarian banks on behalf of BML. These letters indicate that the Fund supports its investee, but does not necessarily guarantee their loans to BML. During 2004 BML increased its capital which required a capital contribution from BAEF of $727,909. The Fund paid

$181,471 of this amount in 2004 and the remainder of $546,438 was accrued and subsequently paid in December, 2004.

The following unaudited financial information is as of September 30, 2004 and for the nine months then ended:

|  | AMETA HOLDING (in EUR) | BM LEASING (in EUR) | BAPM (in EUR) |
|---|---|---|---|
| Assets | 18,434,000 | 7,656,000 | 3,290,000 |
| Liabilities | 5,933,000 | 5,787,000 | 1,967,000 |
| Equity | 12,501,000 | 1,869,000 | 1,323,000 |
| Net income | 901,000 | 314,000 | 134,000 |

## 4. REAL ESTATE INVESTMENTS

Rental contracts are multiyear and include cancellation penalties and guarantee requirements. In 2004 two lessees in the Enterprise Building Complex and the lessee of the Drujba retail building provided approximately 67% of the Fund's rental income, respectively 17%, 36% and 14%. In 2003 two lessees in the Enterprise Building Complex provided 69% of rental income, respectively 48% and 21%. The Fund has engaged BAPM to manage its rental properties under a ten-year contract and requires lessees to execute property management agreements with BAPM. Under the Fund's contract with BAPM, any costs directly attributable to the operation, maintenance, management and repair of the rental properties that are not billable to lessees are billed to the Fund.

## 5. FIXED ASSETS

At September 30, fixed assets consisted of:

| (in S) | 2004 | 2003 |
|---|---|---|
| Computer equipment | 106,495 | 94,229 |
| Furniture and equipment | 40,558 | 40,558 |
| Automobiles | 27,100 | 27,100 |
| Leasehold improvements | 37,464 | 55,371 |
| Total cost | 211,617 | 217,258 |
| Accumulated depreciation and amortization | (163,179) | (167,558) |
|  | 48,438 | 49,700 |

## 6. LOANS AND DEBT SECURITIES

In July, 2004 (and as subsequently amended) the BAEF and Raiffeisenbank (Bulgaria) executed a revolving bank loan agreement whereby the Fund can borrow up to €4,000,000 for the purpose of financing its investment activities. The loan is renewable annually with final maturity in June, 2007. Under the loan agreement the Fund collateralized the Enterprise Building Complex and the related rental income. At September 30, 2004 the outstanding principal balance was €4,000,000 ($4,963,600).

In July, 2004 KD issued a €2,600,000 floating rate mortgage bond to finance acquisition of loans from BACB. The bond is collateralized with the purchased loans and the underlying collateral of the loans. Principal payments are due annually through November, 2012 according to a fixed repayment schedule. At September 30, 2004 the outstanding principal balance was €2,618,915 ($3,202,865). The bond is listed on the Bulgarian Stock Exchange for secondary trading.

In September, 2004 ERG and BACB executed a fixed rate loan agreement whereby ERG can borrow up to €1,036,000 to finance the acquisition of investment property with final maturity in June, 2005. Under the loan agreement ERG pledged its value added tax receivable. At September 30, 2004 the outstanding principal balance was €790,400 ($980,806).

## 7. COMMITMENTS

### Investments

As of September 30, 2004, the Board had approved investments totalling $22.0 million, which were subject to the completion of negotiations and the signing of documents. In addition $20.5 million represented undisbursed commitments on existing investments.

| ($ in millions) | BAEF | BACB |
|---|---|---|
| Agribusiness/Food processing |  | 3.4 |
| Manufacturing |  | 0.6 |
| Distribution/Transportation |  | 3.3 |
| Hotels & Tourism |  | 11.4 |
| Real Estate/Housing construction | 7.0 | 11.9 |
| Residential Mortgage Loans |  | 1.9 |
| Financial Services | 2.7 | 0.3 |
|  | 9.7 | 32.8 |

Operating Leases

The Fund leases office space under an agreement that expires in September, 2007. The total remaining minimum lease payments amount to $90,000. Rent expense for the Chicago office will be $29,000 in 2005, $30,000 in 2006 and $31,000 in 2007. Rent expense for 2004 and 2003 for both the Chicago and Sofia offices was $70,000 and $62,000 respectively.

Guarantees

As stated in Note 12, the Fund has guaranteed the EBRD, FMO, DEG and BSTDB loans to BACB.

## 8. INCENTIVE PLAN

In 2001 the Board of Directors adopted a long-term equity incentive plan for certain employees of the Fund and its subsidiaries. The plan became operational on October 1, 2001 and provides for percentage participation in returns achieved upon exit of specified equity investments. Plan participants are subject to a vesting requirement of 20% per year, which accelerates to 100% at the time of exit of a plan investment. The Audit Committee of the Board of Directors supervises administration, investment valuations and awards under the plan.

## 9. RETIREMENT PLAN

The Fund offers its U.S. citizen employees a retirement plan under Internal Revenue Code section 401(k). The Fund matches employee contributions of up to 7% of salary and makes an additional, annual contribution to the plan in accordance with provisions of the plan. Full vesting in the Fund's contributions occurs after five years of employment. Cost of the plan is approximately $138,000 and $102,000 in 2004 and 2003, respectively. The plan custodian and administrator is Fidelity Investments.

## 10. TAX STATUS

United States

The Fund is exempt from federal income taxes under Section 501(c)(3) of the U.S. Internal Revenue Code (the "Code") and has been classified as an organization that is not a private foundation as defined in Section 509(a)(1) of the Code.

Bulgaria

Under a bilateral agreement between the Government of the United States of America and the Government of Bulgaria regarding cooperation to facilitate the provision of assistance, the Fund is exempt from taxation on income received in connection with implementation of the U.S. assistance programs.

## 11. FINANCIAL HIGHLIGHTS

Due to the private equity nature of its operations, the Fund follows the Guide issued by the AICPA. The revised Guide, issued in November 2001, introduced a new requirement for private equity funds to present financial highlights as part of consolidated financial statements for reporting periods ending after December 15, 2001. According to the Guide, financial highlights should consist of total return, ratio of expenses to average net assets (fund balance) and ratio of net investment income/(loss) to average net assets (fund balance) for the most recent reporting period. The AICPA Technical Practice Aid, issued in February 2002, provides guidance in calculating the ratios.

|  | 2004 | 2003 |
|---|---|---|
| **RATIOS TO AVERAGE FUND BALANCE** | | |
| Ratio of net investment income | **2.8%** | 1.2% |
| Ratio of expenses | **5.3%** | 4.7% |
| TOTAL RETURN | **4.8%** | 1.2% |

Ratios to average fund balance are computed as year-end net investment income and expenses divided by the average fund balance, which is calculated based on quarterly data. Total return represents a change in the value of an investment company, measured by comparing the aggregate ending value of the fund balance to the aggregate beginning value of the fund balance.

## 12. INVESTMENT IN BULGARIAN-AMERICAN CREDIT BANK ("BACB")

The BACB was established by the Fund in 1996 to facilitate lending to small and medium enterprises and hotels in Bulgaria. Subsequently it initiated home mortgage lending and residential construction lending programs. The Fund's

investment in BACB is included in the table in the accompanying consolidated schedule of investments. The carrying value is based on cost, adjusted by valuation changes made in accordance with the Fund's investment valuation policy.

A. During 2004 and 2003 the following transactions occurred between the Fund and BACB:

a) The Fund recognized interest income of $1,767,000 in 2004 and $1,890,000 in 2003 on its loans.

b) Certain administrative support in the normal course of operations is shared by the Fund and BACB. Operating expenses included in BACB's income statements totalled €4,055,000 and €3,407,000 for its fiscal years ended December 31, 2004 and 2003, respectively.

c) The Fund has provided two debt facilities to the BACB. The first facility is a fixed rate, $15 million line of credit that was initiated in March, 1997 and has been fully drawn. The

maturity of $10 million of this line has an indefinite term with repayment subject to approval of the Bulgarian National Bank. This amount is also subordinated to all other debt of the BACB and is treated as a supplementary capital reserve (tier 2 capital) for Bulgarian National Bank reporting purposes. In addition, this line of credit is fully subordinated under long term loan facilities that the BACB has received from the financial institutions listed in the table below. Because of this the loan agreement with respect to the maturity of the remaining $5 million states that the maturity is extended until the final maturity of any loan to which it is subordinated. The Fund has also guaranteed each of the loans except for the IFC facility.

d) The second loan from the Fund is a floating rate, $6 million line of credit that was initiated in April, 1999 and is renewable annually until April, 2007. As of September 30, 2004 and 2003 $1,900,000 and $6,000,000, respectively were drawn.

Following is information on each of the loans in c) above as of September 30, 2004:

| INSTITUTION | FACILITY AMOUNT | FINAL MATURITY |
|---|---|---|
| International Finance Corporation ("IFC") | $   5 million | 2008 |
| European Bank for Reconstruction and Development ("EBRD")* | €  5.1 million | 2008 |
| Nederlandse Financierings-Maatschappij voor Ontwikkelingslanden N.V. ("FMO") | €  6 million | 2008 |
| Nederlandse Financierings-Maatschappij voor Ontwikkelingslanden N.V. ("FMO") | €  7 million | 2010 |
| DEG - Deutsche Investitions – und Entwicklungsgesellschaft mbH ("DEG") | €  6 million | 2009 |
| DEG - Deutsche Investitions – und Entwicklungsgesellschaft mbH ("DEG") | €  5 million | 2010 |
| Black Sea Trade and Development Bank ("BSTDB") | €  10 million | 2010 |

* A new loan agreement for €10 million was executed in October, 2004. Final maturity of the loan is in 2009.

B. Following are extracts from the audited financial statements of BACB as of December 31, 2004 and 2003 and for the years then ended:

17

## BULGARIAN - AMERICAN CREDIT BANK AD STATEMENTS OF INCOME

For the Years ended December 31, 2004 and 2003

Expressed in thousands of Euro

| | 2004 | 2003 |
|---|---|---|
| Interest income | € 20,529 | € 14,436 |
| Interest expense | (6,092) | (4,834) |
| **Net Interest Income** | 14,437 | 9,602 |
| Fees and commission income, net | 1,306 | 727 |
| Gains/(losses) from securities | 59 | 0 |
| Gains/(losses) from foreign currency dealings | 172 | 144 |
| Gains/(losses) from foreign currency revaluation | (369) | (854) |
| Other operating income | 374 | 192 |
| **Operating income** | 15,979 | 9,811 |
| Operating expenses | (4,055) | (3,407) |
| Provisions for impairment | (3,523) | (767) |
| **Income before taxation** | 8,401 | 5,637 |
| Income taxes | (1,192) | (992) |
| **Net income** | € 7,209 | € 4,645 |

# BULGARIAN - AMERICAN CREDIT BANK AD BALANCE SHEETS

As of December 31, 2004 and 2003

Expressed in thousands of Euro

| | 2004 | 2003 |
|---|---|---|
| **ASSETS** | | |
| Cash and balances with the Central Bank | € 8,109 | € 2,650 |
| Due from other banks | 22,263 | 8,897 |
| Loans and advances to customers | 113,861 | 89,509 |
| Investment securities — available-for-sale | 6,007 | 4,908 |
| Investment in associate | 0 | 277 |
| Other assets | 443 | 547 |
| Property, plant and equipment | 2,409 | 2,649 |
| **Total Assets** | **€ 153,092** | **€ 109,437** |
| | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Liabilities** | | |
| Deposits from banks | € 0 | € 15,442 |
| Deposits from customers | 25,531 | 18,240 |
| Other liabilities | 1,490 | 979 |
| Other borrowed funds | 59,029 | 29,475 |
| Debt securities outstanding | 39,610 | 25,196 |
| **Total Liabilities** | **125,660** | **89,312** |
| **Shareholders' Equity** | | |
| Share capital | 6,432 | 6,391 |
| Share premium | 359 | 274 |
| Retained earnings | 20,484 | 13,275 |
| Revaluation reserve | 157 | 185 |
| **Total Shareholders' Equity** | **27,432** | **20,025** |
| **Total Liabilities and Shareholders' Equity** | **€ 153,092** | **€ 109,437** |

# BULGARIAN – AMERICAN CREDIT BANK AD STATEMENTS OF CASH FLOWS

For the Years ended December 31, 2004 and 2003

Expressed in thousands of Euro

| | 2004 | 2003 |
|---|---:|---:|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net income | € 7,209 | € 4,645 |
| Adjustments to reconcile net income to net cash | | |
| provided by operating activities: | | |
| Increase in provision for impairment | 3,523 | 767 |
| Deferred tax expense / (income) | 41 | (6) |
| Depreciation and amortization | 431 | 427 |
| Increase in statutory minimum required reserve | (6,000) | (7,286) |
| Investment in loans and advances to customers | (73,013) | (52,896) |
| Loan repayment | 43,880 | 33,823 |
| Decrease / (increase) in other assets | 104 | (79) |
| Increase in other liabilities | 474 | 126 |
| Net cash (used in) operating activities | (23,351) | (22,881) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Purchase of securities | (3,873) | (1,680) |
| Proceeds from sale and redemption of securities | 2,696 | 5 |
| Investment in associates, net | 77 | (77) |
| Purchase of property, plant and equipment | (191) | (148) |
| Proceeds from sale of property, plant and equipment | 0 | 8 |
| Net cash (used in) investing activities | (1,291) | (1,892) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Increase in deposits from banks and customers, net | 2,549 | 4,392 |
| Proceeds from other borrowed funds | 42,169 | 14,603 |
| Repayments of other borrowed funds | (21,500) | (12,298) |
| Proceeds from debt securities outstanding | 18,081 | 17,947 |
| Repayments of debt securities outstanding | (3,312) | 0 |
| Issue of ordinary shares | 126 | 0 |
| Net cash provided by financing activities | 38,113 | 23,645 |
| Net effect of exchange rate changes on cash and cash equivalents | (501) | (1,204) |
| Net increase / (decrease) in cash and cash equivalents | 12,970 | (2,034) |
| | | |
| Cash and cash equivalents at the beginning of the year | 10,528 | 12,562 |
| Cash and cash equivalents at the end of the year | € 23,498 | € 10,528 |
| | | |
| **SUPPLEMENTAL CASH FLOW INFORMATION:** | | |
| Income tax paid | € 694 | € 967 |
| Interest paid | € 5,590 | € 4,362 |

20

## BOARD OF DIRECTORS

**STEPHEN W. FILLO** [1,2,3]
*Chairman*

President
Fillo & Co., Inc.

Corporate Director
Trustee of Foundations

**FRANK L. BAUER** [1]
*President & Chief Executive Officer*

**JOSEPH J. BORGATTI** [1,2,3]
J.J. Borgatti Associates

**LYNN M. DAFT** [2]
*Senior Vice President,*
Promar International

**LEONARD M. HARLAN**
*President,*
Castle Harlan, Inc.

**GARY E. MACDOUGAL**
*Chairman Emeritus*
Bulgarian-American Enterprise Fund

Corporate Director
Trustee of Foundations

**ANTHONY R. MANNO, JR.** [2]
*President & Chief Executive Officer*
Security Capital Research
& Management Inc.

**CHRIS J. MATLON** [1,2,3]
*Corporate Director*

**MARSHALL LEE MILLER** [1,3]
*Partner*
Baise & Miller P.C.

**CARL H. PFORZHEIMER III** [1,3]
*Managing Partner*
Carl H. Pforzheimer & Co.

1  Executive Committee
2  Audit Committee
3  Bank Oversight Committee

## BULGARIAN ADVISORY BOARD MEMBERS

**VALENTIN BRAYKOV**
Braykov's Legal Office
Sofia, Bulgaria

**PENKO DINEV**
*Manager of Export Regulations*
IBM CEMA

## MANAGEMENT

**FRANK L. BAUER**
*President & CEO*

**STOYAN DINCHIISKI**
*Executive Director*
Bulgarian – American Credit Bank

**DENNIS E. FIEHLER**
*Chief Financial Officer*

**MICHAEL HUNSBERGER**
*Managing Director*
Real Estate & Mortgage Finance

**NANCY L. SCHILLER**
*Managing Director*

**MARIA SHEYTANOVA**
*Chief Operating Officer*
Bulgarian – American Credit Bank

**DIMITER S. VOUTCHEV**
*Executive Director*
Bulgarian – American Credit Bank

Design: Bridgewater/Chicago

333 West Wacker Drive
Suite 460
Chicago, IL 60606
312.629.2500
312.629.2929 (fax)
chicago@baefinvest.com

3 Shipka Street
Sofia 1504, Bulgaria
359.2.948.9200
359.2.946.0118 (fax)
sofia@baefinvest.com
www.baefinvest.com

Bulgarian-American Credit Bank
16 Krakra Street
Sofia 1504, Bulgaria
359.2.965.8358
359.2.944.5010 (fax)



BULGARIAN
AMERICAN
ENTERPRISE
FUND