## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Stroitelstvo Bulgaria Ltd. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | Case No. 07cv00634 RMC |
| | : | |
| The Bulgarian-American Enterprise Fund, *et al*. | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO FEDERAL RULES 12(b)(2) AND 12(b)(3), OR ALTERNATIVELY BASED ON THE DOCTRINE OF *FORUM NON CONVENIENS*

COMES NOW, plaintiff Stroitelstvo Bulgaria Ltd. (hereinafter "plaintiff"),

by and through undersigned counsel, and pursuant to Rule 12 of the Federal Rules of Civil

Procedure, and LCvR 7, and this Court's order entered January 25, 2008, opposes

Defendant Bulgarian American Enterprise Fund's Motion to Dismiss Plaintiff's

Amended Complaint Pursuant to Federal Rules 12(b)(2) and 12(b)(3), or Alternatively

Based on the Doctrine of *Forum Non Conveniens*, and in opposition thereto respectfully

refers this Honorable Court to the annexed memorandum of points and authorities, and

exhibits, as well as the videotape depositions filed January 25, 2008..

WHEREFORE, plaintiff prays that the instant motion be denied.

Respectfully submitted,

Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*: srolinski@rolinski.com

Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*: (202) 466-3883
*Fax*:    (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com


***Attorneys For Plaintiff***

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Stroitelstvo Bulgaria Ltd.                              :
                                                        :
          Plaintiff,                                    :
                                                        :
                                                        :
     vs.                                                :          Case No. 07cv00634 RMC
                                                        :
The Bulgarian-American Enterprise Fund, *et al.*        :
                                                        :
          Defendants.                                   :


**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT
TO FEDERAL RULES 12(b)(2) AND 12(b)(3) OR ALTERNATIVELY BASED ON
THE DOCTRINE OF *FORUM NON CONVENIENS***

**INTRODUCTION**

Defendant BAEF, a Delaware corporation with its principal place of business in Chicago Illinois, and which operated through $58,000,000.00 in federal funds, claims that this court lacks personal jurisdiction over it, and that venue is improper, and that Bulgaria is a more convenient forum.

As is more fully set forth below, this court has personal jurisdiction over BAEF, and venue is proper here, as a result of BAEF's general and specific activities in the District of Columbia, and as a result of BAEF's national contacts.

## I. STATEMENT OF PROCEEDINGS

Plaintiff Stroitelstvo Bulgaria Ltd. (hereinafter "Plaintiff") filed the initial complaint against defendant Bulgarian American Enterprise Fund ("BAEF") and defendant the Bulgarian American Credit Bank[1] (the "Bank," collectively with BAEF the "Defendants") on April 4, 2004.

BAEF filed three motions on August 8, 2007:  its Motion to Transfer the Action to the Northern District of Illinois Pursuant to 28 U.S.C. § 1404(a) (the "BAEF Motion to Transfer"), docket # 12; a Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rules 12(b)(2) and 12(b)(3), or Alternatively Based on the Doctrine of *Forum Non Conveniens*, docket # 10 the ("First BAEF Jurisdiction/Venue Motion"); and, a Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rules 9(b) and 12(b)(6), docket # 11 (the "First BAEF Pleadings Motion").

---

[1] Service on the Bank was effected on July 4, 2007 by delivery to the Ministry of Justice of Bulgaria pursuant to the Hague Convention On The Service Abroad Of Judicial And Extra-Judicial Documents In Civil And Commercial Matters. *See* Amended Praecipe Regarding Service, Docket Number 13. Counsel for BAEF declined to accept service on behalf of the Bank by electronic mail on June 25, 2007.

On September 17, 2007, plaintiff filed its opposition to the BAEF Motion to

Transfer. Docket # 19, and its opposition to the First BAEF Jurisdiction/Venue Motion.

On September 17, 2007, plaintiff also filed its First Amended Complaint (the

"Am. Compl."), docket # 22, pursuant to *Confederate Mem'l Assoc, Inc. v. Hines* 995

F.2d 295, 299 *reh and reh en banc den.* (D.C. Cir. 1993) (addressing the filing of an

amended complaint as a matter of right following the filing of a motion to dismiss).

The Amended Complaint asserted:  Violations of the Racketeer Influenced

Corrupt Organizations Act ("Civil RICO," at Count One); Breach of Contract (Count

Two); Intentional Interference with Contract (Count Three); Intentional Interference with

Prospective Advantage (Count Four); Breach of Fiduciary Duty (Count Five); Abuse of

Process (Count Six); and Violation of Bulgarian Law (Count Seven).  The Complaint also

asserted Civil Conspiracy and Vicarious Liability in Count Eight.

Plaintiff also filed on September 17, 2007, an opposition to the First BAEF

Pleadings Motion. Docket # 20.  That opposition relied in part on the filing of the First

Amended Complaint. *Id.*, at #20, pp. 9-10.

On September 24, 2007, this court denied without prejudice as moot the First

BAEF Jurisdiction/Venue Motion, and the First BAEF Pleadings Motion.

Pursuant to this Court's minute order entered October 1, 2007, plaintiff and BAEF

filed a Joint Statement Regarding Jurisdictional Discovery on October 15, 2007.  That

statement described the following contemplated discovery:  Plaintiff would depose BAEF

witness Nancy L. Shiller ("Ms. Shiller") by telephone and BAEF expert Silvy Chernev

("Mr. Chernev") in Bulgaria.  BAEF would depose plaintiff's experts Vladimir Skochev

2

("Mr. Skochev") Maria Slavova ("Ms. Slavova") in Bulgaria. The parties also agreed to exchange limited categories of documents pertaining to jurisdictional defenses.

The deposition of Ms. Shiller was conducted by telephone on November 15, 2005. Excerpts of the transcript of that deposition are appended hereto as **Plaintiff's Exhibit ("PX") 1A**. The deposition of Mr. Chernev was conducted and videotaped in Sofia Bulgaria on December 5, 2007. Excerpts of the transcript of that deposition are appended hereto as Plaintiff's Exhibit **PX 2**. The deposition of Mr. Skochev was conducted and videotaped in Sofia Bulgaria on December 6, 2007. Excerpts of the transcript of that deposition are appended hereto as **PX 3A**. The deposition of Ms. Slavova was also conducted and videotaped in Sofia Bulgaria on December 6, 2007. Excerpts of the transcript of that deposition are appended hereto as **PX 4A**.

The parties also produced and exchanged documents as described in the October 15, 2007, Joint Statement.

On December 19, 2007, the trial court entered a minute order as follows:

> According to Defendant Bulgarian-American Enterprise Fund ("BAEF") in its Reply in Support of its Motion to Transfer [25], the parties have completed jurisdictional discovery and BAEF intends to file motions to dismiss on January 4, 2008, with responses and replies to follow. Defendant BAEF has requested that the Court review the motions to dismiss before ruling on the pending Motion to Transfer. In light of that request, Defendant BAEF's Motion to Transfer [12] is DENIED without prejudice, but may be resuscitated, if necessary, following resolution of the motions to dismiss.

BAEF filed on January 4, 2008, the instant Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Federal Rules 12(b)(2) and 12(b)(3), or Alternatively Based on the Doctrine of Forum Non Conveniens (the "Second BAEF Jurisdiction/Venue Motion"), docket # 26, as well as a Motion to Dismiss the Amended Complaint Pursuant

to Federal Rule 12(b)(6) ( the "BAEF 12(b)(6) Motion"). Docket # 27. Plaintiff filed its

opposition to the BAEF 12(b)(6) Motion on January 25, 2008.

Plaintiff also filed, on January 25, 2008, a notice of filing of the audiovisual tapes,

and full transcripts, of the depositions of Mr. Chernev, Mr. Skochev and Ms. Slavova.

Defendant the Bank has made no appearance in this case.

For the reasons set forth below, the Second BAEF Jurisdiction/Venue Motion

must be denied.

## II. THE FACTS PERTINENT TO THE INSTANT MOTION

### A. BAEF's Organization and Activities

BAEF is a not-for-profit corporation established pursuant to the Support for East

European Democracy Act, 22 U.S.C. §§ 5402, 5421 (the "SEED Act"). Its ostensible

purpose is and was the promotion of private sector development and entrepreneurship in

Bulgaria through, among other things, grants, loans, and equity investments. Am.

Compl., at ¶ 6. BAEF commenced its operations in 1992, with fifty eight million dollars

($58,000,000.00) in funding from the American government. Am. Compl., at ¶ 6.

BAEF is a corporation organized under the laws of Delaware. Declaration of

Nancy Shiller ("Shiller, Decl."), appended as Defendant BAEF's Exhibit **("DX") 1** to

BAEF's Second Jurisdiction/Venue Motion, at ¶ 4. Ms. Shiller is BAEF's managing

director. Deposition of Nancy Shiller, ("Shiller dep."), **PX 1A**, at 5, and she conducts

BAEF business from Charlottesville, Virginia. *Id.*, at 10. BAEF has its U.S. office in

Chicago, Illinois, and regularly transacts business in Chicago.

BAEF operates under a Board of Directors. Shiller, dep., **PX 1A**, at 13-16.

In 1992, BAEF received, through the U.S. Agency for International Development, ("U.S.AID") approximately $55,000,000.00 in funding under the SEED Act, and a subsequent modification adding three million dollars. Shiller, Decl. at ¶¶ 3, 6, and Shiller dep., **PX 1A** at 8-9. The purpose of the grant is to promote private sector development in Eastern Europe. Shiller, decl. at ¶ 3.

BAEF must report in writing to USAID every six months as a condition of the original grant agreement between USAID and BAEF." Shiller, decl., at ¶ 6; Shiller dep., **PX 1A**, at 29. Those reports must include BAEF's financial statements, any major accomplishments in the preceding six months, and any political developments that might be of interest or have an impact on the ability to do business in Bulgaria. Shiller dep., **PX 1A** at 28-29. Those reports are mailed to Washington, D.C. Shiller dep., **PX 1A** at 30.

BAEF has a contact person at USAID for the semi-annual reports. Shiller dep., **PX 1A** at 30. That contact person is in Washington, D.C. *Id.*

BAEF has a "termination commencement date" of September 30, 2006. Shiller dep., **PX 1A** at 49. An entity called the America for Bulgaria Foundation (the "Foundation") has been incorporated by BAEF as its "legacy institution." Shiller dep., **PX 1A** at 56, 65. There is no one on the board of directors of the Foundation who is not on the BAEF Board of Directors. *Id.* at 65.

BAEF, through the operations of the Bank, has amassed "profits" of as much as $200,000,000.00. Shiller dep., **PX 1A** at 61. The profits are the result of "investing in Bulgaria for the past 15 plus years with U.S. taxpayer dollars." Shiller dep., **PX 1A** at 61. Some of those monies are held in banks in Chicago. Shiller dep., **PX 1A** at 63.

BAEF personnel travel to Washington, D.C. to meet with representatives of USAID, the Department of State ("DOS") and members of Congress. Shiller dep., **PX 1A at 56.**[2]

In November of 2005, BAEF's Stephen W. Filo ("Mr. Filo"), Joseph J. Borgatti, ("Mr. Borgatti") Frank L. Bauer ("Mr. Bauer"), Carl Pforzheimer ("Mr. Pforzheimer") and Ms. Shiller traveled to Washington and met with representatives of DOS and US AID. Shiller dep., **PX 1A at 56.**

In March of 2006, Mr. Filo, Mr. Borgatti, Mr. Pforzheimer, BAEF's Gary MacDougal and Ms. Shiller traveled to Washington and met again with representatives of DOS and UAID, as well as with representatives of the United States Congress.

In October 2006, Ms. Shiller traveled to Washington to discuss with five representatives from DOS and two or three representatives from USAID the amount of money from the Bank's and BAEF's operations that would be provided to the legacy Foundation. Shiller dep., **PX 1A at 62-64.** As Ms. Shiller describes those meetings:

> We were talking about whether the Foundation would receive 100% of the Fund's proceeds or a lesser amount....

> The question is, after investing in Bulgaria for the past 15 plus Bulgaria and return them to the U.S. Treasury. The Answer, if you were to ask our Board, if you were to ask the State years with U.S. taxpayer dollars and doing it at a profit, is it justified to take all of those funds back out of Department and if you were to ask the Bulgarian representatives, would be no because the profits were made in Bulgaria. The purpose of this meeting was to discuss how much of the Fund's returns remain in Bulgaria as part of this Foundation and how much go back to the United States.

> **Q**    Has that decision been made now?
> **A**    It's not final but we're approaching that answer.

---

[2] Plaintiff has obtained limited discovery from BAEF, by mutual agreement. The time period over which records were provided was limited, and the records were limited to travel records for that time period. Telephone records, correspondence, and written or electronic communications were not provided.

| | |
|---|---|
| **Q** | When you were discussing the subject, did anyone take into account or did anyone discuss a return of the original grant amount of 55 million plus? |
| **A** | Did anyone? Yes. |

| | |
|---|---|
| **Q** | Was that part of the discussion mainly that the U.S. taxpayer -- as you referred to him or her -- should at least get back, in the form of profits or otherwise, the initial grant? |
| **A** | Could you restate that, please. |

| | |
|---|---|
| **Q** | Sure. In the course of the discussion, did someone -- you or the Congressman or someone else -- suggest that before a decision is made to leave some of these funds or proceeds in Bulgaria, the initial funding should be returned to the United States? |
| **A** | That was one course of discussion that the parties had that was a consideration. The question is, is it all or part.... |

Shiller dep., **PX 1A** at 56-59.

BAEF has previously been sued in the United States District Court for the District of Columbia for actions arising out of a real estate development project in Bulgaria. *Novecon Ltd. v. Bulgarian-American Enterprise Fund,* 190 F.3d 556 (D.C. Cir. 1999). *Novecon* was brought by a "Washington D.C. firm," according to BAEF's own description. *Id.* at 563. A court, in disposing of a motion to dismiss for failure to state a claim, may take judicial notice of published court opinions. *Covad Comm. Co. v. Bell Atlantic Corp.,* 407 F.3d 1220, 1222 (D.C. Cir. 2005). BAEF apparently vigorously, but unsuccessfully, challenged venue in *Novecon.* At 562.

### B. BAEF's Relationship to the Bank

The Bank commenced banking operations in May 1997. Am. Compl., at ¶ 7. The Bank operated primarily as an investing bank in the areas of small and medium size enterprises (SME) lending, construction lending and home mortgage lending. Am. Compl., at ¶ 7.

7

The main shareholders of the Bank were BAEF and Bulgarian American Property

Management EOOD ("BAPM"), which held 99.99% and 0.01% of the shares,

respectively. BAEF was a 99.99% shareholder of the Bank at the time of its formation.

BAEF was the parent company of BAPM, which conducts BAEF's property management

operations. Am. Compl., at ¶ 6. As of the end of fiscal year 2004, BAEF was also the

owner of a 68% interest in BM Leasing ("BML"). Am. Compl., at ¶ 6.

The Bank operates under a Supervisory Board. Shiller dep., **PX 1A** at 19. At

least over the last three to four years, at least two of the banks' supervisory Board

Members have also been members of the BAEF Board of Directors. Shiller dep., **PX 1A**

at 19-21.

BAEF described the Bank as its major operational subsidiary. Am. Compl., at ¶

7. The Bank is and was BAEF's "major operational subsidiary." Shiller dep., **PX 1A**, at

22.

The Bank was funded by BAEF, which in turn received funding through the

SEED Act. Am. Compl., at ¶ 7. The Bank is a debtor of BAEF. Shiller dep., **PX 1A** at

26.

The Bank is BAEF's principal asset. *Id.* "The majority" of BAEF's profits have

come from the Bank's operations. Shiller dep., **PX 1A** at 61-61. BAEF includes the

Bank's financial statement in the back of BAEF's financial statement, and includes no

other entities in that financial statement other than its own. Shiller dep., **PX 1A**, at 22.

In its 2004 Annual Report, **PX 5**, BAEF discloses that:

The Audit Committee continues its regular quarterly meetings plus ad hoc
sessions when required. The Bank Oversight Committee, created last year to
monitor the BACB more closely, also meets with great frequency. Board
members who serve on these committees spend substantial time discharging their

duties, including attending frequent meetings and conferences, and making additional in-country visits. At p.5.

Grants received from AID are conditioned upon the Fund's compliance with the requirements of the Grant agreement with AID and the SEED Act, which impose certain U.S. policy objectives and reporting obligations. At p.12.

Certain administrative support in the normal course of operations is shared by the Fund and BACB. At p. 17. [3]

On BAEF's website, at baefinvest.com, BAEF lists seven persons under "Management." Shiller dep., **PX 1A** at 14-19 **PX 1B**. (Shiller deposition exhibit 2). The reference to "Management" on BAEF's website refers to "overall management" of BAEF and the Bank. Shiller dep., **PX 1A** at 18-19. The Bank reports to BAEF "if there is a troubled loan of significant size (because it) could have a significant impact on their financial statements." Shiller dep., **PX 1A** at 38.

### C.  The Lending Contract Between Plaintiff and the Bank[4]

Plaintiff entered into a Loan Agreement with the Bank on or about March 24, 2005, (the "Contract,") a copy of which is appended as Exhibit A to the Amended Complaint. Am. Compl. at ¶ 10. The Contract obligated the Bank to provide funds to Plaintiff on specified terms and conditions. Am. Compl. at ¶ 10. On March 24, 2005, Plaintiff executed and delivered a Promissory Note (the "Note"), in the amount of two million six hundred fifty nine thousand seven hundred and four Euro (2,659,704 EUR) (the "Total Note Amount"), due and payable according to its terms in 28 months. Am. Compl. at ¶ 11.

---

[3]  The 2004 BAEF Annual Report, **PX 5**, was obtained by plaintiff on the Internet at *ww.baefinvest/com/eng/annuals* and is subject to judicial notice. *See Comm. Satellite Corp. v. F.C.C.*, 611 F.2d 883, 902, n. 31 (D.C., 1977) (court may take judicial notice of publicly-filed annual reports).

[4]  A detailed description of the facts related to the substantive claims set out in the Amended Complaint is set out in plaintiff's opposition to BAEF's 12(b)(6) Motion, at 3-15.

Plaintiff informed the Bank of the names of the contract purchasers, Am. Compl. at ¶ 14, and Plaintiff engaged contractors, subcontractors, suppliers, tradesmen and mechanics to work on the Project, Am. Compl. at ¶ 15.

On November 11, 2005, the bank wrongfully and without cause suspended credit and asserted an event of default and the right to recover 970,438 EUR, comprised of: a) the drawdown amount of 361,000 EUR; b) the Total Note Interest of 553,143 EUR; and c) the entire Management Fee of 77,511 EUR. The Bank refused to disburse the remaining funds required by the Contract. Am. Compl. at ¶ 19.

The alleged event of default was based on the purported failure of Plaintiff to obtain prior consent of the Bank for certain preliminary contracts, and on Plaintiff's failure to transfer certain advanced payments from the buyers. Am. Compl. at ¶ 20. The alleged breach was groundless and pre-textual. Am. Compl. at ¶ 21.

The Bank, and thus BAEF, knew that the purpose of the Contract was the provision of funds sufficient to enable Plaintiff to design, construct and sell residential housing in Bulgaria. Am. Compl. at ¶ 78. The Bank, and thus BAEF, knew that Plaintiff had entered into contracts with suppliers, vendors, tradesmen and others for the design and construction of residential housing in Bulgaria, and knew of the contracts and the contract terms. Am. Compl. at ¶ 79. The Bank, and thus BAEF, knew that Plaintiff had entered into contracts of sale for the purchase of residential housing in Bulgaria and knew the contract terms. Am. Compl. at ¶ 80. The Bank, and thus BAEF, knew that Plaintiff required the loan funds from the Contract in order to perform under the terms of the contracts entered into for the Project, and to receive the benefits of such contracts. Am. Compl. at ¶ 81.

10

The Bank deliberately, and in bad faith, and in order to strip Plaintiff's assets, including, but not limited to, its interests in the contracts described above, and in order to interfere with those contracts, failed and refused to provided the funds required by the Contract to Plaintiff, and wrongfully suspended credit, and wrongfully froze and attached and interfered with Plaintiff's assets. Am. Compl. at ¶ 82.

Instead of meeting its obligations under the Contract, on November 15, 2005, the Bank, through BAPM, proposed to purchase from Plaintiff "all available units" for 100,000 EUR plus assumption of the debt. Am. Compl. at ¶ 23. That proposed purchase price was in an amount substantially below the value of the assets that BAPM sought to purchase. Am. Compl. at ¶ 24. BAPM failed to disclose that it was affiliated or associated with the Bank. Am. Compl. at ¶ 23.

Instead of meeting its obligations under the Contract the Bank commenced a campaign to interfere with Plaintiff's Project.

The Bank falsely, and maliciously, and with intent to damage plaintiff, and disrupt plaintiff's ability to perform under the Project, and to disrupt plaintiff's construction of the Project, and to interfere with plaintiff's ability to obtain sales revenue from the Project, advised the Project unit purchasers and plaintiff's construction team, that plaintiff was in default under the Contract, and that the Bank intended to put plaintiff in bankruptcy, and that the investment of the Project unit purchasers was unsafe, and that the construction team would be faced with financial losses on the Project. Am. Compl. at ¶ 26.

As a direct and consequential and foreseeable result of the Bank's failure to meet its obligations under the Contract, and its statements to Project unit purchasers and the construction team, Project unit purchasers withdrew from their contracts, or elected to assign

11

their contracts to less creditworthy purchasers, and members of the construction team withdrew from participation in the Project. Am. Compl. at ¶ 28.

On December 12, 2005, the Bank, proceeding *ex parte*, pursuant to an Application apparently filed on or about December 6, 2005, wrongly obtained a decree of execution in the amount of 970,438,41 EUR. Am. Compl. at ¶ 31. The Bank utilized that improper ruling to attach and freeze the assets of Plaintiff. Am. Compl. at ¶ 31[5]. The Bank's purpose in initiating the litigation to freeze Plaintiff's assets was to strip Plaintiff of those assets. Am. Compl. at ¶ 31.

Under the duress created by the improper suspension of credit and the enforcement of the improper judgment, Plaintiff was forced to enter into an Agreement with the Bank (the "Agreement,") on or about May 9, 2006. Am. Compl. at ¶ 34. The Agreement required Plaintiff to take on credit from Investbank in the amount of 563,000 EUR and pay the alleged debt to the Bank. As a consequence of its wrongful conduct the Bank improperly extracted 170,000 EUR more than the actual debt. Am. Compl. at ¶ 35.

The wrongful conduct of the Bank as alleged in the Amended Complaint conforms with the Bank's pattern and practice, and is part of the Bank's overall scheme to strip assets and equity from its borrowers. Am. Compl. at ¶ 41. On at least four other occasions, involving four other small businesses, the Bank has utilized the same pattern of wrongful conduct in an attempt to strip the equity and the assets from those businesses. Am. Compl. at ¶ 42.

BAEF's direct and indirect conduct and participation included its transmission of funds to the Bank without appropriate safeguards, and without appropriate oversight, and

---

[5] BAEF's expert testified that normally creditors in Bulgaria do not execute on the initial writ while an appeal is taking place, even though a suspension of all or part of that writ is not binding. Chernev dep. **PX 2A,** at 104-105.

without appropriate review, and included its failure to properly or fully report the conduct

of the Bank, while accepting without inquiry, review or supervision, the benefits of the

Bank's wrongful conduct. Am. Compl., at ¶ 61.

At all times pertinent to the averments of the Amended Complaint, the Bank acted

as and held itself out as a department of BAEF. Am. Compl. at ¶ 45. The Bank's actions

and decisions were subject to the control and the direction of BAEF. Am. Compl. at ¶

48. The Bank's actions and decisions were subject to the supervision of BAEF. Am.

Compl. at ¶ 49. 50. The Bank's actions and decisions were subject to the policies and the

demands of BAEF. Am. Compl. at ¶ 50. BAEF ratified and affirmed the conduct of the

Bank as alleged in the Amended Complaint, and BAEF failed to repudiate the wrongful

conduct of the Bank. Am. Compl. at ¶ 51.

In failing to supervise the actions of the Bank, and in failing to review the actions

of the Bank, and by failing to monitor the use of federal monies for its intended purposes,

and in failing to take any steps to ensure that the SEED Act funds were properly utilized

by the Bank for the purposes set out in the SEED Act, BAEF acted with willful blindness,

and deliberate ignorance and conscious avoidance. Am. Compl. at ¶ 52. By failing to

supervise the actions of the Bank, and by failing to review the actions of the Bank, and by

failing to monitor the use of federal monies for its intended purposes, and by failing to

take any steps to ensure that the SEED Act funds were properly utilized by the Bank for

the purposes set out in the SEED Act, and by failing to report the Bank's wrongful

activities to USAID and others, BAEF permitted the wrongful scheme of the Bank to be

implemented, and to continue, and to be commenced against plaintiff, and to continue

against plaintiff and others. Am. Compl. at ¶ 53.

13

### D.  The Availability of Bulgarian Courts

Bulgarian courts are not available to Plaintiffs for the redress of the claims herein, Am. Compl. at ¶ 54, for two reasons:  the Bulgarian judicial system is too tainted with corruption; and, even if a fair and impartial hearing could be obtained, the claims in this case are beyond the administrative and the substantive capacity of Bulgarian courts.[6]

### 1.  The Bulgarian Judicial System Is Too Tainted With Corruption

Professor Maria Slavova [7] testified in her deposition as follows:

**Q.**  Is it your opinion that the judiciary is not doing its job as far as corruption is concerned.
**A.**  Definitely.  The judiciary is not doing its job.  The corruption is overwhelming.  There are no real measures to fight corruption.  At 36.

**Q.**  In fact, would you agree that the majority of judiciary based on your experience is not corrupt?
**A.**   The majority of the judiciary is afraid to accept that there are quite a number of judges that are corrupt.  At 18....

**Q.**  But you wouldn't purport to tell the judge in Washington, D.C. that the Bulgarian legal system  is not effective in providing justice to Bulgarian citizens, would you?

---

[6]   To the extent that plaintiff's experts disagree with BAEF's expert on Bulgarian law and the Bulgarian judicial system, the audiovisual tapes of the three expert depositions provide the court with an  additional means to assess the merits of those conflicting opinions. *See Rudder v. District of Columbia*, 890 F.Supp. 23, 30 (D.D.C. 1995 )( trial court assesses credibility of experts in same manner as it assesses credibility of any witness).  Hearing or trial-type fact-finding take on added importance because BAEF's expert concedes that he and his firm have represented and continue to represent BAPM in consultations and in court proceedings. Silvy dep., **PX 2A**, at 9, 12-13, 15-16. *See, e.g., U.S. v. BCCI Holdings (Luxembourg), S.A.* 977 F.Supp. 1, 11, n.23 (D.D.C.,1997)(discussing allegations of expert's bias on motion for summary judgment).

[7]   Professor Slavova is a Bulgarian lawyer who specializes "in administrative, civil and commercial law, and anti-corruption and human rights law." Slavova, declaration, appended hereto as **PX 4B** at ¶ 4.  She is the co-author of *Democracy Against Corruption* (2007), excerpts appended hereto as **PX 4C**, and, among other qualifications, teaches on corruption, Slavova dep., **PX 4A** at 16, attends conferences on "Democracy problems, like trafficking in women and protecting human rights, and devotes half of her professional time to teaching, and twenty percent of her professional time to anti-corruption and human rights, *id.,* at 28-29. She is a member of the Council of Honour, as well as a member of Vital Voices/Women in Democracy/ International Movements she has consulted for; the European  Commission on Bulgarian legislation;  the Bulgaria National Assembly on European Union ("EU") on EU accession;  the Bulgarian Council of Ministers on issues including the transition to democracy; professional legal organizations on the US Embassy democracy Commission; the Ministry of Justice and European Integration on Combating Corruption and Protecting Children's Rights, and the protection of Human Rights, along with a number of other projects.  Slavova Decl., *curriculum vitae*, Slavova decl, **PX 4B**.  Among her many lecturing assignments, she has lectured at the University of Gent, Belgium, fighting corruption.  *Id.*

**A.** I would have to admit that. At 21-22.

**Q.** You think you would or wouldn't?
**A.** I would. I would try to explain what it means, that it is not an easy conclusion, but it is a fact. At 22.

Professor Slavova explained that:

**A.** I would say that this is a very set conclusion and a worry of mine, but it's a fact that the people in Bulgaria are mainly disillusioned and very unhappy with the results of the judiciary activity in Bulgaria. They are not getting fair trials. And they are really trying to avoid going to the courts because the whole process of transition can be estimated as a lot of violation of human rights and false expectations as far as the governments are concerned in their efforts to overcome corruption.

**Q.** You're not saying that it is impossible to get a fair and just hearing in Bulgaria, are you?
**A.** I'm not saying that it is impossible to get a fair and just hearing in Bulgaria and I hope that those examples will become more and more because we are all participating in the process of fighting corruption. There are real results in that area, but, unfortunately, the judiciary system is the last of all systems of society that is improving....

It's a complex combination of factors among, which is the lack of political stability and the economic stability. Of course, the lack of political will to overcome those events, we can talk very long about that, but I think corruption is the key issue.

Slavova dep., **PX 4A** at 16-17. Professor Slavova reiterated the opinion she gave in her declaration, Slavova dep., **PX 4A** at 34-35, in which she testified that: "The declaration of Vladimir Stefanov Skochev accurately describes the current deficiencies in the Bulgarian judicial system. Though some progress has been made, an independent, impartial and objective system capable of a fair and just hearing is not yet in operation." Slavova, decl., **PX 4B** at ¶ 12.

Mr. Skochev, a practicing attorney in Bulgaria who specializes in civil and commercial litigation, Skochev dep., **PX 3A** at 10, testified at his deposition as follows:

**Q.** Are you – let me just ask you, are you telling the American court that in your opinion that Bulgarian judicial system is not independent?
**A.** Yes.

**Q.** Are you telling the American court that in your opinion the Bulgarian legal system is incapable of providing a fair and just hearing?
**A.** Yes.

**Q.** Do you have in mind the present case or in general?
**A.** In general, yes.

**Q.** So it is your opinion that no Bulgarian can get a fair and just hearing in the Bulgarian judicial system?

**A.** In most of the cases, yes.

**Q.** They cannot get a fair hearing?
**A.** Yes.

**Q.** But yet you litigate in the Bulgarian judicial system?
**A.** Yes.

**Q.** So you are litigating in a system that you think you are not going to get a fair hearing in?
**A.** Yes.

**Q.** Are you telling the American court that you think no Bulgarian can get an objective evaluation in an American court?
**A.** In most cases, yes.

**Q.** And what is the basis for that?
**A.** The existence of corruption.

**Q.** So are you saying that all of the judges are corrupt?
**A.** A great part of them are.

**Q.** Do you have any evidence as to how many judges are corrupt in the Bulgarian legal system?
**A.** I cannot give the exact number, but I – in my work, my practice, I have encountered such cases.

**Q.** I am trying to understand, Mr. Skochev, is it really your view that all of the judges in Bulgaria are subject to corruption?
**A.** In most cases, yes.

**Q.** 75 percent?  80 percent?

16

**A.** I cannot give a number.

**Q.** Do you have any estimate as to what percentage of judges you think are corrupt in Bulgaria?
**A.** I will repeat. Again, I cannot give you the exact answer to this question.

**Q.** Your best estimate?
**A.** Two or three out of five in the cases I've been working on we're talking about corruption.

Skochev, dep., **PX 3A** at 28-30.

At his deposition, he reiterated the statements in his declaration, attached hereto as

**PX 3B**, in which he stated:

19.   Despite reforms from the socialist era, the reform of the Bulgarian judicial system is not complete. In practice, the necessary legal mechanisms have not been introduced and the required prerequisites have not been met. Such mechanisms and prerequisites are needed in order to guarantee the efficiency, reliability, impartiality and the objectiveness of the Bulgarian judicial system.

20.   A Monitoring Report on the degree of Bulgaria's and Romania's readiness for EU membership, dated 26 September 2006, prepared by the European Commission, in the section "Safeguards and Other Measures," in the chapter "Judiciary and the Fight against Corruption" sets out benchmarks and measures Bulgaria's performance according to those benchmarks. The Report noted the necessity of the following steps:

a. Adopt constitutional amendments removing any ambiguity regarding the independence and accountability of the judicial system.

b. Ensure a more transparent and efficient judicial process by adopting and implementing a new judicial system act and the new civil procedure code. Report on the impact of these new laws and of the penal and administrative procedure codes, notably on the pre-trial phase.

c. Continue the reform of the judiciary in order to enhance professionalism, accountability and efficiency. Evaluate the impact of this reform and publish the results annually.

d. Conduct and report on professional, non-partisan investigations into allegations of high-level corruption. Report on internal inspections of public institutions and on the publication of assets of high-level officials.

e. Take further measures to prevent and fight corruption, in particular at the borders and within local government.

f. Implement a strategy to fight organised crime, focussing on serious crime, money laundering as well as on the systematic confiscation of assets of criminals. Report on new and ongoing investigations, indictments and convictions in these areas.

21.   The Bulgarian judicial system has been subjected to continuous analytical criticism by His Excellency the US Ambassador to Bulgaria, Mr. John Byerle. The Ambassador's speeches and statements that have been published in most Bulgarian dailies and media web-sites contain objective observations and recommendations, such as:

a. 9th December 2005, The SEGA Newspaper, online edition, reporting on John Beyrle's statement made in Sofia at the discussion on the judicial reform in Bulgaria:

"The judicial system needs to start operating more efficiently and win the fight with organized crime and corruption on all levels. This is the most pressing task that Bulgaria needs to do today. Good laws are efficient only when good judges are there to enforce them."

An effective court system needs adequate resources to do its job. The U.S. experience also shows that judges need salaries appropriate to their demanding work and high responsibilities. The best guarantee of independence and the best protection against corruption in the judiciary, as in all parts of the legal system, is an adequate salary. Judges must play an important role in reforming the judiciary in Bulgaria. The rule of law in this country is important not just to Bulgarians, but also to the United States. American and European businesses want to know that there is an effective, predictable and fair legal system before they invest and do business in Bulgaria. They want to know that contracts will be enforced and that rules will be applied consistently. They want to be sure that, if they have to go to court, they will get a fair and impartial hearing.

b.   27th March 2007, The Bulgarian Post, reporting on John Beyrle's speech on the Bulgarian National Radio 27th March 2007 :

" As long as citizens believe that bribing public officers is the usual practice or that you can 'buy' justice, corruption will flourish on all levels. There are encouraging signs of a change effected in the judicial system in Bulgaria and, however, the problems that the Bulgarian judicial system is facing have a direct influence in the USA."

c. 28th March.2005., the official website of the USA Embassy in Sofia, Bulgaria, reporting excerpts from John Byerle's address to the US Chamber of Commerce in Bulgaria:

18

"First, as was already noted by the EU and the USA, and by the Bulgarians themselves as well, the need for further reform in the Bulgarian judiciary is still pressing. All experts agree that the judicial system must be efficient, transparent and fair. EU experts, as well as US and Bulgarian ones have given guidelines as to what needs to be done...there are some good laws indeed, but most of them appear to exist only on paper."

22.    The judicial system in Bulgaria has been subjected to systematic criticism by the American Association of Jurists. Their Central and East European Initiative (ABA/CEELI) evaluated the judicial reform in Bulgaria for 2006 for the third time in sequence. As reported on 27 June 2007 in the Dnevnik Newspaper, the Bulgarian system received good ratings for only 10 of 30 criteria, with 18 neutral ratings. The report noted that:

"The raise in magistrates' salaries have reached the level on which one of the most persistent justifications for corruption is no longer valid. Nevertheless, the expectations that the public opinion on the high level of corruption among magistrates will change to a more favourable one, have not been met. We have found no progress at all and this is what undermines the credibility of the judicial system. In order to improve the situation the law must be strictly enforced against all corrupt magistrates.

In the 2006 index the unlawful influence exercised on the magistrates is one of the few factors that have been persistently assessed as negative. Analyzers have found the view that court decisions result from corruption, pulling of strings and interceding with superior magistrates is widely spread. The Index also says that the fact that appointment of judges and career progress depend on certain prosecutors and investigators is a sign for ill-practiced institutional influence on the part of the prosecution. This may also lead to exercising influence on individual cases."

22.    It must be definitely concluded that, according to the objective expert assessments in the reports and the results from the monitoring of judicial system reform in Bulgaria as of today, and without disregard for the structural achievements made, a mechanism ensuring the evaluation of the operation of the Bulgarian judicial system as an independent, efficient, impartial and objective one capable of fair and just hearing, is not in operation yet.

BAEF's expert concedes that:

a.    the level of corruption in the Bulgarian judicial system is a problem, Silvy dep., **PX 2A** at 117-118;

19

b.  the Bulgarian public believes the Bulgarian judicial system is corrupt, and among legal professionals, there is a lot of talk, a lot of suspicion; Silvy dep., **PX 2A** at 116-117;

c.  He has had suspicions that some court decisions have been the result of improper influence, and he has heard others express the same suspicions; Silvy dep., **PX 2A** at 34;

d.  "In some cases," he agrees with the negative assessment given to "judicial decisions and improper influence" in the Judicial Reform Index; Silvy dep., **PX 2A** at 119-120;

e.  he agrees with the assessment of the European Union that further progress is necessary in the areas of judicial reform and the fight against organized crime and corruption; Silvy dep., **PX 2A** at 129;

f.  a March 2007 Report on the Judiciary and the Fight Against Corruption states that there has not yet been sufficient progress; Silvy dep., **PX 2A** at 130-131; and,

g.  there is much to be desired about the judicial system in Bulgaria;  Silvy dep., **PX 2A** at 115.

### 2.  Bulgarian Courts Are Not Competent to Effectively Adjudicate Plaintiff's Claims

As Professor Slavova stated in her declaration:

10.     The liability for compensation of the damages, caused by impermissible actions (tort) under Bulgarian law is regulated by The Contracts and Obligations Act. Bulgarian law though does not permit the liability to be effected towards legal entities. The very concept of The Contract and Obligations Act differs substantially from the provisions the RICO Act. The consistent practice of Bulgarian Supreme Courts has enough evidence to support this conclusion. Detailed explanation of the impossibility a legal entity to be held liable for tort due to delictual fault is found in Decision № 6 of 08.01.1973, enacted pursuant to civil case № 2384/1972 of First Civil Department of the Supreme Court, as well as Decree № 7/29.12.1958 of The Plenum of The Supreme Court.

11. It is doubtful that the Bulgarian courts and the relevant experts might have enough experience to analyze the liabilities of both defendants. The pertinent codes do not provide the mechanisms for   hearing the racketeering issues raised in the complaint.

Slavova decl. **PX 4B** at ¶¶ 10, 11. As she explained in her deposition during

plaintiff's cross-examination:

> **Q.**          ...Do I understand you to be saying that there is no
> Bulgarian equivalent to the RICO act, a claim that was asserted by the
> plaintiff in Washington.
> **A.**          Correct.
>
> **Q.**          There are a variety of different remedies or claims that are
> available to the plaintiff who is going to sue in Bulgaria on the claims that
> are asserted in the plaintiff's complaint?
> **A.**          That is true, that you can find pieces of provision here and
> that they could serve as grounds for at least part of the claims.
>
> **Q.**          For at least part of the claims.  And there are remedies for
> that?  They could get damages?
> **A.**          Yes.  If they are very patient.
>
> **Q.**          But at the end of the process, if they were to sue in Bulgaria
> and if they were to prevail, they would get damages from the defendants?
> **A.**          Generally, this is a correct presumption, but you have to
> take into consideration that some of the cases take more that ten years, and
> by that time, the business is over.
>
> **Q.**          Even in the United States, there are cases that have lasted
> more than ten years?
> **A.**          The U.S. is not a country in transition.... At 23-24.
>
> **Q.**          Is it fair to say that any new case that's brought in Bulgaria
> in 2008, along with all the other issues, going to have to deal with the new
> civil procedural laws and new judicial substantive laws?...
>
> Mr. Sieve:  Objection, leading.
>
> **Q.**          You can answer it.
> **A.**          No.  I would only say that to change Civil Procedure code
> is a very heavy duty.  And to have a brand new one means, I'm talking as
> a university professor, we will need at least three to five years to have new
> text books, let along the practice itself will be a very difficult process...
> As far as this specific complaint is concerned I don't think there are
> grounds for such an expectation because we don't have similar laws that
> would tackle such problems.

> In my answer to Mr. Sieve, generally we have grounds here and there, but they are not in one piece that if such a complaint is taken to Bulgarian courts it won't be one court. Such a complaint will never be able to be put in the process in Bulgaria.

Slavova dep., **PX 4A** at 34-35.

Similarly, Mr. Skochev stated in his deposition that: "The claims available to parties in Bulgaria are, of course, different in many respects from the claims made in this case. There is no equivalent of any kind in Bulgaria to claims such as those brought under the so-called RICO statute." Skochev decl., **PX 3B** at ¶ 16. He added that: "I don't think that the Bulgarian law could assist in solving a complex issue as set forth in the present case. The remedies that could be given could be partial, but not complete." Skochev dep., **PX 3A** at 35. Moreover, the case "would have to be brought in pieces." *Id.*, at 43.

He also explained in detail in his deposition that, under the current system in Bulgaria, resources are wholly inadequate to address a claim of the complexity of this case. The judge to whom the case or cases would be assigned would be a "young graduate" of law school. Skochev dep., **PX 3A** at 23, 41. The judge will be called upon to decide "upon 20 other cases in one day," *id.*, at 41, and he will only be able to devote 15 or 20 minutes to each matter, making "normal development of the trial" impossible, *id.*, at 42. Indeed, the physical resources themselves – a room no larger than three or four meters shared with another judge --, *id.*, at 42, in conjunction with the other limitations he described, lead him to conclude that "we cannot seek in Bulgaria or get a fair litigation of this particular case." *Id.* at 42.

BAEF's expert concedes that

a. He has never been involved in a case where American law was applied, Silvy dep., **PX 2A** at 69, and he has "not tried to assess the result of the violation of the American law...," Silvy dep., **PX 2A** at 78; he has not "been involved in many tort cases," Silvy dep., **PX 2A** at 76; he hasn't litigated intentional interference claims in Bulgarian courts, Silvy dep., **PX 2A** at 84; and, he hasn't litigated breach of fiduciary duty claims in Bulgarian courts, Silvy dep., **PX 2A** at 84;

b. he knows of no case in Bulgaria in which civil conspiracy has been litigated, Silvy dep., **PX 2A** at 86-87; he has observed abuse of process as a phenomenon, but not as a claim, in Bulgarian courts, Silvy dep., **PX 2A** at 85-86;

c. If plaintiff attempted to file its claim in Bulgaria, the claim against the Bank would normally be in one proceeding, and the claim against BAEF would be in a different proceeding, Silvy dep., **PX 2A** at 57;

d. If plaintiff attempted to file its claim in Bulgaria, the contract claim would be normally filed in one case, and the tort-type claims would be filed in a second case, Silvy dep., **PX 2A** at 56-57;

e. "(m)ost probably," the case would be split up. Silvy dep., **PX 2A** at 87;

f. the tort claims may be "criminal law," Silvy dep., **PX 2A** at 76;

g. "although not all of the specific claims asserted have Bulgarian equivalents ... the type of remedies available ...(t)here is an equivalent including criminal law... The RICO claim, I admit that I don't know, but I reviewed the facts of the claim, and thus facts can find under Bulgarian law, not under the RICO.... I am not an expert in criminal law." Silvy dep., **PX 2A** at 72-74.

h. if a criminal case is pending, all civil proceedings are suspended; Silvy dep., **PX 2A** at 77;

i. the claimant can participate "as a civil claimant in the criminal proceeding," Silvy dep., **PX 2A** at 77-78;

j. there is no right to trial by jury in a civil proceeding in Bulgaria, Silvy dep., **PX 2A** at 58;

k. there is no procedure in Bulgaria for depositions under oath; Silvy dep., **PX 2A** at 64; there is no procedure for obtaining answers to questions in writing in advance and under oath; Silvy dep., **PX 2A** at 67-68; the system for recoding open court proceedings "is not always very good," Silvy dep., **PX 2A** at 120;

l. Bulgaria is in the midst of implementation of a new Code of Civil Procedure, the major part of which will be in effect as of March 1, 2008, Silvy dep., **PX 2A** at 25;

## II.  THE PROCEDURES AND THE STANDARDS APPLICABLE TO THE PENDING MOTIONS

### A.  The Sequencing of Non-Merits Motions

The Supreme Court has recently clarified the leeway accorded to a trial court in its sequencing of non-merits motions to deny consideration of a complaint.  In *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 127 S.Ct. 1184, 1186-87, 167 L.Ed. 2d 15 (2007), the Supreme Court ruled that:

> Although a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the cause (subject-matter jurisdiction) and the parties (personal jurisdiction) ... there is no mandatory sequencing of nonmerits issues ... A court has leeway to choose among threshold grounds for denying audience to a case on the merits....
>
> *Forum non conveniens* is a nonmerits ground for dismissal.... A district court therefore may dispose of an action by a *forum non conveniens* dismissal, bypassing questions of subject-matter and personal jurisdiction, when considerations of convenience, fairness, and judicial economy so warrant. *Forum non conveniens,* like other threshold issues, may involve a brush with  factual and legal issues of the underlying dispute.... But the critical point, rendering a *forum non conveniens* determination a nonmerits issue that can be determined before taking up jurisdictional inquiries is this: Resolving a *forum non conveniens* motion does not entail any assumption by the court of substantive law-declaring power (internal citations, quotation marks omitted).

Thus, this court has the discretion to dispose of this prior to disposing of the BAEF 12(b)(6) Motion.

> The Supreme Court has made clear that a federal court must resolve all "threshold" issues, such as subject matter jurisdiction and personal jurisdiction,[8] before reaching the merits of a case..... The high court has acknowledged, however, that a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits. A venue

---

[8] In "appropriate circumstances," the trial court may also dispose of challenges to personal jurisdiction prior to disposing of challenges to subject matter jurisdiction, *Int'l Mfg. & Eng'g Servs. Co. v. Semiconductor Energy Lab. Co* , 2007 WL 2059768*1, n.1 (D.D.C. 2007)

challenge need not take precedence over a disentitlement inquiry, then, because both are threshold issues (internal citations, brackets, quotation marks omitted).

*U.S. v. $6,976,934.65 Plus Interest,* 486 F.Supp.2d 37, 38 (D.D.C.,2007). "Jurisdiction to resolve cases on the merits requires both authority over the category of claim in suit (subject-matter jurisdiction) and authority over the parties (personal jurisdiction), so that the court's decision will bind them." *Fasolyak v. The Cradle Society, Inc.,* 2007 WL 2071644*3 (D.D.C.,2007).[9]

This court, thus, should address BAEF's challenge to personal jurisdiction before it addresses BAEF's 12(b)(6) Motion.[10]

### B. The Burdens of Proof and Procedures Applicable to The Instant Motion

#### 1. Motions To Dismiss For Lack Of Personal Jurisdiction.

The plaintiff bears the burden of establishing a factual basis for exercising personal jurisdiction over the non-resident defendant. *Mwani v. Bin Laden,* 417 F.3d 1, 7 (D.C.Cir.2005); *Crane v. New York Zoological Soc'y,* 894 F.2d 454, 456 (D.C.Cir.1990). "In determining whether such a basis exists, factual discrepancies appearing in the record must be resolved in favor of the plaintiff." *Crane,* 894 F.2d at 456. In the absence of an evidentiary hearing, the plaintiff may carry his burden by making a *prima facie* showing that personal jurisdiction exists. *Edmond v. U.S. Postal Serv. Gen. Counsel,* 949 F.2d 415, 424 (D.C .Cir.1991); *Reuber v. U.S.,* 750 F.2d 1039, 1052 (D.C.Cir .1984). This *prima facie* showing must be premised on specific facts, however, and cannot be based

---

[9] As the District of Columbia Circuit noted after *Sinochem,* a *forum non conveniens* motion is not a jurisdictional motion. *Public Citizen v. U.S. Dist. Court for Dist. of Columbia,* 486 F.3d 1342, 1348 (D.C. Cir. 2007).

[10] To the extent that a motion to dismiss proceeds under Fed.R.Civ.P. 12(b)(6), grant of that motion normally operates as an adjudication on the merits.

on mere conclusory allegations. *GTE New Media Servs. Inc.,* 199 F.3d 1343, 1349

(D.C.Cir.2000).

### 2. Motions to Dismiss For Improper Venue

Rule 12(b)(3) allows a case to be dismissed for improper venue. *See* Fed.R.Civ.P. 12(b)(3).The plaintiff bears the burden of establishing that venue is proper....In considering a Rule 12(b)(3) motion, the court accepts the plaintiff's well-pled factual allegations regarding venue as true, draws all reasonable inferences from those allegations in the plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor.... A court need not accept the plaintiff's legal conclusions as true; however, to prevail on a motion to dismiss for improper venue, a defendant must present facts sufficient to defeat a plaintiff's assertion of venue (internal citations, brackets, quotation marks omitted).

*Michilin Prosperity Co., Ltd. v. Dudas,* 2007 WL 2225890 *1 (D.D.C.,2007).

When venue is wrongly or improperly laid, the district court shall dismiss the case, "or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The decision of whether to dismiss or transfer rests within the sound discretion of the district court.... Generally, the interests of justice require transferring such cases to the appropriate judicial district rather than dismissing them.

*Michilin, supra,* at 2.

### 3. Forum Non Conveniens Motions

Defendant bears "the burden of persuasion on all elements of the *forum*

*non conveniens* analysis." *El-Fadl, supra,* at 676-677.

At the outset of any *forum non conveniens* inquiry, the court must determine whether there exists an alternative forum. Ordinarily, this requirement will be satisfied when the defendant is "amenable to process" in the other jurisdiction. In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied. Thus, for example, dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute....[11]

---

[11] "The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The

"The district court need not weigh any factors favoring dismissal, ... if no other forum to

which the plaintiff may repair can grant the relief it may obtain in the forum it chose."

*TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 303 (D.C. Cir. 2005).

> if there is an adequate alternative forum must the court then weigh the
> relative conveniences to the parties against the presumption of the
> plaintiff's forum selection....Availability of adequate alternative fora is a
> threshold test ... in the sense that a *forum non conveniens* motion cannot be
> granted unless the test is fulfilled.... The defendant bears the burden of
> proving that there is an adequate alternative forum (internal citations,
> quotation marks omitted). *Id.* ...

> To show the existence of an adequate alternative forum, the defendant
> "must provide enough information to enable the District Court" to
> evaluate the alternative forum..... Because the defendant has the burden of
> establishing that an adequate alternative forum exists, this court will
> reverse when "the affidavit through which [the defendant] attempted to
> meet its burden contains substantial gaps." .... The amount of information
> that the defendant must provide, in supporting affidavits or other evidence,
> depends on the facts of the individual case..... Accordingly, the defendant
> must provide more detailed information if the plaintiff provides evidence
> that controverts the defendant's evidence..... If the record before the court
> is so "fragmentary" that "it is impossible to make a sound determination"
> of whether an adequate alternative forum exists, the court will remand for
> further development of the facts (internal citations omitted). *Id.*, at 677.

## III.  THIS COURT HAS PERSONAL JURISDICTION OVER BAEF

### A.  Personal Jurisdiction Under District of Columbia State Law

The District of Columbia long-arm statute provides that a District of
Columbia court can exercise personal jurisdiction over a defendant if the
claim arises from the defendant's "transacting any business in the District
of Columbia." D.C.Code § 13-423(a)(1). This provision is "given an
expansive interpretation" that is "coextensive with the due process
clause."

*Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004).

---

court's determination shall be treated as a ruling on a question of law." Fed.R.Civ.P. 44.1, and *c.f.*
Proposed Amendment of Rule 44.1, effective December 1, 2007.

The "transacting any business" formulation applies if the claim arises out of any business transacted between the parties in the District of Columbia, and creates "specific jurisdiction." D.C.Code § 13-423(b), *Gorman v. Ameritrade Holding Corp,.* 293 F.3d 506, 510 (D.C. Cir. 2002). Stated otherwise, "the plaintiff's claims *must be related to* the acts that form the basis for personal jurisdiction (emphasis added)." *Heller v. Nicholas Applegate Capital Management, LLC,* 2007 WL 2137764*7 (D.D.C.,2007).

A defendant is transacting any business when its contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985). "(A) single act, so long as it creates this 'substantial connection,' is sufficient. *Heller, supra,* at 7.

> District of Columbia law also permits courts to exercise "general jurisdiction" over a foreign corporation as to claims not arising from the corporation's conduct in the District, if the corporation is "doing business" in the District. *See* D.C.Code § 13-334(a) ... Under the Due Process Clause, such general jurisdiction over a foreign corporation is only permissible if the defendant's business contacts with the forum district are "continuous and systematic." (internal citations omitted).

> *Helmer, supra*, at 232-233.

> Even when the literal terms of the long-arm statute have been satisfied, a plaintiff must still show that the exercise of personal jurisdiction is within the permissible bounds of the Due Process Clause. In other words, a plaintiff must show "minimum contacts" between the defendant and the forum establishing that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice.

> *GTE New Media Services Inc.,* 199 F.3d at 1347.

BAEF does not dispute that it received $58,000,000.00 in funding from USAID in the District of Columbia under the SEED Act. Nor does it dispute that the relationship between plaintiff and the Bank arose out of that funding or the SEED Act. As BAEF

28

concedes, "(t)he BAEF has semi-annual reporting obligations to ... USAID ... as a condition of the original grant agreement between USAID and BAEF." DX 1, at ¶ 6. That continuous and multi-million dollar contact with the District of Columbia is a "substantial connection" to the District of Columbia and it is "related to" the claims in this case.

That BAEF's District of Columbia contacts are with the federal government does not defeat personal jurisdiction. As the District of Columbia Court of Appeals[12] described it, the government contacts principle is that "mere entry by nonresidents for the purpose of contacting federal government agencies cannot serve as a basis for in personam jurisdiction." *Rose v. Silver*, 394 A.2d 1368, 1370 (D.C., 1978). Emphasizing that "the government contacts principle emerged to protect entities against claims by third parties based on transactions *unrelated to* the entity's special governmental purpose in the District of Columbia (emphasis added)," at 1374, n.6, the *Rose* court explained that:

> The First Amendment provides the only principled basis for exempting a foreign defendant from suit in the District of Columbia, when its contacts are covered by the long-arm statute and are sufficient to withstand a traditional due process attack. Whereas historically the government contacts principle was a way of articulating a limitation on the "doing business" provision of the long-arm statute, having both due process and First Amendment roots, it is clear to us that amendment of the long-arm statute to provide for a "transacting any business" standard, while not erasing the government contacts principle, Lockwood Greene, supra at 813, has shifted its premise solely to the First Amendment.[13]

---

[12] This Circuit looks to the District of Columbia Court of Appeals for construction of the government contacts exception to the District of Columbia jurisdictional statutes. In *Lex Tex Ltd., Inc. v. Skillman*, 1990 WL 147180 (.D.C. Cir.1990), the District of Columbia certified to the District of Columbia Court of Appeals under D.C.Code § 13-423(a)(1), (b), the following question: "does the 'government contacts' exception to the exercise of personal jurisdiction over nonresidents apply when the defendant's contacts with the government themselves constitute the alleged culpable or liability-generating conduct for which plaintiff seeks to recover?" At 1. The District of Columbia Court of Appeals ruled that "the 'government contacts' principle does *not* apply to the facts of this case (emphasis in original)." *Id.*, at 1.

[13] *Environmental Research International, Inc. v. Lockwood Greene Engineers, Inc.*, 355 A.2d 808 (D.C. 1976) (en banc).

Because BAEF's contacts with the District of Columbia are related to the claims in this case, the government contacts exception does not apply, and on that basis alone this court has personal jurisdiction over BAEF.

**B.  Personal Jurisdiction Under RICO**

Whether national contacts are sufficient to meet jurisdictional requirements under RICO is a matter of first impression in this Circuit. The other Circuits are split. In *Doe v. Unocal Corp.,* 248 F.3d 915 (9th Cir. 2001), the court ruled that national contacts establish personal jurisdiction if service is effected as provided in the RICO statute. *Accord, Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 369 (3rd Cir. 2002).  Somewhat more broadly, in *Action Embroidery Corp. v. Atlantic Embroidery, Inc.,* 368 F.3d 1174, 1180 (9th Cir. 2004), the Court ruled that:

> When a statute authorizes nationwide service of process, national contacts analysis is appropriate. In such cases, due process demands [a showing of minimum contacts with the United States] with respect to foreign defendants before a court can assert personal jurisdiction....In a statute providing for nationwide service of process, the inquiry to determine minimum contacts is thus whether the defendant has acted within any district of the United States or sufficiently caused foreseeable consequences in this country.

*Accord, In re Automotive Refinishing Paint Antitrust Litigation,* 358 F.3d 288, 298 (3rd Cir.2004) ("We too are persuaded by the reasoning of our prior opinions on the subject, and, consistent with several of our sister courts of appeals, hold that a federal court's personal jurisdiction may be assessed on the basis of the defendant's national contacts when the plaintiff's claim rests on a federal statute authorizing nationwide service of process.").

National contacts tests under RICO do not violate fundamental notions of due process and fairness. As the court in *Reynolds Tobacco Co. v. Market Basket Food Stores, Inc.,* 2006 WL 2417269*3 (W.D.N.C.2006) explained:

> In this case, the exercise of personal jurisdiction comports with due process. The due process constraint on service under Rule 4(k)(1)(D) and Section 1965(d) is based upon the Fifth Amendment rather than the Fourteenth Amendment....The Fifth Amendment's Due Process Clause limits the extraterritorial scope of *federal* sovereign power whereas the Fourteenth Amendment's Due Process Clause protects *states* in their status as equal sovereigns.... Not unlike the Fourteenth Amendment, the Fifth Amendment's Due Process Clause also protects the liberty interests of individuals against unfair burden and inconvenience.... However, when considering burden and inconvenience factors with respect to a national forum, the constitutional minimum contacts test is more easily satisfied. . As a result, it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern (internal citations, quotation marks omitted).

## IV.  VENUE IN THE DISTRICT OF COLUMBIA IS PROPER

### A.  Venue is Proper in the District of Columbia Pursuant to 28 U.S.C. § 1391

Venue is proper under 28 U.S.C. § 1391(b)(1) and (2).  28 U.S.C. § 1391 (b) provides, in relevant part:

> (b) A Civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in
>
> (1) a judicial district where any defendant resides, if all defendants reside in the same State,
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or
>
> (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

Subsection (b)(1) supports venue in this case.  For purposes of the chapter, "a defendant that is a corporation shall be deemed to reside in any judicial district in which

31

it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. §
1391(c) (2007); and "an alien may be sued in any District." 28 U.S.C. § 1391(d); and see
*Japan Gas Lighter Ass'n v. Ronson Corp.,* 257 F.Supp. 219, 225, fn. 3 (D.N.J. 1966).  As
discussed in section III, *supra,* since this Court posses personal jurisdiction over BAEF it
is deemed to reside in the District of Columbia for purposes of venue under subsection
(b)(1).  Because both BAEF and the Bank reside in the District of Columbia, venue is
therefore proper under 28 U.S.C. § 1391(b)(1).

      Subsection (b)(2) also supports venue in this case.  In order for venue to lie
pursuant to this subsection, "a substantial part of the events or omissions giving rise to
the claim..." must have occurred in the District of Columbia.  That is not to say that a
more substantial portion of the events must occur in the District or even that the most
significant events occurred here.  *See Modaressi v. Vedadi,* 441 F.Supp.2d 51, 56-57
(D.D.C. 2006).  Nor does it mean that a plaintiff is required to establish that "every event
that supports an element of a claim occurred in the district where venue is sought."  *Id.*
Indeed, "venue may be proper even if a greater part of the events giving rise to a claim
happened in another forum."  *Id., (*citing *City of N.Y. v. Cyco.Net, Inc.,* 383 F.Supp.2d
526, 543 (S.D.N.Y. 2005)); *See also, Dooley v. United Technologies Corp.,* 786 F.Supp.
65, 80 (D.D.C. 1992) ("[I]t appears that [section 1391(b)(2)] is intended to place venue
within the District of Columbia, even where the case also might be brought in another
forum.").  "In determining 'whether the events or omissions are sufficiently substantial to
support venue under the amended statute, a court should not focus only on those matters
that are in dispute or that directly led to the filing of the action.  Rather, it should review
"the entire sequence of events underlying the claim.""" *FC Investment Group LC v.*

*Lichtenstein,* 441 F.Supp.2d 3, 11 (D.D.C. 2007) (quoting *Mitrano v. Hawes,* 377 F.3d

402, 405 (4th Cir. 2004) (quoting *Uffner v. La Reunion Francaise, S.A.,* 244 F.3d 38, 42

(1st Cir. 2001)).

Contrary to Defendant's contention that "…none of the relevant events giving rise

to its claim took place in the District of Columbia." At 25, Plaintiff has alleged the

following events that took place in the District of Columbia: a) Defendant BAEF is a

not-for-profit corporation established pursuant to the Support for East European

Democracy Act, 22 U.S.C. §§ 5402, 5421 (the "SEED Act");  b) Defendant BAEF used

funds made available through an American initiative to support private sector

development in Bulgaria; c) BAEF commenced its operations in 1992, with fifty eight

million dollars ($58,000,000.00) in funding from the American government; d) BAEF

was required to report every six months to USAID in Washington, D.C. on its activities;

e) that reporting required the submission of BAEF's financial statements, which in turn

included the Bank's financial statements;  f) the failure to adequately report by BAEF to

USAID permitted the wrongful conduct alleged in the Amended Complaint to continue;

g) the failure of BAEF's Bank Audit Committee undoubtedly permitted the wrongful

conduct alleged in the Amended Complaint to continue; and h) BAEF has, on at least

four occasions, met in Washington, D.C. with representatives of USAID, DOS, and

Congress to discuss among other things, the allocation of monies including the profits

wrongfully acquired from the misconduct alleged in the Amended Complaint.  Those

sums include $58,000,000 in taxpayer funds and as much as $200,000,000 in profits.

These sequence of events, taken as a totality of the events that took place pursuant

to the allegations contained in the Complaint, satisfies the requirements of § 1391(b)(2).

*FC Investments Group,* 441 F.Supp.2d at 11-12. BAEF does not dispute that it received fifty eight million dollars from USAID in the District of Columbia under the SEED Act. Nor does it dispute that the relationship between Plaintiff and the Bank arose out of that funding or the SEED Act. In fact, BAEF concedes that "[t]he BAEF has semi-annual reporting obligations to...USAID...as a condition of the original grant agreement between USAID and BAEF." DX 1, at ¶ 6. Much as it belies BAEF's assertion that the District of Columbia lacks personal jurisdiction over it, that continuous and multi-million dollar contact with the District of Columbia is a substantial event occurring in the District, related to the claims in this case, giving the District of Columbia a "substantial connection to the claim." *FC Investments Group,* 441 F.Supp.2d at 11. Because the funding for the Bank originating in the District of Columbia is a "significant part of the sequence of events underlying the claim, venue is proper here." *Id.* at 12.

As a final matter, subsection (b)(3) does not control venue in this case. Since venue is proper either pursuant to subsection (b)(1) or (b)(2) in the District of Colombia, (b)(3) becomes inapplicable. Subsection (b)(3) is only available when there is no other judicial district within which the claims may be brought. 28 U.S.C. § (b)(3). That is not the case here. Venue is proper in the District of Columbia and therefore subsection (b)(3) is unavailable to establish jurisdiction in any other judicial district, including the Northern District of Illinois.

**B. Venue is Proper in the District of Columbia Pursuant to 18 U.S.C. § 1965**

RICO's venue provision is found at 18 U.S.C. § 1965(a). It provides that an action may "be instituted in the district court of the United States for any district in which [a defendant] resides, is found, has an agent, or transacts his affairs." 18 U.S.C. §

34

1965(a) (2007). RICO's specific venue provision is not exclusive, but rather supplements

the general venue provision found in 28 U.S.C. § 1391. *See Monarch Normandy Square*

*Partners v. Normandy Square Associates, Ltd.*, 817 F. Supp. 899, 904 (D.Kan. 1993)

(The venue provisions of RICO supplement the provisions of § 1391(b)); *Miller Brewing*

*Co. v. Landau*, 616 F.Supp. 1285, 1291 (D. Wisc. 1985); *Farmers Bank of the State of*

*Delaware v. Bell Mortg. Corp.*, 452 F.Supp.1278 (D.Del. 1978) (concluding that the

express language and legislative history of section 1965 indicate that "its venue

provisions were not intended to be exclusive, but rather, were intended to liberalize the

already existent venue provisions found in Title 28").

Because BAEF concedes that it conducts at least some business in the District of

Columbia, DX 1 at ¶ 6, it falls within the purview of section 1965(a).  Furthermore,

pursuant to 1965(b), the ends of justice would clearly require all defendants bringing both

defendants before a District of Columbia forum. *See Monarch Partners,* 817 F. Supp. at

905 (Section 1965(b) was intended to enable a plaintiff to bring before a single court for

trial all members of a nationwide RICO conspiracy"); *Bridge v. Invest America, Inc.,* 748

F.Supp. 948, 953 (D.R.I. 1990) (the ends of justice required that non-resident defendant

be brought before the court in civil RICO action in order to litigate the entire case in one

forum).

Defendant's reliance on *Crenshaw* is unavailing. Def. Mot. at 27. *Crenshaw*

concerned an attorney's action against her opposing counsel in prior litigation for bad

faith in instituting disciplinary proceedings.  The court transferred the action to Indiana

because all events giving rise to the attorney's claim occurred in Indiana, both plaintiff

and defendants resided in Indiana, and the ends of justice did not require that venue be in

the District of Columbia. *Crenshaw*, 287 F. Supp.2d at 43-45. Here, in contrast, a substantial part of the events giving rise to plaintiff's claims occurred in the District of Columbia and, as discussed elsewhere, there is no other appropriate forum within which to try this matter.

## V.  BAEF FAILED TO MEET ITS BURDEN ON *FORUM NON CONVENIENS*

### A.  The Contract's Forum Selection Clause Does Not Warrant Dismissal

BAEF urges the court to apply in its favor a narrowly- drawn forum selection clause in a contract to which BAEF was not a party and about which it purports to have been totally unaware, DX 1, at 8, and to do so according to judicial authority in various American jurisdictions, rather than according to the law selected in the same contract upon which BAEF relies. Its request must be denied both because its demand does not conform to the language of and the scope of the clause and because, even if it did, the factors applicable to a *forum non conveniens* motion do not weigh in favor of dismissal.

#### 1.  The Scope and Construction of the Forum Selection Clause

The Agreement between plaintiff and the Bank provided, in pertinent part, that:

**17.07.  Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the Republic of Bulgaria.[14]

**17.08. Dispute Resolution**. It is agreed and understood by the Parties that any disputes arising from this Agreement or concerning it,[15] including

---

[14]  Though "there is some doubt concerning the appropriate procedural vehicle for giving effect to a forum-selection provision...," *Marra v. Papandreou,* 216 F.3d 1119, 1123, note 3 (.D.C. Cir.,2000), and *see* accompanying text, choice of law provisions are applied to construe forum selection clauses. *Lambert v. Kysar,* 983 F.2d 1110, 1118 (1st Cir.,1993).

"(T)ort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract, even when the contract also includes a broader forum-selection clause. *Latihn America Finance Group, Inc. v. Pareja,* 2006 WL 2032627*7 (S.D.N.Y.,2006).

[15]  *See* and *compare Marra, supra* at 1124 (.D.C. Cir.,2000) ("The clause is broadly written, encompassing 'any dispute or disagreement' between the parties 'arising from the application of this license, the interpretation or performance of its terms ... and in general any matter that may occur concerning a license.'); *Society of Lloyd's v. Siemon-Netto,* 457 F.3d 94, 105 (.D.C. Cir.2006). (the forum selection

disputes arising from or concerning its interpretation, validity, nonperformance or termination, shall be settled by the Competent Bulgarian Court. DX A, Document 10-2, page 21.

While it is undisputed that the forum selection clause covers the breach of contract claim asserted in this case by plaintiff, there is nothing in this express language of the clause which applies to non-contract claims, particularly when viewed against the broader clauses in *Marra, supra*, and *Society of Lloyd's supra*.

As the Second Circuit, applying New York law, ruled in *Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.* 414 F.3d 325, 334,-335 (2nd Cir.2005):

> We turn, therefore, to the leading New York case on the scope of choice-of-law clauses, *Knieriemen v. Bache Halsey Stuart Shields Inc.*, 74 A.D.2d 290, 427 N.Y.S.2d 10 (App. Div. 1st Dep't 1980), *overruled on other grounds, Rescildo v. R.H. Macy's*, 187 A.D.2d 112, 594 N.Y.S.2d 139 (App. Div. 1st Dep't 1993). *Knieriemen* involved a contract between a New Orleans brokerage firm and a customer that contained a choice-of-law clause that "recited that '[t]his contract shall be governed by the laws of the State of New York."... The broker lost a substantial amount of the customer's money, and the customer sued for fraud, breach of contract, negligence, and churning. The court held that the contractual choice-of-law clause did not reach tort claims: "That the parties agreed that their contract should be governed by an expressed procedure does not bind them as to causes of action sounding in tort ...." *Id.* at 12-13.
>
> *Knieriemen* indicates a reluctance on the part of New York courts to construe contractual choice-of-law clauses broadly to encompass extra-contractual causes of action. More recent decisions reflect a similar tendency. In *Twinlab Corp. v. Paulson*, 283 A.D.2d 570, 724 N.Y.S.2d 496, 496 (App. Div.2d Dep't 2001), a suit by a company against outside consultants for breach-of-contract and tort claims based on Florida's civil RICO statute, the court considered the scope of choice-of-law and forum-selection clauses that provided as follows: "The choice of law provision stated, *inter alia*, that the 'validity, interpretation, construction and performance' of the agreement would be governed by and construed in accordance with New York law. It also designated New York as the forum

---

clause provided that "the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business....")

for any actions 'relating directly or indirectly' to the consultant agreement." *Id.* The court held that the Florida civil RICO claim, which was based on the defendant's "alleged criminal activities, which were unrelated to his duties as a consultant," fell outside the scope of the contractual choice-of-law and forum-selection provisions. *Id.*[16]

The broad construction urged by BAEF, moreover, fails to take into account the express limitations on the scope of its application by the requirement that a Bulgarian court to which claims are to be submitted be "competent." While the meaning of "competent court" may vary with the circumstances, *see, e.g., Blackburn v. Portland Gold Min. Co.,* 175 U.S. 571, 581 (1900), *Staats v. County of Sawyer,* 220 F.3d 511, 515-516 ( 7th Cir. ,2000) (equating competence of court with jurisdiction over claim and with willingness to exercise discretion to hear claim), but it can be reasonably construed to mean a court which can actually dispose of the claims made by one party against the other.[17]

## 2.  BAEF Is Not Entitled to Rely on The Forum Selection Clause

BAEF contends that:

> The Bank operates independently from BAEF.  Among other things, BAEF is not involved in the Bank's loan transactions.  BAEF·was not involved in any way in the loan transactions between the Bank and Stroitesltvo.  In fact, BAEF was unaware of that particular loan (and any of its details) prior to receiving notice of this lawsuit.  BAEF maintains no files or records related to the Bank's specific loan transactions, including this one. DX 1, at ¶ 8.

---

[16] BAEF urges the court to construe the clause to apply to all of the non-contract claims in the Complaint. Second BAEF Jurisdiction/Venue Motion, at 20-21. But, in *Worldwide Network Services, LLC v. DynCorp Intern,*. 496 F.Supp.2d 59, 63.(D.D.C.,2007), upon which BAEF in part relies, the court identified two different tests for the application of a forum selection clause to non-contract claims.  As the court wrote: "courts have developed different tests to determine whether tort claims are within the scope of a broad forum selection clause, such as determining whether the tort claims "ultimately depend on the existence of a contractual relationship" between the parties...), or whether the contract-related tort claims involve the same operative facts as a parallel claim for breach of contract....(internal citations omitted)."  BAEF can satisfy neither test.
[17] Whether Bulgarian courts are "available" and  "adequate" for purposes of enforcement of forum selection clauses and *forum non conveniens* analysis is discussed below.

Plaintiff has not asserted against BAEF breach of that agreement.

Nonetheless, BAEF argues that it should be entitled to enforce against plaintiff the forum selection clause in an agreement from which it otherwise takes pains to distance itself, and in support of its argument relies on *Manetti-Farrow Inc. v. Gucci Am Inc.,* 858 F.2d 509, 514 (9th Cir. 1988). Second BAEF Jurisdiction/Venue Motion, at 23. But *Manetti,* relying on *Clinton v. Janger,* 583 F.Supp. 284, 290 (N.D.Ill.1984) and *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190, 202-03 (3d Cir.), *cert. denied,* 464 U.S. 938, (1983), clearly required relationships which are not asserted by BAEF. In *Clinton,* the non-party was determined to be a third party beneficiary of the contract containing the clause. At 290. In *Coastal Steel,* the claimant to the protection of the clause was also a third party beneficiary. At 202-203.

*Manetti* itself insisted on two linchpins: that the claimant to the clause "be subject to" the clause and that the "alleged conduct of the non-parties is so closely related to the contractual relationship that the forum selection clause applies." At 514, n.5. Unless BAEF is prepared to concede that it is and was subject to the forum selection clause in the Agreement, and thus arguably to the remainder of the provisions of that Agreement, and that BAEF's alleged conduct is very closely related to the contractual relationship, it cannot avail itself of the forum selection clause under *Manetti.* In all events, it cannot take advantage of the forum selection clause under the cases upon which *Manetti* relied.

BAEF's reliance on *Brock v. Entre Computer Centers, Inc.,* 740 F.Supp. 428 (E.D.Tex.,1990), BAEF Jurisdiction/Venue Motion, at 23, n. 12, is also unavailing. As the court in *Brock* made clear, the clause is available to those who "...benefit from, and are subject to..." the clause, at 431, and explained that "the court finds that the forum

39

selection clause applies to all parties to the contract, whether signatories or not." *Id.*

BAEF's reliance on *Stephens v. Entre Computer Centers, Inc.,* 696 F.Supp. 636

(N.D.Ga.,1988), BAEF Jurisdiction/Venue Motion, at 23, n. 12, ignores the emphasis

placed in *Stephens* on the rationale of *Coastal, supra,* and in particular on the weight

*Coastal* gave to the foreseeability of the litigating parties that a third party beneficiary

would be entitled to the benefits of, and be subject to, the clause. *Stephens,* at 639.

BAEF makes no such foreseeability assertion, nor can it, in light of its characterization of

its distance from the Agreement.

### 3. There Are Compelling and Countervailing Reasons For Refusing to Enforce the Forum Selection Clause [18]

Even if a forum selection clause is mandatory on its face, it will not be enforced if

there is a "compelling and countervailing reason." *McDonnell Douglas Corp. v. Islamic*

*Republic of Iran,* 758 F.2d 341, 345 (8th Cir. 1985). As the Eighth Circuit observed:

> In *Rockwell International Systems v. Citibank,* 719 F.2d
> 583 (2d Cir.1983), the Court refused to enforce a
> contractual provision stipulating that disputes "must be
> settled in accordance with the rules and laws of Iran via
> referring to the competent Iranian courts." Viewing the
> forum clause as mandatory, the Court nevertheless held
> "[n]either [party] argues that the post-revolutionary Iranian
> judicial system is capable of affording an adequate remedy;
> courts that have passed on this contention have consistently
> rejected it." At 346.

As is discussed in the following subsection, BAEF cannot establish that

the claims in this case can be heard in a Bulgarian court. The absence of a viable

and realistic forum in Bulgaria is a "compelling and countervailing reason" to

refuse to enforce the forum selection clause.

---

[18] The enforcement of a forum selection clause is further subject to all of the factors to be considered by the court in its assessment of a *forum non conveniens* defense. *Worldwide Network Services, LLC, supra,* at 63. *See* discussion below.

**B. The Factors Applicable To A *Forum Non Conveniens* Motion Do Not Weigh In Favor Of Dismissal.**

As the Supreme Court made clear in *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254, n.22 102 S.Ct. 252 (1981):

> At the outset of any *forum non conveniens* inquiry, the court must determine whether there exists an alternative forum. Ordinarily, this requirement will be satisfied when the defendant is "amenable to process" in the other jurisdiction.... In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied. Thus, for example, dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute. Cf. *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.,* 78 F.R.D. 445 (Del.1978) (court refuses to dismiss, where alternative forum is Ecuador, it is unclear whether Ecuadorean tribunal will hear the case, and there is no generally codified Ecuadorean legal remedy for the unjust enrichment and tort claims asserted).

**1. Bulgarian Courts Are Not Available**

As is discussed in II.D above, Bulgarian courts are not available to Plaintiffs for the redress of the claims herein for two reasons: the Bulgarian judicial system is too tainted with corruption; and, even if a fair and impartial hearing could be obtained, the claims in this case are beyond the administrative and the substantive capacity of Bulgarian courts.

**a. The Bulgarian Courts Are Too Tainted By Corruption**

Plaintiff has not merely made "generalized allegations of corruption in the judicial system" *El-Fadl, supra,* at 678, citing *Blanco v. Banco Indus. de Venezuela, S.A.* 997 F.2d 974 (2d Cir 1993The testimony of a Bulgarian attorney who is expert on issues of corruption in the judiciary was specific: corruption is endemic in the Bulgarian judicial

system; and, judges, in particular, are likely to be corrupt. That testimony was corroborated by a practicioner who testified, at the insistence of counsel for BAEF, that three in five cases are tainted by corruption.

The existence of corruption in the Bulgarian judiciary has been confirmed by the EU's monitoring reports, as well as the ABA's Central and East European Initiative. **PX 3B.** Moreover, Transparency International's 2007 Global Corruption Report on Corruption in Judicial Systems quantifies the extent and the frequency of improper influence in Bulgaria. **PX 6A.**, and *see* **PX 6B, PX 6C** (describing Bulgaria's failures in combating judicial corruption, as reported in transparency International's 2007 and 2006 Reports on Bulgaria).

Most significant, in light of judicial hesitance to question the fairness of foreign judicial systems on the basis of generalized allegations of corruption, BAEF's own expert concedes that corruption is a problem in the Bulgarian judiciary. Plaintiff has thus provided evidence of serious and systemic judicial corruption different in every significant respect from the generalized allegations which have failed in the past to support a determination that a foreign forum is inadequate.

> The argument that the alternative forum is too corrupt to be adequate "does not enjoy a particularly impressive track record." However, while "some inconvenience" to litigants does not indicate that a forum is inadequate, (internal quotation marks omitted), courts have said that extreme amounts of partiality or inefficiency may render the alternative forum inadequate. *See, e.g., Bhatnagar v. Surrendra Overseas Ltd.,* 52 F.3d 1220, 1227-31 (3d Cir.1995) (Indian forum was inadequate where delays of up to 25 years were possible).

> The reluctance to hold an alternative forum inadequate on these grounds has manifested itself not only in the degree of corruption or inefficiency that must be shown, but also in the allocation of the burdens of proof... (M)ore recently (the Second Circuit) has indicated a willingness to reject judgments of dysfunctional foreign legal systems, *Bridgeway Corp. v.*

*Citibank,* 201 F.3d 134, 141-42 (2d Cir.2000) (declining to enforce judgment by Liberian court).

In *Eastman Kodak,*[19] the District Court for the Southern District of Florida determined that, where the plaintiff had produced evidence of serious partiality in Bolivia, the defendants had failed to meet their burden of persuading the Court that this evidence was incorrect, and that the forum was in fact adequate.... We think this was the correct approach: defendants have the ultimate burden of persuasion, but only where the plaintiff has substantiated his allegations of serious corruption or delay. Thus, where the allegations are insubstantially supported, as in *Mercier II*[20] and *El-Fadl,*[21] a District Court may reject them without considering any evidence from the defendant. But where the plaintiff produces significant evidence documenting the partiality or delay (in years) typically associated with the adjudication of similar claims, and these conditions are so severe as to call the adequacy of the forum into doubt, then the defendant has the burden to persuade the District Court that the facts are otherwise.... (defendant's evidence was sufficient to sustain burden of demonstrating adequacy of Argentine forum). This approach forbids dismissal to alternative forums that realistically are not capable of producing a remedy for the plaintiff's injuries, without crediting cursory attacks on legal systems simply because they are somewhat slower or less elaborate than ours.

*Leon v. Million Air, Inc.* 251 F.3d 1305, 1312 (11th Cir. 2001).

Plaintiff's challenge to the Bulgarian judicial system is not a "cursory attack," see II.D.1, above, and **see PX 6a, PX 6B, PX 6C,** but a specific and well-documented case. At a minimum, the burden has shifted to BAEF's own expert, who was unable to deny the material and poisoning presence of corruption in the judicial system to which BAEF now seeks to direct this case.

**b. The Claims In This Case Are Beyond The Administrative And The Substantive Capacity Of Bulgarian Courts.**

As plaintiff sets out in detail in II.D.2, there is simply no prospect that the complex claims in this case can be effectively litigated in Bulgaria. BAEF's own expert

---

[19] *Eastman Kodak Co. v. Kavlin,* 978 F.Supp. 1078, 1084 (S.D.Fla.1997).
[20] *Mercier v. Sheraton International, Inc.,* 981 F.2d 1345, 1351 (1st Cir.1992)
[21] *El-Fadl v. Central Bank of Jordan,* 75 F.3d 668, 678 (D.C.Cir.1996)

concedes that the case will have to be split into at least two pieces, and perhaps more. BAEF's expert also appears to concede that some of the claims can only be pursued through criminal court and that, in the event of a criminal filing, all civil proceedings are stayed. Plaintiff's experts testify that some of the claims asserted in this case have no coordinate Bulgarian claim or remedy, and that, in any event, the Bulgarian judicial system is so unfunded and administratively inadequate that there is no prospect that a case of this complexity can be conducted in Bulgaria.

In short, Bulgaria's court's "realistically are not capable of producing a remedy for the plaintiff's injuries." *Leon, supra,* at 1312.

## 2. The Private and Public Factors Weigh Against Dismissal.

If the court determines that a viable alternative forum exists, a three-step process follows:

> (T)he trial judge must consider all relevant factors of *private* interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice. If the trial judge finds this balance of private interests to be in equipoise or near equipoise, he must then determine whether or not factors of *public* interest tip the balance in favor of a trial in a foreign forum. If he decides that the balance favors such a foreign forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.,* 717 F.2d 602, 606 (D.C. Cir.1983).

BAEF does not explain how, as a Delaware corporation with its office in Chicago, conduct of the case in Bulgaria will be more convenient to BAEF. BAEF conceded in its Transfer Motion that, "(t)o the extent that they are relevant, BAEF documents and witnesses are located in the Northern District of Illinois," at 9, and not in Bulgaria.

The absence, if any, of compulsory process in this forum must be compared to similar potential deficiencies in Bulgaria. But the record now before the court is barren of any suggestion that Bulgarian procedures include the sorts of provisions for compulsory process that are available in American federal courts.

BAEF's vague reference to the possibility of "inconsistent judgments" is insufficiently explained. To the extent that BAEF is referring to the Bulgarian litigation which has already taken place, this court will undoubtedly address the effect, if any, of those proceedings on this case.

As to translations, the document upon which BAEF has relied so far have already been translated, DX 4, and while it may be necessary to have translators for witnesses who speak Bulgarian if the case is litigated in the United States, it seems unlikely that BAEF would not require translators from Bulgarian to English if the case were to be tried in a Bulgarian court.

Thus, private factors do not suggest a level of inconvenience sufficient to warrant dismissal. Nor does the public interest tip the balance in BAEF's favor. The misuse of the SEED Act is a matter of particular concern to the District of Columbia, and its citizens are well-suited to resolve disputes surrounding the misuse of their own public monies. And while it is true that Bulgarian law may play a role in the disposition of the case, so will American law. Federal courts are not unaccustomed to the construction of foreign law.

Accordingly, as with the private factors, the public interest does not support dismissal under *forum non conveniens*.

On the basis of the foregoing, the instant motion should be denied.

45

Respectfully submitted,

_____
Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:     (240) 632-0906
*Email*: srolinski@rolinski.com


_____
Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*:  (202) 466-3883
*Fax*:     (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com

***Attorneys For Plaintiff***

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Stroitelstvo Bulgaria Ltd.                         :
                                                   :
           Plaintiff,               :
                                                   :
                                                   :
      v.                               :         Case No. 07cv00634 RMC
                                                   :
The Bulgarian-American Enterprise Fund, *et al.*   :
                                                   :
           Defendants.              :

## ORDER

      This matter having come before this Court on Defendant Bulgarian American

Enterprise Fund's Motion To Dismiss Plaintiff's Amended Complaint Pursuant To

Federal Rules 12(b)(2) And 12(b)(3), Or Alternatively, Based On The Doctrine Of *Forum*

*Non Conveniens,* and opposition thereto, it is this _____ day of _____, 2008, for

cause shown:

      **ORDERED**, that the instant motion be and is hereby denied, and it is

      **FURTHER ORDERED**, that Defendant Bulgarian American Enterprise Fund

shall file and serve an answer to the Amended Complaint within __ days of the date of

entry of this Order.

                          SO ORDERED.

                          _____
                          Rosemary M. Collyer, Judge
                          United States District Court for the
                          District of Columbia

Philip M. Musolino
*Musolino & Dessel*
1615 L Street, NW, Suite 440
Washington, DC 20036

Sylvia Rolinski
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854

Karen N. Walker
Eunnice H. Eun
Samantha A. Gingold
KIRKLAND & ELLIS L.L.P.
655 Fifteenth Street, N.W.
Washington, D.C. 20005

Brian D. Sieve
Stephanie A. Brennan
KIRKLAND & ELLIS L.L.P.
200 East Randolph Drive
Chicago, Illinois 60601