**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STROITELSTVO BULGARIA LTD.,     ) | |
|                          ) | |

STROITELSTVO BULGARIA LTD.,      )
                          )
           Plaintiff,       )
                          )    Case No.:  1:07-CV-00634-RMC
    v.                      )
                          )    Hon. Rosemary M. Collyer
THE BULGARIAN-AMERICAN ENTERPRISE )
FUND and THE BULGARIAN-AMERICAN   )
CREDIT BANK,              )    **ORAL ARGUMENT REQUESTED**
                          )
          Defendants.     )
                          )

**DEFENDANT BULGARIAN-AMERICAN ENTERPRISE FUND'S REPLY IN SUPPORT**
**OF ITS MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**
**PURSUANT TO FEDERAL RULES 12(b)(2) AND 12(b)(3), OR ALTERNATIVELY**
**BASED ON THE DOCTRINE OF FORUM NON CONVENIENS**

## <u>TABLE OF CONTENTS</u>

Page

ARGUMENT ........................................................................................................3

I.    BAEF Is Not Subject To Personal Jurisdiction In The District Of Columbia. ...................3

    A.    Plaintiff Makes No Claim That BAEF's Contacts With The District Of Columbia Are Systematic And Continuous Enough To Confer General Jurisdiction. ...................................................................................................3

    B.    This Court Lacks Specific Jurisdiction Over BAEF Because None Of The Conduct At Issue In The Lawsuit Occurred In The District Of Columbia. ............4

    C.    The RICO Statute Does Not Establish Personal Jurisdiction Over BAEF. ............5

        1.    The More Widely Adopted View Is That At Least One Defendant Must Have Minimum Contacts With The District Of Columbia For RICO Jurisdiction. .........................................................................................6

        2.    Even If This Court Were To Apply The "National Contacts" Analysis, Plaintiff Has Not Shown That The Test Is Satisfied Here. ..........9

II.   Venue Is Not Proper In This District. ...............................................................................9

    A.    The Forum Selection Clause Should Be Enforced. ...............................................9

    B.    Venue Is Not Proper Under 28 U.S.C. § 1391. ....................................................12

    C.    Venue Is Not Proper Under 18 U.S.C. § 1965. ....................................................13

III.  The Amended Complaint Should Be Dismissed Based On The Doctrine Of *Forum Non Conveniens*. ...................................................................................................14

    A.    Bulgarian Courts Are Adequate To Hear The Present Dispute. ............................14

        1.    Bulgarian Courts Are Not Too Corrupt To Resolve Fairly This Dispute. ......................................................................................................15

        2.    Bulgarian Courts Can Administratively And Substantively Handle This Dispute. ...............................................................................................19

    B.    Public And Private Interest Factors Strongly Favor Dismissal. ............................21

CONCLUSION ...............................................................................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*AGS Int'l Servs., S.A. v. Newmont USA Ltd.,*
    346 F. Supp. 2d 64 (D.D.C. 2004) ........................................................................ 7

*Anderson v. Indiana Black Expo, Inc.,*
    81 F. Supp. 2d 494 (S.D.N.Y. 2000) .................................................................... 7

*Base Metal Trading SA v. Russian Aluminum,*
    253 F. Supp. 2d 681 (S.D.N.Y. 2003) ................................................................. 20

*Blanco v. Banco Indus. de Venezuela, S.A.,*
    997 F.2d 974 (2d Cir. 1993) ............................................................................... 17

*Brock v. Entre Computer Ctrs., Inc.,*
    740 F. Supp. 428 (E.D. Tex. 1990) .................................................................... 11

*Brown v. Kerkhoff,*
    504 F. Supp. 2d 464 (S.D. Iowa 2007) ................................................................ 7

*Butcher's Union Local No. 498, United Food & Commercial Workers v. SDC Inv., Inc.,*
    788 F.2d 535 (9th Cir. 1986) ............................................................................... 6

*Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,*
    709 F.2d 190 (3d Cir. 1983) ............................................................................... 11

*Cory v. Aztec Steel Bldg., Inc.,*
    468 F.3d 1226 (10th Cir. 2006) ....................................................................... 6, 8

*Crescent Int'l, Inc. v. Avatar Cmtys., Inc.,*
    857 F.2d 943 (3d Cir. 1988) ............................................................................... 11

*Doe v. Unocal Corp.,*
    27 F. Supp. 2d 1174 (C.D. Cal. 1998) ................................................................. 6

*Dooley v. United Techs. Corp.,*
    786 F. Supp. 65 (D.D.C. 1992) ........................................................................... 7

*Eastman Kodak v. Kavlin,*
    978 F. Supp. 1078 (S.D. Fla. 1997) ................................................................... 18

*El-Fadl v. Cent. Bank of Jordan,*
    75 F.3d 668 (D.C. Cir. 1996) ....................................................................... 17, 19

*Envtl. Research Int'l, Inc. v. Lockwood Green Eng'rs, Inc.,*
    355 A.2d 808 (D.C. 1976) ................................................................................... 3

*Esheva v. Siberia Airlines,*
    499 F. Supp. 2d 493 (S.D.N.Y. 2007) ............................................................................... 17

*FC Inv. Group LC v. IFX Markets, Ltd.,*
    479 F. Supp. 2d 30 (D.D.C. 2007) ............................................................................. 4, 5, 7

*Flores v. Southern Peru Copper Corp.,*
    253 F. Supp. 2d 510 (S.D.N.Y. 2002) ................................................................... 15, 17, 18

*Gonzales v. P.T. Pelangi Niagra Mitra Int'l.,*
    196 F. Supp. 2d 482 (S.D. Tex. 2002) ....................................................................... 16, 17

*GTE New Media Servs., Inc. v. BellSouth Corp.,*
    199 F.3d 1343 (D.C. Cir. 2000) ...................................................................................... 8

*Hawkins v. Upjohn Co.,*
    890 F. Supp. 601 (E.D. Tex. 1994) ................................................................................ 7

*Heller v. Nicholas Applegate Capital Mgmt., LLC,*
    Civil Action No. 03-2662 (GK), 2007 WL 2137764 (D.D.C. 2007) ................................. 4

*Hodgdon v. Needham-Skyles Oil Co.,*
    556 F. Supp. 75 (D.D.C. 1982) ..................................................................................... 13

*In re Arbitration between Monegasque de Reassureances S.A.M. (Monde Re) v. Nak Naftogaz of Ukraine,*
    311 F.3d 488 (2d Cir. 2002) ......................................................................................... 17

*In re Disaster at Riyadh Airport,*
    540 F. Supp. 1141 (D.D.C. 1982) ................................................................................. 20

*Interamerican Trade Corp. v. Companhia Fabricadora de Pecas,*
    973 F.2d 487 (6th Cir. 1992) ........................................................................................ 19

*L&L Constr. Assocs., Inc. v. Slattery Skanska, Inc.,*
    No. CIV. 05-1289, 2006 WL 1102814 (D.D.C. March 31, 2006) .................................. 10

*Lambert v. Kysar,*
    983 F.2d 1110 (1st Cir. 1993) ...................................................................................... 11

*Leon v. Millon Air Inc.,*
    251 F.3d 1305 (11th Cir. 2001) .................................................................................... 17

*Lex Tex Ltd., Inc. v. Skillman,*
    No. 88-7141, 1990 WL 147180 (D.C. Cir. 1990) ........................................................... 3

*Lexington Ins. Co. v. Forrest,*
    263 F. Supp. 2d 986 (E.D. Pa. 2003) ........................................................................... 20

*Lisak v. Mercantile Bancorp, Inc.,*
    834 F.2d 668 (7th Cir. 1987) ............................................................................... 6, 8

*Mallinckrodt Med., Inc. v. Sonus Pharma., Inc.,*
    989 F. Supp. 265 (D.D.C. 1998) ............................................................................ 5

*Manetti-Farrow, Inc. v. Gucci Am., Inc.,*
    858 F.2d 509 (9th Cir. 1988) ......................................................................... 11, 12

*Marra v. Papandreou,*
    59 F. Supp. 2d 65 (D.D.C. 1999) ............................................................ 9, 10, 12, 14

*Mercier v. Sheraton Int'l, Inc.,*
    981 F.2d 1345 (1st Cir. 1992) ............................................................................ 17

*Multi-Media Int'l, LLC v. Promag Retail Servs.,*
    343 F. Supp. 2d 1024 (D. Kan. 2004) ................................................................... 7

*Ontario Inc. v. Auto Enters., Inc.,*
    113 F. Supp. 2d 1116 (E.D. Mich. 2000) ............................................................... 7

*Parex Bank v. Russian Sav. Bank,*
    116 F. Supp. 2d 415 (S.D.N.Y. 2000) .................................................................. 17

*Piper Aircraft Co. v. Reyno,*
    454 U.S. 235 (1981) ......................................................................................... 20

*PT United Can Co. v. Crown Cork & Seal Co.,*
    138 F.3d 65 (2d Cir. 1998) ........................................................................ 6, 7, 20

*Rustal Trading US, Inc. v. Makki,*
    No. 00-1513, 2001 WL 1006176 (6th Cir. Aug. 21, 2001) ........................................ 17

*Stalinski v. Bakoczy,*
    41 F. Supp. 2d 755 (S.D. Ohio 1998) .................................................................. 17

*Stephens v. Entre Computer Ctrs., Inc.,*
    696 F. Supp. 636 (N.D. Ga. 1988) ...................................................................... 11

*Terra Int'l, Inc. v. Miss. Chem. Corp.,*
    922 F. Supp. 1334 (N.D. Iowa 1996) ................................................................... 10

*Textile Museum v. F. Eberstadt & Co.,*
    440 F. Supp. 30 (D.D.C. 1977) ............................................................................ 5

*Torres v. S. Peru Copper Corp.,*
    965 F. Supp. 899 (S.D. Tex. 1996) ...................................................................... 17

*Turedi v. Coca Cola Co.,*
    460 F. Supp. 2d 507 (S.D.N.Y. 2006) ............................................................... 17

*Twinlab Corp. v. Paulson,*
    724 N.Y.S.2d 496 (N.Y. App. Div. 2001) ....................................................... 10

*Vijuk Equip., Inc. v. Otto Hohner KG,*
    728 F. Supp. 1368 (N.D. Ill. 1990) ................................................................. 11

*Warter v. Boston Secs., S.A.,*
    380 F. Supp. 2d 1299 (S.D. Fla. 2004) ........................................................... 17

*World Wide Minerals v. Republic of Kazakhstahn,*
    116 F. Supp. 2d 98 (D.D.C. 2000) ................................................................. 7, 8

*Worldwide Network Servs., LLC v. DynCorp Int'l,*
    496 F. Supp. 2d 59 (D.D.C. 2007) ................................................................... 11

## Statutes

18 U.S.C. § 1965 (2007) ............................................................................. 5, 7, 13, 14

28 U.S.C. § 1391 (2007) ........................................................................................ 12

D.C. Code § 13-423(a) (2007) ............................................................................... 4

Plaintiff maintains that the current dispute should be litigated in this Court even though the dispute centers around a Loan Agreement between two Bulgarian companies that was executed in Bulgaria, pertains to a Bulgarian construction project, and is governed by Bulgarian law. Plaintiff's lawsuit belongs in Bulgaria, not here. Its Amended Complaint may be dismissed on any of the three grounds set forth in BAEF's motion to dismiss: (1) lack of personal jurisdiction; (2) improper venue, and; (3) *forum non conveniens*.

The only connections to the District of Columbia that plaintiff identifies in its opposition are: (1) BAEF received SEED Act funding from the U.S. government more than fifteen years ago and used some of that funding to finance the Bank's operations; (2) copies of BAEF's semi-annual reports to USAID (as a condition of the grant) are mailed to USAID in both the District of Columbia and Bulgaria, and; (3) BAEF employees have had a handful of meetings with government officials in the District of Columbia on matters unrelated to the loan transaction at issue in this case. These facts are insufficient to establish either personal jurisdiction over BAEF or proper venue in the District of Columbia under applicable law.

Because of these deficiencies, plaintiff apparently intends to rely upon its RICO claim to establish personal jurisdiction and venue based on purported "national contacts." But plaintiff has not offered any reason to depart from recent cases in this District holding that RICO cannot be used to establish jurisdiction and venue in such a way. These cases are correctly decided and should be followed in this case. Even if "national contacts" could be considered, plaintiff has not shown that BAEF's United States citizenship meets the "national contacts" standard under RICO.

The doctrine of *forum non conveniens* provides an additional, independent basis for the dismissal of this action. Implicitly recognizing that the ties in this case to Bulgaria are

much stronger than the ties to the United States generally or the District of Columbia in particular, plaintiff attempts to persuade this Court that Bulgaria's courts are corrupt and unsophisticated and therefore inadequate.

That argument rings hollow given that plaintiff agreed to a forum selection clause requiring litigation in Bulgaria.   Moreover, neither plaintiff's generalized allegations of corruption nor its complaints of strategic disadvantages to litigating at home rise to the high level needed to deem another country's courts "inadequate" under the *forum non conveniens* analysis. To the contrary, Bulgarian courts are adequate enough to permit Bulgaria's admission into the European Union.   It would be an unwarranted slap in the face to the European Union and Bulgaria for this Court to be the first American court to declare Bulgaria unfit to hear a dispute between two of its own citizens.

Moreover, the private and public interests in this case heavily favor dismissal. Plaintiff's primary response to those factors is to assert that BAEF was funded many years ago by the U.S. Congress.  That, of course, has nothing to do with this dispute.  Nor can it be the case that every foreign entity that receives funding through an Act of Congress — directly or indirectly — should be haled into federal court in the District of Columbia whenever any kind of dispute arises involving that entity.  For all these reasons, dismissal is appropriate on each of the grounds asserted by BAEF.

## ARGUMENT[1]

### I.    BAEF Is Not Subject To Personal Jurisdiction In The District Of Columbia.

Plaintiff apparently does not dispute that this Court has no general jurisdiction over BAEF. Instead, plaintiff claims that this Court has specific jurisdiction over BAEF for purposes of this case. Plaintiff also seeks to impose personal jurisdiction on BAEF under the RICO statute. But plaintiff has not met its burden of proving that BAEF is subject to personal jurisdiction in this district under either theory.

### A.    Plaintiff Makes No Claim That BAEF's Contacts With The District Of Columbia Are Systematic And Continuous Enough To Confer General Jurisdiction.

Plaintiff includes a block quote in the midst of its specific jurisdiction discussion that sets forth standards for general jurisdiction. (*See* Opp'n at 28)[2] Plaintiff also discusses the basis for the "government contacts" principle, apparently in response to several cases cited in BAEF's initial memorandum that held that sporadic contacts with the federal government did not confer *general* jurisdiction over a defendant.[3] Plaintiff does not argue, however, that it has met

---

[1]    While BAEF disagrees with many of plaintiff's factual assertions, BAEF addresses only those relevant to the present motion to dismiss.

[2]    BAEF's initial Motion and Memorandum in Support of its Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Federal Rules 12(b)(2) and 12(b)(3), or Alternatively Based on the Doctrine of *Forum Non Conveniens* is referred to herein as "J/V/FNC Mot. to Dismiss." Plaintiffs' Response in Opposition is referred to herein as "Opp'n."

[3]    Plaintiff does not directly address any of BAEF's cases. Instead, plaintiff appears to contend that in cases where the claim arises from a defendant's contacts with the government, the court may have *specific* jurisdiction over the defendant. This is not a case where "defendant's contacts with the government themselves constitute the alleged culpable or liability-generating conduct for which plaintiff seeks to recover," as discussed further below. (*See* Opp'n at 29 n.12 (quoting *Lex Tex Ltd., Inc. v. Skillman*, No. 88-7141, 1990 WL 147180 (D.C. Cir. 1990) (involving allegations that a defendant's false filings with the patent office caused plaintiff to suffer financial loss).)) Moreover, both the cases cited by BAEF and those cited by plaintiff demonstrate that plaintiff takes too broad a view of personal jurisdiction. *E.g., Envtl. Research Int'l, Inc. v. Lockwood Green Eng'rs, Inc.*, 355 A.2d 808 (D.C. 1976) ("To permit our local courts to assert personal jurisdiction over nonresidents whose sole contact with the District consists of dealing with a federal instrumentality not only would pose a threat to free public participation in government, but also would threaten to convert the District of Columbia into a national judicial forum.").

the test for general jurisdiction. (*See* Opp'n at 27-30)  BAEF explained in its initial brief why this Court lacks general jurisdiction over BAEF, and for the sake of brevity does not repeat those arguments here.  (*See* J/V/FNC Mot. to Dismiss at 14-16)

> **B.    This Court Lacks Specific Jurisdiction Over BAEF Because None Of The Conduct At Issue In The Lawsuit Occurred In The District Of Columbia.**

Plaintiff claims that BAEF is subject to personal jurisdiction under the provision of the District of Columbia long-arm statute that provides for the exercise of personal jurisdiction "as to a claim for relief arising from the person's . . . transacting any business in the District of Columbia."  D.C. Code § 13-423(a) (2007).  As plaintiff concedes, its claims must be related to the acts that form the basis for personal jurisdiction.  (*See* Opp'n at 28)  In fact, Stroitelstvo does not dispute that a plaintiff relying on this provision must show both that the defendant transacted business in the District of Columbia and that the claim arose from that business.  *See, e.g., FC Inv. Group LC v. IFX Markets, Ltd.*, 479 F. Supp. 2d 30, 39 (D.D.C. 2007).

Plaintiff notes that BAEF received funding as a result of the SEED Act and has semi-annual reporting obligations to USAID as a condition of the original USAID grant.  (Opp'n at 28-29)  But neither of these facts constitute BAEF transacting any business in D.C.  Plaintiff's own memorandum makes clear that it is actions "by the defendant *himself*" that matter.  (Opp'n at 28 (quoting *Heller v. Nicholas Applegate Capital Mgmt., LLC*, Civil Action No. 03-2662 (GK), 2007 WL 2137764, at *7 (D.D.C. 2007) (emphasis in original).))  BAEF neither passed the SEED Act nor imposed semi-annual reporting obligations on itself.  At most, BAEF's compliance with the reporting obligations consists of mailing copies of semi-annual reports to USAID's offices in D.C. and Sofia, Bulgaria in advance of BAEF's meetings with USAID (which take place either on the phone or face-to-face in Sofia, Bulgaria).  (*See* Ex. 2 to J/V/FNC Mot. to Dismiss at 29:20-22, 30:1-3)  As explained in BAEF's initial memorandum, simply

mailing reports to a government agency located within the District does not amount to "transacting business" within it.  *Cf. FC Inv. Group*, 479 F. Supp. 2d at 39; *Textile Museum v. F. Eberstadt & Co.*, 440 F. Supp. 30, 32 (D.D.C. 1977).

Furthermore, the claims at issue in this case do not arise from either the SEED Act or BAEF's semi-annual reporting.[4]  Plaintiff misstates BAEF's position when it claims that BAEF "does not dispute that the relationship between plaintiff and the Bank arose out of [ ] funding [from USAID] or the SEED Act." (*See* Opp'n at 28)  To be clear, BAEF's position is that neither the relationship between plaintiff and the Bank nor the claims in this case have anything to do with either the SEED Act or how the Bank was funded.  (*See* J/V/FNC Mot. to Dismiss at 11-14)  The relationship between the Bank and plaintiff (and the claims in this case) arose out of the Loan Agreement executed in Bulgaria.  The events surrounding this dispute also have nothing to do with BAEF's semi-annual reporting to USAID, much less its mailing copies of those reports to the District of Columbia.  *Cf. Mallinckrodt Med., Inc. v. Sonus Pharma., Inc.*, 989 F. Supp. 265, 272 n.4 (D.D.C. 1998) (noting that clinical tests conducted in D.C. were "irrelevant to [the court's] personal jurisdiction analysis here because plaintiffs' . . . claims could not reasonably be viewed as having arisen from those clinical tests.").  Under these circumstances, it is inconsistent with D.C.'s long arm statute and would violate Due Process to hale BAEF to court in the District of Columbia to defend itself against plaintiff's claims.

**C.    The RICO Statute Does Not Establish Personal Jurisdiction Over BAEF.**

In the alternative, plaintiff urges this Court to hold that solely national contacts may suffice to establish personal jurisdiction under the RICO statute, 18 U.S.C. §§ 1965 (b) and

---

4    Elsewhere in its brief, plaintiff points to a handful of trips that BAEF executives have made to the District of Columbia over the last couple of years for purposes of creating a legacy foundation when BAEF is dissolved. (*See* Opp'n at 6-7)  Plaintiff does not even try to argue that its claims somehow arise out of these trips for purposes of the personal jurisdiction analysis. (*See id.* at 27-30)  Clearly they do not.

(d).  (Am. Compl. ¶ 1)  But plaintiff provides no justification for departing from recent cases in this district holding to the contrary.  Moreover, plaintiff has not met its burden of proving that the "national contacts" test is satisfied here.

> **1.    The More Widely Adopted View Is That At Least One Defendant Must Have Minimum Contacts With The District Of Columbia For RICO Jurisdiction.**

Plaintiff claims that "Circuits are split" on the issue and then misleadingly suggests that the Ninth and Third Circuits have held that the national contacts analysis may be employed to confer jurisdiction under RICO where no single defendant has minimum contacts with the jurisdiction in which the claim has been brought.  (*See* Opp'n at 30)  In fact, one of the Ninth Circuit cases relied upon by plaintiff follows a case cited by BAEF in its opening brief and states (in a section *not* quoted by plaintiff):

> For nationwide service of process to be imposed under section 1965(b), ***the court must have personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy* . . . .**[5]

*See Doe v. Unocal Corp.*, 27 F. Supp. 2d 1174, 1182 (C.D. Cal. 1998), *adopted in* 248 F.3d 915 (9th Cir. 2001); *see also Butcher's Union Local No. 498, United Food & Commercial Workers v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986) (cited in J/V/FNC Mot. to Dismiss at 18). Neither of the Third Circuit cases cited by plaintiff even analyzes the RICO Act, and BAEF is not aware of a Third Circuit opinion addressing this issue.

The majority of circuit and district courts to consider the issue have held that one defendant must have minimal contacts with a jurisdiction before RICO's national contacts test can be applied.[6]  Although the United States Court of Appeals for the District of Columbia

---

[5]    Unless otherwise indicated, all ***emphasis*** is added, and internal citations and quotation marks are omitted.

[6]    *See, e.g., Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1231 (10th Cir. 2006); *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998); *Butcher's Union Local No. 498*, 788 F.2d at 538-39; *Lisak v.*
(Continued...)

Circuit has not addressed the issue, three recent opinions of district courts in the District of Columbia have done so, all adopting the majority view. *See FC Inv. Group*, 479 F. Supp. 2d at 44; *AGS Int'l Servs., S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64, 86-87 (D.D.C. 2004); *World Wide Minerals v. Republic of Kazakhstahn*, 116 F. Supp. 2d 98, 107-08 (D.D.C. 2000).[7]  For several reasons, the better reading of RICO is that adopted in this district's recent decisions.

       *First*, as the Second Circuit has explained, an integrated reading of the various RICO provisions does not support the concept that the statute provides for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the defendants are found. *See PT United Can Co.*, 138 F.3d at 71.  Courts in this district have agreed with the Second Circuit's statutory analysis, explaining:

> [T]he service provisions of the RICO statute must be read together in order to be coherent. *See PT United Can Co.*, 138 F.3d at 70. First, 1965(a) gives personal jurisdiction over defendants when they reside, have an agent, or transact affairs in the district.  This is analogous to having minimum contacts within the district.   Then 1965(b) provides for nationwide jurisdiction over other parties not residing in the district. 1965(c) provides for service of subpoenas. Finally, 1965(d) provides for nationwide service of "all other process".   This clause should not invalidate the division in (a) and (b) between resident and non-resident defendants.  The statute seems to provide for nationwide jurisdiction only when one of the defendants has minimum contacts with the forum.

*World Wide Minerals*, 116 F. Supp. 2d at 108; *see also AGS Int'l Servs.*, 346 F. Supp. 2d at 86-87.

---

*Mercantile Bancorp, Inc.*, 834 F.2d 668, 671-72 (7th Cir. 1987); *Brown v. Kerkhoff*, 504 F. Supp. 2d 464, 493 (S.D. Iowa 2007); *Multi-Media Int'l, LLC v. Promag Retail Servs.*, 343 F. Supp. 2d 1024, 1030 (D. Kan. 2004); *Ontario Inc. v. Auto Enters., Inc.*, 113 F. Supp. 2d 1116, 1127-28 (E.D. Mich. 2000); *Anderson v. Indiana Black Expo, Inc.*, 81 F. Supp. 2d 494, 505 (S.D.N.Y. 2000); *Hawkins v. Upjohn Co.*, 890 F. Supp. 601, 605-06 (E.D. Tex. 1994).

[7]    The only decision of a court in this district that holds to the contrary, *Dooley v. United Techs. Corp.*, 786 F. Supp. 65, 71 (D.D.C. 1992), pre-dates the seminal Second Circuit decision on this issue, *PT United Can Co.*, 138 F.3d at 71, and contains no analysis of the RICO provision.

*Second*, the Second Circuit's reading is consistent with the statute's legislative history. *See Cory*, 468 F.3d at 1229-31 (explaining that the Second Circuit's reasoning is persuasive and consistent with congressional intent, including the antitrust origins of the statute).

*Third*, this reading allows RICO claims, which frequently involve multiple defendants and criminal actions that may not be connected to a single jurisdiction, to be brought and tried in one action. *Lisak*, 834 F.2d at 672 (stating that RICO "authorizes nationwide service so that at least one court will have jurisdiction over everyone connected with any RICO enterprise."). On the other hand, it also ensures that such cases will be brought in a district that has at least some ties to the parties or events at issue. *Id.*

*Fourth*, there is some indication that the District of Columbia Circuit would follow the Second Circuit. In *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000), the Court of Appeals held that nationwide service and jurisdiction under the Clayton Act is proper only when the action is brought in the district where the defendant resides, is found, or transacts business. Finding "substantial similarity" between the service of process provisions in the Clayton Act and those in the RICO statute, the *World Wide Minerals* court noted that the *GTE New Media Services* holding "suggests that a national contacts test might not apply" under RICO unless a defendant has minimum contacts with the forum. *World Wide Minerals*, 116 F. Supp. 2d at 107-108.

*Finally*, it is worth noting that plaintiff's position encourages abuses of RICO not unlike those illustrated by the present action. Plaintiffs should not be encouraged to include vague RICO claims in their complaints in order to achieve a loosening of personal jurisdiction and venue standards. That would allow anyone asserting a RICO claim simply to select the most perceived plaintiff-friendly jurisdiction in the nation in which to sue.

8

**2.      Even If This Court Were To Apply The "National Contacts" Analysis, Plaintiff Has Not Shown That The Test Is Satisfied Here.**

Even if this Court were to decide that "national contacts" may suffice to confer jurisdiction over a defendant, plaintiff has not met its burden of showing that there are sufficient "national contacts" to warrant personal jurisdiction over BAEF in this case.  Plaintiff has neither described what analysis would apply nor how the test is met in this case.[8]  Nor has plaintiff shown that the "ends of justice" require the exercise of jurisdiction over BAEF in this district.

**II.      Venue Is Not Proper In This District.**

Plaintiff has not met its burden of establishing that venue is proper.  Plaintiff concedes, as it must, that the Loan Agreement's forum selection clause, which provides for resolution in Bulgaria, applies to its breach of contract claim.  (Opp'n at 37)  Plaintiff's other claims are so integrally related to the forum selection clause that the clause should govern the entire action.  Moreover, even if the forum selection clause is not enforced, venue has not been properly established under either the general venue provision or RICO.

**A.      The Forum Selection Clause Should Be Enforced.**

As an initial matter, plaintiff wrongly suggests that Bulgarian law should apply to determine whether the forum selection clause should be enforced.  (Opp'n at 36)  Setting aside the selective nature of plaintiff's invocation of Bulgarian law, courts in the District of Columbia have applied federal law in determining whether to enforce a forum selection clause.  *See, e.g.*, *Marra v. Papandreou*, 59 F. Supp. 2d 65 (D.D.C. 1999) (applying federal law to determine enforceability of a forum selection clause that called for matter to be litigated in Greece).  In any

---

[8]      As an example, the test set forth in one of the Ninth Circuit cases cited by plaintiff states:  "In a statute providing for nationwide service of process, the inquiry to determine minimum contacts is thus whether the defendant has acted within any district of the United States or sufficiently caused foreseeable consequences in this country."  Plaintiff would not meet this test, as it has not alleged any relevant actions by BAEF that occurred within this country or any foreseeable consequences in the United States.

event, plaintiff — which bears a heavy burden of proof on this issue[9] — has not shown that Bulgarian law would mandate a different result.

In support of its contention that the clause does not apply to non-contract claims, plaintiff cites two cases in which courts held that forum selection clauses *applied* to non-contractual claims and then asserts that the clauses at issue in those cases were broader than the one at issue here. Even if true, that does nothing to prove that the clause at issue here is not also sufficiently broad to encompass non-contract claims. In fact, the Loan Agreement's forum selection clause is similarly broad. (*See* Am. Compl. Ex. A § 17.08 (applying Bulgarian law to "any disputes *arising from this Agreement or concerning it*, including disputes *arising from or concerning* its interpretation, validity, nonperformance or termination."))

Plaintiff's discussion of *Twinlab Corp. v. Paulson*, 724 N.Y.S.2d 496 (N.Y. App. Div. 2001), adds nothing to the analysis. In *Twinlab*, the court held that a RICO claim involving alleged criminal activities that were *unrelated to* a consulting agreement fell outside the scope of a forum selection clause in the consulting agreement. Here, by contrast, the non-contractual claims arise out of the contract and are inextricably intertwined with the contractual dispute, for the reasons set forth in BAEF's initial memorandum. (*See* J/V/FNC Mot. to Dismiss at 22 (setting forth how each claim is based on the contract)) Plaintiff does not even attempt to show otherwise. Nor does plaintiff address any of the numerous cases cited by BAEF that hold that a contract's forum selection clause applies to various non-contractual claims (such as tort or RICO claims) when they are related to the contract. (*Id.* at 21-22 (citing *Terra Int'l, Inc. v. Miss.*

---

[9]  *E.g., L&L Constr. Assocs., Inc. v. Slattery Skanska, Inc.*, No. CIV. 05-1289, 2006 WL 1102814, at *4 (D.D.C. March 31, 2006) (placing burden to invalidate forum selection clause on plaintiff and noting that the "burden of invalidating a forum selection clause is heavy."); *Marra*, 59 F. Supp. 2d at 70 (holding that forum selection clauses should be enforced "in all but the most exceptional" circumstances).

*Chem. Corp.*, 922 F. Supp. 1334, 1379 (N.D. Iowa 1996); *Lambert v. Kysar*, 983 F.2d 1110, 1121-22 (1st Cir. 1993); *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 (9th Cir. 1988); *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 203 (3d Cir. 1983); *Crescent Int'l, Inc. v. Avatar Cmtys., Inc.*, 857 F.2d 943 (3d Cir. 1988); *Worldwide Network Servs., LLC v. DynCorp Int'l*, 496 F. Supp. 2d 59, 63 (D.D.C. 2007); *Vijuk Equip., Inc. v. Otto Hohner KG*, 728 F. Supp. 1368, 1371 (N.D. Ill. 1990).))

Plaintiff also contends that BAEF is not entitled to rely on the forum selection clause because its claims against BAEF are not related to the contract. (Opp'n at 38-39) Plaintiff's position raises the question of why BAEF has been brought into this lawsuit at all. On the one hand, plaintiff premises its allegations of liability against BAEF on assertions that BAEF ratified the Bank's contractual breaches, supervised the Bank's contractual breaches, and so forth, but on the other hand tries to contend that BAEF has no relationship to the contract. Plaintiff cannot have it both ways. Nor can it avoid the forum selection clause simply by adding BAEF as a defendant. Under relevant case law, BAEF can enforce the venue provision even though it is not a party to and is not bound by the Loan Agreement's provisions. *See Manetti-Farrow*, 858 F.2d at 514 ("We agree with the district court that the alleged conduct of the non-parties is so closely related to the contractual relationship that the forum selection clause applies to all defendants."). *See also Brock v. Entre Computer Ctrs., Inc.*, 740 F. Supp. 428, 430 (E.D. Tex. 1990); *Stephens v. Entre Computer Ctrs., Inc.*, 696 F. Supp. 636, 638 (N.D. Ga. 1988).[10]

---

[10] Plaintiff unsuccessfully attempts to distinguish these cases, none of which deal with or limit their holdings to third party beneficiaries. (*See* Opp'n at 39-40) *Manetti*, for instance, is on all fours with this case. There, the court squarely rejected Manetti-Farrow's argument that the forum selection clause could only be invoked by Gucci Parfums, which was the only defendant to sign the contract, and not by its affiliate Gucci America.

Finally, plaintiff contends that the "absence of a viable and realistic forum in Bulgaria" is a compelling and countervailing reason to refuse to enforce the forum selection clause.[11] Not so. Having agreed to a Bulgarian forum, plaintiff cannot now contend that such a forum is inadequate. *Marra v. Papandreou*, 216 F.3d 1119, 1123-24 (D.C. Cir. 2000) ("a forum-selection clause is best understood as . . . [an] ex ante agreement to waive venue objections to a particular forum."). *See also Manetti-Farrow*, 858 F.2d at 515 (dismissing plaintiff's concern that an Italian court would not "adequately safeguard its rights" as one "which the parties presumably thought about and resolved when they included the forum selection clause in their contract.").

**B.     Venue Is Not Proper Under 28 U.S.C. § 1391.**

Plaintiff claims that venue is proper pursuant to 28 U.S.C. § 1391(b)(1), because both BAEF and the Bank reside in the District of Columbia. But BAEF is not subject to personal jurisdiction for the reasons stated above, and plaintiff has made no showing whatsoever that the Bank, a Bulgarian entity, is subject to personal jurisdiction in D.C.[12] Thus, 28 U.S.C. § 1391(b)(1) is inapplicable.

Plaintiff next claims that 28 U.S.C. § 1391(b)(2) supports venue here because "a substantial part of the events or omissions giving rise to the claim" occurred in D.C. Plaintiff then lists several iterations of the following: (1) BAEF received funding under the SEED Act, and; (2) BAEF reports to USAID. Plaintiff's characterization of these facts as relating to the

---

[11]   The use of the term "Competent Court" in the forum selection clause clearly means the appropriate Bulgarian court and does not somehow impose a requirement that the parties first determine whether Bulgarian courts are "adequate," as suggested by plaintiff. (*See* Opp'n at 38) The construction urged by plaintiff is nonsensical.

[12]   Plaintiff alleges that the Bank has been served but has not yet appeared. (Opp'n at 1 n.1) In fact, the Bank has not been properly served with plaintiff's Amended Complaint pursuant to the Hague Convention and is thus not yet required to appear.

issues in the Amended Complaint is far too much of a stretch.[13]  For instance, in no way did "the failure to adequately report by BAEF to USAID permit[ ] the wrongful conduct alleged in the Amended Complaint to continue"; nor did "the failure of BAEF's Bank Audit Committee undoubtedly permit[ ] the wrongful conduct alleged in the Amended Complaint to continue." (Opp'n at 33)   Even if these facts were somehow relevant, none of them (alone or in combination) constitute a "substantial" part of the events or omissions giving rise to the claim. That is why the Amended Complaint only has *one* paragraph that alleges any conduct in the District of Columbia.  (*See* Am. Compl. ¶ 6)

> C.     **Venue Is Not Proper Under 18 U.S.C. § 1965.**

Plaintiff now concedes that RICO's venue provision is found at Section 1965(a), which provides that an action may be instituted in a district in which a defendant "resides, is found, has an agent, or transacts his affairs." (Opp'n at 34)  Plaintiff then claims, without further argument, support, or analysis, that "[b]ecause BAEF concedes that it conducts at least some business in the District of Columbia . . . it falls within the purview of section 1965(a)." (Opp'n at 35)  Plaintiff is wrong again.  BAEF disputes that it transacts business in the district within the meaning of Section 1965(a).  (J/V/FNC Mot. to Dismiss at 26-27)  *See also*, *e.g.*, *Hodgdon v. Needham-Skyles Oil Co.*, 556 F. Supp. 75, 78 (D.D.C. 1982) (under the RICO provision, a person transacts his affairs within a particular district when he *regularly* conducts business of a "***substantial and continuous nature***" within that district).

---

[13]  Plaintiff again inexplicably claims that BAEF "does not dispute that the relationship between Plaintiff and the Bank arose out of [USAID] funding or the SEED Act." (Opp'n at 34)  BAEF vigorously disputes that contention. As stated in BAEF's initial memorandum, "BAEF's original receipt of funding *over fifteen years ago* by United States Congress through the SEED Act does not bear any relationship to, much less a 'substantial part' of, the underlying events giving rise to plaintiff's claims." (J/V/FNC Mot. to Dismiss at 26 n.17)

Similarly flawed is plaintiff's suggestion that Section 1965(b) requires both defendants to come before a D.C. forum. As explained above, 18 U.S.C. § 1965(b) does not come into play where, as here, venue has not been properly established for at least one defendant. Nor do the "ends of justice" require bringing both defendants before a District of Columbia forum where the dispute is centered in Bulgaria. Plaintiff, therefore, cannot establish the District of Columbia as the proper venue for this case under the RICO statute.

**III.    The Amended Complaint Should Be Dismissed Based On The Doctrine Of Forum Non Conveniens.**

Glossing over the private and public interest factors, plaintiff focuses on the threshold analysis of whether the Bulgarian courts provide an adequate alternate forum.[14] But no U.S. court has ever declared Bulgaria — or any other member of the EU — to be an inadequate alternate forum. While Bulgarian courts may not be identical to United States courts, that is not the standard. Plaintiff's evidence does not prove that Bulgarian courts are inadequate to hear the present dispute. Moreover, BAEF has presented evidence affirmatively demonstrating that Bulgarian courts can fairly resolve the dispute.[15]

**A.    Bulgarian Courts Are Adequate To Hear The Present Dispute.**

Plaintiff has already conceded that Bulgarian courts are adequate, because it agreed to resolve in Bulgaria "any disputes arising from . . . or concerning" the Loan Agreement (Am. Compl. Ex. A ¶ 17.08)    That should end any inquiry on adequacy. *See Marra v.*

---

[14]    Plaintiff's arguments go to adequacy, not availability. Bulgarian courts are available because both the Bank and BAEF are subject to jurisdiction there. *See, e.g., Marra,* 59 F. Supp. 2d at 71.

[15]    Plaintiff seems to suggest that the Court review the entirety of the experts' testimony and make a credibility assessment. (Opp'n at 14 n.6)  BAEF does not believe that such a cumbersome review is necessary to decide any of the substantive issues raised in this motion. However, to the extent that the Court wishes to engage in such a review, BAEF is confident that the Court will find its expert, Mr. Chernev, to be wholly credible and well-qualified to opine on the issues for which he is proffering an opinion. (*See* Ex. 3 to J/V/FNC Mot. to Dismiss at ¶¶ 3-7)

*Papandreou*, 59 F. Supp. 2d 65, 70 (D.D.C. 1999) ("Indeed, a valid forum selection clause [should be] given controlling weight in all but the most exceptional cases."). What is more, both of plaintiff's Bulgarian legal experts have litigated and continue to litigate in Bulgarian courts. (Ex. 6 to J/V/FNC Mot. to Dismiss at 10:21-11:6 (Skochev is currently working on fifteen cases in Bulgarian courts); Ex. 7 to J/V/FNC Mot. to Dismiss at 27:13-19 (Slavova has litigated more than 200 cases in Bulgarian courts)) *See also Flores v. Southern Peru Copper Corp.*, 253 F. Supp. 2d 510 (S.D.N.Y. 2002) (rejecting claim that Peruvian courts were too corrupt to be adequate based on expert affidavit where, among other things, expert used his time and resources suing in Peruvian courts).

In any event, the factual record does not support plaintiff's assertions that: (1) Bulgarian courts are too corrupt to be adequate, or; (2) Bulgarian courts are administratively and substantively inadequate.[16]

### 1.    Bulgarian Courts Are Not Too Corrupt To Resolve Fairly This Dispute.

The factual record does not support a finding that Bulgarian courts are too corrupt to be adequate. BAEF acknowledges that there have been some allegations and reports of corruption in the Bulgarian judiciary. In describing corruption within the Bulgarian judicial system, however, plaintiff's experts have made no attempt to quantify that corruption,[17] nor have

---

[16]  Plaintiff maintains that once it substantiates allegations of serious corruption, the burden of persuasion shifts to BAEF. (Opp'n at 43)  As discussed below, plaintiff has not substantiated any particularized allegations of corruption as required under applicable law.  In any event, BAEF's evidence, including the Declaration of its Bulgarian expert, Silvy Chernev, affirmatively refutes plaintiff's allegation that Bulgarian courts are inadequate.

[17]  Plaintiff's claim that "three in five cases are tainted by corruption" is significantly overstated.  (*See* Opp'n at 42)  Plaintiff's expert did not testify that three of five cases in the Bulgarian system involve corruption.  Instead, he testified that he could not give a number.  When pressed, he then said that in two or three out of the five cases he is currently handling "we're talking about corruption."  (Skochev Tr. (attached as Ex. A) at 30:2-18)  Thus, this statement was limited to his own cases and his own suspicions about the possibility of corruption in those cases.

they cited any hard evidence of it.  Instead, they rely on a general *perception* of corruption based

on suspicion, innuendo, and rumor (including newspaper articles), as its own evidence confirms:

> The Bulgarian judiciary continues to suffer from a ***strong public
> perception that decisions are often based on improper influences*** . . . The
> validity of this perception is by no means clear . . . .

(ABA/CEELI    report    at    2,    available    at    http://www.abanet.org/ceeli/publications/jri/

jri_bulgaria_2006.pdf, and    cited    by    Skochev,    PX3B,    at    ¶ 22;    *see also id.*    at    50 (public

perceptions of corruption in Bulgaria are often derived from "questionable bases, including

unfair criticism from media and politicians . . . .")  The factual record does not contain any

evidence that corruption would necessarily affect a commercial dispute such as this one, much

less any particularized evidence of corruption in this case.[18]

Plaintiff's generalized evidence of corruption is insufficient as a matter of law to

support a finding of inadequacy.  In *Gonzales v. P.T. Pelangi Niagra Mitra Int'l.*, 196 F. Supp.

2d 482 (S.D. Tex. 2002), for example, the court rejected a claim that the Indonesian judiciary

was too corrupt to be adequate, despite "voluminous proof of corruption in the Indonesian

judiciary — including newspaper articles, statements by prominent Indonesian politicians, the

results of a survey conducted by the Partnership for Governance Reform in Indonesia, a World

Bank report and statements by the United States government."  *Id.* at 487-88.  While both

acknowledging and understanding "Plaintiffs' concerns about potential unfairness in the

Indonesian judiciary," the court found that such allegations of corruption failed to render

Indonesia an inadequate forum.  *Id.* at 488.  It based its holding on the fact that prior cases "len[t]

---

[18]    In fact, allegations of corruption in the Bulgarian judicial system generally are made in reference to criminal, not civil cases.  (*See* Chernev Tr. (attached as Ex. B) at 133:1-8 ("Normally, it's not believed that in civil cases there is a lot of corruption, normally.  Not that it could not happen in -- that there is no rumor or suspicion about it; but normally, when they speak about corruption, it's usually related to the criminal justice system, not excluding the civil justice system, but normally it's related to the criminal justice system."))

virtually no support to Plaintiffs' 'the alternative forum is too corrupt to be adequate' argument,"[19] as well as its reluctance to "sit in judgment upon the integrity of the entire Indonesian judiciary."[20]  *Id.*; *see also Warter v. Boston Secs., S.A.*, 380 F. Supp. 2d 1299, 1310-11 (S.D. Fla. 2004) (rejecting claim of inadequacy despite general evidence of corruption, including "extensive social science research and news articles relating to the trustworthiness of the Argentine judicial system" because "*[o]nly evidence of actual corruption in a particular case will warrant a finding that an alternate forum is inadequate*."); *Esheva v. Siberia Airlines*, 499 F. Supp. 2d 493, 499 (S.D.N.Y. 2007) (rejecting claim of inadequacy for lack of particularized allegations of corruption where, among other things, plaintiff's expert offered the "sweeping generalizations" that "Russian courts do not offer a suitable and fair forum for the

---

[19]  *See, e.g., In re Arbitration between Monegasque de Reassureances S.A.M. (Monde Re) v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 499 (2d Cir. 2002) (affirming finding that generalized allegations of corruption were insufficient to render the Ukraine an inadequate forum and emphasizing the reluctance of federal courts to find foreign courts to be "corrupt" or "biased" in evaluating adequacy); *Rustal Trading US, Inc. v. Makki*, No. 00-1513, 2001 WL 1006176 (6th Cir. Aug. 21, 2001) (finding Sierra Leone judiciary adequate despite allegations of corruption and ten-year civil war); *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 678 (D.C. Cir. 1996) (explaining that a State Department Report expressing "concern about the impartiality" of Jordanian courts did not render that forum inadequate); *Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 981-82 (2d Cir. 1993) (finding Venezuela to be an adequate alternative forum despite claims of systemic corruption and bias in favor of defendants); *Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1351 (1st Cir. 1992) (deciding that Turkey was an adequate forum despite claim that Turkish courts were extremely biased against Americans and foreign women); *Turedi v. Coca Cola Co.*, 460 F. Supp. 2d 507, 525 (S.D.N.Y. 2006) (following caution "against judges giving serious consideration to . . . conclusory attacks, underscoring the concerns that censures of this kind raise if endorsed by our courts, especially when based on bare aspersions and expansive generalizations [of corruption and bias].");  *Stalinski v. Bakoczy*, 41 F. Supp. 2d 755 (S.D. Ohio 1998) (finding Honduras to be an adequate forum despite plaintiff's evidence of corruption); *Torres v. S. Peru Copper Corp.*, 965 F. Supp. 899, 903 (S.D. Tex. 1996) (determining that Peruvian judicial system was not so corrupt to be inadequate).

[20]  *See also Monde Re*, 158 F. Supp. 2d at 385 ("Among its central ends, the forum non conveniens doctrine serves precisely to avert . . . unnecessary indictments by our judges condemning the sufficiency of the courts and legal methods of other nations."); *Leon v. Millon Air Inc.*, 251 F.3d 1305, 1313 (11th Cir. 2001) (the doctrine of *forum non conveniens* is not meant to credit "cursory attacks on legal systems simply because they are somewhat slower or less elaborate than ours."); *Blanco*, 997 F.2d at 982 (stating that "it is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation."); *Flores*, 253 F. Supp. 2d at 539-40 ("It would be entirely inappropriate for this Court to hold, on the basis of this record [which included expert affidavits], that these Peruvian citizens cannot obtain justice in the courts of their own country . . . ."); *Parex Bank v. Russian Sav. Bank*, 116 F. Supp. 2d 415, 423 (S.D.N.Y. 2000) (comity required the court to abstain from adversely judging the quality of another nation's justice system).

resolution of Plaintiffs' claims in light of the widespread corruption and the improper exercise of political influence in the Russian judicial system").[21]

Plaintiff's own expert concedes that improvement has been made in fighting corruption and that it is possible to get a fair trial in Bulgaria:

> I'm not saying that it is impossible to get a fair and just hearing in Bulgaria and I hope that those examples [of corruption] will become more and more because we are all participating in the process of fighting corruption. There are real results in that area . . . .

(Slavova Tr. (attached as Ex. C) at 16:21-22, 17:1-3)[22] *Cf. Flores*, 253 F. Supp. 2d 539-40 (rejecting claim that Peruvian courts were too corrupt to be adequate where, among other things, evidence reflected that conditions were improving).

Bulgaria was accepted into the European Union on January 1, 2007.  (Ex. 6 to J/V/FNC Mot. to Dismiss at 20:8-12)  It has thus demonstrated pursuant to the Copenhagen Criteria that it has stable institutions that guarantee the rule of law.  (Ex. 7 to J/V/FNC Mot. to Dismiss at 19:21-20:2; Ex. 6 to J/V/FNC Mot. to Dismiss at 20:4-7; Ex. 5 to J/V/FNC Mot. to Dismiss at 114:5-11)  At a minimum, therefore, Bulgaria's judicial system satisfies EU standards.  Moreover, the EU is monitoring Bulgaria's judicial system (as it does for all newly-admitted members) for its first three years of membership, (Ex. 5 to J/V/FNC Mot. to Dismiss at 124:12-20), which ensures continued improvement and stability.

---

[21]  By contrast, in *Eastman Kodak v. Kavlin*, 978 F. Supp. 1078, 1084 (S.D. Fla. 1997), the only case cited by plaintiff in which a foreign court was held too corrupt to be adequate, there was evidence that criminal charges had been filed against plaintiff's employees in Bolivia to extort a commercial settlement of the dispute.

[22]  Many of the statements quoted by plaintiff, such as those of U.S. Ambassador John Beyrle, must be viewed in their proper context of scrutiny, reform, and resource procurement as part of the continued improvement of the system.  Moreover, many of those same statements expressly acknowledge the improvement that is occurring in the Bulgarian judicial system.

### 2.     Bulgarian Courts Can Administratively And Substantively Handle This Dispute.

Plaintiff asserts that Bulgarian courts are not administratively and substantively capable of resolving the dispute. Plaintiff claims, in essence, that American courts are generally superior to Bulgarian courts in the following ways: (1) they have more experienced judges; (2) they have better resources and are less overburdened, and; (3) they have better procedures available to litigants. Plaintiff also contends that American courts would be better in this particular case, because it would be simpler to litigate the case here, and because United States courts can apply RICO.

Plaintiff's general assertions about American courts being more sophisticated and administratively capable are irrelevant to whether Bulgarian courts meet the legal standard of adequacy. For instance, plaintiff's laundry list of procedures lacking in Bulgaria — such as no right to trial by jury, no depositions under oath, and a recording system that is "not always very good" — does nothing to demonstrate inadequacy. *E.g.*, *El-Fadl*, 75 F.3d at 678 (foreign forum not inadequate where it has less favorable adjudicative procedures); *cf. Interamerican Trade Corp. v. Companhia Fabricadora de Pecas*, 973 F.2d 487, 489 (6th Cir. 1992) (enforcing forum selection clause even though forum (Brazil) had no trial by jury or trial by deposition and plaintiff would be required to deposit $2.2 million as security). As plaintiff's expert agrees, the structure of Bulgarian courts does not differ in any meaningful way from the European standard. (Ex. 6 to J/V/FNC Mot. to Dismiss at 19:1-6; Ex. 3 to J/V/FNC Mot. to Dismiss ¶ 13)

Plaintiff's contention that it would be more difficult and less advantageous to litigate this particular dispute in Bulgaria is similarly immaterial. BAEF's expert testified that "[t]here is no obstacle — there is no technical obstacle with the particular requirement for each claim for a combination of those claims in one proceeding." (Ex. B at 56:20-22, 57:1) Even if

two separate proceedings would be necessary (as plaintiff's expert claims), that does not render a Bulgarian forum inadequate. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981) (forum is inadequate only where "the remedy provided in the alternative forum is so clearly inadequate or unsatisfactory that it is *no remedy at all*.").

Plaintiff's RICO argument is likewise immaterial. It is axiomatic that an alternate forum need not have precise legal equivalents in order to be adequate. *E.g., id.* at 250-54 (the Court of Appeals erred in holding that plaintiffs may defeat a motion to dismiss on the ground of *forum non conveniens* merely by showing that the substantive law that would be applied in the alternative forum is less favorable to the plaintiffs); *In re Disaster at Riyadh Airport*, 540 F. Supp. 1141, 1145 (D.D.C. 1982) (a potentially smaller damage award and the inability to rely on a particular theory of liability do not render a forum inadequate).

Furthermore, courts have expressly rejected the argument that a court system is inadequate because it lacks a RICO equivalent. *E.g., PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d Cir. 1998) ("the nonexistence of a RICO statute [in the alternative forum] does not, by itself, preclude the use of [another forum]."); *Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681 (S.D.N.Y. 2003) (Russia was not an inadequate forum because it had no exact equivalent of the RICO statute where cause of action for fraud was available); *Lexington Ins. Co. v. Forrest*, 263 F. Supp. 2d 986 (E.D. Pa. 2003) (foreign forum not inadequate because RICO is unique to the United States).

The evidence is undisputed that plaintiff has a remedy available in Bulgaria. BAEF's expert detailed how plaintiff could have brought an action in Bulgaria and relied on Bulgarian theories of recovery. (*E.g.*, Ex. 5 to J/V/FNC Mot. to Dismiss at 55:11-19) He also described the comparable Bulgarian theories, including Bulgarian contract and tort law. (*Id.* at

73:2-6; 78:15-79:1, 73:16-74:4, 74:5-10, 87:20-88:5, 89:2-21, 136:19-22, 138:6-11)    And plaintiff apparently agrees.  Plaintiff amended its Complaint to allege a "Violation of Bulgarian Law" claim, asserting a violation of the act that purportedly would be applicable to its claims if brought in Bulgaria.  (Am. Compl. ¶¶ 103-109)  Moreover, plaintiff's expert concedes that a remedy is available in Bulgaria:

> Q.    There are a variety of different remedies or claims that are available to the plaintiff who is going to sue in Bulgaria on the claims that are asserted in plaintiff's complaint?
>
> A.    That is true, that you can find pieces of provision here and that they could serve as grounds for at least part of the claims.
>
> Q.    For at least part of the claims.  And there are remedies for that? They could get damages?
>
> A.    Yes.  If they are very patient.

Thus, it is undisputed that plaintiff can achieve a full and fair resolution of its claims in the Bulgarian court system.  (Ex. 3 to J/V/FNC Mot. to Dismiss ¶ 13)[23]

**B.    Public And Private Interest Factors Strongly Favor Dismissal.**

The numerous public and private interest factors favoring *forum non conveniens* dismissal are set forth in detail in BAEF's opening memorandum and are generally not disputed by plaintiff.  (*See* J/V/FNC Mot. to Dismiss at 32-40)  In particular, plaintiff does not dispute that:

- key documents related to the loan transaction are in the custody of the Bank and/or plaintiff (the parties to the Loan Agreement) in Bulgaria;

- key witnesses to the events alleged in the Amended Complaint are Bulgarian citizens and residents;

---

[23]    Plaintiff points to its expert's statement that some cases in Bulgaria can take more than ten years to resolve. (*See* Opp'n at 21)  But plaintiff elsewhere stated that it did not bring an action in Bulgaria because it would have taken a Bulgarian court "two to three years to reach a final decision." (Am. Compl. ¶ 32)  Moreover, some cases take two, three, or even upward of ten years to resolve in the United States.

- this Court lacks the ability to compel testimony from these witnesses, and even if they were willing to testify, the cost of obtaining their testimony would be prohibitive;

- trial in this forum would require translation of Bulgarian documents and interpretation of Bulgarian witnesses;

- Bulgarian courts have an interest in policing this dispute since the Loan Agreement was entered into in Bulgaria between Bulgarian parties for purposes of financing a Bulgarian residential construction project that would result in sales of residential units to Bulgarians, obligations under the Loan Agreement were to be performed in Bulgaria, any breaches of the Loan Agreement occurred there, and plaintiff and the Bank entered into a settlement agreement in Bulgaria;

- resolution of this lawsuit in this Court would impose a burden on this Court's resources and the people of the District of Columbia;

- Bulgarian law predominates, and plaintiff itself has brought a claim for violation of Bulgarian law;[24]

- plaintiff is Bulgarian and has no connection to this forum, and;

- plaintiff voluntarily agreed to a forum selection clause that provided for resolution of disputes arising out of the Loan Agreement in Bulgarian courts.

Plaintiff notes that BAEF is headquartered in Chicago.  But plaintiff never explains how that would hinder a Bulgarian litigation.  Plaintiff does not specify any relevant documents that can be found at BAEF headquarters, Opp'n at 44-45, no doubt because BAEF maintains no documents concerning this matter, as it had no involvement in the loan.  (*See* Ex. 1 to J/V/FNC Mot. to Dismiss ¶ 8; Ex. 2 to J/V/FNC Mot. to Dismiss at 37:9-15, 38:1-6, 39:15-22) Nor does plaintiff name any BAEF witnesses who have relevant information, much less any for whom a Bulgarian resolution would be inconvenient.

Plaintiff does claim, without support, that compulsory process issues exist in Bulgaria — presumably for BAEF witnesses and documents.  (Opp'n at 45)  BAEF does not

---

[24] Plaintiff concedes that "Bulgarian law may play a role" but claims that American law will also.  (Opp'n at 45) Plaintiff does not even address BAEF's argument that any choice of law analysis would favor Bulgarian law. (*See* J/V/FNC Mot. to Dismiss at 39-40)  The RICO count does not change that result.

understand what plaintiff is referring to, since BAEF is subject to compulsory process in Bulgaria and willing to submit itself to the jurisdiction of Bulgarian courts as a condition of dismissal. (*See* J/V/FNC Mot. to Dismiss at 29)[25]

        Plaintiff's only other argument seems to be that the District of Columbia has an interest in the dispute because the SEED Act was passed there.  But the fact that the Bank indirectly received some portion of its funding through its U.S. parent company, which received funding from the United States Congress years ago, does not even begin to tip the scales toward an American forum.  This controversy has nothing to do with either the source of funding or the United States, let alone the District of Columbia.  It is certainly not the law that any complaint filed in American courts that relates to an entity that has received federal funding in the past is a matter of concern to the courts and citizens of the District of Columbia.  Nor should the citizens of the District of Columbia have to shoulder the burden of resolving all such disputes.  For all these reasons, the public and private interest factors warrant dismissal of this dispute.

---

[25]  Because BAEF does business in Bulgaria and maintains an office there, Bulgaria is a convenient forum for BAEF witnesses. (*See* Ex. 3 to J/V/FNC Mot. to Dismiss ¶ 17)  And there is no support for plaintiff's assertion that documents might have to be translated to English in a Bulgarian forum for BAEF's benefit. (Opp'n at 45)

## CONCLUSION

Plaintiff's dispute arises from the actions taken by the Bank in Bulgaria. Plaintiff should not be allowed to avoid its promise to litigate its dispute in Bulgaria. For all the reasons stated herein and in BAEF's initial Memorandum, this action should be dismissed with prejudice.

Dated: February 14, 2008

Respectfully submitted,

Brian D. Sieve, P.C. (*pro hac vice*)
Stephanie A. Brennan (*pro hac vice*)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
Tel. (312) 861-2000
Fax (312) 861-2200

Karen N. Walker (D.C. Bar No. 412137)
Eunnice H. Eun (D.C. Bar No. 500203)
Samantha A. Gingold (D.C. Bar No. 977743)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Tel. (202) 879-5000
Fax (202) 879-5200

*Attorneys for The Bulgarian-American Enterprise Fund*

24

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2008, I caused a true and complete copy of Defendant's Reply in Support of its Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Federal Rules 12(b)(2) and 12(b)(3), or Alternatively Based on the Doctrine of *Forum Non Conveniens* to be served on the following counsel of record by ECF.

Karen N. Walker

Recipients:

Philip M. Musolino
MUSOLINO & DESSEL
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
Tel.  (202) 466-3883

Sylvia J. Rolinski
Danielle M. Espinet
ROLINSKI & SUAREZ, LLC
14915 River Road
Potomac, Maryland 20854
Tel.  (240) 632-0903

# EXHIBIT A

## Capital Reporting Company

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-------------------------------------+

STROITELSTVO BULGARIA, LTD,              :

        Plaintiff,                   :

                                :

                                : CASE NO.

vs.                                      : 1:07-CV-00634

                                :

THE BULGARIAN-AMERICAN ENTERPRISE        :

FUND, et al,                             :

        Defendant.                   :

-------------------------------------+

                        Wednesday, December 6, 2007

Telephonic Deposition of:

        VLADIMIR STEFANOV SKOCHEV

called for telephonic oral examination by counsel for

Plaintiff, pursuant to notice at before Janie Arriaga of

Capital Court Reporting Company, a Notary Public in and

for the District of Columbia, beginning at 5:00 a.m.,

when were present on behalf of the respective parties:

## Capital Reporting Company

Page 30

1       A       A great part of them are.

2       Q       Do you have any evidence as to how many judges

3    are corrupt in the Bulgarian legal system?

4       A       I cannot give the exact number, but I -- in my

5    work, my practice, I have encountered such cases.

6       Q       I am trying to understand, Mr. Skochev, is it

7    really your view that all of the judges in Bulgaria are

8    subject to corruption?

9       A       In most cases, yes.

10      Q       75 percent?  80 percent?

11      A       I cannot give a number.

12      Q       Do you have any estimate as to what percentage

13   of the judges you think are corrupt in Bulgaria?

14      A       I will repeat.  Again, I cannot give you the

15   exact answer to this question.

16      Q       Your best estimate?

17      A       Two or three out of five in the cases I've

18   been working on we're talking about corruption.

19      Q       Is there any reason, other than corruption

20   that you think a Bulgarian citizen could not get a fair

21   and just hearing in the Bulgarian court?

22      A       Yes.  As I mentioned before, at the present

# EXHIBIT B

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


---------------------------------------+

STROITELSTVO BULGARIA, LTD,                    :

        Plaintiff,                           :

                              : CASE NO.

vs.                                            : 1:07-CV-00634

THE BULGARIAN-AMERICAN ENTERPRISE              :

FUND, et al,                                   :

        Defendant.                           :

---------------------------------------+


Tuesday, December 5, 2007


Telephonic Deposition of:

SILVY CHERNEV

called for telephonic oral examination by counsel for

Plaintiff, pursuant to notice at before Janie Arriaga of

Capital Court Reporting Company, a Notary Public in and

for the District of Columbia, beginning at 8:00 a.m.,

when were present on behalf of the respective parties:

Page 56

1    litigated in a Bulgarian Regional District Court or

2    regional court similar to this particular case,

3    Deposition Exhibit Number 2?

4        A    I would say that, of course, all of those

5    types of behavior and claims would have been treated,

6    but I will not say that it would be such a combined

7    statement of different claims on different sets of

8    issues.

9        Q    That is a complaint that combined with a

10   number of different issues, would be different from any

11   of the complaints that you have had professional

12   experience with, as of this point?  Is that a fair

13   statement in Bulgarian courts?

14       A    This type of complaint compromises a number of

15   issues, and normally those that are related to the

16   breach of contract would be the subject matter of one --

17   one statement of claims.  And the others that are

18   claiming some sort of

19   improper behavior would be the

20   subject of another claim.  There is no obstacle -- there

21   is no technical obstacle with the particular requirement

22   for each claim for a combination of those claims in one

**Capital Reporting Company**

Page 57

1    proceeding.

2        Q    But you haven't seen it before?

3        A    It's not usual to combine torts and

4    contractual claims in the same procedure.  The

5    contractual claims here, we have between two different

6    defendants.  So usually the claim against the bank would

7    be in one proceeding, and the claims against the other

8    defendant be in a different proceeding, I mean, those

9    types of claims.

10        Q    Let me ask you then with respect to this

11    complaint.  This complaint, if it would be filed in

12    Bulgaria, it would be filed in the Sofia District Court;

13    am I correct?

14        A    Yes, because the defendant, who would be the

15    bank, the bank has its office in Sofia.

16        Q    What about the claim against the fund?

17        A    The claim against the fund would not be a

18    contractual claim.  It would be a tort claim.  So it

19    would be, again, on the place where -- where the tort

20    occurred or

21    the result of where the tort occurred.

22        Q    But it would still be at the same level of

Page 133

1    it's much more to criminal.  Normally, it's not believed

2    that in civil cases there is a lot of corruption,

3    normally.  Not that it could not happen in -- that there

4    is no rumor or suspicion about it; but normally, when

5    they speak about corruption, it's usually related to the

6    criminal justice system, not excluding the civil justice

7    system, but normally it's related to the criminal

8    justice system.

9        Q    The reforms that have been initiated in the

10   last two or three years, can you tell me in what areas

11   those forms have been successful and in what areas have

12   those forms not been successful?

13       A    I would say that the reforms started much

14   earlier in the early 1990s concerning the independence

15   of justice.  With respect to the judges that have been

16   successful, so far I think that, as far as they're not

17   being, in general, for at least this 15-year period,

18   have not been so much successful in the particular

19   procedure, because there was some unsuccessful attempts

20   to amend procedures.

21            And, in general, if you have in mind the last

22   three or four years, you don't have the results

# EXHIBIT C

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-------------------------------------+

STROITELSTVO BULGARIA, LTD,              :

             Plaintiff,              :

                              :

                              : CASE NO.

vs.                                      : 1:07-CV-00634

                              :

THE BULGARIAN-AMERICAN ENTERPRISE        :

FUND, et al,                             :

             Defendant.              :

-------------------------------------+

                       Wednesday, December 6, 2007

Telephonic Deposition of:

              MARIA SLAVOVA,

called for oral examination by counsel for Plaintiff,

pursuant to notice before Janie Arriaga of Capital Court

Reporting Company, a Notary Public in and for the

District of Columbia, beginning at 7:30 a.m., when were

present on behalf of the respective parties:

## Capital Reporting Company

Page 16

1    judges or is this a perception that you have?

2    A    I've been a citizen of this country.  This is

3    my life.  I am an active member of the society.  I teach

4    on corruption.  I have written a book on that.  And

5    apart from the reports, like the monitoring report from

6    the European Commission, like the report from the chief

7    prosecutor that was submitted two weeks ago, a number of

8    others that are submitting their reports on the state of

9    fighting corruption in Bulgaria, I would say that this

10   is a very set conclusion and a worry of mine, but it's a

11   fact that the people in Bulgaria are mainly

12   disillusioned and very unhappy with the results of the

13   judiciary activity in Bulgaria.  They are not getting

14   fair trials.  And they are really trying to avoid going

15   to the courts because the whole process of transition

16   can be estimated as a lot of violation of human rights

17   and false expectations as far as the governments are

18   concerned in their efforts to overcome corruption.

19   Q    You're not saying that it is impossible to get a

20   fair and just hearing in Bulgaria, are you?

21   A    I'm not saying that it is impossible to get a

22   fair and just hearing in Bulgaria and I hope that those

## Capital Reporting Company

Page 17

1   examples will become more and more because we are all

2   participating in the process of fighting corruption.

3   There are real results in that area, but, unfortunately,

4   the judiciary system is the last of all systems of

5   society that is improving.

6   Q    But in the 50 cases, where you're representing

7   defendants or representing clients, I assume you are

8   hopeful that you are going to get a fair and just

9   hearing?

10  A    Of course I am hopeful.

11  Q    You said that corruption is the main reason

12  that you believe that an independent impartial and

13  objective system capable of a fair and just hearing is

14  not yet in operation.  Is there anything else that you

15  rely on for that statement?

16  A    Of course.  It's a complex combination of

17  factors among, which is the lack of political stability

18  and the economic stability.  Of course, the lack of

19  political will to overcome those events, we can talk

20  very long about that, but I think corruption is the key

21  issue.

22  Q    Do you understand that the EU has evaluated the